UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL M. DAVIDSON, JAMES D.
KLEIN, RUFUS ORR, and ROBERT : 
ZIMMERMAN, Individually and on Behalf
of All Others Similarly Situated :

      Plaintiffs,               :      Civil Action

      v.                      :

BAIN CAPITAL PARTNERS, LLC, THE :
BLACKSTONE GROUP L.P., THE
CARLYLE GROUP, GOLDMAN SACHS :
GROUP, INC., GS CAPITAL PARTNERS,
JP MORGAN CHASE & CO., JP MORGAN :
PARTNERS, LLC, KOHLBERG KRAVIS
ROBERTS & COMPANY, L.P., MERRILL :
LYNCH & CO., INC., MERRILL LYNCH
GLOBAL PARTNERS, INC., PERMIRA :
ADVISORS LLC, PROVIDENCE EQUITY
PARTNERS, INC., SILVER LAKE :
PARTNERS, TEXAS PACIFIC GROUP,
THOMAS H. LEE PARTNERS, L.P. and :
WARBURG PINCUS LLC

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs, Michael M. Davidson, James D. Klein, Rufus Orr, and Robert Zimmerman on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon information and belief, as follows:

### NATURE OF THE CASE AND SUMMARY OF THE CONSPIRACY

1.    This case arises out of a conspiracy among defendant private equity firms to rig bids, restrict the supply of private equity financing, fix transaction prices, and divide up the market for private equity services for leveraged buyouts ("LBOs"). Plaintiffs, on behalf of

themselves and the Classes defined herein, bring this action pursuant to §1 of the Sherman Act, 15 U.S.C. §1, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

2.      An LBO occurs when a purchaser acquires a controlling majority of the shares of the target company, then withdraws the shares of the company from public stock exchanges, thereby taking the company private.[1]  Substantial debt must be issued and sold in order to fund these transactions, hence the name ***leveraged*** buyout.

3.      The conduct of Defendants challenged herein is not regulated by Federal securities law.

4.      Defendants and their co-conspirators are the largest private equity firms in the United States, both by measure of assets and participation in LBOs.  Defendants, via the bid-rigging and market-allocation cartel described herein, have conspired to dominate and control the largest LBOs in the United States and to fix the prices for target companies at artificially low levels.  The following chart illustrates the operation of Defendants' bid-rigging conspiracy.

---

[1]      The company whose publicly traded stock is purchased in an LBO is referred to as the "target company."

## LEVERAGED BUYOUT



**1** Management of a public company may be approached by *a private equity firm*. In discussing their "strategic alternatives," a public company usually considers a management-led buyout and/or sends solicitations of indications or interest to private equity and strategic buyers. The public company will hire financial and legal consultants.

**2** Private equity firms form *"bidding clubs"* and conspire to rig bids, fix prices and allocate the purchase of stock of certain public companies as part of the LBO transactions.

\* Private equity division of investment bank.

**3** An agreed upon private equity firm (often along with management) will submit a single bid for *control of a public corporation*. Other members of the "cartel" may submit inferior or sham bids.



**4** Investment banks participate in the cartel as advisors, inviting in the private equity firms, and providing debt financing. The successful bidder offers cash for a majority of the company's existing public shares.



**5** Private equity firms are enriched by purchasing a public company for a discount *Debt financing shields the income they pull out of the target company from taxes. The annualized net returns are 20-30%*. Management retains a share of the new private company in addition to a buyout of their public shares. Shareholders lose because the consortium bids were below competitive levels.

**6** The measure of damages is the difference between the competitive price and the actual price.

**DEFENDANTS**

5.      Defendant Bain Capital Partners, LLC ("Bain") is a private investment firm headquartered at 111 Huntington Ave., Boston, Massachusetts 02199.  It has over $20 billion under management and operates private equity funds.

6.      Defendant The Blackstone Group L.P. ("Blackstone"), is a public investment firm headquartered at 345 Park Avenue, New York, New York 10154 and incorporated in Delaware. It has nearly $50 billion under management and operates private equity funds.

7.      Defendant The Carlyle Group ("Carlyle") is a Delaware limited liability company headquartered at 1001 Pennsylvania Avenue, N.W., Washington, DC 20004.  It has nearly $40 billion under management and operates private equity funds.

8.      Defendant Goldman Sachs Group, Inc. ("Goldman") is a diversified financial services firm and investment bank that advises and underwrites the debt for a large percentage of LBOs. Defendant GS Capital Partners ("Goldman Capital") is the private equity arm of Goldman. Goldman Capital has approximately $39 billion under management.  Both Goldman and Goldman Capital are headquartered at 85 Broad Street, New York, New York 10004.  All allegations herein against Goldman are also alleged against its subsidiary Goldman Capital, and all allegations against Goldman Capital are alleged against its parent, Goldman.

9.      Defendant JP Morgan Chase & Co. ("Morgan") is a diversified financial services firm and investment bank that advises and underwrites the debt for a large percentage of LBOs. Defendant JP Morgan Partners, LLC ("Morgan Partners") is the private equity arm of Morgan. All allegations herein against Morgan are also alleged against its subsidiary Morgan Partners, and all allegations against Morgan Partners are alleged against its parent, Morgan.

10.     Defendant Kohlberg Kravis Roberts & Company, L.P. ("KKR") is a private equity firm incorporated in Delaware and headquartered at 9 West 57th Street, New York, NY 10019. KKR has over $30 billion under management and operates private equity funds.

11.     Defendant Merrill Lynch & Co., Inc ("Merrill") is a diversified financial services firm and investment bank that advises and underwrites the debt for a large percentage of LBOs. Defendant Merrill Lynch Global Partners, Inc. d/b/a Merrill Lynch Global Private Equity ("Merrill Partners") is the private equity arm of Merrill. It operates several private equity funds, among them ML Global Private Equity Fund, L.P. Both Merrill and Merrill Partners are headquartered at 4 World Financial Center, 250 Vesey Street, New York, New York 10080. All allegations herein against Merrill are also alleged against its subsidiary Merrill Partners, and all allegations against Merrill Partners are alleged against its parent, Merrill.

12.     Defendant Permira Advisors LLC ("Permira") is a private investment firm with its U.S. office at 320 Park Avenue 33rd Floor, New York, New York 10022. It has approximately $26 billion under management and operates private equity funds.

13.     Defendant Providence Equity Partners, Inc. ("Providence") is a private investment firm incorporated in Delaware and headquartered at 50 Kennedy Plaza, 18th Floor, Providence, Rhode Island 02903. Providence operates private equity funds with nearly $21 billion in equity commitments.

14.     Defendant Silver Lake Partners ("Silver Lake") is a private equity firm headquartered at 2775 Sand Hill Road, Suite 100, Menlo Park, California 94025. It has $5.9 billion under management and operates private equity funds.

15.     Defendant Texas Pacific Group ("Texas Pacific") is a private equity firm headquartered at 301 Commerce Street, Suite 3300, Forth Worth Texas 76102. It has over $30 billion under management and operates private equity funds.

16.     Defendant Thomas H. Lee Partners, L.P. ("Thomas Lee") is a private equity firm, organized in Delaware, with its headquarters at 100 Federal Street, 35th Floor, Boston, Massachusetts 02110.  It has approximately $20 billion under management and operates private equity funds.

17.     Defendant Warburg Pincus LLC ("Warburg") is a private equity investment firm headquartered at 466 Lexington Avenue, New York, New York 10017.  It has approximately $28 billion under management and operates private equity funds.

18.     The defendants listed in paragraphs 5 through 17 above are collectively referred to, where appropriate, as "Defendants."

19.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CO-CONSPIRATORS

20.     Co-conspirator Clayton, Dubilier & Rice, Inc. ("CDR") is a private equity firm headquartered at 375 Park Avenue, New York, New York, 10152. CDR operates private equity funds worth more than $4 billion.

21.     Various other persons, firms and corporations including investment banks, officers and directors of private equity firms and management of target companies not named as Defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

22.     At all times herein mentioned, each and every defendant and co-conspirator was an agent of each and every other defendant and co-conspirator.  Each of the defendants aided and abetted the commission of unlawful, unfair and deceptive business practices by their co-conspirators and were aware, or should have been aware, that the agreements to allocate and rig bids, substantially assisted and/or encouraged their co-conspirators in the commission of the unlawful, unfair and anticompetitive acts alleged herein.

## PLAINTIFFS

23.     Plaintiff James D. Klein, M.D. is a resident of Bergen County, New Jersey. Dr. Klein held shares of The Neiman Marcus Group, Inc. ("Neiman") on or about October 6, 2005.  On that date, Neiman, a public corporation, finalized an arrangement to be taken private by a group formed by Defendants Warburg and Texas Pacific (collectively the "Neiman LBO Group") for the specific purpose of purchasing shares owned by the public.  The prices to be paid by the Neiman LBO Group for securities that Dr. Klein and other public shareholders of Neiman held were suppressed below prices that would otherwise prevail in a competitive market as a result of the conspiracy herein alleged, and as a result of the alleged conspiracy, public shareholders of Neiman were injured in their business and property by reason of the antitrust violations alleged herein.

24.     Plaintiff Robert Zimmerman is a resident of Summit County, Ohio.  Plaintiff Michael M. Davidson is a resident of Prince William County, Virginia.  Mr. Zimmerman and Mr. Davidson held shares Kinder Morgan, Inc. ("Kinder Morgan") on or about May 30, 2007. On that date, Kinder Morgan, a public corporation, finalized an arrangement to be taken private by a group formed by Defendants Carlyle, and Goldman, (collectively the "Kinder Morgan LBO Group") for the specific purpose of purchasing shares owned by the public.  The prices to be paid by the Kinder Morgan LBO Group for securities that Mr. Zimmerman and other public

shareholders of Kinder Morgan held were suppressed below prices that would otherwise prevail in a competitive market as a result of the conspiracy herein alleged, and as a result of the alleged conspiracy, public shareholders of Kinder Morgan were injured in their business and property by reason of the antitrust violations alleged herein.

25.     Plaintiff Rufus Orr is a resident of King County, Washington.  Mr. Davidson and Mr. Orr held shares of Freescale Semiconductor, Inc. ("Freescale") on or about December 1, 2006.  On that date, Freescale, a public corporation, finalized an arrangement to be taken private by a group formed by Defendants Carlyle, Blackstone, Texas Pacific and Permira (collectively the "Freescale LBO Group") for the specific purpose of purchasing shares owned by the public. The prices paid by Freescale were suppressed below prices that would otherwise prevail in a competitive market as a result of the conspiracy herein alleged, and as a result of the alleged conspiracy, Mr. Orr and public shareholders of Freescale were injured in their business and property by reason of the antitrust violations alleged herein.

### Defendants' Scheme to Collude

26.     Defendants' objective in an LBO is to purchase the shares of the public target company at the lowest possible price, remove the company's shares from public stock exchanges, and then after a period of time resell the shares to the public or private buyers at substantially higher price than would have prevailed absent their collusion.  As part of the transaction, Defendants often retain the target company's management to operate the company. Seven such transactions that were part of Defendants' conspiracy are described in this Complaint.  Defendants' collusive behavior in setting prices and terms in these LBOs have enabled them to reap supracompetitive, inflated and monopolistic returns on their invested capital, typically 20-30% per year, and sometimes more than 100% per year.  Such consistently high returns on investment are not due to extraordinary business acumen, rather they are due to

Defendants' ability to acquire the stock of the target companies at less than competitive prices and in violation of federal antitrust law.

27.     During the Class Period, to lessen the competition for deals and to facilitate their scheme to allocate the market and fix prices at artificially low levels, Defendants and their co-conspirators  formed "bidding clubs" – which are also referred to in the private equity industry as "consortia" or "teams" – to rig the bidding for control of public corporations.  The use of bidding clubs restrained competition because they limit the available number of competitors to bid on deals, which artificially depresses buyout prices and thereby harms large company shareholders. Defendants also orchestrate "competing" bids whereby members of the conspiracy knowingly submit inferior sham bids.  An executive of one Defendant admitted that Defendants have strong reasons to submit sham "competing" bids saying "as long as two girls show up at the dance there's enough competition."

28.     Defendants engaged in numerous anti-competitive and collusive tactics to rig the purchase price of the target company shares.  As a result of these violations of antitrust law, Defendants were able to purchase target company stocks for significantly less money than if competitive bidding had occurred.  In the LBOs described in this Complaint, ***there was not one*** legitimate competing bid by other private equity firms in response to the initial bidding club offer.

29.     Two typical examples of Defendants' pattern and course of conduct of rigging LBO bids from mid-2003 through late 2006 were the SunGard and Neiman LBOs:

### SunGard LBO

> SunGard Data Systems Inc. ("SunGard") was purchased by a bidding club consisting of seven private equity firms. In November 2004, Silver Lake made its initial offer for the company and stated that it expected current management to remain with the company and participate in the transaction.  By early February 2005, Silver Lake had made its final offer and executed the agreement on March 27, 2005.  Before that date, no other proposals were made to acquire the

stock of the company, although after Silver Lake made its final offer and after it had reached preliminary agreement with management on its participation in the transaction, six more private equity firms joined in the acquisition with Silver Lake – Bain, Blackstone, Goldman, KKR, Providence and Texas Pacific. These firms agreed not to and did not submit competing bids against Silver Lake for the acquisition of SunGard.

**Neiman LBO**

In the acquisition of Neiman, the company tried to limit the size of the private equity bidding clubs to create competition, but the private equity firms refused to compete. In early 2005, Neiman decided to explore the possibility of selling the company. Eight private equity firms expressed interest in the company. The private equity firms wanted to form a bidding club to make a joint offer for the company, but Neiman limited the size of each bidding club to two members in the hope of creating competition. As a result, four bidding clubs of two private equity firms each were formed. One team simply dropped out and refused to make a bid. That left three bidding clubs: Texas Pacific/Warburg, Blackstone/Thomas Lee and KKR/Bain. The bidding club of Texas Pacific/Warburg offered $100 per share and the offers from the other two bidding clubs were lower. When the other two bidding clubs were invited to re-bid, their second bids were still below $100 per share, ***and the terms were no more favorable than Warburg/Texas Pacific's initial offer***.

30.    Defendants agreed that after the signing of a definitive acquisition agreement with a target company by one bidding club to refrain from submitting legitimate competing bids or taking any action that would interfere with the winning bidding club's acquisition of the target company at the uncompetitive price. Some Defendants even publicly acknowledged that their scheme works and that there is limited competition for LBOs. "There's less competition for the biggest deals," said Texas Pacific Group founder David Bonderman during a March 22, 2006 luncheon speech in New Orleans. During his speech, Bonderman displayed a graphic admitting that "consortia often limits bidding" and that this was one of the benefits of private equity firms combining to form bidding clubs on the largest LBOs.

31.    Some private equity executives concede bidding club deals lower the purchase price of the target companies. One prominent private equity investor admitted, "***You're not going to get me to say that aloud, but let's just say that you're not wrong***," when asked whether

forming a bidding club diminishes the final takeover price. Another senior partner from a private equity firm admitted it was common practice to form bidding clubs to restrain bidding in order to reduce the cost of the deal.

32.     As compensation for not submitting a competitive bid, Defendants who were not members of the winning bidding club (1) were cut into the deal as advisors, where they garnered lucrative fees; (2) were given minority equity stakes in the deal, where they also made fees; and/or (3) received assurances they would be included in the next conspirational LBO bidding club. This collusive conduct prevented competition in LBO bidding and reduced the prices Defendants paid to target company shareholders in the LBOs.

### The Role of Management

33.     One way Defendants limited competitive bids was to co-opt target company management by offering them economic inducements to limit the number of competitive bids or collude with other potential bidders to limit or avoid additional bids. LBOs are often initiated when company management and a primary investment bank meet to discuss "strategic alternatives" for the company. These discussions quickly turn to the feasibility of a management-led LBO. The primary investment bank, which acts as the financial advisor, usually brings in its own private equity arm or a private equity firm recommended by management to discuss the price and terms of the LBO. Just as importantly, the primary investment bank also assesses the financial players and resources needed to be deployed to prevent any of these financial players from submitting competing bids. Once LBO models are developed that demonstrate the feasibility of financing, with a significant rate of return, the primary investment banker solicits participation from other cooperative private equity firms. The discussion centers around which private equity firms will be invited into the bidding club, with the objective of making the leveraged buyout sufficiently attractive for themselves as well

as management.  For example, Goldman and Morgan were originally hired by Aramark to evaluate strategic alternatives.   Ultimately, with Aramark's Chairman and CEO, Joseph Neubauer, they became part of the bidding club, and allowed Thomas Lee and Warburg to join the bidding club to avoid competition.

34.    Management participation and collusion is fundamental to Defendants' scheme because management could, in the interest of shareholders, hold out for the highest price by encouraging competing bids.  Thus Defendants bring management into the conspiracy by giving management a financial stake in the deal in exchange for their assistance in preventing potentially competing bids.  For example, in the Neiman LBO, management realized accelerated stock option gains and huge profits in the conversion of their preferred shares into an equity position in the new private entity.  The Smith family, which owned 12.42% of Neiman, retained an equal share in the private entity.  These were essential components of the deal.  Similarly, Thomas Frist, Jr., Founder and CEO of HCA, conspired with Bain (where he was an investor), KKR and Merrill to buy HCA; Richard Kinder, founder and CEO of Kinder Morgan, conspired with Carlyle and Goldman to take over Kinder Morgan; and Joseph Neubauer, founder and CEO of Aramark, conspired with Thomas Lee, Warburg, Goldman and Morgan in the rigged Aramark LBO.

35.    Thus, management of the target companies become co-conspirators by agreeing to sell the company at a lower price in return for a piece of the private company going forward.  In 2005, shareholders received approximately 9% less per share on LBOs involving management than in LBOs not involving management.

### The Role of the Investment Banks

36.     Investment banks play a critical role in the acquisition, financing, and exit strategies of LBOs and have organizational and financial incentives to align themselves with the largest private equity firms.

37.     At the beginning of the LBO process, an investment bank is typically hired by a company to advise it on "strategies to increase shareholder value", which is often a euphemism for designing and putting an LBO in motion.  The investment banker receives a lucrative fee for advising the company during this process.

38.     Once the company decides to sell itself, or is persuaded to put itself on the block, its investment bank is responsible for packaging the company and contacting selected potential buyers.  Potential buyers comprise two general categories: (1) long-term corporate or strategic buyers; (2) short-term financial buyers such as Defendants.

39.     Over the past several years, the investment bankers that advise on selling a company have shifted from primarily soliciting corporate/strategic buyers to soliciting private equity firms.  The result has been a complete shift of the source of fees for the investment banks. In 2001, 17 of the 20 largest fee generators for investment banks were corporations/strategic buyers, whereas in 2005, only 4 of the 20 largest fee generators were corporations/strategic buyers and 16 of the largest fee generators were private equity firms.  This is especially the case in the largest private equity deals, where Defendants dominate.  Investment banks steer their clients to private equity firms rather than corporate/strategic buyers because LBOs produce much larger advisory and future debt underwriting fees — and often a cut of the deal for the investment banks' private equity affiliates.

40.     Each private equity firm typically will align itself with an investment bank for financing.  When a bidding club is formed, the bidding club will try to tie up numerous

investment banks and potential sources of capital to create an additional barrier to entry for other potential buyers. For example, the largest investment banks, Citigroup, Deutsche Bank, Goldman, Morgan, Credit Suisse and Morgan Stanley, all acted as advisors and/or provided debt financing for the SunGard and Neiman LBOs.

41.    Only the few very large investment banks have the capital, resources and connections to the private equity community necessary to participate in the largest LBOs, and these few banks are all repeat players. Private equity firms exert control over the investment capital markets by aligning with particular investment banks and executing exclusivity deals which tie up these banks and prevent them from financing other potential bidding companies. Defendant firms lock up the investment banks solely to prevent other competing private equity firms from accessing the necessary financing to support a competitive bid. This suppresses competition by excluding other possible bidders for a company.

42.    The investment banks also participate in the scheme to earn substantial fees post acquisition ("recycling fees"). After the acquisition is complete, the private equity firm buyers often place a secondary debt offering to fund a dividend recapitalization to recoup as much as 35% their original investment, often within 6 months of the acquisition.

43.    The investment banks receive a fee for underwriting secondary bond placements. Corporate/strategic buyers are less desirable partners for investment banks as they lack any incentive to hire the banks to issue secondary debt to fund large dividends.

44.    Similarly, private equity firms, soon after they acquire a company, seek to sell some of the company's assets, or sell most or all of their interest in the target company in an initial public offering ("IPO") or to a strategic buyer. These activities also require substantial investment banking services and produce very high fees for investment banks, providing

additional incentive motivation to participate in the conspiracy. In both 2005 and 2006, the big investment banks received fees from private equity firms exceeding $11 billion.

45.    Certain investment banks, including Merrill, Goldman, Credit Suisse, Citigroup, and Morgan, also have private equity arms that participate directly in parts of bidding clubs. This creates a situation ripe for the sharing of competitive information and self-dealing. One hand washes the other, as the investment bank lines up capital and debt financing for its fraternal private equity firm who in turn pays the bank substantial fees along each step in the deal. As a result, the various opportunities for profiting from the deal are kept "in the family." For example, in HCA, Merrill – which HCA retained to discuss strategic alternatives with management – brought in its private equity arm Merrill Partners once HCA's management decided to go private. The four financial advisers to the group – Merrill Lynch, Bank of America, Citigroup, and Morgan – also provided the debt financing.

- In Neiman, Goldman acted as both investor and adviser to the company.
- In Aramark, Goldman participated as a private equity firm, an investment bank and an advisor.
- In Kinder Morgan, Goldman initially acted as adviser to the company as it explored its strategic alternatives, but after the company's CEO and founder Richard Kinder expressed interest in an LBO, Goldman switched sides to advise the buy-out group and Goldman Capital took a 25 percent stake in the deal.
- In PanAmSat, Credit Suisse acted as both adviser to the company and provided debt financing.

46.    The line between investment bank and private equity firms is further blurred, if not erased, by bank investments with funds managed by private equity firms. As a result of interlocking investments, investment banks are often advising the target company to participate in an LBO with a private equity firm they control or in which they have capital. This creates an incentive for the investment bank to render fairness opinions even though the takeover price has been artificially suppressed.

**Defendants' Incentives to Play by "Club Rules."**

47.     Private equity firms' participation in LBOs is based on their willingness to play by "bidding club rules," including abiding by agreements made to allocate participation in present and future LBOs.  As a result, the bidding club's collusive offer is (1) the only real bid on the table; (2) is the only deal that is presented to the shareholders; and (3) has the endorsement of management.  When the bids are rigged in this fashion, members of the bidding club are prevented, through exclusivity agreements and related cartel allocation agreements, from competing or making lower bids.  Potential competitive bidders that were not contacted in the initial search for a private equity firm, *i.e.* who are not a part of the "winning" bidding club cartel, are offered the opportunity to participate in the "syndication" of the bid.  This is a direct quid pro quo for the excluded firms agreeing to fall in line and not submit competitive bids.  By bringing the "losers" into the fold, the winners are assured that, when they are not part of the winning bidding club in a subsequent deal, they too will be offered a financial stake in that deal.  The end result is that there are no private equity firms with the resources to make a competing bid for the transaction who have not been co-opted into the deal or promised a piece of subsequent deals.  Defendants' collusive conduct makes the ultimate price proposed to the target company's shareholders inferior to what it otherwise would be in a competitive market.  The only actual losers are shareholders of the target companies who are paid artificially low prices for their target company shares.

**The Close-Knit Relationship Among Private Equity Firms and Investment Banks.**

48.     Because the investment banks play both sides of the table, information regarding pending and future deals flows freely between investment banks and private equity firms.  This communications network is enhanced when private equity firms, investment banks and target companies invest in one another and/or have common corporate officers and directors.  This

characterizes the deals which are the subject of this complaint. These and other associations provide conduits for communicating competitive information among the co-conspirators.

## JURISDICTION AND VENUE

49.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. §1.

50.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

51.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

52.     Venue is found in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d). Venue is proper in this judicial district because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to plaintiffs claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

53.     Defendants maintain offices, have agents, transact business, or are found within this judicial district.

54.     This Court has personal jurisdiction over each of the Defendants because each was engaged in an illegal scheme directed at and with the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Class") and Sub-Classes:

**Injunctive Relief Class**

All persons who sold their securities, or are in the process of selling their securities, to any of the Defendants in LBOs. Excluded from the Class are the Defendants, co-conspirators, and the present and former partners, predecessors, subsidiaries and affiliates of the foregoing.

**Damages Sub-Classes**

a) All persons who sold their Neiman securities to private equity defendants Texas Pacific and Warburg as part of an LBO on or about October 6, 2005 (the "Neiman Sub-Class"). Excluded from this Sub-Class are the defendants named in this Complaint, their co-conspirators, and the present and former partners, predecessors, subsidiaries and affiliates of the foregoing.

b) All persons who sold their Kinder Morgan securities to private equity defendants Carlyle and Goldman Capital on or about May 30, 2007 (the "Kinder Morgan Sub-Class"). Excluded from this Sub-Class are the defendants named in this Complaint, their co-conspirators, and the present and former partners, predecessors, subsidiaries and affiliates of the foregoing.

c) All persons who sold their Freescale securities to private equity defendants Carlyle, Blackstone, Texas Pacific and Permira on or about December 1, 2006 (the "Freescale Sub-Class"). Excluded from this Sub-Class are the defendants named in this Complaint, their co-conspirators, and the present and former partners, predecessors, subsidiaries and affiliates of the foregoing.

56.     The prosecution of separate actions by individual members of the Class and Sub-Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

57.     Defendants have acted, and refused to act, on grounds generally applicable to the Class and Sub-Classes, thereby making appropriate final injunctive relief with respect to the Class and Sub-Classes as a whole.

58.     Plaintiffs believe that while there are thousands of Class and Sub-Class members as described above, their exact number and identities are ascertainable from trading records.

59.     The Class and Sub-Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

60.     There are questions of law and fact common to the Class and Sub-Classes, which relate to the existence of the conspiracy alleged and the type and common pattern of injury sustained as a result thereof, including but not limited to:

a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix and maintain prices of securities of target companies, as alleged herein, purchased by Defendants and their co-conspirators;

b)   The identity of the participants in the conspiracy;

c)   The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d)   Whether the alleged conspiracy violated §1 of the Sherman Act;

e)   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and other members of the Class and Sub-Classes;

f)   The effect of Defendants' conspiracy on the prices of securities sold to Defendants and their co-conspirators during the Class Period; and

g)   The appropriate measure of damages sustained by Plaintiffs and other members of the Class and Sub-Classes.

61.     Plaintiffs' claims are typical of the claims of the other Class and Sub-Class members, and Plaintiffs will fairly and adequately protect the interests of the members of the Class and Sub-Classes.  Plaintiffs are direct sellers of securities in the target companies that

underwent or are in the process of undertaking an LBO, and their interests are coincident with and not antagonistic to those of the other members of the Class and Sub-Classes. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

62.     The questions of law and fact common to the members of the Class and Sub-Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class and Sub-Classes are readily definable and are ones for which records should exist in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Treatment of this case with a Class and Sub-Classes will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## TRADE AND COMMERCE

64.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

65.     During the time period covered by this Complaint, Defendants and their co-conspirators purchased securities of the target companies enumerated herein, throughout the United States.

66.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to purchase securities of the target companies enumerated herein.

## U.S. DEPARTMENT OF JUSTICE INVESTIGATION

67.     In October 2006, The Wall Street Journal reported that the U.S. Department of Justice ("DOJ") launched an investigation into the bidding practices of private equity firms, including among others (1) KKR; (2) Carlyle; (3) CDR; (4) Merrill Partners; and (5) Silver Lake, relating to deals and business practices in which they participated in the formation of bids for the purchase of businesses. These private equity firms, among others, received letters from the New York regional office of the Department of Justice seeking broad information about their business practices and involvement in LBOs going back to late 2003.

68.     Specifically, the DOJ is investigating instances of collusion in the form of bid-rigging by certain of the Defendants, and is focused on whether the largest private equity firms who control the largest deals, the bidding club members – which include Defendants, investment banks and often the target company's senior management – communicated about prices and the value of bids in order to reach secret agreements and keep the target companies' prices low.

69.     One unnamed source stated that the investigation concentrates on "what deals did we do, who did we work with (and) when did we find out about them." A primary concern of this inquiry is with private equity transactions involving management-led LBOs where management has an incentive to collaborate closely with a club of private equity firms to avoid an open bidding process, *i.e.*, conduct a bidding club deal in order to protect their own financial interests.

70.     In an August 13, 2007 public disclosure, KKR confirmed that the DOJ was requesting documents as part of its bid-rigging investigation. Specifically, KKR disclosed "we

have received a request for certain documents and other information from the Antitrust Division of the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have engaged in conduct prohibited by the United States antitrust laws." This statement indicates other large private equity firms are receiving similar requests.

71.    Since the Department of Justice began its investigation in October 2006, the manner in which private equity firms have participated in LBOs has changed. Generally, the largest private equity firms are now making bids alone or with just one other private equity firm. The prices offered by the private equity firms have also gone up compared with the prices paid during the period of 2003-2006, measured as a multiple of the target company's price-earnings ratio.

## RELEVANT MARKET

72.    The relevant product market for purposes of this action is the market for LBO tender offerings of more than $2.5 billion and related LBO and investment banking services paid for through reduced prices paid for target companies. The relevant geographic market is the United States. The seven LBOs described herein all exceed $2.5 billion and occurred within the United States.

73.    Defendants are among the largest U.S. based private equity firms and controlled approximately 80% of the LBOs in the relevant market during the relevant time period. Defendants collude to dominate the relevant market, setting prices and transaction terms as would a single-firm monopolist via the collective exercise and illegal abuse of their combined monopoly power.

74.    The billions of dollars of both debt and equity that must be raised creates tremendous barriers to entry into the Relevant Market. The number of private equity firms that

have the ability and war chest necessary to control the LBOs in the Relevant Market is limited to a small group of repeat players who often invest with each other.

### OVERVIEW OF THE PRIVATE EQUITY INDUSTRY AND ALLEGATIONS OF WRONGDOING

75.     Private equity firms operate outside the purview of the legal and administrative regime that regulates some aspects of the securities markets.  This lack of regulation and the ability of private equity firms to operate with minimum transparency facilitates the formulation of the conspiracy alleged herein and has made private equity firms indispensable to target company officers who wish to facilitate and share in the gains of uncompetitive LBOs at the expense of the outside shareholders of the target company.

76.     Private equity firms experienced historic economic growth from mid-2003 through 2006.  The total number of acquisitions of public companies was nearly 27% lower from 2003 through 2006 compared to the four preceding years, 1999 through 2002; however, the number of LBOs *almost* doubled.  By 2006, over 40% of all acquisitions of public companies were LBOs.   The following table (Table 1) shows the increasing number of LBOs as a percentage of total public company acquisitions.

77.     The number of LBOs exceeding one billion dollars has escalated tremendously during this period.  During 1999-2002, only 5 LBOs were in excess of $1 billion.  During 2003-2006, the number of billion dollar transactions increased to at least 66 deals.  During 2006, close to 20% of all LBOs were billion dollar deals.  *See* Table #1.

# Table 1

| | 1999 | 2000 | 2001 | 2002 | Total 1998-2002 | 2003 | 2004 | 2005 | 2006 | Total 2003-2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Acquisitions of Publicly Traded Companies | 746 | 676 | 591 | 411 | 2,424 | 463 | 372 | 448 | 488 | 1,771 |
| Total LBOs Percent of Total Acquisitions | 74 9.9% | 77 11.4% | 77 13.0% | 70 17.0% | 298 12.3% | 124 26.8% | 98 26.3% | 142 31.7% | 202 41.4% | 566 32.0% |
| LBOs Greater than $1 Billion | 1 | 1 | 1 | 2 | 5 | 3 | 6 | 19 | 38 | 66 |
| Percent of Total LBOs Greater than $1 Billion | 1.4% | 1.3% | 1.3% | 2.9% | 1.7% | 2.4% | 6.1% | 13.4% | 18.8% | 11.7% |

Source: Mergerstat Review 2006

78.     This seismic shift to private equity firms conducting more and more of public company acquisitions was fueled by over $160 billion pouring into private equity funds during 2006, nearly four times the $41 billion spent in all of 2003.

79.     As private equity firms completed a greater percentage of transactions, the median premiums offered for all public company acquisitions declined from 41.1% in 2000 to 23.4% in 2004 and remained relatively flat for 2005 and 2006.  Likewise, the median premiums for LBOs ranged in the low 40% range during 2000-2003; they suffered a precipitous drop in median premiums to the high teens and low 20% range in 2004 and thereafter.  Due to the large number of LBOs in 2004 through 2006, the median premium for all acquisitions was negatively affected by this huge drop in premiums for LBOs.  The following table (Table 2) shows the drop in LBO premiums after 2003, when the conspiracy began.

# Table 2

**Premiums Offered**

| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| Median Premiums Offered on All Acquisitions | 34.6% | 41.1% | 40.5% | 34.4% | 31.6% | 23.4% | 24.1% | 23.1% |
| Median Premiums Offered on LBOs | 32.7% | 38.7% | 52.2% | 40.0% | 41.5% | 17.2% | 22.5% | 21.1% |

Source: Mergerstat Review 2006



Median Premiums Offered on All Acquisitions
Median Premiums Offered on LBOs

80.     Defendants and their co-conspirators controlled in excess of 80% of the large LBOs and over 90% of the large LBO "bidding club deals" (transactions involving three or more private equity firms) in the United States from 2003 through 2006.

81.     When the LBO transaction in excess of $2.5 billion involves a bidding club deal, the price paid for the target company's stock, as measured by a multiple of the target company's price/earnings ratio, is generally much less than for other LBOs in the same industry.  The prices paid in the specific deals alleged herein are described at length below.

82.     Defendants who collectively bid and ultimately conduct the LBO transaction generally organize a limited partnership of investors which is controlled by the management of the particular private equity firm that serves as a general partner.  The limited partnership funds obtain capital commitments from certain qualified investors who become passive limited partners in the partnership funds.  When the general partner identifies an appropriate investment opportunity and "calls" the required equity capital, each limited partner funds a pro rata portion according to its commitment.  Federal securities laws do not regulate these funds.

83.     The Defendant private equity firms align themselves in LBOs with the large investment banks who provide necessary financing.  Participation in LBOs is immensely profitable to investment banks such as Goldman, Merrill and Morgan.  These banks are repeat players in the LBOs and often function as both investors and advisors.

84.     As a method of enforcing the agreed-upon cartel rules, private equity firms require the prospective investment banks to execute exclusivity agreements, which prevent the investment banks from offering to finance an LBO bid on the same target company from a competing bidder or group of bidders. These exclusivity agreements are designed to – and effectively do –lock out financing for any potential competing bidder for a target company.

## PENALTIES IMPOSED BY TARGET COMPANIES
## ON ADDITIONAL ACQUISITION BIDS

85.     Defendants have conspired to uniformly impose, as a condition of even submitting one initial LBO bid, "termination agreements" requiring the target company to pay huge penalties if it later accepts a higher competing LBO bid. These penalties can reach $500 million. These fees to any potential bidder not part of the cartel do not accurately reflect any lost business cost to the bidders.

86.     These termination agreements make the target company less attractive because these massive termination fees increase the company's price if a competing bid is accepted. Moreover, these termination fees make it uneconomic for a target company to accept a higher price for its stock if the higher price does not exceed the "termination agreement" fees Defendants imposed on the target company. As a result, the prices target company shareholders are paid in LBOs led by Defendants is materially lower than the prices that would prevail in a market free of Defendants' unlawful behavior.

## THE ILLEGAL LBOS

87.     Defendants, along with their investment bank co-conspirators and others, conspired to rig the purchase price in at least seven LBOs: PanAmSat, SunGard, Neiman, Aramark, Kinder Morgan, HCA, and Freescale.

**The PanAmSat Deal**

88.     In early March 2004, PanAmSat, with the assistance of Credit Suisse First Boston, obtained indications of interest from potential buyers. Six bidders or bidder groups were selected to continue with the process, but not all submitted bids. The following chart details the Defendants' cartel, advisors and financier for the PamAmSat deal, date closed and price of the deal.

# PanAmSat Bidding Club
# Deal Amount $4.3 billion
# Date closed August 20, 2004



89.     On March 19, 2004, Carlyle and Providence, the two members of one bidder group, advised that they would be combining with Blackstone, one of the other six bidding groups, thus reducing the field to five bidders.

90.     Only three of the five remaining bidders submitted bids by April 14, 2004: (1) Carlyle, Providence and Blackstone together bid $20 per share; (2) Bain and Thomas Lee together bid slightly more than $20 per share; and (3) KKR bid $24 per share.

91.     By April 18, 2004, KKR *lowered* its offer to $23.50 per share.  The Bain/Thomas Lee bidding group failed to bid more than $22.50 per share.  The Carlyle/Providence/Blackstone bidding group did not make a second offer, even though Carlyle and Providence were still interested in acquiring PanAmSat.

92.     On April 20, 2004, KKR was announced as the winning bidder and it immediately gave Carlyle and Providence a piece of the deal.  On May 17, 2004, KKR sold over half of its rights in the deal (54% to Carlyle and Providence) and retained 44% of the outstanding common stock.  Management received 2% of the deal.

93.     The deal closed on August 20, 2004 for $23.50 per share. This per share price represented a  6.8% discount from the target company's prior day closing share price of $25.21.

94.     As a result of Defendants' bid-rigging, the winning bidder purchased PanAmSat *for less than the highest bid* and the *lowest bidders* walked away with the largest share of the deal.

95.     The total consideration for the shares was in excess of $4 billion (including the assumption of debt), but KKR, Carlyle, and Providence only contributed about $550 million in equity.  The rest of the acquisition price was financed with debt.

96.     On October 19, 2004, PanAmSat borrowed money at a very high interest rate and used the money to pay a dividend of $245 million to KKR, Carlyle and Providence.

97.     On March 22, 2005, PanAmSat completed an IPO at $18 per share in which the Company received $658 million and KKR, Carlyle and Providence received $200 million as a dividend.  PanAmSat issued new shares and did not sell the shares owned by the private equity entities.

98.     On August 29, 2005, strategic buyer IntelSat announced that it was acquiring PanAmSat for $25 per share in cash and closed the deal on October 26, 2005.  While $25 per share on its face seems only slightly more than the private equity cartel paid for the company in the LBO, the strategic buyer paid $25 per share after the company had been loaded up with debt and stripped of $445 million dollars of cash via special dividends.  The sale to IntelSat netted the private equity firms approximately $1.8 billion.  In total, KKR, Carlyle, and Providence received $2.245 billion for a $550 million initial investment made 14 months earlier, or a return of 308%.  But for Defendants' collusive conduct, these gains would have flowed to the initial PanAmSat shareholders.

**The SunGard Deal**

99.     The SunGard LBO was a one-bid auction.  On March 24, 2005, Silver Lake agreed to pay $36 per share for the company.  Although several other parties expressed an interest in SunGard, there were no other proposals.  Instead, Silver Lake and six other private equity firms formed a bidding club and agreed to split the deal.  Those bidding club members were: Blackstone, Bain, KKR, Texas Pacific, Providence, and Goldman Capital.  The following chart details the Defendants' cartel, advisors and financiers for the SunGard deal, date closed and price of the deal.

# SunGard Bidding Club
# Deal Amount $10.8 billion
# Date Closed August 11, 2005



100.    Consistent with Silver Lake's intention at the outset, management participated in the buyout.

101.    As a result of the Defendants' collusive conduct, the bidding club was able to purchase SunGard at an artificially low price.  The price paid by the bidding club for SunGard's stock was less than the average price paid in other acquisitions in the same industry, as measured by the target company's price/earnings ratio.

**The Neiman Deal**

102.    The Neiman deal illustrates the use of "dummy" or false bids to give the illusion of competition for the takeover target.  In this deal, management and the largest shareholders had a motive to and did keep the price as low as possible as each were cut in for a substantial share of the new private entity and used during bids to accomplish this.  The following chart details the Defendants' cartel, advisors and financiers of the Neiman deal, date closed and price of the deal.

# Neiman Marcus Bidding Club
# Deal Amount $5.2 billion
# Date closed: October 6, 2005



103.    In early 2005, Neiman solicited potential bidders for the purchase of the company.

104.    In a April 27, 2005, meeting with potential buyers certain of the executive officers of Neiman, including CEO Burton Tansky, disclosed their interest in staying with the new entity and having their current equity converted into equity in the new entity.  Two days later, on April 29, the bidding clubs consisting of Texas Pacific and Warburg  submitted a bid of $100 per share.  As a condition of the bid, the Smith family pledged to vote all of its shares in favor of the Texan Pacific/Warburg bid.  The other two bidding clubs (Blackstone/Thomas Lee) and (Bain/KKR) submitted bids under $100.  Neiman invited these two bidding clubs to improve their bids.

105.    On April 30, 2005, both Blackstone/Thomas Lee and Bain/KKR communicated increased bids but remained under $100.  These bids were extraordinary because both Blackstone/Thomas Lee and Bain/KKR again submitted bids *less than* the Texas Pacific/Warburg bid which they already knew was $100 per share.  These increased bids were less than the Texas Pacific/Warburg bid because Blackstone/Thomas Lee and Bain/KKR had agreed not to compete with Texas Pacific and were made simply to give the appearance that a fair auction occurred.  This Potemkin Village bidding stratagem was implemented to convince public shareholders of the fairness of the process.  With this ruse in place, the next day, May 1, 2005, Morgan, the investment bank hired by the company to opine on the fairness of the offers, presented an opinion to the company that the Texas Pacific/Warburg bid was fair.  Morgan based its fairness opinion on Neiman Marcus being valued at $93 to $107 per share and estimated a 15% interest rate of return over three years and an 18.3% rate of return over five years. Importantly, other analysts who valued the company valued it at $115.

106.    On October 6, 2005, Texas Pacific/Warburg purchased Neiman Marcus for approximately $5.4 billion.  Regular outside shareholders only saw a paltry gain of 1.7% as a result of the Neiman deal.  However,  it was substantially more lucrative for the Smith family and senior management.  The Smith family retained their 12.4% equity interest in the new entity. Executive management were also granted securities in the new entity.

**The Aramark Deal**

107.    In the Aramark deal, Chairman and CEO, Joseph Neubauer led a second LBO of Aramark – the second under his ownership and control of the company.  The first buyout, in 1984, resulted in Neubauer making a fortune when he took the company public in 1991.  Seeking to reprise this earlier result, Neubauer and a bidding group comprised of Goldman Capital, Morgan Partners, Thomas Lee and Warburg  managed to purchase Aramark in an "auction" that once again was free from competing bids – despite a grossly inadequate bidders club bid – and despite the fact that winning the auction would certainly bring any private equity firm certain substantial profits.  The following chart details the Defendants' cartel, advisors and financiers for the Aramark deal, date closed and price of the deal.

# Aramark Bidding Club
## Deal Amount $8.2 billion
## Deal closed: January 26, 2007



108.    On December 6, 2005, Neubauer, who held slightly more than 12% of the Company's stock, initiated the exploration of strategic alternatives, including an LBO.  To that end, Neubauer brought in Goldman and Morgan as financial advisors.

109.    At a board meeting on March 22, 2006, Neubauer expressed his desire to maintain a significant equity position in the new company.  He also informed the board that he wanted Goldman and Morgan to involve their respective firms' private equity affiliates, Goldman Capital and Morgan Partners.

110.    On April 28, 2006, Warburg and Thomas Lee were added to the bidders club, instead of being asked to make a competing bid.

111.    On May 1, 2006, Neubauer, Goldman Capital, Morgan Partners, Thomas Lee and Warburg (the "Neubauer Group"), submitted and announced a bid for Aramark of $32 per share.

112.    On May 3, 2006, representatives of Eminence Capital, LLC ("Eminence"), an investment manager and Aramark's second largest shareholder, which together with its affiliates owned approximately 7.8% of Aramark's Class B common stock, stated that the $32 per share was "grossly inadequate."  Eminence opined that the Company was worth at least $40 per share, a value that would still represent less than 8.5 X EBITDA.[2]  Eminence also stated that a buyout at $32 per share would permit the Aramark cartel to reap a rate of return of over 30%, and that a buyout at $40 per share would still yield a rate of return in the "mid to high teens in percentage terms."  In June, Eminence refined its analysis and valued Aramark at $38.91-$42.49 per share, a range that would still yield a rate of return of 15-20% for the acquiring bidding club.

---

[2]    EBITDA stands for "earnings before interest, taxes, depreciation, and amortization."  It is a measure of the cash flow available to service debt and pay dividends. EBITDA is, along with price to earning ratio and price to earnings growth ratio, the most common metric by which target companies are valued.

113.    On August 7, 2006, Aramark's special committee, charged with overseeing any sale of the company, indicated a willingness to consider a proposal of $34.00 per share. Later, on August 7, 2006, the Aramark cartel submitted a bid of $33.60 per share. The bid was rejected the same day. That evening, Neubauer agreed to value the portion of his shares of Class A common stock that would be contributed to the sale at less than $33.80 per share. The Aramark Group thereafter informed the special committee that it was willing to enter into the transaction at a price of $33.80 per share. This offer was accepted.

114.    At the time the offer was accepted, Credit Suisse, the special committee's financial advisor, valued Aramark at $33.35 to $41.00. This analysis was based on lowered financial projections submitted by management to Credit Suisse on August 2, 2006, just five days prior to the final bid.

115.    The acquisition premium based on the day of announcement was approximately 20%; however, the acquisition premium over the price from just one month earlier was only 12.9%.

116.    Prior to the deal, Morgan, whose stock analysts cover the company and who had a stake in the deal, issued an analyst report containing negative statements about the company and giving Aramark the equivalent of a sell recommendation. This sent Aramark spiraling downward and *saved Neubauer's group hundreds of millions on the purchase price*.

117.    Despite maintaining the same percentage equity in the new, privately-owned company, Neubauer received approximately $1.37 billion at closing.

118.    In sum, despite separate financial opinions from (1) the special committee and Eminence Capital's that the Company should sell at close to $40 per share; (2) the Aramark Group's winning bid being far less than $40; and (3) the special committee's own advisor, Credit

Suisse, opining that a fair price per share ranged up to $41 per share, not one competing bid was submitted.

**The Kinder Morgan Deal**

119.    The Kinder Morgan deal began with management discussions of an LBO with Goldman, the company's financial advisor.   On February 16, 2006, Kinder Morgan's President, C. Park Shaper spoke with Goldman   about an LBO that would involve Kinder Morgan management, and shortly thereafter, Goldman Capital expressed an interest in participating in such a transaction.   The following chart details the Defendants' cartel, advisors and financiers for the Kinder Morgan deal, date closed and price of the deal.

# Kinder Morgan Bidding Club
## Deal Amount $27.5 billion
## Date closed: May 30, 2007



Carlyle Group
Goldman Sachs
Richard Kinder
Mike Morgan
Bill Morgan
Fayez Sarofim
American Internat'l
AIG Highstar
AIG Financial
Riverstone Holdings

Goldman Sachs (lead)
Citigroup
Deutsche Bank
Lehman Brothers
Pierce, Fenner & Smith
Wachovia

Goldman Sachs

Blackstone (Bill Oglesby)
Morgan Stanley

| Investors | Debt Financing | Advisors to Investors | Advisors to Mgt. |

120.    By May 2006, several other Kinder Morgan insiders expressed an interest in an LBO, including founder Richard Kinder, who owned 18% of the company stock; Michael Morgan, a director and substantial shareholder; and Fayez Sarofim, also a director and a substantial shareholder.   Goldman further enlisted Carlyle.   Together, on May 28, 2006, this bidding club proposed a buy-out at $100 per share.   That represented a modest premium to the stock's then-current trading price of $84.41 but was less than the stock's recent high of $103.75.

121.    On May 31, 2006, an analyst report from Citigroup set $105 as its target price for Kinder Morgan stock, but stated that the "target price represents a minimum amount for a management-led buyout of [the company] and does not provide a reasonable takeout premium."

122.    To give the collusive LBO a patina of legality, 35 potential investors were solicited to present competing bids. None did so, resulting in a one-bid auction won by Kinder Morgan insiders along with Goldman Capital and Carlyle.   Analyst valuations of Kinder Morgan's stock ranged as high as $160 per share.

123.    The special committee was advised that Kinder Morgan's stock should be valued at least 10% more than the current bid of $100, but the committee accepted the group's final offer of $107.50 per share.

**The HCA Deal**

124.    On January 19, 2006, HCA's stock closed at a price of $51.38.   Around this time, HCA disclosed that it had engaged Merrill to review various strategic alternatives to "enhance shareholder value."   The following chart details the Defendants' cartel, advisors and financiers for the HCA deal, date closed and price of the deal.

# HCA Bidding Club
# Deal Amount $32.1 billion
# Date closed: November 11, 2006



125.    Merrill proposed the possibility of a leveraged buyout and in April 2006, Thomas Frist Jr., the company's founder and a substantial shareholder, contacted Bain and KKR and discussed the feasibility of a management-led buyout.[3]   At about the same time, Merrill introduced HCA management to representatives from Merrill Partners.

126.    Based on a capital structure described by Frist, the private equity firms – KKR, Bain and Merrill Partners – concluded that a leveraged buyout would be feasible.  HCA's Board was not informed of these discussions until May 8, 2006.  Thereafter, the private equity firms were allowed to conduct due diligence and discuss terms with management.  The buyout group requested and were allowed to bring in another private equity firm to conduct due diligence – not for the purpose of making a competing bid for the company, but for the purpose of joining the bidding club in making a single bid.

127.    On July 19, 2006, KKR, Bain, and Merrill Partners expressed an interest in acquiring the stock of the company for $51 per share.  No other potential bidders were contacted and/or invited to present a competing bid.

128.    HCA accepted the $51 per share bid and executed a merger agreement on July 24, 2006 with the bidding club that included a $300 million termination fee.  Only after this huge and unattractive termination fee was in place did HCA finally solicit other bidders, but of course no other bids were made.

129.    The $51 price represents a premium of 17.8% based on the HCA share price the day prior to the bid; however, the $51 per share is less than the share price on the day

---

[3]     Notably, Frist was at the time an investor in one or more funds managed by Bain.

(January 19, 2006) that HCA started to review "strategic alternatives with the goal of enhancing shareholder value."

**The Freescale Deal**

130.   In early 2006, Freescale began looking at purchasing Royal Philips Electronics semiconductor unit ("Royal Philips") and other undisclosed strategic alternatives.

131.   In May 2006, Blackstone contacted Michael Mayer, the chief executive officer and the chairman of the board of directors to discuss its interest in the possible acquisition of Freescale.  On June 4, 2006, Blackstone expressed an interest in exploring an acquisition with a possible price of $37.00-$38.00 per share.   No formal offer was presented at this time. The following chart details the Defendants' cartel, advisors and financiers for the Freescale deal, date closed and price of the deal.

## Freescale Bidding Club
## Deal Amount $17.5 billion
## Date closed: December 1, 2006



132.     Shortly thereafter, in mid-June 2006, Royal Philips publicly announced that it was considering a sale of its semiconductor business and Freescale continued to evaluate the merits of acquiring this business.

133.     During July 2006, Freescale decided not to pursue the acquisition of Royal Philips; however, two bidding groups led by the same firms, Blackstone and KKR, appeared to be pursuing both Royal Phillips and Freescale.

134.     On July 25, 2006, Blackstone lowered its preliminary non-binding statement of interest to acquire Freescale to $35.50-$37.00 per share.  It was widely reported at this time that Blackstone was considering bidding for Royal Philips.

135.     On August 3, 2006, a club of private equity firms led by KKR reached a definitive merger agreement with Royal Philips.  It was reported that KKR "edged out a rival bid" from a Blackstone-led group.

136.     On September 10, 2006, KKR, Silver Lake, Bain and Apax Partners Worldwide, LLP ("KKR Group") delivered a written indication of interest in acquiring Freescale for a price of $40.00-$42.00 per share.  The KKR Group also stated that they would consider further increasing their valuation of the Company upon receiving access to due diligence information and meetings with management, which presumably would have included Mr. Mayer.  The KKR Group acknowledged they could pay more for Freescale than any other buyer due to the synergies that they could generate by combining Freescale with the Royal Philips semiconductor business.

137.     KKR indicated that it expected it could complete its due diligence and negotiate a definitive agreement in 2-3 weeks.

138.    Then, on September 14, 2006, an LBO bidding club led by Blackstone submitted a formal offer of $40 a share for Freescale, with a fuse expiring at ten o'clock the next day, thus limiting the ability for any other potential buyers, to conduct due diligence review and prepare a counter offer.

139.    As a component of the Blackstone offer, Mr. Mayer would (1) continue as chairman and CEO of the new company, (2) have all his shares and options acquired in the transaction, and (3) be awarded 133,327 Class B units in the new partnership.  Acquisition by KKR and merger into Royal Phillips created uncertainties for Mr. Mayer's continued future with Freescale.

140.    The next day, on September 15, 2006, Freescale entered into a definite merger agreement with the Blackstone club without soliciting final competitor bids or allowing potential buyers to complete their due diligence.

141.    KKR/Silver Lake withdrew from the bidding the next day allowing Blackstone to acquire the Company for $40 per share even though the Wall Street Journal stated in an article on the same day, September 16, 2006, that:

> [The] KKR-Bain group can conceivably offer billions more to Freescale shareholders by reducing the combined group's research and development and eliminating the overlap in sales and marketing offices and staff.  The prospect of consolidation and more market power makes it possible for them, in turn, to bid more for Freescale.

142.    At the end of the day, the KKR-led bidding club ended up with Royal Phillips, but was the "losing bidder" in the Freescale deal;  the Blackstone-led bidding club ended up with Freescale even though it was reported that KKR could have offered "billions more" for the Company, but was the "losing" bidder in the Royal Phillips deal.  Mayer ended up keeping his positions as CEO and chairman, plus an ownership stake in the acquiring partnership.

**Transaction Premiums and P/E Offered on Illegal LBOs**

143.    Table 3 identifies the acquisition premiums[4] offered and price/earnings (P/E)[5]

ratio of seven collusive LBOs described in detail in this Complaint.

---

[4]    Acquisition premium is measured by the price of the stock five days prior to the announcement of the deal compared to the acquisition price on a per share basis.  An LBO's acquisition premium is the most used measure of the value received from the LBO by the target company's shareholders.  However, measures of the acquisition premium are frequently used in conjunction with the P/E to analyze an acquisition.

[5]    P/E is the ratio of the prior 12 months earnings and the price at which the transaction ultimately closed.  P/E is the single most used measure of a company's relative valuation.

# Table 3

**Transaction Premiums and P/E Offered**

| | | INDUSTRY AVERAGE | |
|---|---|---|---|
| **PanAmSat** | April 20, 2004 | **2004** "Communications and Broadcasting" | |
| Premium Offered | < 0.0 | 52.1% | |
| P/E Offered | 34.0 | 23.5 | |
| | | | |
| **SunGard** | March 28, 2005 | **2005** "Computer Software, Supplies & Services" | |
| Premium Offered | 44.3% | 34.5% | |
| P/E Offered | 22.9 | 33.8 | |
| | | | |
| **Neiman Marcus** | May 2, 2005 | **2005** "Retail" | |
| Premium Offered | 3.5% | 27.0% | |
| P/E Offered | 19.9 | 23.4 | |
| | | | |
| **Aramark** | May 12, 2006 | **2006** "Leisure & Entertainment" | |
| Premium Offered | 21.1% | 20.1% | |
| P/E Offered | 19.3 | 27.7 | |
| | | | |
| **Kinder Morgan** | May 30, 2006 | **2006** "Oil & Gas" | |
| Premium Offered | 30.1% | 48.2% | |
| P/E Offered | 23.7 | 31.4 | |
| | | | |
| **HCA** | July 24, 2006 | **2006** "Health Services" | |
| Premium Offered | 15.8% | 40.1% | |
| P/E Offered | 16.5 | 22.9 | |
| | | | |
| **Freescale** | Sept 15, 2006 | **2006** "Electronic" | |
| Premium Offered | 30.1% | 20.8% | |
| P/E Offered | 20.4 | 30.2 | |

Sources:  Mergerstat Review 2004, 2005 and 2006

144.   In six of the seven deals, the P/E is significantly less than the P/E for other transactions in the relevant industry during the year of the illegal LBO transaction.  For the other transaction, PanAmSat, the P/E is significantly higher due to minimal earnings in the 12 months preceding the transaction.

145.   In all seven deals that are the subject of this Complaint, either the acquisition premium or the P/E of the deal price is significantly lower than the industry average.

146.   However, the post 2006 information, the period subsequent to the DOJ inquiry, shows that companies being acquired are negotiating more with the private equity firms and strategic buyers.

147.   As evidenced by the seven deals addressed herein and as part of their collusive conduct in each of these deals, Defendants agreed that once a private equity firm or group of firms signed a definitive merger agreement with a public company, other members of Defendants' conspiracy would not submit superior competing bids or take other action that might make it more difficult for the bidding group to acquire the target at the lowest possible price.  In fact, as set forth above, certain "sham" competing bids were submitted to promote the impression Defendants were actually competing.

## VIOLATIONS ALLEGED

### COUNT I

**Horizontal Price Fixing**
**Per Se and Rule of Reason Violations - Sherman Act Section 1**

148.   Plaintiffs re-allege and incorporate herein by reference the above-referenced allegations on behalf of the Injunctive Class and Damages Sub-Classes.

149.   Beginning as early as mid 2003 and continuing until late 2006, the exact dates being unknown to Plaintiffs, the Defendants and their co-conspirators engaged in a continuing

agreement, understanding and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain or stabilize prices of securities in the LBOs identified herein in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

150.    In formulating and effectuating the aforesaid contract, combination or conspiracy, the Private Equity Defendants and their co-conspirators did those things that they combined and conspired to do, including, among other things:

a)  forming groups referred to as "bidding clubs" or "consortia" to rig the bidding for control of a public corporation;

b)  allocating the company buyout auctions among themselves;

c)  exchanging information about which companies they would bid for, as well as the price per share and terms and conditions of their bids in order to control and/or limit the number of bids for the target company and the number of defendants participating in the going public transaction;

d)  agreeing among themselves to submit or not submit bids in connection with company buyout auctions;

e)  submitting bids for securities at agreed upon prices in connection with company buyout auctions;

f)  monitoring and implementing the agreements among members of the conspiracy;

g)  entering into exclusive banking arrangements to deprive competitive bidders of financing; and

h)  conspiring with company management to limit or avoid the seeking of competitive bids.

151.    During and throughout the period of the conspiracy, Plaintiffs and members of the Class and Sub-Classes directly sold securities to Defendants.

152.    The unlawful contract, combination or conspiracies alleged herein have had the following effects, among others:

a)  Defendants restrained competitors in the market for LBO tender offers exceeding $2.5 billion;

b)  Defendants allocated the market for LBOs in excess of $2.5 billion amongst transactions;

c)  prices paid by Defendants and their co-conspirators to Plaintiffs and the members of the Class and Sub-Classes for securities in LBOs in excess of $2.5 billion were maintained at artificially low and non-competitive levels; and

d)  Plaintiffs and members of the Class and Sub-Classes were paid less for securities sold to Defendants and their co-conspirators in LBOs exceeding $2.5 billion than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing and market allocation.

153.    As a direct and proximate result of the illegal combination, contract or conspiracy, Plaintiffs and the members of the Class and Sub-Classes have been injured and damaged in their respective businesses and property, in amounts which are presently undetermined.

154.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful arrangements to fix, maintain and/or stabilize prices of securities purchased by Defendants and their co-conspirators in the United States and allocated rig bids and LBOs in excess of $2.5 billion. Such violations and the effects thereof may be continuing and will continue unless the injunctive relief represented is granted.

## COUNT II

### Unjust Enrichment, Restitution and Constructive Trust

155.    Plaintiffs allege and incorporate by reference the allegations set forth above on behalf of themselves and the Damages Sub-Classes.

156.    This Count is alleged against all defendants.  Defendants have benefited from their unlawful and inequitable acts alleged in this Complaint.  Defendants' financial benefits, which result from their unlawful and inequitable conduct, are traceable to defendants' conspiracy to fix and maintain the prices of LBOs at artificially low levels through bid-rigging, market allocation and other anti-competitive acts.

157.    The Damages Sub-Classes have conferred upon defendants an economic benefit in the nature of profits resulting from their market allocation and bid-rigging of LBOs, to the economic detriment of plaintiffs and the members of the Classes.

158.    The economic benefit derived by defendants through their market allocation and bid-rigging of LBOs is a direct and proximate result of defendants' unlawful practices.

159.    The financial benefits derived by defendants by reason of their unlawful conduct rightfully belong to the plaintiffs and the Damages Sub-Classes, as they have been paid artificially low prices for their shares as a result of defendants' market allocation and bid-rigging of LBOs, inuring to the benefit of defendants.

160.    It would be inequitable for defendants to be permitted to retain any of the revenue derived from their unfair and unlawful acts and trade practices as alleged in this Complaint.

161.    Defendants should be compelled to disgorge into a common fund for the benefit of plaintiffs and the Damages Sub-Classes all unlawful or inequitable proceeds received by them. A constructive trust should be imposed upon all sums unlawfully or inequitably received by

defendants traceable to plaintiffs and the Damages Sub-Classes from which plaintiffs and the other Damages Sub-Class members may make restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

C.     That judgment be entered for Plaintiffs and members of the Class against Defendants for damages sustained by Plaintiffs and the Class as provided for in Section 4 of the Clayton Act, together with the costs of this action, including reasonable attorneys' fees.

D.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

E.     That Plaintiffs and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.


Dated: December 28, 2007                    Respectfully submitted,

                                            ROBINS, KAPLAN, MILLER & CIRESI LLP

                                            /s/ David E. Marder
                                            David E. Marder (BBO #552485)
                                            Meghan E. Walt (BBO #658971)
                                            800 Boylston Street, 25th Floor
                                            Boston, MA 02199
                                            (617) 267-2300

                                            Of Counsel:

                                            K. Craig Wildfang
                                            Thomas B. Hatch
                                            Stacey P. Slaughter
                                            ROBINS, KAPLAN, MILLER & CIRESI LLP
                                            2800 LaSalle Plaza
                                            800 LaSalle Avenue
                                            Minneapolis, MN 55402-2015
                                            (612) 349-8500

                                            Patrick J. Coughlin
                                            Christopher M. Burke
                                            David W. Mitchell
                                            Gregory S. Weston
                                            Elisabeth A. Bowman
                                            COUGHLIN STOIA GELLER RUDMAN &
                                            ROBBINS LLP
                                            655 West Broadway, Suite 1900
                                            San Diego, CA 92101
                                            (619) 231-1058

                                            David R. Scott
                                            SCOTT + SCOTT LLP
                                            108 Norwich Avenue
                                            Colchester, CT 06415

(860) 537-3818

Arthur L. Shingler III
Hal Cunningham
SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, CA 92101
(619)233-4565

Jack Landskroner
Jack Grieco
LANDSKRONER • GRIECO • MADDEN, LTD.
1360 West 9th Street, Suite 200
Cleveland, OH 44113
(216)522-9000

Brian Robbins
George Aguilar
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
(619)525-3990

Richard Lockridge
Charles N. Nauen
Karen Riebel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Suite 2200
100 Washington Avenue South
Minneapolis, MN  55401
(612) 339-6900

Dennis Stewart
HULETT HARPER STEWART, LLP
550 West C Street, Suite 1600
San Diego, CA  92101
(619) 338-1133

J. Gerard Stranch, IV
BRANSTETTER, STRANCH & JENNINGS,
PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
(615) 254-8801