UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated, | Lead Case No. 1:07-cv-12388-EFH **(Consolidated)** |
| Plaintiffs, | <u>CLASS ACTION</u> |
| vs. | PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CLARIFICATION OF THE COURT'S DECEMBER 15, 2008 ORDER AND TO COMPEL DISCOVERY |
| BAIN CAPITAL PARTNERS, LLC, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................................1

II.  ISSUES IN CONTENTION .......................................................................................4

III.  STATEMENT OF FACTS .........................................................................................4

   A.  Plaintiffs' Discovery Requests.......................................................................4

   B.  The Meet and Confer Process .........................................................................6

IV.  PLAINTIFFS BELIEVE THAT THE COURT DID NOT INTEND TO
     UNDULY RESTRICT THE DISCOVERY TIME PERIOD...........................................12

V.  PLAINTIFFS BELIEVE THAT THE COURT INTENDED TO PERMIT
    DISCOVERY INTO INFORMATION PROVIDING "INDICIA OF THE
    OVERARCHING CONSPIRACY" ..................................................................16

VI.  DEFENDANTS' PRODUCTION TO THE DOJ SHOULD BE PRODUCED TO
     PLAINTIFFS ........................................................................................19

VII.  CONCLUSION..........................................................................................20

# TABLE OF AUTHORITIES

**Page**

## CASES

*B-S Steel of Kansas, Inc. v Texas Industries, Inc.*,
No. 07-2410-JAR, 2003 WL 21939019 (D. Kan. 2003) ...........................................13, 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................1, 6

*Callahan v. A.E.V. Inc.*,
947 F. Supp. 175 (W.D. Pa. 1996).....................................................................................17

*In re Auto. Refinishing Paint Antitrust Litig.*,
229 F.R.D. 482 (E.D. Pa. 2005).........................................................................................13

*In re Intel Corp. Microprocessor Antitrust Litig.*,
No. 05-1717-JJF, CIVA 05-441-JJF,
CIVA 05-485-JJF, 2007 WL 137152 (D. Del. Jan. 12, 2007)...........................................13

*Kellam Energy, Inc. v. Duncan*,
616 F. Supp. 215 (D. Del. 1985)........................................................................................13

*New York v. Yonkers Contracting Co., Inc.*,
No. 90 Civ. 3779 (CES), 1991 WL 167981
(S.D.N.Y. Aug. 16, 1991) ..................................................................................................13

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
Rule 26 ...................................................................................................................... *passim*

United States District Court for the District of Massachusetts
Local Rule 37.1 ....................................................................................................................4

## SECONDARY AUTHORITIES

Andrew Ross Sorkin, *Dealbook*: *One Word Nobody Dares Speak*, N.Y. Times,
October 16, 2005.................................................................................................................18

## I.      INTRODUCTION

At its core, this case concerns a well-orchestrated conspiracy among the largest, most prominent private equity firms ("PE Firms" or "Defendants")[1] to form "bidding clubs" for the purpose of eliminating competition for leveraged buyouts ("LBOs") between 2003 and 2008 (the "Conspiratorial Era").  *See* Third Amended Complaint Class Action Complaint, Docket No. 123 ("Complaint").  Plaintiffs have alleged that the PE Firms colluded with each other, as well as with co-conspirator investment banks, to rig bids, restrict the supply of private equity financing, fix transaction prices and divide the market for private equity services for LBOs.[2]  Complaint, ¶¶40-44. As a result of their conspiracy, the PE Firms artificially depressed the share prices of the target companies.  *Id.*

This Court, in its December 15, 2008 Memorandum and Order, Docket No. 157 ("Order"), recognized the viability of these allegations when it ruled that Plaintiffs had set forth sufficient facts in the Complaint to "'plausibly suggest'" an illegal agreement in violation of §1 of the Sherman Act. *See* Order at 10-11 (finding allegations in the Complaint to be sufficient under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-56 (2007)).  Indeed, the Court noted in the Order that Plaintiffs' conspiracy claims encompassed "*all LBOs* involving the PE Firms that totaled more than $2.5 billion and occurred between 2003 and 2008."  Order at 2.  The Court further acknowledged that Plaintiffs had alleged, with specificity, nine such transactions that illustrate the "*Overarching Conspiracy*."  *Id*. at 2-3.  These nine transactions are PanAmSat, AMC Entertainment, Inc.,

---

[1]      At this stage, Defendants are Bain, Blackstone, Carlyle, J.P. Morgan Chase & Co., Goldman Sachs, KKR, TPG, Providence and Silver Lake.

[2]      Unless otherwise noted citations are omitted and emphasis is added, here and throughout.

SunGard, Neiman, Michaels Stores, HCA, Freescale, Aramark and Kinder Morgan.  Complaint, ¶122.

Upon sustaining the allegations of the Complaint, the Court ordered discovery to move forward in two phases:

> The court orders that the first stage of discovery shall be directed solely and exclusively to the nine (9) specified transactions alleged in the complaint, which transactions the Shareholders claim constitute indicia of the Overarching Conspiracy.

> At the conclusion of the first stage of discovery, the court shall determine whether further discovery as to additional transactions is warranted.   This determination shall be based on whether or not the first stage of discovery raises sufficient evidence of collusion on the part of the PE firms.

Order at 11.

As set forth herein, Plaintiffs now seek to clarify the breadth and scope of the Court's ruling concerning the first stage of discovery.  Plaintiffs believe that while the Court correctly intended the focus of discovery to be on the nine deals, the Court did not mean to foreclose the production of responsive documents held by the PE Firms that provide "***indicia of the Overarching Conspiracy***," but which do not specifically refer to any of the nine deals.  Order at 12.  This discovery includes, for example, documents showing agreement or some other *quid pro quo* arrangement between the PE Firms to allocate LBO transactions, as well as evidence of collaboration amongst the PE Firms.  Certainly, those types of core documents constitute evidence of collusion and support the existence of the Overarching Conspiracy – regardless of whether they specifically mention any of the deals.

In a deliberate effort to stall the litigation, the PE Firms are now using the Order as a shield to fend off their discovery obligations, claiming they have no duty to search for and produce responsive documents that do not specifically identify or reference one of the nine deals.  Defendants' narrow construction of the Order hinders the production of relevant and compelling evidence needed for the prosecution of this case.  Defendant's refusal to produce these documents

contradicts the broad standards of discovery set forth in Fed. R. Civ. P. 26, and more importantly, is inconsistent with the spirit of the Court's Order.  Plaintiffs believe that the Court intended the production of these core "Overarching Conspiracy" documents and request clarification on this point.

Plaintiffs also seek to clarify the timeframe for discovery.  In the Order, the Court determined for purposes of sustaining the Complaint that the "Conspiratorial Era" spanned from *2003 to 2008*.  Order at 2.  The PE Firms, however, seek to cabin the discovery period to within just a few months before consideration of each of the nine deals and the close of each deal.  Defendants' proposal would allow them to avoid the production of core conspiratorial documents that *pre-date* or *post-date* the nine deals, thus preventing Plaintiffs from obtaining the critical information needed to pursue their collusion and conspiracy claims.

For months now, counsel for Plaintiffs have engaged in an extensive and deliberate meet and confer process in the hopes of resolving these issues.  Yet, despite granting a number of concessions, Plaintiffs continue to be stonewalled by Defendants.  Although Plaintiffs served their document requests *more than a year ago*, the PE Firms have only produced a marginal bit of information, such as preliminary working group lists, which merely identify certain of the participants on the nine deals, but not their roles or significance.  And, even though Defendants have previously produced documents to the Department of Justice ("DOJ") as part of the DOJ's bid-rigging investigation, they are willing to produce only a limited subset of the DOJ documents in this litigation.  The DOJ documents are certainly probative as indicia of the Overarching Conspiracy and can be readily produced here with minimal burden.  As all attempts to informally resolve the foregoing issues have been exhausted, Plaintiffs have no choice but to file this motion to seek clarification of the Court's Order and to compel discovery.

## II.     ISSUES IN CONTENTION

Pursuant to Local Rule 37.1, Plaintiffs respectfully seek clarification on three issues concerning the first phase of discovery:

(1)      The time period for discovery, which Plaintiffs believe should reflect the Conspiratorial Era (2003-2008).  Plaintiffs also believe they are entitled to the production of "post-acquisition" business operation documents, which Defendants have refused to produce;

(2)      Whether Plaintiffs are entitled to the production of documents that are relevant or have a tendency to show the Overarching Conspiracy, yet do not specifically reference any of the nine deals; and

(3)      Whether Plaintiffs are entitled to all documents previously produced by Defendants to the DOJ as part of its bid-rigging investigation.

## III.    STATEMENT OF FACTS

### A.     Plaintiffs' Discovery Requests

More than a year ago, on April 16, 2008, Plaintiffs propounded their First Request for Production of Documents ("RFPs" or "document requests") on all Defendants.[3]  Ex. 1.  Plaintiffs' document requests were specifically tailored to seek evidence of collusion between the PE Firms with respect to the acquisition and LBO of publicly traded companies between 2003 and 2008  (the "target companies"), including, but not limited to, the nine deals specified in the Complaint.  In particular, Plaintiffs sought communications, presentation materials, financial data and due diligence documents relating to the bidding process and acquisition of the target companies (Ex. 1, RFP Nos. 2-8); documents concerning the valuations and financial forecasts for the target companies (*id.*, RFP Nos. 16-18); documents reflecting communications and agreements between PE Firms concerning the acquisitions of the target companies (*id.*, RFP Nos. 20-23, 30-31); and documents provided to, or

---

[3]      All references to "Ex." and "Exs." are to the Declaration of David W. Mitchell in Support of Plaintiffs' Motion for Clarification of the Court's December 15, 2008 Order and to Compel Discovery, filed concurrently ("Mitchell Decl.").

prepared by, investment banks and other companies providing financial advice to the target companies (*id.*, RFP Nos. 9-11, 14-15, 18).  The RFPs were directed to both the PE Firms involved in the acquisition group of the target companies, as well as the non-acquiring PE Firms.  *See*, *e.g.*, *id.*, RFP at 4.

On August 27, 2008, Defendants filed their joint motion to dismiss the Complaint, based on preemption grounds and the failure to plead a Sherman Act §1 claim.  *See* Defendants' Motion to Dismiss the Third Amended Class Action Complaint, Docket No. 127.  Pending the resolution of Defendants' motion, the Court imposed a partial stay of discovery and ordered:  (i) Defendants to produce documents concerning the nine LBOs specified in the Complaint that were previously produced to the DOJ; and (ii) the parties to confer as to the nature and breadth of the "due diligence" documents relating to the nine LBOs.  *See* Order at 2; *see also* Scheduling Order, Docket No. 136 at 2; Joint 26(f) Report, Docket No. 124.

On September 17, 2008, Defendants served their written responses and objections to the RFPs.  *See, e.g.*, Ex. 2, Bain Capital Partners LLC's Objections to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents; *see, e.g.*; Ex. 3, Kohlberg Kravis Roberts & Co. L.P.'s Objections to Plaintiffs' First Request for Production of Documents Addressed to All Defendants.  Notably, Defendants asserted boilerplate objections to the discovery requests, but did not provide any substantive answers to the interrogatories or to produce any documents whatsoever.

Meanwhile, consistent with the Court's September 3, 2008 Scheduling Order, Plaintiffs attempted to negotiate with Defendants in good faith to reach an agreement on a discrete set of due diligence documents that could be produced immediately after the Court entered its Order on the motion to dismiss.  *See* Scheduling Order, Docket No. 136.

- 5 -

On December 15, 2008, the Court denied Defendants' motion to dismiss, holding that Plaintiffs' claims were not preempted by securities laws and that Plaintiffs had sufficiently alleged a Sherman Act §1 claim under *Twombly*. *See* Order at 8-10. As noted, the Court ordered discovery to move forward in two phases, with the first phase focused on the nine deals in the Complaint, as those transactions "constitute indicia of the Overarching Conspiracy." Order at 12. However, while the Order places the focus of discovery on the nine deals, it does not clearly address the parties' discovery obligations concerning materials that do not reference any of the nine deals, yet support the existence of the Overarching Conspiracy. The Order also does not limit discovery to a subset of the alleged conspiratorial timeframe. Finally, the Order intended discovery to move expeditiously, requiring the parties to complete discovery *within a year*. *Id*. at 12.

Despite the Court's clear directive to proceed apace with discovery, and Defendants' representation to this Court that they would begin document production on a rolling basis beginning in February, Defendants retreated into a long and drawn out meet and confer process, which, to this day, has yet to bear any real fruit. *See* Ex. 4, Letter from Slaughter to all defense counsel, dated February 13, 2009 at 1.

**B.     The Meet and Confer Process**[4]

On December 19, 2008, a few days after the Court's Order, Plaintiffs submitted a proposed discovery plan to defense counsel "in an effort to move negotiations forward." *See* Ex. 5, Letter from Walt to Tringali, dated December 19, 2008. Plaintiffs' proposal was intended to be

---

[4]     The following highlights the core meet and confer discussions between the parties regarding "global" issues affecting *all* Defendants. Plaintiffs also had numerous meet and confers with various *individual* Defendants concerning discovery issues specific to them, but those discussions need not be recounted for purposes of this motion.

comprehensive, covering all aspects of discovery, including the document production, interrogatories, depositions, as well as privilege log issues.[5]

Defendants responded on January 7, 2009, effectively rejecting Plaintiffs' proposed discovery plan, while seeking to impose substantial limitations on the scope of discovery. Defendants asserted that they were under no obligation to produce documents outside the nine specified transactions. Further, while claiming that the "Conspiratorial Era" occurred between "2003 and 2006," Defendants stated "the specific time frame for responsive information for each of the nine transactions should be limited to the date when a Defendant first considered one of the nine transactions and 60 days after the transaction closed." *See* Ex. 6, Letter from Tringali to Walt, dated January 7, 2009 at 2. Finally, ignoring the size and complexity of the matter, Defendants sought to severely limit the total number of depositions, interrogatories and requests for production for each party.[6] Ex. 6 at 2-3.

Unable to resolve these issues, Plaintiffs' counsel traveled to New York to meet with counsel for Defendants on February 10, 2009. During the meeting, which occurred nearly two months after the Court had ordered discovery to commence, Plaintiffs were advised that ***most of the Defendants had not yet even started their search and review for responsive documents***. Ex. 7, Letter from Burke dated February 10, 2009.

---

[5]     While Plaintiffs' discovery proposal did not specify any numerical limits on discovery, the proposal contemplated the expansion of depositions, interrogatories and RFPs beyond the general limits set forth under the Local Rules and Fed. R. Civ. P. 26, due to the size and complexity of the litigation. Ex. 5.

[6]     Defendants proposed limiting discovery to merely 25 interrogatories, two set of document requests, and no more than 50 depositions.

Notwithstanding Defendants' delay, Plaintiffs made a concerted effort to reach an accord on the timeframe and scope of discovery requests.  On the "front-end" of discovery, Plaintiffs proposed that the discovery time period begin one year before the first day any of the nine transactions was first considered by any Defendant.  *Id.*  Plaintiffs also sought the production of post-closing documents on the "back-end" of the nine deals.  Ex. 7 at 2.

A week later, defendants responded.  With respect to the "front-end" of the discovery time period, Defendants limited their offer to produce documents ***two months before the submission of the first bid for each of the nine deals***.  Ex. 8, Letter from Tringali to Burke, dated February 17, 2009 at 2.  Furthermore, for the "back-end" of each deal, Defendants sought to limit discovery to ***two months after the close of each deal***.  *Id.* at 2.  Defendants further attempted to narrow the field of responsive documents by proposing to exclude from production any "post-acquisitional operational documents," including critical documents such as board minutes, board packs, business plans, strategic plans, financial reports, and other documents concerning the business operations of the target company, which was now owned by at least one Defendant.  *Id.* at 4.  Defendants offered no explanation as to why these types of documents should be excluded from their production, only reiterating their position that the scope of discovery should be narrowly confined to the nine deals in the Complaint.  *Id.* at 3.

On February 24, 2009, Plaintiffs responded to Defendants' February 17 letter.  Plaintiffs clarified their position concerning the production of materials that would tend to show the existence of the Overarching Conspiracy, yet do not specifically reference any of the nine deals:

> Plaintiffs agree that the Court's order of December 15, 2008 states the "first stage of discovery shall be directed solely and exclusively to the nine (9) specified transactions alleged in the complaint . . . . "  Plaintiffs,  however, disagree with Defendants' apparent position that a document is responsive under the Court's order only if it expressly names one of the nine transactions.  By way of example, if Bain Capital had in its custody a document that expressed an agreement among Bain

Capital and its competitors to allocate LBO transactions, without expressly naming any of the nine deals, Bain Capital would be under an obligation to produce such a document.  The document is discoverable because it relates to the nine deals in that it would tend to show the existence of the overarching conspiracy to allocate LBOs, which *a fortiori* would affect the nine transactions.

*See* Ex. 9, Letter from Burke to Tringali, dated February 24, 2009 at 1.

Plaintiffs also addressed Defendants' position concerning the discovery timeframe:

Defendants' proposal that the "the discovery time period for each of the nine LBOs described in the [Complaint] should begin two months before the submission of the first bid for each of the nine LBOs" is plainly inadequate.  The complaint itself alleges that Defendants' involvement in the overarching conspiracy as well as in many of the nine deals began prior to two months before the submission of the first bid.  One example is the Michaels Stores LBO.  In the Michael's stores LBO, Bain and Blackstone submitted their first bid June 21, 2006, which under Defendants' proposal would make the discovery commencement date some time in April.  Michael' Stores, however, began to undertake a review of its strategic options well before April 2006.

*Id*. at 1-2.

As to Defendants' position concerning the "back-end" of discovery, particularly their proposal of a "two-month post-closing cutoff for each of the nine LBOs'" and their exclusion of "'any post-acquiring operational documents,'" Plaintiffs stated:

Again, Defendants' proposal is inadequate.  Plaintiffs' position is that post-closing documents that monitor the financial performance of the target company, particularly documents monitoring the achievement of the assumptions used in valuing the target company, post-closing communications between and among Defendants, board materials, strategic plans, financing plans, cash flow statements, and profit and loss statements are all highly relevant to the issue of whether the value of the target company was depressed when it was acquired and whether a conspiracy between and among the Defendants continues to exist.  Thus, Defendants' obligation to produce post-closing documents extends to the present.

*Id.* at 2.

Defendants rejected Plaintiffs' proposals by letter on March 5, 2009.  Ex. 10, Letter from Tringali to Burke, dated March 5, 2009.  In essence, Defendants claimed that Plaintiffs' proposals concerning the production of non-deal specific documents and the discovery timeframe were unduly

- 9 -

burdensome and overbroad.  However, Defendants provided little explanation on how the proposed

production would be burdensome for *each particular Defendant*, aside from their general claim

contention that the document review would be "massive," encompassing several years.  *Id*. at 2.

Furthermore, Defendants proposed yet another restrictive time period for discovery, encompassing:

"(i) a commencement date beginning at the time a Defendant first considered the potential

acquisition of each LBO, and (ii) for the reasons set forth in my February 17, 2009 letter, a two-

month, post-closing discovery cut-off date for each of the nine LBOs."  *Id*.

Notably, certain individual Defendants, including J.P. Morgan, did not explicitly refuse to

produce the "Overarching Conspiracy" documents sought by Plaintiffs, but agreed to turn over

documents evincing the conspiracy only if, by chance, they come across those documents during the

course of their review of the nine deals.  *See* Ex. 11, Letter from Hemr to Furnald, dated March 19,

2009 letter at 10.  As discussed below, Plaintiffs believe that this position is still inadequate, as all

Defendants have an *affirmative obligation* to search for these conspiracy-related documents and

cannot merely choose to produce them if they serendipitously find them while looking for something

else.

The parties continued to meet and confer by phone, and on March 13, 2009, Plaintiffs

rejected Defendants' proposal as to the discovery time period as being "unnecessarily limiting" and

suggested that Defendants search for responsive documents going back to *January 2003* – the

beginning of the Conspiratorial Era.

> As to the time-frame of discovery concerning the private equity firms
> themselves, as opposed to the target companies, plaintiffs propose that defendants
> conduct their search for documents from *January 1, 2003 to the present*.  We have
> considered defendants' proposal to limit the time-frame of discovery from the
> earliest date a defendant first considered the potential acquisition of each LBO
> through 2 months after the acquisition.  Because this case alleges the conspiracy to
> allocate the market-including the nine deals-began in 2003 and continues through the

present, plaintiffs believe defendants' proposal is unnecessarily limiting and not consistent with defendants obligations under Rule 26.

Ex. 12, Letter from Mitchell to Tringali, dated March 13, 2009.

Defendants, except for Goldman Sachs,[7] characterized Plaintiffs' proposal as "not tenable" and argued that "plaintiffs have refused to agree to *any* reasonable cut-off on either the start or the end date for discovery relating to the nine leveraged buyouts."  Ex. 13, Letter from Tringali to Mitchell, dated March 25, 2009 at 1 (emphasis in original).  Moreover, Defendants incorrectly stated that Plaintiffs had "failed to explain" how "post-closing" documents were relevant – ignoring the multiple phone conversations and meet and confer letters from Plaintiffs explaining the importance of these documents on the issue of valuation.  *See*, *e.g.*, Ex. 9 at 2.

Finally, Defendants seemingly terminated the meet and confer process, stating that their "compromise proposal is no longer on the table" and asserting their intention to unilaterally proceed with discovery pursuant to their own understanding of the Federal Rules and the Court's Order.  Ex. 13 at 3, 4.

Later that day, Plaintiffs responded by letter.  *See* Ex. 17, Letter from Mitchell to Tringali, dated March 25, 2009.  Plaintiffs disagreed that Defendants' position regarding the scope and timing of discovery "adequately discharges [Defendants'] duties to produce relevant documents pursuant to the Federal Rules and this Court's Order."  *Id*.  Furthermore, in light of Defendants' withdrawal of their "compromise proposal." (which had never included any sort of deadline for acceptance),

---

[7]     Goldman Sachs requested to separately meet and confer on these issues.  However, like the other Defendants, Goldman Sachs disagrees with Plaintiffs' position concerning the production of the specified conspiracy documents and the timeframe for discovery.  Accordingly, this motion applies to Goldman Sachs as well.

Plaintiffs confirmed that they had satisfied their meet and confer obligations under the Local Rules. *Id.*

A day later, Defendants curiously claimed that they "cannot agree with your position that Plaintiffs have satisfied their meet and confer obligations." At no time, however, did Defendants make any further proposals to break any of the position impasses. Ex. 14, Letter from Tringali to Mitchell, dated March 26, 2009.

Of course, Defendants do not determine when Plaintiffs have satisfied their meet and confer obligations. Indeed, the meet and confer process – which has spanned many months and encompassed numerous phone conferences, face-to-face meetings, and written correspondence – has clearly been exhausted.[8] Moreover, in light of Defendants' most recent statements, Plaintiffs believe that engaging in any further dialogue on these issues would simply lead to more unproductive delay. Plaintiffs therefore seek the Court's assistance, asking that it clarify its Order and compel the discovery that they believe falls squarely within the Order and Fed. R. Civ. P. 26. As set forth in §II, *supra*, Plaintiffs request guidance on three discrete discovery issues: (i) the time period for discovery; (ii) the production of documents providing "indicia of the Overarching Conspiracy" that do not specifically reference any of the nine deals; and (iii) the production of all documents previously produced to the DOJ as part of its bid-rigging investigation.

## IV.     PLAINTIFFS BELIEVE THAT THE COURT DID NOT INTEND TO UNDULY RESTRICT THE DISCOVERY TIME PERIOD

Plaintiffs first seek to clarify the time period for discovery. Plaintiffs believe that the Court did not intend to impose any undue limits on the timeframe for discovery, as there are no time

---

[8]     All told, the parties have communicated on these issues over ten times, not to mention the numerous discussions Plaintiffs have had with individual Defendants.

constraints in the Order – beyond the period of illegal conduct alleged in the Complaint.  Indeed,

district courts normally construe the timeframe for discovery in antitrust cases very broadly,

allowing Plaintiffs to probe for information concerning Defendants' activities **even before the**

**commencement of the conspiracy**.[9]  *See B-S Steel of Kansas, Inc. v Texas Industries, Inc.*, No. 07-

2410-JAR, 2003 WL 21939019 (D. Kan. 2003) (citing *Kellam Energy, Inc. v. Duncan*, 616 F. Supp.

215, 218 (D. Del. 1985)) (holding that "the temporal scope of discovery in antitrust cases should not

be confined to the limitations period of the antitrust statutes or the damage period, and plaintiff is

ordinarily permitted to discover Defendant's activities for a "'reasonable period' of time antedating

the earliest possible date of the actionable wrong'"").  The policy of allowing an expansive

discovery timeframe is necessary in antitrust cases because "broad discovery may be needed to

uncover evidence of invidious design, pattern, or intent." *Id.*  This is particularly true here, given the

allegations of a longstanding Overarching Conspiracy, which as this Court has recognized,

encompasses Defendants' collusive activities going back to *2003*.  Order at 2-3.

The Court's Order already limits much of any purported burden claimed by Defendants.

However, Defendants seek to condense discovery to a period shortly before **the *commencement*** of

each particular deal through the ***closing*** of the deal.  As set forth in Defendants' February 17, 2009

---

[9]     Discovery should be construed very broadly in antitrust actions, where the allegations typically concern covert conspiracies, and evidence is often well-concealed.  *See In re Intel Corp. Microprocessor Antitrust Litig.*, No. 05-1717-JJF, CIVA 05-441-JJF, CIVA 05-485-JJF, 2007 WL 137152, at *5 (D. Del. Jan. 12, 2007) ("The broad scope of discovery permitted by Rule 26 has been held to be particularly appropriate in antitrust cases."); *In re Auto. Refinishing Paint Antitrust Litig.*, 229 F.R.D. 482, 493 (E.D. Pa. 2005) ("[C]ourts have recognized that 'a broad scope of discovery is particularly appropriate in antitrust litigation because, for example, relevant business documents pertaining to the antitrust conspiracy may not exist and covert behavior may have to be proven through less direct means.'"); *New York v. Yonkers Contracting Co., Inc.*, No. 90 Civ. 3779 (CES), 1991 WL 167981, at *2 (S.D.N.Y. Aug. 16, 1991) ("Discovery in antitrust cases is extremely broad and not limited to the allegations of the pleadings.").

letter, Defendants would abridge discovery:  (i) on the front-end, to documents two months before the submission of the first bid for each of the nine deals;  and (2) on the back-end, to documents two months after the close of each of the deals.  *Id.* at 3, 4.  And, significantly, Defendants seek to further curtail discovery by excluding from their production all "***post-acquisition operational documents***," such as board minutes, board packs, business plans, strategic plans and financial reports.  *Id.* at 4. But, as indicated in Defendants' March 25, 2009 letter, Defendants have indicated that even this narrow discovery proposal is "no longer on the table."  *See* Ex. 13 at 3.

The discovery limitations sought by Defendants are inconsistent with the Court's Order and will needlessly foreclose the production of critical evidence needed for the prosecution of this case. The Court has already recognized and sustained Plaintiffs' allegations concerning the Overarching Conspiracy, which spans from ***2003*** and ***2008***.  Order at 2.  Throughout this Conspiratorial Era, the PE Firms, along with other co-conspirators, formed bidding clubs to rig bidding and fix the prices in LBOs.  Indeed, as alleged in the Complaint, the PE firms orchestrated "competing" bids, through which members of the ***conspiracy*** submitted inferior sham bids with no intention of actually becoming the prevailing bidder, but merely to provide cover and create a false sense of competition. Complaint, ¶42.  The PE firms who were not members of the winning bid club: (i) were cut into deals as advisors, through which they garnered lucrative fees; (ii) were given minority equity stakes in the deal; and/or (iii) secured an agreement that they would be included in the next LBO bidding club.  Complaint, ¶47.

Given these core allegations, which describe an ongoing conspiracy to control LBOs, it makes little sense to limit discovery to a relatively short period of time ***before*** and ***after*** each of the nine deals.  Defendants' proposed timeframe, while perhaps providing a separate snapshot of each of the nine deals, does not reasonably allow Plaintiffs to capture the overarching evidence of ***linkage***

between those deals.  In order for Plaintiffs to obtain the necessary "indicia of the Overarching Conspiracy" contemplated by the Court, the discovery timeframe should be construed consistent with the allegations of the Complaint and reflect the Conspiratorial Era.

To be clear, Plaintiffs do not (nor have they suggested during their many Discussions with Defendants) suggest a boundless, open-ended timeframe for discovery.  Plaintiffs propose that Defendants conduct their document search and production from January 1, 2003 to the present, which is intended to capture a broad range of responsive documents generated during the Conspiratorial Era.  *See* Ex. 12.  This timeframe is reasonable and appropriate because it is intended to cover the time period when the conspiratorial conduct and alleged harm began.  Indeed, Plaintiffs could have sought, and would normally be entitled to, documents that ***pre-date*** the Conspiratorial Era, but do not make that request here.  *See B-S Steel,* at *3 (allowing discovery into Defendant's activities "which antedat[e] the earliest possible date of the actionable wrong").  Thus, any claim of burden by Defendants is mitigated.  And, importantly, while Defendants generally claim that producing documents through the Conspiratorial Era would require a "massive search," they fail to explain with any particularity why such a search would be unduly burdensome for each particular Defendant.  Ex. 10 at 2.  Plaintiffs' proposed discovery timeframe is reasonable and is consistent with the Conspiratorial Era.

Moreover, with respect to the ***back-end*** of discovery, Defendants attempt to further narrow their production by refusing to provide any "post-acquisition operational documents" – even if such documents fall within Defendants' proposed two-month post-closing period.  Ex. 8 at 4.  The "business operations" documents sought by Plaintiffs, which include, *inter alia*, board documents, strategic planning materials and financial reports (*e.g.*, audited financial statements) for each of the target companies, are highly probative to the central issue of whether the PE Firms eliminated

competition for LBO deals and manipulated the share prices of the target companies.  Indeed, these business operations documents will directly bear on the assumptions and inputs that Defendants used in the valuations of the LBOs, and the reasonableness and accuracy of such valuations.  *See* Ex. 1, RFP Nos. 16-18.

> Plaintiffs clearly articulated this concern to Defendants during the meet and confer process:
>
> Plaintiffs' position is that post-closing documents that monitor the financial performance of the target company, particularly documents monitoring the achievement of the assumptions used in valuing the target company, post-closing communications between and among Defendants, board materials, strategic plans, financial plans, cash flow statements, and profit and loss statements are all highly relevant to the issue of whether the value of the target company was depressed when it was acquired and whether a conspiracy between and among the Defendants continues to exists.

Ex. 9 at 2.  There is no question that these post-acquisitional operational documents are reasonably calculated to lead to the discovery of admissible evidence.  Defendants are obligated to produce these documents and all other responsive materials generated during the Conspiratorial Era, pursuant to the Court's Order.

## V.   PLAINTIFFS BELIEVE THAT THE COURT INTENDED TO PERMIT DISCOVERY INTO INFORMATION PROVIDING "INDICIA OF THE OVERARCHING CONSPIRACY"

Plaintiffs also believe that the Court's Order contemplates the discovery of materials that may not specifically refer to one of the nine deals, but provides "indicia of the Overarching Conspiracy."  *See* Order at 12.  Such discovery is essential because this action is based upon allegations of broad and ongoing collusion between the PE Firms to allocate the market for LBOs.  It is imperative then, as a matter of proof, that Plaintiffs obtain conspiracy-related documents – regardless of whether they are tied to a specific deal.  There is a substantial body of non-deal specific information that is probative to the existence of the Overarching Conspiracy, which Plaintiffs believe that the Court did not intend to exclude, including for example:

- Presentations and/or seminar or industry materials demonstrating collaboration or interaction between the PE Firms.  As noted in the Complaint, for example, David Bonderman, founder of TPG Capital, L.P., stated during an industry speech on March 22, 2006 that, "[t]here's less competition for the biggest deals."  Also, during the speech, Mr. Bonderman displayed a graphic, admitting that "[c]onsortia often limits bidding."  Complaint, ¶3.

- E-mails and other communications between senior members of the PE Firms reflecting an agreement to allocate deals, rig bids, or otherwise suggesting some form of *quid pro quo*, regardless of whether a specific deal is mentioned, identified or contemplated.

- Materials which tend to show a history or pattern of meetings or collaboration between senior members of the PE Firms.  Such information could readily be extracted from Defendants' business software or programs, such as Microsoft Outlook.

- Materials which reflect the PE Firms' involvement in the Private Equity Counsel or other organizations, associations or forums through which they may interact for a common purpose.

These documents comprise the type of evidence that a defendant normally would be obligated to produce in an antitrust action where a conspiracy is alleged.  "Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct.  ***Such conduct is covert and must be gleaned from records, conduct, and business relationships***."  *See Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996).  Thus, discovery of the foregoing materials is necessary given the context of this case, which focuses on the conduct of large "club deals" and the interconnectedness of the PE Firms and the co-conspirator investment banks.  Patterns of interconnectedness and joint bidding among the co-conspirators is part of the factual record that Plaintiffs will construct to demonstrate the existence of the conspiracy.  The requested documents provide pieces to this puzzle.

Discovery of these core conspiracy documents is also appropriate, due to the particular subtleties and complexities of the club deal LBOs at issue here.  As described by Andrew Ross Sorkin, the noted chief mergers and acquisitions reporter for the New York Times and editor of the

- 17 -

Times' DealBook blog, the players involved in private equity consortia operate in a highly strategic and covert manner when conducting club deals:

> While no buyout executives will say on the record that the purpose of forming a team is to keep the asking price from going too high, privately, most will concede that reducing the final takeover price is sometimes the result. "You're not going to get me to say that aloud, but let's just say that you're not wrong," said one legendary private equity investor who then immediately added, "Please don't quote me by name."

See Ex. 18, Andrew Ross Sorkin, *Dealbook: One Word Nobody Dares Speak*, N.Y. Times, October 16, 2005.  Complaint,¶2.

Further detailing the secretive, veiled nature of club deals, Sorkin quotes a private equity executive who suggests that these deals are given the false appearance of competitiveness:  "'***As long as two girls show up to the dance, there's enough competition***.'"  *Id.*  Plaintiffs therefore expect that the evidence of illegal agreement will largely depend on showing the patterns of collaboration during the bidding process – highlighting the importance of the production of "ordinary" information such as communications between the PE Firms and other evidence of their interaction.

This connection between the PE Firms is not the product of mere innuendo or speculation.[10] As stated in the Complaint, private equity participants, including certain of the Defendants, have admitted engaging in collectivist tactics to diminish the takeover price of LBOs.  Complaint,¶3.  For instance, David Bonderman, the founder of TPG Capital acknowledged during an industry speech

---

[10]     Indeed, publicly-available court documents show that the PE Firms regularly meet to discuss club deal LBOs.  Ex. 15, Affidavit of Aaron J. Stone in Support of Motion to Quash Deposition Subpoenas, dated February 27, 2008,¶¶4-6 ; Ex. 16, Declaration of Non-Party James G. Coulter in Support of Motion to Quash Subpoena and for Related Relief, ¶¶2-4.  Plaintiffs believe there were many other meetings, attended by the senior management of the PE Firms, which are probative as indicia of the Overarching Conspiracy – whether or not they specifically pertain to any of the nine deals.

that "[t]here's less competition for the biggest deals."  Complaint, ¶3.  And, during the speech, Mr. Bonderman displayed a graphic admitting that "consortia often limits bidding."  *Id*.  The Bonderman speech and related materials are precisely the type of non-deal specific evidence that provides indicia of the Overarching Conspiracy, which Plaintiffs seek.

The fact that the documents sought by Plaintiffs may not specifically refer to one of the nine deals should not foreclose their production.  Indeed, Plaintiffs have alleged that the collusive behavior occurred **before**, **during** and **continued after** any specific deal.  *See* Complaint, ¶¶41-47, 78-80.  And, as noted, due to the covert nature of club deal LBOs, the evidence sought by Plaintiffs will likely be inconspicuous and not obviously linked to any particular deal – especially when Defendants knew what they were doing was in fact wrong and illegal.  *See* Ex. 18 (when asked whether bidding clubs diminish takeover price, one prominent private equity investor admitted, "[y]ou're not going to get me to say that aloud, but let's say you're not wrong.").  Accordingly, if Defendants are required to search only for documents specifically concerning the nine deals, critical information that is "indicia of the Overarching Conspiracy" will be overlooked and will not be produced.  As noted, certain Defendants have implicitly acknowledged the relevance of these documents, yet have taken the untenable position that they will turn over conspiracy-related documents only if, by chance, they stumble across such materials during the course of their review.  *See* Ex. 11 at 9.  This is simply not good enough under the Court's Order and Fed. R. Civ. P. 26.  Plaintiffs therefore request that the Court order the production of these core, conspiracy documents – regardless of whether they refer to any particular deal.

## VI.   DEFENDANTS' PRODUCTION TO THE DOJ SHOULD BE PRODUCED TO PLAINTIFFS

Finally, Plaintiffs seek clarification as to Defendants' obligations concerning the discovery of documents previously produced to the DOJ as part of its bid-rigging investigation.  *See* Complaint,

¶¶99-101.  The DOJ investigation is consistent with the core allegations in the Complaint, as the investigation focuses on whether bidding clubs – comprised of the PE Firms, co-conspirator investment banks, and in a number of cases, the senior management of certain target companies – communicated about the prices and value of bids in order to reach secret agreements and keep the target companies' prices low.  Complaint, ¶100.  Pursuant to the Scheduling Order, entered ***before*** the Court decided the motion to dismiss, only two Defendants have produced a small subset of the DOJ documents, limited to the nine deals specified in the Complaint.

Plaintiffs believe that the circumstances of the litigation have since changed to warrant the discovery of ***all*** of the previously produced DOJ documents.  Indeed, when it sustained the allegations of the Complaint and denied the motion to dismiss, the Court affirmed the viability of Plaintiffs' conspiracy claims.  Thus, for the very same reasons discussed above, Defendants have an obligation to produce all of the DOJ documents, as such documents are relevant as "indicia of the Overarching Conspiracy."  Order at 12.  Again, such documents are likely to show agreement or interconnectivity between Defendants to allocate the market for LBOs – regardless if such documents refer to any of the nine specified deals.  Moreover, Defendants cannot assert any "burden" claim, as the requested documents have already been produced to the DOJ and therefore can be easily made available to Plaintiffs.

## VII.   CONCLUSION

For all of the foregoing reasons, the Court should grant this motion for clarification and compel the documents sought by Plaintiffs.

## CERTIFICATION PURSUANT TO LOCAL RULE 37.1(B)

I, David W. Mitchell, co-counsel for Plaintiffs, hereby certify that this Motion and related submissions comply with Local Rules 7.1(a)(2) and 37.1(b).

s/ David W. Mitchell
DAVID W. MITCHELL

DATED:  May 1, 2009                              Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (Of Counsel)
SUSAN G. TAYLOR (admitted *pro hac vice*)
DAVID W. MITCHELL (admitted *pro hac vice*)
PHONG L. TRAN (admitted *pro hac vice*)

s/ David W. Mitchell
DAVID W. MITCHELL

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBINS, KAPLAN, MILLER &
  CIRESI L.L.P
LISA A. FURNALD (BBO #631059)800 Boylston
Street, 25th Floor
Boston, MA  02199
Telephone,  617/267-2300
617/267-8288 (fax)

ROBINS, KAPLAN, MILLER &
  CIRESI L.L.P
K. CRAIG WILDFANG (admitted *pro hac vice*)
THOMAS B. HATCH (admitted *pro hac vice*)
STACEY P. SLAUGHTER (admitted *pro hac vice*)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
Telephone:  612/349-8500
612/339-4181 (fax)

SCOTT + SCOTT LLP
DAVID R. SCOTT (admitted *pro hac vice*)
108 Norwich Avenue
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

SCOTT + SCOTT LLP
CHRISTOPHER M. BURKE (admitted *pro hac vice*)
ARTHUR L. SHINGLER III (admitted *pro hac vice*)
HAL CUNNIGHAM (admitted *pro hac vice*)
KRISTEN M. ANDERSON (admitted *pro hac vice*)
600 B Street, Suite 1500
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)

LANDSKRONER • GRIECO • MADDEN, LTD.
JACK LANDSKRONER (admitted *pro hac vice*)
JACK GRIECO (admitted *pro hac vice*)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (admitted *pro hac vice*)
GEORGE AGUILAR (admitted *pro hac vice*)
610 West Ash Street, Suite 1800
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
RICHARD A. LOCKRIDGE (admitted *pro hac vice*)
CHARLES N. NAUEN (admitted *pro hac vice*)
KAREN HANSON RIEBEL (admitted *pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401-2159
Telephone:  612/339-6900
612/339-0981 (fax)

HULETT HARPER STEWART, LLP
DENNIS STEWART (Of Counsel)
525 B Street, Suite 760
San Diego, CA  92101
Telephone:  619/338-1133
619/338-1139 (fax)

BRANSTETTER, STRANCH
   & JENNINGS, PLLC
J. GERARD STRANCH IV (admitted *pro hac vice*)
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone:  615/254-8801
615/255-5419 (fax)

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY (Of Counsel)
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone:  212/682-1818
212/682-1892 (fax)

REINHARDT WENDORF & BLANCHFIELD
MARK REINHARDT (admitted *pro hac vice*)
2201 Atlantic Avenue
Sullivan's Island, SC  29482
Telephone:  651/287-2100

REINHARDT WENDORF & BLANCHFIELD
ROBERTA A. YARD (admitted *pro hac vice*)
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Telephone:  651/287-2100
651/287-2103 (fax)

FARUQI & FARUQI, LLP
NADEEM FARUQI (Of Counsel)
369 Lexington Avenue, 10th Floor
New York, NY  10017-6531
Telephone:  212/983-9330
212/983-9331 (fax)

SHEPHERD FINKELMAN MILLER
   & SHAH, LLP
JAYNE A. GOLDSTEIN (admitted *pro hac vice*)
1640 Town Center Circle, Suite 216
Weston, FL  33326
Telephone:  954/515-0123
954/515-0124 (fax)

Attorneys for Plaintiffs

Document1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 1, 2009.

s/ David W. Mitchell

DAVID W. MITCHELL

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  davidm@csgrr.com

# Mailing Information for a Case 1:07-cv-12388-EFH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George C. Aguilar**
  notice@robbinsumeda.com

- **Katherine A. Ambrogi**
  katherine.ambrogi@weil.com

- **Carrie M. Anderson**
  carrie.anderson@weil.com

- **Kristen M. Anderson**
  kanderson@scott-scott.com,tturner@scott-scott.com,efile@scott-scott.com

- **Kevin J. Arquit**
  karquit@stblaw.com

- **William J. Baer**
  William.Baer@aporter.com

- **Elisabeth A. Bowman**
  LisaB@csgrr.com

- **W. Joseph Bruckner**
  wjbruckner@locklaw.com

- **Christopher M. Burke**
  cburke@scott-scott.com

- **James C. Burling**
  james.burling@wilmerhale.com

- **James R. Carroll**
  jcarroll@skadden.com,tholden@skadden.com

- **Courtney Amber Clark**
  caclark@sherin.com

- **Wayne Dale Collins**
  wcollins@shearman.com,jessica.delbaum@shearman.com

- **Kenneth Conboy**
  Kenneth.Conboy@lw.com

- **Hal Cunningham**
  hcunningham@scott-scott.com

- **John D. Donovan , Jr**
  jdonovan@ropesgray.com,SamplePlead@ropesgray.com,courtalert@ropesgray.com

- **Dane A. Drobny**
  ddrobny@winston.com

- **James C. Egan , Jr**
  jim.egan@weil.com

- **Jerome S. Fortinsky**
  jfortinsky@shearman.com

- **John A. Freedman**
  John_Freedman@aporter.com,Sarah_Friedman@aporter.com

- **Sarah A. Friedman**
  Sarah.Friedman@aporter.com

- **Thomas C. Frongillo**
  thomas.frongillo@weil.com

- **Lisa A. Furnald**
  lafurnald@rkmc.com

- **Paul C. Gluckow**
  pgluckow@stblaw.com

- **H. Lee Godfrey**
  lgodfrey@susmangodfrey.com

- **Jayne A. Goldstein**
  jgoldstein@sfmslaw.com

- **Paul Grieco**
  Paul@lgmlegal.com,Carolyn@lgmlegal.com

- **Julia M. Guaragna**
  guaragnaj@sullcrom.com

- **Peter S. Guryan**
  peter.guryan@friedfrank.com

- **John D. Hanify**
  jdh@hanify.com,adc@hanify.com

- **Erica W. Harris**
  eharris@susmangodfrey.com,kepps@susmangodfrey.com

- **Thomas B. Hatch**
  tbhatch@rkmc.com

- **Kurt W. Hemr**
  khemr@skadden.com,tholden@skadden.com

- **Eric S. Hochstadt**
  eric.hochstadt@weil.com

- **Tyler W. Hudson**
  thudson@wcllp.com

- **Helene D. Jaffe**
  helene.jaffe@weil.com

- **Ryan A. Kane**
  rkane@stblaw.com

- **Jonathan L. Kotlier**
  jkotlier@nutter.com,kpiccirilli@nutter.com,epleadings@nutter.com

- **Kenneth M. Kramer**
  kkramer@shearman.com

- **Jack Landskroner**
  jack@lgmlegal.com,debra@landskronerlaw.com

- **Meredith M. Leary**
  mleary@mintz.com,Docketing@mintz.com

- **Franklin R. Liss**
  Frank.Liss@aporter.com

- **Richard A. Lockridge**
  ralockridge@locklaw.com

- **Michael Thomas Marcucci**
  mtm@hanify.com

- **David E. Marder**
  DEMARDER@RKMC.com,lhdimillio@rkmc.com

- **James W. Matthews**
  jwmatthews@sherin.com,jrossi@sherin.com

- **Michael P. Mayer**
  mmayer@winston.com

- **Austin F. McCullough**
  mcculllougha@sullcrom.com

- **Kevin M. McGinty**
  kmcginty@mintz.com,Docketing@mintz.com

- **Hillary C. Mintz**
  hmintz@stblaw.com

- **David W. Mitchell**
  davidm@csgrr.com,christinas@csgrr.com

- **Robert J. Muldoon , Jr**
  rjmuldoon@sherin.com

- **James H. Mutchnik**
  jmutchnik@kirkland.com,hfisher@kirkland.com

- **Charles N. Nauen**
  cnnauen@locklaw.com,smgrossheim@locklaw.com

- **Roger Netzer**
  rnetzer@willkie.com

- **Steven A. Newborn**
  steven.newborn@weil.com

- **Bernard A, Nigro , Jr**
  bnigro@willkie.com,maodc-dcd@willkie.com

- **Walter W. Noss**
  wnoss@scott-scott.com,lmcalister@scott-scott.com,efile@scott-scott.com

- **R. Hewitt Pate**
  hpate@hunton.com

- **Wesley R. Powell**
  wpowell@hunton.com

- **Craig S. Primis**
  cprimis@kirkland.com

- **Wyley S. Proctor**
  wyley.proctor@wilmerhale.com

- **Mark Reinhardt**
  m.reinhardt@rwblawfirm.com

- **Karen H. Riebel**
  khriebel@locklaw.com

- **Brian J. Robbins**
  notice@robbinsumeda.com

- **Ian D. Roffman**
  iroffman@nutter.com,kcannizzaro@nutter.com,epleadings@nutter.com,cfeldman@nutter.com

- **William H. Rooney**
  wrooney@willkie.com

- **Abby F. Rudzin**
  arudzin@omm.com

- **Mary Kathryn Sammons**
  ksammons@susmangodfrey.com,jingram@susmangodfrey.com

- **Raymond M. Sarola**
  rsarola@willkie.com

- **Fiona Schaeffer**
  fiona.schaeffer@weil.com

- **John E. Scribner**
  john.scribner@weil.com

- **Daniel M. Segal**
  dan.segal@shearman.com,alexandra.kourides@shearman.com,robert.bosslet@shearman.com

- **William Sherman**
  William.Sherman@lw.com

- **Arthur L. Shingler , III**
  ashingler@scott-scott.com

- **Ryan Shores**
  rshores@hunton.com,rloftin@hunton.com,csmoot@hunton.com

- **Ian Simmons**
  isimmons@omm.com

- **Stacey Slaughter**
  spslaughter@rkmc.com,dariehl@rkmc.com

- **Samantha A. Smith**
  SSmith@csgrr.com

- **Reynelle Brown Staley**
  rstaley@stblaw.com,dshogren@stblaw.com

- **J. Gerard Stranch , IV**
  gstranch@branstetterlaw.com,tfaulkner@branstetterlaw.com,tharris@branstetterlaw.com,cbatey@branstetterlaw.com

- **Arun S. Subramanian**
  asubramanian@susmangodfrey.com

- **Harry P. Susman**
  hsusman@susmangodfrey.com

- **Susan G. Taylor**
  SusanT@csgrr.com,e_file_sd@csgrr.com

- **Peter C. Thomas**
  pthomas@stblaw.com

- **Steven J. Torres**
  storres@mintz.com,Docketing@mintz.com

- **Phong L. Tran**
  ptran@csgrr.com

- **Joseph F. Tringali**
  jtringali@stblaw.com

- **Claire L.M. Webb**
  claire.webb@weil.com

- **Alan J. Weinschel**
  alan.weinschel@weil.com

- **Stephanie G. Wheeler**
  wheelers@sullcrom.com

- **Jeffrey L. White**
  jeff.white@weil.com

- **K. Craig Wildfang**
  kcwildfang@rkmc.com,smlocsin@rkmc.com

- **Michael F. Williams**
  mwilliams@kirkland.com

- **Marcellus Williamson**
  Marc.Williamson@lw.com,amy.gibson@lw.com,jennifer.giordano@lw.com

- **Roberta A. Yard**
  r.yard@rwblawfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Gandolfo V. Diblasi**
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

**Douglas H. Flaum**
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

**Richard Parker**
O'Melveny & Myers, LLP
1625 Eye Street N.W.
Washington, DC 20006-4001

**Jonathan Rosenberg**
O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, NY 10036

**David R. Scott**
Scott & Scott LLP
P.O. Box 192
108 Norwich Avenue
Colchester, CT 06415

**Thomas D. Yannucci**
Kirkland & Ellis
655 Fifteenth St., N.W.
Suite 1200
Washington, DC 20005

**Michael B. deLeeuw**
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004