UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated, | ) Lead Case No. 1:07-cv-12388-EFH |
| | ) **(Consolidated)** |
| | ) |
| Plaintiffs, | ) CLASS ACTION |
| | ) |
| vs. | ) |
| | ) |
| BAIN CAPITAL PARTNERS, LLC, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR ENTRY OF ORDER
GOVERNING DISCOVERY FORMAT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     Introduction ...................................................................................................ii

II.    Statement of Facts ......................................................................... 2

III.   Legal Standard............................................................................ 6

IV.   Argument ................................................................................... 7

       A.    Defendants Must Produce All Electronic Documents As They Are Kept in The Usual Course of Business, Including All of the Requested Metadata in Electronic Documents and Spreadsheets Produced in Native Format ............................................................. 7

             1.    Spreadsheets Should Be Produced in Native Format Because Modified Documents Are Unusable and Contrary to the Federal Rules ............................................................. 8

             2.    Defendants Should Produce All of the Requested Metadata .......... 10

       B.    Global Agreements Reached in the Meet-And-Confer Process Should Be Enforced...................................................................... 11

             1.    Scanning and OCR of Paper Documents ........................................ 12

             2.    Privilege Logs Produced in Native (Excel) Format ........................ 15

       C.    The Parties Should Bear Their Own Cost of Production of Electronic Documents.................................................................................... 15

             1.    Cost-Shifting Is Inappropriate Where, As Here, All Documents Are Accessible ............................................................. 16

             2.    Defendants Identify No Category of Documents Where Cost-Shifting is Appropriate ................................................................ 18

V.    Conclusion ........................................................................................ 19

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**CASES**

*Bolton v. Sprint/United Mgmt. Co.*,
  2007 WL 756644 (D. Kan. Mar. 8, 2007) .................................................................. 9

*Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*,
  2009 WL 546429 (M.D. Fla. Mar. 4, 2009) ........................................................ 9, 10

*Cason-Merenda v. Detroit Med. Ctr.*,
  2008 WL 2714239 (E.D. Mich. July 7, 2008) ......................................................... 17

*Fleischman v. Albany Medical Center*,
  No. 06-CV-765 (TJM/DRH), slip op. at 1 (N.D.N.Y. June 12, 2007) ................... 17

*In re Bridgestone/Firestone, Inc.*,
  129 F. Supp. 2d 1207 (S.D. Ind. 2001) .................................................................. 13

*In re Bristol-Myers Squibb Sec. Litig.*,
  205 F.R. D. 437 (D.N.J. 2002) ......................................................................... 14, 19

*IO Group, Inc. v. Veoh Networks*,
  2007 WL 1113800 (N.D. Cal. Apr. 13, 2007) ......................................................... 17

*Mikron Indus. v. Hurd Windows & Doors, Inc.*,
  2008 WL 1805727 (W.D. Wash. Apr. 21, 2008) ..................................................... 17

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978) ......................................................................................... 16, 18

*Peskof v. Faber*,
  240 F.R.D. 26 (D.D.C. 2007) .................................................................................. 17

*Proctor & Gamble Co. v. S.C. Johnson & Son, Inc.*,
  2009 WL 440543 (E.D. Tex. Feb 19, 2009) ................................................. 13, 14, 19

*Ryan v. Gifford*,
  2007 WL 4259557 (Del. Ch. Nov. 30, 2007) ............................................................ 9

*W.E. Aubuchon Co., Inc. v. BeneFirst, LLC*,
  245 F.R.D. 38 (D. Mass. 2007) ............................................................................... 17

*Williams v. Sprint/United Mgmt Co.*,
  230 F.R.D. 640 (D. Kan. 2005) ................................................................................. 9

ii

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*,
    309 F. Supp. 2d 459 (S.D.N.Y. 2003) ................................................................. 18

*Zubulake v. U.B.S. Warburg LLC*,
    217 F.R.D. 309 (S.D.N.Y. 2003) .................................................................. 16, 18

*Zubulake v. UBS Warburg*,
    216 F.R.D. 280 (S.D.N.Y. 2003) ......................................................................... 16

## RULES

LR, D. MASS 26.1(a) ............................................................................................. 6

FED. R. CIV. P. 26(b)(2)(B) ................................................................................. 16

Fed. R. Civ. P. 26(b)(2)(C) ................................................................................. 18

FED. R. CIV. P. 26(f)(2) .......................................................................................... 6

Fed. R. Civ. P. 26(f)(3) ......................................................................................... 6

Fed. R. Civ. P. 34(b) ................................................................................. 7, 9, 10

FED. R. CIV. P. 34(b)(2)(E) ............................................................................... 7, 8

Federal Rules of Civil Procedure 16(b) ............................................................... 6

Federal Rules of Civil Procedure 26(f) ................................................................ 6

## OTHER AUTHORITIES

MANUAL FOR COMPLEX LITIGATION (FOURTH), § 11.444 (2004) .................................. 13

*The Sedona Principles*, Principle 13 (2007) ................................................... 17, 18

# I.    INTRODUCTION

Plaintiffs respectfully seek the Court's guidance on the production format for Defendants' documents in this case. This is an antitrust action against eleven of the largest private equity firms and investment banks with respect to the leveraged buyouts of at least nine companies.[1] Ordinarily, parties should be able to work out their discovery issues without involving the Court, particularly in complex litigation such as this. Unfortunately, and despite Plaintiffs' best efforts, the parties have reached an impasse, requiring the Court's determination of how millions of documents should be produced.

Plaintiffs initiated discussions with Defendants about the format for document production prior to the start of fact discovery. But after nearly three months of meet-and-confer communications, Defendants have reversed positions on agreements previously reached, and they are now attempting to derail global agreement among all parties, instead seeking multilateral negotiations that would ultimately require individual negotiations on a defendant-by-defendant basis — all creating a balkanization of discovery negotiations and protocols. Defendants also insist upon shifting the cost of their own discovery obligations to Plaintiffs, according to a scheme that is without precedent or legal support. Meanwhile, Plaintiffs have received relatively few documents. This is particularly problematic because Defendants agreed to *complete* their document production by June 30, 2009. (Joint Discovery Plan, Dkt # 169 at 2). Moreover, fact discovery for the first phase of this matter is currently scheduled to conclude on January 15, 2010. (Joint Discovery Plan, Dkt

---

[1] Plaintiffs' Third Amended Complaint ("Complaint") targets defendants' collusion on the very largest LBOs.

# 169 at 2.) Simply put, Defendants should not be permitted to delay their document production any further by interposing at this late hour varying positions on the format of document production.

In order to expedite the production of millions of documents in a timely, efficient, and cost-effective manner, Plaintiffs seek an order to govern the production of documents with respect to each Defendant as follows:

1.    Defendants Must Produce All Electronic Documents As They Are Kept in The Usual Course of Business, Including All of the Requested Metadata in Electronic Documents and Spreadsheets Produced in Native Format;

2.    Global Agreements Reached in the Meet-and-Confer Process Should Be Enforced; and

3.    The Parties Should Bear Their Own Cost of Production of Electronic Documents.

Plaintiffs have submitted as Exhibit 1 to Plaintiffs' Motion a [Proposed] Order Governing Discovery Format consistent with the relief requested herein.

## II.    STATEMENT OF FACTS

On February 6, 2009, Plaintiffs provided Defendants with a detailed, eight-page draft Discovery Format Agreement.[2] Plaintiffs' proposed agreement anticipated potential production difficulties, used industry best practices, and provided detailed guidance to the vendors who would ultimately process the electronically stored information ("ESI") and paper documents.[3] On February 10, 2009, the parties participated in an in-person meet-and-confer. Although the purpose of the meet-and-confer was to "reach agreement on the scope and *format of discovery* in the first phase of

---

[2] Anderson Message 2/6/2009, Ex. A, attaching Plaintiffs' First Discovery Format Agreement, Ex. B. (Unless otherwise stated, the exhibits referred to in this Memorandum are attached to the Declaration of Lisa Furnald in Support of Plaintiffs' Motion for Entry of Order Governing Discovery Format.)

[3] Affidavit of Vivian Enck ("Enck Aff.") ¶¶ 5 and 10; *see* Anderson Message 2/6/2009, Ex. A.

2

discovery,"[4] Defendants were unprepared to discuss any issues concerning discovery format. Instead, Defendants stated that they would appoint a representative group to negotiate on behalf of all Defendants.[5] On February 27, 2009, Defendants submitted a counter-proposal to Plaintiffs' draft Discovery Format Agreement.[6]

On March 5, 2009, the parties participated in the first meet-and-confer call to address the discovery format. During the call, the parties reached several agreements.[7] Although Defendants refused to discuss any portion of Plaintiffs' proposed Discovery Format Agreement, Defendants did promise that — after that meet-and-confer call — they would review and be prepared to respond to the portions of Plaintiffs' proposal that had not been discussed.[8] Defendants also sought to shift some of the cost of their production to Plaintiffs, but Defendants provided no authority for that position. Plaintiffs responded that Defendants' position regarding accessible data is contrary to nearly unanimous authority and asked Defendants for any authority in support of cost-shifting. Defendants provided no citation or other authority.

Two weeks later, on March 18, 2009, the parties conducted a second telephonic meet-and-confer. During that call, the parties reached several additional agreements.[9] But Defendants — as a group — refused to accept certain Plaintiffs' proposals because some Defendant(s) disagreed with

---

[4] Tringali Letter 2/17/2009, Ex. C at 2 (emphasis added).

[5] Tringali Letter 2/17/2009, Ex. C at 6 ("Defendants agree to task a team to address plaintiffs' proposal . . . .").

[6] Tringali Letter 2/27/2009, Ex. D at 3.

[7] Riehl Letter 3/6/2009, Ex. E at 1-2 (outlining agreements reached regarding scanning of paper documents, production of electronic documents, and de-duplication.)

[8] Riehl Letter 3/6/2009, Ex. E at 5-6.

[9] Riehl Letter 3/24/2009, Ex. F at 1-2, 4-6 (outlining additional agreements reached regarding paper documents, as well as multi-page OCR of paper documents).

those particular provisions.[10] Yet, Defendants refused to identify which individual Defendant(s) did not agree to particular provisions, instead promising to identify those Defendant(s) later.[11]

Defendants again raised the issue of cost-shifting, giving the names (but not citations) of three cases they alleged supported cost-shifting. Again, Defendants spoke only of global cost-shifting, and again Plaintiffs asked for citations to any authority that would support Defendants' position, since it is contrary to the overwhelming authority. On information and belief, those cases all involved voluntary, stipulated cost-sharing agreements, not court orders.

At that second meet-and-confer, Defendants again did not come prepared to discuss the provisions of Plaintiffs' draft Document Format Agreement that Defendants had earlier promised to consider — provisions that Defendants had received six weeks earlier.[12] Defendants again promised to develop and provide responses to all of those yet-undiscussed proposals.[13]

On April 3, 2009, almost three weeks after the second meet-and-confer, Defendants finally provided Plaintiffs with some response.[14] But Defendants did not provide the information they had promised: they did not identify the holdout individual defendants, and they did not object or otherwise respond to Plaintiffs' outstanding proposals.[15] Instead, Defendants cut off discussions, citing their still-unsupported demand that Plaintiffs engage in cost-shifting.[16] Further, Defendants

---

[10] Riehl Letter 3/24/2009, Ex. F at 1, 4-5, 6.

[11] Riehl Letter 3/24/2009, Ex. F at 1, 4-5, 6.

[12] Riehl Letter 3/24/2009, Ex. F at 6.

[13] Riehl Letter 3/24/2009, Ex. F at 6.

[14] Sammons Letter 4/3/2009, Ex. J; DiBlasi Letter 4/3/2009, Ex. G.

[15] *See* Sammons Letter 4/3/2009, Ex. J; DiBlasi Letter 4/3/2009, Ex. G.

[16] Sammons Letter 4/3/2009, Ex. H at 1 ("[W]e do not believe it is productive to respond to [alleged inaccuracies in Plaintiff's March 24 letter] or to discuss the other outstanding issues regarding the discovery format protocol"); DiBlasi Letter 4/3/2009, Ex. G at 5-6.

split the Defendant Group into two distinct groups: (1) Goldman Sachs and (2) Non-Goldman-Sachs Defendants. In their letter, the Non-Goldman-Sachs Defendants identified — for the first time — the particular categories of documents where they believed cost-shifting was appropriate.[17] In contrast, Goldman Sachs did not identify specific categories, but instead insisted on cost-shifting in general.[18]

On April 10, 2009, Plaintiffs responded to Defendants' April 3 letter by clarifying Plaintiffs' position on cost-shifting.[19] Despite Defendants' apparent foreclosure of discussions,[20] Plaintiffs also provided Defendants with additional time to potentially continue the meet-and-confer process.[21]

On April 17, Defendants further fractured the formerly unified Defendant Group, now providing *three* letters on behalf of three different groups of Defendants: (1) Goldman Sachs,[22] (2) TPG,[23] and (3) the remaining Defendant Group (exempting Goldman Sachs and TPG).[24] In those three letters, all Defendants largely adhered to their prior positions.

After more than two months of negotiations, Defendants have reneged upon an agreed-upon global document-format agreement that would have streamlined production into a uniform process for all parties. Instead, Defendants now insist upon ad-hoc, defendant-by-defendant negotiations that

---

[17] Sammons Letter 4/3/2009, Ex. H at 1-2.

[18] DiBlasi Letter 4/3/2009, Ex. G at 5.

[19] Riehl Letter 4/10/2009, Ex. I.

[20] Sammons Letter 4/3/2009, Ex. H at 1 ("[D]efendants see no utility in continuing to discuss the discovery format agreement unless and until plaintiffs are prepared to make a reasonable proposal on cost-sharing."); DiBlasi Letter 4/3/2009, Ex. G at 5 ("We see no utility in continuing to discuss a discovery format agreement unless and until plaintiffs are prepared to make a reasonable cost-sharing proposal.").

[21] Riehl Letter 4/10/2009, Ex. I.

[22] Wheeler Letter 4/17/2009, Ex. L.

[23] Sammons Letter 4/17/2009, Ex. J.

[24] Tringali Letter 4/17/2009, Ex. K.

would unnecessarily fragment and complicate the massive production of millions of documents, and create more delay in Defendants' production of documents.

## III.  LEGAL STANDARD

The 2006 Amendments to Rules 16(b) and 26(f) of the Federal Rules of Civil Procedure encourage the parties to talk early and to reach agreement about production format, search terms, and other technical issues relating to document format and ESI. As detailed above, Plaintiffs have used the past three months to engage in extensive and detailed negotiations with Defendants regarding these matters. Despite Plaintiffs' best efforts, several issues remain outstanding.

Under Rule 26(f), parties must in good faith attempt to agree on a proposed discovery plan that includes the form or forms in which discovery will be produced. Among the required tasks are "develop[ing] a proposed discovery plan," "attempting in good faith to agree on the proposed discovery plan," and determining "any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced." FED. R. CIV. P. 26(f)(2) and 26(f)(3). Under the Local Rules for the District of Massachusetts, parties are encouraged to engage in informal, cooperative discovery practices — including stipulations, where possible. L R, D. Mass. 26.1(a).

Here, Plaintiffs have attempted to accomplish all of those goals by proffering a global, comprehensive document that would apply to all documents from all parties. Unfortunately, Plaintiffs' attempts have been unsuccessful because Defendants (1) have reversed agreements forged during the meet-and-confer process; (2) have refused to continue discussions, absent a cost-sharing proposal that is without precedent; and (3) have further refused to respond to proposals that have been outstanding for months. Accordingly, the meet-and-confer process required under Local Rules has come to an impasse.

## IV.   ARGUMENT

In accordance with the Joint Scheduling Plan, the parties now have less than 2 months to produce what will likely total millions of documents. That short period affords little time to remedy any errors that are very likely to occur, given the large number of documents that are anticipated. Accordingly, a clear road map guiding document format — in the form of an order — is essential to ensure that all responsive documents are produced as they are kept in the usual course of business. Notably, the additional costs associated with the format described in the Proposed Order are *de minimus*.[25] Vendors can easily follow these provisions without creating any additional burden.[26] Because the requested provisions will add little or no cost to the document productions, and because those provisions are reasonable and proper, they should be implemented.

### A.   Defendants Must Produce All Electronic Documents As They Are Kept in the Usual Course of Business, Including All of the Requested Metadata in Electronic Documents and Spreadsheets Produced in Native Format

It is axiomatic that documents must be produced as they are kept in the usual course of business. FED. R. CIV. P. 34(b)(2)(E). Contrary to this discovery obligation, Defendants are taking the untenable position that certain electronic documents will be not be produced in that manner. Plaintiffs ask the Court to order Defendants to produce all of their documents, including all electronic documents, as they are kept in the usual course of business.

---

[25] Enck Aff. ¶¶ 8, 11.

[26] *Id.*

### 1.    Spreadsheets Should Be Produced in Native Format Because Modified Documents Are Unusable and Contrary to the Federal Rules

Spreadsheets in their native, electronic form contain valuable information that is kept in the usual course of business — including formulae, hidden cells, and cross-references.[27] Spreadsheets are particularly important here, where evidence regarding Defendants' conspiracy is likely to be found in spreadsheets, including but not limited to financial due diligence, target-company valuation, and other areas of financial analysis. While some Defendants have agreed to produce spreadsheets in native format,[28] other Defendants are taking the improper position that they will produce modified versions of those spreadsheets.[29] The latter Defendants' proposals vary from conversion to TIFF images (essentially like pictures of paper printouts) to removing the formulae that is essential for determining how the displayed numbers are calculated.[30] Defendants' proposals would strip away critical information showing how the Defendants arrived at the numbers on the spreadsheet — potentially concealing evidence of Defendants' alleged wrongdoing.  Defendants proposals are wholly improper, and Plaintiffs ask this Court to order all Defendants to produce spreadsheets in unmodified, native format.

Under Rule 34, documents must be produced as they are kept in the usual course of business. FED. R. CIV. P. 34(b)(2)(E). Here, Defendants keep their spreadsheets natively, not as TIFFs or as crippled versions. Defendants' proposed modifications would change the spreadsheets from how

---

[27] Enck Aff. ¶ 9.

[28] E.g., Hamill Letter (Bain) 4/21/2009, Ex. M; Mintz Letter (Blackstone) 4/28/2009, Ex. T; DiBlasi Letter (Goldman) 4/3/2009 Ex. I; Wheeler Letter (Goldman) 4/17/2009, Ex. L;  White Letter (Providence Equity) 4/21/2009, Ex. N; Sammons Letter (TPG) 4/17/2009, Ex. J.

[29] Sammons Letter (Def. Group, including KKR and Silver Lake), 4/3/2009, Ex. H at 2-3; Tringali Letter (Def. Group), 4/17/2009, Ex. K at 2; Schaeffer Letter (THL), 4/22/2009, Ex. P at 3-4.

[30] *See id.*

they are kept in the usual course of business. *See Williams v. Sprint/United Mgmt Co.*, 230 F.R.D. 640, 655-57 (D. Kan. 2005) (requiring native production of spreadsheets "in the form they were maintained," criticizing producing party from "locking" data within spreadsheets' cells); *Ryan v. Gifford*, 2007 WL 4259557, at *1 (Del. Ch. Nov. 30, 2007) (granting motion to compel native production of documents) (Ex. U). Degrading the functionality of spreadsheets is impermissible. *Bolton v. Sprint/United Mgmt. Co.*, 2007 WL 756644, at *6 (D. Kan. Mar. 8, 2007) (holding that spreadsheets must be produced electronically, "in the form in which [they are] currently maintained," and concerns about confidentiality were alleviated by protective order) (Ex. V); *see* Advisory Committee Notes to 2006 Amendments to Fed. R. Civ. P. 34(b) ("If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature."); *see also Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 2009 WL 546429, at *18 (M.D. Fla. Mar. 4, 2009) (holding that TIFF production "removed or significantly degraded [the receiving party's] ability to search the ESI," so it was not in a reasonably usable form as required by Rule 34) (Ex. W).

Some Defendants suggest that they produce documents in modified form, and then require Plaintiffs to identify specific documents to be produced natively later if Defendants agree.[31]  This proposal is inefficient and improper. The volume of documents is expected to be in the millions, and requiring individual requests for many spreadsheets is inefficient. Further, modified spreadsheets are unusable and contrary to Rules 34 and 26, and requiring any intermediary steps is the type of circuitous negotiations that the 2006 Rules Amendments sought to avoid.

---

[31] Sammons Letter (Def. Group, including KKR and Silver Lake), 4/3/2009, Ex. H at 2-3; Tringali Letter (Def. Group), 4/17/2009, Ex. K at 2; Schaeffer Letter (THL), 4/22/2009, Ex. P at 3-4.

Because Defendants keep spreadsheets natively in the usual course of business, and because the formulae, hidden cells, and cross-references contained in native spreadsheets are essential to this financial matter, Plaintiffs ask that all Defendants be required to produce all spreadsheets natively.

### 2.     Defendants Should Produce All of the Requested Metadata

Certain Defendants are also refusing to produce metadata from their electronic documents, such as e-mail messages and Word documents.[32] Metadata and text files are present in the original versions of electronic documents, as they are kept in the usual course of business.[33] Electronic documents generally contain dozens of metadata fields that often include the date created, date last modified, author name, and other fields. Producing metadata is the electronic equivalent of producing photocopies, because producing metadata maintains the document's integrity, components, and searchability to the same extent as is available to Defendants.  Because the metadata resides in the files as they are ordinarily maintained, Defendants should be required to produce those requested, readily accessible metadata fields. *See* Fed. R. Civ. P. 34(b) (requiring production of documents as they are ordinarily maintained); *Bray*, 2009 WL 546429 at *18, 23-24 (imposing sanctions for failure to include metadata, as was required in prior discovery order, finding that the form of production "removed or significantly degraded Lexington's ability to search the ESI and accordingly, that it was not in a reasonably usable form as required by Rule 34") (Ex. W). The *Bray* court held that production as TIFFs "removed or significantly degraded [the receiving party's]

---

[32] *E.g.*, Sammons Letter (Defendant Group), 4/3/2009, Ex. H (not providing any metadata); DiBlasi Letter (Goldman) 4/3/2009, Ex. G at 6 (only providing some metadata, and only for e-mail);  Tringali Letter (Defendant Group) 2/27/2009, Ex. D (omitting metadata).

[33] Enck Aff. ¶ 8.

ability to search the ESI and, accordingly, that it was not in a reasonably usable form as required by Rule 34." *Id.*

Certain Defendants have argued that they should not be required to produce the metadata field showing a document's custodian. [34] But that position is akin to producing thousands of bankers' boxes of paper documents without telling the receiving party the names or locations of the employees who possessed those boxes. The "custodian" field demonstrates how the documents were kept in the usual course of business, as required under Rule 34. All Defendants should be prohibited from stripping the custodian field or any other field from e-mail and all other electronic documents.

Plaintiffs ask the Court to Order all Defendants to produce all requested metadata that resides in the documents kept in the usual course of business. The particular fields are enumerated in the Proposed Order attached to Plaintiffs' Motion. [35]

### B.    Global Agreements Reached in the Meet-And-Confer Process Should Be Enforced

During the meet-and-confer process, the parties came to many agreements regarding the format of paper and electronic document production. [36] These agreements are reflected in letters dated March 8 and March 24, [37] and Defendants have not disputed the letters' reflection of any particular agreement. [38] But on April 3, 2009 — after more than two months of the parties' meeting and conferring — Defendants reneged upon those agreements, insisting that they would instead

---

[34] Riehl Letter 3/6/2009, Ex. E at 5; Riehl Letter 3/24/2009, Ex. F at 2, 3, 4; Wheeler Letter (Goldman) 4/17/2009, Ex. L at 3-4; Schaeffer Letter (THL) 4/22/2009, Ex. P at 2-3 n.4.

[35] Proposed Order at ¶¶ 5, Table 1.

[36] Riehl Letter 3/6/2009, Ex. E at 1-2; Riehl Letter 3/24/2009, Ex. F at 2.

[37] Riehl Letter 3/6/2009, Ex. E at 1-2; Riehl Letter 3/24/2009, Ex. F at 2.

[38] *See generally* Sammons Letter 4/3/2009, Ex. J; DiBlasi Letter 4/3/2009, Ex. I; Wheeler Letter 4/17/2009, Ex. L.

provide documents in a format they chose unilaterally.[39] In essence, Defendants dialed back all of the progress previously reached over two months of telephone calls and letters.

Areas where the parties agreed during the meet-and-confer process are provided in the Proposed Order.[40] Those areas include the production format for paper documents, producing documents from prior proceedings as they were previously produced, the format for load files, and other agreements outlined in the Proposed Order.

In addition, Defendants' April 3 letters fragmented the once unified "Defendant Group" into balkanized factions that now seek to negotiate in an inefficient, defendant-by-defendant basis. After Defendants' unilateral shift, individual defendants have provided at least ten different letters that assert ten different production standards.[41] Because the many global agreements that the parties reached over the two-month meet-and-confer process were reasonable,[42] and because withdrawing from those agreements indicates a lack of good faith, Defendants should be compelled to adhere to the global agreements previously reached.

### 1.    Scanning and OCR of Paper Documents

During the meet-and-confer process, the parties agreed to produce paper documents in a particular electronic format.[43] That agreement included scanning and optical character recognition

---

[39] Sammons Letter 4/3/2009, Ex. H at 2-3; DiBlasi Letter 4/3/2009, Ex. G at 5-6.

[40] Proposed Order §§ 1, 2(a), 2(b), 2(c), 2(e), 3, 4, 6, 7, 8.

[41] Sammons Letter 4/3/2009, Ex. J; DiBlasi Letter 4/3/2009, Ex. I; Sammons Letter 4/17/2009, Ex. J; Tringali Letter 4/17/2009, Ex. K; Wheeler Letter 4/17/2009, Ex. L; Hamill Letter 4/21/2009, Ex. M; White Letter 4/21/2009, Ex. N; Kane Letter 4/22/2009, Ex. O; Schaeffer Letter 4/22/2009, Ex. P; Loftin Letter 4/27/2009, Ex. Q; Sherman Letter 4/27/2009, Ex. R; Mintz Letter 4/28/2009, Ex. T.

[42] Enck Aff. ¶ 7.

[43] Riehl Letter 3/6/2009, Ex. E at 1-2; Riehl Letter 3/24/2009, Ex. F at 2.

("OCR") of paper documents, resulting in electronic files that are searchable.[44] But on April 3, 2009, Defendants unilaterally stated that they would not adhere to the agreement, instead seeking to produce documents in paper format only.[45] For the reasons outlined below, this abrupt reversal would bring inefficiencies and additional cost to the proceedings.

Scanning and OCR of paper documents increases efficiency for all parties, including Defendants. In complex litigation involving multiple parties, paper productions are usually disfavored, in lieu of electronic productions. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 11.444 (2004) ("Central document depositories can promote efficient and economical management of voluminous documents in multiparty litigation."). As the Federal Judicial Center notes, requiring electronic productions in large cases results in substantial savings:

> Requiring the production of all discovery materials in common, computer-readable formats and insisting that these materials be made available on centrally generated computer-readable media (such as CD-ROM or DVD) . . . may reduce substantially the expense and burden of document production and inspection.

*Id.* (citing *In re Bridgestone/Firestone, Inc.*, 129 F. Supp. 2d 1207, 1213 (S.D. Ind. 2001) (Case Management Order dated Jan. 30, 2001)).

A court has recently held that in complex matters involving a "mountain" of paper documents, a producing party was compelled to pay for the OCR of its paper documents. *Proctor & Gamble Co. v. S.C. Johnson & Son, Inc.*, 2009 WL 440543, at *2 (E.D. Tex. Feb 19, 2009) (ordering scanning and OCR of paper documents at producing party's expense) (Ex. X). As the *Proctor & Gamble* court noted, the OCR of all documents would likely "streamline litigation" and "reduce the chance that either side will employ tactics designed to hide relevant information in a mountain of

---

[44] Riehl Letter 3/6/2009, Ex. E at 1-2; Riehl Letter 3/24/2009, Ex. F at 2.

[45] Sammons Letter 4/3/2009, Ex. H at 3; DiBlasi Letter 4/3/2009, Ex. G at 5-6.

difficult-to-search documents." *Id., 2009 WL 440543, at \*2*. As such, the court concluded that ordering the producing party to scan and OCR paper documents "is neither unreasonable nor burdensome." *Id.*, 2009 WL 440543, at \*2.

At least one Defendant seeks to produce its hard copy documents in paper, but has not ruled out scanning and distributing those documents to other Defendants in the future.[46] If Defendants want to require Plaintiffs to incur the cost of scanning the paper documents — postponing Defendants' own scanning and distribution until after Plaintiffs already incurred those costs — that would demonstrate Defendants' lack of good faith. If Defendants plan to scan documents at some point, they should be required to do so now, requiring Plaintiffs to bear only the additional cost of creating a duplicate DVD of that production. *See In re Bristol-Myers Squibb Sec. Litig.*, 205 F.R.D. 437, 438 (D.N.J. 2002) (holding that receiving party need not share cost of scanning paper documents; rather, the receiving party need only pay the "nominal cost of copying compact discs"). A court has recently held that in complex matters involving a "mountain" of paper documents, a producing party was compelled to pay for the OCR of its paper documents. *Proctor & Gamble Co.,* 2009 WL 440543, at \*2 (ordering scanning and OCR of paper documents at producing party's expense) (Ex. X).

The scanning and OCR of paper documents increases efficiencies for all parties, and the parties had *already* agreed to that type of electronic production during the meet-and-confer. As such, the parties' agreement regarding paper documents — reached during the meet-and-confer process, and as reflected in the Proposed Order[47] — should be enforced.

---

[46] Sammons E-mail 4/27/2009, Ex. S at 1.

[47] Proposed Order at §§ 3(a) to 3(f).

### 2.    Privilege Logs Produced in Native (Excel) Format

During the meet-and-confer process, the Parties agreed that all privilege logs in the case would be produced in native (Excel) format, so long as metadata could be stripped from those files.[48] In cases this complex, privilege logs are anticipated to be incredibly large and include thousands of entries. For privilege logs that massive, providing the documents in native format makes those huge logs much more manageable: permitting the log to be sorted by date, attorney, Bates number, and many other fields. The parties recognized this and agreed to produce the logs as electronic files. Now, Defendants seek to back out of this agreement.[49] Defendants would not incur any additional cost by this provision. Again, the provisions of the parties' original agreement, as reflected in the Proposed Order,[50] should be enforced.

### C.    The Parties Should Bear Their Own Cost of Production of Electronic Documents

The Defendant Group (excluding Goldman Sachs) has identified two disputed categories of documents for cost-shifting: (1) scanning and OCR of paper documents, and (2) OCR for electronic documents in the few documents where text cannot be extracted.[51] In contrast to the other defendants, Goldman Sachs provided no such categories, instead insisting on general "cost-sharing" for the entire production.[52] The position of both groups of Defendants is contrary to settled law.

---

[48] Riehl Letter 3/24/2009, Ex. F at 5.

[49] Sammons Letter 4/3/2009, Ex. H at 3; DiBlasi 4/3/2009, Ex. G at 5-6.

[50] Proposed Order at § 6.

[51] Sammons Letter, 4/3/2009, Ex. H at 1-2.

[52] DiBlasi Letter 4/3/2009, Ex. G at 5; Wheeler Letter 4/17/2009, Ex. L at 1-2, 4.

### 1.     Cost-Shifting Is Inappropriate Where, As Here, All Documents Are Accessible

Despite well-established law, Defendants want Plaintiffs to share Defendants' routine costs of producing Defendants' readily accessible ESI.[53] Defendants' demand of cost-shifting for their accessible ESI is directly contrary to established law, as demonstrated by Defendants' apparent inability to provide a single example of any court that has granted the relief it seeks.

Courts have long held that each party must pay its own discovery costs, absent extraordinary circumstances. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) (holding that "the presumption is that the responding party must bear the expense of complying with discovery requests"). The Federal Rules require distinguishing whether the ESI at issue is "from sources that the [responding] party identifies as not reasonably accessible because of undue burden," and the responding party "must show [in a motion for protective order] that the information is not reasonably accessible." FED. R. CIV. P. 26(b)(2)(B).

Defendants have not shown that any ESI is inaccessible, so they fail the very first step of the analysis. Where, as here, ESI is from an accessible source, it is improper to even consider cost-shifting. *Zubulake v. U.B.S. Warburg LLC*, 217 F.R.D. 309, 320, 324 (S.D.N.Y. 2003) (Scheindlin, J.) ("*Zubulake I*") ("For these sources of e-mails —active mail files and e-mails stored on optical disks — it would be wholly inappropriate to even consider cost-shifting."); *see Zubulake v. UBS Warburg*, 216 F.R.D. 280, 384 (S.D.N.Y. 2003) (*Zubulake III*) (same, regarding accessible data). The *Zubulake I* court elaborated that "[a] court should consider cost-shifting only when electronic data is relatively inaccessible, such as in backup tapes." *Zubulake I*, 217 F.R.D. at 320. If

---

[53] *E.g.*, Sammons Letter, 4/3/2009, Ex. H at 1-2; DiBlasi Letter 4/3/2009, Ex. G at 5.

the data is accessible, "Like most typical discovery requests, . . . the producing party should bear the cost of production." *Id.*

This tenet is further affirmed by the Sedona Conference, the primary group restating the law of electronic discovery:

> Absent a specific objection, party agreement or court order, the reasonable costs of retrieving and reviewing electronically stored information should be born by the responding party, unless the information sought is not reasonably available to the responding party in the ordinary course of business. . . .

*The Sedona Principles*, Principle 13 (2007).

Other courts have denied almost identical requests for cost-shifting regarding both accessible ESI and inaccessible ESI. *Cason-Merenda v. Detroit Med. Ctr.*, 2008 WL 2714239, at *3-4 (E.D. Mich. July 7, 2008) (denying cost-shifting for accessible data, noting that "to the extent that [the producing party] maintains that the information produced by it in discovery was accessible, court ordered cost shifting is inappropriate") (Ex. Y); *W.E. Aubuchon Co., Inc. v. BeneFirst, LLC*, 245 F.R.D. 38, 44-45 (D. Mass. 2007) (Hillman, J.) (holding that producing party must bear its own cost of producing inaccessible data); *Fleischman v. Albany Medical Center*, No. 06-CV-765 (TJM/DRH), slip op. at 1 (N.D.N.Y. June 12, 2007) (denying cost-shifting for TIFF and OCR of electronic production) (Ex. Z); *IO Group, Inc. v. Veoh Networks*, 2007 WL 1113800 at *7 (N.D. Cal. Apr. 13, 2007) (denying cost-shifting because producing party produced no information showing that the data was inaccessible) (Ex. AA); *Peskof v. Faber*, 240 F.R.D. 26, 31 (D.D.C. 2007) ("[A]ccessible data must be produced at the cost of the producing party; cost-shifting does not even become a possibility unless there is first a showing of inaccessibility.") (emphasis omitted); *Mikron Indus. v. Hurd Windows & Doors, Inc.*, 2008 WL 1805727 at *2 (W.D. Wash. Apr. 21, 2008) ("Cost-shifting would not be appropriate in the context of . . . search[ing] . . . employee hard drives and active email servers . . . as this ESI is considered reasonably accessible within the meaning of

17

Fed. R. Civ. P. 26(b)(2)(C).") (Ex. BB); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 309 F. Supp. 2d 459, 455, 457(S.D.N.Y. 2003) (considering *Zubulake* factors only after determining that data was inaccessible, even then concluding that cost-shifting was inappropriate).

Here, Defendants have not argued or shown that *any* ESI is inaccessible, and their demand for costs is improper and without precedent. Defendants' only attempted support of its position was orally giving the names (without citations) of three case where the parties apparently *stipulated* to cost-sharing for documents that were *not reasonably accessible*.[54] None of those cases supports cost-shifting here. And as noted above, the overwhelming volume of court decisions have held that absent extraordinary circumstances, a party must pay its own discovery costs. *E.g.*, *Oppenheimer*, 437 U.S. at 358; *Zubulake I*, 217 F.R.D. at 320, 324; *Sedona Principles*, Principle 13 (2007). Defendants have not and cannot show any such extraordinary circumstances here. Accordingly, Plaintiffs ask that this Court order the Defendants to produce ESI at their own cost.[55]

## 2. Defendants Identify No Category of Documents Where Cost-Shifting is Appropriate

The Defendant Group's (excluding Goldman Sachs) demand for cost-shifting with respect to scanning and OCR of paper documents is improper.[56] Goldman Sachs' apparent insistence on general "cost-sharing" for the entire production is wholly untenable.[57]

---

[54] *See* Riehl Letter 3/24/2009, Ex. F at 6-7 (noting Defendants' oral citation of *In re ATM Fee Antitrust Litig.* (N.D. Cal.); *McReynolds v. Merrill Lynch* (N.D. Ill.); *In re Currency Conversion Fee Antitrust Litig.* (S.D.N.Y.).

[55] Proposed Order at § 9.

[56] Sammons Letter, 4/3/2009, Ex. H at 1-2.

[57] DiBlasi Letter 4/3/2009, Ex. G at 5; Wheeler Letter 4/17/2009, Ex. L at 1-2, 4.

A court has recently held that in complex matters involving a "mountain" of paper documents, a producing party was compelled to pay for the OCR of its paper documents. *Proctor & Gamble*, 2009 WL 440543, at *2 (ordering scanning and OCR of paper documents at producing party's expense) (Ex. X). Here, Plaintiffs have offered to pay for the cost of copying the discs, but the cost of scanning and OCR the paper documents properly remains with Defendants. *See In re Bristol-Myers*, 205 F.R.D. at 438 (holding that receiving party need not share cost of scanning paper documents; rather, the receiving party need only pay the "nominal cost of copying compact discs").

## V.    CONCLUSION

The most efficient resolution of this discovery dispute is the entry of a single Order regarding Document Format that applies to the millions of responsive documents that will be produced by all Defendants. For the foregoing reasons, Plaintiffs ask that this Motion be allowed and that the Court enter the Proposed Order Governing Discovery Format.

Dated: May 5, 2009                          ROBINS, KAPLAN, MILLER & CIRESI LLP


                                            /s/       Lisa A. Furnald
                                            Lisa A. Furnald (BBO # 631059)
                                            800 Boylston Street, 25th Floor
                                            Boston, MA 02199
                                            (617) 267-2300


                                            Christopher M. Burke (admitted *pro hac vice*)
                                            Arthur L. Shingler III (admitted *pro hac vice*)
                                            Kristen M. Anderson (admitted *pro hac vice*)
                                            Mary Blasy (admitted *pro hac vice*)
                                            SCOTT + SCOTT LLP
                                            600 B Street, Suite 1500
                                            San Diego, CA 92101
                                            (619) 233-4565


                                            K. Craig Wildfang (admitted *pro hac vice*)
                                            Thomas B. Hatch (admitted *pro hac vice*)

Stacey P. Slaughter (admitted *pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

David R. Scott (admitted *pro hac vice*)
SCOTT + SCOTT LLP
108 Norwich Avenue
Colchester, CT 06415
(860) 537-3818

Walter W. Noss (admitted *pro hac vice*)
SCOTT + SCOTT LLP
108 Norwich Avenue
Colchester, CT 06415
(860) 229-6088

Patrick J. Coughlin (of counsel)
Susan G. Taylor (admitted *pro hac vice*)
David W. Mitchell (admitted *pro hac vice*)
Elisabeth A. Bowman (admitted *pro hac vice*)
Samantha A. Smith (admitted *pro hac vice*)
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Jack Landskroner (admitted *pro hac vice*)
Paul Grieco (admitted *pro hac vice*)
LANDSKRONER • GRIECO • MADDEN, LTD.
1360 West 9th Street, Suite 200
Cleveland, OH 44113
(216) 522-9000

Brian Robbins (admitted *pro hac vice*)
George Aguilar (admitted *pro hac vice*)
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
(619) 525-3990

Richard Lockridge (admitted *pro hac vice*)
Charles N. Nauen (admitted *pro hac vice*)

20

Karen Riebel (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Suite 2200
100 Washington Avenue South
Minneapolis, MN  55401
(612) 339-6900

Dennis Stewart (of counsel)
HULETT HARPER STEWART, LLP
550 West C Street, Suite 1600
San Diego, CA  92101
(619) 338-1133

J. Gerard Stranch, IV (admitted *pro hac vice*)
BRANSTETTER, STRANCH & JENNINGS,
PLLC
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
(615) 254-8801

Jayne A. Goldstein (of counsel)
MAGER & GOLDSTEIN LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
(954) 515-0123

Brian Murray (of counsel)
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, 8th floor
New York, NY 10016
(212) 682-1818

Mark Reinhardt (of counsel)
REINHARDT WENDORF & BLANCHFIELD
P.O. Box 460
2201 Atlantic Avenue
Sullivan's Island, SC 29482
(651) 287-2100

Nadeem Faruqi (of counsel)
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, NY 10017
(212) 983-9330

Attorneys for Plaintiffs

21

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2009, I caused the attached Memorandum in Support of Plaintiffs' Motion for Entry of Order Governing Discovery Format to be served via the Electronic Filing system on all of Defendants' counsel of record and by First Class Mail on all attorneys who have entered an appearance yet are not registered with the Electronic Filing system.

/s/      Lisa A. Furnald
Lisa A. Furnald (BBO # 631059)
Robins, Kaplan, Miller & Ciresi L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199
(617) 267-2300

80715023.15

22