# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIRK DAHL, ET AL., Individually and
on Behalf of All Others Similarly Situated,

        Plaintiffs

        v.        CIVIL ACTION NO.:
                07-12388-EFH

BAIN CAPITAL PARTNERS, LLC, ET AL.,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

January 13, 2011

HARRINGTON, S.D.J.

This matter comes before the Court on the defendants' Motion to Dismiss[1] the Third Claim for Relief and All Claims by the PanAmSat Damages Sub-Class in the Fourth Amended Complaint. The underlying lawsuit relates to an alleged anti-competitive scheme by various financial firms to fix the prices paid for a number of companies undergoing leveraged buyouts. The motion at hand pertains only to damage claims relating to the PanAmSat leverage buyout. The defendants contend that such claims are barred by the four-year statute of limitations under 15 U.S.C. § 15b and that the plaintiffs, public shareholders in PanAmSat, do not have standing to

---

[1] The following defendants join the motion: Kohlberg Kravis Roberts & Co. L.P., Bain Capital Partners, LLC, The Blackstone Group, Inc., The Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Providence Equity Partners Inc., Silver Lake Technology Management LLC, TC Group III, L.P., TC Group IV, L.P., Thomas H. Lee Partners, L.P., TPG Capital, L.P., and Apollo Global Management, LLC.

bring such claims under the indirect purchaser rule set forth in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). The Court grants the defendants' motion.

Discussion.

    a. Statute of Limitations.

After a number of amendments and a case consolidation, the plaintiffs filed a Second Amended Complaint ("SAC") on July 16, 2008. The SAC contained a claim under the Sherman Act § 1 alleging an ongoing anti-competitive conspiracy on the part of the defendants to fix prices with respect to a number of leverage buyout transactions. The PanAmSat transaction was one of the alleged illegal leverage buyouts detailed in the complaint as an illustration of the defendants' ongoing conspiracy. The SAC contained specific allegations relating to bid rigging in the PanAmSat transaction, including allegations that a bidding group failed to make a second offer, but that its members were nonetheless given a piece of the transaction by the winning bidder, defendant Kohlberg Kravis Roberts & Co. L.P. ("KKR"), after bidding had closed. The SAC was filed on behalf of an injunctive relief class which included "[a]ll persons who have an ownership interest in securities in any publicly-listed company traded on any United States securities market or exchange."

On August 26, 2008, plaintiffs filed their Third Amended Complaint ("TAC") and, for the first time, included the Police and Fire Retirement System of the City of Detroit ("Detroit") as a named plaintiff and class representative of the public shareholders of PanAmSat. Like all previous complaints, the TAC recited essentially the same allegations contained in the SAC. On October 7, 2010, plaintiffs filed their Fourth Amended Complaint ("FAC"). The FAC contains allegations relating to the PanAmSat transaction. It also added a separate claim for bid-rigging

2

in the PanAmSat transaction (the "Third Claim for Relief"), and included a damages sub-class with respect to the PanAmSat transaction.

The defendants ask the Court to dismiss all claims by the PanAmSat damages sub-class and the Third Claim for Relief in the FAC, alleging that those claims are barred by the statute of limitations. The defendants contend that the complaint did not allege that any of the named plaintiffs owned shares of PanAmSat until Detroit joined the case on August 26, 2008, after the four-year statute of limitations had already run. See 15 U.S.C. § 15b. The plaintiffs do not dispute that the statute of limitations had run when the TAC and the FAC were filed. Instead, the plaintiffs assert that the new claims relate back to the original complaints pursuant to Fed. R. Civ. P. 15(c) and are, thus, timely.

Federal Rule of Civil Procedure 15(c)(1) governs the analysis as to when an amendment to a complaint relates back to the date of the original complaint. Rule 15(c)(1)(B) allows relation back of an amendment asserting a claim or defense where "the claim or defense arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Rule 15(c)(1)(C) allows changes to a party or the naming of a party. See Young v. Lepone, 305 F.3d 1, 14 (1st Cir. 2002); see also Fed. R. Civ. P. advisory committee notes (While 15(c)(1)(C) seems to apply, by its terms, only to defendants, "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.")

The defendants contend that the addition of Detroit as class representative must comply with the test laid out by the United States Court of Appeals for the First Circuit in Young v. Lepone, 305 F.3d at 14. In Young, the Court of Appeals stated that the addition of a new plaintiff under 15(c)(1)(C) relates back only if it meets the following three requirements:

3

> The amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and undue prejudice must be absent.

Id.

Defendants argue that Detroit fails to meet the identity of interest element set forth above since, as Young further held, "[p]ersons who are identified with each other only by their ownership of stock in the same publicly-traded corporation share some of the same rights, but that fact, standing alone, does not place them in the kind of proximity needed to [satisfy the identity of interest requirement]." Id. at 15. Young, however, did not involve a class action, where, as here, Detroit was a member of the putative class set forth in the earlier timely-filed complaint. The Court, therefore, concludes that the instant situation is distinguishable from Young.

In a recent decision, the United States Court of Appeals for the Third Circuit, while not explicitly ruling on the issue, reasoned that the addition of a named plaintiff in a class action may not constitute the addition of a new party requiring compliance with rule 15(c)(1)(C), since "absent members of a class--at least in relation to an applicable statute-of-limitations period--are essentially 'parties' to the class action while a certification decision is pending." In re Cmty Bank of N. Va., 622 F.3d 275, 298 (3rd Cir. 2010). The Third Circuit, distinguished Young and reasoned that, "[i]n this context, the better conclusion may be that an amended complaint adding a class member as a new named plaintiff need only satisfy Rule 15(c)(1)(B), [regarding the addition of new claims or defenses], to relate back to an earlier complaint." Id. at 297 n.15, 298.

The Court adopts the Third Circuit's reasoning. The addition of Detroit and the PanAmSat damages sub-class did not constitute the addition of new plaintiffs, but rather acted to

4

add claims of particular class members that were already parties to the suit. The claims of Detroit and the PanAmSat damages sub-class, therefore, need only comply with Rule 15(c)(1)(B).

Plaintiffs' damage claims relating to PanAmSat satisfy the Rule 15(c)(1)(B) standard. The SAC, which was filed before the statute of limitations had run, alleged an overarching conspiracy to suppress competition for large leverage buyouts. The PanAmSat deal was specifically identified in the SAC as one of the illegal leverage buyouts, and the complaint set forth specific allegations relating to the defendants' conduct with respect to the PanAmSat transaction. Furthermore, the SAC identifies various bid-rigging practices engaged in by the defendants. Therefore, the Third Claim for Relief and all Claims by the PanAmSat Damages Sub-Class arose out of the same conduct, transaction, or occurrence contained in the SAC and, thus, relate back to the earlier complaints.

b. Standing.

Prior to its buyout, PanAmSat was owned by The DirecTV Group, which held approximately 80% of its shares, and public shareholders, who held the remaining 20% and who now make up the PanAmSat damages sub-class alleged in the complaint. In January 2004, the PanAmSat board of directors began considering whether a sale of PanAmSat could be effectuated. It solicited and received bids from a number of bidding groups. Each group was sent an instruction letter and a draft merger agreement "contemplating a one-step transaction, consisting of a merger of a newly formed subsidiary of the purchaser with and into [PanAmSat] pursuant to which all of the outstanding shares of our common stock would be converted into a per share purchased price to be paid by the purchaser."

Final bids were received on April 14, 2004. One bidding group consisted of defendants Providence, the Caryle Group, and Blackstone. Defendant KKR (d/b/a Constellation) comprised another bidding group. PanAmSat chose KKR's bid because, among other reasons, it offered the highest price per share. KKR's bid contemplated a transaction that was structured in two steps. First, PanAmSat would cash-out its publicly owned shares and would merge with PAS Merger Sub, Inc., an acquisition vehicle that was organized solely for the purpose of entering into the transaction agreement and was wholly-owned by the DirecTV Group. Second, KKR would acquire the ownership of the merged PanAmSat from DirecTV. On April 20, 2004, the transaction agreement was executed. The parties to the transaction agreement included PanAmSat Corporation, The DirecTV Group, Inc., PAS Merger Sub, Inc., and KKR (d/b/a Constellation). On August 13, 2004, PanAmSat held its annual shareholder meeting, at which the stockholders voted to approve the merger set out in the transaction agreement.

On or around August 18, 2004, the merger of PanAmSat with the PAS Merger Sub was executed. In accordance with KKR's plan, the DirecTV Group, Inc., through the merger subsidiary, became the sole owner (except for the shares held by management) of PanAmSat stock. On August 20, 2004, the remaining step contemplated in the transaction agreement was executed, whereby KKR, as well as Providence and Carlyle, who had been invited in on the transaction, held the entire equity interest (except for the shares held by management) in PanAmSat.

The defendants contend that the plaintiffs are barred by the "indirect purchaser rule" from seeking antitrust damages under 15 U.S.C. § 15. The indirect purchaser rule derives from the Supreme Court case of <u>Hanover Shoe, Inc. v. United Shoe Mach. Corp.</u>, 392 U.S. 481 (1968). In <u>Hanover Shoe</u>, the Supreme Court held that a direct purchaser suing for antitrust

6

damages under 15 U.S.C. § 15 can recover the full amount of the illegal overcharge and that a defendant is not permitted to assert that the overcharge was passed on to indirect purchasers down the distribution line. Id. at 492-94. The Supreme Court rejected this pass-on defense because it believed such a defense would overly complicate apportionment calculations and would, in turn, dilute the incentive for private enforcement of antitrust laws. Id. at 494.

In Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), the Court extended the Hanover Shoe rule to apply plaintiffs as well, holding that an indirect purchaser bringing a claim for damages under 15 U.S.C. § 15 did not have standing to sue. Id. at 735, 737. The Court set forth two overriding policy considerations justifying the rule. First, the Court reasoned that, like the policy supporting the Hanover Shoe rule, such claims would require a massive effort to apportion recovery and, in turn, decrease the efficient enforcement of antitrust laws. Id. at 731-32, 737. Second, the Court concluded that allowing offensive but not defensive application of the rule would lead to multiple liability for the defendants since a direct purchaser could receive the full amount of any overcharge. Id. at 730-32.

Defendants argue that the plaintiffs are indirect purchasers under Illinois Brick because DirecTV first acquired sole ownership of PanAmSat before it was ultimately sold to the defendants. The plaintiffs contend that they are in fact direct purchasers because the transaction, while technically involving two steps, was essentially a single transaction in which they dealt directly with the defendants. Plaintiffs further assert that allowing recovery would not implicate the policy considerations underlying Illinois Brick. The Court disagrees with the plaintiffs' contentions.

While the sale of the public shares was the result of a single agreement, there existed two distinct transactions: the first between the plaintiffs and DirecTV and the second between

7

DirecTV and the defendants.[2] As the defendants argue, the sale of the plaintiffs' stock occurred prior to and regardless of whether DirecTV later sold PanAmSat shares to the buyer.[3] Furthermore, while the apportionment of the overcharge may be straightforward, there remains a risk of double recovery since DirecTV could sue the defendants for the entire amount of the overcharge and, under Hanover Shoe, the defendants would be barred from asserting that the overcharge was passed on (by purchasing shares from the plaintiffs at the same price). Accordingly, the Court holds that plaintiffs are indirect purchasers.

The plaintiffs alternatively assert that the matter falls into the so-called "cost-plus exception" to the indirect purchaser rule. The Supreme Court has suggested that there may be an exception where an indirect purchaser received goods from a direct purchaser according to a preexisting "cost-plus contract." Ill. Brick, 431 U.S. at 724 n. 2. Plaintiffs, however, concede that the transaction agreement at hand is not, strictly speaking, a cost-plus contract. Instead, they argue that the agreement is the functional equivalent of a cost-plus contract.

The Court declines to consider whether the cost-plus exception applies to the facts at hand. First, neither the Supreme Court nor the First Circuit has explicitly recognized such an exception and the Supreme Court has indicated that, if such an exception exists, it is narrowly

---

[2] Plaintiffs rely on In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493 (S.D.N.Y 1996), for the proposition that DirecTV's involvement did not constitute a distinct transaction. NASDAQ, however, involved licensed brokers who were simply fulfilling the trade orders placed by their clients and for their clients' account. Id. at 506. The situation at hand is different. Here, DirecTV did not sell the shares for the account of the plaintiffs but rather for itself.

[3] As defendants point out, DirecTV entered into a separate and subsequent agreement with the defendants to sell its shares at a reduced price. The agreement did not affect the price to be paid to the plaintiffs. This agreement supports the defendants contention that DirecTV sale of its stock was a distinct transaction.

construed.  See Kansas v. Utilicorp United, Inc., 497 U.S. 199, 218 (1990).  Second, both the Supreme Court and the First Circuit have cautioned against litigating exceptions to the indirect purchaser rule since such a practice "would generate the type of complicated and costly litigation that the [indirect purchase] rule was trying to avoid."  Cohen v. GMC (In re New Motor Vehicles Canadian Exp. Antitrust Litig.), 533 F.3d 1, 3 (1st Cir. 2008); see also UtiliCorp, 497 U.S. at 217 ("[E]ven assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.").  Accordingly, the plaintiffs' claims pursuant to 15 U.S.C. § 15 are barred by the indirect purchaser rule.

The Defendants' Motion to Dismiss the Third Claim for Relief and All Claims By the PanAmSat Damages Sub-Class in the Fourth Amended Complaint (Docket No. 367) is, hereby, ALLOWED.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge