**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KIRK DAHL, et al., | CIVIL ACTION NO.: 07-12388-EFH |
| Plaintiffs, | |
| v. | |
| BAIN CAPITAL PARTNERS LLC, et al., | |
| Defendants. | |

**FOURTH AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS**

**(REDACTED DOCUMENT)**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

NATURE OF THE CASE AND SUMMARY OF THE CONSPIRACY.........................................4

DEFENDANTS ...........................................................................................................9

CO-CONSPIRATORS....................................................................................................13

PLAINTIFFS ...........................................................................................................13

DEFENDANTS' SCHEME TO COLLUDE...........................................................................14

THE ECONOMIC EVIDENCE ........................................................................................17

ALTERNATIVE ECONOMIC RATIONALES ARE IMPLAUSIBLE............................................19

PRIOR COLLUSION IN THE FINANCIAL MARKETS ........................................................20

THE ROLE OF MANAGEMENT .....................................................................................21

THE ROLE OF THE INVESTMENT BANKS .....................................................................22

DEFENDANTS' INCENTIVES TO PLAY BY "CLUB RULES" ...............................................25

JURISDICTION AND VENUE ........................................................................................26

CLASS ACTION ALLEGATIONS ....................................................................................27

     Injunctive Relief Class................................................................................27

     Damages Sub-Classes.................................................................................27

TRADE AND COMMERCE.............................................................................................31

UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATION............................................31

RELEVANT MARKET....................................................................................................32

OVERVIEW OF THE PRIVATE EQUITY INDUSTRY AND ALLEGATIONS OF
     WRONGDOING.........................................................................................33

DEFENDANTS' PREVIOUS HISTORY OF COMPETITION ...................................................35

THE ILLEGAL LBOS....................................................................................................36

     The PanAmSat LBO ...................................................................................36

i

The AMC LBO and Subsequent Merger with Loews .......................................................41

The SunGard LBO ............................................................................................................46

The Neiman LBO...............................................................................................................53

The Michaels Stores LBO.................................................................................................57

The Aramark LBO .............................................................................................................63

The Kinder Morgan LBO...................................................................................................69

The HCA LBO ...................................................................................................................75

The Freescale LBO ............................................................................................................82

ADDITIONAL TRANSACTIONS In FURTHERANCE OF THE CONSPIRACY....................89

NXP (Philips Semiconductor) ...........................................................................................89

Vivendi................................................................................................................................92

Community Health Systems (CHS) ...................................................................................94

Nalco ..................................................................................................................................96

Cablecom ............................................................................................................................98

Susqehanna .......................................................................................................................100

Warner Music....................................................................................................................101

ECONOMIC INFORMATION ON ILLEGAL LBOS ..............................................................103

Transaction Premiums and Price/Earnings Offered.........................................................103

Compound Returns ...........................................................................................................105

SETTLEMENT AGREEMENTS AND PURPORTED RELEASES .........................................106

FRAUDULENT CONCEALMENT AND TOLLING...............................................................107

CLAIMS FOR RELIEF .............................................................................................................108

First Claim for Relief........................................................................................................108

Second Claim for Relief....................................................................................................110

Third Claim for Relief ......................................................................................................111

REQUEST FOR RELIEF ........................................................................................................112

JURY TRIAL DEMAND ......................................................................................................113

Pursuant to the Court's August 18, 2010 Memorandum and Order, Plaintiffs, Kirk Dahl, Police and Fire Retirement System of the City of Detroit, Helmut Goeppinger, Rufus Orr, and Robert Zimmerman, on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege the following for their Fourth Amended Class Action Complaint for Violations of the Federal Antitrust Laws:

## INTRODUCTION

1.     In the 1980s, the image of the buy-out firm was epitomized by Kohlberg Kravis Roberts & Company, L.P.'s ("KKR") $25 billion conquest of RJR Nabisco and captured by Michael Douglas' character Gordon Gekko in the movie Wall Street, where he intoned that "greed is good." Buyout firms were the new anti-heroes of western capitalism, pale riders in the form of corporate raiders.

2.     In the last two decades, these corporate raiders have self-styled themselves as "private equity firms," but their goal of completing leveraged buyouts ("LBOs") has remained the same. Defendants' means to this end, however, have changed – the winner-take-all approach of the 1980s and 1990s has been replaced by a collaborative, collectivist scheme amongst the private equity ("PE") firms that consciously and intentionally limits competition. Defendants have operationalized "greed is good" through manipulation and collusion. Indeed, some private equity executives have conceded that the private equity firms' formation of bidding clubs lowers the purchase price of target companies. Indeed, one prominent private equity investor admitted, "'*[y]ou're not going to get me to say that aloud, but let's just say that you're not wrong*,'" when asked whether bidding clubs diminish the final takeover price.[1]

3.     This action targets Defendants' collusion in the very largest LBOs. It is here that Defendants' collectivist tactics are most acute. Defendants themselves have stated as much.

---

[1]     Andrew Ross Sorkin, *Dealbook:  One Word Nobody Dares Speak* (Oct. 16, 2005), http://www.nytimes.com/2005/10/16/business/16dealbook.html?scp=1&sq=one+word+nobody+dares+speak&st=nyt#.

"*'There's less competition for the biggest deals*,'" said TPG Capital, L.P. ("TPG") founder David Bonderman during a March 22, 2006 luncheon speech in New Orleans.[2]  During his speech, Bonderman displayed a graphic admitting that "'*[c]onsortia often limits bidding*.'"[3]

4.      People familiar with the decision-making process for LBOs confirm that this type of collusion exists.  For example, when hospital operator HCA, Inc. ("HCA") announced a deal to be taken private by a trio of private equity firms during the summer of 2006 for $21.3 billion, the buyers were confident that a rival bidding group would not crash the party and force the price higher.  In fact, no competing bid materialized ███████████████████████████████ █████████████████   People familiar with how the deal was done say rival bidders backed off because they feared that submitting a competing bid for HCA would open the door for other firms to jump other buyout deals.  In other words, "*you don't bid on my deal, I won't bid on yours*."[5]

5.      Private equity firms agree not to compete in return for the *quid pro quo* of a competitive cease-fire.  The result is that private equity firms collectively capture multi-billion dollar public corporations and take them private at artificially low prices, often cutting in management and directors in return for keeping the price low.

6.      The private equity firms that define and police the new rules of engagement are limited to a handful of the most prominent and best funded – KKR, The Blackstone Group L.P.

---

[2]   Andrew Ross Sorkin, *Dealbook: Colluding or Not, Private Equity Firms Are Shaken* (Oct. 22, 2006), http://www.nytimes.com/2006/10/22/business/yourmoney/22deal.html?scp= 2&sq=one+word+nobody+dares+speak&st=nyt.

[3]   *Id.*

[4]   Ex. 29, ██████████  All references to "Ex." or "Exs." are to the exhibits attached to the Declaration of David W. Mitchell in Support of Plaintiffs' Motion to Proceed to the Second Phase of Discovery or to the Declaration of Christopher M. Burke in Support of Plaintiffs' Reply in Support of Motion to Proceed to the Second Phase of Discovery.

[5]   Dennis K. Berman & Henny Sender, *Probe Brings 'Club Deals' to Fore*, Wall St. J., Oct. 11, 2006, at C1.

("Blackstone"), Carlyle (defined herein), TPG, Goldman Sachs PIA (defined herein) and the other Defendants in this action. They often end up as co-owners of buyout targets. From 2003 through the present (the "Conspiratorial Era"), these firms regularly and repeatedly collaborated in the valuation of deals – sharing proprietary information among themselves and referring to one another interchangeably as "clients" in one breath and "competitors" in the next. For example, in the Kinder Morgan, Inc. ("Kinder Morgan") LBO, Blackstone served as financial advisor to Carlyle, which was part of the winning club. Later, Blackstone and Carlyle bid together to buy Freescale Semiconductor, Inc. ("Freescale").

7.      From the perspective of shareholders who rely on the integrity of the free market, Defendants' collectivist scheme is disastrous. In this conspiracy, the winners and losers are clear. The winners are the private equity firms, management, and the investment banks, whose mammon led Congress to endeavor to raise the private equity firms' tax bracket. The losers are shareholders, whose equity Defendants acquired deceptively and on the cheap. Although deals grew larger and private equity firms' funds exploded from 2003 through 2006, as the following graphic demonstrates, the premiums paid to shareholders in LBOs were significantly less than premiums paid to shareholders in publicly traded company acquisitions:

**Buyout Premiums Paid to Shareholders 2003-2006**



8.      Defendants' previous history of competition belies their current conduct. Throughout the 1980s, 1990s, and up to the Conspiratorial Era, Defendants rarely engaged in club deals. Instead, they competed against each other and strategic buyer companies for LBOs. The premiums paid by Defendants for LBOs prior to the Conspiratorial Era were significantly higher than they are now. Defendants' conduct during the Conspiratorial Era, which represents an about-face from their history of competition, demonstrates an agreement to cease competing in favor of collectivist conduct that pays handsomely at the shareholders' expense.

## NATURE OF THE CASE AND SUMMARY OF THE CONSPIRACY

9.      This action arises out of a conspiracy among Defendant private equity firms that form consortia or bidding clubs to rig bids, restrict the supply of private equity financing, fix transaction prices, and allocate the market for private equity services for LBOs. Plaintiffs, on behalf of themselves and the classes defined herein, bring this action pursuant to §1 of the Sherman Act, 15

4

U.S.C. §1, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. The conduct of Defendants challenged herein is not regulated by federal securities law.[6]

10.    An LBO occurs when a purchaser acquires a controlling majority of the shares of the target company, then withdraws the shares of the company from public stock exchanges, thereby taking the company private. The company whose publicly traded stock is purchased in an LBO is referred to as the "target company." Substantial debt must be issued and sold in order to fund these transactions, hence the name *leveraged* buyout.

11.    Defendants and their co-conspirators formed "bidding clubs" – also known as "consortia" or "teams" in the private equity industry – to rig the bidding for control of target companies. Defendants' collectivist approach suppresses premiums paid to shareholders by restraining the number of players available to compete on deals. Take, for example, the SunGard LBO, where nine of the most formidable private equity firms banded together to create an unstoppable super club. Defendants also suppress premium prices by orchestrating "competing" bids whereby members of the conspiracy knowingly submit inferior sham bids, as occurred in the PanAmSat LBO.

12.    Defendants and their co-conspirators are among the largest private equity firms in the United States, both by measure of assets and frequency of participation in LBOs. Defendants, via the bid-rigging and market-allocation cartels described herein, conspired to dominate and control the largest LBOs in the United States and to fix the prices for target companies at artificially low levels during the Conspiratorial Era.

13.    Data surveying LBOs during the Conspiratorial Era show that the average premium paid to shareholders in club deal LBOs is significantly less than premiums paid in either sole sponsor LBOs or acquisitions by strategic bidders.

---

[6]    *Dahl v. Bain Capital Partners, LLC*, No. 1:07-cv-12388, Dkt. No. 157 (Dec. 15, 2008 Memorandum and Order) at 12.

14.     The following chart illustrates the operation of Defendants' bid-rigging conspiracy:

## THE MECHANICS OF A RIGGED LEVERAGED BUYOUT



**1** Management of a public company may be approached by a *private equity firm*. In discussing their "strategic alternatives," a public company usually considers a management-led buyout and/or sends solicitations of indications of interest to private equity and strategic buyers. The public company will hire financial consultants.



* Private equity division of investment bank

**2** Private equity firms form **"consortia"** or cartels and conspire to rig bids, fix prices and allocate the purchase of stock of certain public companies as part of "going private" transactions.



**3** An agreed-upon group of private equity firms or one firm acting on behalf of a group (often including management) will submit a single bid for *control of a public corporation*. Other members of the "consortia" may submit inferior or sham bids.

## THE MECHANICS OF A RIGGED LEVERAGED BUYOUT



**4** Investment banks participate in the cartel as advisors to and provide debt financing for each of the participant private equity firms. The successful bidder offers cash for a majority of the company's existing public shares.



**5** Private equity firms are enriched by colluding to purchase a public company for a discount. **Debt financing** *shields* the income they pull out of the target company from taxes. The annualized net returns are **20-30%**. Management retains a share of the new private company in addition to a buyout of their public shares. Shareholders lose because the winning firms bid below competitive levels.



**6** The measure of harm is the difference between the competitive price and the actual price paid.

## DEFENDANTS

15.     Defendant Apollo Global Management, LLC ("Apollo") is a global asset manager headquartered at 9 West 57th Street, 43rd Floor, New York, New York 10019. Its private equity arm has over $30 billion of assets under management. Apollo is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Apollo is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

16.     Defendant Bain Capital Partners, LLC ("Bain") is a private investment firm headquartered at 111 Huntington Avenue, Boston, Massachusetts 02199. It has over $20 billion under management and operates private equity funds. Bain is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Bain is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

17.     Defendant The Blackstone Group L.P. ("Blackstone") is a publicly traded investment firm headquartered at 345 Park Avenue, New York, New York 10154 and incorporated in Delaware. It has nearly $50 billion under management and operates private equity funds. Blackstone is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Blackstone is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

18.     Defendant The Carlyle Group LLC is a Delaware limited liability company headquartered at 1001 Pennsylvania Avenue, N.W., Washington, District of Columbia 20004. It has

nearly $40 billion under management and operates private equity funds, including defendants TC Group III, L.P. and TC Group IV, L.P. Collectively, Defendants The Carlyle Group LLC, TC Group III, L.P. and TC Group IV, L.P. will be referred to as "Carlyle." Each of the Carlyle defendants joined the conspiratorial activity alleged herein and is legally responsible for the unlawful conduct because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, each of the Carlyle defendants is legally responsible because it acted through, facilitated, dominated, or controlled the actions of another one of the Carlyle defendants in furtherance of the unlawful conspiratorial activity alleged herein.

19.    Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a diversified financial services firm engaged in investment banking, trading and principal investments, asset management, securities services, and investment research. The investment banking divisions of Goldman Sachs provide financial advice to companies and financial sponsors and underwrite the debt for a large percentage of LBOs and other large leveraged acquisitions. Goldman Sachs' investment management division includes Goldman Sachs Private Equity Group (referred to herein as "Goldman Sachs PIA"), which is the private equity arm of Goldman Sachs. Goldman Sachs PIA has approximately $39 billion under management. Goldman Sachs is headquartered at 85 Broad Street, New York, New York 10004. Goldman Sachs is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Goldman Sachs is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates, including without limitation Goldman Sachs PIA, in furtherance of the unlawful conspiratorial activity alleged herein.

20.    Defendant JP Morgan Chase & Co. ("JP Morgan") is a financial holding company incorporated under Delaware law in 1968 and is a leading global financial services firm and one of the largest banking institutions in the United States. JP Morgan's investment bank and financial operations provide financial advice and underwrite the debt for a large percentage of LBOs. JP

Morgan is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached and participated in an unlawful agreement with their competitors to restrain competition. Alternatively, JP Morgan is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates, including without limitation J.P. Morgan Partners, LLC ("JPMP"), in furtherance of the unlawful conspiratorial activity alleged herein.[7]

21.    Defendant Kohlberg Kravis Roberts & Co. L.P. ("KKR") is a private equity firm incorporated in Delaware and headquartered at 9 West 57th Street, New York, New York 10019. KKR has over $30 billion under management and operates private equity funds. KKR is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, KKR is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

22.    Defendant Providence Equity Partners, Inc. ("Providence") is a private investment firm incorporated in Delaware and headquartered at 50 Kennedy Plaza, 18th Floor, Providence, Rhode Island 02903. Providence operates private equity funds with nearly $21 billion in equity commitments. Providence is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Providence is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

---

[7]    On August 1, 2006, the senior professionals of JPMP spun off to form CCMP Capital Advisors, LLC ("CCMP Capital"). CCMP Capital continues to manage JPMP investments by agreement with JP Morgan, and continued to participate in the unlawful agreement to restrain competition.

23.     Defendant Silver Lake Technology Management, L.L.C. ("Silver Lake") is a private equity firm headquartered at 2775 Sand Hill Road, Suite 100, Menlo Park, California 94025. It has $5.9 billion under management and operates private equity funds. Silver Lake is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Silver Lake is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

24.     Defendant TPG Capital, L.P. ("TPG") is a private equity firm headquartered at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102. It has over $30 billion under management and operates private equity funds. TPG is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, TPG is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

25.     Defendant Thomas H. Lee Partners, L.P. ("T.H. Lee") is a private equity firm, organized in Delaware, with its headquarters at 100 Federal Street, 35th Floor, Boston, Massachusetts 02110. It has approximately $20 billion under management and operates private equity funds. T.H. Lee is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, T.H. Lee is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

26.     The defendants listed in ¶¶15 through 25 above are collectively referred to, where appropriate, as "Defendants."

## CO-CONSPIRATORS

27.    Co-conspirator Clayton, Dubilier & Rice, Inc. ("CD&R") is a private equity firm headquartered at 375 Park Avenue, 18th Floor, New York, New York 10152.  CD&R operates private equity funds worth more than $4 billion.

28.    Various other persons, firms, and corporations, including investment banks, officers, and directors of private equity firms and management of target companies not named as defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

29.    At all times herein mentioned, each and every Defendant and co-conspirator was an agent of each and every other Defendant and co-conspirator.  Each of the Defendants aided and abetted the commission of unlawful, unfair, and deceptive business practices by their co-conspirators and were aware, or should have been aware, that the agreements to allocate and rig bids substantially assisted and/or encouraged their co-conspirators in the commission of the unlawful, unfair, and anticompetitive acts alleged herein.

## PLAINTIFFS

30.    Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit") is located in Wayne County, Michigan and is a public retirement trust fund organized under the laws of the State of Michigan.  Detroit tendered shares to Defendants and/or their co-conspirators in the PanAmSat LBO, SunGard LBO, Neiman Marcus LBO, Michaels Stores LBO, Freescale LBO, HCA LBO, Aramark LBO and Kinder Morgan LBO.  As a result of the conspiracy herein alleged, the prices paid to Detroit and the other public shareholders in those LBOs were suppressed below prices that would otherwise prevail in a competitive market, and as a result of the alleged conspiracy, Detroit and the public shareholders of those companies were injured in their business and property by reason of the antitrust violations alleged herein.

31.    Plaintiff Kirk Dahl is a resident of Stillwater, Minnesota.  Plaintiff Helmut Goeppinger is a resident of Esslingen am Neckar, Germany.  Plaintiff Rufus Orr is a resident of King County, Washington.  Plaintiffs Dahl, Goeppinger and Orr tendered shares of Freescale to

13

Defendants and their co-conspirators in the Freescale LBO. As a result of the conspiracy herein alleged, the prices paid to Plaintiffs Dahl, Goeppinger and Orr, and other public shareholders of Freescale were suppressed below prices that would otherwise prevail in a competitive market, and as a result of the alleged conspiracy, Plaintiffs Dahl, Goeppinger and Orr and the public shareholders of Freescale were injured in their business and property by reason of the antitrust violations alleged herein.

33. Plaintiff Robert Zimmerman is a resident of Summit County, Ohio. Plaintiff Zimmerman tendered shares of Kinder Morgan to Defendants and their co-conspirators in the Kinder Morgan LBO. As a result of the conspiracy herein alleged, the prices paid to Plaintiff Zimmerman and other public shareholders of Kinder Morgan were suppressed below prices that would otherwise prevail in a competitive market, and as a result of the alleged conspiracy, Plaintiff Zimmerman and the public shareholders of Kinder Morgan were injured in their business and property by reason of the antitrust violations alleged herein.

33. The plaintiffs listed in ¶¶30 through 32 above are collectively referred to, where appropriate, as "Plaintiffs."

## DEFENDANTS' SCHEME TO COLLUDE

34. Defendants' objective in an LBO is to purchase the securities of publicly listed target companies at the lowest possible price. As a part of this process, and after the target is taken private, Defendants routinely engage their co-conspirator investment banks to issue bonds to recoup their equity investment. Defendants obtain additional profits by siphoning off cash flow from the private company, a process facilitated by the tax advantage of financing the debt used to take the company private, and then pay themselves back their equity investments. Then, after a period of time, Defendants relist the securities and sell them to the public or to private buyers at a substantially higher price than the collusive price they paid for the target company. Defendants' anticompetitive conduct adversely affected shareholders in club deal LBOs during the Conspiratorial Era. This Complaint describes transactions that are part of Defendants' conspiracy to dominate and control the largest LBOs in the United States and to fix the prices for target companies at artificially low levels.

35.     Defendants' collusive behavior in setting prices and terms in LBOs has enabled them to reap supracompetitive, inflated and monopolistic returns on their invested capital, typically 20%-30% per year, and sometimes more than 100% per year. Such consistently high returns on investment are not due to extraordinary business acumen; rather they are due to the result of Defendants' ability to collectively manipulate the bidding process to acquire the stock of target companies at below-market prices in violation of federal antitrust law.

36.     Throughout the Conspiratorial Era, to lessen the competition for deals and to facilitate their scheme to allocate the market and fix prices at artificially low levels, Defendants and their co-conspirators formed bidding clubs to rig the bidding for control of public corporations. Defendants' bidding clubs restrain competition because they limit the available number of competitors to bid on deals, which artificially depresses buyout prices, thereby harming the shareholders of publicly traded companies. The conspiracy allows Defendants to orchestrate an apparent show of "competition" wherein members of the conspiracy knowingly submit inferior pretended bids. An executive of one defendant admitted that the Defendants have strong reasons to submit sham "competing" bids saying "*'[a]s long as two girls show up to the dance, there's enough competition.'*"[8]

37.     Defendants engaged in numerous anticompetitive and collusive tactics to rig the per share purchase price of target company securities. As a result of these violations of antitrust law, Defendants were able to purchase a target company's stock for significantly less than if competitive bidding had occurred.

38.     As part of their pattern and course of conduct in rigging LBO bids, Defendants agreed that after one bidding club signed a definitive acquisition agreement with a target company they would refrain from "jumping the deal," that is, submitting legitimate competing bids or taking any action that would interfere with the winning bidding club's acquisition of the target company at the

---

[8]     Andrew Ross Sorkin, *Dealbook: One Word Nobody Dares Speak* (Oct. 16, 2005), http://www.nytimes.com/2005/10/16/business/16dealbook.html?scp=1&sq=one+word+nobody+dares+speak&st=nyt#.

Case 1:07-cv-12388-EFH  Document 487  Filed 09/08/11  Page 20 of 122

non-competitive price.  Some Defendants admitted to their agreement to refrain from "interloping," publicly acknowledging that their scheme works by limiting competition for LBOs.  "*There's less competition for the biggest deals*,'" said TPG founder Bonderman during a March 22, 2006 luncheon speech in New Orleans.[9]  During his speech, Bonderman admitted in a graphic that "*[c]onsortia often limits bidding*.'"[10]  This was a prime driver behind Defendants combining to form bidding clubs on the largest LBOs.

39.     Some private equity executives concede bidding club deals lower the purchase price of target companies.  One prominent private equity investor admitted, "*[y]ou're not going to get me to say that aloud, but let's just say that you're not wrong*,'" when asked whether forming a bidding club diminishes the final takeover price.[11]

40.     As compensation for not competing, Defendants who were not part of the winning consortium: (i) were cut into the deal as advisors, where they garnered lucrative fees; (ii) were given equity stakes in the deal; and/or (iii) secured an agreement that they would be included in the next LBO bidding club.

41.     Defendants' senior executives also invested in each other's investment funds and businesses, thus benefiting when their competitors entered going-private transactions on favorable terms. ▮

---

[9]     Andrew Ross Sorkin, *Dealbook: Colluding or Not, Private Equity Firms Are Shaken* (Oct. 22, 2006), http://www.nytimes.com/2006/10/22/business/yourmoney/22deal.html?scp=2&sq=one+word+nobody+dares+speak&st=nyt.

[10]    *Id.*

[11]    Andrew Ross Sorkin, *Dealbook: One Word Nobody Dares Speak* (Oct. 16, 2005), http://www.nytimes.com/2005/10/16/business/16dealbook.html?scp=1&sq=one+word+nobody+dares+speak&st=nyt#.

[12] ▮

16



Certain managing directors also have business ventures together outside of the private equity world. For example, certain managing directors of Bain, Silver Lake and TPG are co-owners of the Boston Celtics.[16]

42.     This collusive conduct prevents competition in LBO club bidding and reduces the prices Defendants pay target company shareholders.

## THE ECONOMIC EVIDENCE

43.     Recent economic scholarship has examined the pricing and characteristics of club deal LBOs. *See* Micah S. Officer, Oguzhan Ozbas & Berk A. Sensoy, *Club Deals in Leveraged Buyouts,* Journal of Financial Economics (2010).  The paper defines a "club deal" LBO as a completed LBO that has a deal value of greater than $100 million in which at least one of the participating private equity partnerships is a prominent private equity firm.  The authors conclude that club deal LBO acquirers paid shareholders significantly lower premiums compared to sole sponsor LBOs (where only one private equity firm is involved in the deal) and strategic acquirers takeovers.

44.     Officer, *et al.,* examine two definitions of "deal premium" in their study.  One definition is an absolute measure of the premium difference and the other is a relative measure of premium.

---

[13]     Ex. 18, ██████████ Ex. 20, ███████████████████.

[14]     Ex. 22, ██████████ Ex. 8, ███████████████████.

[15]     Ex. 23, ██████████.

[16]     Ex. 16, ████████████████████████.

45.     Under the absolute measure, there are two subsets:   Compound Return and Compound Return Net of Market. The Compound Return to the target's shares is determined by the change in premium over the period from the day the deal is announced through the delisting date of the target's shares (or six months after announcement, whichever is earlier). The Compound Return Net of Market is determined by the Compound Return less the compound return to a broad-based market index (provided by the Center for Research in Security Prices at the University of Chicago) over the same period, which filters out the general market return from the Compound Return of the acquired company. These are absolute measures of deal premiums.

46.     The second definition of premium is the percentage difference between the deal multiple (equity deal value plus total debt minus (excess) cash scaled by either sales or EBITDA[17]) for the LBO and the average multiple for comparable (within the same three-year window and in the same industry) non-LBO deals. The percentage difference in deal multiples between LBO and comparable non-LBO deals is a conservative estimate of the percentage difference in premiums between these two types of deals.   Thus, this second measure of premiums is a relative one, providing a metric for comparing premiums in LBO deals to premiums in non-LBO deals announced at about the same time for targets in the same industry.

47.     Under these measures, the authors found that club deal LBOs have statistically significantly lower premiums (both in absolute and relative terms) compared to both sole sponsor LBOs and acquisitions by publicly traded acquirers. For example, under the Compound Return Net of Market absolute measure, the average increase in the target's stock price is 7.3% for club deal LBOs compared to 15.8% for sole sponsor LBOs and 22.0% for acquisitions by strategic acquirers. Thus, the difference in change of premium between club LBOs and the sole sponsor LBOs is

---

[17]     EBITDA stands for "Earnings Before Interest, Taxes, Depreciation and Amortization." It is a measure of the cash flow available to service debt and pay dividends. EBITDA is, along with price to earning ratio and price to earnings growth ratio, the most common metric by which target companies are valued.

approximately 53% (7.3% compounded to 15.8%) and the difference between club LBOs and acquisitions by publicly traded acquirers is approximately 66% (7.3% compared to 22%). In other words, it is extremely unlikely that the differences noted above are mere coincidence.

48.     Under the relative measure, the average percent difference from deal multiples for comparable acquisitions by publicly traded bidders is between 8% and 20% *lower* for club deals than for sole sponsor LBOs, and the disparity is greater still between club deals and strategic deals. This metric therefore suggests that premiums are also statistically significantly lower for club LBOs than sole sponsor and strategic LBOs.

49.     The Department of Justice's ("DOJ") investigation into bidding practices of private equity firms (discussed in more detail at ¶¶90-94) started in the last quarter of 2006. All of the differences in premiums between club and sole sponsor LBO deals noted above are particularly acute for deals announced prior to the end of 2006 (as all illegal club LBOs in this Complaint were). Furthermore, Officer, *et al.*, report that, throughout the period examined in their paper, there were significantly fewer competing bids in successful club deals than successful sole sponsor private equity acquisitions.

50.     Overall, Officer, *et al.*, find that the results of this recent economic analysis are most consistent with the conclusion that club deal LBOs have anticompetitive effects, and are detrimental to target company shareholders. Specifically, by both the absolute and relative measures described above, deal premiums are significantly lower for club deal LBOs relative to both sole sponsor LBOs and acquisitions by publicly traded acquirers.

## ALTERNATIVE ECONOMIC RATIONALES ARE IMPLAUSIBLE

51.     The economic evidence described above does not support benign reasons for the prevalence of club deals. Neither the desire to diversify in sufficiently large or risky deals, nor interest in facilitating the acquisition of debt financing on favorable terms explains Defendants' conduct in club LBOs.

52.     While club deals are larger on average than sole sponsor LBOs, only 20% of club deal LBOs are larger than the largest sole sponsor LBO conducted by any of the Defendants during

the Conspiratorial Era. In other words, the vast majority of club deals are of a size that at least one of the participating private equity firms has recently completed (or is likely contemplating) on its own. Moreover, club deal targets do not appear systematically riskier or harder to value than targets of sole sponsor LBOs, as measured by historical stock return volatility, historical cash flow volatility, number of business segments (a measure of complexity), or analyst forecast errors (a measure of asymmetric information). These facts suggest that capital constraints or diversification concerns are unlikely to be first-order motivations for club deals.

53.     Further, while club deals have somewhat better financing terms than sole sponsor LBOs, the differences are not statistically significant. And, in any event, this factor should actually *increase*, not decrease, premiums paid to shareholders. Finally, club deals also involve significantly more lenders than sole sponsor LBOs because the private equity firms lock up the investment banks to prevent other private equity firms from obtaining financing for competing bids. This further exacerbates the anticompetitive effects of club LBOs.

## PRIOR COLLUSION IN THE FINANCIAL MARKETS

54.     Other instances exist in which economic and statistical evidence first disclosed the existence of collusion in financial markets. For example, in 1994, an economic analysis by two scholars provided the first evidence of collusion by market makers in the Nasdaq stock market in fixing transaction prices. *See* William G. Christie & Paul H. Schultz, *Why do NASDAQ Market Makers Avoid Odd-Eighth Quotes?*, 49 J. Fin. 1813 (1994). An opposing study sponsored by Nasdaq asserted that "the [NASDAQ] market structure makes any collusion inconceivable," arguing that "'it would be prohibitively difficult to establish and maintain collusion on Nasdaq.'" Floyd Norris, *Market Place; The Battle of the Studies: Is there competition at Nasdaq?*, N.Y. Times, Apr. 6, 1995, at D10.

55.     Notwithstanding the derision with which the Christie and Schultz analysis was greeted by Wall Street, the study was taken seriously by the DOJ and the Securities and Exchange Commission ("SEC"), which launched simultaneous investigations in 1994. After a two-year investigation, in July 1996, the DOJ sued 24 of the largest Nasdaq market makers, alleging a market-

wide agreement to avoid quoting in odd-eighths, essentially fixing the transaction price at 25 cents per share. *See U.S. v. Alex Brown & Sons, Inc., et al.*, www.usdoj.gov/atr/cases/f0700/0740.htm. Contemporaneously, the DOJ filed a Stipulated Consent Judgment in which the defendants agreed to terminate their illegal agreement. *See* www.usdoj.gov/atr/cases/f0700/0741.htm. The DOJ also filed a Competitive Impact Statement detailing the evidence of the conspiracy compiled in the course of the Department's two-year investigation. *See* www.usdoj.gov/atr/cases/f0700/0739.htm. Some parties to the DOJ's Nasdaq case – Goldman Sachs and JP Morgan – are also Defendants in this case. The government case brought against these defendants, and all of the other defendants sued in the government case, dramatically reduced the transaction prices for the Nasdaq stocks where they were market makers. *See* Arthur M. Kaplan, *Antitrust as a Public-Private Partnership: A Case Study of the Nasdaq Litigation*, 52 Case W. L. Rev. 111 (2001).

## THE ROLE OF MANAGEMENT

56.     One way Defendants limited competitive bids was to co-opt target company management by offering them economic inducements to limit the number of competitive bids or collude with other potential bidders to depress bidding. LBOs are often initiated when company management and a primary investment bank meet to discuss "strategic alternatives" for the company. These discussions quickly turn to the feasibility of a management-led LBO. The primary investment bank, which acts as the financial advisor, usually brings in its own private equity arm or a private equity firm recommended by management to discuss the price and terms of the LBO. Just as importantly, the primary investment bank also assesses the financial players and resources needed to be deployed to prevent any of these financial players from submitting competing bids.

57.     Once LBO models are developed to demonstrate the feasibility of financing with a significant rate of return, the primary investment banker solicits participation from other cooperative private equity firms. The discussion centers around which private equity firms will be invited into the bidding club, with the objective of making the leveraged buyout sufficiently attractive for themselves as well as management.

58.     In 2005, shareholders received approximately 9% less per share on LBOs involving management than in LBOs not involving management.

## THE ROLE OF THE INVESTMENT BANKS

59.     Investment banks play a critical role in the identification of LBO opportunities and the negotiation, financing, and exit strategies of LBOs, and as such, investment banks have organizational and financial incentives to align themselves with the largest private equity firms.

60.     At the beginning of the LBO process, an investment bank is typically hired by a company to advise it on "strategies to increase shareholder value," which is often a euphemism for designing and putting an LBO in motion.  The investment banker receives a lucrative fee for advising the company during this process.

61.     Once the company decides to sell itself, or is persuaded to put itself on the block, its investment bank is responsible for packaging the company and contacting selected potential buyers. Potential buyers comprise two general categories: (i) long-term corporate or strategic buyers; and (ii) short-term financial buyers such as Defendants.

62.     The investment bankers that advise on selling a company have shifted from primarily soliciting corporate/strategic buyers to soliciting private equity firms.  The result has been a complete shift of the source of fees for the investment banks from corporate/strategic buyers to private equity firms.  In 2001, 17 of the 20 largest fee generators for investment banks were corporations/strategic buyers, whereas in 2005, only four of the 20 largest fee generators were corporations/strategic buyers and 16 of the largest fee generators were private equity firms.  In 2006, the top ten global LBO firms, including Defendants and their co-conspirators, paid more than $5 billion in investment banking advisory fees in connection with LBOs.  Investment banks steer their clients to private equity firms rather than corporate/strategic buyers because LBOs produce much larger advisory and future debt underwriting fees – and often a cut of the deal for the investment banks' private equity affiliates.

63.     Each private equity firm typically aligns itself with an investment bank for financing. When a bidding club is formed, the bidding club will tie up numerous investment banks and

22

potential sources of capital to create an additional barrier to entry for other potential buyers. For example, some of the largest investment banks, Citigroup, Deutsche Bank, Goldman Sachs, JP Morgan, Credit Suisse First Boston ("Credit Suisse"), and Morgan Stanley, acted as advisors and/or provided debt financing for the SunGard and Neiman LBOs. ████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████

64.     Only a few investment banks have the capital, resources, and connections to the private equity community necessary to participate in the largest LBOs, and these few banks are all repeat players.  Private equity firms exert control over the investment capital markets by aligning with particular investment banks and executing exclusivity deals with these banks.  Defendant private equity firms lock up the investment banks to prevent other competing private equity firms from obtaining necessary financing to support a competitive bid and to receive a lower interest rate on the deal financing.  This suppresses competition by excluding other possible bidders for a target company.

65.     The investment banks also participate in the scheme to earn substantial fees post-acquisition ("recycling fees").  These recycling fees provide the financial incentive for the investment banks to offer lower interest rates to the private equity firms who most often participate in LBOs as compared to other possible acquirers (such as strategic buyers).  Economic data indicate that the lower interest rates paid by private equity firms led to a four percentage point *increase* in equity return to the private equity firms, while at the same time premiums paid to shareholders in club LBOs *decreased*.

66.     After the acquisition is complete, the private equity firm buyers often place a secondary debt offering to fund a dividend recapitalization in order to recoup as much as 35% of their original investment, often within six months of the acquisition.  The investment banks also receive a fee for underwriting secondary bond placements.  Corporate/strategic buyers are less

desirable partners for investment banks because they lack any incentive to hire the banks to issue secondary debt to fund large dividends.

67.     Similarly, private equity firms, soon after they acquire a company, seek to sell some of the company's assets, or sell most or all of their interest in the company in an initial public offering ("IPO") or to a strategic buyer.  These activities also require substantial investment banking services and produce very high fees for investment banks, providing additional motivation to participate in the conspiracy.  In 2005 and 2006, the big investment banks received fees from private equity firms exceeding $11 billion, including advisory fees and recycling fees from follow-on bond offerings and exit strategies.  The chart after ¶127, which illustrates the sources of fees in the PanAmSat Holding Corporation ("PanAmSat") deal, serves as an example, in general, of how investment banks generate fees from private equity firms.

68.     Certain investment banks, including Merrill Lynch, Goldman Sachs, Credit Suisse, Citigroup, and JP Morgan, also have private equity arms that participate directly in bidding clubs. This creates a situation ripe for the sharing of competitive information and self-dealing.  One hand washes the other, as the investment bank lines up capital and debt financing for its fraternal private equity firm which in turn pays the bank substantial fees along each step in the deal.  As a result, the various opportunities for profiting from the deal are kept in the family.  For example:

a.      In HCA, Merrill Lynch – which HCA retained to discuss strategic alternatives with management – brought in its private equity arm, Merrill Partners, once HCA's management decided to go private.  The four financial advisors to the group – Merrill Lynch, Bank of America, Citigroup, and JP Morgan – also provided the debt financing.

b.      In Neiman, Goldman Sachs acted as both investor and advisor to the company.

c.      In Aramark, both Goldman Sachs and JP Morgan participated as a private equity firms, investment banks, and advisors. ████████████████
████████████████████

d.      In AMC, JP Morgan acted as investor, advisor to purchasers, and provided debt financing.

e.      In Kinder Morgan, Goldman Sachs initially acted as advisor to the company as it explored its strategic alternatives, but after the company's CEO and founder, Kinder, expressed interest in an LBO, Goldman Sachs switched

sides to advise the buyout group and Goldman Capital took a 25% stake in the deal.

    f.    In PanAmSat, Credit Suisse acted as both advisor to the company and provided debt financing.

    g.    In Michaels Stores, Inc. ("Michaels Stores"), JP Morgan acted as both the advisor to the company and provided debt financing.

    69.    The line between investment banks and private equity firms is further blurred, if not erased, by bank investments in funds managed by private equity firms. ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ As a result of interlocking investments, investment banks are often advising the target company to participate in an LBO with a private equity firm they control or in which they have invested capital. This creates an additional incentive for the investment bank to render favorable fairness opinions even though the takeover price has been artificially suppressed.

    70.    Because the investment banks play both sides of the table, information regarding pending and future deals flows freely between investment banks and private equity firms. This communications network is enhanced when private equity firms, investment banks, and target companies invest in one another and/or have common corporate officers and directors or associations, such as in the HCA LBO, and other specific deals identified in this Complaint. For example, JP Morgan's National Advisory Board, chaired by Jimmy Lee, Co-Chair of the Investment Bank, has a selective membership roster that has included, during the time period relevant to this Complaint, senior leadership from Defendants Texas Pacific Group, Blackstone, T.H. Lee, Silver Lake, Carlyle and Apollo. These and other associations provide conduits for communicating competitive information among Defendants and their co-conspirators.

## DEFENDANTS' INCENTIVES TO PLAY BY "CLUB RULES"

    71.    Bidding clubs are comprised of the major private equity firms, including the Defendants. These are repeat players who have raised and deployed the largest funds. These private equity firms' following private equity "etiquette" in the large club LBOs is based on their willingness to play by "bidding club rules," including abiding by agreements made to allocate participation in present and future LBOs and to exclude participation by outside bidders. As a result, the bidding club's collusive offer: (i) is the only real bid on the table; (ii) is the only deal that is

presented to the shareholders; and (iii) has the endorsement of management. When the bids are rigged in this fashion, potential competitors, including members of the bidding club, are prevented, through exclusivity agreements, and cartel allocation agreements, from competing or making lower bids.

72.     Playing by "club rules" undermines the free market and provides these private equity firms a collectivist, conspiratorial safety net. Potential competitive bidders that were not contacted in the initial search for a private equity firm, *i.e.*, who were not a part of the "winning" bidding club cartel, were offered the opportunity to participate in the "syndication" of the bid. This is a *quid pro quo* for the excluded firms agreeing to fall in line and not submit competitive bids. By bringing the "losers" into the fold, the winners are assured that, if they are not part of the winning bidding club in a subsequent deal, their financial interests will be protected.

73.     The end result is that there are no private equity firms with the resources to make a competing bid for the transaction which have not been co-opted into the deal or promised a piece of subsequent deals in exchange for not competing. The private equity Defendants and their co-conspirators, including the investment banks, as well as target company management are all winners in this game. Defendants' collusive conduct causes the ultimate price paid to the target company's shareholders to be less than what a competitive market would yield. The only actual losers are those left out of the clubs, *i.e.*, the shareholders of the target companies who are paid artificially low premiums.

## JURISDICTION AND VENUE

74.     This action is instituted under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the class and sub-classes by reason of the violations, as herein alleged, of §1 of the Sherman Act, 15 U.S.C. §1.

75.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of §1 of the Sherman Act, as alleged herein.

76.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by §§4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

77.     Venue is found in this District pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b)-(d).   Venue is proper in this judicial District because during the Conspiratorial Era one or more of the Defendants resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described herein has been carried out, in this District.

78.     Defendants maintain offices, have agents, transact business, or are found within this judicial District.

79.     This Court has personal jurisdiction over each Defendant because each was engaged in an illegal scheme directed at and with the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Class") and sub-classes:

**Injunctive Relief Class**

> All persons who have an ownership interest in securities in any publicly-listed company traded on any United States securities market or exchange. Excluded from the Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

**Damages Sub-Classes**

### a. PanAmSat Damages Sub-Class

> All persons who tendered their PanAmSat securities as part of the PanAmSat LBO on or about August 20, 2004 (the "PanAmSat Sub-Class").   Excluded from the PanAmSat Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

27

### b. SunGard Damages Sub-Class

All persons who tendered their SunGard securities as part of the SunGard LBO on or about August 11, 2005 (the "SunGard Sub-Class"). Excluded from the SunGard Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### c. Neiman Marcus Damages Sub-Class

All persons who tendered their Neiman Marcus securities as part of the Neiman Marcus LBO on or about October 6, 2006 (the "Neiman Marcus Sub-Class"). Excluded from the Neiman Marcus Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### d. Michaels Stores Damages Sub-Class

All persons who tendered their Michaels Stores securities as part of the Michaels Stores LBO on or about October 31, 2006 (the "Michaels Stores Sub-Class"). Excluded from the Michaels Stores Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### e. Aramark Damages Sub-Class

All persons who tendered their Aramark securities as part of the Aramark LBO on or about January 26, 2007 (the "Aramark Sub-Class"). Excluded from the Aramark Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### f. HCA Damages Sub-Class

All persons who tendered their HCA securities as part of the HCA LBO on or about November 11, 2006 (the "HCA Sub-Class"). Excluded from the HCA Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### g. Freescale Damages Sub-Class

All persons who tendered their Freescale securities as part of the Freescale LBO on or about December 1, 2006 (the "Freescale Sub-Class"). Excluded from the Freescale Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

### h. Kinder Morgan Damages Sub-Class

All persons who tendered their Kinder Morgan securities as part of the Kinder Morgan LBO on or about May 30, 2007 (the "Kinder Morgan Sub-Class"). Excluded from the Kinder Morgan Sub-Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, and their co-conspirators, and the present and former partners, predecessors, subsidiaries, and affiliates of the foregoing.

81.     The prosecution of separate actions by individual members of the Class and sub-classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants and their co-conspirators.

82.     Defendants and their co-conspirators have acted, and refused to act, on grounds generally applicable to the Class and sub-classes, thereby making appropriate final injunctive relief with respect to the Class and sub-classes as a whole.

83.     Plaintiffs believe that while there are thousands of Class and sub-class members as described above, their exact number and identities are ascertainable from trading records.

84.     The Class and sub-classes are so numerous and geographically dispersed that joinder of all members is impracticable.

85.     There are questions of law and fact common to the Class and sub-classes, which relate to the existence of the conspiracies alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

    a.    whether Defendants and their co-conspirators engaged in combinations and conspiracies among themselves to fix and maintain prices of securities of target companies, as alleged herein, purchased by Defendants and their co-conspirators;

    b.    the identity of the participants in the conspiracies;

    c.    the duration of the conspiracies alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracies;

    d.    whether the alleged conspiracies violated §1 of the Sherman Act;

    e.    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and other members of the Class and sub-classes;

    f.    the effect of Defendants' conspiracies on the prices of securities sold to Defendants and their co-conspirators during the Conspiratorial Era;

g.    the appropriate measure of damages sustained by Plaintiffs and other members of the Class and sub-classes;

h.    the appropriate injunctive relief;

i.    whether releases obtained in state court breach of fiduciary duty class action settlements release any Defendant from the Class' claim for injunctive relief; and

j.    whether releases obtained in state court breach of fiduciary duty class action settlements release any Defendant from the subclasses' claims for damages.

86.    Plaintiffs' claims are typical of the claims of the other Class and sub-class members, and Plaintiffs will fairly and adequately protect the interests of the members of the Class and sub-classes. Plaintiffs tendered their securities of the target companies that underwent an LBO, and their interests are coincident with and not antagonistic to those of the other members of the Class and sub-classes. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

87.    The questions of law and fact common to the members of the Class and sub-classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class and sub-classes are readily definable and are ones for which records should exist in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Treatment of this case with a Class and sub-classes will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## TRADE AND COMMERCE

89.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce. During the time period covered by this Complaint, Defendants and their co-conspirators used the instrumentalities of interstate commerce to purchase securities of the target companies enumerated herein throughout the United States.

## UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATION

90.     On October 11, 2006, the *Wall Street Journal* reported that the DOJ had launched an investigation into the bidding practices of private equity firms including, among others, the following Defendants and co-conspirators: (i) KKR; (ii) Carlyle; (iii) CD&R; (iv) Merrill Partners; and (v) Silver Lake. Each received letters from the New York regional office of the DOJ seeking broad information about their business practices and involvement in LBOs going back to late 2003.

91.     Specifically, the DOJ is investigating instances of collusion in the form of bid-rigging, focusing on whether bidding clubs – which include Defendants, the investment banks, and often the target company's senior management – communicated about prices and the value of bids in order to reach secret agreements and keep target companies' prices low.

92.     One unnamed source stated that the DOJ investigation concentrates on "'what deals did we do, who did we work with [and] when did we find out about them.'"[18] Private equity transactions involving management-led LBOs are a primary target of the inquiry because management has an incentive to protect their own financial interests by collaborating closely with a club of private equity firms to avoid an open bidding process.

93.     In the August 13, 2007 Amendment No. 1 to Form S-1, KKR confirmed that the DOJ was requesting documents as part of its bid-rigging investigation. Specifically, KKR disclosed "we have received a request for certain documents and other information from the Antitrust Division of

---

[18]     Peter Smith, *Buy-Out Firms Face Harsher Regulation*, Financial Times, Oct. 12, 2006, at 29.

the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have engaged in conduct prohibited by the United States antitrust laws." In the April 8, 2008 Form S-1, Apollo stated that "it has been reported in the press that a few of our competitors in the private equity industry have received information requests relating to private equity transactions from the Antitrust Division of the U.S. Department of Justice." This indicates that the DOJ's investigation of several Defendants is ongoing.

94.    The DOJ investigation is ongoing.  ███████████████████████
████████████████████████████████████[19]

## RELEVANT MARKET

95.    The relevant product market for purposes of this action is the market for LBO tender offerings of more than $2.5 billion and related LBO and investment banking services paid for through reduced prices paid for the acquisition of target companies. The relevant geographic market is the United States.

96.    Defendants are among the largest United States-based private equity firms and controlled approximately 80% of the LBOs in the relevant market (LBO offerings of more than $2.5 billion) during the relevant time period. Defendants and their co-conspirators collude to dominate the relevant market, setting prices and transaction terms, as would a single firm monopolist, via the collective exercise of their combined monopoly power.

97.    The billions of dollars of both debt and equity that must be raised to participate in these LBOs creates tremendous barriers to entry into the relevant market. The number of private equity firms that have the ability and financial means necessary to control the LBOs in the relevant

---

[19]    *See* Ex. 24, ████████████████████████████████████████
████████████████████Ex. 25,█████████████████████████████████
█████████████████████████████████████████████Ex. 26,█████████
████████████████████

market is limited to a small group of repeat players who invest collectively. This "club" approach further restricts an already inaccessible market.

## OVERVIEW OF THE PRIVATE EQUITY INDUSTRY AND ALLEGATIONS OF WRONGDOING

98.     Private equity firms operate outside the purview of the legal and administrative regime that regulates some aspects of the securities markets. This lack of regulation and the ability of private equity firms to operate with minimum transparency facilitates the formulation of the conspiracies alleged herein and has made private equity firms indispensable to target company officers who wish to share in the gains of uncompetitive LBOs at the expense of the outside shareholders of the target company.

99.     Defendants who collectively bid and ultimately conduct an LBO transaction generally organize a limited partnership of investors which is controlled by the management of the particular private equity firm that serves as a general partner. The limited partnership funds obtain capital commitments from certain qualified investors who become passive limited partners in the partnership funds. When the general partner identifies an appropriate investment opportunity and "calls" the required equity capital, each limited partner pays a *pro rata* portion according to its commitment. Federal securities laws do not regulate these funds.

100.     The defendant private equity firms align themselves in LBOs with the large investment banks who provide necessary financing. Participation in LBOs is immensely profitable to investment banks such as Goldman Sachs, Merrill Lynch and JP Morgan. These banks are repeat players in LBOs and often function as both investors and advisors.

101.     As a method of enforcing the agreed-upon cartel rules, private equity firms require the prospective investment banks to execute exclusivity agreements, which prevent the investment banks from offering to finance an LBO bid on the same target company from a competing bidder or group of bidders. These exclusivity agreements are designed to – and effectively do – lock out financing for any potential competing bidder for a target company.

102.   Private equity firms experienced historic economic growth from mid-2003 through 2006. The total number of acquisitions of public companies by both strategic buyers and single sponsor LBOs was nearly 27% lower from 2003 through 2006 compared to the four preceding years, 1999 through 2002; however, the number of LBOs *almost doubled*.  By 2006, over 40% of all acquisitions of public companies were LBOs.

| | 1999 | 2000 | 2001 | 2002 | Total 1998-2002 |
|---|---|---|---|---|---|
| Acquisitions of Publicly Traded Companies - Both Strategic Buyers & LBOs | 746 | 676 | 591 | 411 | 2,424 |
| Total LBOs | 74 | 77 | 77 | 70 | 298 |
| % of Total Acquisitions | 9.90% | 11.40% | 13% | 17% | 12.30% |

| | 2003 | 2004 | 2005 | 2006 | Total 2003-2006 |
|---|---|---|---|---|---|
| Acquisitions of Publicly Traded Companies - Both Strategic Buyers & LBOs | 463 | 372 | 448 | 488 | 1,771 |
| Total LBOs | 124 | 98 | 142 | 202 | 566 |
| % of Total Acquisitions | 26.80% | 26.30% | 31.70% | 41.40% | 32% |

Source: Mergerstat Review 2006

103.   This seismic shift to private equity firm bidding clubs was fueled by over $160 billion pouring into private equity funds during 2006, nearly four times the $41 billion invested in all of 2003.

104.   As private equity firms completed a greater percentage of transactions, the median premiums offered for all acquisitions, including LBOs, as measured from five days prior to the announcement date to the announcement date, declined from 41.1% in 2000 to 23.4% in 2004 and remained relatively flat for 2005 and 2006.  Similarly, the median premiums for only LBOs was in the low 40% range from 2000 through 2003.  However, LBOs suffered a precipitous drop in median premiums from 41.5% in 2003 to 17.2% in 2004.  Due to the large number of LBOs from 2004 through 2006, the median premium for all acquisitions was negatively affected by this huge drop in premiums for LBOs.  In other words, as the number of LBOs increased, the median premium offered on all acquisitions was mathematically reduced due to the low premium paid on LBOs, indicating

34

non-LBO premiums would be significantly higher during 2004, 2005 and 2006 than the median premiums on all acquisitions.

105.    As set forth in recent economic scholarship, club LBO premiums are statistically significantly lower than premiums paid by publicly traded companies and in sole sponsor LBOs. Using the absolute measure of premium, calculated using the period from announcement date through delisting, the average Compound Returns and average Compound Returns Net of Market (as defined in ¶45) for all acquisitions of publicly traded companies through club LBOs, sole sponsor LBOs, and by publicly traded companies are summarized as follows:

|  | Announcement Date | |
|---|---|---|
|  | Compound Return | Compound Return Net of Market |
| Club LBO | 13.8% | 7.3% |
| Sole sponsor LBOs | 21.58% | 15.76% |
| Publicly-Traded | 26.6% | 21.9% |

106.    Using the relative measure of premiums (as defined in ¶46), the average premiums for club LBOs are approximately 24% less than the average premiums for acquisitions by publicly traded companies.

## DEFENDANTS' PREVIOUS HISTORY OF COMPETITION

107.    Defendants' previous history of competition belies the collective nature of their conduct during the Conspiratorial Era.  Throughout the 1980s, 1990s and up to the Conspiratorial Era, Defendants rarely engaged in club deals.  Instead, they competed against each other and strategic buyers for LBOs. As shown above, the premiums paid by Defendants for LBOs prior to the Conspiratorial Era were significantly higher.  Defendants' conduct during the Conspiratorial Era, which represents an about-face from their history of competition, demonstrates an agreement to cease competing and instead engage in collectivist conduct that handsomely rewards private equity firms at the shareholders' expense.

### THE ILLEGAL LBOS

108.    During the Conspiratorial Era, Defendants, along with their co-conspirators, conspired to rig the purchase price in club LBOs, the number and identity of which are unknown to Plaintiffs at this time, but which include the following:  PanAmSat, AMC Entertainment Inc. ("AMC"), SunGard, Neiman, Michaels Stores, HCA, Freescale, Aramark and Kinder Morgan.

**The PanAmSat LBO**

109.    The PanAmSat LBO was ostensibly conducted as an "auction," but Defendants in fact cooperated with one another, shared bidding strategies, and used sham (or "soft") bids to manipulate the outcome of the auction.

110.    In early March 2004, PanAmSat, with the assistance of Credit Suisse, obtained indications of interest from potential buyers.  The following chart details Defendants' cartel, advisors, and financiers for the PanAmSat deal, date announced and price of the deal:

| **PanAmSat** | |
| --- | --- |
| Deal amount | $4.3 billion ($23.50/share) |
| Date deal announced | April 20, 2004 |
| Purchasing PE firms | KKR<br>Carlyle<br>Providence |
| Debt financers | CSFB<br>Citigroup<br>JP Morgan |
| Purchasing advisor(s) | Citigroup<br>JP Morgan (for Carlyle and Providence) |

| Company advisor(s) | CSFB<br>Evercore Partners |
|---|---|
| Other participating<br>PE firms | Apollo[20]<br>Madison Dearborn<br>Bain Capital<br>T.H. Lee<br>Blackstone<br>Texas Pacific Group<br>Spectrum Equity Investors<br>Silver Lake[21] |

111. 

112.

---

[20]    Andy Pasztor and Dennis K. Berman, *PanAmSat's Appeal Is Global, but Bidders In U.S. Have an Edge, The Asian Wall Street Journal* (April 14, 2004) (various competing bids for PanAmSat rumored to come from the following private equity teams/firms: (1) Apollo and Madison Dearborn; (2) T.H. Lee, Bain and Quadrangle Group; (3) Blackstone, The Carlyle Group and Providence; (4) Texas Pacific Group and Spectrum Equity Investors; and (5) KKR).

[21]    

[22]    Ex. 100, ▮▮▮▮▮ Ex. 100, ▮▮ Ex. 873 ▮▮▮▮.

[23]    Ex. 101, ▮▮▮▮

[24]    *Id.*

[25]    *Id.*; Ex. 102, ▮▮▮▮

113.    During the first round of bidding, Carlyle and Providence submitted a joint indication of interest for PanAmSat at ███████ per share.[26] T.H. Lee (███████ per share), KKR (███████ per share), Blackstone (███████ per share) and Bain (███████ per share) also submitted indications of interests as sole sponsors.[27]

114.    ███████████████████████████████, Carlyle, Providence and Blackstone came together after the first round and submitted a joint second round bid.[28]

115.    ████████████████████████████████████
████████████████████████████████████
███████████████████████[29] █████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
█████████████████████████

116.    ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████[30]

117.    ████████████████████████████████████
████████████████████████████████████

---

[26]     Ex. 103, ███████████████.

[27]     *Id.*

[28]     Ex. 104, ███████████████.

[29]     Ex. 105, ██████████.

[30]     *Id.*



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ ,"[31]

118.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮[32] ▮▮▮▮▮▮▮▮▮▮▮▮, KKR submitted a higher second round bid of $24 per share.[33]

119.   KKR "won" the auction on April 20, 2004 as sole sponsor, and although the deal did not close for another four months, no other competing bids were ever made. KKR's victory entitled it to: (1) 100% of the ▮▮ million sponsor fee; (2) PanAmSat's future merger and acquisition proceeds; and (3) the profit from any future sale of or IPO of PanAmSat.

120.   But less than a month later, on May 17, 2004, KKR cut the losing bidders, Carlyle and Providence, in the deal, allowing those firms to each invest $185 million in PanAmSat.[34] In so doing, KKR lowered its equity participation from 100% to 44%. KKR also permitted Carlyle and Providence to receive (1) a *pro rata* portion of the ▮▮ million sponsor fee (▮▮ million each for Carlyle and Providence); (2) an equal split of future merger and acquisition and IPO proceeds; and (3) board representation at PanAmSat.[35]

121.   The deal closed on August 20, 2004 for $23.50 per share. This per share price represented a 6.8% discount from the target company's prior day closing share price of $25.21.

122.   As a result of Defendants' bid-rigging, the winning bidder purchased PanAmSat *for less than the highest bid* and the *lowest bidders* walked away with the largest share of the deal.

---

[31]   Ex. 106, ▮▮▮▮▮▮▮

[32]   Ex. 107, ▮▮▮▮▮▮▮; Ex. 104, ▮▮▮▮▮▮▮▮▮.

[33]   Ex. 108, ▮▮▮▮▮▮▮▮▮▮▮▮

[34]   Ex. 109, ▮▮▮▮▮▮▮▮▮▮ Ex. 110, ▮▮▮▮▮▮▮▮▮▮▮▮

[35]   Ex. 111, ▮▮▮▮▮▮▮.

123.   The total consideration for the shares was in excess of $4 billion (including the assumption of debt), but KKR, Carlyle and Providence collectively contributed only $550 million in equity. The rest of the acquisition price was financed with debt.

124.   On October 19, 2004, PanAmSat borrowed money at a very high interest rate and used the money to pay a dividend of $245 million to KKR, Carlyle and Providence.

125.   On March 22, 2005, PanAmSat completed an IPO at $18 per share in which the company received $658 million and KKR, Carlyle and Providence received $200 million as a dividend. PanAmSat issued new shares and did not sell the shares owned by the private equity entities.

126.   On August 29, 2005, strategic buyer Intelsat, Ltd. ("Intelsat") announced that it was acquiring PanAmSat for $25 per share in cash and closed the deal on October 26, 2005. Intelsat paid $25 per share after PanAmSat had been loaded up with debt and stripped of $445 million of cash via special dividends. The sale to Intelsat netted the private equity firms approximately $1.8 billion. In total, KKR, Carlyle and Providence received $2.245 billion for a $550 million initial investment made 14 months earlier, or a return of 308%. But for Defendants' collusive conduct, these gains would have flowed to the initial PanAmSat shareholders.

127.   Below is a chart illustrating the sources of fees in the PanAmSat deal:

**Life Cycle of PanAmSat DEAL**

| | Advise on LBO | Closing Price: $4.0 B | Secondary Bond Offering: $245 M | Additional Shares Issued in IPO: Company Received $658 M | Sale of Entire Company to IntelSat |
|---|---|---|---|---|---|
| **Date:** | March 2004 | August 20, 2004 | October 19, 2004 | March 22, 2005 | August 29, 2005 |
| **Private Equity Firms:** | Contacted by Investment Banks | $550 M INVESTED - Receive Shares of Stock in New Company | $245 M Dividend Paid to PE Firms | $200 M Dividend Paid to PE Firms; PE Firms Maintained All Their Shares | $1.8 B Paid to PE Firms for Their Shares |
| **Investment Banks:** | Received Fees to Advise | Received Fees for Sale Closing; Received Fees to Underwrite Debt to PE Firms | Received Fees to Underwrite Bond Offering | Received Fees to Underwrite IPO | Received Fees Related to Sale of Shares |

**The AMC LBO and Subsequent Merger with Loews**

128.    Apollo, JP Morgan, Goldman Sachs, Bain and Carlyle orchestrated the AMC deal, in which two separate companies – AMC and Loews Cineplex – were purchased absent any competition and were subsequently merged to form a single company.

### a. The AMC Transaction

129.    The following chart details Defendants' cartel, advisors, and financiers for the AMC deal, the date announced and price of the deal:

| **AMC** | |
|---|---|
| Deal amount | $2.5 billion ($19.50/share) |
| Date deal announced | July 22, 2004 |
| Purchasing PE firms | Apollo<br>JP Morgan Partners |
| Debt financers | Citigroup<br>JP Morgan |
| Purchasing advisor(s) | Lazard Freres |
| Company advisor(s) | Goldman Sachs |

| | Blackstone |
| | T.H. Lee |
| | TPG[36] |
| Other participating | Goldman Sachs PIA[37] |
| PE firms | Warburg Pincus[38] |
| | Bain |
| | Carlyle |
| | Spectrum Equity Investors |

130.    In March 2004, AMC retained Goldman Sachs to evaluate the potential acquisition of Loews.[39]  At the time, Apollo owned over 50% of the shares of AMC, and three of its senior members (founder Leon Black and managing directors Marc Rowan and Larry Berg) sat on AMC's board.[40]  AMC's management, under the guidance of Apollo and Goldman Sachs, believed that consummating an outright buyout of Loews would be expensive and difficult.[41] ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Under Apollo's plan, resulting "synergies" from the merger would flow to Apollo and the other private equity firms who participated in the deal, because Apollo had always intended to take AMC private.[43]

---



36  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

37  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

39    Ex. 160, AMC Entertainment, Inc., Proxy Statement (Form DEFM 14A) (hereinafter, "AMC Proxy"), at 38; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40    Ex. 160, AMC Proxy at 7 and 32; Ex. 160, ▮▮▮▮▮▮▮▮▮▮▮

41    Ex. 160, AMC proxy at 38-39; Ex. 160, ▮▮▮▮▮▮▮▮▮▮▮▮

42    Ex. 161, ▮▮▮▮▮▮▮▮▮▮.

43    Ex. 162, ▮▮▮▮▮▮



131. ████████████████████████████████████████
████████████████████████████████████████████████
███ ██ ██████████████████████████████████████████
████████████████████████████████████████████████
█████████ █

132. ████████████████████████████████████████
████████████████████████████ ██ ██████████████
██████████████████████████████████ █ ████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

133. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████ 40

---

44   Ex. 163, ████████████████████████.

45   Ex. 164, ███████████████████; Ex. 95, ████████████. *See also* Ex. 165, ███████████;
Ex. 165, J████████████.

46   ██████████████.

47   Ex. 167, ████████████████; Ex. 162, ████████████ Ex. 168, █████████
███████.

48   Ex. 164, █████████████████████████████
███████.

49   Ex. 168, ███████████████.

50   Ex. 169, ██████████████.

134.    On July 22, 2004, AMC's board accepted JP Morgan's buyout offer of $19.50 per share.  There were no competing offers for the company.[51]

### b.  The Loews Transaction

135.    The same firms, quarterbacked by Apollo, rigged the Loews side of the deal.  The following chart details Defendants' cartel, advisors, and financiers for the Loews transaction, the date announced and the price of the deal:

| Loews | |
| --- | --- |
| Deal amount | $2.0 billion ($/share) |
| Date deal announced | June 21, 2004 |
| Purchasing PE firms | Bain Capital<br>Carlyle<br>Spectrum |
| Debt financers | unknown |
| Purchasing advisor(s) | unknown |
| Company advisor(s) | CSFB<br>Citigroup Global |

---

[51]     Ex. 160, ▮▮▮▮▮▮▮▮▮▮▮▮



| Other interested PE firms | T.H. Lee JP Morgan Partners Providence[52] |
|---|---|

136. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████ ████████████████████████
████████████████████████████████████

137.   ████████████████████, Bain, Carlyle and Spectrum subsequently submitted separate initial bids for Loews.[55]  T.H. Lee, Providence and JPMorgan Partners also reportedly submitted bids for Loews.[56]  By early June 2004, Bain was close to negotiating a deal with Loews management.[57]  By that time, both Spectrum and Carlyle had stopped competing for Loews and instead decided to partner with Bain on the buyout.[58]  JP Morgan Partners did not submit a final bid because it had been chosen by Apollo to invest in the AMC side of the AMC/Loews merger.[59]

138.   On June 14, 2004, Loews announced it had entered into an agreement to be sold to Bain, Carlyle and Spectrum.  Press Release, "The Carlyle Group, Loews Cineplex Entertainment

---

[52]   *Dow Jones Factivia*, "Movie Chain Loews gets bids of up to $1.7 bln—WSJ." (April 14, 2004).  (Various bidders are believed to have an interest in Loews.  They include T.H. Lee, Bain Capital, Providence and J.P. Morgan Partners.)

[53]   Ex. 97, ████████████████████

[54]   Ex. 170, ████████████████.

[55]   ████████████████████████; Ex. 171, ████████████████████

[56]   Ex. 172, ████████████████

[57]   Ex. 164, ████████████████

[58]   Ex. 164, ████████████████████  *see* Ex. 98, ████████████████████
████████████████

[59]   Ex. 96, ████████████████  Ex. 96, ████████████████████████

45

Announces Close of Acquisition by Bain Capital, The Carlyle Group and Spectrum Equity Investors" (July 30, 2004), http://www.carlyle.com/Media%20Room/News%20Archive/2004/Item 6706.html. Although Bain had technically "outbid" Carlyle and Spectrum, it allocated 38% and 20% of the equity to Carlyle and Spectrum, respectively.[60]

### c. The AMC/Loews Merger

139.    On June 20, 2005, less than one year after the sale of AMC and Loews, the companies merged and Apollo, JPMorgan Partners, Bain, and Carlyle all became co-owners.

**The SunGard LBO**

140.   SunGard was a non-auction deal in which almost *every single Defendant* participated, through the equity and/or debt financing side.

141.   The following chart details Defendants' cartel advisors and financiers for the SunGard transaction, the date announced and the price of the deal:

---



[60]   Ex. 17,                       .
[61]   Ex. 173,                 Ex. 174,
[62]   Ex. 42,                                       *see also* Ex. 43,

*see also* Ex. 44,

| **SunGard** | |
| --- | --- |
| Deal amount | $10.8 billion ($36/share) |
| Date deal announced | March 24, 2005 |
| Purchasing PE firms | Silver Lake<br>Blackstone<br>Bain Capital<br>KKR<br>TPG<br>Providence<br>Goldman Sachs |
| Debt financers | Goldman Sachs<br>Deutsche Bank<br>JP Morgan<br>Citigroup<br>Morgan Stanley |
| Purchasing advisor(s) | Citigroup<br>Deutsche Bank<br>Goldman Sachs<br>JP Morgan<br>Morgan Stanley |
| Company advisor(s) | CSFB<br>Lazard Freres |

| Other participating PE firms | Carlyle[63] T.H. Lee[64] Hellman & Friedman[65] |
|---|---|

142.   On March 24, 2005, Silver Lake offered to pay $36 per share for the company. Although several other parties expressed an interest in SunGard, there were no other proposals. Instead, Silver Lake and six other private equity firms – Blackstone, Bain, KKR, TPG, Providence, and Goldman Capital – joined together and agreed to split the deal.

143.   Consistent with Silver Lake's intention at the outset, management participated in the buyout. Concurrently with the buyout negotiation, five-year employment contracts were negotiated with the top seven executives, which offered the CEO/President and six other senior executives the opportunity to invest up to $35 million of their proceeds from the sale of the company into new company stock. The employment contracts also included a 15% incentive equity stake of the new company stock.

144.   As a result of Defendants' collusive conduct, the bidding club was able to purchase SunGard at an artificially low price. The price paid by the bidding club for SunGard's stock was less than the average price paid in other acquisitions in the same industry over the same time period as measured by the target company's price/earnings ratio.

145.





146.

147.

66

67

68   Ex. 46,

Ex. 42,

148.    The first wave of invitations went out to Bain, Carlyle, KKR, and T.H. Lee on or about February 18, 2005.[69] Silver Lake offered each of these firms equal partnership in the deal and mandated that each of the PE firms confirm their decision to continue due diligence by approximately February 26, 2005.  Each decided to continue.[70]

149.





[69]                              Ex. 49,
[70]
[71]   Ex. 51,                              .
[72]   Ex. 52,
[73]
[74]   Ex. 53,
[75]



150.   SunGard shareholders did not in fact benefit because ████████ ███████████████ as the firms had agreed not to compete for SunGard.[77] ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████[78]███████

████████████████████████████████████████████ On March 2, 2006, TPG and Blackstone were invited into Silver Lake's consortium ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████

151.   T.H. Lee and Carlyle decided to drop out of the consortium in mid-March.  The Silver Lake-led consortium then invited Goldman Sachs and Providence into the deal ███████ ████████████████████████████ ███████████████████████████

████████████████████████████████████████████████████████

---

76   Ex. 10, ████████████████████████

77   Ex. 44, ███████████████████████; Ex. 42, ████████████████████

78   Ex. 55, ████████████████

79   ████████████████

80   Ex. 13, ████████████████ Ex. 56, ████████

81   ████████████████████████████████████████.

82   ████████████████████████

51

███████████████████████████████████████████████████████████

████████████████████████████████████

152.    With no competition, the Silver Lake-led group purchased SunGard at $36 per share for over $11 billion.  The SunGard buyout bolstered Silver Lake's relationship with the firms it had invited into the deal.  ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████[86]

153.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ █ ██████████████████████████████████████████████████

██████████████████████████████[88]

---

[83]    Ex. 8, ██████████████████████.

[84]    Ex. 45, █████████████████████████████.

[85]    Ex. 176, ██████████████████.

[86]    Ex. 177, ████████████████████.

[87]    Ex. 8, █████████████████████ Ex. 8, ████████████████████████████████
██████████████████.

[88]    Ex. 8, ████████████████████████; Ex. 45, ████████████████████████.

154.    Reciprocity was not a hope; it was an expectation one conspirator had of another.



**The Neiman LBO**

155.    The following chart details Defendants' cartel, advisors and financiers for the Neiman

deal, the date announced and the price of the deal:

| Neiman Marcus | |
|---|---|
| Deal amount | $5.2 billion ($100/share) |
| Date deal announced | May 1, 2005 |
| Purchasing PE firms | TPG<br>Warburg Pincus |
| Debt financers | CSFB<br>Goldman Sachs<br>Deutsche Bank<br>B of A |
| Purchasing advisor(s) | CSFB |

---

[89]    Ex. 13, ▮▮▮▮▮; Ex. 8, ▮▮▮▮▮▮▮▮▮.

| Company advisor(s) | Goldman Sachs<br>JP Morgan |
| --- | --- |
| Other participating<br>PE firms | Apollo[90]<br>Leonard Green<br>KKR<br>Bain Capital<br>T.H. Lee<br>Blackstone |

156.    In January 2005, Neiman authorized its advisor, Goldman Sachs, to solicit bids for the company.[91] By February 22, 2005, Neiman received seven preliminary indications of interest: Bain (███████ per share), TPG (███████, T.H. Lee (█████████████████, Apollo (███████), Blackstone (███████), Warburg (███████), and KKR (███████).[92] After the first round of bidding, Neiman required each bidder to partner with another bidder █████████████████████████████ █████████████████████████████"[93] The participants were not pleased with the auction process. █████████████████████████████████████████ ████████████████"[94]

157.    After the first round, the bidding firms attempted to influence and manipulate the pairing efforts. █████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

90  ███████████████████████████████████████████████ *See*
████████████████████████████████.

91  Ex. 115, ███████████████████████████

92  Ex. 116, ███████████████████

93  Ex. 115, █████████████████████

94  Ex. 117, ████████████████

95  Ex. 119, ████████████████

96  Ex. 118, ██████████████████



158.

159.

[redacted][103] Four bidding teams were established (T.H. Lee and Blackstone; Bain and KKR; TPG and Warburg; and Apollo and Leonard Green).[104]

---

97    Ex. 14, [redacted] Ex. 14, [redacted]

98    Ex. 14, [redacted]

99    Ex. 14, [redacted].

100   Ex. 119, [redacted]

101   [redacted]

102   Ex. 119, [redacted]

103   Ex. 119, [redacted]

104   Ex. 122, [redacted]

160.   The firms from the competing consortia remained in contact with one another throughout the auction process. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ ▪ ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ 106

161.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ ▪ ████████████████████████████

████████████████████████████████████████

████████

---

105   ████████████

106   Ex. 123, ████████████████

107   Ex. 122, ████████████████

108   Ex. 124, ██████████████

109   Ex. 125, █████████████████████; *see also* Ex. 123, ████████████████
████████████████████

162.     In an April 27, 2005 meeting with potential buyers, certain of the executive officers of Neiman, including CEO Burton Tansky, disclosed their interest in staying with the new entity and having their current equity converted into equity in the new entity.  Two days later, on April 29, a bidding club consisting of TPG and Warburg submitted a bid of $100 per share.  As a condition of the bid, the Smith family, which held over 12% of the outstanding shares, pledged to vote all of its shares in favor of the TPG/Warburg bid.  The other two bidding clubs (Blackstone/T.H. Lee and Bain/KKR) submitted bids under $100 per share.  Neiman invited these two bidding clubs to improve their bids.

163.     On April 30, 2005, both Blackstone/T.H. Lee and Bain/KKR communicated increased bids but remained under $100 per share.  These bids were extraordinary because both Blackstone/T.H. Lee and Bain/KKR again submitted bids *less than* the TPG/Warburg bid, which they already knew was $100 per share.

164.     The next day, May 1, 2005, JP Morgan, the investment bank hired by the company to opine on the fairness of the offers, presented an opinion to the company that the TPG/Warburg bid was fair.  JP Morgan based its fairness opinion on Neiman being valued at $93 to $107 per share and estimated a 15% interest rate of return over three years and an 18.3% rate of return over five years. Importantly, other analysts who evaluated the company valued it at $115 per share.

165.     On October 6, 2005, TPG/Warburg purchased Neiman for approximately $5.4 billion. Outside shareholders, such as Plaintiffs and Class members, realized a meager gain of 1.7% as a result of the Neiman deal.  However, the deal was substantially more lucrative for the Smith family and senior management.  The Smith family retained their 12% equity interest in the new entity. Executive management were also granted securities in the new entity.

**The Michaels Stores LBO**

166.     In early 2006, Michaels Stores considered a review of its strategic plan and potential alternatives to maximize shareholder value.  First JP Morgan and then Goldman Sachs advised Michaels Stores in this process when two private equity clubs were seemingly bidding for the company.  Ultimately, the economic data reveal a diminished price was paid to shareholders.  The

57

following chart details Defendants' cartel, advisors and financier for the Michaels Stores deal, the date announced and price of the deal:

| Michaels Stores | |
|---|---|
| Deal amount | $6.1 billion ($44/share) |
| Date deal announced | June 30, 2006 |
| Purchasing PE firms | Bain Capital<br>Blackstone |
| Debt financers | Deutsche Bank<br>JP Morgan<br>B of A<br>CSFB |
| Purchasing advisor(s) | Deutsche Bank<br>CSFB<br>B of A |
| Company advisor(s) | JP Morgan<br>Goldman Sachs |

| | |
|---|---|
| Other participating PE firms | Apollo[110]<br>KKR[111]<br>TPG<br>T.H. Lee<br>Carlyle[112]<br>Goldman Sachs PIA |

167. On March 20, 2006, the Board of Michaels Stores retained JP Morgan as its financial advisor to evaluate the potential sale of the company. JP Morgan reached out to a number of parties (both strategic and financial entities) and invited them to bid on Michaels.[113] Among the parties contacted by JP Morgan were Bain, Blackstone, Carlyle, T.H. Lee, KKR, TPG, Goldman Sachs, and Apollo. While the Michaels buyout appeared to be set up as a competitive auction, [redacted][114]

168. Between March and April 2006, there were a flurry of discussions between various private equity firms concerning the possibility of teaming up on the Michaels deal.[115] By mid-April, Bain and Blackstone agreed to form a consortium.[116] KKR, TPG and Apollo also formed a separate consortium around that time. [redacted][117]

---

110 [redacted]

111 [redacted]

112 [redacted]

113 *See, e.g.*, Ex. 129, [redacted].

114 Ex. 126, [redacted]

115 [redacted]

116 [redacted]

117 Ex. 132, [redacted]

Importantly, Bain invited TPG to partner on Michaels, but TPG ████████████
████████████declined the invitation. ████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████[119]

169.     Carlyle considered forming a third consortium with T.H. Lee or joining one of the existing consortia.[120] Carlyle made overtures to both KKR and Bain to join their respective bidding groups. ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████[121] However, KKR ultimately decided not to invite Carlyle into its consortium, ████████████████████████████████████████[122]████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████[123]

170.     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████



[118]   Ex. 134, ████████████████████████

[119]   Ex. 135, ████████████████████████████

[120]   ████████████████████████

[121]   ████████████████████████████████

[122]   ████████████████████████████████████████████████████████████████

[123]   ████████████████



*Id.*

173.    By April 21, 2006, Bain and Blackstone allowed Carlyle and T.H. Lee to join their consortium.[131] ████████████████████████████████████████████████

███████████████████████████████████████.

174.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[132]

175.    On June 21, 2006, Bain and Blackstone submitted a $42 per share bid for the purchase of the company. On the same day, a second bidding club comprised of KKR and TPG submitted a bid for $42.50 per share. T.H. Lee, who had been participating in the process, dropped out of the bidding process at approximately the same time.

176.    Bain/Blackstone and KKR/TPG submitted second bids of $44.00 and $43.50, respectively. On June 30, 2006, nine days after the initiation of the bidding process, the bidding club of Bain and Blackstone entered into an agreement with Michaels Stores for $44 per share, with a total deal value of approximately $6 billion. The price of $44 per share was approximately the same as the stock's 52-week high.

177.    This ultimate price was only $2 per share higher (a 4.5% increase) than the initial offer by the same bidding club. This was slightly less than the average percentage increase in club LBO premiums and far less than the 15% average premium for sole sponsor LBOs or the 21% average premium for purchases by public companies and strategies during the relevant time period.

178.    As a result of the Defendants' collusive and abbreviated bidding process, the Bain/Blackstone bidding club was able to purchase Michaels Stores' public shares at an artificially deflated price less than the average price paid for acquisitions by publicly traded companies and was

---

[131]    ██████████.

[132]    Ex. 139, ████████████

62

less than the average price paid in other acquisitions in the same industry during the same time period (whether acquired by public or private companies).

179. 

180.    Nine PE firms expressed interest in Michaels, but due to (i) Defendants' extensive anticompetitive communications, including communications about their respective valuations of the company; (ii) promises amongst Defendants of opportunities on future deals; and (iii) Defendants' ability to tie up financing by entering exclusivity agreements with banks, only two clubs submitted bids.  Moreover, the difference between the initial high bid and the accepted bid amounted to less than a 4% increase, despite three rounds of bidding.

**The Aramark LBO**

181.    In the Aramark deal, Chairman and CEO Joseph Neubauer led the LBO of Aramark – the second under his ownership and control of the company.  The first buyout, in 1984, resulted in Neubauer making a fortune when he took the company public in 1991.  Seeking to reprise this earlier result, Neubauer and a bidding group comprised of Goldman Capital, JP Morgan Partners, T.H. Lee and Warburg managed to purchase Aramark in an "auction" that once again was free from

---

[133]    Ex. 141,



[134]    Ex. 141,

competing bids – despite a grossly inadequate club bid – and despite the fact that winning the auction would certainly bring any private equity firm substantial profits.

182.   The following chart details the Defendants' cartel, advisors and financiers for the Aramark deal, date announced and price of the deal:

| Aramark | |
|---|---|
| Deal amount | $8.2 billion ($33.80/share) |
| Date deal announced | August 8, 2006 |
| Purchasing PE firms | Goldman Sachs<br>JP Morgan<br>T.H. Lee<br>Warburg Pincus<br>Joseph Neubauer, Aramark CEO |
| Debt financers | Goldman Sachs<br>JP Morgan |
| Purchasing advisor(s) | Goldman Sachs<br>JP Morgan |
| Company advisor(s) | Goldman Sachs<br>JP Morgan<br>CSFB |

| Other participating PE firms | Blackstone[135] KKR Carlyle[136] |
| --- | --- |

183.   On December 6, 2005, Neubauer, who held slightly more than 12% of Aramark's stock, initiated the exploration of strategic alternatives, including an LBO.  To that end, Neubauer brought in Goldman Sachs and JP Morgan as financial advisors.

184.   At a board meeting on March 22, 2006, Neubauer expressed his desire to maintain a significant equity position in the new company.  He also informed the board that he wanted Goldman Sachs and JP Morgan to involve their respective firms' private equity affiliates, Goldman Capital and JP Morgan Partners.

185.   [137]

Goldman Sachs and JP Morgan sought to include other private equity firms on the deal for relationship reasons, to suppress competition, and to ensure their bid for Aramark remain unchallenged.

---



[135]

[136]

[137]   Neubauer had previously relied on Goldman Sachs and JP Morgan to conduct Aramark's first LBO in 1984 and subsequently turned to those firms again in December 2005 to lead the second LBO. Ex. 57, ▮▮▮▮▮▮▮▮▮▮; Ex. 58, ▮▮▮▮▮▮▮▮▮.

[138]   Ex. 59, ▮▮▮▮



[139]

186.    On April 28, 2006, Goldman Sachs and JP Morgan therefore invited T.H. Lee and Warburg to join their consortium, instead of being asked to make a competing bid.[140]

187.     *Id.* at 832. *Id.*

188.    On May 1, 2006, Neubauer, Goldman Capital, JP Morgan Partners, T.H. Lee and Warburg (the "Neubauer Group"), submitted and announced a bid for Aramark of $32 per share. The consortium's offer was dramatically lower than the consensus market valuations at the time, including the valuation of major shareholder Eminence Capital, which held 7.8% of Aramark's shares and had valued the share price as high as $48 per share, 50% more than the consortium's offer.[142]

---

[139] 

[140]    *Id.*. Ex. 60, ███████████ Ex. 61, ███████████

[141]    Ex. 60, ███████████ Ex. 61, ███████████

[142]    Ex. 62, ███████████ Ex. 63, ███████████ (Thomas Weisel Partners - $37-$38); Ex. 64, ███████████ (Morgan Stanley - $35-$38; Citigroup - $35-$36; Baird - $35-$38; Wachovia - $34-$40).

189.    After the offer became public, other private equity firms sought inclusion in the Neubauer buyout group. ████████████████████████████



190.    ██████████████████████████████████████

191.    The Neubauer Group succeeded in eliminating any competition for Aramark. Blackstone and KKR had at one point considered partnering to pursue Aramark. ████████████

---

[143]   Ex. 178, ████████████ Ex. 198, ████████████.

[144]   ████████████

[145]   Ex. 198, ████████.

[146]   Ex. 66, ████████.

[147]   Ex. 64, ████████.

[148]   Ex. 68, ████████.



192.    On May 3, 2006, representatives of Eminence Capital, LLC ("Eminence"), an investment manager and Aramark's second largest shareholder, which together with its affiliates owned approximately 7.8% of Aramark's Class B common stock, stated that the $32 per share was "grossly inadequate." Eminence opined that the company was worth at least $40 per share, a value that would still represent less than 8.5 X EBITDA.  Eminence also stated that a buyout at $32 per share would permit the Neubauer Group to reap a rate of return of over 30%, and that a buyout at $40 per share would still yield a rate of return in the "mid to high teens in percentage terms."  In June 2006, Eminence refined its analysis and valued Aramark at $38.91 to $42.49 per share, a range that would still yield a rate of return of 15%-20% for the Neubauer Group.

193.    On August 7, 2006, Aramark's special committee, charged with overseeing any sale of the company, indicated a willingness to consider a proposal of $34.00 per share.  The same day, the Neubauer Group submitted a bid of $33.60 per share.  The bid was rejected the same day.  That evening, Neubauer agreed to value the portion of his shares of Class A common stock that would be contributed to the sale at less than $33.80 per share.  The Neubauer Group thereafter informed the special committee that it was willing to enter into the transaction at a price of $33.80 per share.  This offer was accepted.[151]  Not one competing offer was made.

194.    The acquisition premium based on the day of announcement was approximately 20%; however, the acquisition premium over the price from just one month earlier was only 12.9%.

---

[149] ▮▮▮▮▮▮▮▮

[150] Ex. 69, ▮▮▮▮▮

[151] Ex. 70, ▮▮▮▮▮▮▮

195.    At the time the offer was accepted, Credit Suisse, the special committee's financial advisor, valued Aramark at $33.35 to $41.00 per share.  This analysis was based on lowered financial projections submitted by management to Credit Suisse on August 2, 2006, just five days prior to the final bid.

196.    Despite maintaining the same percentage equity in the new, privately owned company, Neubauer received approximately $1.37 billion at closing.

197.    In sum, despite separate financial opinions from: (i) the special committee and Eminence that the company should sell at close to $40 per share; (ii) the Neubauer Group's winning bid being far less than $40 per share; and (iii) the special committee's own advisor, Credit Suisse, opining that a fair price per share ranged up to $41 per share, not one competing bid was submitted.

**The Kinder Morgan LBO**

198.    In early 2006, Kinder Morgan's financial advisor Goldman Sachs and founder and CEO Richard Kinder, developed a plan to take Kinder Morgan private.  On February 16, 2006, Kinder Morgan's President, C. Park Shaper, spoke with Goldman Sachs about an LBO that would involve Kinder Morgan management, and shortly thereafter Goldman Capital expressed an interest in participating in the transaction.  The following chart details the Defendants' cartel, advisors and financiers for the Kinder Morgan deal, date announced and price of the deal:

| **Kinder Morgan** | |
|---|---|
| Deal amount | $27.5 billion ($107.50/share) |
| Date deal announced | August 28, 2006 |

| | |
|---|---|
| Purchasing PE firms | Goldman Sachs<br>Carlyle<br>Riverstone (Carlyle affiliate)<br>AIG<br>Richard Kinder, et al. |
| Debt financers | Goldman Sachs<br>Citigroup<br>Deutsche Bank<br>Lehman Bros.<br>Merrill Lynch<br>Wachovia |
| Purchasing advisor(s) | Goldman Sachs |
| Company advisor(s) | Morgan Stanley<br>Blackstone Group |
| Other participating PE firms | Apollo[152]<br>Blackstone<br>KKR<br>TPG[153]<br>Bain[154]<br>Hellman & Friedman |

199.    By May 2006, several other Kinder Morgan insiders expressed an interest in an LBO, including founder Kinder, who owned 18% of the company stock; Michael Morgan, a director and substantial shareholder; and Fayez Sarofim, also a director and substantial shareholder.

---



200.    On May 23, 2006, Goldman Sachs hosted the founders and leaders of the largest private equity firms at its New York headquarters and discussed the formation of a consortium to take Kinder Morgan private. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ █ ████████████████████████████████████████

████████████████████████████████████

201.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

202.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[155]    Ex. 83, ██████████████████████████████████

[156]    Ex. 86, ██████████████████████████████████

[157]    *See* Ex. 85, ██████████████████████████████████████████████████████.

[158]    Goldman Sachs played multiple, if not conflicting, roles on the deal, including: (1) serving as advisor to the acquisition group; (2) serving as the lead private equity sponsor; and (3) providing debt financing on the deal. ████████████████████████████████████████████████ Ex. 204,
████████████████████████

[159]    Ex. 86, ████████████████████

[160]    ████████████████████████████

71

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████      ████████████████

██████████████████████[161] Goldman Sachs subsequently refused to allow TPG to join the buyout group.

203.    Goldman Sachs required any party potentially interested in the deal, including Defendants Apollo, Bain, Blackstone, Carlyle, KKR and TPG to execute a confidentiality agreement with an exclusivity provision that effectively prevented any signing party from making a competing bid for Kinder Morgan for a one-year period.[162] The Special Committee of Kinder Morgan's board, recognizing its anticompetitive nature, later dropped the provision. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[161]    ████████████████.

[162]    Ex. 87, ██████████████; Ex. 88, ██████████████████; Ex. 89, ██████████████████; Goldman Sachs also had an exclusivity agreement with Rich Kinder, effectively precluding him from soliciting or supporting any competing bid and from discussing such proposals with other parties – even if the proposals were more favorable to the shareholders. Ex. 89, ████████████████ The Special Committee, recognizing the impropriety of this arrangement, ultimately rejected the exclusivity agreement. ████████████████████████

███████████████████████████████████████████████████████████
████████████████████████████████████████ *see also* ███████
████████████████████████████████████████████.

[163]    Ex. 90, ██████████████

72

204. Moreover, to secure the cooperation of management, Goldman Sachs also had an exclusivity agreement with Rich Kinder, which effectively precluded him from soliciting or supporting any competing bid for the company.[165] Rich Kinder therefore could not discuss competing buyout proposals with other parties – even if the proposals were more favorable to the shareholders than Goldman Sachs' offer. The Special Committee, recognizing the impropriety of Goldman Sachs' arrangement with Rich Kinder, rejected the exclusivity agreement and released Kinder from the agreement. ███████████████████████████████████████████

███████████████[166]

205. By May 28, 2006, Carlyle, AIG and Riverstone (a private equity firm affiliated with Carlyle) had agreed to join Goldman Sachs' buyout group. This group proposed a buy out at $100 per share. That represented a modest premium to the stock's then-current trading price of $84.41 per share but was less than the stock's recent high of $103.75 per share on January 20, 2006.[167]

206. On May 31, 2006, an analyst report from Citigroup set $105 per share as its target price for Kinder Morgan stock, but stated that the "target price represents a minimum amount for a management-led buyout of [the company] and does not provide a reasonable takeout premium."

207. To give the collusive LBO a patina of legality, 35 potential investors were solicited to present competing bids. None did so, resulting in a one-bid auction won by Kinder Morgan insiders

---



[164]   Ex. 58, ███████████████████

[165]   Ex. 89, ███████████████

[166]   ███████████████████████████████████████████████

[167]   ███████████████████

along with Goldman Capital and Carlyle.  Analyst valuations of Kinder Morgan's stock ranged as high as $150 per share.[168]

208.    The special committee was advised that Kinder Morgan's stock should be valued at least 10% more than the current bid of $100 per share, but the committee accepted the group's final offer of $107.50 per share.[169]

209.    On August 28, 2006, Kinder's board accepted the Goldman Sachs consortium's offer of $107.50 per share.  The consortium's offer was significantly lower than various valuations of the company and of the Special Committee at the time.[170] ███████████████████████

████████████████████████████[171]  Just as Goldman Sachs had planned, no competing offers for Kinder Morgan surfaced.

210.    ████████████████████████████████████████

████████████████████████████████████████████[172]

211.    Goldman Sachs viewed the Kinder Morgan buyout as an investment opportunity for which it could extract *quid pro quo* from other private equity firms.  ████████████████

████████████████████████████████████████████



---

[168]    ████████████████.

[169]    █████████████████████

[170]    Ex. 91, █████████████Ex. 92, ████████████ (valuing the company as high as $150 per share).

[171]    *See* Ex. 93, ███████████████████████████████████

████████████████████████████████████.

[172]    ████████████████████████████████████████

████████████████████████████████████████████

*(see* Ex. 17, █████

████████████████████████████████████ *See*

████████████████████████████████████████████████████████
████████████████████████████[173]

212.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████  *Id.*

## The HCA LBO

213.    The HCA deal is an example of a large, attractive LBO to which the private equity industry explicitly agreed there would be no competition.  The HCA deal shows how Defendants agreed not to compete on exclusive deals.

214.    KKR, Bain and Merrill Lynch, along with HCA management insiders led by CEO and Chairman Dr. Thomas Frist, orchestrated a $33 billion proprietary deal to buy HCA, which was at the time the largest LBO in history.  The following chart details the Defendants' cartel, advisors and financiers for the HCA deal, date announced and price of the deal:

---

[173]  Ex. 178, ████████  Ex. 198, ████████████████████.  *See also* Ex. 58

[174]  Ex. 6, ████████

| **HCA** | |
|---|---|
| Deal amount | $32.1 billion ($51/share) |
| Date deal announced | July 24, 2006 |
| Purchasing PE firms | KKR<br>Bain Capital<br>Merrill Lynch Global PE<br>Frist entities |
| Debt financers | B of A<br>Citigroup<br>JP Morgan<br>Merrill Lynch |
| Purchasing advisor(s) | B of A<br>Citigroup<br>JP Morgan<br>Merrill Lynch |
| Company advisor(s) | Merrill Lynch<br>CSFB<br>Morgan Stanley |

| | |
|---|---|
| Other participating PE firms | Apollo[175] Blackstone Carlyle Goldman Sachs PIA Hellman & Friedman[176] Permira[177] Texas Pacific Group T.H. Lee[178] Warburg Pincus[179] |

215. The KKR-led consortium was the only buying group to submit an offer and faced no competing bids or competition from other private equity firms for the company. ███████ ██████████████████████████████████████████ No competition occurred even though the $51 per share price represented a small premium of only 17.8% based on the HCA share price the day prior to the bid, and the $51 per share was less than the share price on the day that HCA began exploring strategic alternatives aimed at increasing shareholder value.

216. The facts set forth below demonstrate that KKR and Bain were able to purchase the shares of HCA at a suppressed price because the owners of the other large private equity firms –



including at least Blackstone, TPG, Carlyle and Goldman Sachs PIA – had agreed not to submit competing bids for the company.

217.    On January 19, 2006, HCA disclosed that it had engaged Merrill Lynch to review various strategic alternatives to "enhance shareholder value." HCA's stock closed that day at a price of $51.38 per share.

218.    Merrill Lynch proposed the possibility of a leveraged buyout. In April 2006, Dr. Frist, the company's founder and a substantial shareholder, contacted Bain and KKR to explore the feasibility of a management-led buyout.[180] At about the same time, Merrill Lynch introduced HCA management to representatives from Merrill Partners, its private equity arm.

219.    The private equity firms – KKR, Bain and Merrill Partners – concluded that a leveraged buyout could be feasible. HCA's full board was informed of these discussions on May 8, 2006. Thereafter, the private equity firms were allowed to conduct due diligence and officially evaluate the company and management team on a proprietary basis. No other potential bidders were contacted and/or invited to conduct due diligence.

220.    Because Dr. Frist and Merrill Lynch were part of the buying group, the HCA board formed a Special Committee that negotiated with the buying group. On July 24, 2006, the parties reached a deal under which KKR, Bain, Merrill Lynch and Dr. Frist's buying group would acquire the stock of the company for $51 per share. The parties executed a merger agreement the same day. No other offers for HCA were submitted to the special committee at the time.

221.    The merger agreement with HCA included a 50-day "go-shop" provision during which the Special Committee and its advisor, Credit Suisse, sought out higher bid proposals from other private equity firms and potential buyers.[181]

---

[180]    Notably, Frist was, at the time, an investor in one or more funds managed by Bain.

[181]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* ▮▮▮▮▮▮▮▮▮▮▮. After the target's board accepts a bid and publicly announces a proprietary deal, there is typically a "go-shop" period. The go-shop period is the time between the board's announcement of the deal and the deal's formal closing. During the go-shop period, the target's advisor "proactively goes out to buyers and also

222.    Around the time of the announcement, other large private equity firms like Blackstone, TPG, Carlyle and Goldman Sachs PIA expressed strong interest in owning HCA.

223.    However, none of these firms made an offer for HCA.  Incredibly, only 48 hours into the seven week "go-shop" period, the leaders of Blackstone, Carlyle, TPG and Goldman Sachs confirmed that no competition would be forthcoming for HCA. ███████████████



_____

responds to all inquiries that are received and tries to stimulate the interest and to create a higher bid for the company." Ex. 14, ██████████████

[182]    Ex. 9, ████████████

[183]    Ex. 32, █████████████

[184]    Ex. 33, █████████████.

[185]    Ex. 34, █████████████.



224. ███████████████████████████████
████████████████████████████████████████
██████████████████

225. A███████████████████████████████
████████████████████████████████████████
███████████[187]████████████████████████
████████████████████████████████████████
█████████████████████████████████

226. ███████████████████████████████
████████████████████████████████████[188]
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████[189]

227. ███████████████████████████████
████████████████████████████████████████
███████████████████████[190]████████████

_____

[186] Ex. 29, ██████████
[187] Ex. 202, ████████████
[188] Ex. 2, ████████ Ex. 38, ████████████████████████
[189] Ex. 2, ████████.
[190] Ex. 36, ████████████



228. ███████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████[195]

229.    The private equity firms' agreement not to compete for HCA cost the shareholders of the company more than a billion dollars. ███████████████████████████████



---

[191]    Ex. 9, ████████████
[192]    *Id.*
[193]    *Id.*
[194]    Ex. 40, ███████████
[195]    Ex. 41, ████████.
[196]    Ex. 37, █████████████

████████████████████████[197]  In other words, these other private equity firms at the time acknowledged that the deal worked even paying an addition $1.6 billion or more.

230.    The deal closed on November 11, 2006 at $51 per share. The KKR-led buying group was able to pay a suppressed price gaining more the $1.6 billion or more. ████████████████ ██████████████████████████████████████████████[198]  Even HCA's own management valued its stock at well over $51 per share. In the months leading up to the LBO, HCA purchased its own common stock at prices as high as $52.47 per share.[199]

231.    ████████████████████████████████████████ ████████████[00] ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████Moreover, HCA recently issued a $1.75 billion dividend to its private equity owners. HCA Press Release, January 29, 2010, "HCA Previous Fourth Quarter and Year-End 2009 Results, Board Declares Distribution to Stockholders." The owners of HCA recently announced they are taking the company public once again and selling a portion of the company in an IPO. The owners stand to realize a gain of more than $3 billion in just five years.

**The Freescale LBO**

232.    The following chart details the Defendants' cartel, advisors and financiers for the Freescale deal, date announced and price of the deal:

---

[197]    Ex. 35, ████████████████████

[198]    ████████████████████████████████████████████████
████████████████████████Ex. 31,████████████████████
████████████████████████████████████████████████
Moreover, HCA recently issued a $1.75 billion dividend to its private equity owners.
HCA Press Release, January 29, 2010, "HCA Previous Fourth Quarter and Year-End 2009 Results,
Board Declares Distribution to Stockholders."

[199]    ████████████████ (HCA Form DEFA14A at ¶5, filed November 8, 2006).

[200]    Ex. 31, ████████████████████████

| **Freescale** | |
|---|---|
| Deal amount | $17.5 billion ($40/share) |
| Date deal announced | September 15, 2006 |
| Purchasing PE firms | Blackstone<br>TPG<br>Carlyle<br>Permira |
| Debt financers | CSFB<br>Citigroup<br>JP Morgan |
| Purchasing advisor(s) | Blackstone Group<br>Citigroup<br>CSFB |
| Company advisor(s) | Goldman Sachs |
| Other participating PE firms | Silver Lake<br>KKR<br>Bain Capital<br>Apax[201] |

233.    In early 2006, Freescale began to consider various strategic alternatives, including purchasing Royal Philips Electronics semiconductor unit ("Philips").

234.    As early as February 2006, Blackstone, TPG, Silver Lake, Bain and KKR were communicating with one another regarding potential buyouts in the semiconductor industry,

---

201

including a potential going-private deal involving a combination of Freescale and Philips Semiconductor.[202]

235.   By May 2006, Blackstone had expressed to Freescale's board that it was interested in purchasing the company at $37-$38 per share ████████████████████████████████ ████████████████████[203]

236.   Shortly thereafter, in mid-June 2006, Philips publicly announced that it was considering a sale of its semiconductor business and Freescale continued to evaluate the merits of acquiring this business.

237.   During July 2006, Freescale decided not to pursue the acquisition of Philips; however, two bidding groups led by the same firms, Blackstone and KKR, appeared to be pursuing both Philips and Freescale.

238.   ████████████████████████████████████████████████████ ████████████████[204]

239.   Around the same time, Blackstone teamed with TPG and Permira to bid on the semiconductor unit of Philips.  Two other consortia – a KKR/Silver Lake group and a Bain-led group – also submitted separate bids to acquire Philips.[205]

240.   On August 3, 2006, the KKR Group reached a definitive merger agreement with Philips (Bain was folded into the deal).

---



[202]   Ex. 80, ██████████████████████████████████████████ ██████████████████████

[203]   Ex. 71, ████████████████ Ex. 72, ████████████████.

[204]   Ex. 73, ██████████████.

[205]   ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 80, ████████████████████; Ex. 42, ██████████████████.

241.    After KKR/Silver Lake acquired Philips, Blackstone formed a consortium to bid for Freescale that included Carlyle, Permira and TPG to acquire Freescale.[206]



242.    Blackstone submitted a buyout offer of $38 per share, which was accepted by the board on September 10, 2006.[211]

243.    Later the same day, KKR, Silver Lake, Bain and Apax Partners Worldwide, LLP (the "KKR Group") delivered a written indication of interest in acquiring Freescale for a price of $40.00 to $42.00 per share.[212] The KKR Group acknowledged it could pay more for Freescale than any other buyer due to the synergies that it could generate by combining Freescale with the Philips semiconductor business, it purchased Bain and Silver Lake one month earlier.

---



[206]    Ex. 5, ███.

[207]    Ex. 74, ███

[208]    Ex. 75, ███

[209]    Ex. 76, ███

[210]    Ex. 5, ███

[211]    Ex. 78, ███

[212]    ███ Ex. 80, H███ Ex. 81, ███



244.

245.

246.

247.

248.     On September 14, 2006, Blackstone's group submitted a formal offer of $40 per share for Freescale, with a fuse expiring at ten o'clock the next day. This offer was on the low end of KKR's indication of interest of $40-$42/per share.[217]

249.     The Freescale board accepted this bid and entered into a definitive agreement with the Blackstone Group on the afternoon of September 15, 2006.[218]   The KKR Group immediately withdrew from the bidding, allowing Blackstone to acquire the company for $40 per share even though the *Wall Street Journal* stated in an article on September 16, 2006, that:

---

[213]   Ex. 29, ████████

[214]   Ex. 148, ████████ Ex. 149, ████████ ; *see also* Ex. 148, ████████

[215]   Ex. 150, ████████

[216]   *Id.*

[217]   Ex. 151, ████████

[218]   *Id.*

[T]he KKR-Bain group can conceivably offer billions more to Freescale shareholders by reducing the combined group's research and development and eliminating the overlap in sales and marketing offices and staff. The prospect of consolidation and more market power makes it possible for them, in turn, to bid more for Freescale.[219]



250. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████[220]

251. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████[221]

252. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████[222]

---

[219]   Henny Sender & Don Clark, *Freescale Agrees to Blackstone Offer $17.6 Billion*, Wall St. J., Sept. 16, 2006, at A3.

[220]   Ex. 153, ██████████████

[221]   Ex. 11, ████████

[222]   Ex. 151, ███████████████

253.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████[223]

254.   ████████████████████████████████████████████████

██ ████████████ .[24]

255.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████[25]

256.   All of the private equity firms quickly assured each other of their alliance. ████████

████████████████████████████████████████████████████████████

██████████████████[226]█████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

257.   After Freescale announced the deal, Blackstone considered how to fund the equity

requirement. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████,,[228]████████████████████████████████████████

████████████████████████████████████████████████████████████

_____

[223]   Ex. 155, ████████████ .

[224]   Ex. 2, ██████████ .

[225]   Ex. 155, ████████████ *see also* ████████████ .

[226]   Ex. 147, ██████████ and Ex. 158, ██████████ .

[227]   Ex. 156, ████████████ .

[228]   Ex. 180, ██████████████ .



258.    At the end of the day, the KKR-led group ended up with Philips and HCA, but was the "losing bidder" in the Freescale deal; the Blackstone-led bidding club ended up with Freescale even though it was reported that the KKR Group could have offered "billions more" for the company, but was the "losing" bidder in the Philips deal and did not bid for HCA. KKR ended up being able to buy HCA without any competition. The shareholders of all companies ended up with far less money per share than they would have received in the absence of Defendants' collusive agreements.

## ADDITIONAL TRANSACTIONS IN FURTHERANCE OF THE CONSPIRACY

259.    In addition to the nine preceding club LBOs, Defendants participated in a number of other buyout transactions, which highlight their collusive and anticompetitive conduct.

### NXP (Philips Semiconductor)

260.    In the Philips Semiconductor deal, Defendants communicated extensively with each other and discussed buyout strategies. Ultimately, the "winning" bidding group comprised of KKR and Silver Lake cut in the losing bidders Bain and Apax, which incredibly were granted the most board seats and ownership interest in Philips.

261.    In early 2006, private equity firms were targeting for acquisition various semiconductor companies, including ST Micro, Infineon, Freescale and Philips Semiconductor ("Philips"), a business division of the Dutch company, Royal Philips Electronics (NYSE:PHG,

---

229    Ex. 76, ████████████████████████.

230    ████████████

231    Ex. 18, ██████████████████████████

AEX:PHI).  The following chart details the Defendants' cartel, advisors and financiers of the NXP deal, date announced and price of the deal.

| Philips Semiconductor/NXP | |
|---|---|
| Deal amount | $4.4 billion ($/share) |
| Date deal announced | August 3, 2006 |
| Purchasing PE firms | Silver Lake<br>KKR<br>Bain Capital<br>AlpInvest |
| Debt financers | CSFB<br>Morgan Stanley<br>Deutsche Bank |
| Purchasing advisor(s) | unknown |
| Company advisor(s) | Morgan Stanley |
| Other participating PE firms | Blackstone<br>TPG<br>Permira |

262. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████

263. ███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



265.     By July 2006, Blackstone had submitted an expression of interest for Freescale. Blackstone still planned to acquire Freescale first, then pursue an acquisition of Philips, and merge the two companies.

266.     Around the same time in July, Blackstone agreed to partner with TPG and Permira to bid on Philips.  Two other consortia – KKR/Silver Lake and Bain/Apax/Francisco – also bid on Philips.

267.     Toward the end of July, after bids were submitted for Philips but before the announcement of the winners, Bain sought to join either the Blackstone or KKR bidding groups.  By July 31, 2006, KKR and Silver Lake's bid for Philips was accepted. ▆▆▆▆▆▆▆▆

268.     On August 3, 2006, Royal Philips announced that it had agreed to sell an 80.1% stake in Philips' Semiconductor business to KKR, Silver Lake and AlpInvest Partners NV.  The combined purchase price was 8.3 billion euro (over $10 billion), consisting of 3.4 billion euro purchasing price, 4 billion euro for debt and other liabilities, and .9 billion euro for Philips' remaining stake.

---

232 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

269.     Just a week after the public announcement of the Philips deal, Bain and Apax were invited to join the KKR/Silver Lake/Alpinvest buyout consortium – just as Bain had planned. Indeed, although they were technically "losing" bidders, Bain and Apax were given twice as many board seats as Silver Lake.

270.     Immediately after the Philips deal was announced, members of the Philips consortium discussed acquiring Freescale and merging it with Philips.

271.     On September 10, 2006, Blackstone and its partners Carlyle, TPG and Permira submitted a buyout offer for Freescale of $38/share, which was preliminarily accepted by Freescale's board.

272.



273.

274.     Thus, even though KKR and its partners wanted to acquire Freescale with the goal of merging it with their Philips investment, they chose to back down from competition so as not to disrupt their relationship with Blackstone and its partners.

**Vivendi**

275.     Around September 2006, Jean-Bernard Levi, Chairman of the Board of Vivendi, the French entertainment and telecommunications conglomerate, approached KKR about a potential

buyout of the company.  KKR had a special relationship with Vivendi; Marie-Josee Kravis, the wife of Henry Kravis, KKR's co-founder, had formerly been a member of Vivendi's supervisory board.

276.    In selecting its buyout partners, KKR placed heavy consideration on whether it owed favors to other private equity firms.



279.    Buyout discussions between Vivendi's board and KKR spanned several months.  In November 2006, KKR made a non-binding offer to purchase the company for 40 billion euro ($51.10 billion).  However, Vivend's board declined KKR's offer.  Buyout discussions ultimately stalled, reportedly because of French tax laws and other legal and regulatory complications that would have arisen from such a deal.

---

[233]    Ex. 114, █████████

280.    Had the deal been consummated at KKR's offer price, it would have been the largest leveraged buyout in history.

**Community Health Systems (CHS)**

281.    

;234

282.    Carlyle had ties to CHS.  In 1996, Sandra Horbach (Carlyle managing director) and Tom Lister (Permira managing director) had participated in an earlier leveraged buyout of CHS when they worked together at Forstmann Little.[235]

283.

284.

---

234

235     On June 10, 1996, Forstmann Little and CHS entered into a definitive agreement to acquire the outstanding shares of CHS for $52/share in cash.   The total value of the transaction was $1.37 billion, including the assumption and refinancing of existing debt.

236     , Smith responded to a question on a Q2 earnings call about whether CHS would ever consider going private again that

285. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████[237]

286. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████[238]

---

[237] ████████████████████████████████████████████████████

CHS management is obligated to look at any and every possibility that is in the best interest of the shareholders.

[238] ████████████████████████████████████████████████████



287.    Carlyle did not proceed with the buyout of CHS. In February 2007, CCMP Capital Advisors (JP Morgan's buyout arm) and GS Capital Partners agreed to a leveraged buyout of hospital operator Triad Hospitals Inc. for $6.4 billion, or $50.25/share. On Monday, March 19, 2007, CHS agreed to buy Triad, outbidding the PE consortium during the 40 day go-shop period, offering $6.8 billion or $54/share, including the assumption of $1.7 billion of debt. CHS paid the $20 million break-up fee to the consortium. The purchase price represented a 9.4% premium to Triad shares' Friday closing price. After the acquisition, Community Health Systems became the largest publicly traded hospital company operating in the United States.

**Nalco**

288.    In early 2003, Suez SA ("Suez") began evaluating a possible sale of Ondeo Nalco Co. ("Nalco"), a water treatment company, and publicly committed to reduce its debt by one-third and dispose of non-strategic assets. Nalco is a top provider of chemicals for water treatment and other chemical processing services, like those for the paper and manufacturing industries.

289.    Suez invited Blackstone into the process to evaluate the potential sale because it had previously worked in the sector, having considered a purchase of Betz Dearborn, a competitor of Nalco.

290.    Apollo and Goldman Sachs also submitted bids for Nalco. Apollo was invited to compete in what was described as the "limited Nalco auction,"[239] and Goldman Sachs PIA teamed up with Apollo one month later. Goldman had been Apollo's mergers and acquisitions advisor and its chief source of debt financing in the deal.[240]

---

[239]    Lisa Gurwitz, Josh Kosman, and Samer Iskandar: *"Apollo, Goldman stay in Suez deal,"* The Daily Deal, Sept. 4, 2003.

[240]    *Id.*

291.    KKR and CD&R were also involved in the auction process. KKR was considered "the favorite to win" just days after the August 1 bid deadline.[241]  Only ten days later, however, inside sources confirmed that KKR was no longer involved in the bidding process.[242]

292.    In an effort by the seller to foster honest competition, UBS advised bidders that they would not be able to join the winners after the deal closed.  Suez had earlier insisted that bidders not partner together "in order to create a more competitive auction process," but Apollo and Goldman ignored that directive.[243]

293.    On September 4, 2003 it was announced that the Blackstone Group would acquire Nalco from Suez SA.

294.    And despite the seller's attempt to prevent losing bidders from participating in the investment alongside the winner after closing, Blackstone invited Apollo and Goldman Sachs to join it as equal partners in the Nalco deal, again ignoring the restriction set by the seller to protect the integrity of the auction process.

295.    In other words, although Apollo and Goldman Sachs lost the auction to Blackstone, each was able to take a majority stake in the company.  In the end, Apollo purchased 36.8% of Nalco, the exact same amount purchased by auction-winner Blackstone.  Goldman Sachs received a 25.3% interest in Nalco.

296.    There is no question that Blackstone could have executed the Nalco LBO alone. Nevertheless, it chose to bring in Apollo and Goldman Sachs PIA as co-lead investors.

---

[241]    Josh Kosman, "*KKR Leading Suez Unit Auction*," The Daily Deal, Aug. 4, 2003.

[242]    Josh Kosman, "*LBO Giants Vie For Suez's Nalco*," The Daily Deal, Aug. 14, 2003 ("At the same time, auction favorite Kohlberg Kravis Roberts & Co. is out, sources said.").

[243]    Lisa Gurwitz, Josh Kosman, and Samer Iskandar: "*Apollo, Goldman stay in Suez deal*," The Daily Deal, Sept. 4, 2003.

297.     The private equity purchasers exited Nalco in 2004 and reaped a $992 million profit, a 160% return on investment.  These astronomical returns resulted in part from the private equity firms' agreement to structure the deal as a three-way investment.

298.



**Cablecom**

299.     In the 1990s, NTL, a British company, purchased Cablecom, which was, at the time, the largest cable television provider in Switzerland, with three million customers and 1,400 employees.

300.     Several banks, including JP Morgan, Morgan Stanley and RBS, lent heavily to Cablecom.  In fact, Cablecom borrowed so much that it risked violating Swiss laws regarding over-indebtedness beginning in 2002.

---



244   Ex. 198, ▮▮▮.

245   Ex. 178, ▮▮▮; Ex. 198, ▮▮▮▮▮▮▮▮   *See also* Ex. 58, ▮.

246   Ex. 178, ▮▮▮.

247   Ex. 198, ▮▮▮.

301.    Over-indebtedness would require Cablecom to liquidate, leading to substantial losses for its creditors.

302.    Cablecom's creditors negotiated a refinancing plan that allowed Cablecom to operate for an additional year without running afoul of Swiss law.

303.    Beginning in December 2002, Apollo started purchasing Cablecom's debt at a steep discount from the banks that held it.  Apollo retained Goldman Sachs Investment Bank to advise it.

304.    In early 2003, Goldman Sachs PIA and Soros Private Equity Partners joined Apollo and also began purchasing Cablecom's debt.  Apollo invited Goldman Sachs into the deal as an advisor, and invited Goldman Sachs PIA to follow its lead with an eye toward jointly acquiring control of Cablecom by purchasing its debt.

305.    After taking a substantial portion of the debt in Cablecom, the private equity consortium orchestrated a restructuring that swapped debt for equity.  The consortium knew that, absent a restructuring agreement, the company would be forced into insolvency, known in Switzerland as a moratorium.  In order to move forward with restructuring, however, all creditors had to agree to a restructuring plan.  The private equity firms took the position that they would accept no plan but their own.  The consortium's plan included a steep write-off of Cablecom's debt, from 3.8 billion Swiss francs to 1.7 billion francs.

306.    The consortium made it clear it was acquiring the company with an eye toward controlling it, as it would in a traditional leveraged buyout.  By presenting a united front to the other creditors, the consortium was able to negotiate a 60% reduction in Cablecom's debt.

307.    After the consortium invested $350 million in Cablecom, it was able to acquire 53% of the company.

308.    Cablecom exited restructuring on November 12, 2003.

309.    Within two years, Cablecom was preparing for an initial public offering.  Before the IPO could launch, Liberty Global Inc. offered to purchase the company for nearly $2.2 billion.

310. 

311.

**Susqehanna**

312.    In 2005 and 2006, media companies were viewed as attractive targets by private equity firms, because the immediate and substantial cash flows generated by those companies could be used to support debt-financed buyouts.

313.    In April 2005, Susquehanna Pfaltzgraff, a private family-owned company, announced its plan to sell off its major subsidiaries, including Susquehanna Media (Susquehanna), a large radio station operator, consisting of 33 radio stations in eight U.S. markets.  Analysts viewed Susquehanna as an attractive asset and valued it around $1.5 to $2 billion.

314.    In May 2005, current and former members of Susquehanna management approached Providence to submit a bid for Susquehanna.  Providence subsequently began looking for buyout partners.

315. 

---

248    Ex. 178,

249    Ex. 178,

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

316. Providence ultimately agreed to allow KKR into its consortium. Providence also brought in private equity firm Madison Dearbourn Partners.

317. Bain Capital, the Blackstone Group, T.H. Lee Partners and a radio broadcast company, Cumulus Media, Inc. ("Cumulus") also formed a buyout consortium. A number of strategic bidders also showed interest in Susquehanna, including Comcast, Inc., Citadel Broadcasting Corp and Entercom Communications Corp.

318. Bids for Susquehanna were submitted in September 2005. In late October 2005, Bain, Blackstone, T.H. Lee and Cumulus submitted a buyout offer which was accepted by Susquehanna's board. The deal was announced on October 31, 2005. Each of those entities had an equal 25% ownership stake in Susquehanna, and it was agreed that Cumulus would provide management services for the company.

319. Susquehanna was purchased at a significant discount, as analysts had valued its business to be worth around $1.5 to $2 billion.

**Warner Music**

320. In 2003, Time Warner sought to reduce its debt load by selling off Warner Music Group.

321. In early November 2003, T.H. Lee and Haim Saban agreed to back Edgar Bronfman Jr., heir to the Seagram distillery fortune and a member of JP Morgan Chase's National Advisory Board, in his pursuit of a leveraged buyout of Warner Music Group.[251]

---

[250]   Ex. 175, ██████████████████ .

[251]   Bronfman, as CEO of Seagram's, acquired Universal Entertainment, which was eventually sold to Vivendi. Seagram was acquired by Pernod Ricard, which in 2005 sold Dunkin' Donuts to T.H. Lee, Bain and Carlyle.

322.    Bain and Providence expressed an interest in the deal as well.

323.    Instead of joining forces to mount a competing bid, by November 19, 2003, both Bain and Providence had joined the Bronfman-led consortium. Edgar Bronfman Jr. had previously bid unsuccessfully for Vivendi Universal with T.H. Lee, Blackstone and Haim Saban.[252] Once Vivendi announced its intent to partner with NBC, Bronfman and his private equity supporters turned their sights to Warner Music company.

324.    Rival music group EMI Group PLC also expressed interest in purchasing Warner Music.

325.    Backed by three major private equity partners, Bronfman was able to prevail in his effort to acquire Warner Music due to his relationship with Warner Music Chairman Roger Ames, potential antitrust concerns implicated by a merger with EMI, and because the private equity consortium offered Time Warner an option to repurchase up to 20% of Warner Music in the future.

326.    No other private equity firms submitted bids for Warner Music Group.

327.    In February 2004, the deal closed.

328.    Financing was provided by Bank of America, Deutsche Bank, Lehman Brothers and Merrill Lynch, all of whom acted as financial advisors to the Bronfman consortium.

329.    After the deal closed, Warner continued to lose money despite the new owners' consolidation of divisions and layoffs of over 20% of Warner Music Group's employees.

330.    In September 2004, Warner Music returned $342 million to the investors and paid a dividend of $8 million.

331.    In November 2004, Warner Music borrowed $700 million dollars, of which $681 million was used to pay additional dividends to investors and repurchase stock.

---

[252]    Saban teamed with Providence, TPG and THL to buy Univision and sits on the board of ProSeibenSat.1 with Scott Sperling (THL). Bronfman, as CEO of Seagram's, acquired Universal Entertainment, which was eventually sold to Vivendi. Seagram was acquired by Pernod Ricard, which in 2005 sold Dunkin' Donuts to T.H. Lee, Bain and Carlyle.

332.   After a year and a half, Warner announced it would go public again in an effort to raise an additional $750 million.

333.   The stock offering targeted a $22-$24 range, but traded under $17 per share. Despite this lackluster offering and despite the private equity consortium's failure to help Warner become profitable, the buyout partners were able to strip $3.2 billion out of the company on an investment of just $1.3 billion.

334.   

## ECONOMIC INFORMATION ON ILLEGAL LBOS

335.   Under accepted econometric analyses and using industry averages, the premiums paid in the nine of the LBO deals described herein in which information was publicly available were statistically significantly lower than the premiums paid in non-club LBO acquisitions in the same year.

**Transaction Premiums and Price/Earnings Offered**

336.   The following table identifies the acquisition premiums[253] offered and P/E ratio for nine of the collusive LBOs described in this Complaint for which information was publicly available:

---

[253]   Acquisition premium in this instance is measured by the price of the stock five days prior to the announcement of the deal compared to the acquisition price on a per share basis. An LBO's acquisition premium is a frequently used absolute measure of the value received from the LBO by the target company's shareholders. However, measures of the acquisition premium are frequently used in conjunction with the price/earnings (P/E) to analyze an acquisition. P/E is the ratio of the prior 12 months earnings and the price at which the transaction ultimately closed. P/E (or Price/EBITDA) is a commonly used measure of a company's relative valuation.

## Transactions Premiums and P/E Offered

|  | | Industry Average |
|---|---|---|
| **PanAmSat** | | **2004** |
| | April 20, 2004 | **"Communications and Broadcasting"** |
| Premium Offered | < 0.0% | 52.1% |
| P/E Offered | 34.0 | 23.5 |
| | | |
| **AMC Entertainment** | | **2004** |
| | July 22, 2004 | **"Leisure and Entertainment"** |
| Premium Offered | 35.9% | 24.1% |
| P/E Offered | NEG | 27.3 |
| | | |
| **SunGard** | | **2005** |
| | March 28, 2005 | **"Computer Software, Supplies & Services"** |
| Premium Offered | 44.3% | 34.5% |
| P/E Offered | 22.9 | 33.8 |
| | | |
| **Neiman Marcus** | | **2005** |
| | May 2, 2005 | **"Retail"** |
| Premium Offered | 3.5% | 27.0% |
| P/E Offered | 19.9 | 23.4 |
| | | |
| **Michaels Stores** | | **2006** |
| | June 30, 2006 | **"Retail"** |
| Premium Offered | 16.4% | 32.7% |
| P/E Offered | 26.5 | 26.7 |
| | | |
| **HCA** | | **2006** |
| | July 24, 2006 | **"Health Services"** |
| Premium Offered | 15.8% | 40.1% |
| P/E Offered | 16.5 | 22.9 |
| | | |
| **Freescale** | | **2006** |
| | September 15, 2006 | **"Electronic"** |
| Premium Offered | 30.1% | 20.8% |
| P/E Offered | 20.4 | 30.2 |
| | | |
| **Aramark** | | **2006** |
| | May 12, 2006 | **"Leisure & Entertainment"** |
| Premium Offered | 21.1% | 20.1% |
| P/E Offered | 19.3 | 27.7 |
| | | |
| **Kinder Morgan** | | **2006** |
| | May 30, 2006 | **"Oil & Gas"** |
| Premium Offered | 30.1% | 48.2% |
| P/E Offered | 23.7 | 31.4 |

337.    In seven of the nine LBOs, the P/E is less (in most circumstances, significantly less) than the P/E for other transactions in the relevant industry during the year of the illegal LBO transaction. In only two deals was the P/E not lower than the industry P/E. (In one, PanAmSat, the P/E is significantly higher than the industry average due to its minimal earnings (compared to the company's historical returns) in the 12 months preceding the transaction. (In the other, AMC, the P/E cannot be calculated due to negative earnings in the 12 months preceding the LBO).

**Compound Returns**

338.    Using the absolute measure of premiums, the average Compound Returns and average Compound Returns Net of Market (as defined in ¶45) for all nine LBOs set forth in this Complaint based on deal premiums from the announcement date through delisting are summarized as follows:

|  | Announcement Date | |
|---|---|---|
|  | Compound Return | Compound Return Net of Market |
| PanAmSat | <5.4%> | <1.5%> |
| AMC | 13.5% | 0.5% |
| SunGard | 14.0% | 6.2% |
| Neiman | 3.0% | <3.4%> |
| Michaels Stores | 16.4% | 8.1% |
| HCA | 6.8% | <7.2%> |
| Freescale | 6.4% | <0.8%> |
| Aramark | 19.2% | 14.4% |
| Kinder Morgan | 26.4% | 15.6% |
|  |  |  |
| **Club LBOs** | **13.8%** | **7.3%** |
| **Sole sponsor LBOs** | **21.5%** | **15.7%** |
| **Publicly Traded** | **26.6%** | **21.9%** |

339.    Based on the announcement date data, all of the transactions in the Complaint had Compound Returns and Compound Returns Net of Market below (and, in most instances, significantly below) the average for acquisitions by publicly traded bidders. Also on the announcement date, eight of the nine transactions detailed in the Complaint had Compound Returns

and Compound Returns Net of Market below (and, in most instances, significantly below) the average for acquisitions through sole sponsor LBOs.

340.    As evidenced by the nine deals addressed herein and as part of their collusive conduct in each of these deals, Defendants agreed that once a private equity firm or group of firms signed a definitive merger agreement with a public company, other members of Defendants' conspiracy would not submit superior competing bids or take other action that might make it more difficult for the bidding group to acquire the target at the lowest possible price. In fact, as set forth above, certain "sham" competing bids were submitted to promote the impression Defendants were actually competing. The data illustrates that these rigged auctions resulted in a reduced price per share.

## SETTLEMENT AGREEMENTS AND PURPORTED RELEASES

341.    In four of the nine club LBOs identified herein, settlements were reached in separate, unrelated earlier-filed state court breach of fiduciary duty actions, in which plaintiffs alleged that the directors and officers of the target companies breached their fiduciary duties to the company and its shareholders by agreeing to have the company engage in a going-private transaction. The plaintiffs in those actions did not allege antitrust claims.

342.    The cases were resolved through settlement and each settlement contained releases. The releases were drafted in vague fashion, but antitrust claims and claims sounding in antitrust were absent from the release language.

343.    Each release was by its own terms limited to the parameters of a swift transaction. The settlements purported to release the directors, officers and the private equity firms involved in the specific deals from all claims that were or could have been brought.[254] The releases do not however run in favor of private equity firms, investment banks and their co-conspirators who did not take part in the specific deals.

_____

[254]    In one case, where the plaintiffs alleged breach of fiduciary duty during the Aramark LBO, the company and its board of directors were named as defendants. In the subsequent settlement, not only did Aramark and its board of directors receive releases, but non-defendants GS Capital Partners, JP Morgan Partners, T.H. Lee and Warburg were released as well.

344.   The release terms do not address prospective conduct, such as secondary bond offerings used by the Defendant private equity firms to recoup their initial equity investment, the recycling of the target company in a subsequent IPO, or the future participation of Defendants in LBO auctions to lower the price paid per share.

345.   Additionally, Defendants' pursuit of settlement agreements are acts in furtherance of their conspiracy to rig bids in club LBOs.  Defendants' failure to disclose the existence of the ongoing DOJ antitrust or private antitrust litigation investigation to class members, or to the courts who were asked to approve the settlements, demonstrates Defendants' coordinated efforts to limit their antitrust liability.

## FRAUDULENT CONCEALMENT AND TOLLING

346.   Throughout the period of the conspiration alleged herein, Defendants and their co-conspirators fraudulently concealed their unlawful activity from Plaintiffs and other shareholders of the target companies.  Plaintiffs were unable to detect this secret conspiratorial activity, described more fully herein, which by its nature is self-concealing.  Furthermore, as supported by the facts alleged herein, Defendants and their co-conspirators acted fraudulently and deceptively to conceal the unlawful collusion, by *inter alia*:

a.     Falsely representing to Plaintiffs and other shareholders that prices and paid for shares of the target company were fair and competitive, when, in fact, Defendants had concealed from Plaintiffs their unlawful collective conduct wherein they agreed to allocate participation in and ownership of particular transactions;

b.     Falsely representing to Plaintiffs and other shareholders that prices and paid for shares of the target company were fair and competitive, when in fact the pricing was set through the conspiratorial activity alleged herein;

c.     Submitting false bids to create the false impression of competition when in fact Defendants had agreed not to compete for the target companies;

      d.     Issuing announcements to Plaintiffs and other shareholders of the target companies to create the false impression of independent or unilateral conduct, when in fact Defendants and their co-conspirators had agreed beforehand; and

      e.     Confining participation in the unlawful activity to a limited number of persons so as to reduce the risk of detection.

347.    Plaintiffs did not learn of the unlawful conspiratorial activity, and could not have learned of the unlawful activity, until the existence of ongoing Department of Justice investigation was publicly disclosed by news media and SEC filings from certain of the Defendants. For example, on or about October 11, 2006, the Wall Street Journal reported that the DOJ had launched an investigation into the bidding practices of private equity firms. In the August 13, 2007 Amendment No. 1 to Form S-1, KKR confirmed that the DOJ was requesting documents as part of its bid-rigging investigation, disclosing, "we have received a request for certain documents and other information from the Antitrust Division of the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have engaged in conduct prohibited by the United States antitrust laws." In its April 8, 2008 Form S-1, Apollo stated that "it has been reported in the press that a few of our competitors in the private equity industry have received information requests relating to private equity transactions from the Antitrust Division of the U.S. Department of Justice."

## CLAIMS FOR RELIEF

### First Claim for Relief

*Market Allocation and Horizontal Price Fixing Per Se and Rule of Reason Violations - Sherman Act §1*

348.    Plaintiffs re-allege and incorporate herein by reference the above-referenced allegations on behalf of the Injunctive Relief Class and Damages Sub-Classes.

349.    Beginning as early as mid-2003 and continuing until late 2006, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement,

understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs in violation of §1 of the Sherman Act, 15 U.S.C. §1.

350.    In formulating and effectuating the aforesaid contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, among other things:

    a.    forming groups referred to as "bidding clubs" or "consortia" to rig the bidding for control of a public corporation;

    b.    allocating the company buyout auctions among themselves, including without limitation the HCA and Freescale LBOs;

    c.    exchanging information about which companies they would bid for, as well as the price per share and terms and conditions of their bids in order to control and/or limit the number of bids for the target company and the number of Defendants participating in the going public transaction;

    d.    agreeing among themselves to submit or not submit bids in connection with company buyout auctions;

    e.    submitting bids for securities at agreed-upon prices in connection with company buyout auctions;

    f.    monitoring and implementing the agreements among members of the conspiracy;

    g.    entering into exclusive banking arrangements to deprive potential competitive bidders of financing;

    h.    conspiring with company management to limit or avoid the seeking of competitive bids; and

    i.    attempted to obtain the release of their antitrust liability in certain breach of fiduciary duty state actions.

351.    During and throughout the period of the conspiracy, Plaintiffs and members of the Class and sub-classes directly sold securities to Defendants.

352.    The unlawful contracts, combination, or conspiracies alleged herein have had the following effects, among others:

    a.    Defendants restrained competitors in the market for club LBO tender offers exceeding $2.5 billion;

b.   Defendants allocated the market for club LBOs in excess of $2.5 billion amongst themselves;

c.   prices paid by Defendants and their co-conspirators to Plaintiffs and the members of the Class and sub-classes for securities in club LBOs in excess of $2.5 billion were maintained at artificially low and non-competitive levels; and

d.   Plaintiffs and members of the Class and sub-classes were paid less for securities sold to Defendants and their co-conspirators in club LBOs exceeding $2.5 billion than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing and market allocation.

353.   As a direct and proximate result of the illegal combination, contract, or conspiracy, Plaintiffs and the members of the Class and sub-classes have been injured and damaged in their respective businesses and property, in amounts which are presently undetermined.

354.   The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful arrangements to fix, maintain, and/or stabilize prices of securities in club LBOs and allocate club LBOs in excess of $2.5 billion in the United States. Such violations and the effects thereof may be continuing and will continue unless the injunctive relief requested is granted.

**Second Claim for Relief**

*Bid Rigging - Per Se Violations - Sherman Act §1*

*(Against Bain, Blackstone, Carlyle, Goldman Sachs, KKR and TPG)*[255]

355.   Plaintiff Detroit alleges and incorporates by reference the allegations set forth above on behalf of the HCA Damages Sub-Class.

356.   As part of their overarching conspiracy, Defendants committed violations of the Sherman Act for which shareholders of the target companies have separate and distinct claims for

---

[255]   In the [Proposed] Fourth Amended Complaint, Plaintiffs have named KKR and Bain in the HCA bid rigging claim just as they did in the overarching conspiracy claim. Plaintiffs acknowledge and concede that the Court ruled that KKR and Bain are released from liability for the HCA deal. [Docket 153]. Plaintiffs include KKR and Bain only for purposes of preserving any rights on appeal and acknowledge that the claim against KKR and Bain with respect to HCA has been dismissed by the Court.

relief.  Plaintiff Detroit, on behalf of itself and the HCA Damages Sub-Class, hereby brings a separate claim against defendants Bain, Blackstone, Carlyle, Goldman Sachs, KKR and TPG (collectively, the "HCA Defendants") for entering into an agreement, understanding, and conspiracy in restraint of trade to rig bids and not compete for the purchase of HCA in violation of §1 of the Sherman Act, 15 U.S.C. §1.

357.    The agreements between the leaders of the HCA Defendants, on the other, were reached on or around July 24-26, 2006, and defendants KKR and Blackstone reaffirmed the agreement on September 15, 2006.

358.    The *per se* illegal agreements and conspiracy eliminated competition between private equity firm buyers in the HCA LBO.

359.    The conspiracy was an unreasonable restraint of trade that resulted in a suppressed purchase price for HCA.

360.    Plaintiff Detroit and members of the HCA Damages Sub-Class were paid at least $1 billion less for securities tendered in the HCA LBO to defendants Bain, KKR, and their co-conspirators than they would have been paid in a competitive marketplace unfettered by the HCA Defendants' and their co-conspirators' collusive and unlawful bid rigging conspiracy.

361.    As a direct and proximate result of the *per se* illegal agreements and conspiracy, Plaintiff Detroit and the members of the HCA Damages Sub-Class have been injured and damaged in their respective businesses and property, in exact amounts that are presently undetermined.

**Third Claim for Relief**

*Bid Rigging - Per Se Violations - Sherman Act §1*

*(Against Blackstone, Carlyle, KKR and Providence)*

362.    Plaintiff Detroit alleges and incorporates by reference the allegations set forth above on behalf of the PanAmSat Damages Sub-Class.

363.    As part of their overarching conspiracy, Defendants committed violations of the Sherman Act for which shareholders of the target companies have separate and distinct claims for relief.  Plaintiff Detroit, on behalf of itself and the PanAmSat Damages Sub-Class, hereby bring a

111

separate claim against Blackstone, Carlyle, KKR and Providence (collectively, the "PanAmSat Defendants") for entering into an agreement, understanding, and conspiracy in restraint of trade to rig bids for the purchase of PanAmSat in violation of §1 of the Sherman Act, 15 U.S.C. §1.

364.    The *per se* illegal agreements were reached on or around February, 2004.

365.    The agreements and conspiracy eliminated competition between private equity firm buyers in the PanAmSat LBO.

366.    The conspiracy was an unreasonable restraint of trade that resulted in a suppressed purchase price for PanAmSat.

367.    Plaintiff Detroit and members of the PanAmSat Damages Sub-Class were paid less for securities tendered in the PanAmSat LBO to the PanAmSat Defendants and their co-conspirators than they would have been paid in a competitive marketplace unfettered by the PanAmSat Defendants' and their co-conspirators' collusive and unlawful bid ridding conspiracy.

368.    As a direct and proximate result of the illegal agreements and conspiracy, Plaintiff Detroit and the members of the PanAmSat Damages Sub-Class have been injured and damaged in their respective businesses and property, in exact amounts that are presently undetermined.

## REQUEST FOR RELIEF

369.    Plaintiffs respectfully respect relief as follows:

A.    That the Court rule that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure for each claim for relief.

B.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, as set forth in each claim for relief be adjudged to have been in violation of §1 of the Sherman Act, 15 U.S.C. §1.

C.    That judgment be entered for Plaintiffs and members of the sub-classes against Defendants for damages sustained by Plaintiffs and the sub-classes as provided for in §4 of the Clayton Act, together with the costs of this action, including reasonable attorneys' fees.

D.    That Defendants and their co-conspirators and their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all

other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

E.      That Plaintiffs and members of the Class and sub-classes have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

370.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  September 17, 2010

SCOTT+SCOTT LLP

CHRISTOPHER M. BURKE (admitted *pro hac vice*)
WALTER W. NOSS (admitted *pro hac vice*)
KRISTEN M. ANDERSON (admitted *pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619/233-4565

SCOTT+SCOTT LLP
DAVID R. SCOTT (admitted *pro hac vice*)
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone:  860/537-5537

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN (Of Counsel)
SUSAN G. TAYLOR (admitted *pro hac vice*)
DAVID W. MITCHELL (admitted *pro hac vice*)
PHONG L. TRAN (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

ROBINS, KAPLAN, MILLER &
  CIRESI L.L.P
LISA A. FURNALD (BBO #631059)
800 Boylston Street, 25th Floor
Boston, MA 02199
Telephone: 617/267-2300

ROBINS, KAPLAN, MILLER &
  CIRESI L.L.P
K. CRAIG WILDFANG (admitted *pro hac vice*)
THOMAS B. HATCH (admitted *pro hac vice*)
STACEY P. SLAUGHTER (admitted *pro hac vice*)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Telephone: 612/349-8500

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER (admitted *pro hac vice*)
PAUL GRIECO (admitted *pro hac vice*)
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216/522-9000

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (admitted *pro hac vice*)
GEORGE AGUILAR (admitted *pro hac vice*)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619/525-3990

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
RICHARD A. LOCKRIDGE (admitted *pro hac vice*)
CHARLES N. NAUEN (admitted *pro hac vice*)
KAREN HANSON RIEBEL (admitted *pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2159
Telephone: 612/339-6900

HULETT HARPER STEWART, LLP
DENNIS STEWART (Of Counsel)
525 B Street, Suite 760
San Diego, CA 92101
Telephone: 619/338-1133

BRANSTETTER, STRANCH
    & JENNINGS, PLLC
J. GERARD STRANCH IV (admitted *pro hac vice*)
227 Second Avenue, North – 4th Floor
Nashville, TN 37201-1631
Telephone: 615/254-8801

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY (Of Counsel)
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: 212/682-1818

REINHARDT WENDORF & BLANCHFIELD
MARK REINHARDT (admitted *pro hac vice*)
2201 Atlantic Avenue
Sullivan's Island, SC 29482
Telephone: 651/287-2100

REINHARDT WENDORF & BLANCHFIELD
ROBERTA A. YARD (admitted *pro hac vice*)
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Telephone: 651/287-2100

FARUQI & FARUQI, LLP
NADEEM FARUQI (Of Counsel)
369 Lexington Avenue, 10th Floor
New York, NY 10017-6531
Telephone: 212/983-9330

SHEPHERD FINKELMAN MILLER
   & SHAH, LLP
JAYNE A. GOLDSTEIN (admitted *pro hac vice*)
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone:  954/515-0123

WAGSTAFF & CARTMELL LLP
TYLER W. HUDSON
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone:  816/701-1177

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the United States of America that on September 17, 2010, I caused the above document to be served via e-mail on all attorneys of record who have agreed to accept service via e-mail at defendantsprivateequity@scott-scott.com. Additionally, I caused a copy of the above document to be served by e-mail upon the following attorneys for Apollo Global Management, LLC:

> Jonathan Rosenberg
> Abby Rudzin
> O'Melveny & Myers LLP
> Times Square Tower
> 7 Times Square
> New York, NY 10035
> E-mail: jrosenberg@omm.com
>          arudzin@omm.com

WALTER W. NOSS (*pro hac vice*)
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619/233-4565
E-mail: wnoss@scott-scott.com

An Attorney for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2011, a copy of the foregoing Fourth Amended Class Action Complaint for Violations of the Federal Antitrust Laws (Redacted) was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

    s/ Walter W. Noss
Walter W. Noss
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone 619/ 233-4565
wnoss@scott-scott.com