UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIRK DAHL, et al., Individually and on Behalf of All Others Similarly Situated, ) ) ) ) ) | Lead Case No. 1:07-cv-12388-EFH |
| Plaintiffs, ) ) | CLASS ACTION |
| vs. ) ) ) | FIFTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS |
| BAIN CAPITAL PARTNERS, LLC, et al., ) ) | Leave to File Granted on June 14, 2012 |
| Defendants. ) ) ) | |
| _____ ) | DEMAND FOR JURY TRIAL |

**FILED UNDER SEAL**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................1

THE PARTIES.................................................................................................................6

    Plaintiffs.................................................................................................................6

    Defendants .............................................................................................................7

    Co-Conspirators ...................................................................................................12

JURISDICTION AND VENUE .....................................................................................14

TRADE AND COMMERCE..........................................................................................15

MODE OF ANALYSIS OF THE CLASS' ANTITRUST CLAIMS............................15

CLASS ACTION ALLEGATIONS ..............................................................................19

DEFENDANTS' OVERARCHING CONSPIRACY.....................................................22

    Defendants Agree Not to Let History Repeat Itself............................................23

    The Rules of the Game:  Conspiratorial Rules and Conduct for Large LBOs .................25

    Defendants Monitored Compliance with the Rules.............................................32

THE ROLE OF THE INVESTMENT BANKS .............................................................34

UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATION.......................38

THE LBOS AND RELATED TRANSACTIONS IN THE CONSPIRACY .................40

    Nalco ...................................................................................................................40

    Cablecom .............................................................................................................46

    The PanAmSat LBO ...........................................................................................48

    The AMC LBO and Subsequent Merger with Loews .........................................55

    The AMC Transaction ........................................................................................56

    The Loews Transaction.......................................................................................59

    The AMC/Loews Merger....................................................................................62

**Page**

The Toys "R" Us, Inc. LBO ............................................................62

The SunGard LBO ............................................................68

The Neiman Marcus LBO ............................................................75

Warner Music ............................................................80

The Texas Genco LBO ............................................................82

Susquehanna ............................................................89

The Education Management Corporation LBO ............................................................91

The Univision LBO ............................................................99

The Michaels Stores LBO ............................................................109

The HCA LBO ............................................................116

The Aramark LBO ............................................................124

The Kinder Morgan LBO ............................................................131

The Freescale LBO ............................................................139

Philips/NXP ............................................................146

Vivendi ............................................................152

The Harrah's LBO ............................................................154

The Clear Channel LBO ............................................................160

The Sabre Holdings LBO ............................................................167

The Biomet LBO ............................................................173

The TXU LBO ............................................................180

Community Health Systems ............................................................186

The Alltel LBO ............................................................188

**Page**

ECONOMIC EVIDENCE OF THE CONSPIRACY AND ITS ANTICOMPETITIVE
EFFECTS ............................................................................................................... 195

THE OFFICER STUDY .................................................................................................... 196

ALTERNATIVE ECONOMIC RATIONALES ARE IMPLAUSIBLE ..................................... 199

CLUB DEALS REFERENCED IN THIS COMPLAINT ........................................................ 200

SETTLEMENT AGREEMENTS AND PURPORTED RELEASES ........................................ 206

FRAUDULENT CONCEALMENT AND TOLLING .............................................................. 207

CLAIMS FOR RELIEF .................................................................................................... 209

First Claim for Relief ..................................................................................................... 209

Overarching Market Allocation and Horizontal Price Fixing Per Se and  Rule of
Reason Violations, §1 of the Sherman Act, 15 U.S.C. §1 ............................... 209

Second Claim for Relief ................................................................................................. 211

Bid Rigging – Per Se Violations – §1 of the Sherman Act, 15 U.S.C. §1 (Against
Bain, Blackstone, Carlyle, Goldman Sachs, KKR and TPG) ......................... 211

REQUEST FOR RELIEF .................................................................................................. 212

JURY TRIAL DEMAND .................................................................................................. 213

Plaintiffs, Kirk Dahl, Police and Fire Retirement System of the City of Detroit, Helmut

Goeppinger, Rufus Orr, Robert Zimmerman, and City of Omaha Police and Fire Retirement System

(collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through

their undersigned attorneys, allege the following for their Fifth Amended Class Action Complaint for

Violations of the Federal Antitrust Laws:

## INTRODUCTION

1.      This action challenges a market allocation and bid-rigging conspiracy that violates

Section 1 of the Sherman Act, 15 U.S.C. §1.  Plaintiffs are former shareholders of certain public

companies who sold their shares to the Defendant private equity firms in large leveraged buyouts

("LBOs") announced between 2003 and 2007 ("the Conspiratorial Era").  Rather than compete,

Defendants agreed to work together to allocate deal outcomes and purchase the target companies at

artificially suppressed prices, depriving shareholders of billions of dollars.

2.      Defendants' conspiracy involves 19 LBOs of large publicly-held companies, and

eight related transactions.[1]  The 19 LBOs include PanAmSat, AMC, SunGard, Neiman Marcus,

Michaels Stores, Aramark, Kinder Morgan, HCA, Freescale, Toys "R" Us, Texas Genco, Education

Management, Univision, Harrah's, Clear Channel, Sabre, Biomet, TXU, and Alltel. The other eight

transactions, in which Defendants purchased target companies that were not LBOs, include Philips

Semiconductor, Loews, Vivendi, Community Health Systems, Nalco, Cablecom, Susquehanna and

Warner Music.  These LBOs and transactions were not separate, isolated events; rather, they were

---

[1]      As set forth in Plaintiffs' Overarching Conspiracy Class definition, Plaintiffs seek damages
and other relief for only 17 of the LBOs.  Specifically, Plaintiffs do not seek damages and other
relief for the PanAmSat or Texas Genco LBOs.

interconnected deals that Defendants carefully planned, coordinated and tracked as part of their ongoing conspiracy.

3.      To implement their conspiracy, Defendants agreed to certain rules and conduct, often referred to as *"club etiquette"*[2] and *"professional courtesy."*[3] These rules governed how Defendants conducted large LBOs and related buyout transactions. By following these rules and acting contrary to their individual and unitary self-interests, Defendants suppressed price competition for large LBOs.

4.      The overarching rule by which Defendants carried out their unlawful agreement was the formation of bidding *"clubs"* or *"consortia,"* through which they joined together to take target companies private at a lower price than would have prevailed had they vigorously competed. Forming clubs enabled Defendants to suppress price competition by making it easier for them to:

- allocate LBOs and buyout transactions among themselves;

- ensure no Defendant *"jumped"* deals;[4]

- ensure no Defendant *"topp[ed]"* bids;[5]

---

[2]     GSPE00367587-88.

[3]     April 2, 2010 Deposition Transcript of Glenn H. Hutchins ("Hutchins Depo.") at 119:16-120:5.

[4]     *"Jumping a deal"* occurs when a potential purchaser(s) enters the sale process at a late stage of negotiations when the target company and another potential purchaser are close to a deal. Deal jumping potentially causes *"a change in the deal process whereby the purchase price could change, more likely than not, increase."* Deposition Transcript of Kenneth Hao, taken December 4, 2009 ("Hao Depo.") at 154:24-155:6.

[5]     A *"topping bid"* is a bid submitted by a competing firm that is higher than the bid accepted by the target company's board. Declaration of Christopher M. Burke in Support of Plaintiffs' Memorandum in Support of Their Motion for Leave to Complete Fact Discovery on the Remaining Deals and Amend the Complaint to Conform to the Evidence ("Burke Decl."), Ex. O, GSPE00086935-65 at 35 (suggesting *"that the market does not expect a strategic topping bid"* during the 50-day go-shop period in the Freescale deal).

- enable Defendants to rig the bidding in auctions; and

- ensure that "losers" were paid back for adhering to the conspiracy.

As Defendant TPG's founder David Bonderman[6] candidly observed, formation of such *"[c]onsortia . . . limits bidding"* and ensures that *"[there's] less competition for the biggest deals."*[7]

5.      KKR Co-Founder and Co-CEO George Roberts could not identify a single instance during the 2003-2007 time period where KKR made a bid after a signed agreement was entered by another private equity firm.[8]

6.      The $31 billion buyout of HCA illustrates how the operation of Defendants' conspiracy.  On July 24, 2006, at the height of the conspiracy, a consortium comprised of Defendants KKR and Bain, along with co-conspirator Merrill Lynch, announced their plan to acquire HCA.  To ensure the deal was consummated, KKR expressly requested *"the industry to step down on HCA."*[9]

7.      The other private equity firms followed KKR's directive and agreed not to bid for HCA.  Immediately after the announcement and during the 50-day "'go shop'" period when other Defendants had the opportunity to submit competing bids for HCA, James Attwood, a managing director at Carlyle, informed Alexander Navab, a managing director at KKR, that Carlyle would not

---

[6]      For ease of reference, an alphabetized list of individuals, titles and firms is attached hereto as Appendix 1.  Although titles may vary across Defendants (*i.e.*, "managing director," "partners," or "U.S. member"), the vast majority of the individuals listed on the chart and quoted in the Complaint are senior personnel.

[7]      Andrew Ross Sorkin, *Dealbook: Colluding or Not, Private Equity Firms are Shaken* (Oct. 22, 2006).  *See also* TPG-E-0000381393 – 429 at 401.

[8]      Roberts Depo. at 160:13-20; Carlyle's co-head of U.S. Buyouts said the same thing.  Holt Depo. At 104:17 – 105:5.

[9]      TCG0216411.

compete for HCA.[10]  Likewise, Defendants Blackstone, TPG and Goldman Sachs informed KKR

that they would not compete for HCA.  Defendants adhered to their conspiracy not to compete on

large LBOs, even though they all viewed HCA as an attractive asset.  Blackstone went so far as to

state that KKR and Bain's purchase was *"highway robbery."*[11]  Nevertheless, it did not compete for

HCA.

8.      HCA illustrates that Defendants would forego competing for a potentially lucrative

deal – even one where the purchase price was *"highway robbery"* – to reap the long term financial

gains from collusion.  Two TPG senior executives discussing TPG's decision not to compete against

KKR and Bain for HCA admit this fact: *"All we can do is do [u]nto others as we want them to do*

*unto us . . . it will pay off in the long run even though it feels bad in the short run."*[12]

9.      Reinforcing the ties among Defendants were the close professional and personal

relationships between Defendants' founders and senior executives, many of whom worked at each

others' firms, put numerous deals together, sat on company boards together, and invested in each

other's funds.  Defendants openly advertised their interpersonal relationships with other firms and

claimed that the benefits of club deals were to *"reduce competition in auctions."*[13]

10.     The close ties among Defendants' senior executives allowed them to police their

conspiratorial agreement, rewarding co-conspirators for following the agreement and punishing

those who did not.  Defendants maintained detailed "scorecards" and otherwise communicated with

---

[10]    TCG0236888 (Attwood states: *"We are NOT forming a competing group (although we have received many calls), we are not signing an NDA, we are not taking any info and we will not in any way interfere with your deal.").*

[11]    BX-0658842.

[12]    TPG-E-0000096555.

[13]    KKR DAHL 000524307-16 at 12; KKR DAHL 000538771-72 at 71.

each other about the various *quid pro quos* (paybacks) owed to and from each Defendant. Reciprocity was not a hope; it was an expectation and the glue that bound the conspiracy together. For example, KKR co-founder George Roberts suggested to TPG co-founder James Coulter that their firms meet and discuss opportunities to team up and collaborate on deals.[14] The luncheon occurred in Spring 2006. As Silver Lake co-founder Glenn Hutchins wrote to Blackstone President Tony James regarding the SunGard LBO, "*Sun[G]ard reciprocation . . . we invited you into Sun[G]ard and have a reasonable expectation of your reciprocating.*"[15]

11.     The winners were the private equity firms, and the losers were shareholders, whose shares the Defendants had acquired deceptively and at artificially reduced prices as a result of the collusion. The measure of harm the shareholders suffered is the difference between the price the shareholders received for their shares and the price they would have received "but for" Defendants' conspiracy. These "but for" prices are reasonably ascertainable by the application of well-recognized principles of economics. Recent economic scholarship and analyses confirm that shareholders received far lower prices in LBOs than they would have in a competitive market during the Conspiratorial Era. The economic evidence, when combined with the factual evidence uncovered during discovery, makes clear that Defendants' collusion directly caused significant economic losses to Plaintiffs and the other shareholders in this case.

12.     Defendants recognized that their collusive conduct damaged shareholders. TPG co-founder James Coulter made clear during the SunGard deal that being "*aggressive*" in competing only makes "*enemies*" of other private equity firms and "*benefits noone [sic] but the . . .*

---

[14]     Roberts Depo. at 188:16-23, "I suggested to Jim Coulter that we get together, have a lunch, and see what other opportunities are out there that we could work together."

[15]     BX-1199536-38 at 36.

*shareholders.*"[16] Steve Wise of Carlyle expressed Carlyle's reason for not competing for HCA, "the likely outcome is forcing KKR and Bain to pay upwards of $1 billion more and *souring two relationships.*"[17] And Larry Berg of Apollo stated why Apollo would not compete for Aramark, "we'd probably spend time and money and *piss off friends* [other PE firms] and they'd pay a few bucks more and we'd get nothing."[18] Likewise, Blackstone's President Tony James bluntly confirmed the financial advantages of refraining from competing when he wrote to KKR co-founder George Roberts: *"We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money.*"[19]

13.     Defendants' anticompetitive conduct has attracted the attention of the Department of Justice. In late 2006, the Antitrust Division launched an investigation focusing on whether joint bidding by private equity consortia in buyout deals, including those described herein, stifled competition and diminished prices paid to shareholders. The Department of Justice has since issued Civil Investigative Demands to a number of private equity firms, including Silver Lake, KKR and Carlyle.

## THE PARTIES

**Plaintiffs**

14.     Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit") is located in Wayne County, Michigan and is a public retirement trust fund organized under the laws of the State of Michigan. Detroit tendered shares to Defendants and/or their co-conspirators in the

---

[16]     TPG-E-0000002681-82 at 81.

[17]     TCG0208667.

[18]     APOLLO104805.

[19]     BX-0430719.

PanAmSat LBO, SunGard LBO, Neiman Marcus LBO, Michaels Stores LBO, Freescale LBO, HCA

LBO, Aramark LBO, Kinder Morgan LBO, Biomet LBO, Toys "R" Us LBO, Education

Management Corporation ("EDMC") LBO, Univision LBO, Clear Channel LBO, Sabre Holdings

LBO, TXU LBO, Alltel LBO and Texas Genco LBO.

15.     Plaintiff Kirk Dahl is a citizen of Minnesota.  Plaintiff Dahl tendered shares to

Defendants and/or their co-conspirators in the Freescale LBO and Univision LBO.

16.     Plaintiff Rufus Orr is a citizen of Washington.  Plaintiff Orr tendered his shares of

Freescale to Defendants and their co-conspirators in the Freescale LBO.

17.     Plaintiff Helmut Goeppinger is a citizen of Germany.  Plaintiff Goeppinger tendered his

shares of Freescale to Defendants and their co-conspirators in the Freescale LBO.

18.     Plaintiff Robert Zimmerman is a citizen of Ohio.  Plaintiff Zimmerman tendered

shares of Kinder Morgan to Defendants and their co-conspirators in the Kinder Morgan LBO.

19.     Plaintiff City of Omaha Police and Fire Retirement System ("Omaha") is located in

Omaha, Nebraska and is a public pension fund organized under the laws of the State of Nebraska.

Omaha tendered shares to Defendants and/or their co-conspirators in the HCA LBO.

20.     As a result of the conspiracy herein alleged, the price paid to Plaintiffs and other

public shareholders of the target companies for the LBOs identified in Plaintiffs' class definitions

were suppressed below the price that would otherwise prevail in a competitive market, and as a

result of the alleged conspiracy, Plaintiffs and the public shareholders of the target companies were

injured in their business and property by reason of the antitrust violations alleged herein.

**Defendants**

21.     Defendant Apollo Global Management, LLC ("Apollo") is a global asset manager

headquartered at 9 West 57th Street, 43rd Floor, New York, New York 10019.  Apollo's private

equity arm has over $30 billion of assets under management.  Apollo is legally responsible for the

unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Apollo is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

22.     Defendant Bain Capital Partners, LLC ("Bain") is a private investment firm headquartered at 111 Huntington Avenue, Boston, Massachusetts 02199. It has over $20 billion under management and operates private equity funds. Bain is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Bain is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

23.     Defendant The Blackstone Group L.P. ("Blackstone") is a publicly traded investment firm headquartered at 345 Park Avenue, New York, New York 10154 and incorporated in Delaware. It has nearly $50 billion under management and operates private equity funds. Blackstone is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, Blackstone is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

24.     Defendant The Carlyle Group LLC is a Delaware limited liability company headquartered at 1001 Pennsylvania Avenue, N.W., Washington, District of Columbia 20004. It has

- 8 -

nearly $40 billion under management and operates private equity funds, including defendants TC

Group III, L.P. and TC Group IV, L.P.  Collectively, Defendants The Carlyle Group LLC, TC Group

III, L.P. and TC Group IV, L.P. are referred to as "Carlyle." Each of the Carlyle defendants joined

the conspiratorial activity alleged herein and is legally responsible for the unlawful conduct because

its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached

an unlawful agreement with their competitors to restrain competition.  Alternatively, each of the

Carlyle defendants is legally responsible because it acted through, facilitated, dominated, or

controlled the actions of another one of the Carlyle defendants in furtherance of the unlawful

conspiratorial activity alleged herein.

   25.  Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a diversified

financial services firm engaged in investment banking, trading and principal investments, asset

management, securities services, and investment research.  The investment banking divisions of

Goldman Sachs provide financial advice to companies and financial sponsors and underwrite the

debt for a large percentage of LBOs and other large leveraged acquisitions.  Goldman Sachs'

investment management division includes Goldman Sachs Private Equity Group (referred to herein

as "Goldman Sachs PIA"), which is the private equity arm of Goldman Sachs.  Goldman Sachs PIA

has approximately $39 billion under management.  Goldman Sachs is headquartered at 85 Broad

Street, New York, New York 10004. Goldman Sachs is legally responsible for the unlawful conduct

alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of

their authority, reached an unlawful agreement with their competitors to restrain competition.

Alternatively, Goldman Sachs is legally responsible because it acted through, facilitated, dominated,

or controlled the actions of its affiliates, including without limitation Goldman Sachs PIA, Goldman,

Sachs & Co., and Goldman Sachs Capital Partners, L.P., in furtherance of the unlawful conspiratorial activity alleged herein.

26.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a financial holding company incorporated under Delaware law in 1968 and is a leading global financial services firm and one of the largest banking institutions in the United States. J.P. Morgan's investment bank and financial operations provide financial advice and underwrite the debt for a large percentage of LBOs. J.P. Morgan is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached and participated in an unlawful agreement with their competitors to restrain competition. Alternatively, J.P. Morgan is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates, including without limitation J.P. Morgan Partners in furtherance of the unlawful conspiratorial activity alleged herein.[20]

27.     Defendant Kohlberg Kravis Roberts & Co. L.P. ("KKR") is a private equity firm incorporated in Delaware and headquartered at 9 West 57th Street, New York, New York 10019. KKR has over $30 billion under management and operates private equity funds. KKR is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, KKR is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

---

[20]     On August 1, 2006, the senior professionals of J.P. Morgan Partners spun off to form CCMP Capital Advisors, LLC ("CCMP Capital"). CCMP Capital continues to manage J.P. Morgan Partners' investments by agreement with J.P. Morgan, and continued to participate in the unlawful agreement to restrain competition, as alleged herein.

28.     Defendant Providence Equity Partners, Inc. ("Providence") is a private investment firm incorporated in Delaware and headquartered at 50 Kennedy Plaza, 18th Floor, Providence, Rhode Island 02903.  Providence operates private equity funds with nearly $21 billion in equity commitments.  Providence is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, Providence is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

29.     Defendant Silver Lake Technology Management, L.L.C. ("Silver Lake") is a private equity firm headquartered at 2775 Sand Hill Road, Suite 100, Menlo Park, California 94025.  It has $5.9 billion under management and operates private equity funds.  Silver Lake is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, Silver Lake is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

30.     Defendant TPG Capital, L.P. ("Texas Pacific Group" or "TPG") is a private equity firm headquartered at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.  It has over $30 billion under management and operates private equity funds.  TPG is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, TPG is legally responsible because it acted through, facilitated,

dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

31.     Defendant Thomas H. Lee Partners, L.P. ("T.H. Lee") is a private equity firm, organized in Delaware, with its headquarters at 100 Federal Street, 35th Floor, Boston, Massachusetts 02110.  It has approximately $20 billion under management and operates private equity funds.  T.H. Lee is legally responsible for the unlawful conduct alleged herein because its directors, partners, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition.  Alternatively, T.H. Lee is legally responsible because it acted through, facilitated, dominated, or controlled the actions of its affiliates in furtherance of the unlawful conspiratorial activity alleged herein.

32.     The defendants listed in ¶¶21-31 above are collectively referred to, where appropriate, as "Defendants."

**Co-Conspirators**

33.     Various other persons, firms, and corporations, including other private equity firms, investment banks, officers, and directors of private equity firms and management of target companies not named as defendants in this Complaint participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted, and performed acts and made statements in furtherance of the conspiracy. These Co-conspirators include, but are not limited to the following:

34.     Co-conspirator American International Group, Inc. ("AIG"), an insurance corporation with a financial services arm, headquartered at 180 Maiden Lane, New York, New York 10038.

35.     Co-conspirator Banc of America Securities LLC, an investment banking firm, headquartered at 9 West 57th Street, New York, New York 10019.

36.     Co-conspirator Barclays Capital, Inc., an investment banking firm, headquartered at 200 Park Avenue, New York, New York 10166.

37.     Co-conspirator Citigroup Global Markets Inc., an investment banking and securities brokerage business, headquartered at 388 Greenwich Street, New York, New York 10013.

38.     Co-conspirator Clayton, Dubilier & Rice, Inc. ("CDR"), a private equity firm, headquartered at 375 Park Avenue, 18th Floor, New York, New York 10152. CDR operates private equity funds worth more than $4 billion.

39.     Co-conspirator Credit Suisse Securities, a U.S. registered broker-dealer, headquartered at 11 Madison Avenue, 7th Floor, New York, New York 10010.

40.     Co-conspirator J.P. Morgan Partners LLC ("JPMP"), the private equity division of J.P. Morgan Chase & Co., headquartered at 1221 Avenue of the Americas, New York, New York 10020. JPMP has invested over $15 billion worldwide since 1984.

41.     Co-conspirator Madison Dearborn Partners ("MDP"), a private equity firm, headquartered at Three First National Plaza, Suite 4600, Chicago, Illinois 60602.

42.     Co-conspirator Merrill Lynch Global Private Equity, a private equity firm headquartered at 4 World Financial Center, 250 Vesey Street, New York, New York 10080.

43.     Co-conspirator Morgan Stanley, a global financial services corporation, headquartered at 1585 Broadway, New York, New York 10036.

44.     Co-conspirator Permira, a global private equity firm, headquartered in London, United Kingdom. Permira's U.S. offices are located at 320 Park Avenue, 33rd Floor, New York, New York 10022. Since 1985 Permira has made almost 200 private equity investments and returned close to €14 billion to their investors over the past 10 years.

45.     Co-conspirator Warburg Pincus LLC ("Warburg"), a private equity firm, headquartered at 466 Lexington Avenue, New York, New York 10017. Warburg has invested more than $35 billion dollars in approximately 600 companies in more than 30 countries.

46.     Co-conspirator Hellman & Friedman, LLC, a private equity firm, headquartered at One Maritime Plaza, 12th Floor, San Francisco, California 94111. Hellman & Friedman has invested more than $25 billion in over 70 companies.

47.     At all times herein mentioned, each and every Defendant and co-conspirator was an agent of each and every other Defendant and co-conspirator. Each of the Defendants aided and abetted the commission of unlawful, unfair, and deceptive business practices of their co-conspirators and was aware, or should have been aware, that the agreements to allocate and rig bids substantially assisted and/or encouraged their co-conspirators in the commission of the unlawful, unfair, and anticompetitive acts alleged herein.

## JURISDICTION AND VENUE

48.     This action is instituted under §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes by reason of the violations, as herein alleged, of §1 of the Sherman Act, 15 U.S.C. §1.

49.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of §1 of the Sherman Act, 15 U.S.C. §1, as alleged herein.

50.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by §§4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

51.     Venue is found in this District pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b)-(d). Venue is proper in this judicial District because during the Conspiratorial Era one or more of the Defendants resided, transacted business,

was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described herein was carried out, in this District.

52.     Defendants maintain offices, have agents, transact business, or are found within this judicial District.

53.     This Court has personal jurisdiction over each Defendant because each was engaged in an illegal scheme directed at and with the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## TRADE AND COMMERCE

54.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce. During the time period covered by this Complaint, Defendants and their co-conspirators used the instrumentalities of interstate commerce to purchase securities of the target companies enumerated herein throughout the United States.

## MODE OF ANALYSIS OF THE CLASS' ANTITRUST CLAIMS

55.     Analysis of antitrust claims is informed by modern economic analysis. The branch of economics which studies issues of competition among firms is called "Industrial Organization Economics." *See* Carlton, Dennis, and Jeffrey Perloff, *Modern Industrial Organization*, 4th ed., Boston: Pearson/Addison-Wesley, 2005. The application of these modern principles of Industrial Organization Economics is described, *inter alia*, in the recently revised Horizontal Merger Guidelines adopted by the DOJ and FTC on August 19, 2010.[21] Although the Horizontal Merger

---

[21]     U.S. Department of Justice and Federal Trade Commission, HORIZONTAL MERGER GUIDELINES (revised August 19, 2010) (hereinafter "Horizontal Merger Guidelines").

Guidelines are designed for the purpose of evaluating the competitive effects of horizontal mergers, both the DOJ and FTC, as well as economists and lawyers in private cases, use the mode of analysis set forth in the Horizontal Merger Guidelines to help evaluate the competition effects of any type of potentially anticompetitive conduct.  Thus, the Horizontal Merger Guidelines are instructive and useful in analyzing Defendants' collusive conduct in this case.

56.     The DOJ and FTC have also adopted guidelines describing how they analyze joint ventures or other collaborations among competing firms.[22]  The Collaborations Guidelines are also instructive and useful in analyzing Defendants' conduct, in particular, since Defendants have claimed, in part, that their "club bidding" is pro-competitive.  As the allegations of this Complaint make clear, that is not true.

57.     Both the Horizontal Merger Guidelines the Collaborations Guidelines make it clear that the ultimate goal of antitrust analysis is to determine whether any particular conduct has caused actual anticompetitive effects.  Where there are clear and demonstrable actual anticompetitive effects resulting from conduct, without any countervailing benefits to competition, then both agencies move directly to the remedy phase of their analysis.  Here, as described in this Complaint there are clear, unambiguous and demonstrable anticompetitive effects.

58.     Where the competitive effects of conduct are ambiguous, under both the Horizontal Merger Guidelines and Collaboration Guidelines, one tool the agencies use to help them decide if anticompetitive effects are likely to result from the conduct is to determine if the parties to that conduct have market power, *i.e.*, the power to cause anticompetitive effects.  The first step in using

---

[22]     *See* U.S. Department of Justice and Federal Trade Commission, ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS (April 2000) (hereinafter "Collaborations Guidelines").

the market power analysis tool is to define a relevant market in which the conduct has occurred. As described below, there is a relevant market in which the Defendants have market power.

59.    A product market for purposes of the market power analysis consists of the market for buying the targeted firms identified in this Complaint through LBOs. Plaintiffs claim that Defendants agreed to a market allocation and bid-rigging conspiracy. Thus, the relevant type of market power is the ability of a firm or firms to maintain prices below a competitive level profitably for a significant period of time. In this regard, the Horizontal Merger Guidelines state:

> To evaluate whether a merger is likely to enhance market power on the buying side of the market, the Agencies employ essentially the [hypothetical monopolist] framework described above for evaluating whether a merger is likely to enhance market power on the selling side of the market. In defining relevant markets, the Agencies focus on the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist.[23]

60.    These market definition principles have been summarized by Dr. Gregory Werden, a prominent economist who has worked at DOJ for over 20 years:

> Market delineation in antitrust is a means to an end rather than an end in itself. Markets are tools used to aid in the assessment of market power-related issues. The best tool for any task is one designed to perform it. A market delineated for one purpose may be not any more suitable for another than a dental drill is for coal mining or a mining drill for dentistry. Assuring that markets are suitable for the purposes to which they are put requires that a preliminary step be taken before market delineation. This step is the identification of who might exercise market power, against whom it might be exercised, and how it might be exercised.[24]

61.    In the current context, Dr. Werden's preliminary step is taken by asking "who might exercise market power"—defendant private equity firms; "against whom it might be exercised"—

---

[23]    Horizontal Merger Guidelines at §12.

[24]    Werden, G. (1992), "Four Suggestions on Market Delineation," *Antitrust Bulletin*, vol. 37, pp. 107-121.

sellers of the targeted firms; and "how it might be exercised"—through an agreement to create and

maintain a market allocation and bid-rigging conspiracy.

62.    In the present case, defendant private equity buyers of the targeted firms price

discriminated in their bid-rigged offers. As discussed by the DOJ and FTC:

> When examining possible adverse competitive effects from a merger, the
> Agencies consider whether those effects vary significantly for different
> customers [selling] the same or similar products. Such differential impacts
> are possible when [buyers] *can discriminate*, e.g., *by profitably* [lowering]
> price to certain targeted [sellers] *but not to others*.

> When price discrimination is feasible, adverse competitive effects on targeted
> [sellers] can arise, even if such effects will not arise for other [sellers]. A
> price [decrease] for targeted [sellers] may be profitable even if a price
> [decrease] for all [sellers] would not be profitable because too many other
> [sellers] would substitute away. When discrimination is reasonably likely, the
> Agencies may evaluate competitive effects separately by type of [seller].

> For price discrimination to be feasible, two conditions typically must be met:
> differential pricing and limited arbitrage.[25]

63.    In the present case, defendant private equity firms made *differential offers* to the

targeted sellers. That is, Defendants did not make the same below-competitive market offers to all

firms selling themselves through LBOs. Moreover, sellers cannot arbitrage buyers' offers in LBOs.

For example, consider a firm selling itself through an LBO that receives multiple bids from

competing buyers, resulting in a competitive acquisition share price. This seller cannot arbitrage its

competitive acquisition share price by somehow requiring buyers to make a competitive offer to the

targeted firms identified in this Complaint. Therefore, the relevant product market consists of the

market for buying the targeted firms identified in this Complaint through LBOs.

64.    The billions of dollars of both debt and equity that must be raised to participate in

these LBOs creates tremendous barriers to entry into the relevant market. The number of private

---

[25]    Horizontal Merger Guidlines at §3.

equity firms that had the ability and financial means necessary to control the LBOs in the relevant market was limited to a small group of repeat players who invest collectively.

65.     The relevant geographic market for the purposes of this action is the United States. A relevant antitrust geographic market has been defined as "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."[26] Or in the present case, the market area in which the buyer operates, and to which the seller can practicably turn for LBO buyers. A relevant geographic market has been said to "correspond to the commercial realities of the industry and be economically significant."[27] In the present case, the geographic area in which the targeted sellers could practicably turn for LBO buyers is the United States.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following two classes:

**Overarching Conspiracy Class**

All persons who sold their common stock of (1) AMC Entertainment Inc., (2) Toys "R" Us, Inc., (3) SunGard Data Systems Inc., (4) The Neiman Marcus Group, Inc., (5) Education Management Corporation, (6) Univision Communications Inc., (7) Michaels Stores, Inc., (8) HCA Inc., (9) Aramark Corporation, (10) Kinder Morgan, Inc., (11) Freescale Semiconductor, Inc., (12) Harrah's Entertainment, Inc., (13) Clear Channel Communications, Inc., (14) Sabre Holdings Corporation, (15) Biomet, Inc., (16) TXU Corp., or (17) Alltel Corporation, directly to a Defendant or an entity controlled by a Defendant as part of the LBO for each of the preceding target companies. Excluded from this Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, including their predecessors, successors, and affiliates as well as their current and former directors, managers, partners, officers, and employees, and the directors and officers of each target company at the time of the LBO.

---

[26]     *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

[27]     *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962).

- 19 -

**HCA Class**

All persons who sold their common stock of HCA Inc. directly to a Defendant or an entity controlled by a Defendant as part of the HCA LBO which occurred on or about November 11, 2006. Excluded from the HCA Class are the federal government, the Court and any members of the Court's immediate family, the Defendants, including their predecessors, successors, and affiliates as well as their current and former directors, managers, partners, officers, and employees, and the directors and officers of HCA Inc. at the time of the LBO.

67.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants and their co-conspirators.

68.     Defendants and their co-conspirators have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief.

69.     Plaintiffs believe that while there are thousands of members of the Classes as described above, their exact number and identities are ascertainable from trading records.

70.     The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.

71.     There are questions of law and fact common to both of the Classes, which relate to the existence of the conspiracies alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)     whether Defendants and their co-conspirators engaged in combinations and conspiracies among themselves to allocate the markets for and/or to rig the bidding for the securities of target companies, as alleged herein, purchased by Defendants and their co-conspirators;

(b)     the identity of the participants in the conspiracies;

(c)     the duration of the conspiracies alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracies;

(d)     whether the alleged conspiracies violated §1 of the Sherman Act, 15 U.S.C. §1;

(e)  whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and other members of the Classes;

(f)  the effect of Defendants' conspiracies on the prices of securities sold to Defendants and their co-conspirators during the Conspiratorial Era;

(g)  the appropriate measure of damages sustained by Plaintiffs and other members of the Classes;

(h)  the appropriate injunctive relief;

(i)  whether releases obtained in state court breach of fiduciary duty class action settlements release any Defendant from the Classes' claims for injunctive relief; and

(j)  whether releases obtained in state court breach of fiduciary duty class action settlements release any Defendant from the Classes' claims for damages.

72.    Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs tendered their securities in the target companies that underwent an LBO, and their interests are coincident with and not antagonistic to those of the other members of the Classes. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

73.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

74.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable and are ones for which records should exist in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual

actions would engender.  Treatment of this case as a class action will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## DEFENDANTS' OVERARCHING CONSPIRACY

75.     An LBO is a type of transaction in which a purchaser, often a private equity firm, acquires substantially all of a company's outstanding shares using some of its own capital along with a substantial amount of debt financing.  The purchaser then typically takes the company private (by withdrawing its shares from the public exchange), operates it for a period of time, and sells it or conducts a public offering for its shares.  The debt used in an LBO is secured by the target company's assets and paid off with its cash flow.

76.     Through a well-orchestrated market allocation and bid-rigging conspiracy, Defendants suppressed competition in 19 of the largest LBOs – and 8 related transactions – that closed between 2003 and 2007.  Defendants fostered their conspiracy by regularly and explicitly affirming that "working together," instead of competing, best served their interests.  In each of the 19 LBOs, Defendants formed joint purchasing clubs (or consortia), refused to top one another's bids, and divided deals among themselves through a series of *quid pro quo* arrangements.  At its essence, this anticompetitive conduct amounted to following the conspiracy's mutually understood Rules that Defendants referred to as "*[c]lub etiquette,*" "*quid-pro-quo,*" "*payback,*" "*IOU,*" and "*professional courtesy.*"[28]

---

[28]     GSPE00367587-88 at 87; BX-0033380; TCG0450308-09 at 08; KKR DAHL 000538008-10 at 09; Hutchins Depo. at 119:16-120:5.

**Defendants Agree Not to Let History Repeat Itself**

77.     Historically, private equity firms fiercely competed.  For example, KKR's acquisition of RJR Nabisco in 1989 epitomized an era of robust competition.  After Shearson Lehman Hutton, Inc. announced that it would acquire RJR Nabisco for $75 per share, a bidding war broke out between KKR, Shearson Lehman Hutton and Forstmann Little & Co.  Ultimately, KKR acquired the company for $109 per share – a 40% increase from the initial bid.  At $31.1 billion, RJR Nabisco remained the largest LBO on record for the next 17 years.

78.     After RJR Nabisco, large LBOs occurred infrequently.  By 2003, however, a combination of cheap, plentiful debt, low interest rates, easy access to capital, and favorable valuations of public companies made LBOs more appealing.  A second LBO boom occurred from 2003 to 2007, providing Defendants with a sufficient number of targets to allocate profitably among themselves to keep competition from breaking out as it had in earlier eras.

79.     But this time, Defendants agreed not to compete for target companies.  Defendants feared creating RJR Nabisco-like bidding wars for large LBOs where no Defendant benefitted.  An internal Blackstone email states: *"[t]he reason we didn't go forward [on HCA] was basically a decision on not jumping someone elses [sic] deal and creating rjr [Nabisco] 2."*[29]  Blackstone President Tony James aptly described Defendants' new ethos, and affirmed their conspiracy, in an email he sent to George Roberts, the co-founder of KKR,*"[w]e would much rather work with you guys than against you.  Together we can be unstoppable but in opposition we can cost each other a lot of money."*[30]  Roberts affirmed the conspiracy with one word, *"[a]greed."*[31]

---

[29]     BX-0658842.

[30]     BX-0430719.

80.     In order to avoid costly bidding wars, Defendants agreed not to compete for another Defendant's exclusive deal.  In exchange, Defendants were assured that they may potentially be brought into the deal as a reward.  This suppressed the price paid to shareholders for each LBO and benefitted Defendants by artificially decreasing their acquisition costs.  Also driving Defendants' agreement not to compete was the fact that they shared numerous limited partners (LPs), that is, investors in their buyout funds.  Competition drove up the price for the target company and thus threatened the Defendants' returns to their common LPs.  As a result, Defendants did not wish to be seen as "jumping deals" and driving up prices.  This is illustrated by Silver Lake co-founder Jim Davidson's explanations to a Silver Lake LP who was offered a co-investment opportunity in Freescale by the Blackstone consortium that Silver Lake did not jump the Freescale deal and thus unnecessarily drive up the price.[32]  Davidson was adamant that Silver Lake not be seen as jumping someone's deal because that would have violated the agreement not to compete and counseled others in Silver Lake to stick to his script when communicating with LPs.

81.     Defendants described their collusive agreement as pursuing a "long-run" approach. For example, after passing up a "good deal" on a target company to allow KKR and Bain to acquire it at an artificially reduced price, Jonathan Coslet, TPG's Chief Investment Officer, reminded one of his colleagues, "*[a]ll we can do is do [u]nto others as we want them to do unto us . . . it will pay off in the long run even though it feels bad in the short run*."[33]  On another occasion, TPG and Blackstone chose to join an existing club with other Defendants rather than submit an independent

---

[31]    *Id.*

[32]    *See* STLM-DAHL-E-0202960 and SLTM-E-0177339.

[33]    TPG-E-0000096555.

bid because, in the words of TPG's James Coulter, being *"aggressive"* would make *"enemies,"* *"while perhaps benefiting noone [sic] but the [company's] shareholders."*[34] These TPG emails demonstrate how Defendants agreed to forego short-run profits for greater pay-offs in the long run. Such an agreement was possible because Defendants are a close-knit community of private equity firms whose founders and top executives attended the same schools, started their careers at the same firm(s), worked together at the highest levels of finance, regularly socialized with one another, and even personally invested in each other's funds. Moreover, the firms they commanded were the only ones with the resources to close the large LBOs which are the subject of this action. In short, the nature of the private equity and investment banking industries made it a fecund environment for fixing the market.

82.     With a conspiracy firmly in place, Defendants, such as KKR bragged to its investors in 2005: *"'Gone are the days when buy-out firms fought each other with the ferocity of cornered cats to win a deal.'"*[35]

**The Rules of the Game:  Conspiratorial Rules and Conduct for Large LBOs**

83.     Defendants implemented their agreement to "work together" by adhering to several rules of conduct.  Defendants referred to these rules using multiple euphemisms, such as: *"[c]lub etiquette,"* *"quid-pro-quo,"* *"payback,"* *"IOU,"* *"at-bat[s],"* and *"professional courtesy."*[36] Goldman Sachs referred to these Rules when it remarked, *"club etiquette prevails,"* after Blackstone and KKR

---

[34]     TPG-E-0000002681-82.

[35]     KKR DAHL 000524307-16 at 10.

[36]     GSPE00367587-88; BX-0033380; TCG0450308-09 at 08; KKR DAHL 000538008-10 at 09; November 6, 2009 Deposition Transcript of Matthew Levin ("Levin Depo.") at 200:21-201:2; Hutchins Depo. at 119:16-120:5; April 12, 2012 Deposition of Allan Holt ("Holt Depo.") at 197:14-20.

determined that, rather than compete over both HCA and Freescale, Blackstone would cede one company and KKR would cede the other.

84.     Regardless of nomenclature, Defendants observed two broad rules when pursuing any given target: (1) Defendants must work together and not compete; and (2) Defendants must be compensated for their adherence to the Rules.  Defendants followed these Rules throughout their conspiracy, and in each of the 19 LBOs – and eight related transactions – that it spanned.

85.     Rule 1 – which required Defendants to work together instead of competing – caused Defendants to engage in the following conspiratorial conduct:

(a)     <u>Form Clubs to Bid on Large LBOs</u>: From the 1980s through 2003, club bidding was relatively rare.  In stark contrast, during the Conspiratorial Era, Defendants formed clubs in *every single* large LBO.  These clubs would number as many as seven Defendants even when any one Defendant could have profitably purchased the target on its own.  Defendants admitted that forming clubs suppressed price competition.  Blackstone stated that club deals promote a *"[l]ess competitive deal environment."*[37]  KKR stated that club deals *"[r]educe competition in auctions."*[38]  TPG's founder David Bonderman admitted forming *"[c]onsortia often limits bidding,"*[39] and ensures that *"[t]here's less competition for the biggest deals."*[40]  Forming clubs also facilitated Defendants' adherence to the other Rules described below.

---

[37]     BC-E 0112808-21 at 10; Burke Decl., Ex. P, KKR DAHL 000538771-72; *see also* BX-1031261 (*"teaming with a consortium to reduce competition"*).

[38]     KKR DAHL 000524307-16 at 12.

[39]     Burke Decl., Ex. A, TPG-E-0000345097-128 at 104; *see also* Burke Decl., Ex. B, TPG-E-0000381393-429 at 401.

[40]     BC-E0580250-51 at 50.

(b)     Do Not Compete for Another Club's Proprietary Deal: Defendants refused to compete for proprietary deals during both the negotiation process and the go-shop period. Every time a Defendant's club signaled that it had a proprietary deal in place for a target company during the course of the conspiracy, the other Defendants refused to submit a better offer – even when they could have done so and still made a profit on the company.  For example, in HCA, a KKR-led club asked "*the industry to step down*" on its proprietary deal.[41]  As a result, just 3 days into HCA's 50 day "*go-shop*" period, before it was possible to conduct due diligence, Carlyle's James Attwood wrote KKR's Alexander Navab, "*[w]e are NOT forming a competing group (although we have received many calls), we are not signing an NDA [non-disclosure agreement], we are not taking any info and will not in any way interfere with your deal.*"[42]  Blackstone, TPG and Goldman Sachs, who were all interested in HCA, each affirmed that they would not compete.[43]  This enabled KKR's club to purchase HCA at such a low price, it amounted to "*highway roberry [sic].*"[44]  When KKR later returned that favor in compliance with the Rules, TPG's managing director, John Marren, reported to one of his colleagues, "*KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal.*"[45]  In Freescale, Defendants KKR, Bain and Silver Lake expressly wrote to Freescale's Board that it would not compete in a go-shop if Freescale signed an agreement with

---

[41]     TCG0216411.

[42]     TCG0236888.

[43]     TPG-E-0000096555; BX-0658842; KKR DAHL 000051683-87.

[44]     BX-0658842.

[45]     TPG-E-0000034009.

another group, which they knew to be lead by Blackstone.[46] Consistent with this Rule, Defendants did not jump a single proprietary deal during the conspiracy period.

(c) <u>Manipulate Auctions</u>: When faced with the prospect of an auction, as opposed to a proprietary deal, Defendants worked together to manipulate the auction to suppress price competition. Defendants formed clubs to limit the total number of bidders, often resulting in only two potential bidding groups. Defendants also discussed their bidding strategy with each other and used traditional bid-rigging ploys, such as submitting soft or sham bids. During the entire conspiracy, no Defendant ever topped a "winning" bid for a target company that had been submitted by a co-conspirator – even when a Defendant could have done so and still made a profit on the company. In PanAmSat, for instance, a club made up of Carlyle, Providence and Blackstone plotted with KKR to rig the company's auction. During phone calls with the club, KKR's Alexander Navab, suggested that they "*both bid separately and try to come together later.*"[47] Subsequently, in an email with the subject line "*RE: bid strategy*," Carlyle's Michael Connelly signaled "*maybe we shouldn't bid today – let KKR bid $22 or so and then we take a look at their deal as participant, as agreed. [O]r KKR bids $22-$23, we bid $20 and then join up later if they can educate us.*"[48] The club submitted what it described as a "'*soft bid*'" of $20,[49] allowing KKR to "*win*" the auction. To complete the scheme, KKR then let Carlyle and Providence into the deal as partners, giving them a

---

[46]   STLM-DAHL-E-0080771.

[47]   TCG0236361.

[48]   TCG0288350.

[49]   TCG0000063; TCG0065289-94 at 89.

total of 56% of the company[50] – although KKR attempted to keep the fact that Carlyle and Providence had been "*losing*" bidders out of PanAmSat's proxy filing.[51]

86.     Similarly, Defendants' application of Rule 2 – Defendants must be compensated for their adherence to Rule 1 – led them to  repeatedly engage  in the following conduct:

(a)     <u>Let's Trade – My Club Gets Deal A, and Your Club Gets Deal B</u>:  When multiple target companies became available at the same time, Defendants would allocate the deals among themselves, such that they each took a turn as the "winner."  This enabled Defendants to maintain order while ensuring that they paid the lowest possible prices for companies.  The HCA and Freescale transactions illustrate this conduct where communications between the highest ranking members of Blackstone and KKR resulted in an agreement that Blackstone's club would "*win*" Freescale and KKR's club would "*win*" HCA.[52]  Describing this agreement, KKR's co-founder Henry Kravis wrote, "*[t]hey [Blackstone] are very happy campers that we are not going any further, since they now have a signed agreement [for Freescale].*"[53]  Defendants made similar allocations in AMC and Loews, Kinder Morgan, Univision, EDMC, and Philips/NXP.

(b)     <u>Rewards for Not Competing – Participation in a Current LBO</u>:  Defendants rewarded each other for not competing for large LBOs.  Defendants agreed not to compete, that is, make an independent bid, in exchange for being offered an invitation to participate in that LBO with its co-conspirators.  These *quid pro quos* restrained competition by eliminating competitive bids, thereby suppressing price.  It also furthered the conspiracy, because it ensured that Defendants

---

[50]     KKR DAHL 002359-69; KKR DAHL 000413963-74.

[51]     KKR DAHL 000430909-10; TCG0216512; BX-1165731-33.

[52]     KKR DAHL 000430909-10; TCG0216512; BX-1165731-33.

[53]     KKR DAHL 000430909-10.

would have an opportunity to participate in enough deals to make the conspiracy economically advantageous.  Numerous examples of these *quid pro quos* occurred during the conspiracy.  In SunGard, the Silver Lake-lead club rewarded Blackstone and TPG for not forming a competing club.[54]  The Silver Lake group used J.P. Morgan's "*trillion dollar man*" Jimmy Lee "*to soothe them for not getting invited but not to bid against [Silver Lake] as [Silver Lake] will let them in.*"  In Michaels Stores, Bain and Blackstone rewarded Carlyle and T.H. Lee for not forming a competing club, because the prospect of Carlyle forming its own club "*would probably mean a bad process,*"[55] *i.e.*, a competitive process.  Blackstone summed it up best: "*you scratch our back, we scratch yours.*"[56]  Silver Lake expected similar treatment for not bidding against Bain and TPG in a telecommunications deal involving Huawei and 3Com.  Jim Davidson of Silver Lake noted he did not want to bid against TPG and Bain and that Silver Lake would expect to get a call if they won but was unwilling to go forward and bid against them.[57]

(c)     I Let You in on My Current Deal, You Let Me in on Your Future Deal:  Defendants who were invited into a current deal understood that they were required to invite their co-conspirators into a subsequent deal.  By doing so, Defendants understood that their co-conspirators would not compete against them.  For example, in Kinder Morgan, Goldman Sachs brought Carlyle in with the understanding that Carlyle would return the favor in the future.  Recognizing that obligation, Carlyle sought to find a place for Goldman Sachs in the subsequent Community Health Systems ("CHS") deal.  Allan Holt, Carlyle's co-head of U.S. Buyouts, asked his

---

[54]     SLTM-DAHL-E-0177300.

[55]     *Id.*

[56]     *Id.*

[57]     SLTM-DAHL-E-0363274.

colleagues who had proposed partnering with Permira on CHS, "*[a]re we committed to Permira as I had hoped we could invite in [Goldman Sachs] PIA as payback on Kinder for future consideration.*"[58]   Revealing how intertwined Defendants' conspiracy had become, Carlyle's managing director Sandra Horbach responded that "*[a]s far at [sic] Goldman [Sachs PIA] is concerned, I didn't think we owed them payback on [Kinder] because I thought that was payback for EDMC [Education Management].*"[59]   This policy was enshrined in a Goldman Sachs document titled "PIA Financial Sponsor Strategy" dated in June, 2003. A slide subtitled "The Strategy" stated that Goldman Sachs should "Develop 'chits' that will encourage reciprocity with Financial Sponsors, PIA and IBD" and noted that "Co-investment opportunities in PIA deals will enhance FSG's relationships with Sponsors and encourage reciprocity towards PIA."[60] KKR repaid Silver Lake for SunGard by inviting them into the Auna deal and Silver Lake specifically negotiated this as payback. Other examples of this conduct took place throughout the conspiracy including in PanAmSat, AMC, SunGard, Neiman Marcus, Michaels, Aramark, Freescale, HCA, Vivendi, CHS, Nalco, Cablecom and Susquehanna.

(d)   Prior to SunGard, KKR had never invested in an LBO with Silver Lake.[61] After SunGard, KKR teamed up with Silver Lake in NXP, Freescale and Avago.[62]

---

[58]   TCG0450308-09; *see also* Holt Depo. at 197:14-20 (testifying that he "considered it a *professional courtesy*" for Carlyle to offer CHS to Goldman Sachs as payback for Kinder Morgan and for future consideration).

[59]   *Id.*

[60]   GSPE00807828 at 840.

[61]   Roberts Depo. at 96:2-4.

[62]   *Id.* at 96:5-12.

(e)    <u>Rewards for Not Competing – Participation in Future Deals</u>: Defendants also rewarded each other for not competing for current large LBOs by offering co-conspirators who agreed not to compete, the opportunity to participate in future LBOs. Defendants did this when the circumstances were unfavorable to an invitation into the current deal. These *quid pro quos* restrained competition by eliminating competitive bids, thereby suppressing price. It also furthered the conspiracy because it ensured that Defendants would have an opportunity to participate in enough deals to profit from the conspiracy.

(f)    The Rules thus established the repeated pattern of conduct that Defendants engaged in throughout their overarching conspiracy, and in each of the 19 LBOs and eight related transactions that they spawned. The Rules succeeded in part because they provided Defendants with simple methods of suppressing competition that could be applied regardless of how a deal unfolded, and despite the fact that Defendants could not always foresee which large target companies would become available or who would show an interest in a particular target when it did. The Rules also provided Defendants an easy-to-follow system of interlocking obligations and *quid pro quos* which consistently produced allocations that left all Defendants satisfied.

**Defendants Monitored Compliance with the Rules**

87.    Defendants accordingly monitored the *quid pro quos* that arose from the conspiracy to ensure that deals were adequately allocated, and the conspiracy thrived. Defendants monitored compliance through detailed scorecards and communications amongst themselves, which prevented competition from breaking out. Defendants, like Goldman Sachs, Bain, KKR and Silver Lake maintained detailed "scorecards" that listed the deals they worked on, who else was involved in

those deals, and the resulting favors that they owed others and that others owed them.[63] Monitoring *quid pro quos* occurred in communications at highest levels of the companies. TPG founder David Bonderman met with Goldman Sachs CEO Lloyd Blankfein concerning reciprocal deal flow for TPG's inviting Goldman Sachs PIA into TXU, Biomet, and Alltel.[64] Regarding paybacks, Glenn Hutchins, Silver Lake's co-founder, wrote Blackstone's Tony James, *"[y]ou are one of the very few firms in the Sun[G]ard consortium who hasn't found an opportunity to invite us into something that we weren't otherwise engaged with."*[65] Hutchins continued, *"we invited you into SunGard and have a reasonable expectation of your reciprocating."*[66]

88.     One Defendant, TPG, collected a list of deals that it worked on together with KKR in preparation for a luncheon that occurred in which its industry team leaders collaborated with KKR's industry team leaders (including KKR's co-heads of North American private equity Alexander Navab and Michael Michelson) in order to discuss opportunities to team up and to simply *"say thanks for where [KKR] invited [TPG] in."*[67] In another instance, when Apollo co-founder Leon Black expressed his anger at Goldman Sachs' *"lack of reciprocity"* for two deals he had invited

---

[63]     January 27, 2010 Deposition Transcript of Richard A. Friedman ("Friedman Depo."), Exhibit 657; Friedman Depo. at 135:2-8; October 29, 2009 Deposition Transcript of Kenneth A. Pontarelli ("Pontarelli Depo.") Exhibit 214; Pontarelli Depo. at 148:17-24.

[64]     GSPE01346837-42

[65]     BX-1199536-38; Hutchins Depo. at 323:9-23.

[66]     BX-1199536-38.

[67]     Burke Decl., Ex. Q, TPG-E-0000345839-41 (referencing Sungard, Philips/NXP and Community Health Systems, among others).

Goldman Sachs to join, Goldman Sachs' executives reviewed their scorecard and readily agreed that they *"truly need[ed] to involve [Apollo] soon in a principal deal."*[68]

## THE ROLE OF THE INVESTMENT BANKS

89.     Investment banks play a critical role in the identification of LBO opportunities and the negotiation, financing, and exit strategies of LBOs.   As such, investment banks have organizational and financial incentives to align themselves with the largest private equity firms.

90.     At the beginning of the LBO process, a target company typically hires an investment bank to advise it "to seek strategic alternatives," a euphemism for selling the company.   The investment banker received a lucrative fee for advising the company during this process.

91.     Once the company decided to sell itself, its investment bank would be responsible for soliciting potential buyers.   Potential buyers comprised two general categories: (i) long-term strategic buyers, such as companies in the same industry; and (ii) short-term financial buyers such as Defendants.

92.     During the conspiracy, investment banks shifted their focus from soliciting strategic buyers to soliciting private equity firms, particularly Defendants.   Investment banks steered target companies to the Defendants, rather than strategic buyers, because the LBOs orchestrated by Defendants generated significantly larger fees for the investment banks than the acquisitions by strategic buyers.   Unlike strategic buyers who would often fund the acquisition through cash and/or their stock, Defendants relied upon debt to fund their purchase.   This provided investment banks with the opportunity to earn large fees through debt underwriting.

---

[68]     GSPE00380294-95.

93.    The investment banks also participated in the scheme to earn substantial fees post-acquisition ("recycling fees").   These recycling fees provided the financial incentive for the investment banks to offer lower interest rates to the private equity firms who most often participate in LBOs as compared to other possible acquirers (such as strategic buyers).  Economic data indicate that the lower interest rates paid by private equity firms led to a four percentage point *increase* in equity return to the private equity firms, while at the same time premiums paid to shareholders in club LBOs *decreased*.

94.    After the acquisition was completed, the private equity firm buyers often placed a secondary debt offering to fund a dividend recapitalization in order to recoup as much as 35% of their original investment, often within 6 months of the acquisition.  The investment banks also received a fee for underwriting secondary bond placements.  Corporate/strategic buyers were less desirable partners for investment banks because they lacked any incentive to hire the banks to issue secondary debt to fund large dividends.

95.    Similarly, private equity firms eventually would sell some of the company's assets in an initial public offering ("IPO") or to a strategic buyer.  These activities also required substantial investment banking services and produced very high fees for investment banks, providing additional motivation to participate in the conspiracy.

96.    In 2001, corporate/strategic buyers made up 17 of the 20 largest fee generators for investment banks; whereas, by 2005, only 4 of the 20 largest fee generators were corporate/strategic buyers, and 16 of the largest fee generators were private equity firms.  The fees private equity firms pay investment banks are enormous.  In 2005 and 2006, the big investment banks received fees from private equity firms exceeding $11 billion, including advisory fees and recycling fees from follow-

on bond offerings and exit strategies. Moreover, Defendants, the largest private equity firms, paid the majority of these fees to investment banks.

97.     The chart after ¶152, which illustrates the sources of fees in the PanAmSat Holding Corporation ("PanAmSat") deal, serves as an example of how investment banks generate fees from private equity firms.

98.     Thus, the Defendant private equity firms exerted considerable control over the investment capital markets by aligning with certain select investment banks and executing exclusivity deals with these banks. Only a few investment banks had the capital, resources, and connections to the private equity community necessary to participate in the largest LBOs, and these few banks, and individual bankers such as Jimmy Lee at J.P. Morgan and Boon Sim at Credit Suisse, are all repeat players with close personal and financial relationships with the Defendants.

99.     Additionally, investment banks had private equity arms that participated directly in bidding clubs, even when they were already advising the target company. This created a situation ripe for the sharing of competitive information and self-dealing. One hand washed the other, as the investment bank lined up capital and debt financing for its fraternal private equity firm, which, in combination with the consortium of private equity partners, in turn paid the bank substantial fees. As a result, the various opportunities for profiting from the deal were kept in the family. For example, in the Kinder Morgan deal, Defendant Goldman Sachs achieved what it favorably referred to as the "*triple play*" – controlling the buyout by taking on multiple, if not conflicting roles including: (1) serving as advisor to the acquisition group; (2) serving as the lead private equity

sponsor; and (3) providing debt financing on the deal.[69]   Other examples of the conjoined

relationship between investment banks and private equity firms include:

(a)   **HCA:** Merrill Lynch – which HCA retained to discuss strategic alternatives with management – brought in its private equity arm, Merrill Partners, once HCA's management decided to go private. The four financial advisors to the group – Merrill Lynch, Bank of America, Citigroup, and J.P. Morgan – also provided the debt financing.

(b)   **Neiman Marcus:** Goldman Sachs acted as both investor and advisor to the company.

(c)   **Aramark:**  Both Goldman Sachs and J.P. Morgan participated as private equity firms, investment banks, and advisors.

(d)   **AMC:**  J.P. Morgan acted as investor, advisor to purchasers, and provided debt financing.

(e)   **PanAmSat:**  Credit Suisse acted as advisor to the company and provided debt financing.

(f)   **Michaels Stores:**  J.P. Morgan acted as both the advisor to the company and provided debt financing.

(g)   **Biomet:**  Goldman Sachs participated in the buyout as a member of the buyout consortium and by providing debt financing.

(h)   **TXU:**  Credit Suisse acted as advisor to the company and provided debt financing. Further, Goldman Sachs acted as a large equity investor, provided debt financing, acted as an advisor and had a large role in TXU's commodity hedging business.[70]

100.   However, the Defendant private equity firms did not tolerate direct competition from

the investment banks on buyout deals. For example, the fallout from the 2004 Warner Chilcott LBO

in which the private equity arms of investment banks Credit Suisse and J.P. Morgan prevailed in an

---

[69]   November 12, 2009 Deposition Transcript of Sanjeev Mehra ("Mehra Depo.") at 176:15-177:2.

[70]   May 16, 2012 Deposition of Richard Friedman ("May 16, 2012 Friedman Depo.") at 507:7-15.

LBO over KKR, Bain and TPG, is telling.[71]  KKR co-founder George Roberts confirmed that after

the Warner Chilcott buyout, Credit Suisse and J.P. Morgan were forced to spin off their private

equity arms because continuing to compete with KKR and the other Defendant private equity firms

would cause them to forfeit future banking fees.[72]

       101.    The investment banks also invested in funds managed by Defendants. ███████

██████████████████████ As a result of interlocking investments, investment banks

often advised the target company to participate in an LBO with a private equity firm they controlled

or in which they had invested capital. This created an additional incentive for the investment banks

to render favorable fairness opinions even though the takeover price had been artificially suppressed.

       102.    Because the investment banks played both sides of the table, information regarding

pending and future deals flowed freely between investment banks and private equity firms. For

example, J.P. Morgan's National Advisory Board, chaired by Jimmy Lee, Co-Chair of the

Investment Bank, had a selective membership roster during the Conspiratorial Era that included

senior leadership from Defendants TPG, Blackstone, T.H. Lee, Silver Lake, Carlyle and Apollo.

These and other associations, such as the Private Equity Council and Private Equity Leadership

Group, provided conduits for communicating competitive information among Defendants and their

co-conspirators.

## UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATION

       103.    On October 11, 2006, *The Wall Street Journal* reported that the Department of Justice

had launched an investigation into the bidding practices of private equity firms including, among

---

[71]     May 15, 2012 Deposition of George Roberts ("Roberts Depo.") at 191:16-24.

[72]     Roberts Depo. at 194:11-14 ("I mean, why would you go give business to somebody that –
your direct competitor?  You give business to somebody that is going to help you, not hurt you.").

others, the following Defendants and their co-conspirators: (i) KKR; (ii) Carlyle; (iii) CDR; (iv) Merrill Partners; and (v) Silver Lake. Each received letters from the New York Regional Office of the Department of Justice seeking broad information about their business practices and involvement in LBOs going back to late 2003.

104.    Specifically, the Department of Justice is investigating instances of collusion in the form of bid-rigging, focusing on whether bidding clubs – which include Defendants, the investment banks, and often the target company's senior management – communicated about prices and the value of bids in order to reach secret agreements and keep target companies' prices low.

105.    One unnamed source stated that the Department of Justice investigation concentrates on "'what deals did we do, who did we work with [and] when did we find out about them.'"[73] Private equity transactions involving management-led LBOs are a primary target of the inquiry because management has an incentive to protect their own financial interests by collaborating closely with a club of private equity firms to avoid an open bidding process.

106.    The Department of Justice issued formal Civil Investigative Demands to at least Defendants Silver Lake, KKR and Carlyle.[74] In its August 13, 2007 Amendment No. 1 to Form S-1, KKR confirmed that the Department of Justice had requested documents as part of its bid-rigging investigation. Specifically, KKR disclosed "we have received a request for certain documents and other information from the Antitrust Division of the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have

---

[73]    Peter Smith, *Buy-Out Firms Face Harsher Regulation*, Fin. Times, Oct. 11, 2006, at 29.

[74]    *See* Silver Lake Technology Management LLC's Objections and Responses to Plaintiffs' First Set of Interrogatories; TC Group III, L.P. and TC Group IV, L.P.'s Supplemental Objections and Responses to Plaintiffs' First Set of Interrogatories; Kohlberg Kravis Roberts & Co. L.P.'s Responses and Supplemental Objections to Plaintiffs' First Set of Interrogatories.

engaged in conduct prohibited by the United States antitrust laws." KKR also received requests for documents in March 2009. In the April 8, 2008 Form S-1, Apollo stated that "it has been reported in the press that a few of our competitors in the private equity industry have received information requests relating to private equity transactions from the Antitrust Division of the U.S. Department of Justice." This indicates that the Department of Justice's investigation of several Defendants is ongoing.

### THE LBOS AND RELATED TRANSACTIONS IN THE CONSPIRACY

107.   The conspiracy included 27 transactions.  Seventeen of the 27 transactions were public-to-private LBOs that are part of Plaintiffs' overarching conspiracy damages class.  The remaining transactions are related transactions which further connect the deals in the overarching damages class and also illustrate how "*club rules*" and "*club etiquette*" ordered Defendants' conduct.

108.   These large LBOs and buyout transactions, in chronological order, include Nalco, Cablecom, Warner Music, PanAmSat, AMC Entertainment Inc. ("AMC"), Loews, Toys "R" Us, SunGard, Neiman Marcus, Texas Genco, Susquehanna, Education Management ("EDMC"), Univision, Michaels Stores, HCA, Aramark, Kinder Morgan, Freescale, Philips Semiconductor ("Philips"), Vivendi, Harrah's, Clear Channel, Sabre, Biomet, TXU, Community Health Systems ("CHS"), and Alltel.  Allegations concerning each of the above deals and their relationship to the conspiracy follow.

**Nalco**

109.   The Nalco transaction, which involved the sale of a private company, highlights central elements of Defendants' conspiracy to restrain competition, particularly the use of *quid pro quo* payback and Defendants' willingness to manipulate the auction process and thereby share a deal when the alternative (competition between Defendants) would have raised the price of the target company.

110.    In early 2003, Suez SA ("Suez") began evaluating a possible sale of its subsidiary, Ondeo Nalco Co. ("Nalco"), a water treatment company. Suez invited certain private equity firms, including Blackstone, Apollo, KKR and CDR, to participate in what was described as a "limited Nalco auction."[75] On March 27, 2003, KKR signed a comprehensive non-disclosure agreement with Suez which prohibited disclosure to "any person ... that you are contemplating a transaction with Suez..."[76] Apollo and Blackstone signed similar agreements.[77] The deadline to submit first round bids for Nalco was August 1, 2003.

111.    Although Suez had previously insisted that bidders not partner together "in order to create a more competitive auction process,"[78] Apollo ignored that directive and teamed up with Goldman Sachs, which had previously served as its advisor, and which would later serve as a source of debt financing for the deal. Apollo and Goldman Sachs jointly submitted a bid for Nalco, and Blackstone submitted a bid on its own.

112.    KKR and CDR were considered "the favorite to win" the Nalco auction, but in a surprising move, dropped out of the bidding process soon after the August 1 bid deadline, leaving the consortium of Apollo and Goldman Sachs to bid against Blackstone for the company.[54]

113.    UBS, Suez's advisor, informed the private equity firms that they would not be able to join the winning bidders in a club. This restriction presumably would encourage firms to compete aggressively, as there would be no other way to purchase any part of Nalco.

---

[75]    Lisa Gewirtz, Josh Kosman, and Samer Iskandar, *Apollo, Goldman stay in Suez deal*," The Daily Deal, Sept. 4, 2003.

[76]    KKR DAHL 000599066.

[77]    APOLLO026638-42; BX-1214915-20.

[78]    *Id.*

114.    Ignoring Suez's auction rules, Stephen Schwarzman, Chairman and CEO of Blackstone, and Leon Black, Chairman CEO of Apollo, entered into a secret bid-rigging agreement whereby the Apollo/Goldman Sachs consortium would permit Blackstone to submit a "winning" bid for Nalco in exchange for an award of a piece of Blackstone's deal after the auction was closed. This agreement was memorialized in multiple internal emails to and from senior executives for the Defendants.  As early as August 29, 2003, Rich Friedman, the head of Goldman Sachs' Merchant Banking Division, observed in an internal email "On Nalco, it appears the other side is favoring blackstone … *If B wins, we will likely get an opportunity to join. We don't want to be played off against them.* "[79]  On August 31, 2003, before Blackstone submitted the winning bid, Friedman emailed Goldman executive Sanjeev Mehra (who subsequently organized efforts to dissuade competitors in the Aramark "auction"), stating: *"If steve s lives up to his word with leon, we and apollo have an option.  We'll see."* [80]  In a follow on email that same day, Friedman told Mehra: *"Leon claims we will be offered equal 1/3rd share of deal and fees….* You and josh should continue to work closely together and we should channel our issues thru leon, as I haven't had any dialogue with Blackstone."[81]  True to this agreement, Blackstone consummated the acquisition of Nalco without further competition and then let Apollo and Goldman Sachs come into the deal on the same terms as Blackstone.

115.    In the days leading up to the September 1 deadline for final bids, Leon Black and Stephen Schwarzman were seen at a beach party where it was assumed by others in the industry that

---

[79]    GSPE00807181; GSPE00818412.

[80]    GSPE00755407.

[81]    GSPE00755407.

- 42 -

they worked out their arrangement to rig the bidding for Nalco. On September 4, 2003, the day after Apollo's participation in Blackstone's acquisition was announced in the press, Lazard LLC managing director Jeffry Rosen emailed Schwarzman regarding "NALCO" and stated "Congratulations ... I now appreciate why Leon and you were so deep in conversation at the beach party."[82]

116.   It was Goldman Sachs' understanding that Schwarzman and Black had an expectation that Henry Kravis at KKR would cooperate and not jump their deal. Asked on the eve of final bids "what happens to KKR," Friedman at Goldman Sachs responded "We'll see. It'll be up to Leon and Steve. Also, not KKR's style. I don't think Leon and Steve are figuring that Henry will play."[83] Three days earlier, on August 27, 2003, KKR had already shared its case models on Nalco, which it considered propriety and highly confidential, with its "competitor" Blackstone.[84]

117.   Knowing that their bid-rigging agreement violated their non-disclosure agreements with Suez, violated Suez's instructions that bidders not partner, and violated Suez's directive that losing bidders not join winning bidders, Blackstone, Apollo, and Goldman were careful to keep their collusive activity secret from Suez's management until after Blackstone had inked its deal for the purchase of the company. On September 3, 2003, after Blackstone had executed its purchase agreement, Paul Graves emailed fellow Goldman Sachs executive John Vaske and asked, referring to "Bradley" - David Bradley, a managing director at UBS, Suez/Nalco's advisor on the transaction -

---

[82]   BX-1288773.

[83]   GSPE00807178.

[84]   Burke Decl., Ex. R, KKR DAHL 000609392-94.

"*Do they know we are talking to Blackstone?*"[85]  That same day, Graves noted to Goldman Sachs

executive Pete Lyons "I'm in a mgt presn with the ubs guy who was on suez' side and *he alluded*

*this morning to not realizing we were joining B.*"[86] Lyons responded: "It is a 3 way deal but *I would*

*be careful about what you talk to him about as I do not who knows what yet at UBS* and the company

is not doing a formal press release until tomorrow AM...but a lot has already leaked to the press

about GSxApollo joining B'Stone." To this, Graves responded "*I never say anything to Bradley ...*

*He's good to get the inside track from though.*"

118.    On September 4, 2003, it was announced that the Blackstone Group would acquire

Nalco from Suez.  Although Blackstone could have executed the buyout of Nalco alone, it had

invited Apollo and Goldman Sachs to join it as equal partners in the Nalco deal, ignoring the prior

restriction set by the seller.  Goldman Sachs understood that in joining forces with Blackstone and

Apollo prior to the submission of Blackstone's bid, they were acting without the consent of

management.  One executive executing the transaction noted in an August 7, 2003 email, "*UBS to*

*this day has explicitly prohibited any formal partnering.*"[87]

119.    At least one Suez executive charged that Defendants Blackstone, Apollo and

Goldman Sachs had colluded during the auction process.  On September 10, 2003, Rich Friedman

was forwarded an email in which Paul Schapira, a senior Goldman Sachs executive, recounted his

conversation with the Chief Finanical Officer of Suez, Gerard Lamarche: "*Spent some time with*

*Gerard Lamarche last night and we talked briefly about Nalco.  He sounded quite satisfied with the*

---

[85]     GSPE 0085342.

[86]     GSPE00853432.

[87]     GSPE00804749-50 at 49.

*outcome and happy we had found a way into the deal. He was concerned that we had colluded with Blackstone, but I think I was able to put his mind to rest on the issue.* "[88]

120.    Thus, while Apollo and Goldman Sachs lost the auction to Blackstone, each was, thanks to the secret deal worked out by Schwarzman and Black, able to take a major stake in the company. Apollo purchased 36.8% of Nalco, the exact same amount purchased by auction-winner Blackstone. Goldman Sachs received a 25.3% interest in Nalco, and it would also serve as a chief source of debt financing on the deal.

121.    The private equity purchasers exited Nalco in 2004 and reaped a $992 million profit – a 160% return on investment. These astronomical returns resulted in part from the private equity firms' agreement to structure the deal as a three-way investment rather than compete among themselves.

122.    After the Nalco deal, Leon Black of Apollo reminded Goldman Sachs that it "owed" him for getting Goldman Sachs a piece of the deal. According to Goldman Sachs documents, Black felt that a subsequent invitation to participate in the Kinder Morgan deal, when Goldman Sachs also invited TPG, Carylyle, KKR and Blackstone to the party, was insufficient repayment for Apollo's Nalco favor.[89] Black insisted that he deserved more for his invitation into Nalco.[90] Goldman Sachs executives affirmed in an email exchange that Black was upset because of the "lack of reciprocity from Nalco and Cablecom," and that Goldman Sachs "truly need to involve them [Apollo] soon in a

---

[88]    GSPE00807131.

[89]    GSPE00380042-43.

[90]    GSPE00380294-95; GSPE00380042-43; Burke Decl., Ex. SS, GSPE00379824-25; *see also* Friedman Depo. at 340:21 (Goldman Sachs *"didn't really get credit for [offering Kinder to Apollo]."*).

principal deal."[91]   These Goldman Sachs executives agreed that they owed Apollo a deal, but lamented it was "[h]ard to serve and please a king," referring to Apollo's Leon Black.[92]

123.    The Nalco transaction highlights the *quid pro quo* relationship between Apollo and Goldman Sachs that continued throughout the Conspiratorial Era and is characteristic of the Rule of favor trading between and among Defendants.   Apollo and Goldman Sachs agreed to cease competing for Nalco in exchange for Stephen Schwarzman's word that Blackstone would agree to let them into its deal on equal terms.   Nalco, and the contemporaneous Cablecom debt purchase discussed below, were chits that Apollo tried to cash in for future favors from Goldman Sachs. Goldman Sachs attempted to repay its debt by inviting Apollo into, *inter alia*, Kinder Morgan.[93]

**Cablecom**

124.    Like the Nalco deal, the Cablecom transaction demonstrates the importance of *quid pro quo* payback in Defendants' conspiracy.

125.    In the 1990s, NTL, a British company, purchased Cablecom, which at the time was the largest cable television provider in Switzerland.   By 2002, Cablecom had borrowed so much money from various banks, including J.P. Morgan, Morgan Stanley and RBS, that it risked violating Swiss laws regarding over-indebtedness, forcing it to liquidate.

126.    Beginning in December 2002, Apollo started purchasing Cablecom's debt at a steep discount and retained Goldman Sachs Investment Banking to advise it on that process.

---

[91]     GSPE00380294-95.

[92]     GSPE00380042-43.

[93]     GSPE00380294-95; GSPE00380042-43; Burke Decl., Ex. SS, GSPE00379824-25; *see also* Friedman Depo. at 340:21 (Goldman Sachs "*didn't really get credit for [offering Kinder to Apollo]*.")

127.    In early 2003, Apollo invited Goldman Sachs PIA to join in its effort to acquire control of Cablecom by purchasing the company's debt.  Goldman Sachs PIA and Soros Private Equity Partners agreed to join Apollo's consortium and began purchasing Cablecom's debt.

128.    After buying up a substantial portion of Cablecom's debt, the private equity consortium orchestrated a restructuring that swapped debt for equity.  The consortium knew that, absent a restructuring agreement, the company would be forced into insolvency.  In order to move forward with restructuring, however, all creditors had to agree to a restructuring plan.  The consortium made it clear that it would accept no plan but its own, which included a steep write-off of Cablecom's debt, from 3.8 billion Swiss francs to 1.7 billion francs.

129.    The consortium also made clear that it was acquiring Cablecom with the intention of controlling it, as it would in a traditional leveraged buyout.  By presenting a united front against other creditors, the consortium negotiated a 60% reduction in Cablecom's debt.  After the consortium invested $350 million in Cablecom, it was able to acquire 53% of the company.

130.    Cablecom exited restructuring on November 12, 2003.  Within two years, Cablecom was preparing for an initial public offering.  Before the IPO could launch, Liberty Global Inc. agreed to purchase the company for nearly $2.2 billion, yielding a tremendous profit to consortium members.

131.    Years after the Cablecom and Nalco deals, Apollo's Joshua Harris and Leon Black continued to demand payback for inviting Goldman Sachs PIA into, among others, the Cablecom deal.[94]

132.    As with the Nalco transaction, Cablecom is an example of a *quid pro quo* obligation, which was recognized by both Apollo (who was owed) and Goldman Sachs (who owed).  Notably,

---

[94]    GSPE00380294-95 (Apollo's Joshua Harris is upset that Goldman Sachs PIA has not reciprocated in almost three years despite Apollo delivering Nalco and Cablecom.)

Apollo's invitation into Cablecom aided both Goldman Sachs PIA and Goldman Sachs Investment Banking. Goldman Sachs, in an effort to repay these and other debts, invited Apollo into Kinder Morgan.[95] Goldman Sachs also contemplated offering Apollo a piece of the Biomet deal.[96]

**The PanAmSat LBO**

133.   The PanAmSat LBO demonstrates how Defendants manipulated the auction process. Rather than meaningfully compete, Defendants cooperated with one another, shared bidding strategies, and used sham (or "soft") bids to rig the auction to achieve their conspiratorial goals.

134.   In early March 2004, PanAmSat, with the assistance of Credit Suisse, obtained indications of interest from potential buyers.

135.   Shortly thereafter, Carlyle and Providence agreed to "*team up*" to bid on PanAmSat.[97]

136.   Carlyle and Providence also contacted Blackstone, which had been "*inundated with request[s] by other PE firms to partner on the transaction.*"[98]   Instead of forming a three-firm consortium at the outset, Mark Gallogly (Blackstone managing director) suggested that Blackstone bid separately from Carlyle and Providence in the first round of the auction and then the three firms could "*come together in the second round.*"[99]   Gallogly and his counterparts, Bruce Rosenblum (Carlyle managing director) and Paul Salem (Providence managing director), further agreed that Blackstone, Carlyle and Providence would not team up with another private equity group without

---

[95]   *Id.*; GSPE00380042-43; Burke Decl., Ex. SS, GSPE00379824-25; *see also* Friedman Depo. at 339:24 (Goldman Sachs "*didn't really get credit for [offering Kinder to Apollo].*).*"

[96]   Burke Decl., Ex. SS, GSPE00379824-25.

[97]   February 26, 2010 Deposition Transcript of Paul Salem ("Salem Depo.") at 88:12-92:18; Salem Depo. Exhibit 873 (TCG0215697).

[98]   TCG0286733-34 at 33.

[99]   *Id.*

first consulting each other.[100]  This agreement concealed the firms' working relationship from the formal bidding process.

137.    During the first round of bidding, Carlyle and Providence submitted a joint indication of interest for PanAmSat at $24-$26 per share.[101]  T.H. Lee ($21-$24 per share), KKR ($23-$25 per share), Blackstone ($23.50-$25.50 per share) and Bain ($24-$26 per share) also submitted indications of interests as sole sponsors.[102]

138.    Consistent with their earlier agreement, Carlyle, Providence and Blackstone came together after the first round and submitted a joint second round bid.[103]

139.    On April 12, 2004, the eve of the deadline to submit second round bids, Carlyle, Providence and Blackstone attempted to put together a *"four handed deal"* with KKR, which had previously submitted an indication of interest alone.[104]  During phone calls with Carlyle and Providence, Alexander Navab (at the time, KKR's managing director; now KKR's co-head of North American Private Equity) discussed bidding strategies with the Carlyle/Providence/Blackstone consortium, including whether to: (1) submit a single bid as one consortium; or (2) *"both bid separately and try to come together later."*[105]

140.    The next day, on April 13, 2004, members of the Carlyle/Providence/Blackstone consortium discussed submitting a second round bid of $20 per share – a sham bid which was far

---

[100]    *Id.*; BX-1176238-39 at 39.

[101]    CS 001317-38 at 20.

[102]    *Id.*

[103]    TCG0065289-94 at 89.

[104]    TCG0236361.

[105]    *Id.*

lower than the consortium's first round bid of $24-$26 and considerably under PanAmSat's stock closing price from a week earlier.  The consortium members knew at that time that: (1) they had no chance of winning the auction outright;[106] (2) KKR intended to submit a bid higher than $20; and (3) they had an agreement whereby they could later join KKR after KKR won the auction.[107]

141.    On April 14, the day after bids were submitted, Paul Salem of Providence emailed Mark Gallogly of Blackstone and Bruce Rosenblum of Carlyle to confirm their bid-rigging deal with KKR.  Referring to Alex Navab of KKR, Salem confirmed "Yes, I did speak to Alex ... He *reiterated his commitment to give us an opportunity to invest on a heads up basis.*"[108]  In his deposition, Navab confirmed that "[h]eads up would typically mean invest on the same basis that we're investing in the company, same price."[109]  Thus, immediately after submission of bids, Navab confirmed to co-conspirator Salem the "commitment" he had made to permit Providence, Blackstone and Carlyle to invest in PanAmSat on the terms set out in KKR's bid – the commitment that ensured that they would not compete and permit KKR to "win" the auction.  Salem took pains to ensure that this secret "commitment" was not inadvertently revealed to the selling company, noting in the email, with reference to John Tousdale, the CSFB banker representing PanAmSat, that "*Trousdale is not copied on this.*"[110]

---

[106]    Holt Depo. at 62:8-63:3 (in response to the question whether it would be difficult to prevail in an auction for PanAmSat by submitting a bid that was below the current trading value, Holt stated "any time you're below the current trading value ... your chances of success are – are probably less"); *see also* Holt Ex. 1247 (TCG0000073-92 at 75).

[107]    *Id.*; TCG0288350.

[108]    BX-1176286.

[109]    (Navab Depo. 45:9-11)

[110]    BX-1176286.

142.    In an e-mail with the subject line "*RE: bid strategy*," Michael Connelly (Carlyle managing director) wrote, "*[M]aybe we shouldn't bid today – let KKR bid $22 or so and then we take a look at their deal as participant, as agreed. [O]r KKR bids $22-23, we bid $20 and then join up later if they can educate us.*"[111]

143.    The Carlyle/Providence/Blackstone consortium subsequently submitted a "*soft bid*" of $20 that would "*preserve our ability to stay in the process*" – with no intention of winning the auction outright.[112] And, just as planned, KKR submitted a higher second round bid of $24 per share.[113]

144.    KKR "*won*" the auction on April 20, 2004 as sole sponsor, and although the deal did not close for another four months, no other competing bids were ever made. KKR's victory entitled it to: (1) 100% of the $50 million sponsor fee; (2) PanAmSat's future merger and acquisition proceeds; and (3) the profit from any future sale of PanAmSat.

145.    But less than a month later, on May 17, 2004, KKR cut the "losing" bidders, Carlyle and Providence, into the deal, allowing those firms to each invest $185 million in PanAmSat.[114] In so doing, KKR lowered its equity participation from 100% to 44%. KKR also permitted Carlyle and Providence to receive (1) a *pro rata* portion of the $50 million sponsor fee ($11 million each for Carlyle and Providence); (2) an equal split of future merger and acquisition and IPO proceeds; and (3) board representation at PanAmSat.[115] KKR's co-founder George Roberts testified that KKR

---

[111]    TCG0288350.

[112]    TCG0000063; TCG065289-94.

[113]    KKR DAHL 000405041-45 at 41.

[114]    KKR DAHL 002359-69; KKR DAHL 000413963-74.

[115]    PEP-0163039.

always intended to bring other private equity partners into the PanAmSat deal, but never told CSFB of his intention.[116]

146.   The deal closed on August 20, 2004 for $23.50 per share.  This per share price represented a 6.8% discount from the target company's prior day closing share price of $25.21.

147.   As a result of Defendants' bid-rigging, the winning bidder purchased PanAmSat *for less than the highest bid* and the *lowest bidders* walked away with the largest share of the deal.

148.   The total consideration for the shares exceeded $4 billion (including the assumption of debt); KKR, Carlyle and Providence collectively contributed only $550 million in equity and financed the remainder.

149.   On October 19, 2004, PanAmSat borrowed money at a very high interest rate and used the money to pay a dividend of $245 million to KKR, Carlyle and Providence.

150.   Then, on March 22, 2005, PanAmSat completed an IPO at $18 per share in which the company received $658 million and KKR, Carlyle and Providence received $200 million as a dividend.  PanAmSat issued new shares and did not sell the shares owned by the private equity entities.

151.   A few months later, on August 29, 2005, strategic buyer Intelsat, Ltd. ("Intelsat") announced that it was acquiring PanAmSat for $25 per share in cash and closed the deal on October 26, 2005.  Intelsat paid $25 per share after PanAmSat had been loaded up with debt and stripped of $445 million of cash via special dividends.  The sale to Intelsat netted the private equity firms approximately $1.8 billion.  In total, KKR, Carlyle and Providence took $2.245 billion from a $550 million initial investment made 14 months earlier, or a return of 308%.  But for Defendants' collusive conduct, these gains would have flowed to the initial PanAmSat shareholders.

---

[116]   Roberts Depo. at 76:20-77:15.

152.     Below is a chart illustrating the sources of fees in the PanAmSat deal:



153.     In an auction specifically designed to encourage competition, Defendants communicated bid strategies and made promises of future cooperation that removed any incentive to outbid each other.

154.     Carlyle and Providence were partners from the very beginning. Carlyle and Providence followed the rules of the conspiracy and thus never jumped one another's deal or topped a bid on any other deal during the Conspiratorial Era.

155.     Blackstone, which did not end up joining the acquiring group, coordinated with Carlyle and Providence in the first round of bidding. In the second round, Blackstone joined with its purported competitors Carlyle and Providence, and submitted a bid, knowing it was going to be lower than KKR's bid. Blackstone followed the rules of the conspiracy and thus never jumped Carlyle's or Providence's deal or topped a bid on any other deal in the Conspiratorial Era. The benefits of their relationship, built

and strengthened during the PanAmSat process, helped clear the way for Blackstone to work with Carlyle on the Freescale deal and with Providence on the SunGard deal, both discussed *infra*.

156.     Having "won" the auction, KKR paid back Providence and Carlyle for their non-competitive bidding with a majority of the investment opportunity that the firms had purportedly been competing over.  Carlyle and Providence followed the rules of the conspiracy and never jumped a KKR deal or topped a bid on any other deal during the Conspiratorial Era.

157.     Carlyle stood down at KKR's request in HCA and KKR stood down on Freescale, which Carlyle's consortium then purchased.  Prior to PanAmSat, Providence and Carlyle had not worked with KKR.  After the deal, Providence worked with KKR on SunGard, Susquehanna, EDMC, Knight Ridder and Verizon; and Carlyle worked with KKR on Alltel, Michaels, Verizon and Univision.  KKR dropped out of EDMC and Univision, which Providence was able to purchase at considerably lower prices due to the lack of competition.

158.     In fact, KKR felt it was "owed" by Providence after the PanAmSat LBO.  So much so that KKR's Alex Navab mentioned the deal by name when asking Providence to make room for KKR in the Susquehanna deal: "*I must say I am personally and we are institutionally very disappointed in how you guys have handled this situation with us.  After panamsat and sungard, we should not be chasing after you guys to figure out a way to include as real partners in susq [Susquehanna].*"[117]

159.     The following chart details Defendants' cartel, advisors, and financiers for the PanAmSat deal, date announced and price of the deal:

---

[117]     KKR DAHL 000538767-68.

| PanAmSat | |
|---|---|
| Deal amount | $4.3 billion ($23.50/share) |
| Date deal announced | April 20, 2004 |
| Purchasing private equity firms | KKR<br>Carlyle<br>Providence |
| Debt financers | CSFB<br>Citigroup<br>J.P. Morgan |
| Purchasing advisor(s) | Citigroup<br>J.P. Morgan (for Carlyle and Providence) |
| Company advisor(s) | CSFB<br>Evercore Partners |
| Other participating private equity firms | Apollo[118]<br>Madison Dearborn<br>Bain Capital<br>T.H. Lee<br>Blackstone<br>Texas Pacific Group<br>Spectrum Equity Investors<br>Silver Lake[119] |

**The AMC LBO and Subsequent Merger with Loews**

160.    Apollo, J.P. Morgan, Goldman Sachs, Bain and Carlyle orchestrated the AMC deal, in which two separate companies – AMC and Loews Cineplex – were purchased absent any competition and were subsequently merged to form a single company.

---

[118]    Andy Pasztor and Dennis K. Berman, "PanAmSat's Appeal Is Global, but Bidders In U.S. Have an Edge," *The Asian Wall Street Journal* (April 14, 2004) (various competing bids for PanAmSat rumored to come from the following private equity teams/firms: (1) Apollo and MDP; (2) T.H. Lee, Bain and Quadrangle Group; (3) Blackstone, The Carlyle Group and Providence; (4) Texas Pacific Group and Spectrum Equity Investors; and (5) KKR.

[119]    BX-1031119 (Mike Bingle (Silver Lake) reaches out to Blackstone to partner on PanAmSat).

**The AMC Transaction**

161.    In March 2004, AMC retained Goldman Sachs to evaluate the potential acquisition of Loews.[120]  At the time, Apollo owned more than 50% of the shares of AMC, and three of its senior members (founder Leon Black and managing directors Marc Rowan and Larry Berg) sat on AMC's board.[121]  AMC's management, under the guidance of Apollo and Goldman Sachs, believed that consummating an outright buyout of Loews would be expensive and difficult.[122]  Apollo and Goldman Sachs therefore decided to orchestrate the buyouts of AMC and Loews separately, then merge them into a single company.[123]  Under Apollo's plan, resulting "synergies" from the merger would flow to Apollo and the other private equity firms who participated in the deal, because Apollo had always intended to take AMC private.[124]

162.    At Apollo's behest, Goldman Sachs identified Bain, Carlyle, J.P. Morgan Partners, T.H. Lee, Blackstone, Warburg and Spectrum Equity Partners ("Spectrum") as potential "*A-List*" buyers of AMC.[125]  Apollo, which was "*[r]eally leading the deal and should be respected as such*," chose to work with J.P. Morgan on an "*exclusive*" basis – rather than seek offers from other potentially interested parties.[126]

---

[120]    AMC Entertainment, Inc., Proxy Statement (Form DEFM 14A) (hereinafter, "AMC Proxy"), JPM-008194-321 at JPM-P008243.

[121]    AMC Proxy at JPM-P008210, JPM-P008236.

[122]    AMC Proxy at JPM-P008243-44.

[123]    GS/PE 019120-214 at 127, 129.

[124]    BX-0001537-65 at 38.

[125]    GSPE00165150-207 at 159.

[126]    THL DAHL 00296579; JPM 00061162; *see also* JPM 00086541.

163.    In exchange for granting exclusivity to J.P. Morgan, Apollo demanded the opportunity to invest and contribute up to half of the equity on the AMC deal.[127] Apollo also offered T.H. Lee, Blackstone and TPG the opportunity to join in the AMC buyout as co-investors in the deal.[128] Apollo believed that the offer to co-invest would constitute future *quid pro quo* for later deals with those firms.[129] As Apollo's Larry Berg wrote to TPG's Jonathan Coslet, "*what I really want is to trade co-invests somewhere along the line.*"[130]

164.    Apollo also sought to reward Goldman Sachs for its part in orchestrating the AMC deal.  In August 2004, Apollo offered Goldman Sachs PIA a co-investment opportunity in AMC, which Goldman Sachs reluctantly declined due to Goldman Sachs's role as AMC's advisors: "*as much as it pains PIA, we are going to stand down for now. . . .   We really appreciate the look and if anything changes on our side and you have not yet sold down, we will certainly come back to you/JPMP.*"[131]

165.    On July 22, 2004, AMC's board accepted J.P. Morgan's buyout offer of $19.50 per share.  There were no competing offers for the company.[132]

166.    As noted, *supra*, the AMC transaction is evidence of the relationship between Apollo and Goldman Sachs that continued throughout the Conspiratorial Era.  After inviting Goldman Sachs

---

[127]    THL DAHL 00452706.

[128]    THL DAHL 00025251-57; BX-0001537-65 at 38; TPG-E-0000091530.

[129]    THL DAHL 00296579 (Marc Rowan of Apollo "*reiterated that they wanted a co-invest opp.*").

[130]    TPG-E-0000091530.

[131]    JPM 00069226-27.

[132]    January 21, 2010 Deposition Transcript of Stephen P. Murray ("Murray Depo.") at 36:23-37:4.

PIA into Nalco, and Goldman Sachs PIA and Investment Banking into the contemporaneous Cablecom debt purchase, Apollo hired Goldman Sachs Investment Bank to advise AMC and offered Goldman Sachs PIA an opportunity to invest in the company.

167.    In addition to strengthening its relationship with Goldman Sachs, Apollo offered the AMC investment to its Nalco partner, Blackstone, to T.H. Lee, and to TPG, in the hopes of generating future deal flow via the *quid pro quo* system.

168.    Apollo followed the rules of the conspiracy and thus never jumped T.H. Lee's nor TPG's bids on any deal in the Conspiratorial Era. Though TPG declined Apollo's offer to join the AMC deal, Apollo later joined with TPG on the Harrah's deal rather than offering a competing bid.

169.    The following chart details Defendants' cartel, advisors, and financiers for the AMC deal, the date announced and price of the deal:

| AMC | |
|---|---|
| Deal amount | $2.5 billion ($19.50/share) |
| Date deal announced | July 22, 2004 |
| Purchasing private equity firms | Apollo<br>J.P. Morgan Partners |
| Debt financers | Citigroup<br>J.P. Morgan |
| Purchasing advisor(s) | Lazard Freres |
| Company advisor(s) | Goldman Sachs |
| Other participating private equity firms | Blackstone<br>T.H. Lee<br>TPG[133]<br>Goldman Sachs PIA[134]<br>Warburg Pincus[135]<br>Bain<br>Carlyle<br>Spectrum Equity Investors |

**The Loews Transaction**

170.    The same firms in the AMC LBO, quarterbacked by Apollo, rigged the Loews' side

of the deal.

171.    In late March 2004, Goldman Sachs, ostensibly in its capacity as AMC's advisor,

prepared a presentation for Bain, Carlyle, and Spectrum Equity Investors, which detailed various

---

[133]    Apollo offered T.H. Lee, Blackstone and TPG the opportunity to join the AMC buyout as co-investors.  THL DAHL 00025251-57; BX-0001537-65 at 38; TPG-E-0000091530.

[134]    Apollo reached out to Goldman Sachs PIA on a co-invest opportunity in AMC.  JPM 00069226-27.

[135]    In early April 2004, Apollo held meetings regarding AMC/Loews merger (Project Runawaybride) with Bain, Carlyle, Warburg and Spectrum.  GSPE00162676-99; GSPE00182589.

AMC/Loews merger scenarios. One scenario described those firms acquiring Loews for the purpose of merging Loews with AMC.[136]  In early April 2004, Apollo and Goldman Sachs met with representatives of Bain and Carlyle to further discuss the proposed AMC/Loews merger.[137]

172.    As Apollo had anticipated, Bain, Carlyle and Spectrum subsequently submitted separate initial bids for Loews.[138]  T.H. Lee, Providence and J.P. Morgan Partners also reportedly submitted bids for Loews.[139]  By early June 2004, Bain was close to negotiating a deal with Loews management.[140]  By that time, both Spectrum and Carlyle had stopped competing for Loews and instead decided to partner with Bain on the buyout.[141]  J.P. Morgan Partners did not submit a final bid because it had been allocated by Apollo to invest in the AMC side of the AMC/Loews merger.[142]

173.    On June 14, 2004, Loews announced it had entered into an agreement to be sold to Bain, Carlyle and Spectrum.[143]  Although Bain had technically "outbid" Carlyle and Spectrum, it allocated 38% and 20% of the equity to Carlyle and Spectrum, respectively.[144]

---

[136]    GSPE00162676-99 at 99.

[137]    GSPE00182589.

[138]    January 29, 2010 Deposition Transcript of John Connaughton ("Connaughton Depo.") at 317:18-318:9; TCG 00824078-84 at 78.

[139]    THL DAHL 00365827-28.

[140]    THL DAHL 00296579.

[141]    Id.; see THL DAHL 00452723 (noting that Carlyle appeared "extremely confident, overconfident" and that Carlyle was "in cahoots" with Bain all along).

[142]    Murray Depo. at 97:8-13; Murray Depo. Exhibit 639 (JPM 00077865-868 at 65-66).

[143]    Press Release, "The Carlyle Group, Loews Cineplex Entertainment Announces Close of Acquisition by Bain Capital, The Carlyle Group and Spectrum Equity Investors" (July 30, 2004).

[144]    Connaughton Depo. at 140:3-141:5.

174.   The Loews transaction required Apollo to work closely with Bain, Carlyle, and Goldman Sachs to manipulate both the AMC and Loews purchases.   Importantly, the Loews purchasers never submitted a bid for the AMC LBO.   Apollo, Bain, and Carlyle followed the rules of the conspiracy and never jumped each other's deals or topped a bid on any other deal during the Conspiratorial Era.

175.   Bain paid Apollo back for Loews by giving Apollo an equity opportunity in the subsequent Toys "R" Us LBO, even though Apollo was the "losing" bidder in that deal.[145] Also, in the Michaels LBO, the acquiring group, which included Bain, gave Apollo a financing role.[146]

176.   Likewise, Carlyle and Bain exchanged *quid pro quo*.   On the HCA deal, discussed *infra*, Carlyle was one of the private equity firms that stood down, allowing a consortium that included KKR and Bain to purchase the company.[147] Additionally, Carlyle and Bain were involved in the buyout of two separate semiconductor companies which occurred around the same time – Carlyle purchased Freescale, while Bain was in the purchasing group for the related Philips transaction.

177.   The following chart details Defendants' cartel, advisors, and financiers for the Loews transaction, date announced and price of the deal:

---

[145]   APOLLO011850-83 at 53.

[146]   BX-0812809-13 at 09-10.

[147]   TCG0236888.

| Loews | |
|---|---|
| Deal amount | $2 billion |
| Date deal announced | June 21, 2004 |
| Purchasing private equity firms | Bain Capital<br>Carlyle<br>Spectrum |
| Company advisor(s) | CSFB<br>Citigroup Global |
| Other interested private equity firms | T.H. Lee<br>J.P. Morgan Partners<br>Providence[148] |

**The AMC/Loews Merger**

178.   In August 2004, following up on their discussion prior to the Loews deal, representatives of J.P. Morgan met with representatives of Bain and T. H. Lee to discuss the future partnership between AMC and Loews.[149]  On June 20, 2005, less than one year after the sales of AMC and Loews, the companies merged and Apollo, J.P. Morgan Partners, Bain, and Carlyle all became co-owners.

**The Toys "R" Us, Inc. LBO**

179.   After disappointing sales during the 2003 holiday season, Toys "R" Us, Inc. began exploring strategic alternatives in early 2004.  As part of this process, Toys "R" Us worked with potential buyers, including Apollo, Blackstone, Goldman Sachs, and KKR, to execute non-disclosure

---

[148]   *Reuters News*, "Movie Chain Loews gets bids of up to $1.7 bln – WSJ." (April 14, 2004). (Various bidders are believed to have an interest in Loews.  They include T.H. Lee, Bain, Providence and J.P. Morgan Partners.)

[149]   THL DAHL 00299447.

agreements, which required the firms to "disclose to any person" information relating to the potential acquisition or even "that discussions or negotiations are taking place."[150]

180.    Toys "R" Us retained Credit Suisse First Boston as its financial advisor. On July 19, 2004, a group comprised of Cerberus, Apollo, and Permira Advisors expressed their preliminary interest in the company. In January 2005, management presented the company to another group of interested firms, including KKR, Bain, and Vornado.

181.    The potential buyers initially explored the idea of separating the company's global toys business from the more-profitable Babies "R" Us business. KKR was the first potential acquirer to express an interest in purchasing the entire company, including Babies "R" Us, and the worldwide operations. Bain and Vornado decided to form a group and KKR planned to bid separately. Despite signing a non-disclosure agreement, KKR had, by December 7, 2004, "*had discussions with several of the bidders @ various levels of detail.*"[151] By January 3, 2005, Bain had a formal commitment with Vornado, and Bain's Josh Bekenstein and KKR's Mike Calbert were in discussions about making "a decision on Toys."[152]

182.    On March 3, Bekenstein emailed fellow Bain executive Steve Barnes and noted: "*It would be a good thing if I could call mike calbert (KKR) now because I would like to learn something from him about Toys.*"[153] On March 4, 2005, Bekenstein circulated an email following up on his conversation with Mike Calbert. While claiming that Calbert did not mention Toys "R" Us,

---

[150]    APOLLO113696-703 at 97; APOLLO113697; *see also* BX-1639855-65; GSPE01327765-76; KKR DAHL 001246261-69 [unsigned].)

[151]    KKR DAHL 000852814.

[152]    BC-E01073237.

[153]    BC-E01074946.

Bekenstein said *"My suggestion is that we should just sit tight on Toys. .....If C wins, we can always try to buy 100% or maybe 50% of International from then depending on what price they are willing to sell it for."*[154] On the same day, Bekenstein approved a letter to be sent with Bain's revised bid.[155] Thus, immediately after a call with a "competing bidder," Bain decided to "just sit tight" with its bid.

183.    On or about March 9, 2005, Toys "R" Us, through its representative CSFB, invited bidders back for another round and requested bids for the whole company.[156] At this point, the bidding private equity firms were extensively communicating without regard to their non-disclosure agreements with the selling company. As one Goldman Sachs executive observed, *"Everyone is talking to everyone, and I don't want KKR, if they are feeling comfortable, to get spooked that we are gaining momentum. If Permira has called our consortium thru GS, Cerberus, and Jay, I've got to assume they are reaching out to KKR as well."*[157]

184.    On Thursday, March 10, KKR, Bain, and Vornado cemented their deal to come together with a consolidated bid for the whole Toys "R" Us company. One KKR executive noted: *"Apollo reached out for us"* and *"Bain: Does it make sense for us to partner & make a bid for the whole? Josh [Beckenstein, Bain] suggested 1/3 1/3 1/3 or letting Vornado have 50% & us splitting the other 50%."*[158] That same day, Bain executive Celina Zlotoff confirmed the bid that was

---

154    BC-E00574136.

155    BC-E01073554.

156    KKR DAHL 000853044.

157    GSPE01336865.

158    KKR DAHL 000853045.

ultimately presented to Toys "R" Us. Under the heading "Josh B [Bekenstein]," Zlotoff wrote: "*Wont change global toy bid. 1/3 each deal. Keep individual bids outstanding.*"[159]

185.    Although Bain and Vornado initially bid separately from KKR, the three firms subsequently decided not to compete against each other, instead, communicating to coordinate their efforts before each round of bidding and ultimately joining together to form the winning consortium, despite KKR's ability to purchase the company on its own. KKR representatives admitted that KKR decided to partner with Bain and Vornado due in part to its "desire to effectively eliminate a competitor from the auction process."[160] KKR, Bain and Vornado did not reveal their arrangement to bid as a group to Toys "R" Us representatives until Saturday, March 10. The three firms bid $26.75 per share, or a total sale price of $6.6 billion. The deal was announced on March 16, 2005. According to press reports, Apollo, which had reached out to KKR the day before KKR submitted its bid, did not submit its own bid. In an April 1, 2005 presentation on Neiman Marcus, Apollo noted that if they won Neiman, other private equity firms that bid on the asset might want to participate in the transaction. "This is what ultimately happened in the Toys "R" Us situation, and is another reason to stay in the game as we may want to be in a position to join the winning group if we do not prevail."[161] Richard Friedman, head of merchant banking and PIA at Goldman Sachs, acknowledged in an email the belief that "*the competing bidders ha[d] colluded and ganged up!!*"[162]

---

[159]    KKR DAHL 000845975-93 at 85.

[160]    KKR DAHL 000843538-63 at 56.

[161]    APOLLO011850-83 at 53.

[162]    Friedman Ex. 1510 (GSPE01317612).

186.    Only days after the winning bid was announced, CSFB reached out to both KKR and Bain, the winning bidders, to obtain financing business.[163] Bain viewed this request favorably; Josh Bekenstein said "Given CSFB's role in the deal, I strongly believe that we should bring them in and give them as good a role as we can. Also, the sooner that we can tell them, the better to make them feel good about how we appreciate them."[164] Although CSFB ostensibly worked for the Toys "R" Us company and its shareholders, it had a strong disincentive to run a competitive process when it was being rewarded with business from one of the bidding consortiums.

187.    Goldman Sachs also reached out to Bain for a reward for not competing aggressively on the deal. On March 17, 2005, just a day after the deal was announced, Goldman Sachs approached Bain with "interesting and unique financing thoughts we would like to share with you."[165] On March 19, Matt Levin at Bain said of the call from Goldman: "I took as a good sign as I assume they needed pai's [PIA's] approval to call so hopefully means cerebus [Cerberus] is out for good."[166] Bain executives recognized that by rewarding Goldman Sachs with a financing role, they would ensure that Goldman would be willing to accept the auction result and not jump their deal.

188.    The "winning" bidders agreed to include the company's financial advisor, Credit Suisse, among the banks that would provide financing for the deal. This dual role meant that Credit Suisse had an ongoing relationship with KKR. Credit Suisse was able to benefit substantially from KKR's proposal, both in the additional fees it received for financing the deal, and in the form of an incentive clause in their contract with Toys "R" Us that rewarded Credit Suisse for selling the whole

---

[163]    BC-E00680992-93.

[164]    BC-E00680992-93.

[165]    GSPE01341212-13.

[166]    BC-E00680992-93.

company, as opposed to simply the toy business.  In return, Credit Suisse needed only to ensure that KKR's consortium succeeded in purchasing a company at an attractive price.  KKR was able to stack the deck in its favor by including Credit Suisse in the deal, with whom it had worked often in the past.

189.    KKR, Bain, and Vornado, despite initially expressing their separate interest in Toys "R" Us, split the company evenly rather than compete with each other.  Indeed, KKR said in a presentation to its limited partners on April 18, 2005, that it decided to partner with Bain and Vornado "to effectively eliminate a competitor from the auction process."[167]

190.    The following chart details Defendants' cartel, advisors, and financiers for the Toys "R" Us transaction, date announced and price of the deal:

---

[167]    Roberts Depo. Ex. 1440 at KKR DAHL 000843556.

| TOYS "R" US | |
|---|---|
| Deal amount | $ 6.6 billion ($26.75/share) |
| Date deal announced | March 17, 2005 |
| Purchasing private equity firms | Bain<br>KKR<br>Vornado Realty Trust<br>GB Holdings I, LLC |
| Debt financers | Bank of America<br>Deutsche Bank |
| Company advisor(s) | Credit Suisse<br>Duff & Phelps, LLC<br>DJM Asset Management |
| Other interested private equity firms | Apollo<br>Cerberus<br>Permira |

**The SunGard LBO**

191.    SunGard was a proprietary deal in which almost *every single Defendant* participated, through the equity and/or debt financing side.  As KKR told its investors, the SunGard LBO was a *"good deal"* because *"the large PE universe was all working together,"* and *"there was no competition."*[168]

192.    On March 24, 2005, Silver Lake offered to pay $36 per share for the company. Although several other parties expressed an interest in SunGard, there were no other proposals.

---

[168]    December 1, 2009 Deposition Transcript of Adam H. Clammer ("Clammer Depo.") Exhibit 425 (KKR DAHL 000521174-76 at 74); *see also* PEP-0156114-117 at 116 (Providence characterized SunGard as one of six deals that was not "a large competitive auction" and stated that *"[t]here was actually less competition in [SunGard] than in most smaller deals."*); *see also* THL DAHL 00328701-04 at 01 (*"The author leaves out the fact that there was no competition for this asset as the large PE universe was all working together . . . ."*).

Instead, Silver Lake and six other private equity firms – Blackstone, Bain, KKR, TPG, Providence, and Goldman Capital – joined together and agreed to split the deal.

193.   Consistent with Silver Lake's intention at the outset, management participated in the buyout.  Concurrently with the buyout negotiation, 5-year employment contracts were negotiated with the top 7 executives, which offered the CEO/President and six other senior executives the opportunity to invest up to $35 million of their proceeds from the sale of the company into new company stock.  The employment contracts also included a 15% incentive equity stake of the new company stock.

194.   As a result of Defendants' collusive conduct, the bidding club was able to purchase SunGard at an artificially low price.  The price paid by the bidding club for SunGard's stock was less than the average price paid in other acquisitions in the same industry over the same time period as measured by the target company's price/earnings ratio.

195.   Silver Lake had been considering which firms to invite into the deal since December 2004 and anticipated approaching partners in waves.  Silver Lake's initial list of private equity firms to invite into the deal included Apollo, Bain Capital, Blackstone, Carlyle, CDR, KKR, TPG, T.H. Lee, Warburg, Welsh, CSFB private equity, Goldman private equity, and J.P. Morgan private equity.[169]  Silver Lake further prioritized the Private equity into *"Tier 1"* (Bain Capital, Carlyle, KKR, and T.H. Lee) and *"Tier 2"* (Blackstone and Warburg).[170]

---

[169]   Burke Decl., Ex. S, SLTM-DAHL-E-0057989-8006 at 8003.

[170]   Burke Decl., Ex. T, SLTM-DAHL-E-0067438-42 at 39.

196.    As a prerequisite to joining the consortium, Silver Lake required the other firms to

*"agree to . . . not participate in any way in any other transaction involving . . . [SunGard] . . . for a*

*period of 1 year without Silver Lake's express written consent."*[171]

197.    The first wave of invitations went out to Bain, Carlyle, KKR, and T.H. Lee on or

about February 18, 2005.[172] Silver Lake offered each of these firms equal partnership in the deal and

mandated that each of the private equity firms confirm their decision to continue due diligence by

approximately February 25, 2005.[173] Each decided to continue.[174]

198.    By late February 2005, TPG discovered that Silver Lake was leading a consortium to

acquire SunGard and *"reached out to [Silver Lake] to discuss partnering, but . . . also consider[ed]*

*leading a consortium and reaching out to SunGard directly."*[175] TPG co-founder David Bonderman

contacted Silver Lake co-founder David Roux about partnering on SunGard, but was rebuffed.[176]

Describing an early conversation with Roux regarding SunGard, Bonderman stated, *"I told Roux that*

*apropos to his and my last conversation, before doing anything where we might trip over each*

*other[,] I thought I'd give him a call and see if they were interested, [and] if so, we'd be happy to do*

---

[171]    March 3, 2010 Deposition Transcript of David Roux ("Roux Depo."), Exhibit 906 (SLTM-DAHL-E-0067420-22); Clammer Depo. Exhibit 398 (SLTM-DAHL-E-0084634 at SLTM-DAHL-E-0006595); Clammer Depo. at 41:25-48:16.

[172]    BC-E00520905; TCG0276773; TCG0175378; TCG0042213; SLTM-DAHL-E-0084658; THL_DAHL-00314484; SLTM-DAHL-E-0053262.

[173]    SLTM-DAHL-E-0052699-863 at 702; Burke Decl., Ex. U, SLTM-DAHL-E-0067204-11 at 04 (noting that *"[a]ll four firms have decided to proceed"*).

[174]    KKR DAHL 000538858.

[175]    TPG00040538-51 at 39.

[176]    TPG-E-0000002678-79 at 79.

*something with them.*"[177]   After being rebuffed, Bonderman then invited Blackstone to join TPG to form a buyout consortium.[178]   Following talks with Jim Coulter (TPG's other co-founder) and Bonderman, Brian Taylor (TPG managing director) told Chinh Chu (Blackstone managing director) that he thought TPG could "*put in much higher prices, say $34-38 range.*"[179]   But Coulter cautioned Taylor that the odds were against TPG and Blackstone and "*being overly aggressive here will make further enemies at [Silver Lake] and Bain while perhaps benefitting noone [sic] but the Sungard shareholders.*"[180]

     199.    SunGard shareholders did not in fact benefit because "*the large PE universe was all working together,*" as the firms had agreed not to compete for SunGard.[181]   Indeed, Silver Lake reached out to Blackstone via J.P. Morgan chief banker Jimmy Lee "*to soothe them [Blackstone] for not getting invited but to not bid against [Silver Lake] as [Silver Lake] will let them in.*"[182]   Silver Lake, despite being peeved with TPG's "classless behavior" agreed to bring it into the consortium.[183]   As a result, on March 2, 2005, after negotiations between Jamie Greene of KKR, Steve Paglicua of Bain and Glenn Hutchins of Silver Lake, and Bonderman and Coulter of TPG and Tony James of

---

[177]    SLTM-DAHL-E-0177300; TPG00040554.

[178]    BX-0009522-58 at 22.

[179]    BX-0973312.

[180]    TPG-E-0000002681-82 at 81.

[181]    THL DAHL 00328701-04 at 01; Clammer Depo. Exhibit 425 (KKR DAHL 000521174-76) ("*This is a good deal for our investors for there was no competition.*").

[182]    JPM 00163820-21 at 20.

[183]    SLTM-DAHL-E-0177300.

Blackstone, Silver Lake, KKR and Bain agreed to fold TPG and Blackstone into the growing consortium.[184]

200.    T.H. Lee and Carlyle subsequently dropped out of the consortium in mid-March. As a result, Silver Lake offered Providence and Goldman Sachs the opportunity to join the consortium to "*backfill for the remaining equity*."[185] Hutchins of Silver Lake reached out to Jonathan Nelson of Providence, as well as Goldman Sachs, on March 23, 2005, and Providence committed $300 million and Goldman Sachs PIA committed $500 million to the deal in less than 48 hours, as did Goldman Sachs. *Id.* Carlyle founder David Rubenstein agreed, at the request of Silver Lake founder Glenn Hutchins, not to lobby the remaining firms on price and to give Silver Lake a clear runway "*to get the deal done.*"[186]

201.    With no competition, the Silver Lake-led group purchased SunGard at $36 per share for a total of more than $11 billion. The SunGard buyout bolstered Silver Lake's relationship with the firms it had invited into the deal. As a result of SunGard, George Roberts (KKR co-founder) spoke to Jim Davidson (Silver Lake co-founder), expressing his "*hope[] there was something [KKR] was working on that they could invite [Silver Lake] to join.*"[187] Davidson "*said basically the same thing back to him.*" *Id.* Similarly, Milton Berlinski (Goldman Sachs managing director) thanked Glenn Hutchins (Silver Lake co-founder) for "*letting [Goldman Sachs] be a significant part of the [SunGard] transaction,*" and hoped that "*this is the first of many,*" suggesting that Goldman would

---

[184]    BX-1176105; BC-E00551988; TPG-E-0000000360; SLTM-DAHL-E-0052070.

[185]    PEP-0060606-12 at 08; GSPE00280642-43 at 42.

[186]    Hutchins Depo. Exhibit 1142.

[187]    November 12, 2009 Deposition Transcript of Michael J. Bingle ("Bingle Depo."), Exhibit 309 (SLTM-DAHL-E-0064119).

be honoring its *quid pro quo* obligation with future partnerships.[188] Scott Sperling (T.H. Lee co-president) said to David Roux (co-founder Silver Lake) that "*[T.H. Lee] would love to do something with [Silver Lake]*," as a result of Silver Lake having invited T.H. Lee to be part of its consortium.[189]

202. Silver Lake received written promises of reciprocity from many of the Defendants it invited into the SunGard deal. Indeed, the SunGard deal bolstered Silver Lake's deal flow as the participating firms made good on their promises of reciprocation. Prior to the SunGard transaction, Silver Lake and KKR had never partnered on a transaction, but after SunGard, KKR invited Silver Lake into four deals – Avago, Philips/NXP, Auna, and Freescale.[190] TPG also repaid Silver Lake, working together on a number of subsequent deals, including "*Project Stellar*," Sabre Holdings, and Avaya.[191]

203. Reciprocity was not a hope; it was an expectation conspirators had of one another. Glenn Hutchins, co-founder of Silver Lake, expressed frustration that Blackstone and Bain had not reciprocated to his satisfaction. Hutchins wrote to Blackstone president Tony James:

> *SunGard reciprocation: wholly unrelated to partnering discussions, we believe, perhaps mistakenly, that we invited you into Sungard and have a reasonable expectation of your reciprocating. You are one of the very few firms in the Sungard consortium who hasn't found an opportunity to invite us into something that we weren't otherwise engaged with. It has caused me to wonder if you and I have different views on that subject or if there is something I am missing.*[192]

---

[188]  GSPE00279979-80 at 79.

[189]  THL DAHL 00328215-16 at 15.

[190]  Hutchins Depo. at 354:7-355:9; Hutchins Depo. Exhibit 1150; Roux Depo. at 113:2-5, 232:21-241:9; SLTM-DAHL-E-0069699.

[191]  Hutchins Depo. at 354:7-355:9; Bingle Depo. Exhibit 310 (SLTM-DAHL-E-0073280).

[192]  BX-1199536-38; Hutchins Depo. at 323:9-23.

204.   Other firms considered SunGard the source of *quid pro quo* obligations as well. For example, KKR mentioned SunGard by name when successfully joining a bidding group for Susquehanna with Providence.  KKR's Alex Navab wrote "*I must say I am personally and we are institutionally very disappointed in how you guys have handled this situation with us.  After panamsat and sungard, we should not be chasing after you guys to figure out a way to include us as real partners in susq [Susquehanna].*"[193]

205.   The following chart details Defendants' cartel advisors and financiers for the SunGard transaction, date announced and price of the deal:

| SunGard | |
| --- | --- |
| Deal amount | $10.8 billion ($36/share) |
| Date deal announced | March 24, 2005 |
| Purchasing private equity firms | Silver Lake<br>Blackstone<br>Bain Capital<br>KKR<br>TPG<br>Providence<br>Goldman Sachs |
| Debt financers | Goldman Sachs<br>Deutsche Bank<br>J.P. Morgan<br>Citigroup<br>Morgan Stanley |
| Purchasing advisor(s) | Citigroup<br>Deutsche Bank<br>Goldman Sachs<br>J.P. Morgan<br>Morgan Stanley |
| Company advisor(s) | CSFB<br>Lazard Freres |

---

[193]   KKR DAHL 000538767-68 at 67.

| SunGard | |
|---|---|
| Other participating private equity firms | Carlyle[194] T.H. Lee[195] Hellman & Friedman[196] |

**The Neiman Marcus LBO**

206.    In January 2005, Neiman Marcus authorized its advisor, Goldman Sachs, to organize an auction and solicit bids for the company.[197]  By February 22, 2005, Neiman Marcus received seven preliminary indications of interest: Bain ($84-$90 per share), TPG ($83.50), T.H. Lee (*"approximately"* $90), Apollo ($82-$85), Blackstone ($85-$90), Warburg ($87-$90), and KKR ($91-$94).[198]  After the first round of bidding, Neiman Marcus required each bidder to partner with another bidder and directed Goldman Sachs to *"work with the financial sponsors in forming 'teams.'"*[199]

207.    After the first round, the bidding firms attempted to influence and manipulate the pairing efforts.  Blackstone told Bain that it would advise Goldman Sachs of its desire to partner

---

[194]    Silver Lake reaches out to Carlyle to partner on SunGard. *See* TCG0276773, TCG0175378. Carlyle executes a non-disclosure agreement for SunGard. SLTM-DAHL-E-0084572-76.

[195]    Glenn Hutchins (Silver Lake) reaches out to T.H. Lee to partner on SunGard. *See* THL DAHL 00314476-77, THL DAHL 00314484. T.H. Lee executes a non-disclosure agreement. SLTM-DAHL-P-0006611.

[196]    Around March 25, 2005 the "SunGard Team" (KKR, Silver Lake, Blackstone, TPG, Bain, Goldman Sachs PIA and Providence) invited Hellman & Friedman into the deal. *See* KKR DAHL 000538858 and KKR DAHL 000539200.

[197]    GSPE00121216-390 at 240, 242.

[198]    GSPE00184460-93.

[199]    GSPE00121216-390 at 244.

with Bain and T.H. Lee and suggested that Bain and T.H. Lee "*do the same.*"[200] KKR led a "*[p]ow-wow*" with Blackstone, TPG and T.H. Lee to discuss potential partnerships.[201]

208.   T.H. Lee had just awarded Goldman Sachs a financing role in the Warner Music deal and directed Goldman Sachs to reciprocate by pairing it with Blackstone, its preferred partner.[202] Scott Sperling (T.H. Lee) told Milton Berlinski (Goldman Sachs) that "*we want an absolute answer on bain or blkstn now,*" and "*I need a hard commitment from you that we will be with bain or blkstn [Blackstone].   No outs, no excuses.   Rock solid.*"[203]   Hours later, Goldman Sachs confirmed Blackstone and T.H. Lee as partners, and Berlinksi communicated to Sperling and Todd Abbrect (T.H. Lee), "*I did my part.*"[204]   Abbrect responded, "*[t]hanks.*"[205]

209.   Blackstone also attempted to invoke *quid pro quo* to pressure Bain into a partnership in pursuit of the Neiman Marcus deal.[206]   Although ultimately Bain was directed to partner with KKR,[207] Howard Lipson (Blackstone senior managing director) advised Bain founder and managing director Josh Bekenstein that Bain "*should look kindly on*" Blackstone's attempt to partner with them on Neiman Marcus "*because [Blackstone] just cut [Bain] in on a big equity account in Europe on*

---

[200]   BC-E00574133-34 at 34.

[201]   THL DAHL 00442503.

[202]   March 12, 2010 Deposition Transcript of Milton Berlinski ("Berlinski Depo."), Exhibit 954 (GSPE00319321-22); Berlinski Depo. at 119:9-120:2.

[203]   THL DAHL 00466909-10.

[204]   GSPE00330455-56.

[205]   *Id.*

[206]   BC-E00574133-34.

[207]   BC-E00574135.

*Italian wireless deal.*"[208]  Mark Nunnelly (Bain managing director) described this as a "*quid pro quo with wireless Italy.*"[209]  Four bidding teams were established (T.H. Lee and Blackstone; Bain and KKR; TPG and Warburg; and Apollo and Leonard Green).[210]

210.    The various consortia remained in contact with one another throughout the auction process.  After Goldman Sachs directed Bain to partner with KKR, Bekenstein (Bain) noted that Bain, Blackstone, and T.H. Lee "*agreed [they] would touch base once Goldman called,*" suggesting that they would remain in touch even if Goldman Sachs did not place all three of them together.[211]  Moreover, after the TPG-Warburg bid was ultimately accepted, Anthony DiNovi of T.H. Lee, visited Kewsong Lee, a senior member of Warburg's Neiman Marcus team, in New York city to "*build[ ] relationships*" in return for Warburg reaching out to T.H. Lee "*pre bid.*"[212]

211.    Certain of the bidding firms, including Apollo, Warburg and T.H. Lee, expected to get a piece of the deal regardless of the outcome of the auction – "*win or lose.*"  An internal Apollo memorandum stated "*should we [Apollo] prevail in [the Neiman Marcus] process, other private equity firms that bid on the asset may want to participate in the transaction.  This is what ultimately happened in the Toys 'R' Us situation, and is another reason to stay in the game as we may want to be in a position to join the winning group if we do not prevail.*"[213]  Additionally, Warburg told Goldman Sachs that it "*would like to partner with [T.H. Lee] as a third*" consortium member if T.H. Lee's group

[208]    BC-E00574133-34 at 34.

[209]    *Id.* at BC-E00574133.

[210]    APOLLO011850-83 at 51.

[211]    BC-E00574135.

[212]    THL DAHL 00313366-68 at 66.

[213]    APOLLO011850-883 at 53.

won the bid.[214]  And, just days after the company announced an agreement with TPG and Warburg,

T.H. Lee's co-president Anthony DiNovi met with Warburg to discuss "*join[ing] their deal.*"[215]

212.    In an April 27, 2005 meeting with potential buyers, certain of the executive officers of

Neiman Marcus, including CEO Burton Tansky, disclosed their interest in staying with the new entity

and having their current equity converted into equity in the new entity.  Two days later, on April 29, a

bidding club consisting of TPG and Warburg submitted a bid of $100 per share.  As a condition of the

bid, the Smith family, which held over 12% of the outstanding shares, pledged to vote all of its shares

in favor of the TPG/Warburg bid.  The other two bidding clubs (Blackstone/T.H. Lee and Bain/KKR)

submitted bids under $100 per share.  Neiman Marcus invited these two bidding clubs to improve their

bids.

213.    On April 30, 2005, both Blackstone/T.H. Lee and Bain/KKR communicated

increased bids but remained under $100 per share.  These bids were extraordinary because both

Blackstone/T.H. Lee and Bain/KKR again submitted bids *less than* the TPG/Warburg bid, which

they already knew was $100 per share.

214.    The next day, May 1, 2005, J.P. Morgan, the investment bank hired by the company

to opine on the fairness of the offers, presented an opinion to the company that the TPG/Warburg bid

was fair.  J.P. Morgan based its fairness opinion on Neiman Marcus being valued at $93 to $107 per

share and estimated a 15% rate of return over three years and an 18.3% rate of return over five years.

Importantly, J.P. Morgan's assessment departed significantly from other analysts who valued the

company at $115 per share.

---

[214]    THL DAHL 00312429.

[215]    THL DAHL 00313357-58 at 57; *see also* THL DAHL 00313366-68 at 66 (questioning
whether "*wp [Warburg Pincus] offered a piece of their deal*").

215.    On October 6, 2005, TPG/Warburg purchased Neiman Marcus for approximately $5.4 billion. Outside shareholders, such as Plaintiffs and Class members, realized a meager gain of 1.7% as a result of the Neiman Marcus deal. The deal, however, was substantially more lucrative for the Smith family, who retained their 12% equity interest in the new entity, and senior management, who were granted securities in the new entity.

216.    While the Neiman Marcus Board attempted to limit the Private Equity Defendants' efforts to coordinate and collude on the auction, they were unable to prevent the favor-trading and *quid pro quo* that led to the manipulation of the bidding group assignments. T.H. Lee was able to receive a partner of its choice in exchange for giving Defendant Goldman Sachs a favor in the form of lucrative underwriting work. Bain and KKR were able to pair following their successful cooperation in the Toys "R" Us deal, which led Defendant Apollo to conclude that (like Toys "R" Us), any incentive to compete would be tempered by the reward of an invitation into the deal to even the "losing" bidders.[216]

217.    The following chart details Defendants' cartel, advisors and financiers for the Neiman Marcus deal, date announced and price of the deal:

---

[216]    APOLLO011850-883 at 53.

| Neiman Marcus | |
|---|---|
| Deal amount | $5.2 billion ($100/share) |
| Date deal announced | May 1, 2005 |
| Purchasing private equity firms | TPG<br>Warburg Pincus |
| Debt financers | CSFB<br>Goldman Sachs<br>Deutsche Bank<br>Bank of America |
| Purchasing advisor(s) | CSFB |
| Company advisor(s) | Goldman Sachs<br>J.P. Morgan |
| Other participating private equity firms | Apollo[217]<br>Leonard Green<br>KKR<br>Bain Capital<br>T.H. Lee<br>Blackstone |

**Warner Music**

218.   In November 2003, T.H. Lee and media proprietor, Haim Saban, agreed to back Edgar Bronfman Jr., heir to the Seagram distillery fortune and a member of J.P. Morgan Chase's National Advisory Board, in his pursuit of a leveraged buyout of Warner Music Group.[218] Bronfman had previously bid unsuccessfully for Vivendi Universal with T.H. Lee, Blackstone and Saban.[219]

---

[217]   Private equity firms interested in the Neiman Marcus LBO included: (1) T.H. Lee and Blackstone; (2) TPG/Warburg; (3) Apollo/Leonard Green; and (4) Bain/KKR. *See* BC-E00119955-79 at 56, BC-E00307461-62 at 62.

[218]   Bronfman, as CEO of Seagram's, acquired Universal Entertainment, which was eventually sold to Vivendi.  Seagram was acquired by Pernod Ricard, which in 2005 sold Dunkin' Donuts to T.H. Lee, Bain and Carlyle.

[219]   Saban teamed with Providence, TPG and T.H. Lee to buy Univision and sits on the board of ProSeibenSat.1 with Scott Sperling (T.H. Lee).

Once Vivendi announced its intent to partner with NBC, Bronfman and his private equity supporters turned their sights to Warner Music.

219.    Bain and Providence also expressed interest in Warner Music. Instead of mounting competing bids for the Company, Bain and Providence joined the Bronfman consortium.

220.    Rival music group EMI Group PLC also expressed interest in purchasing Warner Music. No other private equity firms submitted bids for Warner Music.

221.    In February 2004, Warner Music was principally acquired by Bronfman, T.H. Lee, Bain and Providence.

222.    Bank of America, Deutsche Bank, Lehman Brothers and Merrill Lynch provided financing and acted as financial advisors to the Bronfman consortium.

223.    After the deal closed, Warner continued to lose money despite the new owners' consolidation of divisions and layoffs of over 20% of Warner Music's employees.

224.    In September 2004, Warner Music returned $342 million to the investors and paid a dividend of $8 million. In November 2004, Warner Music borrowed $700 million, of which $681 million was used to pay additional dividends to investors and re-purchase stock.

225.    After a year and a half, Warner announced it would go public again in an effort to raise an additional $750 million. The stock offering targeted a $22-$24 range, but traded under $17 per share. Despite this lackluster offering and despite the private equity consortium's failure to help Warner become profitable, the buyout partners were able to strip $3.2 billion out of the company on an investment of just $1.3 billion.

226.    In addition to the profits taken from the Warner Music deal, T.H. Lee used the IPO as an opportunity to trade a favor to Goldman Sachs to manipulate another buyout. In exchange for giving Goldman Sachs the underwriting work on the Warner Music IPO, T.H. Lee was able to

choose its partner in the Neiman Marcus auction. T.H. Lee and Goldman Sachs followed the rules of the conspiracy and never jumped each other's deals or topped a bid on any other deal during the Conspiratorial Era. During the AMC-Loews deals and subsequent merger that Goldman Sachs helped orchestrate, T.H. Lee was given the opportunity to invest in the AMC side of the transaction.[220] Goldman Sachs later invited T.H. Lee into the Aramark transaction, discussed *infra*.[221]

**The Texas Genco LBO**

227.    In the summer of 2003, CenterPoint Energy, Inc. ("CenterPoint") began examining strategic alternatives for its interest in Texas Genco, an electricity company.

228.    In February of 2004, CenterPoint's advisor, Citigroup Global Markets, contacted potential financial and strategic buyers seeking indications of interest for an auction process involving CenterPoint's share of Texas Genco. On April 15, 2004, CenterPoint received six preliminary indications of interest ranging from $33 to $41 per share. Two of the indications came from strategic buyers, four were from groups primarily composed of financial buyers, and one declined the opportunity to conduct due diligence. The remaining five groups that had expressed interest and one additional party were invited to continue with the auction process and submit bids.

229.    During the month of June, multiple bidders submitted proposals for CenterPoint's share of Texas Genco. One of these bidders was GC Power Group, a consortium including Defendants Blackstone, KKR, and TPG, as well as private equity firm Hellman & Friedman L.L.C.

---

[220]    GSPE00165150-207 at 159; THL DAHL 00025251-57; BX-0001537-65 at 38.

[221]    GSPE00385220.

Although Blackstone, KKR, and TPG each possessed the capability to bid separately,[222] they chose to join forces along with Hellman & Friedman, to submit a single bid.

230.    Bidders were asked to submit different bids based on whether CenterPoint would be selling the 81% of the Texas Genco shares that it held, or the full 100% of the shares that it would be required to purchase from public shareholders. Bids also varied based upon a "tax election," which would have required CenterPoint to make an election pursuant to Section 338(h)(10) of the Internal Revenue Code.

231.    In the first round, at least four bids were made, which included GC Power Group, groups composed of hedge funds, and a group of financial buyers paired with a strategic bidder. GC Power Group bid $41 per share (for the 81% owned by CenterPoint) and $42 per share (for 100% of the company). A second group consisting of three financial buyers and a strategic buyer bid $39 for 81% of the company and $40 for the entire company. The second group also submitted higher bids of $45.50 and $46.50 with the tax election. A third hedge fund group bid $39.50 per share.

232.    During the next round, the GC Power Group raised its bid to $43.50 and $44.50 for 81% of the company and 81% with the tax election, respectively. GC Power Group also bid $45.25 for 100% of the company, and $47.50 for 100% with the tax election, respectively. The second group raised its bid to $40 per share for the 81% of the company owned by CenterPoint ($46.50 with the tax election) and $41.25 per share for 100% of the company ($47.25 with the tax election). The third hedge fund group bid $40.75 per share for the 81% owned by CenterPoint.

---

[222]    BX-1728817-18.

233.   On July 16, 2004, GC Power Group "won" the auction for Texas Genco and agreed to pay $47 per share for the public shares and $45.25 per share for CenterPoint's 81% in order to acquire 100% of the company. In terms of actual equity, the four members of the GC Power Group contributed just $41.75 million each (totaling $167 million). Debt provided the remainder of the purchase price, which was roughly $3.65 billion in total.

234.   In a two-part transaction memorialized in an agreement dated July 21, 2004, a subsidiary of CenterPoint would take full control of all shares of the company. The private equity firms, through GC Power Group, would then acquire the entire company.

235.   The new owners of Texas Genco held their investment for a very short period of time. In less than two years, the buyers re-sold the company to NRG Energy for a gain of nearly $5 billion – an immense profit that dwarfed the purchase price.

236.   This dramatic return was made possible in large part by the fact that Blackstone, KKR, and TPG had partnered together to purchase Texas Genco – even though each was fully capable of purchasing the company alone. Blackstone's David Foley said, "We could have all written this check and done the deal ourselves."[223] As part of Blackstone's decision to join the consortium, David Foley said, "We are going to bid on this w/o TPG/KKR and are probably the only other PE shop with the right experience capable of writing a $500mm plus check."[224] He then concluded that Blackstone should join the TPG/KKR consortium to avoid competition: ". . .better for everyone to join forces and have a much higher chance of winning the deal and not drive the

---

[223]   KKR_DAHL_001081436-39.

[224]   BX-1728817-18.

price up[225] These Defendants – three of the largest private equity buyers and most active during the Conspiratorial Era – chose not to compete with each other, and instead split the target company, reaping supracompetitive gains. The fallout landed on the shareholders once again, as they received less per share than they would have received in the presence of actual competition.

237.    The decision to combine in club deals was a deliberate and strategic effort to "*reduce competition in auctions*" as confirmed in a draft presentation produced by KKR, which compared Texas Genco to SunGard, where "*the large PE universe was all working together,*" and "*there was no competition.*"[226] Early on in the deal, TPG characterized Blackstone as an expected competitor, however, Blackstone's Tony James soon called TPG's David Bonderman and asked him to be "supportive" of Blackstone joining the consortium of KKR, TPG and Hellman & Friedman.[227] Blackstone knew that upon joining the consortium, it would be agreeing not to compete with the others. Upon submission of a bid letter, it would have "a moral commitment to follow through."[228] Blackstone's pitch to join the consortium along with TPG and KKR focused on how it was "better for everyone to join forces and have a much higher chance of winning the deal and not drive the price up."[229] An internal Blackstone investment committee memorandum confirmed that it was invited into the consortium due to "the mutual desire to improve the competitive dynamics."[230]   In

---

[225]    *Id.*

[226]    KKR DAHL 000524307-16 at 12; Clammer Depo. Exhibit 425 (KKR DAHL 000521174-76 at 74).

[227]    TPG-E-0001051415-18 at 2; TPG-E-0001083450.

[228]    BX-1753535-65 at 3.

[229]    BX-1728817-18.

[230]    BX-1753535-65 at 9.

fact, KKR believed that Blackstone got a "free ride" in Texas Genco, but allowed Blackstone into the consortium in order to minimize competition.[231]  In fact, in a PowerPoint presentation entitled "Anatomy of a Perfect Deal:  TexasGenco", one of the "winners," Goldman Sachs Credit Partners, which financed the debt, pokes fun at the shareholders with a slide that quotes a Hellman & Freeman partner as saying, "'By the time anyone figures out the financials, we'll be working on the IPO.'"[232]

238.    The conspiracy extended to investments in the Texas Genco debt.  Although there was a great deal of demand for investment in the Texas Genco deal debt, Blackstone was concerned about giving favorable debt investment allocations to "friends of Blackstone," including its fellow private equity firms, and was hopeful those allocations would pay off with other quid pro quo opportunities.[233]  The Private equity regularly offered investments to each other, so a PE firm that "lost" a deal did not completely lose an opportunity to invest in a deal.  When allocating debt investments, Blackstone tried to "look out" for Carlyle, Bain (Sankaty) and KKR because those firms returned the favor and helped Blacktone get allocations in their deals.[234]  Blackstone thought the Texas Genco allocations were "very reasonable for the people who mattered" to them.[235]

239.    During the Texas Genco deal, high-level TPG partners formulated a plan to "reach out" to T.H. Lee, Blackstone, Bain Capital, Carlyle and Warburg.  TPG thought such socializing might get it "a deal or two over the next couple of years."[236]  TPG used Texas Genco as an example

---

[231]    KKR_DAHL_001272815-16.

[232]    GSPE00918417-447.

[233]    BX-1560084-85.

[234]    BX-1557466-67.

[235]    *Id.*

[236]    TPG-E-0001120419-20.

of a consortium success story to encourage KKR to find deals "of mutual interest" that the firms could work on together.[237]

240.    These efforts to "reach out" to other Private equity did, in fact, pay off.  Blackstone, KKR, and TPG were frequent partners during the Conspiratorial Era.  In addition to Texas Genco, all three were in the acquiring group on SunGard and Biomet, discussed herein.  Also, in the Univision deal, discussed *infra*, Blackstone and KKR dropped out, paving the way for TPG to buy the company.  Blackstone's purchase of Michaels, discussed *infra*, included a financing role for KKR.[238]  On HCA, TPG and Blackstone both stood down in response to a request from KKR.[239]  In the Freescale and Philips/NXP transactions, Blackstone and TPG purchased Freescale after KKR withdrew an indication of interest.[240]  During the aftermath of the Freescale deal, Blackstone and KKR discussed partnering together in future transactions and did so soon after on Clear Channel.[241]  TPG thanked Goldman Sachs for going out of its way to help TPG in Texas Genco, Warner Chilcott, Toys "R" Us and other deals in 2004, and both firms looked forward to continuing the relationship in 2005.[242]  Blackstone highlighted Texas Genco and VNU as examples of working with its Freescale partners, TPG and Carlyle.[243]  In addition, TPG and KKR continued to partner together on another similar acquisition, the later acquisition of TXU.  The Texas Genco deal, in fact, added insult to the

---

[237]    TPG-E-0000501459.

[238]    BX-0812809-13 at 09-10.

[239]    KKR DAHL 000051683-87; KKR DAHL 000132995.

[240]    BX-0430720-21; BX-0430719; KKR DAHL 000430909-10; TCG0216532-34 at 34; BX-0658842.

[241]    BX-0430719; BX-1454056-57.

[242]    GSPE01315645; TPG-E-0000539367.

[243]    Burke Decl., Ex. I, BX-0084905-07.

shareholders' injury: not only did Blackstone, KKR and TPG buy Texas Genco at a reduced price due to lack of competition, but during the deal, TPG remained close to the management of TXU, a competitor of Texas Genco.   During the deal, TXU approached TPG to form a large power generation joint venture.   TXU proposed that the consortium would buy Texas Genco, contribute some of the assets to a joint venture with TXU and sell other assets directly to TXU.[244]   In fact, during the Texas Genco deal, TXU agreed not to bid on Texas Genco, but instead, helped the consortium of Blackstone, KKR and TPG.[245]   After the purchase, the consortium sold Texas Genco in 2005 for cash and assets to NRG.   The consortium members monetized their interest in NRG in 2006, and TPG and KKR joined forces again to buy TXU in 2007.[246]   The consortium realized huge profits from the deal.   For example, Blackstone reported that it had received a gross annual return rate of ▮▮▮▮▮ on its investment in Texas Genco.[247]

241.   The following chart details Defendants' cartel advisors and financiers for the Texas Genco transaction, the date announced, and the price of the deal:

---

[244]   TPG-E-0000654250-54 at 3.

[245]   TPG-E-0000536492.

[246]   TPG-E-0000587286-313 at 24.

[247]   BX-1525170-372 at 42.

| TEXAS GENCO | |
|---|---|
| Deal amount | $3.65 billion ($47/share) |
| Date deal announced | July 21, 2005 |
| Purchasing private equity firms | Blackstone<br>Hellman & Friedman L.L.C.<br>KKR<br>TPG |
| Debt financers | Goldman Sachs Credit Partners L.P. |
| Company advisor(s) | Citigroup |

**Susquehanna**

242.    In 2005 and 2006, media companies were viewed as attractive targets by private equity firms because the immediate and substantial cash flows generated by those companies could be used to support debt-financed buyouts.

243.    In April 2005, Susquehanna Pfaltzgraff, a private, family-owned company, announced its plan to sell off its major subsidiaries, including Susquehanna Media (Susquehanna), a large radio station operator, consisting of 33 radio stations in eight U.S. markets.  Analysts viewed Susquehanna as an attractive asset and valued it at around $1.5 to $2 billion.

244.    In May 2005, current and former members of Susquehanna management approached Providence to submit a bid for Susquehanna.  Providence subsequently began looking for buyout partners.

245.    The factors Providence used to evaluate potential partners were laid out in internal email discussions regarding whether to partner with KKR and MDP, another private equity firm.  In discussing how to "sell" this arrangement to Susquehanna management, Providence's Michael Angelakis told Providence founder Paul Salem, the consortium *"eliminates a potential*

*competitor . . . and provides more firepower for future acquisitions . . . and . . . covers our backside in case we lose to them."*[248]

246.    A March 29, 2005 email from Providence's Al Dobron to Paul Salem and Michael Angelakis notes that Alex Navab, managing director at KKR, approached Providence about Susquehanna, and reminded Angelakis that he was *"going to speak with MDP and try to plant the seed that we could come back to them later (without making any promises) in order to discourage competition in the process."*[249]

247.    Providence initially declined to invite KKR into its consortium. However, after learning that Providence was actively pursuing Susquehanna, KKR pressured Providence into letting it join the consortium. KKR believed it was owed a favor by Providence and was entitled to a role in the consortium, because of KKR's prior partnership with Providence in the PanAmSat and SunGard deals. Indeed, in an e-mail dated May 11, 2005, Alex Navab emphasized KKR's expectation of *quid pro quo* to his counterpart at Providence, Paul Salem: *"I must say I am personally and we are institutionally very disappointed in how you guys have handled this situation with us. After panamsat and sungard, we should not be chasing after you guys to figure out a way to include us as real partners in susq [Susquehanna]."*[250]

248.    Discussing Alex Navab's *quid pro quo* demand, Providence principals exchanged email messages acknowledging that they owed KKR, *"I think we should tell Alex that we owe them*

---

[248]    Burke Decl., Ex. W, PEP-0181378-79.

[249]    Burke Decl., Ex. X, PEP-0183874.

[250]    KKR DAHL 000538767-68 at 67.

*and would like to work with them . . . [w]e can tell MDP and KKR that we do owe KKR and we want to repay them,*" but noting that including MDP in the deal is "*a total gift to MDP.*"[251]

249.  Providence ultimately agreed to allow KKR and MDP into its consortium.

250.  Bain Capital, the Blackstone Group, T.H. Lee Partners and a radio broadcast company, Cumulus Media, Inc. ("Cumulus") also formed a buyout consortium. A number of strategic bidders also showed interest in Susquehanna, including Comcast, Inc., Citadel Broadcasting Corp. and Entercom Communications Corp.

251.  Bids for Susquehanna were submitted in September 2005. In late October 2005, Bain, Blackstone, T.H. Lee and Cumulus submitted a buyout offer which was accepted by Susquehanna's board. The deal was announced on October 31, 2005. Each of those entities had an equal 25% ownership stake in Susquehanna, and it was agreed that Cumulus would provide management services for the company. No topping bids were made.

252.  Susquehanna was purchased at a significant discount, as analysts had valued its business to be worth around $1.5 to $2 billion, not the $716 million the winners paid.

**The Education Management Corporation LBO**

253.  In late December, 2005, a consortium comprised of Carlyle, T.H. Lee and Bain entered into discussions to acquire Education Management Corporation ("EDMC"), one of the largest for-profit universities in North America. On January 6, 2006, a second consortium including Providence, Goldman Sachs, and Leeds Equity entered into acquisition discussions to acquire EDMC. Earlier the same year, Leeds Equity had attempted to acquire EDMC with Blackstone, but dropped out from the process.

---

[251]  Burke Decl., Ex. D, PEP-0183826-29 at 26, 27, 28.

254.    EDMC worked with the potential buyers to get confidentiality agreements in place. On January 6, 2006, Thomas H. Lee signed a confidentiality agreement and agreed not to "disclose to any person the fact that discussions or investigations regarding a possible transaction with the Company (or any other discussions between or involving the parties) are taking or have taken place or other facts with respect to such discussion or investigations, including the status thereof."[252] On January 21, 2006, Providence, Leeds and Goldman Sachs collectively signed an agreement with the same language.[253]   Merrill Lynch also reminded the Bain/Carlyle/T.H. Lee consortium in its February 4, 2006 Final Bid Instructions that "[a]ny discussions with any other parties regarding the Company and this process without the Company's express written consent would be a breach of the Confidentiality Agreement."[254]

255.    On January 19, Carlyle managing director Sandra Horbach emailed members of the Carlyle/T.H. Lee/Bain consortium, Tony DiNovi (T.H. Lee) and Mark Nunnelly (Bain), to alert them that Paul Salem (Providence) had called one of her Carlyle partners in an attempt to get information on EDMC.  Salem had asked if Carlyle was working with Leeds and asked if Carlyle would be interested in partnering with Providence.  Horbach said Salem was told "[w]e would call [Salem] if we thought he could play a role down the road."[255]  Horbach, Nunnelly and DiNovi had previously worked together on the Dunkin Donuts LBO, and they continued to serve on the board of that company together.  Horbach, Nunnelly and DiNovi hoped to bolster the relationship of their firms through an acquisition of EDMC.

---

[252]    THL_DAHL_0068646975 at 69.

[253]    GSPE00981710-21.

[254]    THL_DAHL_00607612-15 at 614.

[255]    TCG1041403.

256.    Providence also reached out to Goldman Sachs to partner on EDMC.  On January 29, 2006, Horbach emailed Carlyle co-founder and CEO David Rubenstein to inform him that Leeds was working with Providence and Goldman, but assured Rubenstein that Providence and Goldman were "far behind us."[256]

257.    While two separate consortia had formed – one comprised of Carlyle, T.H. Lee and Bain and the other comprised of Providence, Goldman Sachs and Leeds – the members of the consortia continued to communicate, share information and strategize with each other.  On February 9, Carlyle managing director Bruce Rosenblum emailed Horbach and Carlyle co-founder Bill Conway, confirming that "Providence is working with Goldman Sachs and Leeds Equity ... They know (although we have not told them or officially confirmed) that we are working with Bain and Lee; and they would like to find a way to collapse the consortia."[257]  A year earlier, it was Rosenblum who had worked closely with Providence to rig the bidding for PanAmSat.

258.    Also, on February 9, in an email exchange between Horbach and Mark Fariboz, a colleague at Carlyle, Horbach raised the possibility of the joining with Providence, which "has called us a bunch."[258]

259.    On February 25, 2006, Horbach emailed Salem at Providence and asked: "can you please call me on cell?... New developments."[259]  Later the same day, Salem emailed that he tried to call her, and she responded that he should try and call her now.[260]

---

[256]    TCG1040740-41.

[257]    TCG1041279.

[258]    TCG1042992-94 at 92.

[259]    TCG1077317.

[260]    TCG1077318.

260.     On February 26, 2006, T.H. Lee dropped out of the bidding for EDMC, and on February 28, Carlyle and Bain submitted a $42 per share bid for the company.[261]  On March 2, following a request for revised bidding by EDMC, Carlyle and Bain increased their bid by fifty cents per share, to $42.50.[262]

261.     Carlyle knew its bid would not be the winning bid. At 7:55 a.m. on March 3, Sandra Horbach said of a conversation with Robert Knutson, EDMC's Chairman, "If I didn't know the answer, I might even assume we could be the winning party."[263]

262.     As they had in PanAmSat, Providence and Carlyle had worked out a deal in EDMC whereby one bidder, Carlyle, would refrain from further bidding and then join the deal negotiated by the firm that "won" the auction – Providence and Goldman Sachs. At 12:32 on the afternoon of March 3, 2006, Carlyle CEO Rubenstein emailed Horbach and told her that "Nelson [Jonathan Nelson, Providence co-founder and CEO] confirmed that ... [t]hey will announce the deal *and then give us a chance to take fifty percent*."[264]  Later that day, Rubenstein emailed Horbach and added "*Nelson said he would honor what was discussed* but he would be delighted if it was a three way deal and delighted if you can persuade them [Bain] not to come in."[265]

263.     Asked by Horbach whether Providence would call to coordinate, Rubenstein noted that Providence had to go to "merrill [Merrill Lynch, the Board's advisor] to get approval. They

---

[261]   TCG1061810-17 at 11.

[262]   TCG1064858.

[263]   TCG1064861.

[264]   TCG1040749-51 at 51.

[265]   TCG1040749-51 at 49.

think merrill will give it by monday or tuesday."[266]  Having secretly discussed bidding strategies with Carlyle for weeks – discussions prohibited by the non-disclosure agreements signed by both firms – Providence, at this point, went to great pains to officially obtain "permission" from the company's representative before meeting with Carlyle to formalize the arrangement that CEO's Rubenstein and Nelson had already made.

264.    An email exchange between Providence and Goldman Sachs executives confirmed that they knew Carlyle would not be "waiting in the wings" to submit a competing bid.  Goldman Sachs managing director Adrian Jones reported to Salem and Wilde at 5:43 p.m. on March 3, that "He [Scott Levy of Merrill Lynch] just called to say the board would be meeting soon to discuss our bid, and that it looked like we would get the nod."[267]  At 5:46 p.m. Wilde responded, "He told me he thinks Carlyle is looking at this."[268]  Adrian Jones [Goldman Sachs] noted at 8:25 p.m., "there is no-one waiting in the wings."[269]  The board voted that evening to approve Providence and Goldman's purchase of EDMC at $43 per share.

265.    By March 6, Carlyle was formally invited to participate in the deal with Providence and Goldman, as agreed.[270]  However, Carlyle was disappointed with certain aspects of the offered participation, such as the fact that Providence, apparently unbeknownst to Carlyle, had agreed to permit Leeds to have a seat on EDMC's board.  Then Carlyle managing director and co-head of U.S. Buyout Dan Akerson viewed this as a significant breach of club etiquette, stating in an internal

---

[266]    TCG1040749-51 at 49.

[267]    GSPE01380141-43 at 41.

[268]    GSPE01380141-43 at 41.

[269]    GSPE01600599-60 at 99.

[270]    TCG1065171-73 at 71.

email: "I will predict David [Rubenstein] will want to push forward but both Bill and Allan (as of Friday PM) were pretty much against proceeding with Providence" because Providence did not play "according to Hoyle" that is, according to the Defendants' prescribed rules ("Hoyle" being a reference to Edmond Hoyle, an author of card game rules).[271] Carlyle ultimately did not come into the deal, since Providence was not sufficiently assiduous in playing by the rules and did not give Carlyle the precise role it had been promised.

266.    Carlyle co-founder and CEO David Rubenstein admitted in an internal email that the reason Carlyle chose not to put in a competitive bid for EDMC was that Carlyle had been assured it would be offered an opportunity to join the winning bidders, Providence and Goldman Sachs, after they won the auction. Reflecting about EDMC, Rubenstein gave the following candid assessment of Carlyle's EDMC effort: *"Probably if we had know[n] there was no option to team up with Providence--because of the Leeds deal--we might have bid a bit more..."* Rubenstein made it clear that he expected Carlyle to be paid back in some other way for removing itself from the EDMC competition, noting: "We still have leverage with Goldamn [sic] and Providencne [sic]--which nis [sic] now trying to get into our new Asian cable deal."[272]

267.    Documents produced by Defendants reveal that in evaluating what level of investment to give Providence in the "Asian deal" – an effort to acquire a Taiwanese cable company – Carlyle sought to penalize Providence for not fully living up to its agreement to reward Carlyle for ceasing to compete for EDMC. By March 28, 2006, Carlyle was discussing giving 25%-

---

[271]    TCG1065171-73 at 71.

[272]    TCG1056204-05 at 05.

33% of its Taiwan Cable deal to Providence.[273] David Rubenstein wrote to Bill Conway "Twenty five to thirty three is okay with me. Above that seems unfair to us — *we did the work, etc. plus his game on the education deal was a bit of a let down — he never told us about the signed deal and bd seat for leeds.*"[274] James Attwood (Carlyle) responded that he agreed with giving Providence a third because "their 'invite' into Univision is bull, but they did invite us into the Spanish Situation (Ono) last year…. Lastly we will continue to see them a lot in telecom/media deals around the world. *A gentle reminder that these partnering deals should be a two-way street is appropriate.*"[275]

268.    In the same vein, Horbach believed Carlyle was owed by Goldman Sachs for its decision to pave the way for Goldman's bid for EDMC. Emailing her colleagues about which firms to include in a proposed Community Health Systems LBO, Horbach noted: "as far as Goldman [PIA] is concerned, I didn't think we owed them payback on [Kinder Morgan] because I thought that was payback for EDMC."[276] Other Defendants also kept deal scorecards that tracked the EDMC deal.[277] Since Carlyle did not win the bidding or participate in the purchasing group, the payback to which Horbach referred was for "standing down" or refusing to participate in the EDMC auction. Goldman Sachs would have had no need to reward a bidder which it had simply bested based on a willingness to pay more for the company.

269.    The EDMC deal further provides a textbook example of the complicity of major financial institutions in Defendants' conspiracy. At the same time Merrill Lynch was ostensibly

---

[273]    TCG1040729-30.

[274]    TCG1040729-30 at 29.

[275]    TCG1056078-80 at 79.

[276]    TCG0450308-09 at 08.

[277]    *See, e.g.*, Burke Decl., Ex. Y, GSPE00381443-44; TCG0263661-75 at 64.

acting in the EDMC deal as a representative of the interests of EDMC shareholders, it was reaching out to bidding Private equity to obtain financing business in connection with its purchase of the company.  On March 3, 2006, the day the EDMC board approved the bid by Goldman Sachs and Providence for the company, Merrill Lynch managing director Scott Levy emailed Adrian Jones at Goldman Sachs to thank Goldman Sachs for getting Merrill a financing role in the EDMC deal and for convincing Providence to give Merrill Lynch close to equal economics and titles as Credit Suisse and Goldman Sachs.[278]  This arrangement with Goldman Sachs was consummated prior to the end of the bidding process and created a clear conflict of interest; the promise of lending business made it in Merrill Lynch's economic interest to facilitate Goldman's and Providence's acquisition of the company, to overlook collusion between the "winning" bidders and Carlyle, and to avoid pressing Carlyle and other potential buyers to offer competing bids.

270.    The following chart details Defendants' cartel advisors and financiers for the EDMC transaction, the date announced, and the price of the deal:

---

[278]    GSPE01380141-42.

| EDUCATION MANAGEMENT | |
| --- | --- |
| Deal amount | $ 3.55 billion ($43/share) |
| Date deal announced | March 3, 2006 |
| Purchasing private equity firms | Goldman Sachs PIA<br>Providence Equity Partners |
| Debt financers | Bank of America<br>Goldman Sachs Credit Partners L.P.<br>Credit Suisse<br>Merrill Lynch<br>Pierce Fenner & Smith, Inc. |
| Company advisor(s) | Merrill Lynch<br>Lazard Feres & Co. L.L.C. |
| Other interested private equity firms | Carlyle[279]<br>Bain[280] |

**The Univision LBO**

271.    In February 2006, Univision, the largest U.S. Hispanic media corporation broadcasting in television, radio, and on the internet, announced that it was for sale.

272.    Televisa, a programming company with over 11% ownership interest in Univision, was one of the bidders for Univision. Televisa approached numerous private equity firms about sponsoring a bid, including Carlyle, MDP, Providence, KKR, and Blackstone. Providence proposed to Televisa that it become the "deal coordinator" for the Televisa consortium, touting its ability to reduce competition for Univision. A Providence presentation to Televisa recommended that Televisa *"Select partners of choice before PE firms form groups or UBS process generates highest bidder,"* warned that choosing partners later would make it "[m]ore difficult for partners to align"

---

[279]    *See* TCG0450308-09.

[280]    Burke Decl., Ex. Z, BC-E00674175-76.

and concluded that Televisa should use a "deal coordinator" which "*Limits competitive groups from forming.* "[281] Televisa ultimately put together a consortium with Bain, Carlyle, KKR, Blackstone and Cascade, Bill Gates' investment vehicle. KKR brought Carlyle into the deal ("compromise[ing] and increase[ing] the deal by one") and in return, Carlyle's James Attwood told KKR's Alex Navab that "I owe you one (again!)."[282] Because of Televisa's existing ownership and its involvement with programming used by Univision, it was viewed as the likely winner of any auction.

273.    As executives from Providence and KKR jockeyed for leadership of the Televisa consortium, they revealed that exchanges of *quid pro quos* per Defendants' overarching conspiracy, rather than considerations relating to Univisions' business, were central to their efforts to assemble a large bidding consortium. In the days immediately before the announcement of the bidding groups, Paul Salem emailed Alex Navab of KKR with his disappointment that KKR had not helped get Providence into the Televisa group, and said "we have always been supportive of KKR. I hope you in turn support us."[283] Navab responded "I think I have demonstrated the support [for Providence] time and time again including Panamsat…. I must say, however, that I'm in a bit of disblief with respect to your comments and request below as it relates to all the recent history on this transaction. Your firm's actions violated several dimensions of good partnership and in our view seriously mishandled our relationship."[284] Salem reminded Navab that Providence had helped KKR in the past: "If you remember, I personally called you on TDC and helped you get more excited about the

---

[281]    PEP-0210286-326 at 22-33.

[282]    KKR DAHL 001254904-05 at 04.

[283]    PEP-0218469-71 at 70-71.

[284]    PEP-0218469-71 at 70.

deal when I heard KKR was waffling."[285]   Salem forwarded this email chain to Providence executive

Al Dobron who had a few points "to weave into this" including that "Our strong sense all along was

that T [Televisa] had KKR ranked 6th out of 6 firms.  Alex may dispute this but I think that it is true,

and it was certainly our assumption (*the tide shifted when KKR left our group and told T that we

were colluding with other firms.)* "[286]   Dobron continued, "Our 'foot fault' of not calling them

first…is very different from them icing us out of the deal completely…It should be recognized that

the intent was not to harm KKR…At the time, we were in a very good position to get invited into the

deal.  By agreeing to join with Bain and Blackstone, we were hoping that terms would improve for

everyone, not harm or cut out KKR."[287]

     274.    T.H. Lee, TPG, and Goldman Sachs initially formed a separate bidding consortium

for Univision.  By May 2006, Goldman Sachs dropped out of the bidding.  In an internal email, Rich

Friedman, Goldman Sachs' head of Merchant Banking and Goldman Sachs PIA, as well as the head

of the firm's Investment Committee, made clear that the decision to cease competing reflected

Goldman Sachs' desire to avoid competition with KKR, Blackstone, Bain and Carlyle: "*Gerry told

tlee [T.H. Lee] and tpg that we were folding.  .  .  .  Gerry is a bit disappointed but its the right

decision.  Not smart to go into this war and lose and suffer casualties.*"[288]   Goldman Sachs decided

not to compete for Univision, despite its desire to achieve a coveted "triple play" in the deal.[289]

---

[285]    PEP-0218472-74 at 73.

[286]    PEP-0218472-74 at 72.

[287]    PEP-0218472-74 at 72.

[288]    Burke Decl., Ex. J, GSPE00384225-26 at 25.

[289]    May 16, 2012 Friedman Depo. at 488:5-15.  ("Q.  Goldman Sachs wanted a triple-play on
Univision; didn't it? … A.  Yes.  We are trying to finance, advise and invest.")

275.   In the same email, Friedman noted, referring to the simultaneously unfolding Kinder Morgan deal, discussed *infra*, that Goldman Sachs' *"KMI [Kinder Morgan] team is very stressed"* and *"needing to have at least 1 other sponsor.*[290] He then noted that Goldman Sachs was planning to offer the sponsorship opportunity to *"kkr and blackstone"* – members of the consortium competing for Univision that benefited when Goldman Sachs stood down on that deal.[291]

276.   Friedman held out hope that offering a share of Kinder Morgan might generate a *quid pro quo* in the form of a piece of Univision if it were acquired by the competing Televisa-led consortium: *"Tlee and tpg told [G]erry they would be very upset if gs showed up in televisa deal [for Univision] in any way. Gerry never suggested that was a possibility. I'll handle any flack if it comes back. I told [G]erry that we shouldn't expect to be able to get into televisa deal under any circumstances, though after we offer kmi [Kinder Morgan] to kkr and blackstone, they should be very friendly to us. We'll see."*[292]

277.   Later that month, on May 23, 2006, Goldman Sachs did, in fact, offer KKR and Blackstone, as well as TPG and Apollo, an opportunity to invest in Kinder Morgan.[293] By dropping out of Univision, Goldman Sachs directly helped at least three of these private equity firms with which it had been "competing" for Univision – KKR, Blackstone and Apollo, so that they would reciprocate and help Goldman with Kinder Morgan, or at least, not compete.

278.   Providence and Madison Dearborn Partners did not reach agreement with Televisa to join Televisa's consortium, and instead joined with T.H. Lee and TPG. The consortium also invited

---

[290]   *Id.*

[291]   *Id.*

[292]   *Id.*

[293]   TPG-E-0000032291-94.

media investor Haim Saban, who had partnered with T.H. Lee and Providence in acquiring Warner Music, into the group. Executives at Providence, like TPG and T.H. Lee, took a hard line against competition by Goldman Sachs. On May 14, 2006, Al Dobron of Providence emailed Providence Founder and CEO Jonathan Nelson, asking "are we being too nice to GS [Goldman Sachs]? I wonder if TT [T.H. Lee/TPG] should just ask them to stand down."[294]

279.    T.H. Lee was in constant communication during the Univision bidding process with its "competitors" for Omnivision, Blackstone and Bain. At the same time it was ostensibly competing for Univision as part of the TPG/T.H. Lee/Providence/MDP consortium against the Blackstone/Bain/KKR/TCG consortium, T.H. Lee was working with Blackstone and Bain as part of a consortium bidding for Michaels.

280.    Providence executives also had "backchannel" access to bidding strategies employed by the "competing" consortium. Providence's Al Dobron noted in an email to Bressler [T.H. Lee] and Karl Peterson [TPG] with the subject "U – Tactics" that "FYI, Navid [UBS] is point on a sellside process for me right now on a different matter – I speak with him regularly out of necessity. I typically avoid the U topic, although this can be an effective backchannel as needed."[295]  In the same vein, Providence's Jonathan Nelson noted to Jimmy Lee at JPM that because Providence had united with the Televisa consortium "it would be easy to bid knowing exactly what T [Televisa] would sign."[296]

---

[294]    PEP-0212367.

[295]    PEP-0207555.

[296]    PEP-0221750-52 at 50.

281.   Carlyle decided to drop out of the bidding process in mid-June, but decided not to advise Televisa of its decision for several days in efforts "to manage the timing of [Carlyle's] exit from the process in a way that helps the other sponsors.[297]   Carlyle knew that KKR, Bain and possibly Blackstone would submit final bids for Univision and wanted to ensure that its exit from the process would not cause its partners to pay more for the company that necessary, thus furthering the long-term relationships between the firms at the expense of the Univision shareholders.[298]

282.   Final bids for Univision were due June 20, 2006 – one day before bids were due for Michaels – and the Private equity timed their bidding to allocate the two companies amongst themselves.  The only bid Univision received – from the TPG/T.H. Lee/Providence consortium – was delayed one day until June 21, 2006, allowing those firms to coordinate their bidding for Univision to take into account the status of Michaels bidding, which was commenced that same day.

283.   Within T.H. Lee, analysts recognized that the bid for Michaels was dependent on the status of the bid for Univision – as Ravi Paidipaty noted on June 21, 2006, "*the outcomes are definitely related.*"[299]   The heads of T.H. Lee's Univision (Scott Sperling) and Michaels (Todd Abbrecht/Charles Brizius) deal teams remained in close coordination during the bidding period, June 21-22, 2006, with information about competing bids for both companies passed between the teams. Brizius, having spent all day on June 22, 2006, with representatives of Blackstone and Bain, was aware, before his team submitted a bid for Michaels, that BX and KKR had dropped out of the bidding on Univision and that TPG/ T.H. Lee were "*all alone on Univision*" with a bid of 35.50.[300]

---

[297]   TCG1040802.

[298]   *Id.*

[299]   THL_DAHL_00432230.

[300]   THL_DAHL_00466558-60 at 60.

Armed with the knowledge that the competing Televisa consortium had fallen apart, T.H. Lee's Sperling, the head of the Univision deal team, emailed T.H. Lee executives Abbrecht and Brizius on that same day and confirmed that his bid for Univision was "staying at 36," such that "*we just don't need to stretch*" to get Univision.[301]  At that point, members of both T.H. Lee teams, having been in close coordination with their "competitors" for Univision, knew that there would likely be no competition on Univision and chose to stick with their low bid for Univision while submitting a low-end bid for Michaels.

284.    Televisa, despite having a significant ownership interest in Univision and status as Univision's primary provider of programming, found that its PE firm partners had abandoned it at the last minute and its consortium did not submit a bid for Univision.  Blackstone and Bain, having jettisoned Televisa, were simultaneously rewarded with a "win" in Michaels made possible by Univision winners TPG and T.H. Lee.

285.    T.H. Lee bid $42 for Michaels on June 22, 2006, along with its fellow consortia members Blackstone and Bain.[302]  Yet after it secured Univision, it dropped out of the Michaels bidding, telling its partners it was "in the $42ish range."[303]  Thus, having agreed with its partners to make a first round bid of $42, T.H. Lee suddenly became unwilling to increase that initial bid by even a penny in the second round, rewarding Blackstone and Bain for dropping out of Univision with complete ownership of Michaels.  Internal emails show that senior executives at T.H. Lee were careful to develop a "party line" explanation for the curious alignment of their interests with those of

---

[301]    THL_DAHL_00466517-18 at 17.

[302]    THL_DAHL_00466517-18 at 18.

[303]    THL_DAHL_00353265.

their Univision competitors. On June 28, 2006, after Michaels had accepted the Blackstone/Bain bid, T.H. Lee managing director Todd Abbrecht, co-team leader on the Michaels transaction, emailed T.H. Lee senior management and stated, with regard to dropping out of the Michaels bidding: *"Lets keep the party line straight. Im telling people (not in email) that it's a great company but price was beyond our POV of value on the business. Has nothing to do with Univision. Are we on the same page?"*[304]

286.    As Scott Sterling of T.H. Lee had predicted, T.H. Lee did "not need to stretch" to win Univision.[305] Univision ultimately accepted the TPG/ T.H. Lee group's bid of $36.25 per share on June 27, 2006, even though it was far less than the $40 per share Univision initially sought. No other bids were made.

287.    The merger agreement did not contain a "go-shop" provision which allows a target company to continue reviewing offers even after signing an agreement with a bidder.

288.    Blackstone and Carlyle, having paved the way for TPG's successful bid for Univision, teamed with TPG to purchase Freescale in a deal announced on September 15, 2006. KKR and Bain, the other members of the "losing" Televisa group, facilitated the Freescale purchase, discussed *infra*, by withdrawing their own bid for that company, leaving the TPG, Blackstone and Carlyle consortium as the only Freescale bidder. The linkage among these contemporaneous deals was sufficiently obvious that outside bankers suggested to TPG that their willingness to give a

---

[304]    THL_DAHL_00466769.

[305]    THL_DAHL_00466558-60.

"*speedy commitment*" for financing of Freescale should be rewarded with participation in Univision.[306]

289.    A Merrill Lynch email on the topic noted that Carlyle would likely be excluded from the HCA deal, announced on July 24, 2006, as punishment for sabotaging the Univision deal.  In fact, Carlyle was not offered a piece of the HCA deal, and Carlyle founder David Rubenstein rejected the notion of putting in a competing bid against KKR, part of the HCA consortium with Merrill Lynch and Bain, "*at the same time we are teaming on other deals elsewhere.*"[307]  Both TPG, a member of the Freescale and Univision consortia, and Goldman Sachs, which formed the only consortium to bid on Kinder Morgan, assured KKR that they would not compete for HCA.[308]  At the same time, Jonathan Coslet at TPG got the impression that Bain, KKR's consortium member in HCA, was "*angling to get into our Univision deal and perhaps is holding that [possible participation in HCA] over our head.*"[309]

290.    Both consortia formed to "compete" for Univision were thus dominated by Defendants who had completed many deals together in various combinations and who understood and played by "*club rules*" to depress the price paid to the shareholders.  At least Goldman Sachs and T.H. Lee included the Univision deal on a "scorecard" they used to track deals with other firms over time.[310]

---

[306]    Burke Decl., Ex. AA, TPG-E-0000013727-29 at 27.

[307]    TCG0216478.

[308]    KKR DAHL 000051683-87 at 83.

[309]    Burke Decl., Ex. BB, TPG-E0000002296.

[310]    Burke Decl., Ex. G, GSPE00385219-20; Burke Decl., Ex. F, THL DAHL 00283871-72.

291.    The result was that the "auction" for Univision resulted in only one real bid suppressed by the web of interlocking *quid pro quo* obligations on the part of the Defendants.

292.    Having stepped aside, Goldman Sachs accepted a *quid pro quo* benefit from at least KKR and Blackstone, possibly on the Kinder Morgan transaction.    Another beneficiary of Goldman's standing down, Carlyle became Goldman's Kinder Morgan partner.[311]

293.    The following chart details Defendants' cartel advisors and financiers for the Univision transaction, the date announced, and the price of the deal:

---

[311]    *See, e.g.,* TCG0450308-09 (TCG discusses how to pay back Goldman Sachs PIA for its invite into the Kinder Morgan deal).

| UNIVISION | |
|---|---|
| Deal amount | $13.7 billion ($36.25/share) |
| Date deal announced | June 26, 2006 |
| Purchasing private equity firms | Broadcasting Media Partners, Inc.<br>Madison Dearborn<br>Providence Equity Partners<br>SCG Investments II, LLC<br>T.H. Lee<br>TPG |
| Debt financers | Deutsche Bank<br>Credit Suisse<br>Bank of America<br>Wachovia<br>The Royal Bank of Scotland<br>RBS Securities Corp.<br>Lehman Brothers |
| Purchasing advisor(s) | Credit Suisse |
| Company advisor(s) | UBS |
| Other interested private equity firms | Carlyle<br>KKR<br>Blackstone<br>Bain<br>Goldman Sachs PIA |

**The Michaels Stores LBO**

294.    In early 2006, Michaels Stores considered a review of its strategic plan and potential alternatives to maximize shareholder value.  First J.P. Morgan and then Goldman Sachs advised Michaels Stores in this process when two private equity clubs were seemingly bidding for the company.  Ultimately, the economic data reveal a diminished price was paid to shareholders.

295.     On March 20, 2006, Michaels Stores retained J.P. Morgan as its financial advisor to evaluate the potential sale of the company.  J.P. Morgan reached out to a number of parties (both strategic and financial entities) and invited them to bid on Michaels.[312]  Among the parties contacted by J.P. Morgan were Defendants Bain, Blackstone, Carlyle, T.H. Lee, KKR, TPG, Goldman Sachs, and Apollo.  While the Michaels Stores buyout appeared to be set up as a competitive auction, it would be later characterized by an auction participant as a "*shady process*" run by J.P. Morgan.[313]

296.     Between March and April 2006, there was a flurry of discussions between various private equity firms concerning the possibility of teaming up on the Michaels Stores deal.[314]  By mid-April, Bain and Blackstone agreed to form a consortium.[315]  KKR, TPG and Apollo also formed a separate consortium around that time.  KKR decided to adjust its valuations to match TPG's in order to keep "*TPG in the corral.*"[316]  Importantly, Bain invited TPG to partner on Michaels, but TPG had already "*hooked up*" with KKR and Apollo and declined the invitation.  TPG, however, made it known to Bain that it appreciated the invitation and promised to reach out to Bain "*next time, particularly on retail.*"[317]  Similarly, KKR declined an invitation to partner with Goldman Sachs PIA

---

[312]     *See, e.g.*, Levin Depo. at 36:11-39:15, 44:23-46:9, 51:25-52:12.

[313]     KKR DAHL 000434517.

[314]     On or around March 21, 2006, Goldman Sachs PIA contacted Bain, T.H. Lee and Warburg to discuss partnering on Michaels.  THL DAHL 00329467; GSPE00299228.  Carlyle contacted KKR and Bain.  TCG0298442-44; TCG0298479.  T.H. Lee considered contacting TCG, Blackstone, Warburg and MDP.  THL DAHL 00329869-71 at 70.  Bain contacted TPG.  BC-E00536408.  KKR and Apollo also contacted TPG.  TPG-E-0000003087.

[315]     BC-E00533496-97 at 97; GSPE00384225-26.

[316]     KKR DAHL 000433485-86 at 85.

[317]     BC-E00533514.

on Michaels Stores, but made sure to advise Goldman Sachs PIA that it would *"reach out to [them] sooner in the future."*[318]

297.    Carlyle considered forming a third consortium with T.H. Lee or joining one of the existing consortia.[319] Carlyle made overtures to both KKR and Bain to join their respective bidding groups.  In late March, Sandra Horbach, Carlyle managing director and head of its retail sector, reached out to KKR co-founder Henry Kravis to discuss partnering on Michaels.[320]  Horbach and Kravis knew each other, as they were both on the board of trustees for Rockefeller University.[321] KKR believed that Carlyle would be *"very aggressive"* in its pursuit of Michaels Stores and considered inviting Carlyle into its group (with TPG and Apollo) as a *"defensive measure"* to mute any potential bid from Carlyle.[322]  However, KKR ultimately decided not to invite Carlyle into its consortium, but made sure to leave the door open to working with Carlyle in the future.[323]  Calvert of KKR advised Sandra Horbach of Carlyle that he was *"happy to stay in dialogue with [her]"* and *"would enjoy working with [Carlyle] on another deal."*[324]

298.    Bain owed Carlyle for an invitation to join in EDMC and sought to pay back the favor to Carlyle.  After speaking with Sandra Horbach of Carlyle, Mark Nunnelly of Bain wrote to his colleagues Josh Bekenstein and Mark Levin, *"[I] do think we owe them for bringing us into the*

---

[318]    KKR DAHL 000432713.

[319]    THL DAHL 00331287-91 at 88.

[320]    TCG0298447-49 at 8.

[321]    Holt Depo. at 88:16-20.

[322]    KKR DAHL 000432336.

[323]    Calvert e-mailed his colleagues at TPG and Apollo, noting that their consortium *"can always bring someone [e.g., an aggressive bidder, such as Carlyle] in later."* KKR DAHL 000432479.

[324]    TCG0824554.

education [Education Management] deal over the coming year."[325] Bekenstein replied, "[w]ould this be considered a way to pay them back?"[326]

299.   In his e-mail response, Levin wrote that he initially did not consider Carlyle as a viable partner for Michaels because they "didn't possess any spin," meaning a unique ability to analyze the deal.[327] However, Levin admitted in initially rejecting Carlyle as a partner, he "didn't focus on the favor column."[328] Shifting his focus to the favor column, Levin wondered whether Bain would "get credit now or later."[329] At his deposition, Levin explained what he meant by the "favor column," testifying that consideration of having been given a previous "at-bat" on an LBO opportunity was an important factor when selecting a deal partner.[330]

300.   Bain and Blackstone were concerned that shutting the door on Carlyle would lead Carlyle to form another consortium with T.H. Lee, resulting in more competition for Michaels. Nunnelly, at Bain, raised a red flag to warn his colleagues that Carlyle would form another club and would "work with [T.H.] Lee unless we nod differently."[331] Bekenstein, at Bain, responded that multiple groups "would probably mean a bad process," i.e., a more competitive process.[332] He

---

[325]   BC-E00533496-97 at 97.

[326]   Id.

[327]   Levin Depo. at 162:23-163-163:9; BC-E00536578-79.

[328]   BC-E00533496-97 at 97.

[329]   Id.

[330]   Levin Depo. at 202:19-204:14.

[331]   BC-E00570203-04 at 03.

[332]   Id.

explained they hoped to reduce the number of bidding groups as had happened in the Neiman deal.[333]

301.   By April 21, 2006, Bain and Blackstone allowed Carlyle and T.H. Lee to join their consortium.[334]   Bain had successfully removed the threat of a third club and repaid its favor to Carlyle for the "at bat" in the EDMC deal. Also, Bain, Carlyle and T.H. Lee had previously worked together on the Dunkin Donuts buyout, and each firm had representatives on that company's board.

302.   There was even discussion among the Defendants of consolidating the Bain/Blackstone group with the KKR/TPG/Apollo group. On April 21, Tony James, president of Blackstone, e-mailed Jim Coulter, co-founder of TPG, and floated the idea that Blackstone and Bain join the TPG/KKR/Apollo club, so that *"there is only one really strong group."*[335]

303.   On June 21, 2006, Bain and Blackstone submitted a $42 per share bid for the purchase of the company. On the same day, a second bidding club comprised of KKR and TPG submitted a bid for $42.50 per share. T.H. Lee, who had been participating in the process, dropped out of the bidding process at approximately the same time.

304.   Bain/Blackstone and KKR/TPG submitted second bids of $44 and $43.50, respectively. On June 30, 2006, nine days after the initiation of the bidding process, the bidding club of Bain and Blackstone entered into an agreement with Michaels Stores for $44 per share, with a total deal value of approximately $6 billion. The price of $44 per share was approximately the same as the stock's 52-week high.

---

[333]   *Id.*

[334]   BX-0123555.

[335]   BX-0430689.

305.    This ultimate price was only $2 per share higher (a 4.5% increase) than the initial

offer by the same bidding club.  This was slightly less than the average percentage increase in club

LBO premiums and far less than the 15% average premium for sole sponsor LBOs or the 21%

average premium for purchases by public companies and strategies during the relevant time period.

306.    As a result of the Defendants' collusive and abbreviated bidding process, the

Bain/Blackstone bidding club was able to purchase Michaels Stores' public shares at an artificially

deflated price which was less than the average price paid for acquisitions by publicly traded

companies and was less than the average price paid in other acquisitions in the same industry during

the same time period (whether acquired by public or private companies).

307.    After winning the deal, Bain and Blackstone offered a financing role to the supposed

"losers" in the deal, KKR and Apollo, as well as J.P. Morgan who served as financial advisor to

Michaels Stores throughout the bidding process.[336]  Blackstone justified its decision to bring these

firms into the deal by saying, "*[y]ou scratch our back, we scratch yours.*"[337]  J.P. Morgan had been a

purchaser of AMC, which Bain did not bid on despite purchasing Loews.  The two Defendants had

become co-owners of the merged entity after they – along with other Defendants – orchestrated the

merger of AMC and Loews.

---

[336]    BX-0812809-13 at 09-10.  J.P. Morgan sought to be included in the deal as a source of financing despite being retained by the board of Michaels to serve as the company's neutral and objective financial advisor, raising an inherent conflict.  Blackstone assured J.P. Morgan that if the Bain/Blackstone consortium won, J.P. Morgan would be "*include[d] . . . in a highly attractive financing role.*"  JPM 00031619; JPM 00031617.  Even though J.P. Morgan submitted a financing proposal that was weaker than proposals submitted by other banks, after the winning bid was accepted, Bain and Blackstone did in fact reward J.P. Morgan by diluting a proposal from another bank in order to offer the second most prominent debt financing role to J.P. Morgan.  JPM 00031557-58; JPM 00031803; December 3, 2009 Deposition Transcript of Roderick N. Reed ("Reed Depo.") at 225:7-13.

[337]    BX-0812809-13.

308.    In addition to partnering on Michaels, Bain and Blackstone partnered on purchases of Susquehanna and SunGard. Bain was one of the buyers of HCA, on which Blackstone stood down and did not compete.

309.    Bain and KKR would work together on the HCA deal, discussed *infra*, which Blackstone did not bid on because of an agreement not to compete with KKR.[338] The same three firms were involved in the Freescale and Philips deals, discussed *infra*, with KKR and Bain purchasing Philips and standing down on Freescale to allow Blackstone to purchase that company with Carlyle.[339]

310.    Nine private equity firms expressed interest in Michaels, but due to: (i) Defendants' extensive anticompetitive communications, including communications about their respective valuations of the company; (ii) interlocking promises between Defendants for opportunities on future deals; and (iii) Defendants' ability to tie up financing by entering exclusivity agreements with banks, only two clubs submitted bids.  Moreover, the difference between the initial high bid and the accepted bid amounted to an increase of less than a 5%, despite three rounds of bidding.

311.    The following chart details Defendants' cartel, advisors and financier for the Michaels Stores deal, the date announced and price of the deal:

---

[338]    KKR DAHL 000132995; *see also* TCG0216411 and TPG-E-0000098437-38.

[339]    KKR DAHL 000430909-10; TCG0216532-34.

| Michaels Stores | |
|---|---|
| Deal amount | $6.1 billion ($44/share) |
| Date deal announced | June 30, 2006 |
| Purchasing private equity firms | Bain Capital<br>Blackstone |
| Debt financers | Deutsche Bank<br>J.P. Morgan<br>Bank of America<br>CSFB |
| Purchasing advisor(s) | Deutsche Bank<br>CSFB<br>Bank of America |
| Company advisor(s) | J.P. Morgan<br>Goldman Sachs |
| Other participating private equity firms | Apollo[340]<br>KKR[341]<br>TPG<br>T.H. Lee<br>Carlyle[342]<br>Goldman Sachs PIA |

**The HCA LBO**

312.    KKR, Bain and Merrill Lynch, along with HCA management insiders led by CEO

and Chairman Dr. Thomas Frist, orchestrated a $33 billion proprietary deal to buy HCA, which was

at the time the largest LBO in history.  Defendants and their co-conspirators explicitly agreed there

---

[340]    Private equity firms interested in the Michaels Stores LBO included: (1) Blackstone, Bain, Carlyle and T.H. Lee; (2) TPG, KKR and Apollo; (3) Warburg; and (4) Goldman Sachs PIA. Burke Decl., Ex. CC, TPG-E-0000002979.

[341]    According to an August 9, 2006 internal Blackstone e-mail, Bain is okay with offering bridge financing to Apollo and KKR.  BX-0812809-13.

[342]    In April of 2006, Blackstone teamed up with Bain, Carlyle and T.H. Lee.  BX-0123555

would be no competition for HCA notwithstanding its attractiveness to a number of Defendants and co-conspirators including Blackstone, TPG, Goldman Sachs, Apollo, Warburg, T.H. Lee, Permira and Carlyle.

313.    The KKR-led consortium was the only buying group to submit an offer and faced no competing bids or competition from other private equity firms for the company.  In fact, KKR expressly asked the private equity industry to "*step down on HCA*."  No competition occurred even though the $51 per share price represented a depressed premium of only 17.8% based on the HCA share price the day prior to the bid, and the $51 per share was less than the share price on the day that HCA began exploring strategic alternatives aimed at increasing shareholder value.

314.    As discussed below, KKR and Bain were able to purchase HCA at a suppressed price because the owners of the other large private equity firms – including at least Blackstone, TPG, Carlyle and Goldman Sachs PIA – explicitly agreed not to submit competing bids for the company.

315.    On January 19, 2006, HCA disclosed that it had engaged Merrill Lynch to review various strategic alternatives to "*enhance shareholder value*."  HCA's stock closed that day at a price of $51.38 per share.

316.    Merrill Lynch proposed the possibility of a leveraged buyout.  In April 2006, Dr. Frist, the company's founder and a substantial shareholder, contacted Bain and KKR to explore the feasibility of a management-led buyout.[343]  At about the same time, Merrill Lynch introduced HCA management to representatives from Merrill Partners, its private equity arm.

317.    The private equity firms – KKR, Bain and Merrill Partners – concluded that a leveraged buyout could be feasible.  HCA's full board was informed of these discussions on May 8,

---

[343]    Notably, Frist was, at the time, an investor in one or more funds managed by Bain.

2006. Thereafter, the private equity firms were allowed to conduct due diligence and officially evaluate the company and management team on a proprietary basis. No other potential bidders were contacted and/or invited to conduct due diligence.

318.   Because Dr. Frist and Merrill Lynch were part of the buying group, the HCA board formed a Special Committee that negotiated with the buying group. On July 24, 2006, the parties reached a deal under which KKR, Bain, Merrill Lynch and Dr. Frist's buying group would acquire the stock of the company for $51 per share. The parties executed a merger agreement the same day. No other offers for HCA were submitted to the special committee at the time.

319.   The merger agreement with HCA included a 50-day "go-shop" provision during which the Special Committee and its advisor, Credit Suisse, sought out higher bid proposals from other private equity firms and potential buyers.[344]

320.   Around the time of the announcement, other large private equity firms like Blackstone, TPG, Carlyle and Goldman Sachs PIA expressed strong interest in owning HCA.

321.   However, none of these firms made an offer for HCA. Incredibly, only 48 hours into the seven week "go-shop" period, the leaders of Blackstone, Carlyle, TPG and Goldman Sachs confirmed that no competition would be forthcoming for HCA. As demonstrated by the following e-mails, Defendants agreed not to challenge KKR and Bain during the go-shop period.

a.   On July 25, Jonathon Coslet of TPG noted: "*I spoke to both Michaelson[sic] [KKR] and Paglicua [Bain] and told them we had decided to pass on the HCA situation.*"[345]

---

[344]   KKR DAHL 000490024-30 at 24; *see also* TPG-E-0000036037-44. After the target's board accepts a bid and publicly announces a proprietary deal, there is typically a "*go-shop*" period. The go-shop period is the time between the board's announcement of the deal and the deal's formal closing. During the go-shop period, the target's advisor "*proactively goes out to buyers, and also responds to all inquiries that are received, and tries to stimulate the interest and to create a higher bid for the company*." Berlinski Depo. at 186:5-11.

     b.     On July 26, KKR member Jim Momtazee noted: *"FYI – only new info on this topic [competitive bids for HCA] is that TPG and GS [Goldman Sachs] have both told us that they will not compete.  Conversations with Blackstone and Carlyle indicate that they are still deciding what to do."*[346]

     c.     Later on July 26, KKR Co-founder Henry Kravis noted in an internal e-mail: *"I received a call from Tony James [President and COO of Blackstone] today.  He called to tell me that Blackstone was not going to bid on HCA.  Happy to give you additional color if you want it."*[347]

     d.     On July 27, James Attwood, managing director of The Carlyle Group, wrote to Alex Navab of KKR: *"I left you a voicemail.  We are NOT forming a competing group (although we have received many calls), we are not signing an NDA, we are not taking any info and we will not in any way interfere with your deal.  We would, of course, love to join you if you need more equity, but rest assured that you will not see us in any other context on HCA."*[348]

322.     As explained by Dan Akerson, co-head of Carlyle's U.S. Buyout Group, KKR had asked *"the industry to step down on HCA."*[349]  Defendants heeded KKR's call to *"step down"* and agreed not to compete for HCA.

323.     Indeed, all four firms called KKR or Bain and agreed not to compete for HCA within 48 hours of the announced deal.  It would have been impossible for these firms to have fully

---

[345]     TPG-E-0000096555.

[346]     KKR DAHL 000051683-87 at 83.

[347]     KKR DAHL 000132995.

[348]     TCG0236888.

[349]     TCG0216411.

evaluated HCA in that short time.[350] The private equity firms agreed not to submit competing bids, not based on independent business decisions or a realization that the buyers were paying a full price, but instead because of an agreement with KKR and Bain not to compete for the company, *i.e.*, to allocate HCA to KKR and Bain as a part of their conspiracy.

324. Blackstone's managing directors internally acknowledged the agreement: *"The reason we didn't go forward was basically a decision on not jumping someone else's deal . . . ."*[351] The extremely low price KKR paid for HCA confirmed Defendants' collective understanding not to compete, as explained by a Blackstone executive in a July 28, 2006 e-mail: *"[the HCA] deal represents good value and is a shame we let kkr get away with highway robbery."* In the same e-mail, the executive even speculated to another executive *"[t]here may also be something else at play with henry [Kravis, head of KKR] and steve [Schwarzman, chairman and co-founder of Blackstone]."*[352]

325. TPG internal e-mails similarly show that they did not compete because of the agreement with KKR and Bain. TPG expressly stated that it decided not to compete for HCA because *"our relationship with them, KKR and Bain was more important."*[353] E-mails between TPG managing directors Jonathan Coslet and Philippe Costeletos reflect TPG's concern over maintaining an alliance with KKR and Bain. Coslet wrote to Costeletos, *"I spoke to both Michaelson [sic]*

---

[350]   February 26, 2010 Deposition Transcript of Michael Michelson ("Michelson Depo.") at 150:22-152:6.

[351]   BX-0658842; *see also* BX-0658829 (*"After some soul searching, we decided wisdom was the better part of valour [sic] and passed on hca."*).

[352]   BX-0658842.

[353]   TPG-E-0000098437-38 at 37.

*[KKR] and Paglicua [Bain] and told them we had decided to pass on the HCA situation.*"[354]
Costeletos responded, "*Probably the right decision even though I hate to see a good deal get away.
I guess we'll find out some day how much our relationship means to them.*"[355]   Coslet responded,
"*Yup. All we can do is do [u]nto others as we want them to do unto us . . . it will pay off in the long
run even though it feels bad in the short run.*"[356]

326.   Carlyle executives also wanted to keep its promise to KKR and Bain by standing
down because "*[o]therwise, we may be sending a bad signal to KKR/Bain.*"[357] David Rubenstein of
Carlyle expressed the same sentiments.  "*Some have proposed we try to compete by participating in
a competing deal [HCA].  I do not think that is a good idea for many reasons, but particularly
because I do not want to be in a pissing battle with KKR at the same time we are teaming on other
deals elsewhere.*"[358]

327.   The private equity firms' agreement not to compete for HCA cost the shareholders of
the company more than a billion dollars.  Blackstone internally projected a purchase price of ▮ per
share or ▮ per share higher than the ultimate sale price for the company.[359] A July 24, 2006 internal
Goldman Sachs valuation (inexplicably produced from *Blackstone's* files) indicated that "*a take
private for HCA works with purchase prices into the high $50s per share.*"[360] In other words, the

---

[354]   TPG-E-0000096555.

[355]   *Id.*

[356]   *Id.*

[357]   TCG0089611.

[358]   TCG0216478.

[359]   BX-0658897-99.

[360]   BX-0653720-65 at 23.

Defendants who agreed to stand down acknowledged at that time that the deal worked even paying an additional $1.6 billion or more than KKR and Bain had paid.

328.    The deal closed on November 11, 2006 at $51 per share.  KKR bragged that it was able to purchase HCA at an *attractive valuation for a high-quality asset*.[361]  Even HCA's own management valued its stock at well over $51 per share.  In the months leading up to the LBO, HCA purchased its own common stock at prices as high as $52.47 per share.[362]

329.    KKR's $1.2 billion investment in HCA nearly doubled in value to $2 billion in just three years.[363]  Bain and Merrill Lynch invested a similar amount of equity and also amassed a similar profit, which means that these private equity firms collectively had paper profits of about $2.4 billion from the HCA deal alone.  Moreover, HCA recently issued a $1.75 billion dividend to its private equity owners.[364]  The owners of HCA recently took the company public once again and sold a portion of the company in an IPO, raising $3.79 billion and further padding their profits on the deal.

330.    The HCA transaction was a resounding success for KKR, Bain and Merrill Lynch – because they were able to rely upon their purported competitors' willingness to *stand down*" and not compete.  While initially successful, the request that the remaining possible competitors "*stand down*" met with a hiccup when KKR inadvertently interfered with Blackstone's attempt to purchase

---

[361]    KKR DAHL 000541296-322 at 312.

[362]    CS 000153-332 (HCA Form DEFA14A), ¶5 (Nov. 8, 2006).

[363]    Michelson Depo. at 187:11-188:10.

[364]    HCA Press Release, *HCA Previous Fourth Quarter and Year-End 2009 Results, Board Declares Distribution to Stockholders* (Jan. 29, 2010).

Freescale, discussed *infra*, at an artificially low price.[365] What followed was an agreement between Blackstone and KKR to allocate the Freescale and HCA deals among themselves and their partners. This exchange, detailed more thoroughly below at ¶¶370-397, captures the connections between Freescale and HCA as well as the network of *quid pro quos* that bound the repeat private equity sponsor players together at the expense of the shareholders of the companies Defendants conspired to purchase without competition.

331.    The following chart details the Defendants' cartel, advisors and financiers for the HCA deal, date announced and price of the deal:

| HCA | |
|---|---|
| Deal amount | $32.1 billion ($51/share) |
| Date deal announced | July 24, 2006 |
| Purchasing private equity firms | KKR<br>Bain Capital<br>Merrill Lynch Global PE<br>Frist entities |
| Debt financers | Bank of America<br>Citigroup<br>J.P. Morgan<br>Merrill Lynch |
| Purchasing advisor(s) | Bank of America<br>Citigroup<br>J.P. Morgan<br>Merrill Lynch |
| Company advisor(s) | Merrill Lynch<br>CSFB<br>Morgan Stanley |

---

[365]    TCG0216532-34; *see also* BX-1165731-33.

| HCA |
| --- |

| Other participating private equity firms | Apollo[366]<br>Blackstone<br>Carlyle<br>Goldman Sachs PIA<br>Hellman & Friedman[367]<br>Permira[368]<br>TPG<br>T.H. Lee[369]<br>Warburg[370] |

**The Aramark LBO**

332.     Aramark Chairman and CEO Joseph Neubauer led the LBO of Aramark – the second

under his ownership and control of the company.  The first buyout, in 1984, resulted in Neubauer

making a fortune when he took the company public in 1991.  Seeking to reprise this earlier result,

Neubauer and a bidding group comprised of Goldman Capital, J.P. Morgan Partners, T.H. Lee and

Warburg managed to purchase Aramark in an "*auction*" that once again was devoid of competition –

---

[366]     August 2, 2006 Morgan Stanley internal document regarding HCA.  David Law (MS Ibanking) states that Warburg, Apollo and Bain are "*all chatting on HCA.*" MS_DAHL_0021734. Law also states that Permira has decided not to upset KKR and will pass on the deal.  *Id.*

[367]     August 1, 2006 e-mail between John Connaughton (Bain) and Patrick Healy (Hellman & Friedman) regarding the HCA deal.  Connaughton states that he looks forward to having Hellman & Friedman as a partner on HCA.  BC-E00657245.

[368]     September 12, 2006 internal Carlyle e-mail between Karen Bechtel, Sandra Horbach and Steve Wise regarding HCA.  Bechtel states that there is a proposed consortium of Blackstone, Carlyle, TPG and Permira for the HCA LBO.  TCG0242827-28.

[369]     July 24, 2006 e-mail from Vikrant Sawhney (DB Securities) to Todd Abbrecht (T.H. Lee) and George Taylor (T.H. Lee) regarding the possibility of T.H. Lee, Blackstone, TPG, Welsh, Carson, Anderson & Stowe and Goldman Sachs PIA forming a competing consortia for HCA.  THL DAHL 00427314.

[370]     June 14, 2005 KKR e-mail between Peter Stavros and Scott Nuttall regarding HCA deal. Stavros states that "*Warburg is not yet involved [in HCA] but they [KKR] have been told (by Mike) that we will find room for them if they sit on the sidelines for now.*" KKR DAHL 000024303-14 at 12.

despite a grossly inadequate club bid – and despite the fact that winning the auction would certainly bring any private equity firm substantial profits.

333.   On December 6, 2005, Neubauer, who held slightly more than 12% of Aramark's stock, initiated the exploration of strategic alternatives, including an LBO.  To that end, Neubauer brought in Goldman Sachs and J.P. Morgan as financial advisors.

334.   At a board meeting on March 22, 2006, Neubauer expressed his desire to maintain a significant equity position in the new company.  He also informed the board that he wanted Goldman Sachs and J.P. Morgan to involve their respective firms' private equity affiliates, Goldman Capital and J.P. Morgan Partners.

335.   Goldman Sachs and J.P. Morgan orchestrated a *"sweetheart deal"* for management.[371] Goldman Sachs and J.P. Morgan sought to include other private equity firms on the deal for relationship reasons, to suppress competition, and to ensure that their bid for Aramark remained unchallenged.  Milton Berlinski (Goldman Sachs managing director) admitted that announcing a buyout with a two-firm consortium limited to just Goldman Sachs and J.P. Morgan *"will hurt GS a lot and cause people to increase the likely hood [sic] that they jump the [deal]."*[372]  In Goldman Sachs' view, limiting the buyout to a two-firm consortium of private equity arms of investment banks (and therefore not sharing the spoils of the deal with their client private equity firms) would harm its relationship with the Defendants and increase the likelihood of potential competition.[373]

---

[371]   Neubauer had previously relied on Goldman Sachs and J.P. Morgan to conduct Aramark's first LBO in 1984 and subsequently turned to those firms again in December 2005 to lead the second LBO. KKR DAHL 000438778-79; Friedman Depo. at 224:16-22.

[372]   GSPE00274091-93 at 91.

[373]   Goldman Sachs' head of private equity explained:

336.    On April 28, 2006, Goldman Sachs and J.P. Morgan therefore invited T.H. Lee and Warburg to join their consortium.[374]

337.    T.H. Lee and Warburg subsequently signed confidentiality agreements with exclusivity provisions.[375] Under the terms of exclusivity, T.H. Lee and Warburg bound themselves to the Goldman Sachs/J.P. Morgan consortium and agreed not to otherwise compete for Aramark.[376]

338.    On May 1, 2006, Neubauer, Goldman Capital, J.P. Morgan Partners, T.H. Lee and Warburg (the "Neubauer Group"), submitted and announced a bid for Aramark of $32 per share. The consortium's offer was dramatically lower than the consensus market valuations at the time, including the valuation of major shareholder Eminence Capital LLC ("Eminence"), which held 7.8% of Aramark's shares and had valued the share price as high as $48 per share, 50% more than the consortium's offer.[377]

---

"[I]f two [ ] groups did this deal on their own, we think that would have been stressful from a relationship standpoint, so we concluded we wanted to go to a few others. . . . When I say stressful, I mean a lot of universal anger towards the fact that . . . there wasn't another private equity firm in here, other than the bank arms of these private equity groups . . . they would prefer to see us in partnership with other private equity firms . . . ."

Friedman Depo. at 221:24-222:3, 223:6-17.

[374]    *Id.*; THL DAHL 00388807-37 at 34; GSPE00560316-21.

[375]    THL DAHL 00388807-37 at 32; GSPE00560316-21 at 19.

[376]    THL DAHL 00388807-37 at 32 (The T.H. Lee/Goldman/J.P. Morgan exclusivity provision provides: "*you . . . shall not . . . propose or seek to enter into . . . any acquisition transaction . . . relating to all or part of the Company . . . other than with us.*").

[377]    GSPE00536777-803 at 791; GSPE00429411-20 at 11 (Thomas Weisel Partners – $37-$38); GSPE00424138 (Morgan Stanley – $35-$38; Citigroup – $35-$36; Baird – $35-$38; Wachovia – $34-$40).

339.     After the offer became public, other private equity firms sought inclusion in the Neubauer buyout group.  Apollo believed that Goldman Sachs "*owed*" Apollo for involving Goldman Sachs on the "*Nalco and Cablecom*" deals and therefore expected an invitation to partner on Aramark.[378]  Goldman Sachs' Friedman characterized Apollo's managing partner Leon Black as a "*king*" to whom Goldman Sachs "*owe[s] a special deal*."[379]  While there was no room for Apollo in Aramark, Goldman Sachs offered to cut Apollo in on the Kinder Morgan deal or another "*special opportunity*."[380]  As a result, Apollo did not mount a competing bid for Aramark.

340.     In the weeks that followed, Goldman Sachs and J.P. Morgan made a concerted effort to "*dissuade interlopers*" from seeking to challenge their bid for Aramark.  Sanjeev Mehra, who led the buyout team for Goldman Sachs, sought "*to get the word out*" to other private equity firms that the consortium had co-opted management and that the buyout was a "*done deal*."[381]  Indeed, Credit Suisse, the advisor to the Special Committee of Aramark's board, remarked that "*gs and jpm are telling lbo firms to stay away and the [special] committee is upset about this*."[382]

341.     The Neubauer Group succeeded in eliminating any competition for Aramark.  Blackstone and KKR had at one point considered partnering to pursue Aramark.  However, Chinh Chu of Blackstone acknowledged that "*given the inside job and the fact that the CEO is part of the buyer group and is a large shareholder . . . it is likely [going] to be difficult to compete*."[383]

---

[378]     GSPE00380294-95; GSPE00380042-43.

[379]     GSPE00380042-43 at 43.

[380]     *Id.* at 42.

[381]     GSPE00279682-90 at 82.

[382]     THL DAHL 00387264.

[383]     BX-0394340.

Goldman Sachs' Mehra, who at the time sat on the boards of SunGard and Nalco with Chu, further discouraged Blackstone from pursuing Aramark.[384] Similarly, KKR recognized that the buyout by the Goldman Sachs/J.P. Morgan consortium was a foregone conclusion and made no effort to compete on the deal.[385]

342.    On May 3, 2006, representatives of Eminence, an investment manager and Aramark's second largest shareholder, which together with its affiliates owned approximately 7.8% of Aramark's Class B common stock, stated that the $32 per share was *grossly inadequate.*[386] Eminence opined that the company was worth at least $40 per share, a value that would still represent less than 8.5 x EBITDA.[387] Eminence also stated that a buyout at $32 per share would permit the Neubauer Group to reap a rate of return of over 30%, and that a buyout at $40 per share would still yield a rate of return in the *"mid to high teens in percentage terms."*[388] In June 2006, Eminence refined its analysis and valued Aramark at $38.91 to $42.49 per share, a range that would still yield a rate of return of 15% to 20% for the Neubauer Group.

343.    Christopher Behrens of J.P. Morgan Partners was also concerned that the price was not high enough to allow the special committee to approve a bid. He wrote in an email that the "[b]igger issue is making spec[ial] comm[ittee's] life easier by finding way to help get stock price

---

[384]    KKR DAHL 000438791.

[385]    BX-0394341.

[386]    Burke Decl., Ex. DD, GSPE00446860-73 at 72-73.

[387]    *Id.*; EBITDA stands for "Earnings Before Interest, Taxes, Depreciation and Amortization."

[388]    *Id.*

down."[389] Mr. Behrens wrote this in an email to James Grant, a J.P. Morgan investment banker charged with covering companies such as Aramark.

344.    On August 7, 2006, Aramark's special committee, charged with overseeing any sale of the company, indicated a willingness to consider a proposal of $34 per share. The same day, the Neubauer Group submitted a bid of $33.60 per share, which was rejected several hours later. That evening, Neubauer agreed to value the portion of his shares of Class A common stock that would be contributed to the sale at less than $33.80 per share. The Neubauer Group thereafter informed the special committee that it was willing to enter into the transaction at a price of $33.80 per share. This offer was accepted.[390] Not one competing offer was made despite the documented interest of other Defendants.

345.    The acquisition premium based on the day of announcement was approximately 20%; however, the acquisition premium over the price from just one month earlier was only 12.9%.

346.    At the time the offer was accepted, Credit Suisse, the special committee's financial advisor, valued Aramark at $33.35 to $41 per share. This analysis was based on lowered financial projections submitted by management to Credit Suisse on August 2, 2006, just five days prior to the final bid.

347.    Neubauer received approximately $1.37 billion at closing, while maintaining the same percentage equity in the new, privately owned company.

348.    Accordingly, notwithstanding separate financial opinions from: (i) the special committee and Eminence that the company should sell at close to $40 per share; (ii) the Neubauer

---

[389]    JPM_00160808

[390]    GSPE00058700-887 at 724-25.

Group's winning bid being far less than $40 per share; and (iii) the special committee's own advisor,

Credit Suisse, opining that a fair price per share ranged up to $41 per share, not one competing bid

was submitted.

349.    The following chart details the Defendants' cartel, advisors and financiers for the

Aramark deal, date announced and price of the deal:

| Aramark | |
|---|---|
| Deal amount | $8.2 billion ($33.80/share) |
| Date deal announced | August 8, 2006 |
| Purchasing private equity firms | Goldman Sachs<br>J.P. Morgan<br>T.H. Lee<br>Warburg Pincus<br>Joseph Neubauer, Aramark CEO |
| Debt financers | Goldman Sachs<br>J.P. Morgan |
| Purchasing advisor(s) | Goldman Sachs<br>J.P. Morgan |
| Company advisor(s) | Goldman Sachs<br>J.P. Morgan<br>CSFB |
| Other participating private equity firms | Blackstone[391]<br>KKR<br>Carlyle[392] |

---

[391]    In June of 2006, KKR and Blackstone partnered on the Aramark deal. *See* KKR DAHL 000438741-42.

[392]    In an e-mail between Sandra Horbach (Carlyle) and David Rubenstein (Carlyle) regarding Aramark, Horbach states that T.H. Lee and Warburg were included in the LBO because of their relationships with management.   Carlyle expressed interest in pursuing the HCA LBO. TCG0823782.

**The Kinder Morgan LBO**

350.    In early 2006, Kinder Morgan's financial advisor Goldman Sachs and founder and CEO Richard Kinder, developed a plan to take Kinder Morgan private.  On February 16, 2006, Kinder Morgan's President, C. Park Shaper, spoke with Goldman Sachs about an LBO that would involve Kinder Morgan management, and shortly thereafter Goldman Sachs PIA expressed an interest in participating in the transaction.

351.    By May 2006, several other Kinder Morgan insiders expressed an interest in an LBO, including founder Kinder, who owned 18% of the company stock; Michael Morgan, a director and substantial shareholder; and Fayez Sarofim, also a director and substantial shareholder.

352.    On May 23, 2006, Goldman Sachs hosted the founders and leaders of the largest private equity firms at its New York headquarters and discussed the formation of a consortium to take Kinder Morgan private.  Participants at the meeting included the founders or co-founders of KKR, Blackstone, TPG and Apollo (Henry Kravis, Steve Schwarzman, Jim Coulter and Leon Black, respectively), Henry Cornell, Chief Operating Officer of Goldman Sachs' Merchant Banking Division, and Rich Kinder.[393]   Goldman Sachs and Mr. Kinder provided these firms with information about the prospective LBO and advised the firms that they had two days to decide whether they wanted to participate in the deal on preexisting terms and conditions.[394]  The firms could either "*say yes or say no*" to Goldman Sachs' invitation and there was no room for negotiation.

---

[393]    TPG-E-0000032291-93 at 92-93; *see also* BX-001409 (hand written notes summarizing respective positions).

[394]    TPG-E-0000226986-87.

353.    Goldman Sachs was clear during the meeting that it would be leading the buyout effort and that any firm joining its consortium would not have equal decision-making authority.[395] The firms were unhappy with Goldman Sachs' one-sided approach, as KKR's Kravis and TPG's Bonderman reportedly "*express[ed] disappointment at the limited influence they would receive.*"[396]

354.    Goldman Sachs later expressed concern that TPG was trying to "*assert themselves into a role of greater importance*" in the Kinder Morgan deal.[397] Viewing TPG's impertinence as a brazen attempt to circumvent Goldman Sachs' authority and a clear breach of club etiquette, Henry Cornell responded: "*TPG/MacDougall [TPG Partner] has not acted like a gentleman and has caused us a problem with kinder. We need to let coulter know, politely, this is not the response we expected. We are going to let mcdougal know he has stepped far (very, very far) over the line. This needs to really resonate.*"[398] Goldman Sachs subsequently refused to allow TPG to join the buyout group.

355.    Goldman Sachs required any party potentially interested in the deal, including Defendants Apollo, Bain, Blackstone, Carlyle, KKR and TPG to execute a confidentiality agreement with an exclusivity provision that effectively prevented any signing party from making a competing

---

[395]    Goldman Sachs played multiple, if not conflicting, roles on the deal, including: (1) serving as advisor to the acquisition group; (2) serving as the lead private equity sponsor; and (3) providing debt financing on the deal. Goldman Sachs viewed this arrangement very favorably, referring to it as the "triple play," because it allowed Goldman Sachs to maximize its deal fees. Mehra Depo. at 176:15-177:2.

[396]    BX-0001409-10.

[397]    GSPIA00138015-16 at 16.

[398]    *Id.* at 15.

- 132 -

bid for Kinder Morgan for a one-year period.[399] The Special Committee of Kinder Morgan's board,

recognizing its anticompetitive nature, later dropped the provision. Even without the exclusivity

provision, it was "*[n]ot a possibility*" that other private equity firms would team up to "top

[Goldman's] bid."[400] Such an action would be a "franchise killer," because, as Richard Friedman,

head of Merchant Banking and the Principal Investment Area at Goldman Sachs, testified: "*it was

my belief at this time that we had agreements that they either would work with us or they would not

compete against us . . . so it would not bode well for them to try to read the fine print of a document

saying, well, we still could do this, even though we agreed we wouldn't do that.*"[401] And Friedman

was correct – no firm violated this understanding not to compete.

356.     Moreover, to secure the cooperation of management, Goldman Sachs also had an

exclusivity agreement with Rich Kinder, which effectively precluded him from soliciting or

supporting any competing bid for the company.[402]  Rich Kinder therefore could not discuss

competing buyout proposals with other parties – even if the proposals were more favorable to the

shareholders than Goldman Sachs' offer. The Special Committee, recognizing the impropriety of

---

[399]     BX-0703235-43; GS/PE 00046492-97; Pontarelli Depo. Exhibit 209 (BX-0703235-43); Pontarelli Depo. Exhibit 210 (GS/PE046492-97); Pontarelli Depo. at 94:4-22; 105:16-106:4. Goldman Sachs also had an exclusivity agreement with Rich Kinder, effectively precluding him from soliciting or supporting any competing bid and from discussing such proposals with other parties – even if the proposals were more favorable to the shareholders. Pontarelli Depo. at 170:6-12. The Special Committee, recognizing the impropriety of this arrangement, ultimately rejected the exclusivity agreement. Goldman Sachs nonetheless believed that Rich Kinder would stick to the agreement, commenting: "*we need to trust rich, I think he will stick by us. . . . That dynamic is more important than anything on paper.*" GSPIA00146461 ("*We will have to trust kinder and the honor among thieves.*"); *see also* GSPIA00025038-39 at 38 ("*I think it is worth a 'look into the steel blue eyes talk' with rich.*").

[400]     GSPE00380334.

[401]     Friedman Depo. at 276:10-277:6.

[402]     Pontarelli Depo. at 170:6-12.

Goldman Sachs' arrangement with Rich Kinder, rejected the exclusivity agreement and released Kinder from the agreement. Goldman Sachs nonetheless *"trust[ed] Rich Kinder and believed that he would 'stick with us.'"*[403]

357.   By May 28, 2006, Carlyle, AIG and Riverstone (a private equity firm affiliated with Carlyle) had agreed to join Goldman Sachs' buyout group. This group proposed a buy out at $100 per share. That represented a modest premium to the stock's then-current trading price of $84.41 per share, but was less than the stock's recent high of $103.75 per share on January 20, 2006.[404]

358.   On May 31, 2006, Carlyle co-founder David Rubenstein wrote in an email to the founder of Carlyle's European arm that they were able to join the Kinder Morgan deal "because we had complained about goldman competing with us and never having brought us a deal. So [former Goldman Sachs Chairman Henry] paulson told his partners to bring us into the deal."[405]

359.   On May 31, 2006, an analyst report from Citigroup set $105 per share as its target price for Kinder Morgan stock, but stated that the *"target price represents a minimum amount for a management-led buyout of [the company] and does not provide a reasonable takeout premium."*

360.   To give the collusive LBO a patina of legitimacy, 35 potential investors were solicited to present competing bids. None did so, resulting in a one-bid auction won by Kinder Morgan insiders along with Goldman Sachs PIA and Carlyle. Analyst valuations of Kinder Morgan's stock ranged as high as $150 per share.[406]

_____

[403]   GSPIA00025038-39 at 38 (look into Rich Kinder's *"steel blue eyes"* to determine their exclusivity); GSPIA00146461 (*"We will have to trust kinder and the honor among thieves."*).

[404]   TCG0000201-37 at 02.

[405]   TCG0450392.

[406]   GSIBD00004544-47.

361.    The special committee was advised that Kinder Morgan's stock should be valued at least 10% more than the current bid of $100 per share, but the committee accepted the group's final offer of $107.50 per share.[407]

362.    On August 28, 2006, Kinder's board accepted the Goldman Sachs consortium's offer of $107.50 per share.  The consortium's offer was significantly lower than various valuations of the company and of the Special Committee at the time.[408]  Goldman Sachs had valued the company far above its offer price, as had other third-party analysts.[409]  Just as Goldman Sachs had planned, no competing offers for Kinder Morgan surfaced.

363.    Goldman Sachs also worked hard to accommodate its favorite partners when syndicating the remaining equity of the deal, even when it was oversubscribed on the transaction.[410]  Goldman Sachs went so far as to offer investments in the deal to individuals at Bain, its SunGard partner and a participant in the AMC-Loews merger where Goldman advised and orchestrated the separate buyouts of two companies that subsequently merged.[411]

---

[407]    GSPE00517056-285 at 083.

[408]    B 17809-87 at 12; B 08337-96 at 62 (valuing the company as high as $150 per share).

[409]    *See* GSPIA00093788-871 at 855 (Goldman Sachs valuations as high as $120 per share); GSIBD00004544-47 at 46 (letter from Perot Investments president stating that "*$100 is not even close to a fair price*" and valuing the company at "*above $150 per share*").

[410]    GSPE00382274-76; GSPIA00146335 ("*We need to figure out how to give AIG a piece of this, even just 100m.*"); GSPE00381349-54 at 49 ("*Will be very bad now that we reached out to bain, cerberus and HF not to give them a decent size and aso[sic] a chunk for the hedge funds (250 ish).*"); *see* January 29, 2010 Deposition Transcript of John Connaughton ("Connaughton Depo.") at 185:25-186:25 (individual partners and managing directors at Bain were given opportunities to invest in Kinder Morgan).  Goldman Sachs kept both a syndication list and a "*request list*" for the syndication of Kinder Morgan.  *See* GSPE00379961; GSPE00380016.

[411]    *See* BC-E00545359; GSPE00382197-98; GSPE00234854-99.

364.    Goldman Sachs viewed the Kinder Morgan buyout as an investment opportunity for which it could extract *quid pro quo* from other private equity firms.  Indeed, Goldman Sachs offered Apollo's founder Leon Black the opportunity to invest in Kinder Morgan as payback for Apollo's inclusion of Goldman Sachs in the Nalco and Cablecom deals.  But Leon Black told Goldman Sachs that the syndication offer in Kinder Morgan was inadequate payback to Apollo.[412]

365.    Carlyle recognized its obligation to Goldman Sachs for the invitation to join the buyout group and understood it needed to reciprocate by offering Goldman other deal opportunities.  In an internal Carlyle e-mail, Allen Holt (Carlyle's co-head of U.S. Buyout) wrote, "*Are we committed to Permira as I had hoped we could invite in GS PIA as payback on Kinder and for future consideration.*"[413]  Sandra Horbach (Carlyle managing director) responded, "*As far as Goldman is concerned, I didn't think we owed them payback on KM [Kinder Morgan] because I thought that was payback for EDMC [Education Management].*"[414]

366.    The Kinder Morgan deal was connected through the network of *quid pro quos* to at least the Nalco, Cablecom, Aramark, Univision, and EDMC deals.  In addition to these connections, Goldman Sachs offered roles in the deal to many large private equity Defendants in the hopes of securing still more benefits in the future.  Goldman Sachs was able to do all of these things without fear of losing the deal despite pricing so low that the special committee was able to force a more than 7% increase.  Defendants' agreement not to compete on price ensured that no competing bid would

---

[412]    GSPE00380294-95; GSPE00380042-43; Burke Decl., Ex. SS, GSPE00379824-25; *see also* Friedman Depo. at 339:24 (Goldman Sachs "*didn't really get credit for [offering Kinder to Apollo]*").

[413]    TCG0450308-09 at 08.

[414]    *Id.*

be entered so long as Goldman Sachs did its part and offered enough of its purported competitors the chance to buy into the deal.

367.    This deal was very valuable, as evidenced by Kinder Morgan's recent public offering, which raised nearly $3 billion for the acquiring firms, including over $900 million for Goldman Sachs and over $400 million for Carlyle. This is in addition to their remaining stakes in the company, valued at over $4 and $2 billion, respectively -- substantially more than their initial investments.

368.    Goldman Sachs and Carlyle, partners in Kinder Morgan, followed the rules of the conspiracy and never jumped each other's deals or topped a bid on any other deal in the Conspiratorial Era. In addition to inviting Carlyle into Kinder Morgan, Goldman Sachs orchestrated the AMC merger with Loews, which included Carlyle.

369.    The following chart details the Defendants' cartel, advisors and financiers for the Kinder Morgan deal, date announced and price of the deal:

| **Kinder Morgan** | |
|---|---|
| Deal amount | $27.5 billion ($107.50/share) |
| Date deal announced | August 28, 2006 |
| Purchasing private equity firms | Goldman Sachs<br>Carlyle<br>Riverstone (Carlyle affiliate)<br>AIG<br>Richard Kinder, et al. |
| Debt financers | Goldman Sachs<br>Citigroup<br>Deutsche Bank<br>Lehman Bros.<br>Merrill Lynch<br>Wachovia |
| Purchasing advisor(s) | Goldman Sachs |
| Company advisor(s) | Morgan Stanley<br>Blackstone Group |
| Other participating private equity firms | Apollo[415]<br>Blackstone<br>KKR<br>TPG[416]<br>Bain[417]<br>Hellman & Friedman |

---

[415]    May 24, 2006 TPG e-mail addressed to Blackstone, Apollo, KKR and AIG regarding Kinder Morgan governance. TPG00042184-86. This e-mail evidences that these private equity firms were interested in the Kinder Morgan LBO; *see also* TPG00042209-12 at 12 (Blackstone, Apollo, KKR and AIG setting a meeting on how to divide and conquer deal tasks.).

[416]    May 24, 2006 internal Goldman Sachs PIA e-mail regarding TPG's conduct around the Kinder Morgan deal. According to Henry Cornell, Michael Mcdougal (TPG) has not acted like a "*gentleman*" in the process and has caused GSPIA problems with Kinder. GSPIA00138015.

[417]    May 29, 2006 internal Goldman Sachs PE e-mail regarding Kinder Morgan financing. Goldman Sachs wants to offer Cerberus, Hellman & Friedman, and Bain a decent size of the deal in order to not "*piss*" them off. GSPE00380744.

- 138 -

**The Freescale LBO**

370.    In early 2006, Freescale began to consider various strategic alternatives, including purchasing Royal Philips Electronics semiconductor unit ("Philips").

371.    As early as February 2006, Blackstone, TPG, Silver Lake, Bain and KKR were communicating with one another regarding potential buyouts in the semiconductor industry, including a potential going-private deal involving a combination of Freescale and Philips Semiconductor.[418]

372.    By May 2006, Blackstone had expressed to Freescale's board that it was interested in purchasing the company at $37-$38 per share and was given *"the opportunity to work with the Company on an exclusive basis."*[419]

373.    Shortly thereafter, in mid-June 2006, Philips publicly announced that it was considering a sale of its semiconductor business and Freescale continued to evaluate the merits of acquiring this business.

374.    During July 2006, Freescale decided not to pursue the acquisition of Philips; however, two bidding groups, one led by Blackstone and the other led by KKR, appeared to be pursuing Philips and Freescale simultaneously.

375.    *"On July 18 [2006], [Blackstone] submitted a preliminary non-binding offer letter with a bid of $35.50 - $37/share . . . ."*[420]

---

[418]    Hao Depo. at 101:24-103:25, 197:19-199:3; BX-0530708-12; SLTM-DAHL-E-0199798-800; KKR_DAHL_000537988-990; BX-0088747-49.

[419]    BX-0014628-46 at 29; BX-0014551-615 at 551.

[420]    BX-0009360-73 at 60.

376.    Around the same time, Blackstone teamed with TPG and Permira to bid on the semiconductor unit of Philips.  Two other consortia – a KKR/Silver Lake group and a Bain-led group – also submitted separate bids to acquire Philips.[421]

377.    On August 3, 2006, the KKR Group reached a definitive merger agreement with Philips (Bain was folded into the deal).

378.    After KKR/Silver Lake acquired Philips, Blackstone formed a consortium to acquire Freescale that included Carlyle, Permira and TPG.[422]  Blackstone invited TPG and Permira to join its consortium as recognition for their "*partnership*" in the Philips deal.[423]  Blackstone wanted TPG in its group to "mitigate the risk of competition" and prevent an auction.[424]  TPG was "*arguably the most knowledgeable of firms on semiconductor private equity investing,*" making TPG potentially a credible competing bidder for Freescale.[425]  Blackstone also invited Francisco Partners as "*payback*" because it was a "*good friend.*"[426]  Further, Blackstone "*owe[d] [Silver Lake] for SunGard*" and considered giving Silver Lake a *quid pro quo* on the Freescale deal.[427]

---

[421]    In mid-2006, shortly after the Philips bids were submitted, Bain tried to join both the Blackstone/TPG/Permira consortium and the KKR/Silver Lake consortium. BX-0910301-03 at 02-03.  Egon Durban (managing director, Silver Lake) and Adam Clammer (managing director, KKR) discussed inviting Bain into their consortium and Bain joined the KKR/Silver Lake consortium after having "*lost*" the auction to them.  SLTM-DAHL-E-0086008-11 at 09; BC-E00576708-20 at 09; Hao Depo. at 177:11-18, 54:21-23; Clammer Depo. at 247:11-249:11.

[422]    BX-0033380.

[423]    BX-0041416-18 at 16-17.

[424]    BX-0652537.

[425]    March 17, 2010 Deposition Transcript of James Coulter ("Coulter Depo.") at 188:20-22.

[426]    BX-0033380.

[427]    *Id.*

379.    Blackstone submitted a buyout offer of $38 per share, which was accepted by the board on September 10, 2006.[428]

380.    Later the same day, KKR, Silver Lake, Bain and Apax Partners Worldwide, LLP (the "KKR Group") delivered a written indication of interest in acquiring Freescale for a price of $40 to $42 per share.[429]   The KKR Group acknowledged it could pay more for Freescale than any other buyer due to the synergies that it could generate by combining Freescale with the Philips semiconductor business, which it had purchased with Bain and Silver Lake one month earlier.

381.    On September 11, upon hearing the news of the KKR-led group's indication of interest, Dan Akerson at Carlyle, which was part of Blackstone's group, wrote: *"[a]nd just think, KKR asked the industry to step down on HCA."*[430]

382.    The same day, September 11, Blackstone contemplated an unsolicited bid to buy HCA at $55/per share as retaliation.[431]   By September 12, Blackstone, TPG, Carlyle, and Permira formed an HCA consortium.[432]

383.    On September 12, Tony James of Blackstone called George Roberts of KKR to say Blackstone signed a confidentiality agreement on HCA.[433]

---

[428]    February 19, 2010 Deposition Transcript of Paul C. Schorr, IV ("Schorr Depo.") (Blackstone) at 41:15-42:21; TPG-E-0000229538-39 at 39 (referencing a *"[h]andshake"* deal with the board at $38 per share as early as August 30, 2006).

[429]    Schorr Depo. at 42:22-43:3; Hao Depo. at 206:12-20; SLTM-DAHL-E-0080770-73; TCG0216512.

[430]    TCG0216411.

[431]    BX-0508134-35; BX-0652508.

[432]    TCG0242827-28.

[433]    *Id.*

384.    Blackstone's threat to compete for HCA, prompted by KKR's conduct in Freescale, led the leaders of KKR (Henry Kravis and George Roberts) and Blackstone (Tony James and Steve Schwarzman) to communicate directly and reaffirm their promise not to compete.

385.    On September 14, 2006, Blackstone's group submitted a formal offer of $40 per share for Freescale, with a fuse expiring at 10:00 a.m. the next day.  This offer was on the low end of KKR's indication of interest of $40-$42 per share.[434]

386.    The Freescale board accepted this bid and entered into a definitive agreement with the Blackstone Group on the afternoon of September 15, 2006.[435]  The KKR Group immediately withdrew from the bidding, allowing Blackstone to acquire the company for $40 per share even though *The Wall Street Journal* stated in an article on September 16, 2006, that:

> [T]he KKR-Bain group can conceivably offer billions more to Freescale shareholders by reducing the combined group's research and development and eliminating the overlap in sales and marketing offices and staff.  The prospect of consolidation and more market power makes it possible for them, in turn, to bid more for Freescale.[436]

387.    The agreement to withdraw is confirmed by Blackstone's Tony James in an internal e-mail: "*Henry Kravis just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours.*"[437]

388.    The same night, September 15, George Roberts of KKR wrote Tony James of Blackstone: "*Congrats.  Pls give me a call on cell . . . Grr.*"  On September 17, Tony James responded: "*Thx for the call George.  I talked to Henry Friday night and he was good enough to call*

---

[434]    KKR DAHL 000430909-10.

[435]    *Id.*

[436]    Henny Sender & Don Clark, *Freescale Agrees to Blackstone Offer $17.6 Billion*, Wall St. J., Sept. 16, 2006, at A3.

[437]    BX-0430720-21 at 21.

*Steve Saturday. We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money. I hope to be in a position to call you with a large exclusive PTP [public to private] in the next week or 10 days. You are the natural but we need to get management's clearance. Sorry for the email but I don't have your cell number. Tony.*" George Roberts responded the same day: "*Agreed.*"[438]

389.    On the morning of September 16, Henry Kravis wrote an internal e-mail to KKR partners: "*I spoke with Tony James last night and Steve Schwarzmann this morning re Freescale. They are very happy campers that we are not going any further, since they now have a signed agreement. We got lucky!!!! They told me that they are working on a large one, which they say is 'right up our alley' and they will be happy to have us work with them. We will see!!!*"[439] The "large one" referenced by Blackstone was Clear Channel.  True to its word as payback for KKR's agreement to step down in Freescale, Blackstone invited KKR into Clear Channel.

390.    A September 16 Carlyle internal email also confirms the agreement: "*As you may have heard, kkr is dropping out. Kravis says he would not have upset the previous deal if he had known how close we were. But that cost us eight hundred million.*"[440]

391.    A September 16 Goldman internal e-mail confirmed Defendants' agreement to allocate deals so as to suppress competition and price: after learning of the KKR/Silver Lake/Bain/Apax group's letter withdrawing from Freescale, Goldman wrote "*club etiquette prevails.*"[441]

---

[438]    BX-430719.

[439]    KKR DAHL 000430909-10 at 09.

[440]    TCG0216532-34 at 34.

[441]    GSPE00367587-88 at 87.

392.    On September 16, the day after Tony James and Henry Kravis spoke and KKR withdrew its letter of interest for Freescale, Blackstone informed other private equity firms that it had "*dropped HCA.*"[442]

393.    All of the private equity firms quickly assured each other of their alliance. Permira's Tom Lister received an "olive branch like" communication from both Alexander Navab of KKR and Egon Durban of Silver Lake.[443]   John Marren at TPG also got "*nice notes from kkr and slp.*"[444] Silver Lake founder Glenn Hutchins communicated directly with TPG founder David Bonderman concerning Silver Lake's decision to withdraw from the process.

394.    After Freescale announced the deal, Blackstone considered how to fund the equity requirement. There were "*[p]lenty of possibilities,*" but Tony James wanted to "*survey the partners and see where people owe favors or where we will get something back.  Then make an organized well thought out list.*"[445]   John Marren (TPG managing director) reported a conversation with a partner of Golden Gate Capital, which was considering a commitment of $150-$250 million on the Freescale deal.[446]   In that conversation, Marren assured Golden Gate that "*KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal.*"[447]   Even Bain's senior

---

[442]    TCG0216532-34 at 33; *see also* BX-1165731-33.

[443]    BX-0516392-96 at 92; BX-0087468.

[444]    BX-0743228-29.

[445]    BX-1190213-15 at 13.

[446]    Coulter Depo. Exhibit 1037; TPG-E-0000034009.

[447]    TPG-E-0000034009.

executives, because they were also limited partners of Blackstone, were given the opportunity to co-invest in Freescale.[448]

395.    At the end of the day, the KKR-led group ended up with Philips and HCA, which it purchased without competition, but was the "losing bidder" in the Freescale deal; the Blackstone-led bidding club ended up with Freescale even though it was reported that the KKR Group could have offered "billions more" for the company, but was the "losing" bidder in the Philips deal and did not bid for HCA. The shareholders of all companies ended up with far less money per share than they would have received in the absence of Defendants' collusive agreements.

396.    The Freescale deal is directly connected to HCA, as Blackstone's reaction to KKR's bid in Freescale was to threaten to retaliate with a competitive bid in HCA.[449] Rather than compete, the Freescale interlopers withdrew immediately and claimed that their letter of interest was a mistake.[450] Within a very short period of time, the conspiracy had been reaffirmed and titans of the industry Steve Schwarzman of Blackstone and Henry Kravis of KKR were already making plans to work together on a large deal.[451]

397.    The following chart details the Defendants' cartel, advisors and financiers for the Freescale deal, date announced and price of the deal:

---

[448]    BC-E 00545381-96.

[449]    TCG0242827-28.

[450]    BX-0430720-21; BX-430719; KKR DAHL 000430909-10.

[451]    KKR DAHL 000430909-10.

- 145 -

| Freescale | |
|---|---|
| Deal amount | $17.5 billion ($40/share) |
| Date deal announced | September 15, 2006 |
| Purchasing private equity firms | Blackstone<br>TPG<br>Carlyle<br>Permira |
| Debt financers | CSFB<br>Citigroup<br>J.P. Morgan |
| Purchasing advisor(s) | Blackstone Group<br>Citigroup<br>CSFB |
| Company advisor(s) | Goldman Sachs |
| Other participating private equity firms | Silver Lake<br>KKR<br>Bain Capital<br>Apax[452] |

**Philips/NXP**

398.    In the Philips/NXP deal, Defendants communicated extensively with each other and discussed buyout strategies. Ultimately, the "winning" bidding group, comprised of KKR and Silver Lake, cut in the losing bidders, Bain and Apax, pursuant to a plan gathered before the bids were placed in which the "winners" would invite the "losers" into the deal. Incredibly, Bain and Apax, the "losers," were granted the most board seats and ownership interest in Philips after the buyout.

---

[452]    September 15, 2006 e-mail from Alfred Rose (Silver Lake) to Bain, KKR and Apax forwarding the agreement Blackstone signed with Freescale. SLTM-DAHL-E-0048823-24. KKR, Bain, Silver Lake and Apax also submitted an indication of interest for Freescale at a standalone purchase price of $40-$42 per share. KKR DAHL 000430437-43.

399.     In early 2006, private equity firms were targeting various semiconductor companies for an acquisition, including ST Micro, Infineon, Freescale and Philips Semiconductor ("Philips" later renamed "NXP"), a business division of the Dutch company, Royal Philips Electronics (NYSE:PHG, AEX:PHI).

400.     In January 2006, representatives of KKR, Blackstone, TPG, Silver Lake and private equity firm CVC discussed forming a giant, "knockout" consortium to acquire Philips. Bain was separately talking to Morgan Stanley, Philips' advisor, about a buyout.

401.     In late February 2006, Blackstone, TPG, Silver Lake and CVC held a conference call to discuss the Philips buyout strategy. Two scenarios were discussed. First, the firms considered acquiring Philips and Freescale separately and then merging the two companies, as had occurred in the AMC and Loews purchases. Second, if a buyout of Freescale was not possible, the firms considered approaching Philips as a single consortium to conduct the buyout.

402.     The private equity firms ultimately did not form a single buyout consortium. By mid-March 2006, the firms had organized themselves into four bidding clusters: (1) KKR/Silver Lake; (2) TPG; (3) Blackstone; and (4) Bain/Apax/Francisco Partners. Importantly, KKR, Silver Lake, TPG and Blackstone continued to discuss buyout strategies for Philips and shared information, including valuations of the company.[453] Silver Lake's partnership with KKR on Philips partially repaid Silver Lake for KKR's invitation into the SunGard deal.[454]

---

[453]     Specifically, Egon Durban (Silver Lake) forwarded a Philips valuation prepared by Goldman Sachs to KKR, Blackstone, TPG and CVC.

[454]     BC-E00520905-06; SLTM-DAHL-E-0084658; TCG0042213-18.

403.    By July 2006, Blackstone had submitted an expression of interest for Freescale. Blackstone still planned to acquire Freescale first, then pursue an acquisition of Philips, and merge the two companies.

404.    Around the same time, Blackstone agreed to partner with TPG and Permira to bid on Philips. Two other consortia – KKR/Silver Lake and Bain/Apax/Francisco – also bid on Philips.

405.    During June, as TPG's John Marren explained in an internal email to senior TPG executives, leaders of the Blackstone/TPG/Permira consortium and KKR/Silver Lake consortium "had a discussion about collapsing into one team and all agreed *it would be great as long as the seller did not go crazy.*" (TPG-E-0000339088) However, "Blackstone ... *got feedback that Phillips would not tolerate the four strongest guys [all] being on one team....* Blackstone delivered the message to kkr/slp; via a conversation between [Blackstone co-founder and CEO] Schwarzman and [KKR co-founder] Kravis."[455]

406.    After Philips refused to allow the formation of a consortium among the Blackstone and KKR led consortia, KKR and Bain developed a plan in which their respective consortia would bid separately, but if one consortium were to win the other consortium would be allowed into the deal. Silver Lake agreed to this approach. Philips, however, expressly refused to permit KKR and Bain from forming a combined consortium. On June 30, 2006, Johannes Huth of KKR told KKR founder George Roberts that "As I mentioned to you we had agreed to merge with bain last night. I spoke to [P]hilips today and they were very much against this... I tried to push hard but to no avail."[456]

---

[455]    TPG-E-0000339088.

[456]    KKR DAHL 000708938.

407.    Disregarding Philips' demand that they remain competitors, Bain and KKR and Silver Lake continued to collude and before final bids were to be submitted on August 1, 2005, cemented a secret deal whereby Bain would permit KKR and Silver Lake to submit the winning bid and then invite Bain into its deal on equal terms.  On June 30, 2006, Egon Durban of Silver Lake reported KKR had agreed with Bain that, "If either of our consortia wins, the other will be allowed into the deal."[457]  On July 31, 2005, Mark Nunelly at Bain emailed Alex Navab at KKR, and stated, in clear reference to the Dutch management of Philips, "*Understand from out team that you may want comfort on where we are with the crazy dutch... we are there as represented... call if you want to chat ...* ▬▬▬▬▬▬"  That same evening, Michael Plantevin at Bain emailed another Bain executive stating "Got a call from our friend looking to [for a] formal agreement from us (Call between senior partner) that we (Bain and Apex) would be in their deal ... need to have it tonight as looking/nees to have their final bid in tomorrow but noon CET/6am EST."[458]  Later that evening, the deal was confirmed by KKR's Huth in an email to KKR founders George Roberts and Henry Kravis: "Got a call from B [Bain] – there are ok up to €8.0 bn for €1.0 bn underwrite...They have been through this as a firm and [Bain's Mark Nunnelly] Nunnelly will confirm to Alex [Navab of KKR]. So we are done on this."[459]  Thus, in defiance of Philips' directive that Bain and KKR and Silver Lake not partner, those firms made a secret arrangement whereby Bain permitted KKR and Silver Lake to "win" the auction and then was invited by KKR to join its deal.[460]

---

[457]    SLTM-DAHL-E-0363387.

[458]    BC-E00882536.

[459]    KKR DAHL 000706436-38 at 36.

[460]    Roberts Depo. at 118:3-8 ("Q. And can you remember when you reached out to Bain? A. I think we reached out to Bain once we had won the transaction.  Q. They were actually a losing bidder right?  A. That's correct.")

408.    By close of business on July 31, 2006, KKR and Silver Lake's bid for Philips was accepted. On August 2, 2006, the day before Royal Philips publicly announced the agreement with the KKR/Silver Lake group, Bain's Mark Nunnelly told his partners *"it is highly likely that [Bain] will come into the deal as an equal partner to kkr .... and senior to apex and silverlake."*[461]

409.    On August 3, 2006, Royal Philips announced that it had agreed to sell an 80.1% stake in Philips' Semiconductor business to KKR, Silver Lake and AlpInvest Partners NV. The combined purchase price was 8.3 billion euro (over $10 billion), consisting of 3.4 billion euro purchasing price, 4 billion euro for debt and other liabilities, and .9 billion euros for Philips' remaining stake.

410.    Just a week after the public announcement of the Philips deal, Bain and Apax were invited to join the KKR/Silver Lake/AlpInvest buyout consortium – just as KKR and Bain had planned six week earlier. Indeed, although they were technically "losing" bidders, Bain and Apax were given twice as many board seats as Silver Lake. Internal emails show that Bain and KKR did not disclose their collusive arrangement and that "Phillips ... was initially not happy at all about two new investors showing up around the table" after Philips accepted Blackstone's bid.[462] Only after KKR had inked the deal did Johannes Huth travel to Amsterdam to obtain approval from Philips to allow Bain and Apex to join its consortium.[463]

411.    Immediately after the Philips deal was announced, members of the Philips consortium discussed acquiring Freescale and merging it with Philips.

---

[461]    Burke Decl., Ex. EE, BC-E00670012-13 at 12.

[462]    BC-E00800330-31 at 30.

[463]    BC-E00852703.

412.    On September 10, 2006, Blackstone and its partners Carlyle, TPG and Permira submitted a buyout offer for Freescale of $38/share, which was preliminarily accepted by Freescale's board.

413.    However, later that day, the Philips consortium led by KKR – apparently without knowledge that Blackstone had already submitted a firm offer for Freescale – submitted a written indication of interest of $40-$42/share for Freescale. Blackstone viewed the KKR-led group's offer as a flagrant breach of the agreement among Defendants not to jump another firm's exclusive deal. In retaliation for KKR's conduct, the Blackstone group took affirmative steps to mount a competing bid in KKR's pending HCA LBO. Additionally, as a result of the KKR-led consortium's indication of interest, the Blackstone group ultimately increased its bid on Freescale from $38/share to $40/share.

414.    Within days of the Blackstone group's retaliatory efforts, however, discussions at the highest levels between KKR and Blackstone resulted in KKR agreeing to not bid on Freescale, and Blackstone agreeing not to make a competing offer for HCA.

415.    Thus, even though KKR and its partners wanted to acquire Freescale with the goal of merging it with their Philips investment, and though they could have bid more than Blackstone because of synergies resulting from combining Freescale with Philips, they chose to back down from competition so as not to disrupt their relationship with Blackstone and its partners.

416.    The following chart details the Defendants' cartel, advisors and financiers of the Philips deal, date announced and price of the deal:

| Philips Semiconductor/NXP | |
|---|---|
| Deal amount | $4.4 billion |
| Date deal announced | August 3, 2006 |
| Purchasing private equity firms | Silver Lake<br>KKR<br>Apax<br>Bain Capital<br>AlpInvest |
| Debt financers | CSFB<br>Morgan Stanley<br>Deutsche Bank |
| Company advisor(s) | Morgan Stanley |
| Other participating private equity firms | Blackstone<br>TPG<br>Permira |

**Vivendi**

417.    Around September 2006, Jean-Bernard Levi, Chairman of the Board of Vivendi, the French entertainment and telecommunications conglomerate, approached KKR about a potential buyout of the company. KKR had a special relationship with Vivendi; Marie-Josee Kravis, the wife of Henry Kravis, KKR's co-founder, had formerly been a member of Vivendi's supervisory board.

418.    In selecting its buyout partners, KKR placed heavy consideration on whether it owed favors to other private equity firms. As reflected in a September 14, 2006 e-mail exchange, Henry Kravis, KKR co-founder George Robert, KKR managing director Alex Navab, and other senior KKR decision-makers discussed forming a consortium with Blackstone, TPG, Carlyle, Permira and Bain – all firms that KKR had worked with in the past.

419.    In the e-mail exchange, Johannes Huth, head of KKR's European Private Equity business, acknowledged that KKR owed payback to Permira, Bain and TPG and that those firms

should be considered as partners in Vivendi: "*[o]n a recent IOU basis – it would be good to think of Permira and Bain. We probably also need to take care of TPG.*" KKR followed through on its "payback" promise to Permira by inviting Permira to join in pursuing a 20% stake in Vivendi.[464]

420.    In the e-mail exchange, co-founder George Roberts asked, "*[w]anna leave Blackstone out?*"[465] Alex Navab responded that it was his preference to "*leave them out but we can discuss this later once the dust settles on Freescale, HCA, etc. Perhaps an olive branch we can throw their way if they don't do something stupid on HCA and we prevail on Freescale.*"[466] Navab believed that if KKR did not include Blackstone in the Vivendi deal, Blackstone would be "*pretty aggressive in forming another group.*"[467] Navab acknowledged at his deposition that meant including Blackstone in Vivendi in exchange for Blackstone not competing in HCA.[468]

421.    Buyout discussions between Vivendi's board and KKR spanned several months. In November 2006, KKR made a non-binding offer to purchase the company for 40 billion euro ($51.10 billion). However, Vivend's board declined KKR's offer. Buyout discussions ultimately stalled, reportedly because of French tax laws and other legal and regulatory complications that would have arisen from such a deal. Had the deal been consummated at KKR's offer price, it would have been the largest leveraged buyout in history.

422.    Despite it never being consummated, the Vivendi buyout demonstrates the conspiracy's reliance on a commitment not to compete on price supported by *quid pro quos* and how

---

[464]    Nathalie Meistermann, *Vivendi Considers Sale of NBC Universal Stake* (Nov. 17, 2006).

[465]    Navab Depo. Exhibit 1118 at KKR DAHL000538008.

[466]    *Id.*

[467]    *Id.*

[468]    Navab Depo. at 262:5-22.

carefully the Defendants tracked their obligations to one another. KKR owed previous partners Bain and TPG as well as Permira. They also planned to include Blackstone to smooth over any tension from the Freescale and HCA deals.

**The Harrah's LBO**

423.   The Harrah's transaction highlights Defendants' adherence to "club etiquette"[469], particularly Defendants' willingness to share a deal to prevent competition among club members.

424.   In the summer of 2006, Apollo began exploring the possibility of an LBO with Harrah's Entertainment ("Harrah's"), and subsequent merger with Gala Coral Group ("Gala"), a casino operator. Apollo reached out to Global Leisure Partners and Permira, whom it had partnered with on the Gala transaction.[470] Although Apollo ultimately withdrew from the Gala process, it believed a partnership with Permira would appeal to the Harrah's board and portray Apollo as "more of a strategic than financial" buyer.[471]

425.   Apollo also discussed the possibility of including TPG, to whom it offered a co-investment on AMC, to prevent the possibility of a "competitive threat."[472]

426.   In August 2006, Apollo co-founder Marc Rowan, met with Harrah's CEO Gary Loveman to discuss a potential transaction.[473] In an email exchange, Loveman discussed Apollo

---

[469]   GSPE00367587-88.

[470]   APOLLO131378-95 at 89.

[471]   APOLLO131378-95 at 88.

[472]   APOLLO131504-07 at 05.

[473]   APOLLO124542-43 at 43.

partnering with TPG. Rowan informed Loveman that Apollo would "invite TPG as a partner in any transaction" and promised to get "Leon up to speed."[474]

427.    Shortly thereafter, Apollo's Leon Black approached TPG's David Bonderman about the potential transaction, laying the groundwork for a club deal and a partnership with Apollo. Pursuant to the rules of the conspiracy, TPG promised to reciprocate with a future deal.[475]

428.    TPG and Apollo agreed to work together to acquire Harrah's. Although Apollo began the process with Permira, TPG felt including Permira in the transaction would allow it to penetrate the "US megacap" and gain admission to Defendants' exclusive club.[476] Ultimately, TPG chose to keep Permira from joining the consortium,[477] despite realizing *"this is somewhat risky from the firm-to-firm relationship point of view."*[478]

429.    Just days after Harrah's Special Committee began contacting bidders, Apollo and TPG signed standstill agreements with six potential financing banks. These agreements threatened to eliminate any competing bids from strategic buyers that required significant financing (a feature of every deal over $2.5 billion) and signaled to the private equity industry that Harrah's had been claimed by a consortium.[479]

---

[474]    APOLLO123729-32 at 29.

[475]    TPG-E-0000552029

[476]    TPG-E-0000213181.

[477]    JPM_00483551.

[478]    TPG-E-0000213181.

[479]    The Special Committee forced Apollo and TPG to release the banks from their exclusive agreements soon after they were signed. TPG-E-0000002981-86 at 84.

430.    On September 25, 2006, TPG and Apollo bid $81.00 per share for Harrah's.[480]

431.    Harrah's Special Committee rejected TPG's and Apollo's initial offer. According to an October 8, 2006 Apollo email, the Special Committee rejected the bid as not having enough value. The Special Committee also expressed concern over Loveman's alignment with Apollo and TPG, as it put the company in a position "where it would be difficult to generate an alternative bid."[481]

432.    On October 9, 2006 TPG and Apollo submitted a revised bid of $83.50 per share.[482]

433.    Penn National Gaming, a strategic buyer, was the only other bidder. Importantly, Penn National Gaming was not a member of the conspiracy. None of the other Defendants or their co-conspirators bid on Harrah's. Penn National's bidding resulted in Apollo and TPG eventually offering $90 per share for Harrah's.

434.    Despite failure to generate a rival bid, multiple Defendants expressed an interest in Harrah's. Bain, which had a team of individuals looking into the deal in late October, chose not to submit a bid for Harrah's.[483] Instead, Bain contacted Apollo about a co-investment.[484] T. H. Lee also considered pursuing Harrah's but decided not to compete for concern over "stepping on TPG."[485]

---

[480]    BX-1696031-78 at 36.

[481]    APOLLO126053-54.

[482]    BX-1696031-78 at 36.

[483]    Burke Decl., Ex. HH, BC-E00674169-70; Burke Decl., Ex. Z, BC-E00674175-76.

[484]    APOLLO126417-20 at 18.

[485]    THL_DAHL_00705459.

Goldman Sachs and Blackstone entered into discussions with Penn National, however, each ultimately stood down to further the goals of the conspiracy.[486]

435.   On December 19, 2006, Harrah's accepted Apollo's and TPG's offer, and a 25-day go-shop period commenced.  Consistent with the rules of the conspiracy, no Defendant or co-conspirator submitted a competing bid.

436.   TPG and Apollo both knew that Harrah's, like all of their large deals, required that they consider any outstanding *quid pro quo* obligations they had to their previous partners.[487]  In a January 3, 2007 Memorandum, Apollo outlined potential co-investors in the Harrah's transaction and emphasized the need to bring in private equity firms that have "strong relationships" with Apollo and TPG.[488]  In addition to approaching Blackstone, Apollo reached out to KKR about equity co-investments. KKR expressed interest and promised to reciprocate with small stakes in deals to Apollo.[489]

437.   With over $2 billion in equity to raise, Apollo and TPG also offered sizeable investments to co-Defendant J.P. Morgan as well as co-conspirators Banc of America, Citigroup, Credit Suisse, Merrill Lynch and Morgan Stanley.[490]

---

[486]   BX-1695879.

[487]   TPG-E-0000021500 (TPG's "*PE Partner Tracker*" spreadsheet keeps track of TPG's *quid pro quo* obligations).

[488]   APOLLO126417-20 at 18.

[489]   APOLLO126430.

[490]   BX-1696031-78 at 31; APOLLO126417-20.

438.    The Harrah's transaction underscores the complexity of Defendants' *quid pro quo* relationships. In particular, Blackstone and Goldman Sachs were able to secure large co-investments in Harrah's because of their partnerships with Apollo and TPG on other deals.

439.    Goldman Sachs, who partnered with TPG on the concurrent Biomet deal, used its *quid pro quo* relationship with Apollo to secure a larger equity allocation than the other investment banks.[491] In a December 19, 2006 email, Apollo co-founder, Joshua Harris, acknowledged that Apollo needed to appease Goldman Sachs because of its role in Apollo's GE Plastics deal.[492] Goldman Sachs also used its investment in AP Alternative Assets, L.P. (a limited partnership that Apollo launched in 2006) as additional leverage on the Harrah's co-invest.[493] Ultimately, Apollo agreed to Goldman Sachs' demands, both to strengthen its current partnerships and to rebuild its long-standing relationship with Goldman Sachs after the "disappointments we experienced around the AAA and other deals last summer."[494]

440.    Blackstone's *quid pro quo* relationships with TPG and Apollo prevented it from submitting a competing bid. When Lehman Brothers approached Blackstone about "jumping the TPG/Apollo bid through a pipe investment in Penn National" Blackstone refused because it "didn't think we should play like that."[495] Once TPG received assurance that Blackstone would stand down,[496] Blackstone was rewarded with a minority ownership in the company.[497] Blackstone knew

---

[491]    APOLLO123577-80 at 78.

[492]    APOLLO123769-71 at 71.

[493]    APOLLO123837; APOLLO123838.

[494]    APOLLO123577-80 at 77.

[495]    BX-1695879.

[496]    BX-1694980.

accepting the Apollo/TPG offer would come at the expense of its ability to "execute another investment in the sector."[498] However, Blackstone ultimately accepted the $275 million co-investment rather than compete against TPG, whom it was concurrently partnering with on the Biomet transaction. Later, Blackstone would partner with Apollo and TPG in the 2008 Norwegian Cruise Line LBO.

441.   The Harrah's LBO also solidified the Apollo/TPG relationship. While working together on Harrah's, Apollo and TPG discussed teaming up to launch a bid for Sky City, a casino operator. Apollo and TPG would later partner on the Norwegian Cruise Line LBO in 2008 as part of the *quid pro quo* for Apollo inviting TPG into the Harrah's transaction.[499]

442.   The following chart details the Defendants' cartel, advisors and financiers of the Harrah's deal, date announced and price of the deal:

| HARRAH'S | |
|---|---|
| Deal amount | $ 17.1 billion ($90/share) |
| Date deal announced | October 2, 2006 |
| Purchasing private equity firms | Apollo<br>TPG |
| Company advisor(s) | UBS Securities |

---

[497]   BX-0677390-99.

[498]   BX-1696031-78 at 33.

[499]   APOLLO130428.

| HARRAH'S | |
|---|---|
| Other interested private equity firms | Goldman Sachs<br>Permira<br>Blackstone<br>Bain<br>T.H. Lee<br>KKR |

**The Clear Channel LBO**

443.     The Clear Channel LBO involved nearly all of the Defendants.  While multiple consortia had expressed interest in the radio broadcast company, Defendants once again succeeded in suppressing the price of the deal.  Indeed, Bain Capital, one of the members of the "winning" consortium, acknowledged that Clear Channel was one of the deals that was consummated as part of a "*[l]ess competitive deal environment*."[500]

444.     On or around August 18, 2006, Clear Channel management retained Goldman Sachs as its financial advisor to assess Clear Channel's strategic alternatives, including a potential buyout.

445.     Clear Channel management sought to avoid potential business disruptions that it believed could arise from openly pursuing strategic alternatives and initially engaged in non-public buyout discussions with only Blackstone and Providence, which had separately expressed interest in the company.  In early September 2006, Blackstone and Providence formed a consortium to bid on the Clear Channel.

446.     On September 22, 2006, Blackstone and Providence bid $34.50 per share.  After Clear Channel's board rejected its preliminary offer, on September 27, 2006, Blackstone and Providence bid $35.50 per share.

---

[500]     BC-E00112808-21 at 11.

447.    On September 29, 2006, KKR joined Blackstone and Providence's club. Blackstone's invitation to KKR was reciprocation for KKR's agreement to stand down on the Freescale LBO. On September 17, 2006 Tony James of Blackstone reached out to George Roberts of KKR to invite him into an exclusive public to private deal that Blackstone was negotiating at the time.[501] As promised, Tony James subsequently contacted KKR to invite it into their exclusive Clear Channel deal.[502]

448.    On or around October 13, 2006, T.H. Lee contacted Clear Channel's management to express its interest. Clear Channel's board, however, was still concerned about the potential adverse impact that could arise from the public's awareness that Clear Channel was for sale. They declined to negotiate with T.H. Lee.

449.    On October 18, 2006, KKR withdrew from Blackstone and Providence's club. To insure that Blackstone could pay back KKR with an immediate *quid pro quo*, Steve Schwarzman hastily instructed his team to redesign its Clear Channel offer so it could convince KKR to partner at a lower price.[503]

450.    Blackstone and Providence informed Clear Channel that they were now willing to bid only $35 per share, which was $0.50 per share less than their previous offer.

451.    By late October, Clear Channel's board felt that it was no longer possible to avoid the business disruptions involved in a public buyout process. Subsequently, Clear Channel issued a press release that it was conducting a review of strategic alternatives and that Goldman Sachs would

---

[501]    BX-0430719 ("Together we can be unstoppable but in opposition we can cost each other a lot of money..").

[502]    BX-1454056-57.

[503]    KKR_DAHL_001244252.

help carry out the review. Clear Channel's board directed Goldman Sachs to contact T.H. Lee to determine whether it was still interested in pursuing a buyout

452.   On October 24, 2006, after discussions with management, T.H. Lee submitted a buyout offer of $35 to $37 per share. The same day as T.H. Lee's offer, Blackstone and Providence submitted a revised offer of $35 per share. They also alerted Clear Channel that KKR had rejoined their group.

453.   With the public announcement, other private equity firms began looking at purchasing Clear Channel, including Bain, TPG, Carlyle, Apollo, Cerberus Capital Management ("Cerberus"), and Oak Hill Capital Management ("Oak Hill"). Bain and TPG joined T.H. Lee to form a club. T.H. Lee and Bain had at this time a long history of working together on deals. Apollo and Carlyle formed a club. Cerberus and Oak Hill formed a club.

454.   To prevent competing consortiums from forming, Blackstone contacted Bain to invite it into the deal.[504]   Mark Nunnelly of Bain was also contacted by his close, personal friend Scott Sperling of T.H. Lee to partner on the Clear Channel deal.[505]   Other consortiums also tried to merge to reduce competition. Carlyle reached out to Alex Navab and Paul Salem to ask to join the club.[506]

455.   Jonathan Nelson of Providence was furious that Bain disregarded the club deal rules and joined with T.H. Lee to disrupt Providence's exclusive deal, and in retaliation, Nelson refused to

---

[504]   GSPE01477703; BC-E00936242.

[505]   GSPE01477703.

[506]   TCG1043646; TCG1040641.

let Bain join the winning consortium in Univision.[507]  "B [Bain] wants in [to Univision] but there is no deal.  Our big radio was ours to do, but a couple of very big firms misplayed it badly."[508]

456.    On October 27, 2006, Apollo and Carlyle submitted an indication of interest of $36 per share.

457.    On October 29, 2006, Cerberus and Oak Hill submitted an indication of interest of $37 – $39 per share.  For reasons unknown at this time, Clear Channel decided not to pursue negotiations with these firms.

458.    On November 1, 2006, Apollo advised Goldman Sachs that Carlyle would not be pursuing Clear Channel.  Thereafter, Apollo submitted a revised buyout offer of $35 per share – a dollar less than its previous offer.  Thereafter, Apollo was told to stand down.[509]

459.    TPG dropped out of the club it formed with Bain and T.H. Lee.

460.    On November 13, Blackstone, Providence and KKR submitted an offer of $36.50 per share.  T.H. Lee and Bain submitted an identical offer so as not to unnecessarily drive up the price for the eventual winner.

461.    Goldman Sachs advised the two clubs to submit new bids to break the tie. On November 15, Blackstone, Providence and KKR bid $36.85 per share.  T.H. Lee and Bain bid $37.60 per share.  Notably, neither bid topped the $39 high-end range that Cerberus and Oak Hill had proposed in late October.  Later that day, Clear Channel's Board accepted T.H. Lee and Bain's $37.60 bid.

---

[507]    PEP-0221351-56 at 53.

[508]    *Id.*

[509]    PEP-0275659-60.

462.    After the merger agreement was executed, Clear Channel management directed Goldman Sachs to look for other potential buyers pursuant to a 21-day "go-shop" period. Consistent with the rules of the conspiracy, no Defendant or co-conspirator submitted a bid.

463.    Although multiple parties seemed interested in Clear Channel, the participants in the deal recognized the lack of true competition for the deal. Indeed, Bain, as one of the winning sponsors of the buyout, acknowledged in a presentation that the Clear Channel deal had been consummated in a "*[l]ess competitive deal environment*."[510]  Moreover, T.H. Lee maintained a "scorecard," in which it kept track of deals such as Clear Channel, for the exchange of future *quid pro quos*.[511]

464.    Consistent with the rules of the conspiracy, the losers were invited into the deal by the winners.[512]  After being told to "stand down," Apollo was given a co-invest on Clear Channel.[513] Blackstone and Goldman Sachs also contributed equity to the deal.[514]  Providence was allowed to buy the Clear Channel television group on April 20, 2007 for $1.2 billion.[515]

465.    Notably, the Clear Channel deal did not close immediately, as there was an uproar over the price of the deal, which shareholders believed was too low. In the ensuing months, T.H. Lee and Bain were forced to increase their offer price to $39 per share in April 2007 and once again

---

[510]    BC-E00112808-21 at 11.

[511]    Burke Decl., Ex. F, THL DAHL 00283871.

[512]    TPG-E-0001084656-57.

[513]    PEP-0275659; BX-1469358-59.

[514]    BX-1469358-59.

[515]    JPM_00400822-23.

to $39.20 per share in May 2007. Despite this, no Defendant or co-conspirator submitted a bid for Clear Channel.

466.    However, due to the burgeoning credit crisis, the banks had become skittish about providing the $22 billion in debt needed to finance the buyout. T.H. Lee and Bain ultimately reached an agreement with the banks to complete the buyout at $36 per share, or $24.4 billion including debt. The Clear Channel LBO finally closed in July 2008, though the relevant price negotiations and conspiratorial behavior by Defendants occurred throughout late 2006 and early 2007.

467.    During testimony in a lawsuit filed over the financing of the Clear Channel LBO, Bain chief John Connaughton described how Bain was approached by a number of private equity firms to join in a club bid. Ultimately, he testified that Bain decided to go forward with Defendant T.H. Lee who was "*very good friends of ours [Bain] who we've done a number of transactions with.*"[516] Connaughton described how Bain and T.H. Lee had partnered on nearly 10 transactions, confirming the historical *quid pro quo* nature of their relationship.[517] Clear Channel was simply another deal where they determined not to compete.

468.    Connaughton also described the *quid pro quo* nature of Bain's interaction with the banks that have funded or advised in virtually every deal outlined in this Complaint. "*Well, for my 19 years, we've worked with virtually every commercial investment bank on Wall Street. That would include Goldman Sachs, Morgan Stanley, Merrill-Lynch. The banks in this group, Deutsche Bank, Citibank, Wachovia, Royal Bank of Scotland. All of these banks are typically the ones we find in*

---

[516]    *BT Triple Crown Merger Co., Inc. v. Citigroup Global Markets, Inc.*, No. 600899/08, Trial Testimony ("TT") at 45:2-6 (N.Y. Sup. Ct. May 13, 2008) (Freedman, J.).

[517]    TT at 45:11-21.

*these transactions.*"[518] "*So in all of that activity, we find ourselves every day working with the very same banks, the very same people and many of the people I've known for 19 years.*"[519]

469.   T.H. Lee and Bain's partnership on many different deals demonstrates the centrality of the *quid pro quos* in allocating deals during the Conspiratorial Era, as well as the fact that many of the *quid pro quo* relationships can span several years and can include agreements to stand down and invitations to provide financing.

470.   The following chart details Defendants' cartel, advisors, and financiers for the Clear Channel deal, date announced and price of the deal:

| CLEAR CHANNEL | |
|---|---|
| Deal amount | $24.4 billion ($36/share) |
| Date deal announced | November 15, 2006 |
| Purchasing private equity firms | T.H. Lee<br>Bain |
| Debt Financers | Citigroup<br>Deutsche Bank<br>Credit Suisse<br>Morgan Stanley |
| Company Advisors | Goldman Sachs |
| Other Participating private equity Firms | Blackstone<br>Providence<br>Carlyle<br>Apollo<br>TPG<br>Cerberus Capital Management<br>Oak Hill |

---

[518]   TT at 23:6-12.

[519]   TT at 23: 19-22.

**The Sabre Holdings LBO**

471.    In 2005 and 2006, the travel industry saw several substantial transactions involving private equity firms – notably Blackstone's $4.3 billion purchase of Travelport in June 2006, Travelport's subsequent acquisition of Worldspan in December 2006, and Silver Lake and TPG's acquisition of Sabre Holdings Corp. ("Sabre") in December 2006.

472.    After Blackstone purchased Travelport, several private equity firms began contacting Sabre to explore a potential acquisition.[520]  In response to these inquiries and meetings with private equity firms, Sabre began exploring the possibility of an LBO.[521]  Sabre's board started the sales process in mid-September 2006, holding a limited auction.[522]

473.    Goldman Sachs and Morgan Stanley, as advisors to the board, began contacting several private equity firms, including Silver Lake, Carlyle, Permira, Bain, Apollo, TPG, and KKR, about the sales process.[523]

474.    T.H. Lee was also interested in joining the sale process but was not permitted to participate at that time.[524]

475.    By September 19, 2006, Silver Lake, TPG, and Apollo agreed to partner on the Sabre deal.[525]  The agreement to partner formed after discussions at TPG about "'rebuilding bridges'" with

---

[520]    Sabre Holdings Corp., Proxy Statement (Schedule 14A) (Feb. 21, 2007) ("Sabre Proxy Statement") at 17.

[521]    Sabre Proxy Statement at 17.

[522]    Sabre Proxy Statement at 18.

[523]    Sabre Proxy Statement at 18; GSPE01524272-338 at 313; *Id.* at 317.

[524]    THL DAHL 0065231-20 at 20; THL DAHL 00652575-76; THL DAHL 00652614-16 at 14; GSPE01501225-29.

[525]    SLTM-DAHL-E-0412151; SLTM-DAHL-E-0374792; TPG-E-0001089173.

Silver Lake,[526] following TPG's opposition to Silver Lake in the NXP and Freescale sale processes earlier in 2006.

476.     Sabre, however, forbade the private equity firms from partnering in the first round of bidding. Sabre's advisors delivered "ground rules" for the sale process to the private equity firms.[527] Importantly, these ground rules included (1) not partnering without the board's permission and (2) not working with any advisors or financing sources without the board's permission.[528] These ground rules were later documented in a letter to the private equity firms outlining the sale process[529] as well as in non-disclosure agreements, signed by the private equity firms.[530] The process letter set forth the following:

> We wish to remind you that your non-disclosure agreement provides that you will not contact or have discussions with potential financing sources or co-investors without Sabre's prior consent.[531]

Further, discussions between private equity firms about partnering or the sale process were prohibited. The process letter set forth the following:

> [P]lease note that as reflected in the Non-Disclosure Agreement that you have executed, you are prohibited from disclosing any information to, or otherwise discussing the proposed transaction with, any other potential financing sources or co-investors unless and until Sabre expressly permits such disclosures and discussions.[532]

---

[526]     TPG-E-0001089173.

[527]     GSPE01555208-09 at 08; GSPE01501655-58 at 56; *Id.* at 57.

[528]     GSPE01501638; TPG-E-0001199316-17 at 16; GSPE01499567-94 at 68.

[529]     *E.g.*, SLTM-DAHL-E-0374760-61; APOLLO105508-09; TPG-E-0000633166-67; GSPE01500045-46 (Carlyle); GSPE01500958-59 (Bain); GSPE01535303-04 (KKR).

[530]     *E.g.*, SLTM-DAHL-E-0384173-82; APOLLO105566-73; TPG-E-0001091563-71; GSPE01500678-85 (KKR); GSPE01501483-90.

[531]     SLTM-DAHL-E-0374760-61 at 60.

[532]     *Id.* at 61.

477.    Apollo described Sabre as "firm about no partnering."[533]   Similarly, TPG's investment committee memo, dated October 30, 2006, stated that in the first round of bidding, "partnering has been prohibited."[534]

478.    TPG, Apollo, and Silver Lake, however, violated the no partnering rule by engaging in communications prior to obtaining Sabre's consent to partner.[535]   In fact, Sabre never consented to a partnership among the three firms but consented, only after the first round of bidding, to a partnership between TPG and Silver Lake.[536]

479.    On November 1, 2006, in the first round of bidding, seven private equity firm bidders submitted solo indications of interest:  Silver Lake ($28.75/share mid-point of bid range), TPG ($28/share), Permira ($30/share mid-point of bid range), Bain ($31/share mid-point of bid range), KKR ($35/share), Carlyle ($28.50/share mid-point of bid range), and Apollo ($28/share mid-point of bid range).[537]

480.    Five firms were selected to continue to the second round of bidding:  Silver Lake, TPG, Permira, Bain, and KKR.[538]  The board approved the combination of Silver Lake and TPG and

---

[533]    TPG-E-0001199316-17 at 16.

[534]    TPG-E-0000537400-06 at 00.

[535]    SLTM-DAHL-E-0374790; TPG-E-0001199316-17 at 16; APOLLO105688.

[536]    GSPE01524272-338 at 322.

[537]    Id. at 321; Sabre Proxy Statement at 19.

[538]    Burke Decl., Ex. MM, BX-0723396-402 at 397; GSPE01524272-338 at 322.

the combination of Permira and Bain.[539]   Further due diligence and management meetings

commenced, and second round bids were due December 8, 2006.[540]

481.   The private equity firms submitted memos to and received feedback and authorization

from their investment committees in the days before the December 8, 2006 bidding deadline.[541]

482.   On December 8, 2006, Sabre received formal bids from the TPG/Silver Lake

consortium ($32.25/share) and KKR ($30/share), as well as an informal indication of per share value

from Bain/Permira.[542]   Sabre also received a term sheet that day from Expedia, a strategic company

interested in a potential merger.[543]

483.   The next day, Goldman Sachs and Morgan Stanley provided feedback to KKR on its

bid.   They were "startled" that KKR reduced its bid by $5 per share and stated that KKR would need

to raise its bid to move forward.[544]   John Saer of KKR reported this information to KKR's

investment committee.[545]   In response, Johannes Huth of KKR wrote that he was in a budget meeting

at NXP and would try to call Saer later.[546]   In a separate response to the same email from Saer, Huth

---

[539]   GSPE01524272-338 at 322; SLTM-DAHL-E-0374675.

[540]   SLTM-DAHL-E-0401753-55; TPG-E-0000718730; GSPE01495824-26 (Permira); GSPE01535292-94 (KKR); GSPE01555441-43 (Bain).

[541]   *E.g.*, SLTM-DAHL-E-0429501-0429576; SLTM-DAHL-E-0414984-0415056; SLTM-DAHL-E-0381219-0381248; TPG-E-0000739191-0000739221; TPG-E-0000639736-0000639741; TPG-E-0000577815-839; KKR_DAHL_000818220-253; KKR_DAHL_000818187-91; KKR_DAHL_000818192-205; KKR_DAHL_000818206.

[542]   GSPE01524272-338 at 333; SLTM-DAHL-E-0465634-39; GSPE01495246; GSPE01578542.

[543]   GSPE01524272-338 at 33.

[544]   KKR_DAHL_001245816.

[545]   *Id.*

[546]   KKR_DAHL_001245820.

wrote, "I am with the SLP [Silver Lake] guys tonight – do you want me to find out where they are?"[547] Saer replied, "Aboslutely."[548]

484.   Huth and Egon Durban of Silver Lake both sat on the NXP board of directors. Durban, a member of Silver Lake's investment committee, had received memos on Silver Lake's proposed Sabre investment and proposed per share offer.  Indeed, on December 7, 2006, Egon Durban had provided feedback to the deal team on the Sabre bid, recommending a bid at $32-$33 per share.[549]

485.   On December 10, 2006, the Sabre board met and eliminated Bain/Permira and Expedia from consideration, focusing on TPG/Silver Lake and KKR.[550]

486.   The following day, December 11, TPG/Silver Lake and KKR submitted updated bids, with the TPG/Silver Lake group bidding $32.75 per share,[551] and KKR bidding "$31, maybe a bit more."[552]

487.   The final price paid by the TPG/Silver Lake group was $32.75 per share, or $5 billion.

488.   Sabre retained the ability to accept a superior takeover proposal.[553]  No subsequent offers were made, however.  Despite T.H. Lee's strong interest in the company and extensive efforts

---

[547]   KKR DAHL 00124583032 at 30.

[548]   *Id.*

[549]   SLTM-DAHL-E-0381335.

[550]   Sabre Proxy Statement at 21; GSPE01524272-338 at 335.

[551]   Sabre Proxy Statement at 22.

[552]   KKR DAHL 001245820.

[553]   Sabre Proxy Statement at 63.

to join the sale process, it never made a superior offer.  Providence also expressed interest in the company but never made a superior offer.[554]

489.    In a separate deal bid (Ceridian), Bain, Blackstone, and TPG touted that they had "collectively participated" in the largest technology deals of 2006 – including Sabre and Travelport.[555]  Consistent with their agreement to divide the market, in Ceridian no private equity firms, including previous bidders KKR and Apollo, attempted to top the Bain, Blackstone and TPG bid.

490.    The following chart details Defendants' cartel advisors and financiers for the Sabre Holdings transaction, date announced, and price of the deal:

| SABRE HOLDINGS | |
| --- | --- |
| Deal amount | $5 billion ($32.75/share) |
| Date deal announced | December 12, 2006 |
| Purchasing private equity firms | Silver Lake<br>TPG |
| Debt financers | Deutsche Bank<br>Merrill Lynch<br>Pierce, Fenner & Smith, Inc.<br>Goldman Sachs Credit Partners<br>Morgan Stanley |
| Purchasing advisor(s) | Deutsche Bank<br>Merrill Lynch |
| Company advisor(s) | Morgan Stanley<br>Goldman Sachs |

---

[554]    *See* PEP-0270798800 at 798.

[555]    Burke Decl., Ex. OO, BX-0677400-08 at 401.

| SABRE HOLDINGS | |
|---|---|
| Other interested private equity firms | Apollo, Blackstone, KKR, Bain, Permira, Carlyle, T.H. Lee, Providence |

**The Biomet LBO**

491.   In March 2006, Biomet's management began evaluating strategic alternatives. Around that time, Dr. Dane Miller resigned as Biomet's President and CEO, but continued to maintain his seat on the board through June 2006.

492.   In May, Dr. Miller began discussions with a private equity consortium comprised of KKR, TPG and Warburg about a going-private transaction, which would include Dr. Miller as a member of the consortium. In a June 8, 2006 email, KKR representatives discussed strategies on approaching the Biomet buyout to "avoid a competitive process on the front end." [556]

493.   By June, the consortium, comprised of KKR, TPG and Warburg, contacted Biomet's financial advisor, Morgan Stanley, to express interest in a buyout of the company.

494.   Goldman Sachs also was considering forming a consortium to buy out Biomet. However, as detailed in an email from Milton Berlinski, managing director at Goldman, Warburg caught wind of Goldman's interest in Biomet and advised Goldman to "stand down and at the right time [Warburg] would find a way to include [Goldman]."[557]   Warburg, along with the other consortium members, would later decide to include Goldman Sachs in the Biomet deal, to ensure that Goldman would not "disrupt [the] process."[558]

---

[556]   KKR DAHL 000185017.

[557]   GSPE01386323-25 at 23.

[558]   *Id.*

495.    On July 6, 2006, the consortium submitted a preliminary indication of interest to purchase Biomet at a range of $38 – $39 per share, but the company's board responded negatively to the offer. The consortium responded that it could offer a higher price, but would require access to additional due diligence in order to do so. Thereafter, the board determined that it would not provide any other diligence materials to any other potential purchaser until after senior management presented its five-year strategic business plan to the board.

496.    On July 17, the consortium notified Biomet's board of its interest in acquiring the company for $40 per share subject to receiving further access to non-public information and successfully completing due diligence. The consortium continued to reiterate its interest in pursuing a buyout to the board through mid-September, at which time it confirmed its interest to offer greater than $40 per share upon completion of a successful diligence review.

497.    In September, Warburg invited Goldman Sachs PIA to join the consortium, as documented in Goldman Sachs' *quid pro quo* tracking "scorecard."[559]   Goldman Sachs PIA maintained its "scorecard" to track which firms it owed favors to and which firms owed favors to Goldman Sachs PIA. Goldman Sachs and KKR also tracked their relationship with each other and other private equity firms by both the number of deals they partnered on together, and the total dollars invested in each others' companies.[560] Based in large part on billion dollar-plus investments such as Biomet, KKR was Goldman Sachs's "*most active partner across all LBO firms,*" Blackstone

---

[559]    Burke Decl., Ex. G, GSPE00385219-20.

[560]    Burke Decl., Ex. PP, GSPE00389473-74.

was "ranked" second and TPG was ranked third.[561]  As Goldman Sachs PIA described it, *the large equity investments [such as Biomet] are the driver*" in the firms' *quid pro quo* exchanges.[562]

498.    Blackstone was also invited to join the consortium.  Jonathan Coslet, managing director at TPG, believed that Blackstone was a potential competitor for Biomet and by "tying up Blackstone" through an invitation to join the consortium, the competitive threat would be eliminated.[563]

499.    Despite their size and interest in Biomet, neither Goldman Sachs PIA, KKR, TPG, Warburg nor Blackstone chose to compete separately for the company, choosing instead to cooperate and share Biomet with each other.

500.    By September 21, Biomet management presented the five-year strategic business plan and the board authorized Biomet to enter into confidentiality agreements with the consortium.  The board was also informed at this time that Blackstone and Goldman Sachs PIA had joined the consortium.

501.    In early October, Smith & Nephew PLC, a medical device company, indicated that it would submit an offer of $42 per share for Biomet subject to the successful completion of a diligence review.

502.    On November 10, Morgan Stanley separately advised the various bidders of the procedures for submitting a final bid for the company and set a deadline of December 4, 2006 (later extended to December 11) for the submission of bids.

---

[561]    *Id.* at 73.

[562]    *Id.* at 74.

[563]    TPG-E-0001247940.

503.   On the eve of the deadline for the bid submission, around December 10, a disagreement arose between Goldman Sachs and Warburg concerning Goldman Sachs' role in the consortium.   Representatives of Goldman Sachs were "extremely upset" because they had been under the impression that Goldman Sachs had been invited to participate in the buyout as an equal partner with an equal equity and governance stake as the rest of the consortium members. Warburg's view was that Goldman Sachs had been asked by the consortium to commit $400 million in equity and was not an equal partner.  However, Warburg and the remaining consortium members believed that fighting with Goldman Sachs "at the eleventh hour would not be productive," and therefore agreed to "cut Goldman in for an equal slice because we valued our partnership..." [564]

504.   By December 11, the consortium, now comprised of KKR, TPG, Goldman Sachs PIA, Blackstone and Warburg, submitted a buyout proposal for $43 per share.  Two days later, Smith & Nephew submitted a proposal for $45 per share.

505.   On December 14, at the request of the board's Strategic Alternatives Committee, the consortium submitted an increased "best and final" offer of $44 per share.  That same day, Smith & Nephew submitted its "best and final" offer for $45 per share.

506.   Remarkably, while Smith & Nephew had submitted the higher bid, the board ultimately chose to approve the transaction with the consortium at $44 per share, rather than the higher strategic bid. Indeed, a J.P. Morgan banker involved in the deal was "very surprised" that the consortium had "won," given Smith & Nephew's higher bid.[565] The merger agreement was executed

---

[564]    BX-1423455.

[565]    TPG-E-0000595410.

the following day, December 18.  Warburg dropped out of the consortium a few days before the merger execution.

507.   Notably, Goldman Sachs was not only one of the private equity sponsors of the deal, it also had a lead financing role, for which it received additional fees.

508.   Just days after the signing of the merger agreement, two Goldman Sachs executives discussed their efforts to repay or "*serv[e]*" Apollo's founder Leon Black, who they referred to as the "*king*," by offering Black a piece of equity in a LBO.[566]  Goldman Sachs' head of Merchant Banking Rich Friedman reminded his colleague that Goldman Sachs had offered Apollo $1 billion in equity in the Kinder Morgan deal.[567]  However, because the two firms did not ultimately partner on the Kinder Morgan deal, Goldman Sachs never got "*credit*" for doing a deal with Apollo. Accordingly, Friedman and his colleague instead considered giving Apollo a piece of the Biomet deal.[568]  Goldman Sachs ultimately determined that it would be "more valuable" to conduct a deal together with Apollo, rather than give Apollo a piece of the Biomet transaction.[569]

509.   There was an immediate backlash to the deal from investors and analysts who felt that the takeover price offered by the consortium was far too low.  One influential investor wrote to shareholders just days after the agreement was announced, arguing that management's claim that the $44 per share price is "'*a 27% premium over Biomet's closing price on April 3, 2006*,'" was

---

[566]   Burke Decl., Ex. SS, GSPE00379824-25 at 24.

[567]   *Id*. at 25

[568]   *Id*. at 24.

[569]   *Id*. at 24.

misleading.[570] The investor argued that the "premium" was measured from over eight months prior to the merger announcement to more than ten months in the future – the proposed closing date of October 31, 2007.[571] Annualized, the "premium" was 16.1%, which was less than the shares' long-term performance.[572]

510.    The consortium received another blow when it was reported on May 30, 2007 that the influential proxy advisory firm Institutional Shareholder Services recommended that Biomet shareholders vote down the $10.9 billion takeover.[573]

511.    On June 7, 2007, the consortium partially succumbed to the criticism of the deal and was forced to increase its offer by 4.5% from $10.9 billion to $11.4 billion, representing a final value of $46 per share.

512.    A few days before the consortium's final buyout offer, Jonathan Coulter, co-founder of TPG, emailed senior representatives of Goldman Sachs, including Rich Friedman, Lloyd Blankfein and David Solomon, to express his disappointment over the uneven deal flow between the two firms.[574] Coulter indicated that TPG had "reached out strongly to [Goldman Sachs] as a partner," citing Biomet, Alltel and TXU as deals for which TPG had invited Goldman Sachs to participate in.[575] Noting that TPG had "received no reciprocal calls of equal quality from [Goldman

---

[570]    Eddy Elfenbein, *Open Letter To Biomet Shareholders: Vote No On The Buyout* (December 20, 2006).

[571]    *Id.*

[572]    *Id.*

[573]    Dealbook, *Proxy Firm Deals Blow to Biomet Buyout, Report Says* (May 30, 2007).

[574]    GSPE01386323-25.

[575]    GSPE01386323-25 at 24.

Sachs]," Coulter made it clear that he expected payback from Goldman Sachs for the "advantaged deal flow" TPG had provided.[576]

513.    Members of the Biomet consortium also cooperated and partnered on other deals. Goldman Sachs and Blackstone also partnered on the SunGard LBO and the Nalco transaction after Blackstone invited Goldman Sachs into the deal. Goldman Sachs offered Blackstone an opportunity to participate in the Kinder Morgan acquisition.[577]  Goldman Sachs withdrew from the Univision process in the hopes of earning goodwill from Blackstone.[578]

514.    In addition to Biomet, KKR and Goldman Sachs were partners on the SunGard and TXU LBOs. Goldman Sachs stood down for KKR on the HCA deal, refusing to offer a competing bid despite valuing the company above the price KKR was going to pay.[579] Goldman Sachs also stood down on the Univision deal in the hopes of earning goodwill from KKR.  Goldman Sachs offered KKR the opportunity to invest in Kinder Morgan.[580]

515.    The following chart details Defendants' cartel advisors and financiers for the Biomet transaction, date announced and price of the deal:

---

[576]    *Id.*

[577]    TPG-E-0000032291-94 at 92-93 (Goldman Sachs coordinates a meeting regarding the Kinder Morgan deal with TPG, KKR, Apollo and Blackstone).

[578]    GSPE00384225-26 at 25.

[579]    KKR DAHL 000051683-87 at 83; BX-0653720-65 at 23.

[580]    TPG-E-000032291-94 (Goldman Sachs-hosted meeting).

| BIOMET | |
|---|---|
| Deal amount | $ 11.4 billion ($46/share) |
| Date deal announced | December 18, 2006 |
| Purchasing private equity firms | Blackstone<br>Goldman Sachs PIA<br>KKR<br>TPG |
| Debt financers | Bank of America<br>Goldman Sachs<br>Bear Stearns<br>Lehman Brothers<br>Merrill Lynch<br>Pierce, Fenner & Smith<br>Wachovia |
| Company advisor(s) | Morgan Stanley |
| Other interested private equity firms | Warburg |

516.    In sum, only a single private equity consortium, along with a strategic bidder, submitted bids for Biomet.  Certain members of the consortium, including Goldman Sachs, TPG, KKR and Warburg, used the Biomet deal as leverage to collect or repay *quid pro quo* investments. Warburg inexplicably dropped out of the consortium just days before the announcement of the merger.  After the LBO was announced, there was a backlash from investors and analysts who thought the purchase price was too low, suggesting that the *quid pro quos* and other club rules were in effect and helped Defendants suppress competition and lower the price paid to shareholders.

**The TXU LBO**

517.    The $45 billion LBO of TXU Corp. ("TXU") spearheaded by KKR and TPG highlights the existence of *quid pro quo* arrangements and lack of competition that occurred during the Conspiratorial Era.  Despite the attractiveness of the target and its size, the company did not

consider competing offers from other private equity firms prior to the execution of the merger agreement, and no offers to purchase TXU in its entirety were submitted during the subsequent "go-shop" period.

518.    In early 2006, TXU management and its financial advisors initiated separate discussions with KKR and TPG concerning a possible buyout of TXU's electric distribution and power generation businesses.  By November 2006, KKR and TPG had combined their efforts to take all or part of TXU private.

519.    On January 18, 2007, KKR and TPG submitted a proposal to take the company private for $66 per share.  That same evening, exactly one month after KKR, TPG and Goldman Sachs (along with Blackstone) announced the Biomet transaction together, KKR discussed inviting Goldman Sachs into the deal.[581]  When Marc Lipschultz, KKR's lead managing director for the deal, advised Henry Kravis of this the next morning, Kravis told Lipschultz that Goldman Sachs "will be very happy" with the invitation and that it "is a good follow on to my meeting this week with Lloyd [Blankfein – Chairman and CEO of Goldman Sachs] and Gordon Dyal, head of global M&A."[582] KKR knew that once offered the opportunity to join the consortium, Goldman Sachs would not then compete against KKR and TPG because to do so would sour the firms' relationship.[583]

520.    Although Lipschultz was willing to give Goldman Sachs its share of deal fees in addition to an equity commitment, he was also considering giving Goldman a share of *all* the deal

---

[581]    KKR DAHL 001151785.

[582]    KKR DAHL 001151789.

[583]    May 16, 2012 Deposition of Richard A. Friedman ("May 16 Friedman Depo.") at 510:7-15 (regarding TXU, "[i]t would be a little antithetical to be sort of called to be offered an opportunity then turn around and say thanks very much for the opportunity but now we are going to go try buy the company and compete against you. So, no, it [competing] didn't occur to us to do that.").

fees (a higher percentage that amounted to 27% of the deal fees) "if that is what it takes."[584]
Lipschultz later explained that KKR was *"bending over backwards"* to satisfy Goldman Sachs's
thirst for a significant investment in the deal.[585]  KKR and TPG ultimately let Goldman Sachs PIA
invest $1.5 billion in the deal, even though KKR co-founder George Roberts admitted that KKR and
TPG could have done the deal without Goldman Sachs, and were simply giving Goldman an
investment opportunity.[586]

521.    After TXU's advisors requested that KKR and TPG increase their offer, the
consortium submitted a revised bid of $69 per share.  By February 20, the Strategic Transactions
Committee, established by TXU's board of directors to evaluate the KKR/TPG proposal, decided not
to open up a broader auction process prior to the execution of the merger agreement and instead
determined that it would seek a higher price from KKR and TPG.

522.    Blackstone and Carlyle then attempted to join the consortium by reaching out directly
to senior KKR, TPG and Goldman Sachs personnel, including TPG's co-founder David Bonderman,
KKR's Marc Lipschultz and Goldman's Art Peponis.[587]  Carlyle's co-founder David Rubenstein
went so far as to contact Bonderman while he was traveling outside of the country in efforts to join
the deal, and planned on seeing Bonderman in Germany the day after the deal's announcement.[588]
Despite Carlyle's efforts to join the consortium, Rubenstein eventually admitted that *"appearing to*

---

[584]    KKR DAHL 001140575-76 at 75.

[585]    *Id.*

[586]    GSPE01460243-46 at 243; Roberts Depo. at 180:22-181-7 and 180:2-4; ("Train is leaving. If not gs [Goldman Sachs] then we will move on."); Roberts Depo. Exhibit 1436 (KKR DAHL 001157382-85 at 82).

[587]    BX-1527596; TCG1056333-34; TCG1056572.

[588]    TCG1057634-35.

*invite in a potential competitor is not going to look good at this point.*"[589]  Similarly, Blackstone's

David Foley expressed doubt that co-founder Steve Schwarzman would "*jump a signed deal,*" in

accordance with club rules.[590]

523.    On February 25, TXU executed a merger agreement with the consortium for $69.25

per share, less than 5% more than the consortium's original offer.  With the competition eliminated

prior to the signing of the merger agreement, KKR and TPG were able to purchase the company for

only $.25 more than their previous offer.  The deal was announced the next day by KKR, TPG and

Goldman Sachs.  Notably, TXU's proxy statement does not mention Goldman Sachs at all prior to

the deal's announcement, despite Goldman Sachs' significant involvement in the deal for almost a

month prior to the announcement.

524.    During the "go-shop" period, notwithstanding the solicitation of interest from dozens

of potential purchasers and the execution of confidentiality agreements with ten entities, no investor

or consortium of private equity firms submitted an expression of interest to purchase the company

for anywhere near the KKR/TPG consortium's price.  Blackstone and Carlyle adhered to the rules of

the conspiracy and never ended up jumping the deal.  Carlyle admitted that to do so would be a

"reputational risk."[591]

525.    The TXU deal closed on September 7, 2007 for $45 billion, including $13 billion in

old TXU debt, and was considered the largest LBO in U.S. history at the time.  The TXU deal was

an important component of the KKR-Goldman Sachs relationship.[592]  As of May 2007, current

---

[589]    TCG1056652.

[590]    BX-1527596.

[591]    TCG1057604.

[592]    Roberts Depo. at 184:13:21; Roberts Depo. Exhibit 1437 (KKR DAHL 001238847-48 at 47).

Goldman Sachs PIA investments with KKR in the U.S. included Biomet, Dollar General, First Data, Harman International and TXU.[593] The firms also partnered on several other deals in Asia and Europe, and just days before TXU was announced, Rich Friedman invited Henry Kravis and George Roberts to join Goldman Sachs in the pursuit of the South African retailer Foschini as payback for KKR's invitation in the TXU deal.[594] Additionally, the most senior members of the firms, Lloyd Blankfein and Henry Kravis, met just prior to KKR inviting Goldman Sachs into the consortium and again just months after the deal's announcement.[595]

526.    The TXU transaction furthered other relationships as well. KKR and TPG partnered on Texas Genco and Biomet prior to TXU. TPG and Goldman Sachs partnered on Alltel and Biomet, and both TPG and Goldman Sachs stood down on the HCA deal at KKR's request.[596] The day after the TXU deal was announced, TPG's Jonathan Coslet wrote an email to TPG's "friends at KKR" thanking them for their collaboration on the deal.[597] KKR's John Saer responded by thanking Coslet for inviting KKR into the HD Supply consortium with TPG, Blackstone and LPG.[598] Saer recognized that the HD Supply invitation "was *an accommodation*" and stated that he was "*sure there will be opportunities to reciprocate*."[599]

---

[593]    GSPE01460243-46 at 43-44.

[594]    Roberts Depo. Exhibit 1439 (GSPE01448415).

[595]    Burk Decl., Ex. PP (GSPE00389473-74 at 73); GSPE01460243-46 at 43.

[596]    TCG0216411; TPG-E-0000096555; KKR DAHL 000051683.

[597]    TPG-E-0000781556.

[598]    *Id.*

[599]    *Id.*

527.    The TXU LBO was incredibly lucrative for the investment banks, as J.P. Morgan, Goldman Sachs, Citigroup, Credit Suisse, Morgan Stanley and Lehman Brothers contributed both equity and debt financing, while raking in $1.1 billion in financing fees alone.  TPG maintained banking fee and private equity partner tracking scorecards for its deals, and documented a possible financing fee "*award*" to J.P. Morgan in the TXU deal.[600]   Goldman Sachs, who together with Lehman Brothers committed $1.9 billion in equity financing in the deal, played all sides of the table, acting as a large private equity investor, an investment banker, a lender and also taking a large piece of TXU's huge commodity hedging business.  According to participants in the deal, it was "hard to ascertain whose interests [Goldman] was serving."[601]

528.    The following chart details the purchasers, advisors and financiers for the TXU transaction, date announced and price of the deal:

---

[600]    *See* Burke Decl., Ex. H, TPG-E-0000021500 (referencing Project "*Grover*," *i.e.*, TXU).

[601]    Jenny Anderson and Julie Creswell, *For Buyout Kingpins, the TXU Utility Deal Gets Tricky* (February 27, 2010); *see also* May 16 Friedman Depo. at 507:18-508:3 ("In TXU the firm, we were one of the lead sponsors so we invested in the equity with KKR and TPG and others. The firm also have a role in hedging against commodities and the firm was involved with the debt financing for the transaction. And I think overall financial advisory to the buying group.").

| TXU | |
|---|---|
| Deal amount | $45 billion ($69.25/share) |
| Date deal announced | February 26, 2007 |
| Purchasing private equity firms | KKR<br>TPG<br>Goldman Sachs PIA<br>J.P. Morgan<br>Citigroup<br>Morgan Stanley<br>Lehman Brothers |
| Debt financers | Citigroup<br>Credit Suisse<br>Goldman Sachs<br>J.P. Morgan<br>Lehman Brothers<br>Morgan Stanley |
| Company advisor(s) | Credit Suisse<br>Lazard |

**Community Health Systems**

529.   Carlyle's interest in pursuing a buyout of Community Health Systems ("CHS") developed in large part from its inability to take part in the buyout of HCA, another healthcare company, due to KKR's directive to "*stand down*" on HCA.  By late July 2006, when Carlyle realized that HCA was a "*longshot*," Carlyle co-founder David Rubenstein suggested that "*Community Health would be a much better deal – particularly if [Carlyle] can be the lead.*"[602]

---

[602]   Burke Decl., Ex. QQ, TCG0208676. Rubenstein thought that "*being the lead or sole firm in a deal helps [Carlyle] more than tagging along a bit in someone else's announced deal.*" *Id.*  He clarified that it "*is not harmful – just not quite as good as investors try[ing] to assess whetether [sic] [Carlyle is] in the driver's seat and providing opportunities their other gp's are not or cannot.*" *Id.*

530.    Carlyle had ties to CHS. In 1996, Sandra Horbach (Carlyle managing director) and Tom Lister (Permira managing director) had participated in an earlier LBO of CHS when they worked together at private equity firm Forstmann Little.[603] In early August 2006, Horbach contacted CHS's Chairman of the Board, President and CEO, Wayne Smith, and raised the possibility of going forward with a buyout of the company.

531.    Smith reportedly told Horbach that he was interested in going forward and considering a deal with Carlyle and that CHS's board would be supportive. Smith also indicated that CHS had been approached by many buyers but he had turned them away.

532.    Smith wanted to know whether Carlyle was "*really interested*" before a September 20, 2006 board meeting because if they were, he would try to get the board's approval to proceed with Carlyle as a sponsor. When Horbach relayed this information to Carlyle's U.S. Buyout Co-heads Alan Holt and Dan Akerson, Holt responded that he believed they should move forward but wanted to "*[see if] the numbers work*" first.[604]

533.    Horbach suggested partnering with Permira for a number of reasons: (1) Permira's Tom Lister was her former partner at Forstmann who worked with her on the first CHS LBO; (2) Lister was very interested in doing the deal with Carlyle, knew the company very well and would be a great partner; (3) CHS's CEO Wayne Smith preferred Lister and would be "very happy" with that outcome; (4) *it "would keep the only other knowledgeable party on [the] company out of*

---

[603]    Burke Decl., Ex. RR, TCG0881322. On June 10, 1996, Forstmann Little and CHS entered into a definitive agreement to acquire the outstanding shares of CHS for $52/share in cash. The total value of the transaction was $1.37 billion, including the assumption and refinancing of existing debt. Milt Freudenheim, *Forstmann to Acquire Community Health for $1.1 Billion*, N.Y. Times, June 11, 1996.

[604]    Burke Decl., Ex. RR, TCG0881322.

*competition*"; and (5) Horbach suspected Permira would try to compete with Carlyle for CHS if Carlyle didn't partner with them.[605]

534.    Allan Holt, co-head of U.S. Buyouts for Carlyle, had other partners in mind for a possible CHS deal.  Upon hearing of Horbach's conversations with Smith and the suggested pairing with Permira, Holt asked whether Carlyle was "*committed to Permira as [he] had hoped we could invite in GS PIA as payback on Kinder and for future consideration.*"[606]  Horbach responded, "*didn't think [Carlyle] owed them [GS PIA] payback on KM because [she] thought that was payback for EDMC.*"[607]  Horbach's response reveals that she believed that Goldman's invitation to Carlyle in May 2006 to join the Kinder Morgan consortium was a *quid pro quo* for Carlyle's assistance to Goldman in the EDMC deal.[608]  Ultimately, CHS chose not to sell itself.

**The Alltel LBO**

535.    On May 21, 2007, Alltel announced it was being purchased by TPG and Goldman Sachs's PIA for $27.5 billion or $71.50 a share.

536.    TPG had targeted Alltel and companies like it as part of "Project Jumbo."  Project Jumbo was an effort by TPG to partner with co-conspirators even earlier in the LBO process on

---

[605]    *Id.* As an example of why Horbach believed Permira would try to compete for CHS, she said that Permira was "*very close to leading a competitive European consortium on HCA so they have a big interest in the space [i.e., healthcare].*"  TCG0450308-09 at 08.

[606]    TCG0450308-09 at 08. Holt testified that he considered it a professional courtesy" to offer CHS to Goldman Sachs as payback for Kinder Morgan and for future consideration.  Holt Depo. at 197:14-20.

[607]    TCG0450308-09 at 08.

[608]    Carlyle, however, did not ultimately purchase EDMC. Education Management Corporation's (NASDAQ: EDMC) board agreed to a $3.4 billion, or $43/share, buyout by Providence and Goldman in March 2006.  Carlyle believed Kinder was payback for EDMC because Carlyle bowed out of the bidding process in EDMC in favor of Goldman.  TCG0450308-09.

certain large deals. Rather than seeking to compete for these large companies, TPG wanted to "ensure that [they were] working with [Defendants] KKR, Blackstone, and Bain."

537.     Early in 2007, Alltel hired J.P. Morgan and Merrill Lynch to advise the company on a potential sale to a strategic buyer (AT&T). In the event AT&T did not purchase Alltel, J.P. Morgan was to advise Alltel on a potential recapitalization or a public-to-private LBO to a private equity firm or consortium.[609]

538.     J.P. Morgan and Alltel's other advisors asked for indications of interest from selected private equity firms by April 17, 2007.[610] There were four separate, preliminarily-interested Defendant firms interested in acquiring Alltel: TPG[611], who ultimately partnered with Goldman Sachs's PIA;[612] KKR;[613] who ultimately partnered with Carlyle;[614] and Blackstone[615] and Providence,[616] both who expressed separate preliminary indications of interest but joined together to pursue the transaction.[617] The firms submitted these preliminary indications of interest, ranging from

---

[609]   JPM_00358056 email to J.P. Morgan's Jamie Dimon and Doug Braunstein.

[610]   TPG00061087.

[611]   TPG-E-0000501830. TPG submitted a range of $69-$72 per share

[612]   GSCP-VI-075760 Goldman contacted by TPG through the Financial Sponsors Group head Milton Berlinski. Goldman sought a release by a non-private equity client in order to work with TPG.

[613]   KKR DAHL 000794206-09. KKR submitted a range of $65-67.50 per share

[614]   TCG1040511.

[615]   Blackstone-Alltel 0864.

[616]   PEP-0222276.  Providence submitted a range of $70-74 per share.

[617]   BX-1510780.

$65-$74 per share, on April 17, 2007. Bain Capital attempted to join the Alltel process but was rebuffed.[618]

539.    On May 8, Alltel sent letters of invitation and instructions for submitting final bids for the acquisition. The deadline for final bid submission was June 6, but the letter reserved the ability to accelerate or preempt that process without notice to the other bidders.

540.    On May 17, TPG's Jim Coulter had a phone conversation with Alltel's CEO Scott Ford, where Ford indicated interest in an early bid, preempting the process. The next day, TPG and Goldman Sachs expressed interest to Alltel's management in proceeding on an accelerated basis.[619]

541.    In exchange for moving quickly, TPG/PIA wanted certain things from Alltel: market-specific due diligence information, accelerate discussions, and no go-shop period.

542.    On May 19, 2007, TPG and Goldman communicated an offer of $71 per share. Alltel's management requested a higher price in response to that offer. TPG and Goldman then submitted a best and final offer of $71.50 per share, which was accepted by management on May 21, 2007. This offer was lower than the range initially provided by at least one other interested private equity firm.[620]

543.    News reports indicated that one competing group had notified Alltel that its bid would likely be in the $70 to $74 per share range and that another had stated its intentions to bid more than $71 per share.[621]

---

[618]    BC-E01006850-51.  Ian Loring of Bain expressing surprise at being excluded from the process by the advisory firms; see also JPM_00381563.

[619]    GSCP-VI-098546.

[620]    See PEP-0218214-16 at 14 ("If I were a shareholder and knew the facts I'd be furious"); PEP-0247326-27 at 26 (noting that the price was in Providence's "range").

[621]    Andrew Ross Sorkin, *Phone Company Deal Irks Would-Be Bidders* (May 22, 2007).

544.    Nevertheless, when Alltel canvassed bidders prior to accepting the offer by the Goldman/TPG consortium, it concluded that it would not get a higher bid than the $71.50 offered by the consortium, and no competing bid emerged.[622] Neither KKR/Carlyle nor Blackstone/ Providence bid against TPG and Goldman Sachs.

545.    Despite the other indications from other interested Defendants, no competing bid ever emerged. No one submitted an offer topping the signed deal, in compliance with the Rules.[623] Although there were still a few weeks before the deadline to submit bids to purchase the company, no other interested firms actually submitted a higher offer.[624] Blackstone's Sameer Narang emailed Michael Chae regarding "V" and Alltel, saying, *"why wouldn't V[...] 'join' the TPG/GS group?[...it] would not be negatively perceived for coming in late and topping but instead could play the role of friendly partner of the winners (TPG and GS)."* Mr. Chae responds, *"These aren't great topics for email."*[625]

546.    In addition to Blackstone, both Providence and Bain made overtures to seek inclusion in the winning group.[626]

547.    TPG and Goldman were concerned about fallout with other firms for cutting them out of the process early and pursuing the deal alone. Milton Berlinski of Goldman Sachs emailed

---

[622]    *Id.*

[623]    "Also, it would be unprecedented for one private-equity firm to trump another on a done deal." BX-1659349-50 at 50.

[625]    BX-1659990.

[626]    PEP-0270009-10 at 09; PEP-0221987; BC-E01003697; GSPE01400424

Goldman's CEO Lloyd Blankfein regarding the status of the transaction: *"Alltel deal signed at*

*$71.50 [with] no go shop. Expect fireworks from those who lost."*[627]

548.    J.P. Morgan, as advisors to the company, received threats for its part in running a

process that the losing private equity firms didn't like. Carlyle's Allan Holt wrote to J.P. Morgan

executives John Coyle and John Gammage, stating *"The whole Alltel process has been damaging to*

*the Carlyle relationship [with JP Morgan]. Fix it now or your standing with Carlyle will drop from 1*

*or 2 to nowhere worldwide."*[628]

549.    Thomas H. Lee reached out to J.P. Morgan noting that they had stood down initially

with the understanding they would be alerted before anything happened in Alltel.[629]

550.    J.P. Morgan may have upset Carlyle and Thomas H. Lee, but TPG was "very

appreciative" of its help on Alltel and J.P. Morgan Head of Americas Investment Banking managing

director Doug Braunstein informed colleagues at J.P. Morgan that he had spoken to Jim Coulter of

TPG and that a "spot is reserved" for J.P. Morgan.[630]

551.    Following their victory, TPG and Goldman Sachs found themselves at odds over the

distribution of certain fees from deal syndication. What followed was a series of discussions about

"deal flow" and whether Goldman Sachs was taking advantage of TPG without properly

reciprocating. This discussion leaves no doubt that both TPG and Goldman viewed their relationship

as one that transcended each individual deal, and that behavior on one deal had repercussions

---

[627]    GSPE01387666. Blackstone and Providence, for example, found the Alltel bid acceptance and process outrageous. BX-1659349-50 at 49.

[628]    JPM-00354024.

[629]    JPM-00047723.

[630]    JPM-00394459.

(positive and negative) in other deals. Goldman relationship tracking profiles noted that TPG believes that the "deal flow" between Goldman and TPG has been "one-sided."[631] TPG's Jim Coulter emailed Richard Friedman of Goldman Sachs PIA, stating: "Over the past half year we have reached out strongly to GS as a partner. I believe you would not be participating as a full partner in Alltel, TXU, Biomet or PRG had not we, at TPG, opened our deal flow to you…During this period we received no reciprocal calls of equal quality from GS."[632]

552.    That TPG and Goldman Sachs viewed their relationship as one that transcended any one particular deal and covered all parts of Goldman Sachs is evident. Rich Friedman noted in an email that "these guys are treating us holistically now.  Generally is good for us, but if they feel cheated they will throw the book at us."[633]

553.    The six private equity firms ostensibly competing for Alltel were all Defendants which had teamed up, in various combinations in prior deals, including Freescale (Blackstone, TPG and Carlyle), Kinder Morgan (Goldman Sachs and Carlyle), PanAmSat (Blackstone, Carlyle, Providence and KKR) and SunGard (Blackstone, KKR, TPG, Providence and Goldman Sachs). These firms were well aware of "club rules," including the rule that firms did not "jump" one another's bids or top an accepted bid.

554.    The private equity firms forming the "winning" consortium – Goldman and TPG – had done favors for the firms that showed interest, but ultimately decided not to bid – Blackstone, Carlyle, Providence and KKR.  For example, Goldman had offered Blackstone, Carlyle and KKR the

---

[631]    GSPE01388182-84 at 82.

[632]    GSPE01386323-25 at 24.

[633]    GSPE01431383-85 at 83.

opportunity to participate in the Kinder Morgan deal. TPG had promised KKR it would not make a competing bid for HCA.

555.   On June 5, 2007, TPG and Goldman Sachs announced the sale of Alltel to telecommunications giant Verizon Wireless for $28.1 billion. Goldman Sachs and TPG turned a $1.3 billion profit on the sale, announced less than a year after the private equity firms purchased the company from its public shareholders.

556.   On June 8, 2007, TPG and Goldman Sachs reached out to Silver Lake and Bain and provided them with "preferential information flow and management access" to evaluate large equity investments in the Alltel deal. This offer by TPG and Goldman Sachs to two potential competitors, Bain and Silver Lake, is consistent with rules regarding reciprocity and rewarding for not bidding.[634]

557.   Goldman Sachs and TPG worked together on multiple deals, beginning with SunGard. Before SunGard, TPG was a purchaser of Univision, where Goldman Sachs stood down and did not bid in the hopes of finding a partner for the Kinder Morgan deal.[635] Goldman offered TPG a role in Kinder Morgan, though ultimately TPG did not participate in that deal. Both firms stood down in the HCA deal at KKR's request, and then partnered together in Biomet, TXU, and finally Alltel. Despite being purported competitors, TPG and Goldman Sachs never meaningfully competed against each other, yet cooperated on four deals and aided or offered to work with each other on at least one more deal.

558.   The following chart details Defendants' cartel advisors and financiers for the Alltel transaction, date announced and price of the deal:

---

[634]   SLTM-DAHL-E-0437241-46.

[635]   GSPE00384225-26.

| ALLTEL | |
|---|---|
| Deal amount | $ 27.5 billion ($71.50/share) |
| Date deal announced | May 20, 2007 |
| Purchasing private equity firms | Goldman Sachs PIA<br>TPG |
| Debt financers | Bank of America<br>Goldman Sachs<br>Bear Stearns<br>Lehman Brothers<br>Merrill Lynch<br>Pierce, Fenner & Smith<br>Wachovia |
| Company advisor(s) | J.P. Morgan<br>Merrill Lynch<br>Stephens, Inc. |
| Other interested private equity firms | Blackstone<br>Carlyle<br>Providence<br>KKR<br>Bain Capital<br>Silver Lake |

## ECONOMIC EVIDENCE OF THE CONSPIRACY AND ITS ANTICOMPETITIVE EFFECTS

559.    Economic analysis of the relevant market shows that Defendants conspired to divide the LBO market and rig bids during the Conspiratorial Era. The economic evidence demonstrates that beginning in 2003, when Defendants started working together instead of competing, shareholders received far lower prices in LBOs than they would have in a competitive market.

560.    Although deals grew larger and private equity firms exploded from 2003 through 2006, the premiums paid in club LBOs were significantly lower than premiums paid by publicly-traded companies (also "strategic buyers") and by "sole sponsor" LBOs (where a private equity firm

purchases the target company without partners).[636]   The lower prices paid in club LBOs did not

occur by chance (or, for any other systematic reason), but were instead caused by Defendants'

coordinated efforts to allocate deals in the market.  The following graph illustrates how much lower

club LBO premiums are compared to premiums in LBOs by strategic buyers and sole sponsors.



**THE OFFICER STUDY**

561.   Recent economic scholarship examining the pricing and characteristics of club deal

LBOs provides further evidence of the conspiracy.[637]   The paper defines a "club deal" LBO as a

---

[636]   *See* Micah S. Officer, Oguzhan Ozbas & Berk A. Sensoy, *Club Deals in Leveraged Buyouts*, J. of Fin. Econ. (2010) (the "Officer Study") at 215, 221-23.

[637]   Officer Study.

completed LBO that has a deal value of greater than $100 million in which at least one of the participating private equity partnerships is a prominent private equity firm.  The authors conclude that in club deal LBOs, private equity purchasers paid shareholders significantly lower premiums compared to sole sponsor LBOs (where only one private equity firm is involved in the deal) and acquisitions by publicly traded buyers (also known as "strategic" acquisitions).

562.    The Officer Study examines two definitions of "deal premium," the first of which is an absolute measure of the premium and the second is a relative measure of premium.

563.    The Compound Return to the target's shares is the change in the target's stock price over the period from the day the deal is announced (capturing the effect of deal announcement on the target's stock price) through the delisting date of the target's shares (or six months after announcement, whichever is earlier).  The Compound Return Net of Market is the Compound Return less the compound return to a broad-based market index over the same period, which removes the effect of general market returns on the target's stock price.  These are absolute measures of deal premiums, and both are commonly employed measures in the academic literature.

564.    The second definition of premium is the percentage difference between the deal multiple (equity deal value plus total debt minus (excess) cash scaled by either sales or EBITDA[638]) for the LBO and the average multiple for comparable (within the same three-year window and in the same industry) non-LBO deals.  The percentage difference in deal multiples between LBO and comparable non-LBO deals is a conservative estimate of the percentage difference in premiums between these two types of deals.  Thus, this second measure of premiums is a relative one,

---

[638]    EBITDA is a measure of the cash flow available to service debt and pay dividends.  EBITDA is, along with price to earning ratio and price to earnings growth ratio, the most common metric by which target companies are valued.

providing a metric for comparing premiums in LBO deals to premiums in non-LBO deals announced at about the same time for targets in the same industry.

565.     Applying these measures, the authors found that club deal LBOs have statistically significantly lower premiums (both in absolute and relative terms) compared to both sole sponsored LBOs and strategic acquisitions by publicly traded buyers.  For example, under the Compound Return Net of Market absolute measure, the average increase in the target's stock price is 8.1% for club deal LBOs compared to 16.1% for sole sponsored LBOs and 22% for acquisitions by strategic acquirers.  Thus, the premiums in club LBOs are approximately 50% of those in sole sponsored LBOs (8.1% compared to 16.1%) and approximately 37% of those in acquisitions by publicly traded acquirers (8.1% compared to 22%).  Given those figures, it is extremely unlikely that the much lower premiums for club LBOs are mere coincidence.

566.     The relative measure of premiums in the Officer Study also suggests that premiums are statistically significantly lower for club LBOs than comparable (in time and industry) sole sponsored LBOs and strategic acquisitions.  Specifically, the differences in deal multiples between club and comparable sole sponsored LBOs implies premium differences that average approximately 12% to 20% (depending on the multiple used), magnitudes that are comparable to the evidence using absolute premiums.

567.     The Department of Justice's investigation into bidding practices of private equity firms started in the last quarter of 2006.  All of the differences in premiums between club and sole sponsor LBO deals noted above are particularly acute for deals commenced prior to the end of 2006: not surprisingly, before the Department of Justice's investigation.  Furthermore, the Officer Study reports that, throughout the period examined in their paper, there were significantly fewer competing bids in successful club deals than successful sole sponsored private equity acquisitions.

## ALTERNATIVE ECONOMIC RATIONALES ARE IMPLAUSIBLE

568.    The economic evidence in the Officer Study does not support benign rationales for the prevalence of club deals or the effect that club deals appear to have on deal premiums paid to target shareholders.  Neither the desire to diversify in sufficiently large or risky deals, nor an interest in facilitating the acquisition of debt financing on favorable terms explains Defendants' conduct in club LBOs.

569.    While club deals are larger on average than sole sponsored LBOs, only 23% of club deal LBOs are larger than the largest sole sponsored LBO conducted by any of the club members around the same period of time.  In other words, the vast majority of club deals are of a size that at least one of the participating private equity firms has recently completed (or is likely contemplating) on its own.  Moreover, club deal targets do not appear systematically riskier or harder to value than targets of sole sponsored LBOs, as measured by historical stock return volatility, historical cash flow volatility, number of business segments (a measure of complexity), or analyst forecast errors (a measure of asymmetric information).   These findings suggest that capital constraints or diversification concerns are unlikely to be first-order motivations for club deals.

570.    Further, while club deals have somewhat better financing terms than sole sponsored LBOs, the differences are not statistically significant.  And, in any event, this factor should actually *increase*, not decrease, premiums paid to target shareholders.  Finally, club deals also involve significantly more lenders than sole sponsor LBOs, suggesting that private equity firms lock up investment banks (with debt financing commitments) to prevent other private equity firms from obtaining financing for competing bids.  This further exacerbates the anticompetitive effects of club LBOs.

571.    Overall, the Officer Study finds that the results of their economic analysis are most consistent with the conclusion that club deal LBOs have anticompetitive effects and are, therefore,

detrimental to target company shareholders. Specifically, by both the absolute and relative measures described above, deal premiums are significantly lower for club deal LBOs relative to both sole sponsored LBOs and acquisitions by publicly traded acquirers, and these differences do not appear to be explained by benign rationales for club deals (such as those put forth by the Defendants).

## CLUB DEALS REFERENCED IN THIS COMPLAINT

572.    An analysis of the Compound Return[639] and Compound Return Net of Market measures,[640] which are the absolute measures of deal premiums in the Officer Study and described above, demonstrates that buyout premiums for the club LBOs referenced in this Complaint are significantly lower than premiums in sole sponsor LBOs and corporate/strategic acquisitions. The Compound Returns and Compound Returns Net of Market for the LBOs referenced in this complaint are:

---

[639]    The "Compound Return" measure is the compound return to the target's shares over the period from the day the deal is announced until the delisting of the target's shares (or six months after announcement, whichever is earlier). This captures the change in the target's share price from just before the deal is announced (*i.e.*, the pre-deal stock price) until it is delisted from the exchange (or six months after announcement if delisting occurs more than six months later).

[640]    The "Compound Return Net of Market" measure is the compound return less the compound return to a broad-based market index over the same period, which removes the effect of general market returns (presumably unrelated to the deal in question) on the stock price return of the acquired company.

| LBO | Announcement date | Compound return | Compound return net of market |
|---|---|---|---|
| PanAmSat Corp | 20-Apr-2004 | -5.4% | -1.6% |
| Texas Genco Holdings Inc | 21-Jul-2004 | 2.2% | -8.2% |
| AMC Entertainment Inc | 22-Jul-2004 | 13.6% | 0.6% |
| Toys "R" Us Inc | 17-Mar-2005 | 8% | 2.9% |
| SunGard Data Systems Inc | 28-Mar-2005 | 14.1% | 6.3% |
| Neiman Marcus Group Inc | 2-May-2005 | 3% | -3.5% |
| Education Management Corp | 6-Mar-2006 | 16.2% | 15.7% |
| Aramark Corp | 1-May-2006 | 19.3% | 14.5% |
| Kinder Morgan Inc | 29-May-2006 | 26.4% | 15.6% |
| Univision Communications Inc | 27-Jun-2006 | 10.4% | -3.5% |
| Michaels Stores Inc | 30-Jun-2006 | 16.4% | 8.1% |
| HCA Inc | 24-Jul-2006 | 6.8% | -7.3% |
| Freescale Semiconductor Inc | 15-Sep-2006 | 6.4% | -0.9% |
| Harrah's Entertainment Inc. | 2-Oct-2006 | 28.9% | 18.2% |
| Clear Channel Communications Inc. | 16-Nov-2006 | 12.9% | 1.9% |
| Sabre Holdings Corp | 12-Dec-2006 | 8.1% | 6.1% |
| Biomet Inc | 18-Dec-2006 | 8.4% | -0.5% |
| TXU Corp | 25-Feb-2007 | 16.3% | 15.3% |
| Alltel Corp | 20-May-2007 | 9.3% | 11.3% |
| **Average** | | **11.6%** | **4.78%** |
| **Averages from the Officer Study** | | | |
| **Club LBOs** | | 14.2% | 8.1% |
| **Sole sponsored LBOs** | | 21.9% | 16.1% |
| **Publicly traded ("strategic") acquirers** | | 26.6% | 22% |

573.    Under the Compound Return Net of Market absolute measure of premiums, the average increase in the target's stock price between the announcement date and the date the target is delisted from the exchange (or six months later) net of market returns for the LBOs referenced in this Complaint is 4.78%, lower than the average for all club LBOs studied in the Officer Study. In the Officer Study, the average compound return net of market is 8.1% for club deals compared to 16.1% for sole sponsored LBOs and 22% for acquisitions by strategic buyers. Under the compound return absolute measure of premiums, the average increase in the target's stock price between the announcement date and the date the target is delisted from the exchange (or six months later) for the

- 201 -

LBOs referenced in this complaint is 11.6%, slightly lower than the average for all club LBOs studied in the Officer Study. In the Officer Study, the average compound return is 14.2% for club deals compared to 21.9% for sole sponsored LBOs and 26.6% for acquisitions by strategic buyers.

574.    Based on the foregoing data, all of the LBOs referenced in this Complaint had Compound Returns Net of Market below (and, in most instances, significantly below) the average for acquisitions by corporate/strategic bidders and all but one (Harrah's) had Compound Returns below the average for acquisitions by corporate/strategic bidders. Also, all but two (Harrah's and Kinder Morgan) had Compound Returns below (and, in most instances, significantly below) the average for acquisitions through sole sponsored LBOs.

575.    The following chart shows a comparison between premiums paid and the price-to-earnings returns[641] on the nine transactions and each target company's industry average premium and price-to-earnings during the year of each transaction.

**Transaction Premiums and P/E Offered**

| PanAmSat | 20-Apr-04 | Industry Average 2004 "Communications and Broadcasting" |
|---|---|---|
| Premium Offered | < 0.0% | 52.10% |
| P/E Offered | 34 | 23.5 |
| **AMC Entertainment** | 22-Jul-04 | 2004 "Leisure and Entertainment" |
| Premium Offered | 35.90% | 24.10% |
| P/E Offered | NEG | 27.3 |
| **SunGard** | 28-Mar-05 | 2005 "Computer Software, Supplies & Services" |
| Premium Offered | 44.30% | 34.50% |
| P/E Offered | 22.9 | 33.8 |

---

[641]    Price-to-earnings is a measure of relative valuation calculated as a function of the company's current share price to its per-share earnings measured over the last 12 months. Price-to-earnings is calculated as: (market value per share)/(earnings per share). For example, if a company is currently trading at $40 a share and earnings over the last 12 months were $2 per share, the P/E ratio for the stock would be $20 ($40/$2).

**Transaction Premiums and P/E Offered**

| Neiman Marcus | | 2005 |
|---|---|---|
| | 2-May-05 | "Retail" |
| Premium Offered | 3.50% | 27.00% |
| P/E Offered | 19.9 | 23.4 |

| Michaels Stores | | 2006 |
|---|---|---|
| | 30-Jun-06 | "Retail" |
| Premium Offered | 16.40% | 32.70% |
| P/E Offered | 26.5 | 26.7 |

| Aramark | | 2006 |
|---|---|---|
| | 12-May-06 | "Leisure & Entertainment" |
| Premium Offered | 21.10% | 20.10% |
| P/E Offered | 19.3 | 27.7 |

| Kinder Morgan | | 2006 |
|---|---|---|
| | 30-May-06 | "Oil & Gas" |
| Premium Offered | 30.10% | 48.20% |
| P/E Offered | 23.7 | 31.4 |

| HCA | | 2006 |
|---|---|---|
| | 24-Jul-06 | "Health Services" |
| Premium Offered | 15.80% | 40.10% |
| P/E Offered | 16.5 | 22.9 |

| Freescale | | 2006 |
|---|---|---|
| | 15-Sep-06 | "Electronic" |
| Premium Offered | 30.10% | 20.80% |
| P/E Offered | 20.4 | 30.2 |

| Toys "R" Us | | 2005 |
|---|---|---|
| | 17-Mar-05 | "Wholesale and Distribution" |
| Premium Offered | 13% | 48.70% |
| P/E Offered | 23.5 | 23.6 |

| Texas Genco | | 2005 |
|---|---|---|
| | 21-Jul-05 | "Electric, Gas, Water and Sanitary Services" |
| Premium Offered | 2.9% | 32.50% |
| P/E Offered | 15.0 | 22.1 |

| Education Management | | 2006 |
|---|---|---|
| | 3-Mar-06 | "Miscellaneous Services" |
| Premium Offered | 13% | 31.90% |
| P/E Offered | 28.1 | 26 |

| Univision Communications | | 2006 |
|---|---|---|
| | 27-Jun-06 | "Broadcasting" |
| Premium Offered | 2.40% | 18.30% |

| Transaction Premiums and P/E Offered | | |
| --- | --- | --- |
| P/E Offered | 39.5 | 25.1 |
| **Harrah's Entertainment, Inc.** | | **2006** |
| | 2-Oct-06 | "Leisure and Entertainment" |
| Premium Offered | 33.30% | 20.10% |
| P/E Offered | 21.8 | 27.7 |
| **Clear Channel Communications** | | **2006** |
| | 16-Nov-06 | "Broadcasting" |
| Premium Offered | 8.50% | 18.30% |
| P/E Offered | 30.8 | 25.1 |
| **Sabre Holdings** | | **2006** |
| | 12-Dec-06 | "Computer Software, Supplies and Services" |
| Premium Offered | 16.90% | 30.90% |
| P/E Offered | 31.6 | 37 |
| **Biomet** | | **2006** |
| | 18-Dec-06 | "Drugs, Medical Supplies and Equipment" |
| Premium Offered | 5.90% | 51.60% |
| P/E Offered | 26.4 | 39.3 |
| **Laureate Education Inc.** | | **2007** |
| | 28-Jan-07 | "Miscellaneous Services" |
| Premium Offered | 16.90% | 28.90% |
| P/E Offered | 32.6 | 32.9 |
| **TXU** | | **2007** |
| | 25-Feb-07 | "Electric, Gas Water and Sanitary Services" |
| Premium Offered | 22.20% | 26.90% |
| P/E Offered | 12.9 | 30.7 |
| **Alltel Corp** | | **2007** |
| | 20-May-07 | "Communications" |
| Premium Offered | 9.30% | 35.90% |
| P/E Offered | 34.8 | 36.2 |

576.  Defendants' prior history of competition also supports the existence of the overarching market allocation conspiracy.  The relevant time period coincides with the rise in club bidding by Defendants.  Prior to 2003, Defendants rarely engaged in club deals.  Throughout the 1980s and 1990s, and up until 2003, Defendants competed against each other and strategic buyers

for large LBOs. From 1984 to 2003, there were a total of 28 club deal LBOs. From 2004 to 2007, there were 42 club deal LBOs.

577.   Consistent with the increase in the proportion of club deals as noted above, beginning in late 2003 (when competition appears to have been most adversely affected by collusion amongst private equity firms), there was a dramatic decrease in prices paid to shareholders in LBOs. As private equity firms began to complete a greater percentage of LBOs, the premiums paid in acquisitions dropped from 41.5% in 2003 to 17.2% in 2004, meaning relative premiums dropped almost 170%.



578.   As evidenced by the 27 deals addressed herein and as part of their collusive conduct in each of these deals, Defendants agreed that once a private equity firm or group of firms signed a definitive merger agreement with a public company, other members of Defendants' conspiracy would not submit superior competing bids or take other action that might make it more difficult for the bidding group to acquire the target at the lowest possible price. In fact, as set forth above, certain

"sham" competing bids were submitted to promote the impression Defendants were actually competing. The data illustrates that these rigged auctions resulted in a reduced price per share.

## SETTLEMENT AGREEMENTS AND PURPORTED RELEASES

579.    In a number of the club LBOs identified herein, settlements were reached in unrelated, earlier-filed state court breach of fiduciary duty actions, in which plaintiffs primarily alleged that the directors and officers of the target companies breached their fiduciary duties to the company and its shareholders by agreeing to have the company engage in a going-private transaction. The plaintiffs in those actions did not allege antitrust claims nor did they explicitly release any antitrust claims.

580.    The cases were resolved through settlement and each settlement contained releases. The releases were drafted in vague fashion, but antitrust claims and claims sounding in antitrust were absent from the release language. Release of the antitrust claims were not explicitly bargained for by the parties to those settlements nor did any of the Defendants pay any consideration for release of antitrust claims in any of the settlements.

581.    Each release was by its own terms limited to the parameters of a swift transaction. The settlements purported to release the directors, officers and the private equity firms involved in the specific deals from all claims that were or could have been brought.[642]   The releases do not, however, run in favor of private equity firms, investment banks and their co-conspirators who did not take part in the specific deals.

---

[642]    In one case, where the plaintiffs alleged breach of fiduciary duty during the Aramark LBO, the company and its board of directors were named as defendants. In the subsequent settlement, not only did Aramark and its board of directors receive releases, but non-defendants GS Capital Partners, J.P. Morgan Partners, T.H. Lee and Warburg were released as well.

582.    The release terms do not address prospective conduct, such as secondary bond offerings used by the Defendant private equity firms to recoup their initial equity investment, the recycling of the target company in a subsequent IPO, or the future participation of Defendants in LBO auctions to lower the price paid per share.

583.    Additionally, Defendants' pursuit of settlement agreements are acts in furtherance of their conspiracy to rig bids in club LBOs.  Defendants' failure to disclose the existence of the ongoing Department of Justice's antitrust or private antitrust litigation investigation to class members, or to the courts who were asked to approve the settlements, demonstrates Defendants' coordinated efforts to limit their antitrust liability.

## FRAUDULENT CONCEALMENT AND TOLLING

584.    Throughout the period of the conspiracy alleged herein, Defendants and their co-conspirators fraudulently concealed their unlawful activity from Plaintiffs and other shareholders of the target companies.  Plaintiffs were unable to detect this secret conspiratorial activity, described more fully herein, which by its nature is self-concealing.  Furthermore, as supported by the facts alleged herein, Defendants and their co-conspirators acted fraudulently and deceptively to conceal the unlawful collusion, by *inter alia*:

(a)    Falsely representing to Plaintiffs and other shareholders that prices paid for shares of the target company were fair and competitive, when, in fact, Defendants had concealed from Plaintiffs their unlawful collective conduct wherein they agreed to allocate participation in and ownership of particular transactions;

(b)    Falsely representing to Plaintiffs and other shareholders that prices paid for shares of the target company were fair and competitive, when in fact the pricing was set through the conspiratorial activity alleged herein;

- 207 -

(c)     Submitting false bids to create the false impression of competition when in fact Defendants had agreed not to compete for the target companies;

(d)     Issuing announcements to Plaintiffs and other shareholders of the target companies to create the false impression of independent or unilateral conduct, when in fact Defendants and their co-conspirators had agreed beforehand; and

(e)     Confining participation in the unlawful activity to a limited number of persons so as to reduce the risk of detection.

585.   Plaintiffs did not learn of the unlawful conspiratorial activity, and could not have learned of the unlawful activity, until the existence of ongoing Department of Justice investigation was publicly disclosed by news media and SEC filings from certain of the Defendants.  For example, on or about October 11, 2006, the Wall Street Journal reported that the Department of Justice had launched an investigation into the bidding practices of private equity firms.  In the August 13, 2007 Amendment No. 1 to Form S-1, KKR confirmed that the Department of Justice was requesting documents as part of its bid-rigging investigation, disclosing, "we have received a request for certain documents and other information from the Antitrust Division of the United States Department of Justice, or the DOJ, in connection with the DOJ's investigation of private equity firms to determine whether they have engaged in conduct prohibited by the United States antitrust laws."  In its April 8, 2008 Form S-1, Apollo stated that "it has been reported in the press that a few of our competitors in the private equity industry have received information requests relating to private equity transactions from the Antitrust Division of the U.S. Department of Justice."

## CLAIMS FOR RELIEF

### First Claim for Relief

**Overarching Market Allocation and Horizontal Price Fixing Per Se and
Rule of Reason Violations, §1 of the Sherman Act, 15 U.S.C. §1**

586.   Plaintiffs allege and incorporate herein by reference the above-referenced allegations on behalf of the Overarching Conspiracy Class.

587.   Beginning as early as mid-2003 and continuing until 2007, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs in violation of §1 of the Sherman Act, 15 U.S.C. §1.

588.   In formulating and effectuating the aforesaid contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, among other things:

    (a)    forming groups referred to as "bidding clubs" or "consortia" to rig the bidding for control of a public corporation;

    (b)    allocating the company buyout auctions among themselves, including without limitation the HCA and Freescale LBOs;

    (c)    exchanging information about which companies they would bid for, as well as the price per share and terms and conditions of their bids in order to control and/or limit the number of bids for the target company and the number of Defendants participating in the going public transaction;

    (d)    agreeing among themselves to submit or not submit bids in connection with company buyout auctions;

(e)     submitting bids for securities at agreed-upon prices in connection with company buyout auctions;

(f)     monitoring and implementing the agreements among members of the conspiracy;

(g)     entering into exclusive banking arrangements to deprive potential competitive bidders of financing;

(h)     conspiring with company management to limit or avoid the seeking of competitive bids; and

(i)     attempted to obtain the release of their antitrust liability in certain breach of fiduciary duty state actions.

589.    During and throughout the period of the conspiracy, Plaintiffs and members of the Overarching Conspiracy Class directly sold their common stock to Defendants.

590.    The unlawful contracts, combination, or conspiracies alleged herein have had the following effects, among others:

(a)     Defendants restrained competitors in the market for the LBOs set forth in this Complaint;

(b)     Defendants allocated the market for the LBOs set forth in this Complaint;

(c)     prices paid by Defendants and their co-conspirators to Plaintiffs and the members of the Overarching Conspiracy Class for common stock in club LBOs set forth in this Complaint; and

(d)     Plaintiffs and members of the Overarching Conspiracy Class were paid less for common stock sold to Defendants and their co-conspirators in club LBOs set forth in this Complaint than they would have paid in a competitive

marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing and market allocation.

591.    As a direct and proximate result of the illegal combination, contract, or conspiracy, Plaintiffs and the members of the Overarching Conspiracy Class have been injured and damaged in their respective businesses and property, in amounts which are presently undetermined.

592.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful arrangements to fix, maintain, and/or stabilize prices of common stock in club LBOs and allocate club LBOs set forth in this Complaint. Such violations and the effects thereof may occur in the future unless the injunctive relief requested is granted.

### Second Claim for Relief

**Bid Rigging – Per Se Violations – §1 of the Sherman Act, 15 U.S.C. §1 (Against Bain, Blackstone, Carlyle, Goldman Sachs, KKR and TPG)[643]**

593.    Plaintiffs Detroit and Omaha allege and incorporate by reference the allegations set forth above on behalf of the HCA Class.

594.    As part of their overarching conspiracy, Defendants committed violations of the Sherman Act for which shareholders of the target companies have separate and distinct claims for relief. Plaintiffs Detroit and Omaha, on behalf of themselves and the HCA Class, hereby bring a separate claim against defendants Bain, Blackstone, Carlyle, Goldman Sachs, KKR and TPG (collectively, the "HCA Defendants") for entering into an agreement, understanding, and conspiracy

---

[643]    Plaintiffs have named KKR and Bain in the HCA bid rigging claim just as they did in the overarching conspiracy claim. Plaintiffs acknowledge and concede that the Court ruled that KKR and Bain are released from liability for the HCA deal. Plaintiffs include KKR and Bain only for purposes of preserving any rights on appeal and acknowledge that the claim against KKR and Bain with respect to HCA has been dismissed by the Court.

in restraint of trade to rig bids and not compete for the purchase of HCA in violation of §1 of the Sherman Act, 15 U.S.C. §1.

595.    The agreements between the leaders of the HCA Defendants, on the other, were reached on or around July 24-26, 2006, and defendants KKR and Blackstone reaffirmed the agreement on September 15, 2006.

596.    The per se illegal agreements and conspiracy eliminated competition between private equity firm buyers in the HCA LBO.

597.    The conspiracy was an unreasonable restraint of trade that resulted in a suppressed purchase price for HCA.

598.    Plaintiffs Detroit and Omaha and members of the HCA Class were paid at least $1 billion less for common stock tendered in the HCA LBO to Defendants Bain, KKR, and their co-conspirators than they would have been paid in a competitive marketplace unfettered by the HCA Defendants' and their co-conspirators' collusive and unlawful bid rigging conspiracy.

599.    As a direct and proximate result of the per se illegal agreements and conspiracy, Plaintiffs Detroit and Omaha and the members of the HCA Class have been injured and damaged in their respective businesses and property, in exact amounts that are presently undetermined.

<strong>REQUEST FOR RELIEF</strong>

Plaintiffs respectfully request relief as follows:

A.    That the Court rule that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure for each claim for relief;

B.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, as set forth in each claim for relief be adjudged to have been in violation of §1 of the Sherman Act, 15 U.S.C. §1;

C.     That judgment be entered for Plaintiffs and members of the Overarching Conspiracy Class and HCA Class against Defendants for damages sustained as provided for in §4 of the Clayton Act, together with the costs of this action, including reasonable attorneys' fees;

D.     That Defendants and their co-conspirators and their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining, or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

E.     That Plaintiffs and members of the Overarching Conspiracy Class and HCA Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: June 14, 2012                     Respectfully submitted,

SCOTT+SCOTT LLP

Walter W. Noss

CHRISTOPHER M. BURKE (admitted *pro hac vice*)
WALTER W. NOSS (admitted *pro hac vice*)
KRISTEN M. ANDERSON (admitted *pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  619/233-4565

SCOTT+SCOTT LLP
DAVID R. SCOTT (admitted *pro hac vice*)
156 South Main Street
Colchester, CT  06415
Telephone: 860/537-5537

ROBINS, KAPLAN, MILLER &
    CIRESI L.L.P
LISA A. FURNALD (BBO #631059)
800 Boylston Street, 25th Floor
Boston, MA  02199
Telephone:  617/267-2300

ROBINS, KAPLAN, MILLER &
    CIRESI L.L.P
K. CRAIG WILDFANG (admitted *pro hac vice*)
THOMAS J. UNDLIN (admitted *pro hac vice*)
STACEY P. SLAUGHTER (admitted *pro hac vice*)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
Telephone:  612/349-8500

ROBBINS GELLER RUDMAN
    & DOWD LLP
PATRICK J. COUGHLIN (Of Counsel)
SUSAN G. TAYLOR (admitted *pro hac vice*)
DAVID W. MITCHELL (admitted *pro hac vice*)
PHONG L. TRAN (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058

LANDSKRONER • GRIECO • MADDEN, LLC
JACK LANDSKRONER (admitted *pro hac vice*)
PAUL GRIECO (admitted *pro hac vice*)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (admitted *pro hac vice*)
GEORGE AGUILAR (admitted *pro hac vice*)
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: 619/525-3990

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
RICHARD A. LOCKRIDGE (admitted *pro hac vice*)
CHARLES N. NAUEN (admitted *pro hac vice*)
KAREN HANSON RIEBEL (admitted *pro hac vice*)
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401-2159
Telephone:  612/339-6900

HULETT HARPER STEWART, LLP
DENNIS STEWART (Of Counsel)
525 B Street, Suite 760
San Diego, CA  92101
Telephone:  619/338-1133

BRANSTETTER, STRANCH
   & JENNINGS, PLLC
J. GERARD STRANCH IV (admitted *pro hac vice*)
227 Second Avenue, North – 4th Floor
Nashville, TN  37201-1631
Telephone: 615/254-8801

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY (Of Counsel)
275 Madison Avenue, Suite 801
New York, NY  10016
Telephone:  212/682-1818

REINHARDT WENDORF & BLANCHFIELD
MARK REINHARDT (admitted *pro hac vice*)
2201 Atlantic Avenue
Sullivan's Island, SC  29482
Telephone:  651/287-2100

REINHARDT WENDORF & BLANCHFIELD
ROBERTA A. YARD (admitted *pro hac vice*)
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN  55101
Telephone:  651/287-2100

FARUQI & FARUQI, LLP
NADEEM FARUQI (Of Counsel)
369 Lexington Avenue, 10th Floor
New York, NY  10017-6531
Telephone:  212/983-9330

SHEPHERD FINKELMAN MILLER
   & SHAH, LLP
JAYNE A. GOLDSTEIN (admitted *pro hac vice*)
1640 Town Center Circle, Suite 216
Weston, FL  33326
Telephone:  954/515-0123

WAGSTAFF & CARTMELL LLP
TYLER W. HUDSON (admitted *pro hac vice*)
4740 Grand Avenue, Suite 300
Kansas City, MO  64112
Telephone:  816/701-1177

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury under the laws of the United States of America that I caused the above document to be served via e-mail on June 14, 2012 on all attorneys of record who have agreed to accept service via e-mail at defendantsprivateequity@scott-scott.com.

Dated:  June 14, 2012

WALTER W. NOSS
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619/233-4565
E-mail: wnoss@scott-scott.com

*An Attorney for Plaintiffs*