# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIRK DAHL, ET AL., Individually and
on Behalf of All Others Similarly Situated,

        Plaintiffs

      v.                                        CIVIL ACTION NO.:
                                      07-12388-EFH

BAIN CAPITAL PARTNERS, LLC, ET AL.,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

March 13, 2013

This matter comes before the Court on thirteen motions for summary judgment. The motions consist of one omnibus motion for summary judgment as to Count One of the Fifth Amended Complaint filed jointly by the Defendants, one motion for summary judgment as to Count Two filed by the Defendants named in that Count,[1] and eleven separate motions for summary judgment filed by each Defendant individually as to both counts.

*I. Background.  The Claims.*

The Plaintiffs are former shareholders of a number of large public companies that were subject to leverage buyout transactions (the "LBOs")[2] between 2003 and 2007. The Defendants

---

[1] The Defendants named in Count Two are Bain, Blackstone, Carlyle, Goldman Sachs, KKR, and TPG. Bain and KKR have been released.

[2] The Fifth Amended Complaint states that:

are financial firms which were involved with those transactions. The Defendants include ten large private equity firms, including Apollo Global Management LLC ("Apollo"), Bain Capital Partners, LLC ("Bain"), The Blackstone Group L.P. ("Blackstone"), The Carlyle Group, LLC ("Carlyle"), Goldman Sachs Group, Inc. ("Goldman Sachs" or "Goldman")[3], Kohlberg Kravis Roberts & Company, L.P. ("KKR"), Providence Equity Partners, Inc. ("Providence")[4], Silver Lake Technology Management, L.L.C. ("Silver Lake")[5], TPG Capital L.P. ("TPG"), Thomas H. Lee Partners, L.P. ("THL"). These firms are in the business of purchasing publicly-traded companies. The eleventh Defendant, JP Morgan Chase and Co. ("JP Morgan"), is not a private equity firm but provided financing and advice for some of the transactions at issue.

The Plaintiffs bring two claims pursuant to the Sherman Act, 15 U.S.C. § 1, on behalf of themselves and others similarly situated, alleging that the Defendants illegally colluded to artificially fix the sales prices of the companies in which Plaintiffs held securities. Plaintiffs

---

An LBO is a type of transaction in which a purchaser, often a private equity firm, acquires substantially all of a company's outstanding shares using some of its own capital along with a substantial amount of debt financing. The purchaser then typically takes the company private (by withdrawing its shares from the public exchange), operates it for a period of time, and sells it or conducts a public offering for its shares.

[3] Defendant Goldman Sachs provided financial advice and financing for certain transactions in addition to having a separate private equity division which was involved in the purchase of some of the Target Companies.

[4] Defendant Providence was limited to investing in the telecommunications, media and technology industries and was only involved in the purchase of companies in those industries.

[5] Defendant Silver Lake was bound by its Limited Partnership Agreements to invest only in technology and technology-related growth industries and was only involved in the purchase of the Target Companies in those industries.

contend that they were, in turn, deprived of the true value of their stock.

Count One of the Fifth Amended Complaint alleges that "[b]eginning as early as mid-2003 and continuing until 2007 . . . Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs in violation of §1 of the Sherman Act, 15 U.S.C. §1." The Fifth Amended Complaint describes Count One as a single "overarching conspiracy" which resulted in "suppressed competition in 19 of the largest LBOs – and 8 related transactions – that closed between 2003 and 2007."

The transactions at issue in Count One concerned the following companies (the "Target Companies"): (1) PanAmSat; (2) AMC; (3) SunGard; (4) Neiman Marcus; (5) Michaels Stores; (6) Aramark; (7) Kinder Morgan; (8) HCA; (9)Freescale; (10) Toys 'R' Us; (11) Texas Genco; (12) Education Management; (13) Univision; (14) Harrah's; (15) Clear Channel; (16) Sabre; (17) Biomet; (18) TXU; (19) Alltel; (20) Philips/NXP; (21) Loews; (22) Vivendi; (23) Community Health Systems; (24) Nalco; (25) Cablecom; (26) Susquehanna; and (27) Warner Music.

Of the twenty-seven transactions, nineteen were LBOs, six were non-LBOs, and two were never consummated. Of the nineteen LBOs, Plaintiffs have standing to seek damages for seventeen under Count One. The remaining ten transactions are alleged to be relevant to and illustrative of the overarching conspiracy pled in Count One.

Count Two (referred to as "Count Two" or the "HCA Claim") alleges a conspiracy involving certain Defendants to rig bids and not to compete with respect to the leverage buyout transaction of HCA, one of the Target Companies.

_The Alleged Overarching Conspiracy._

3

Plaintiffs contend that the evidence supports a finding of an overarching conspiracy on the part of the Defendants to allocate the market for large LBOs. They contend that the evidence establishes a motive on the part of the Defendants to conspire, an opportunity to do so, and actions in furtherance of the overarching conspiracy, including the establishment of rules of conduct. They further assert that the economic evidence supports a finding of an overarching conspiracy.

Plaintiffs assert that the alleged overarching conspiracy was in effect by 2003. At that time, the private equity industry had entered an era of "mega-fund" investment, making the buyout of "mega-cap" targets – large multi-billion dollar companies – possible for a limited number of private equity firms who could garner sufficient funds to compete for the transactions.

Plaintiffs assert that the late 1980s marked the last time the market conditions in the industry were as fertile. During that time, the then-largest private equity firm, Defendant KKR, conducted a $31 billion LBO of RJR Nabisco. Leading up to the RJR Nabisco transaction, a bidding war between potential purchasers erupted, causing the price to rise substantially.

The transactions at issue were all "mega-cap" transactions and the Defendants, who are some of the largest private equity firms in the world, constituted a portion of the limited pool of potential participants in those transactions. Plaintiffs contend that Defendants understood that the large amounts of capital and access to cheap debt could create an RJR Nabisco-like bidding war for other large LBOs, where billions of dollars of capital could be deployed to muscle out competition. Plaintiffs contend that Defendants understood that, by working together, they could suppress competition and avoid another price escalation.

_The Transactions._

4

The evidence shows that the twenty-seven transactions were initiated by the boards of directors of the Target Companies either on their own determination or in response to an inquiry. When a potential sale was deemed desirable, the board of directors would often hire a financial advisor, such as JP Morgan or Goldman Sachs, to administer the process. While the details of the sales process for each transaction was set by each Target Company's board of directors and financial advisors, they generally took two different forms.

The first form was an auction, in which a Target Company would announce that it was for sale and solicit bids pursuant to particular rules set up for the auction. The second form was a proprietary deal, in which the Target Company would either deal with one buyer or a consortium of buyers and sign an agreement for sale. The signed agreement would then be announced to the public and the Target Company would have a period of time between the announcement of the signed agreement and its formal closing to find a better offer. During this "go-shop" period, the Target Company's financial advisor "proactively goes out to buyers, and also responds to all inquiries that are received, and tries to stimulate the interest and to create a higher bid for the company."

Plaintiffs contend that the alleged conspiracy was in operation from the 2003 Nalco transaction until the 2007 Alltel transaction, affecting every transaction for the Target Companies in the interim. The evidence of the Defendants' conduct during those four years shows a kaleidoscope of interactions among an ever-rotating, overlapping cast of Defendants as they considered acquiring, attempted to acquire, or successfully acquired the Target Companies.

Plaintiffs assert that the evidence shows a pattern of conduct on the part of the Defendants evidencing the alleged overarching conspiracy. They contend that Defendants employed certain

practices or rules to effectuate the alleged overarching conspiracy and that these rules were referred to as "club etiquette" and "professional courtesy" within the industry.

Plaintiffs assert the rules to be as follows:  First, Defendants formed bidding clubs or consortiums, whereby they would band together to put forth a single bid for a Target Company. The Plaintiffs assert that the purpose of these bidding clubs was to reduce the already limited number of private equity firms who could compete and to allow multiple Defendants to participate in one deal, thereby ensuring that every Defendant got a "piece of the action."   Second, Defendants monitored and enforced their conspiracy through "quid pro quos" (or the exchange of deals) and, in the instances where rules were broken, threatening retaliatory action such as mounting competition against the offending conspirator's deals.  Third, to the extent the Target Company set up an auction, Defendants did their best to manipulate the outcome by agreeing, for example, to give a piece of the company to the losing bidders.  Fourth, Defendants refused to "jump" (or compete for) each other's proprietary deals during the "go shop" period.  This gave Defendants the comfort to know they could negotiate their acquisitions without the risk of competitive bidding.

*Bidding clubs.*

Working together to jointly purchase the Target Companies was a common practice in the industry.  Transactions resulting from these consortiums were often referred to as "club deals." Each of the twenty-seven transactions for the Target Companies was such a "club deal," in which at least one consortium was formed.  In almost all of the transactions, multiple consortiums of Defendants (some including non-defendants) were formed.

While certain Defendants worked more often with other Defendants, the consortiums, as

viewed across all the transactions, generally consisted of different groups of Defendants.  In some cases, certain Defendants that would work together in one transaction, would be in opposing consortiums in other transactions.  No single defendant was involved in every transaction.

The evidence shows that Defendants viewed "club deals" and the formation of consortiums as having certain potential drawbacks, including governance confusion, lack of focus and accountability, and a "group think" mentality, in which conventional wisdom was never challenged.  The evidence shows, however, that Defendants believed that working together also provided many benefits, including the ability to complete larger transactions, share expertise, minimize costs, and diversify risk.

Another benefit articulated by the Defendants was the reduction of competition.  In many instances, the Defendants' executives observed that less competition was a beneficial effect of forming consortiums, especially in larger transactions where the competition was already limited.[6]  The evidence shows that in some transactions certain Defendants invited other Defendants into a consortium in order to remove them from the field of potential competitors.[7]  Other

---

[6] For instance, a KKR executive observed that the SunGard LBO was a "good deal" because "there was no competition."  Providence characterized SunGard as not "a large competitive auction" and stated that "[t]here was actually less competition in [SunGard] than in most smaller deals."  A KKR executive stated, in reference to the SunGard transaction, that "the large PE universe was all working together," and "there was no competition."

[7] For example, in referring to the Toys 'R' Us transaction, a KKR executive stated that "[g]iven the increased size of the transaction, and our desire to effectively eliminate a competitor from the auction process, we decided to partner with Bain and Vornado."  Likewise, during the Freescale transaction, Blackstone executives wanted TPG to join their consortium in order to "mitigate the risk of competition."  Similarly, during the Michaels Stores transaction, KKR believed that Carlyle would be "very aggressive" and considered inviting Carlyle into its group (with TPG and Apollo) as a "defensive measure" to mute any potential bid from Carlyle.  In an internal email, Carlyle executives indicated that partnering with Permira, a private equity firm that is not a defendant, would "keep [the] only other knowledgeable party on [the] company out of

correspondence suggest mutual agreements to join forces on a given deal for the purpose of not

driving up the price of the stock.[8]  Certain Defendants also used the threat of competition to

leverage their way into an established consortium.[9]  Plaintiffs assert that the evidence shows that

Defendants had the ability to finance many of the deals on their own, but instead chose to form

consortiums as a way to limit competition.

*Quid pro quos.*

Plaintiffs further assert that the Defendants made "quid pro quo" arrangements,

exchanging lucrative deals in an effort to limit competition.  They cite to statements between

Defendants in which one Defendant believed the other owed it a deal or had an expectation of

reciprocation.  The record is rife with instances of Defendants seeking to exchange participation

in each other's deals.  The Plaintiffs assert that this evidence shows that the Defendants monitored

---

competition."

[8] A Goldman executive testified, in reference to exclusivity agreements signed by other
Defendants during the Kinder Morgan transaction, that:

> [I]t was my belief at this time that we had agreements that they either would work
> with us or they would not compete against us . . . so it would not bode very well
> for them to try to read the fine print of a document saying, well, we still could do
> this, even though we agreed we wouldn't do that.

A Blackstone executive wrote about Texas Genco that Blackstone's message to TPG and
KKR is that it was "better for everyone to join forces and have a much higher chance of winning
the deal and not drive the price up."

[9]  During the Texas Genco transaction, Blackstone planned follow-up calls with KKR and
TPG to deliver the message that if Blackstone is not made part of the TPG/KKR consortium
Blackstone can and will compete.  During the Sungard transaction, a Blackstone memorandum
stated that "[a]s a result of the threat of our competing offer, the Silver Lake consortium invited
BCP [Blackstone Capital Partners]/TPG team to join its group."  During the Biomet transaction,
Warburg Pincus, a private equity firm that is not a defendant, along with the other consortium
members, decided to include Goldman, to ensure that Goldman did not "disrupt [the] process."

and enforced "at bat[s]" to ensure that each Defendant was properly rewarded for its participation in the alleged overarching conspiracy.

The evidence, however, indicates that these "quid pro quo" arrangements were generally made on a one-on-one basis and were predicated on prior working relationships. If a Defendant had worked successfully with another Defendant on a prior deal, they would generally expect to be invited into a subsequent deal.[10]

Many of the Defendants' executives also knew each other personally and corresponded informally. Contemporaneous emails and other documents created during the transactions at issue show that executives of the Defendants appeared at the same events, communicated directly with one another, and referred to each other by nicknames. The evidence also shows that these executives invested in each other's funds and worked together as they moved from firm to firm over the years. In 2006, some of the executives of different Defendants formed the Private Equity Council, "to promote and protect the interests of the private equity industry and its investors."

*Conduct during auctions.*

Plaintiffs contend that the Defendants manipulated auctions by ignoring binding non-disclosure agreements and by secretly communicating price information to pre-determined auction winners, who then offered the losers the opportunity to participate in the final deal.

_____

[10] For example, after the Cablecom and Nalco deals, Apollo's executives continued to demand payback from Goldman for inviting them into those deals. Goldman, in an effort to repay these and other business opportunities, invited Apollo into the Kinder Morgan transaction. A KKR executive, in another example, felt KKR was owed by Providence after the PanAmSat LBO, telling a Providence executive: "I must say I am personally and we are institutionally very disappointed in how you guys have handled this situation with us. After panamsat and sungard, we should not be chasing after you guys to figure out a way to include us as real partners in susq [Susquehanna]."

The record contains a few communications indicating that certain Defendants did not want to disclose to the Target Company that they had discussed joint bidding.[11] The record also contains a few instances of certain Defendants agreeing to bid separately and then potentially coming together in later bidding rounds.[12] The record, however, does not support the allegation that Defendants were sharing price information or had predetermined winners. In fact, there are many instances of contemporaneous communications on the record indicating that Defendants had no predetermined winner and that certain Defendants had no knowledge of which party had won the auction or at which price.[13]

Defendants assert that losing bidders were occasionally invited into final deals for the reason that they had already conducted due diligence and were interested in the deal. There were six transactions in which losing bidders were invited into final deals and only five transactions in

---

[11] For example, in referring to Blackstone's invitation to Goldman Sachs and Apollo to be a part of the Nalco transaction, a Goldman internal email states, "[l]et's be careful about what we say about how the group comes together."

[12] For example, during the PanAmSat transaction, a Blackstone executive suggested that Blackstone bid separately from Carlyle and Providence in the first round of the auction and then the three firms could "come together in the second round."

[13] During the Alltel transaction, Goldman Sachs PIA and TPG executed a "dawn raid," hoping to close a deal for Alltel weeks before the bid deadline and before the "other two groups [including other defendants] kn[e]w what hit them." During the Clear Channel Transaction, there was an "intense" auction that "squeezed every last penny" from the winning bidding group. During the Michaels Stores transaction, the Defendants did not know each other's bid because KKR commented that anyone who bid higher than their $43.50/share bid (which did occur) would have "crossed over into 'stupid territory.'" In the Neiman Marcus transaction, the THL bidding group submitted a "[b]lind" bid with "no sense on price." Furthermore, when Bain learned about the winning bid, it reacted: "WOW!!!!!!!!!! If we were going to lose, I am glad it is by a lot!! $1.5 billion of equity!!" During Clear Channel transaction, after losing to another bidder, KKR called it a "very, very disappointing outcome," and lamented that "it's heart-breaking to lose," but noted that KKR "did everything [they] could and stretched very far." During the Neiman Marcus transaction, THL characterized TPG's win as "[v]ery depressing."

which the losing bidders agreed to become part of the final deal. The instances where losing bidders were invited to join a final deal involved different groups of Defendants and there are many instances in which losing bidders were not invited into final deals.[14]

*Jumping Deals.*

Plaintiffs contend that, as part of the alleged overarching conspiracy, Defendants did not "jump" each other's proprietary deals and never submitted a topping bid after a Target Company announced a signed agreement for sale. Plaintiffs further contend that, pursuant to the overarching conspiracy, Defendants "stepped down" during the auction process to allow a predetermined co-conspirator to win.

On the second day of the hearing on these motions, Plaintiffs chose to abandon the above arguments regarding joint bidding, "quid pro quos" and bid rigging to focus on this allegation as the gravamen of their overarching conspiracy claim. Plaintiffs' attorney stated that, "[y]ou have other activity that is illegal like bid rigging and other things like that but that's not the agreement. The agreement is not to jump a signed deal or a deal that hit a certain level in an auction . . . ."

The Plaintiffs' theory rests primarily on a contemporaneous email written by a TPG executive during the Freescale transaction, which states "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal."[15] Plaintiffs contend that this

_____

[14] The six transactions in which losing bidders were invited into final deals were Clear Channel, Education Management, Michaels Stores, Nalco, PanAmSat, and Philips/NXP. The losing bidders did not choose to be part of the final Education Management transaction.

[15] Plaintiffs also cite a number of other statements regarding the Defendants' decisions to "stand down." For instance, regarding the Freescale transaction, a Blackstone executive stated that "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." Regarding HCA, a Blackstone executive stated, "[t]he reason we didn't go forward was basically a decision on not

11

statement, and other statements made during the Freescale and HCA transactions, in combination the fact that no topping bids were made during any of the transactions' "go-shop" periods, evidence an overarching conspiracy on the part of the Defendants not to "jump" each other's announced agreements for sale.

Defendants contend that the TPG executive's statement and other statements cited by the Plaintiffs fail to evidence an overarching agreement. Defendants assert that those statements merely show a recognition on the part of the Defendants that "jumping" an announced deal was generally considered a poor business decision. Defendants assert that when a Target Company has already entered into an agreement to be sold to a buyer, the presence in the agreement of commonplace protection provisions makes it more costly for any party to submit competing bids.

Among these standard provisions are break-up fees (fees the company must pay the buyers if the company terminates the deal for a different offer) and matching rights (rights giving the current bidders the ability to match any competing offer made to the company after the current bidders' offer has been accepted). Defendants also contend that they independently decided not to "jump" certain deals for fear of retaliation from other Defendants on other deals. Defendants cite to contemporaneous correspondence indicating instances where Defendants were concerned that others would "jump" their deals or considered "jumping" deals, but were dissuaded due to potentially independent justifications.[16] Defendants assert the small sample of transactions, as

_____

jumping someone elses deal and creating rjr2 [referring to the Nabisco deal] . . . ." In another example, a Carlyle executive stated that KKR had asked "the industry to step down on HCA."

[16] For instance, during the Aramark Deal, a Goldman Sachs executive cautioned that announcing a buyout with a two-firm consortium "will hurt GS a lot and cause people to increase the likely hood [sic] that they jump the [deal]." In regards to the Sungard transaction, a TPG executive explained that being "aggressive," would make "enemies," with the other Defendants,

limited by discovery, fails to show any systematic behavior indicating an agreement not to compete.

*Expert Reports.*

Plaintiffs assert that economic evidence also supports an overarching conspiracy. They cite to one of their experts, who reviewed the characteristics of the large LBO market during the alleged conspiratorial era and concluded that there were more factors favoring the formation and operation of a cartel than factors that would act against its formation. Plaintiffs also refer to two of their other experts who concluded that actions taken by Defendants during the alleged conspiratorial era were consistent with coordinated behavior and inconsistent with competition.

*The HCA transaction.*

Count Two of the Fifth Amended Complaint alleges a conspiracy involving certain Defendants to rig bids and not to compete with respect to the leverage buyout transaction of HCA, one of the Target Companies. The Defendants named in Count Two are Blackstone, Carlyle, TPG, Goldman Sachs, Bain, and KKR. Bain and KKR have been released from the claim. Blackstone, Carlyle, TPG, and Goldman Sachs are referred to as the "Remaining HCA Defendants." The HCA Transaction is also, as explained below, highly relevant to Count One. The detailed circumstances surrounding the HCA transaction are as follows.

In 2006, HCA engaged Merrill Lynch to review various strategic alternatives to "enhance

---

"while perhaps benefiting noone [sic] but the [company's] shareholders." A Carlyle executive stated, "[s]ome have proposed we try to compete by participating in a competing deal [HCA]. I do not think that is a good idea for many reasons, but particularly because I do not want to be in a pissing battle with KKR at the same time we are teaming on other deals elsewhere." With respect to Aramark, an Apollo executive concluded "we'd probably spend time and money and piss off friends."

shareholder value." In April 2006, Merrill Lynch met with representatives of Bain, KKR, and

Merrill Lynch Global Private Equity (collectively, the "HCA Sponsors") to discuss the possibility

of an LBO transaction of HCA by the HCA Sponsors. HCA was viewed in the private equity

world as a healthcare industry leader with "topnotch" assets. In May 2006, HCA's board of

directors granted the HCA Sponsors' request to begin due diligence on HCA.

*Rumors and Interest in the Deal.*

By June 15, 2006 rumors about a potential purchase of HCA by the HCA sponsors had

begun to circulate. KKR reported to its investment committee: "We and Merrill have received

multiple inbound phone calls from both other sponsors and investment banks . . . ." Around that

time KKR stated "we have done our best to dispel the rumors with everyone other than

Warburg . . . [who we] have promised a place in the consortium provided they sit on the sidelines

for now, and Citigroup, to whom we have told that they will have a place in the financing as long

as they do not make outbound phone calls."

Goldman Sachs learned of the potential HCA LBO in June, and was interested in being

involved. Ken Hitchner, Managing Director of Goldman Sachs, stated in an intra-office email that

Mike Michelson at KKR "has spent the last six months praising us and implying the next one was

ours." Nat Zilkha at Goldman Sachs noted in his reply to Hitchner that Goldman Sachs had just

invited KKR into the Kinder Morgan deal. Blackstone likewise discussed the rumor stating in an

intra-office email: "We are definitely interested in exploring hca further."

*HCA Sponsors' Negotiations.*

On June 30, 2006, the HCA Sponsors contacted management and stated that they had

conducted sufficient due diligence to confirm their view that an LBO involving HCA was feasible

and that they expected to be in a position to determine whether to submit a proposal regarding such a transaction by July 14, 2006. On that same day, HCA's board of directors established a Special Committee with the full power and authority to negotiate a possible acquisition of HCA by the HCA Sponsors and any other alternatives and to engage Credit Suisse as financial advisor.

On July 3, 2006, the Special Committee rejected Bain and KKR's request to approach additional potential equity sources. According to a July 31, 2006 internal email from David Bonderman of TPG (relating a conversation he had with Nate Thorne of Merrill Lynch), the Special Committee rejected the request "so that there were enough firms outside the deal so that there could be a competing offer and [the Special Committee] had left us [TPG] out of the process on purpose for this reason."

On July 18, 2006, Bain reported internally that the HCA Sponsors agreed on a price with the Special Committee for the acquisition of HCA at $51.00 per share. On July 21, 2006, Credit Suisse calculated, based upon Merrill Lynch's July 20, 2006 "LBO Implications" report on HCA, that HCA's current value is $55.50 per share.

_WSJ Article and Growing Interest in the deal._

On July 19, 2006, the Wall Street Journal published an article regarding rumors of a potential LBO of HCA. Other private equity firms immediately considered the deal. On July 19, 2006, Goldman Sachs and Apollo began discussing the possibility of forming a consortium. On July 19, 2006, Carlyle learned about an HCA LBO through the Wall Street Journal and began internal discussions. Upon learning the news, Betchel of Carlyle put a call into Michelson of KKR about joining KKR's consortium. TPG, likewise, spent days trying to contact Michelson and Bain to request involvement in the HCA deal.

*Announcement of the HCA Sponsors' Agreement.*

On the morning of July 24, 2006 the HCA's board of directors announced it had approved a merger agreement with the HCA Sponsors. HCA was, therefore, the HCA Sponsor's proprietary deal. The price for HCA was $51.00 per share, which "represented a premium of approximately 18% to the closing share price of the HCA common stock on July 18, 2006, the last trading day prior to press reports of rumors regarding a potential acquisition of the Company." The approved merger agreement included a fifty-day "go shop" provision that permitted competing consortiums to form and submit superior proposals from July 24, 2006 through September 12, 2006. The same day, Boon Sim of Credit Suisse First Boston ("CSFB"), the lead advisor for the Special Committee of the HCA board of directors, asked a number of fellow CSFB employees to call the big private equity firms about HCA.

*Flurry of Activity Amongst the Remaining HCA Defendants.*

Following the announcement of the merger, there was a flurry of activity amongst the remaining HCA Defendants over the following ninety-six hours. The communications indicate interest in HCA and a desire to potentially form a competing consortium. The evidence includes an assessment of a potential purchase price at price per share that was higher than the one agreed to by the HCA sponsors and a report stating that "HCA is a high quality hospital company trading at the low end of historical averages" with "good market positions in growing markets."

*An Abrupt-Stand Down by the Remaining HCA Defendants.*

On the morning of July 27, 2006, all four Remaining HCA Defendants had abruptly notified KKR directly of their decision not to compete on HCA. Jonathan Coslet of TPG emailed TPG's top executives: "I spoke to both Michaelson [KKR] and Paglicua [Bain] and told them we

had decided to pass on the HCA situation." On July 26, 2006, KKR sent an intra-office email stating that "TPG and GS have both informed us that they will not compete" on HCA. On July 26, 2006, Henry Kravis of KKR sent an intra-office email to his top executives stating: "I received a call from Tony James [of Blackstone] today. He called to tell me that Blackstone was not going to bid on HCA. Happy to give you additional color if you want it." Two days later, a Carlyle executive wrote to Alex Navab of KKR: "I left you a voicemail. We are NOT forming a competing group (although we have received many calls), we are not signing an NDA, we are not taking any info and we will not in any way interfere with your deal. We would, of course, love to join you if you need any more equity, but rest assured that you will not see us in any other context on HCA." These notifications came within ninety-six hours of the fifty-day "go shop" period having commenced.

*Reasons for the Stand-Down.*

After TPG's Jonathan Coslet informed TPG's key executives of the decision to "stand down" on HCA, TPG's Philippe Costeletos replied: "Probably the right decision even though I hate to see a good deal get away. I guess we'll find out some day how much our relationship means to them." Coslet responded to Costeletos: "Yup. All we can do is do onto others as we want them to do unto us . . . it will pay off in the long run even though it feels bad in the short run."

On July 29, 2006, Costeletos e-mailed David Bonderman and Coslet stating that he delivered the same message to Merrill Lynch that TPG had delivered to KKR and Bain, namely that "we [at TPG] were extremely disappointed" not to be included in the consortium and "while we considered a competing bid [for HCA], we felt that our relationship with them, KKR and Bain

17

was more important."

On July 28, 2006, Joseph Baratta of Blackstone in Europe emailed Neil Simpkins of Blackstone asking about HCA. Mr. Simpkins responded that "the reason we didn't go forward was basically a decision on not jumping someone elses deal and creating rjr 2 with us as kkr . . . ." Baratta responded: "I think deal represents good value and is a shame we let kkr get away with highway robbery but understand decision. There may also be something else at play with henry [Kravis of KKR] and steve [Schwartzman of Blackstone]."

In response to their decision not to pursue HCA, a Blackstone executive wrote that "Pags [Pagliuca of Bain] probably will be able to steal the company." On July 27, 2006, another Blackstone executive wrote, "[a]fter some soul searching, we decided wisdom was better part of valour and passed on hca. . . . charlie was right; we are a bunch of p**s*es—I am on plane and will call you both with the rationale although it still drives me crazy."

On August 1, 2006, Tony James of Blackstone briefly contemplated bidding for HCA after "vigorous competition" by KKR on the Philips transaction in which KKR prevailed in an auction, but Neil Simpkins suggested not even signing a confidentiality agreement unless they planned to win because "we [would] just lose all the value we gained by dropping a week ago . . . ." On July 26, 2006, Steve Wise of Carlyle sent an intra-office email stating "I think we should drop out of the CSFB process. Otherwise, we may be sending a bad signal to KKR/Bain." The same day, David Rubenstein of Carlyle sent an intra-office email stating that HCA "is over" and that "[n]o group is being formed to top the offer."

_Evidence of an Agreement to Stand-Down._

On August 7, 2006, Larry Berg of Apollo wrote an internal email to Mark Rowan of

Apollo about HCA and rumors that Apollo and Warburg may form a competing consortium. Berg questioned whether "apollo would want to topple a kkr deal." He concluded his email with an observation about KKR: "p.s. be careful of the kkr call. They offered Warburg a piece but they turned it down because it was too small. I'm sure they offered tpg a piece to stand down. We're not in that boy's club yet and let's not agree to stand down too quickly and meekly. I'm tired of mike michaelson ignoring us."

On September 11, 2006 in an intra-office email exchange between top executives of Carlyle who had just learned that KKR had decided to compete for their Freescale deal, Daniel F. Akerson of Carlyle responded: "And just think, KKR asked the industry to step down on HCA."

*Second Agreement to Stand-Down on HCA.*

In September, 2006, a consortium of Blackstone, Carlyle, TPG, and Permira were negotiating the buyout of Freescale. On September 10, 2006, KKR, Silver Lake, Bain, and Apax Partners Worldwide delivered to Freescale's board an unsolicited written indication of interest to acquire Freescale.

The next day, Blackstone, in apparent retaliation, immediately contemplated a bid to buy HCA at $55 per share. The following day, September 12, 2006, a proposed buying consortium of Blackstone, TPG, Carlyle and Permira was considering HCA. The same day, Tony James of Blackstone called George Roberts of KKR to say Blackstone signed a confidentiality agreement on HCA.

On September 15, 2006, KKR immediately withdrew its interest in Freescale. That same day, the Freescale board of directors accepted the Blackstone consortium's bid to buy the company at $40.00 per share and entered into a definitive agreement with that consortium that

afternoon. Tony James wrote that night: "Henry Kravis just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours."

That same night, September 15, 2006, George Roberts of KKR wrote Tony James of Blackstone: "Congrats. Pls give me a call on my cell." Two days later, Tony James responded:

> Thx for the call George. I talked to Henry [Kravis] Friday night and he was good enough to call Steve [Schwarzman] Saturday. We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money. I hope to be in a position to call you with a large exclusive PTP [public to private] in the next week to 10 days. You are the natural but we need to get management's clearance. Sorry for the email but I don't have your cell number. Tony.

George Roberts responded the same day: "Agreed."

On the morning of September 16, 2006, Henry Kravis wrote an internal e-mail to his KKR top executives: "I spoke with Tony James last night and Steve Schwarzman this morning re Freescale. They are very happy campers that we are not going any further, since they now have a signed agreement. We got lucky!!!! They told me that they are working on a large one, which they say is 'right up our alley' and they will be happy to have us work with them. We will see!!!" A September 16, 2006, Carlyle internal email stated: "As you may have heard, kkr is dropping out [on FreeScale]. Kravis says he would not have upset the previous deal if he had known how close we were. But that cost us eight hundred million." In the same email chain on September 16, 2006, Carlyle confirmed that Blackstone had already "dropped HCA."

On September 16, 2006, after learning that KKR had decided to withdraw from Freescale, a Goldman Sachs executive observed "club etiquette prevails . . . ." On September 19, 2006,

John Marren of TPG, wrote in an email concerning the Freescale LBO that "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal."

*Due Diligence.*

The KKR led consortium took nearly seven weeks to perform due diligence on a potential LBO of HCA and to make a determination to propose an initial offer per share for HCA. On the other hand, within forty-eight hours of the fifty-day "go shop" period having commenced, all four Remaining HCA Defendants agreed not to compete with the KKR-led consortium. KKR's Mike Michelson testified at a deposition that due diligence could not have been completed in such a short period of time.

*HCA as an Investment.*

KKR's $1.2 billion investment in HCA nearly doubled in value to $2 billion in four years.

*Lack of Competition for HCA.*

From July 24, 2006 through September 12, 2006 (the fifty-day "go shop" period), representatives of Credit Suisse and Morgan Stanley contacted parties that they believed, based on size and business interests, would be capable of, and might be interested in, consummating an acquisition of HCA. No party submitted a competing proposal for HCA. The HCA deal closed on November 11, 2006 at $51.00 per share without any other private equity firm having submitted a competing bid.

*II. Legal Standards.  The Summary Judgment Standard.*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a summary judgment motion, the Court views the record "in the light most

favorable to the nonmovant." Hoffman v. Applicators Sales and Service, Inc., 439 F.3d 9, 11 (1st Cir. 2006) (citing Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 50 (1st Cir. 2000)). All reasonable inferences are to be drawn in the favor of the nonmoving party. Poulis-Minott v. Smith, 388 F.3d 354, 361 (1 Cir. 2004).

*Section 1 of the Sherman Antitrust Act.*

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. A Section 1 claim requires "(1) the existence of a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade . . . and (3) that the restraint affected interstate commerce." Lee v. Life Ins. Co. of N. Am., 829 F.Supp. 529, 535 (D.R.I. 1993), aff'd, 23 F.3d 14 (1st Cir. 1994).

*Permissible Inferences for Establishing the Existence of an Antitrust Conspiracy.*

"Section 1 by its plain terms reaches only 'agreements'—whether tacit or express." White v. R.M. Packer Co., Inc., 635 F.3d 571, 575 (1st Cir. 2011) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "It does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." White, 635 F.3d at 575. Accordingly, in order to survive summary judgment, plaintiffs must produce direct or circumstantial evidence that is not only consistent with conspiracy, but "tends to exclude the possibility of independent action." Monsanto Co. v. Spray–Rite Serv. Corp., 465 U.S. 752, 767, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

While the summary judgment standard, as set forth above, requires all reasonable inferences to be drawn in favor of the nonmoving party, the Supreme Court has "limit[ed] the range of permissible inferences from ambiguous evidence in a § 1 case," holding that "conduct as

consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]n other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action . . . ." Id.

Evidence that tends to exclude the possibility of independent action may include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," Twombly, 550 U.S. at 556 n.4 (internal citations omitted), or "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision," Brown v. Pro Football, Inc., 518 U.S. 231, 241, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (internal citations omitted).

*Establishing the Existence of an Overarching Conspiracy.*

Where a single, overarching conspiracy derived from discrete incidents is alleged, as is the case in Count One, the evidence must establish a "'larger picture' from which inferences of a wider conspiracy can be drawn . . . ." In re Iowa Ready-Mix Concrete Antitrust Litigation, 768 F.Supp.2d 961, 975 (N.D. Iowa 2011). In determining whether such a "larger picture" exists, Courts, in other contexts, have looked for "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." See, e.g., U.S. v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (drug conspiracy case); U.S. ex rel. Miller v. Bill Harvert Int'l Const., Inc., 608 F.3d 871, 899 (False Claims Act case).

23

A "common goal" exists where there is "one objective, or set of objectives, or an overall objective to be achieved by multiple actions." U.S. v. Richerson, 833 F.2d 1147, 1153 (5th Cir. 1987) (quoting United States v. Perez, 489 F.2d 51, 62 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974) (internal quotations omitted)); see In re High-Tech Employee Antitrust Litigation, 856 F.Supp. 2d 1103, 1119 (N.D. Cal. 2012) (in a Section 1 case, a common goal exists where six discrete agreements were identical and agreed to in secrecy by closely connected executives of defendant companies within a span of two years). "Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose, then a single conspiracy exists." U.S. v. Richerson, 833 F.2d at 1153.

"Interdependence" can be established where "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." U.S. v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (quoting United States v. Wilson, 116 F.3d 1066, 1075-76 (5th Cir. 1997) (internal quotations omitted)); see In re Magnesium Oxide Antitrust Litigation, 2011 WL 5008090 (D. NJ 2011) (in a Section 1 case, a single, overarching conspiracy exists where one agreement not to compete with respect to one product was occasioned by a second agreement to allocate the market with respect to another product). In the criminal context, courts have concluded that "[e]ach individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key." Portela, 167 F.3d at 695 (explaining that "a single [drug] conspiracy [exists] if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers").

"The 'overlap' requirement can be satisfied by the pervasive involvement of a single 'core conspirator,' a hub character . . . .'" Portela, 167 F.3d at 695. While it is not necessary that every defendant participate in every transaction, id., the mere overlap of some of the defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement. See Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd., 2011 WL 7053807, *29 (E.D.N.Y 2011) ("Some overlapping parties" were insufficient to show that various conspiracies were "formulated pursuant to an overarching scheme."); In re Iowa Ready-Mix Concrete Antitrust Litigation, 768 F.Supp.2d 961, 975 (N.D. Iowa 2011).

"[W]hile the analysis of 'common goals,' 'interdependence,' and 'overlap' is useful for resolving challenges to the sufficiency of the evidence . . . [the courts have] looked beyond any such lists of factors to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy." Portela, 167 F.3d at 696.

### III. Analysis.   Count One: Overarching Conspiracy.

The sole issue that must be determined by this Court as to Count One is whether there is sufficient evidence to create a genuine issue as to the existence of an overarching conspiracy.

The majority of the evidence that Plaintiffs cite as support for their position consists of the Defendants' decisions to partner with one another to pursue the purchase of the Target Companies. Joint bidding and the formation of consortiums, however, are, as Plaintiffs concede, established and appropriate business practices in the industry. Like the purchase of any other asset, parties may join together to purchase large public companies. Defendants have cited evidence indicating that such partnerships are beneficial to the individual Defendant for a number of reasons that are unrelated to any alleged overarching conspiracy, including the fact that such

partnerships minimize the costs and the risk for each partner. The existence of these partnerships is, therefore, just as consistent, if not more consistent, with a widely-accepted and independent business strategy, as it is with a vast price-fixing conspiracy.

The occasional inclusion of a losing bidder in a final deal is no different. A losing bidder that has interest, knowledge and the ability to contribute to a final transaction may be invited into a consortium for the same reasons that any Defendant was originally invited into a consortium. Each consortium member may want to, among other things, further minimize its costs and risk even after the bidding has ended. Such conduct, on its own, does not suggest an overarching conspiracy. Nor does the Defendants' occasional acknowledgment that joint bidding may minimize competition. A Defendant interested in a specific transaction may have an independent motivation to form a consortium to minimize competition as to a single transaction that is unrelated to a market-wide, price-fixing conspiracy.

Furthermore, the frequent communications, friendly relationships and the "quid pro quo" arrangements between Defendants can be thought of as nothing more than the natural consequences of these partnerships. Defendants that have previously worked together or are currently working together would be expected to communicate with each other and to exchange business opportunities. That is the very nature of a business relationship and a customary practice in any industry. Accordingly, the mere fact that Defendants are bidding together, working together, and communicating with respect to a specific transaction does not tend to exclude the possibility that they are acting independently across the relevant market.

The Plaintiffs further contend that the Defendants' motivations to avoid creating RJR Nabisco-like price runups suggests the existence of an overarching conspiracy. A Defendant's

decision not to pursue a specific transaction, however, is, without more, legally insufficient to allow an inference of a market-wide price-fixing scheme. There is no legal requirement that Defendants compete or, for that matter, inflate the price of a Target Company. At some point in the process, each Defendant will either win the transaction or "step down" to avoid purchasing a potentially overvalued asset. The decision as to whether to continue to pursue a given transaction or to "step down" is a fundamental function of the private equity business. There are enumerable reasons why a given Defendant would make the individual decision to pass on a specific transaction.

The Defendants' alleged motivations to maintain friendly relationships with other Defendants in the industry further fail to suggest the existence of a market-wide conspiracy. A Defendant who is acting independently would have the same motivation. Each Defendant may simultaneously, but independently, institute a policy of not inciting retaliation from other Defendants. As the Supreme Court and First Circuit have noted, such instances exist where independent actions can lead to less competitive results. See, e.g., White, 635 F.3d at 575. Thus, the fact that Defendants failed to compete with the same ferocity of prior eras or were concerned that their actions would incite retaliation cannot provide an inference of an overarching conspiracy.

The evidence of each specific transaction, including Defendants' communications with each other, for the most part, fails to connect to a "larger picture" of an overarching conspiracy. Even where the evidence suggests misconduct related to a single transaction, there is largely no indication that all the transactions were, in turn, connected to a market-wide agreement. Rather, the evidence shows a kaleidoscope of interactions among an ever-rotating, overlapping cast of

Defendants as they reacted to the spontaneous events of the market. While some groups of transactions and Defendants can be connected by "quid pro quo" arrangements, correspondence, or prior working relationships, there is little evidence in the record suggesting that any single interaction was the result of a larger scheme. Furthermore, unlike other cases where an overarching conspiracy was found, here there is no single Defendant that was involved in every transaction or other indication that the transactions were interdependent.[17]

When pressed at the second day of oral argument for the evidence supporting the "larger picture," the Plaintiffs largely abandoned the above arguments to focus on the following statement by a TPG executive regarding the Freescale transaction, a proprietary deal: "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal." Plaintiffs contend that this statement, in combination with the fact that Defendants never "jumped" a deal during the "go-shop" period,[18] as well other statements such as the Goldman Sachs executive's observation

---

[17] The Court further concludes that the Plaintiffs' experts' opinions fail to support an inference of an overarching agreement. The evidence on the record is not of a nature that requires an expert's insight nor is there an indication that the experts were applying the correct legal standard in determining the existence of an overarching conspiracy. Most significantly, however, the experts' ultimate conclusions do not provide a permissible inference under the controlling case law. The conclusions that there are "factors favoring the formation and operation of a cartel" or conduct "consistent with coordinated behavior and inconsistent with competition" do not exclude the possibility of independent action. As the case law makes clear, parallel behavior that is inconsistent with competition may result from independent action.

[18] Although Plaintiffs contend that this statement applies to all deals, including auctions, the statement was made in the context of a proprietary deal and references "jumping" announced deals, which applies only to the nine proprietary purchases for sale where a deal is reached, announced publicly, and shopped to the market. Furthermore, Defendants' conduct during auctions does not provide any discernable pattern of behavior suggesting that Defendants were uniformly "stepping down." The auction process is, moreover, essentially different from the proprietary process, where "jumping" an announced purchase for sale during the "go shop" period is of the very nature of that process.

that "club etiquette prevail[ed]," with respect to the Freescale transaction, provides a permissible inference of an overarching conspiracy.

The statement that "no one in private equity ever jumps an announced deal" and the fact that no announced deals for the propriety transactions at issue were ever "jumped," tends to show that such conduct was the practice in the industry. On its own, these two pieces of evidence would be insufficient to provide a permissible inference of an overarching conspiracy. They do not tend to exclude the possibility that each Defendant independently decided not to pursue other Defendants' proprietary deals because, for instance, a pursuit of such deals was generally futile due to matching rights.

When viewed in combination with the Goldman Sachs executive's statement and in the light most favorable to the Plaintiffs, however, the evidence suggests that the practice was not the result of mere independent conduct. Rather, the term "club etiquette" denotes an accepted code of conduct between the Defendants.[19] Taken together, this evidence suggests that, when KKR "stepped down" on the Freescale transaction, it was adhering to some code agreed to by the Defendants not to "jump" announced deals. The Court holds that this evidence tends to exclude the possibility of independent action. Count One may, therefore, proceed solely on an alleged overarching agreement between the Defendants to refrain from "jumping" each other's announced proprietary deals.

Plaintiffs persistent hesitance to narrow their claim to something cognizable and supported

---

[19] The term "club" is defined as "an association of persons for some common object usu. jointly supported and meeting periodically." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 252 (1984). The term "etiquette" is defined as "the code of ethical behavior among the members of a profession." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 449 (2nd Ed. 1998).

by the evidence has made this matter unnecessarily complex and nearly warranted its dismissal. Nevertheless, the Court shall allow the Plaintiffs to proceed solely on this more narrowly defined overarching conspiracy because the Plaintiffs included allegations that Defendants did not "jump" each other's proprietary deals in the Fifth Amended Complaint and argued in response to the present motions that the evidence supported these allegations. Furthermore, the Court concludes that a more limited overarching conspiracy to refrain from "jumping" each other's proprietary deals constitutes "a continuing agreement, understanding, and conspiracy in restraint of trade to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs" as alleged in Count One of the Fifth Amended Complaint.

The Defendants' Omnibus Motion as to Count One is, therefore, denied. The Plaintiffs may proceed under Count One solely on an alleged overarching agreement between the Defendants to refrain from "jumping" each other's announced proprietary deals.

JP Morgan's individual motion is allowed. The evidence does not establish that JP Morgan was in the business of bidding on Target Companies and does not otherwise support its participation in the narrowed overarching conspiracy. The Court shall entertain renewed individual motions for summary judgment from the other Defendants contending that the evidence does not create a genuine dispute as to their participation in the more narrowly-defined overarching conspiracy.

*Count Two: the HCA Claim.*

Unlike Count One, Count Two does not require the showing of a "larger picture." The only issue relevant to Count Two, is whether the evidence provides a permissible inference of an agreement to "stand down" as to the HCA transaction only. The Court holds that the evidence

30

does provide such an inference.

The evidence establishes that each Remaining HCA Defendant showed interest in the HCA transaction, but promptly "stepped down" from making a topping bid within 48 hours of the commencement of the fifty-day "go-shop" period. The evidence further shows that the Remaining HCA Defendants communicated their decision to "step down" on HCA to KKR or Bain within ninety-six hours of the commencement of the "go shop" period and subsequently lamented having forgone a potentially lucrative deal. While this uniform conduct on the part of the Remaining HCA Defendants would not, on its own, support an inference of a conspiracy as to HCA, in combination with at least two statements made by executives of the Remaining HCA Defendants, it does support such an inference.

The first statement was made during an intra-office email exchange between top executives of Carlyle after they had learned that KKR had decided to compete for Freescale, a transaction for which Carlyle was close to an agreement. The statement reads, "And just think, KKR asked the industry to step down on HCA." This statement is significant for two reasons. First, it suggests that the Remaining HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to "step down" on HCA. Second, the shock conveyed in the statement by the Carlyle executive at KKR's decision to pursue Freescale indicates that KKR's decision was a breach of its agreement not to pursue Freescale.

The second statement was made by a Blackstone executive after KKR had ultimately decided to pass on Freescale. It reads, "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed

deal of ours." This statement suggests there was a previous agreement not to "jump" Freescale and that KKR had decided to adhere to that agreement. Furthermore, in combination with the rest of the evidence, the statement provides an inference that the decision by the Remaining HCA Defendants to "step down" on HCA was in exchange for KKR not competing for Freescale.

These statements tend to exclude the possibility that the Remaining HCA Defendants' uniform conduct was the result of independent actions. The Remaining HCA Defendants' motions as to Count Two are, therefore, denied.

In sum, the Defendants' omnibus motion as to Count One (Docket No. 630) is DENIED with respect to the overarching conspiracy relating to the proprietary deals. JP Morgan's individual motion (Docket No. 643) is ALLOWED. The remaining Defendants' individual motions (Docket Nos. 620, 622, 624, 626, 629, 633, 635, 636, 639, 644) are DENIED as to Count One but may be renewed to address the evidence regarding their participation in the more narrowly-defined overarching conspiracy. The HCA Defendants' motions as to Count Two (No. 641, 639, 626, 622, 620) are DENIED.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge