## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
KIRK DAHL, ET AL., Individually and
on Behalf of All Others Similarly Situated,

                Plaintiffs

              v.                         CIVIL ACTION NO.:
                                            07-12388-EFH

BAIN CAPITAL PARTNERS, LLC, ET AL.,

                Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM AND ORDER

June 20, 2013

      This matter comes before the Court on the HCA Defendants' Motion for Reconsideration of the Court's Order Denying Summary Judgment on Plaintiffs' HCA claim.  In a March 13, 2013 Memorandum and Order (the "Prior Order"), <u>Dahl v. Bain Capital Partners, LLC</u>, 2013 WL 950992 (D. Mass. March 13, 2013), this Court denied summary judgment as to Count Two of the Plaintiffs' Fifth Amended Complaint.  The HCA Defendants contend that the Prior Order contains manifest errors of law caused by the Court's misapprehension of the undisputed chronology of events related to Count Two.

I. <u>Background.</u>

      Plaintiffs are former shareholders of HCA and Count Two alleges, under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, a conspiracy on the part of Goldman Sachs, Carlyle, TPG

1

and Blackstone (the "HCA Defendants") to fix the price paid to the Plaintiffs during the 2006 leverage buyout of HCA.  KKR and Bain formed a consortium (the "Winning HCA Consortium") which ultimately consummated the HCA transaction.  KKR and Bain were originally named as defendants under Count Two, but were dismissed due to shareholders' releases.

In the Prior Order, the Court found a dispute of fact as to whether the HCA Defendants participated in an agreement with the Winning HCA Consortium to refrain from competing for HCA.  Dahl, 2013 WL 950992, at *17.  The Court concluded that the evidence suggested at least two instances, one in July of 2006 and one in September of 2006, where an agreement to refrain from "jumping" HCA was reached between the HCA Defendants and the Winning HCA Consortium.  Id. at *8-10, 17.  The Court, accordingly, held that the evidence supported a denial of the HCA Defendants' summary judgment motions as to Count Two.  Id. at *17.

Much of the evidence relating to the HCA transaction was also made in the context of another transaction, the Freescale leverage buyout, which occurred in September of 2006.  A consortium including three of the HCA Defendants, Carlyle, TPG and Blackstone, won the Freescale deal (the "Winning Freescale Consortium").  Goldman Sachs, who has both a private equity division and a investment banking division, was acting in its investment banking capacity as a financial advisor to Freescale during the Freescale leveraged buyout.

As to the circumstances of the HCA and Freescale transactions, in late July of 2006 the Winning HCA Consortium was negotiating a deal for HCA.  As the Court concluded in the Prior Order, the evidence, in the light most favorable to the Plaintiffs, shows that the Winning HCA Consortium had "asked the industry to step down on HCA" and, despite strong interest in HCA, the HCA Defendants "stood down" and communicated their decision to "stand down" to the

Winning HCA Consortium within ninety-six hours of the transaction's fifty-day "go shop" period.[1]  Id. at *8.

The evidence further shows that, in September of 2006, the Winning Freescale Consortium was close to securing a deal to purchase Freescale when a consortium including Bain and KKR sent an indication of interest to the Freescale Board, disrupting the Winning Freescale Consortium's deal.  Id. at *10.  The Winning Freescale Consortium, shocked by Bain and KKR's action, began mounting, as retaliation, a competing bid for HCA.  Id.  The Prior Order found that, due to the threat of the competing bids, the consortiums communicated with each other and abruptly "stood down" from each other's respective deals.  Id.

The Court found in the Prior Order that the timeline of events when paired with at least two statements made by the HCA Defendants suggested that the HCA Defendants were acting pursuant to an agreement to refrain from "jumping" HCA.  Id. at *16.  As the Court explained in the Prior Order:

> The first statement was made during an intra-office email exchange between top executives of Carlyle after they had learned that KKR had decided to compete for Freescale, a transaction for which Carlyle was close to an agreement. The statement reads, "And just think, KKR asked the industry to step down on HCA."  This statement is significant for two reasons.  First, it suggests that the Remaining HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to "step down" on HCA. Second, the shock conveyed in the statement by the Carlyle executive at KKR's decision to pursue Freescale indicates that KKR's decision was a breach of its agreement not to pursue Freescale.
>
> The second statement was made by a Blackstone executive after KKR had ultimately decided to pass on Freescale.  It reads, "Henry Kravis [of KKR] just

---

[1] A "go-shop" period is a period after a deal is signed, but before the deal closes, during which the financial advisor to the company undergoing the buyout rallies competition and seeks additional bids.

3

>called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." This statement suggests there was a previous agreement not to "jump" Freescale and that KKR had decided to adhere to that agreement. Furthermore, in combination with the rest of the evidence, the statement provides an inference that the decision by the Remaining HCA Defendants to "step down" on HCA was in exchange for KKR not competing for Freescale.

Id. at *16-17.

II. Legal Standard.

To obtain relief on a motion for reconsideration, "the movant must demonstrate either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." Palmer v. Champion Mortg., 465 F.3d 24, 29 (1st Cir. 2006); Latin Am. Music Co. v. Am. Soc'y of Composers, 642 F.3d 87, 91 (1st Cir. 2011). "Unless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." Palmer, 465 F.3d at 30 (citing Appeal of Sun Pipe Line Co., 831 F.2d 22, 24025 (1st Cir. 1987)).

III. Analysis.

   a. Evidence Supporting Two Instances of Agreements.

The HCA Defendants argue that, in the Prior Order, the Court erroneously held that the evidence, in the light most favorable to the Plaintiffs, supported two points in the chronology of events at which an agreement to "stand down" on HCA can be inferred. The HCA Defendants specifically challenge the Court's conclusion that the evidence allows an inference that the "stand down" on "HCA was in exchange for KKR not competing for Freescale." Dahl, 2013 WL 950992, at *17. The HCA Defendants argue that there could not have been an exchange for

4

Freescale in either July or September and that without such an exchange an agreement to "stand down" on HCA would have been implausible.

        1. Agreement to "Stand Down" in July.

The HCA Defendants argue that the "Plaintiffs do not, and cannot, offer any evidence that Freescale was even discussed with KKR or Bain in the context of HCA [in July] or otherwise prior to the KKR bid for Freescale." The Court reaffirms its prior holding on this matter for three reasons.

First, an exchange with respect to Freescale was not necessary to the Court's holding that the evidence creates an issue of fact as to the existence of an agreement to "stand down" on HCA in July. Rather, the Court held that KKR's request to the industry and the evidence of each HCA Defendant's precipitous "stand down" was sufficient to "suggest[] that the [] HCA Defendants did not pursue the HCA transaction because they had previously agreed to do what KKR had asked, namely to 'step down' on HCA." Id. at *16. Such evidence alone tends to exclude the possibility of independent action. White v. R.M. Packer Co., Inc., 635 F.3d 571, 576 (1st Cir. 2011) (A tacit agreement under the Sherman Act may be found where there is "'uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.'") (quoting Brown v. Pro Football, Inc., 518 U.S. 231, 241, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996)).

Second, contrary to the HCA Defendants' argument, the evidence does support an inference that an exchange for Freescale occurred in July. The evidence shows that Carlyle had an expectation of reciprocation with respect to Freescale after KKR "asked the industry to step

down on HCA." The evidence also shows that KKR, in "standing down" on Freescale, "had told [Blackstone] before [that it] would not jump a signed deal of [theirs]." These statements allow for an inference that an exchange for Freescale was made in July. Such an inference, in turn, acts to bolster the conclusion that the evidence tends to exclude the possibility that the HCA Defendants were acting independently when they decided to "stand down" on HCA.

Third, it does not matter whether or not an exchange was made specifically for Freescale. While the HCA Defendants' contend that KKR, Bain and Carlyle did not know about the Freescale negotiations in July, such a contention is largely irrelevant. The exchange could have been made for the next signed deal or for all future signed deals.[2] The evidence simply shows that Carlyle considered KKR's pursuit of Freescale in September a breach of an agreement that had required it to "stand down" on HCA in July and that KKR had told Blackstone before that it would not "jump a signed deal of [theirs]." Such evidence acts to bolster the other evidence tending to exclude the possibility of independent action by providing additional support as to the HCA Defendants' motive for the abrupt "stand down" in July.[3] Such evidence also acts to explain

---

[2] An agreement to refrain from "jumping" the next signed deal or any future signed deal is not, as the Defendants argue, too speculative to have benefitted the HCA Defendants, making their motive for "standing down" on HCA implausible. KKR and Bain's promise that it would not "jump" a future signed deal constitutes a tangible benefit to the HCA Defendants, who are in the business of signing deals. Carlyle further argues that "the alleged overarching conspiracy [not to "jump" any signed deal under] Count I cannot supply the purported motive because Count II [dealing only with HCA] is a separate, stand-alone count." In ruling on a motion for summary judgement, the Court need only conclude that there exists an issue of fact as to whether there was an agreement to "stand down" on HCA. Evidence relevant to Count II may be considered, even if such evidence is also relevant to Count I.

[3] In a similar vein, Goldman Sachs contends that it could not have benefitted from a "stand down" on Freescale because, as an advisor to Freescale, its private equity arm was barred from taking part in any deal to purchase the company. Goldman Sachs argues that because it could not have benefitted from a "stand down" on Freescale, any mutual exchange to "stand down" on

6

the reason for Carlyle, TPG, and Blackstone's subsequent pursuit of HCA in September.

For the foregoing reasons, the evidence, in the light most favorable to the Plaintiffs, supports the Court's prior holding that there exists an issue of fact as to whether the HCA Defendants entered an agreement to "stand down" on HCA in July of 2006.

### 2. Agreement to "Stand Down" in September.

Defendants argue that the chronology of events in September do not allow for an inference of a second agreement to "stand down" on HCA.[4] Defendants contend that the agreement in September could not have occurred until (1) after the HCA "go-shop" period had expired; (2) after the Winning Freescale Consortium had raised its bid for Freescale; and (3) after KKR had already unilaterally decided not to compete for Freescale.[5] The HCA Defendants contend that these facts negate the possibility that a September agreement was reached. The Court reaffirms its holding on this matter.

---

HCA would be implausible. As set forth above, Goldman Sachs's connection to an agreement to "stand down" on HCA can be inferred regardless of any motivation it had with respect to Freescale. The exchange for Freescale, however, is nevertheless relevant to the claim against Goldman Sachs. The evidence shows that KKR asked the industry to "stand down" on HCA and offered Carlyle and Blackstone some reciprocal benefit for doing so. The evidence further shows that Goldman Sachs, acting in conformity with Carlyle and Blackstone, complied with KKR's request by abruptly "standing down" on HCA. An inference can be made that Goldman Sachs, through its membership in the industry and its conformity of action, also received a benefit from KKR.

[4] Evidence of a second "stand down" agreement in September between the Winning HCA Consortium and the Winning Freescale Consortium is ultimately superfluous to the other evidence showing a "stand down" agreement in July. For that reason, the Prior Order did not address the September agreement in its analysis section.

[5] Defendants suggest that the Plaintiffs have conceded their claim in a prior motion by arguing that "[t]he Freescale LBO also offers a glimpse into what the world should have looked like for shareholders during the LBO boom of the conspiracy period." The Court does not view this statement as a concession that no agreement existed with respect to HCA.

7

The evidence, in the light most favorable to the Plaintiffs, allows for an inference that a second "stand down" agreement on HCA occurred on September 15, 2006, before either the HCA or Freescale deal had closed. The evidence shows that, after KKR and Bain had submitted their indication of interest on Freescale, tensions between the parties were at an all-time high. The Winning Freescale Consortium believed that KKR and Bain's action was a blatant violation of an agreement, which had previously required them to "stand down" on HCA. KKR, Bain, and their partner in the Freescale transaction, Silver Lake, on the other hand, believed they had not violated any prior agreement to refrain from "jumping" Freescale because they had not technically "jumped" a *signed* deal.[6]

On September 12, 2006, members of the Winning Freescale Consortium, in apparent retaliation, discussed forming a competing consortium to topple KKR and Bain's HCA deal. Blackstone, who was particularly angered by KKR's action, communicated to KKR on that date the fact that it had signed a confidentiality agreement with HCA, the first step in pursuing a deal for the company. While the HCA fifty-day "go-shop" period also expired on September 12th, the Winning Freescale Consortium's discussions about competing for the HCA transaction on that date indicate their intention to pursue the deal after the expiration of the "go-shop" period.[7]

---

[6] The evidence shows that KKR, Bain and Silver Lake believed that they were operating in conformity with the agreement because they had not jumped a "signed" deal. The evidence shows that KKR had "told [Blackstone] before it would not jump a signed deal of [theirs]" and had "told [Freescale] that [it] would not compete with a signed deal." KKR, however, admitted that it "would not have upset [the Winning Freescale Consortium's] previous deal if [it] had known how close [the Winning Freescale Consortium was to signing a deal]." Additionally, Silver Lake defended its action by stating that "we did not jump an almost signed deal."

[7] Competing bids may have been made after the expiration of the "go-shop" period. The evidence shows that the deal for HCA did not ultimately close until November 11, 2006, after the shareholders had voted to approved the agreement's terms.

8

On September 13th and 14th, tensions between both sides continued as KKR, Bain and Silver Lake conducted due diligence on Freescale. On September 14th, the Winning Freescale Consortium raised its bid for Freescale and the deal was accepted the following day by the Freescale Board on September 15, 2006. As a result of the signed deal with the Winning Freescale Consortium, KKR, Bain and Silver Lake were removed from the due diligence process. KKR was angry with Freescale for signing the deal without allowing them to finish their due diligence. In an internal communication, a KKR executive asked "[h]ow did this happen? I thought they gave us two weeks to do our work? We told the company that we would not compete with a signed deal!!" Another KKR executive stated that, "although they were struggling, this is obviously a disappointment."

On September 15, KKR, Bain and Silver Lake discussed repairing relations with the Winning Freescale Consortium. KKR was especially interested in "officially tell[ing] the other side that [they would] stand down [on Freescale]." At this point in the chronology, it can be inferred that the Winning HCA Consortium was sending its official word to the Winning Freescale Consortium, at least in part, for the purpose of obtaining an agreement from the Winning Freescale Consortium to "stand down" on HCA.[8] While the HCA Defendants contend that KKR, Bain and Silver Lake had already independently decided not to pursue Freescale, the evidence supports an inference that KKR, Bain and Silver Lake nevertheless used a potential "stand down" on Freescale as a bargaining chip to repair relations and to secure an agreement to "stand down" on HCA.

---

[8] The evidence shows that KKR, Bain and Silver Lake were also concerned about their position in another transaction, Philips/NXP, for which members of both consortiums were currently involved.

The evidence shows that over the next couple days, the Winning HCA Consortium members made a number of calls to the members of the Winning Freescale Consortium to repair relations. In one communication, Henry Kravis of KKR reported back to his colleagues after communicating with the other side, stating: "I spoke with Tony James [of Blackstone] last night and Steve Schwarzmann [of Blackstone] this morning re Freescale. They are very happy campers that we are not going any further, since they now have a signed agreement. We got lucky!!!!" This communication, in the light most favorable to the Plaintiffs, allows an inference that, at that point, relations were restored and that the Winning HCA Consortium was "lucky" that the Winning Freescale Consortium were "happy campers" and had agreed to "stand down" on HCA.

Other communications also suggest that a mutual "stand down" occurred on September 15th. For instance, on that date, George Roberts of KKR wrote Tony James of Blackstone: "Congrats. Pls give me a call on cell . . . Grr." On September 17, Tony James responded:

> Thx for the call George. I talked to Henry [Kravis of KKR] Friday night and he was good enough to call Steve [Schwarzmann of Blackstone] Saturday. We would much rather work with you guys than against you. Together we can be unstoppable but in opposition we can cost each other a lot of money.

For the foregoing reasons, the evidence in the light most favorable to the Plaintiffs, supports the Court's prior holding that there exists an issue of fact as to whether Carlyle, TPG and Blackstone entered an agreement to "stand down" on HCA.

b. Goldman Sachs's "Frenzied" Effort.

Goldman Sachs challenges the Court's prior ruling that the evidence establishes that it "showed interest in the HCA transaction, but promptly 'stepped down' from making a topping bid within 48 hours of the commencement of the fifty-day 'go-shop' period." Dahl, 2013 WL

950992, at *17. Goldman Sachs argues that the evidence shows that its investment banking division engaged in a "frenzied" effort to organize a rival consortium for HCA after any alleged agreement to "stand down" could have been reached. The Court reaffirms its prior holding on this matter.

The evidence, in the light most favorable to the Plaintiffs, supports a finding that Goldman Sachs, in conformity with the other HCA Defendants, promptly "stood down" from the HCA transaction around the time that KKR had asked the industry to "stand down."[9] The HCA deal was signed on July 24, 2006. Prior to that date, the evidence shows that Goldman Sachs was interested in HCA. On that date, Ken Hitchner, the Managing Director of Goldman Sachs, communicated to KKR its intention to "stand down" on HCA by stating "[y]ou know my style by now and my only message is that we are here to be helpful and if there is a significant role to play, GS and I would really appreciate strong consideration." Shortly after that date, on the morning of July 26th, KKR sent an intra-office email stating that "TPG and GS have both informed us that they will not compete on HCA." That email came within ninety-six hours of the commencement of the 50-day "go-shop" period.

Goldman Sachs argues a number of communications sent after the commencement of the "go-shop" period conclusively establish that its investment banking division was in a "frenzied" effort to put together a competing consortium. The first communication is an internal Carlyle email sent on the morning of July 25th. The email states that "Goldman, Sachs is in a frenzy trying to organize a competing consortium (they have reached out to us, TPG and Blackstone as

---

[9] The date at which KKR asked "the industry to step down on HCA," as relayed by a Carlyle executive, can be inferred to have occurred sometime before July 26, 2006, the date at which the evidence shows that Carlyle had clearly "stood down" on HCA.

potential leads and have spoken with Warburg, GS PIA, Thomas Lee, Madison Dearborn as well)." This email merely creates an issue of fact as to whether, in the face of the other evidence, Goldman Sachs had ceased its pursuit of HCA upon KKR's request that the industry "stand down."[10] The other communications to which Goldman Sachs cites as support occurred on the 25th and 26th of July and merely show that Goldman Sachs was exchanging information it had collected about HCA with private equity firms. The last set of communications occurred between August 7 and August 9, 2006 and shows only that Goldman Sachs discussed a rumor that a potential consortium involving other private equity firms was forming to pursue HCA. These other communications, in the light most favorable to the Plaintiffs, fail to negate the existence of an issue of fact as to Goldman Sachs's prompt "stand down" on HCA.

    c. Evidence Supporting Independent Justification for Not Competing on HCA.

The HCA Defendants contend that the Court disregarded evidence supporting their independent bases for "standing down" on HCA. The HCA Defendants cite to depositions and contemporaneous communications suggesting that each HCA Defendant "stood down" on HCA because a pursuit of the deal would have been costly and/or futile. For instance, on July 25, 2006, Steve Wise of Carlyle, in discussing the Winning HCA Consortiums' deal which had been signed the previous day, stated:

> My sense is that a competing consortium is a losing proposition. Tommy Frist [HCA's founder] is rolling over $800mm and is teamed up with KKR and Bain. I don't think they will lose and the likely outcome is forcing KKR and Bain to pay

---

[10] The Carlyle executive that wrote the email may have been referring to the investment banking division's efforts up until July 24, 2006, prior to an agreement by Goldman Sachs to "stand down" on HCA. The email, therefore, in the light most favorable to the Plaintiffs, fails to negate the existence of an issue of fact as to Goldman Sachs's prompt "stand down" on HCA.

upwards of $1 billion more and souring two relationships.

In another correspondence, a TPG executive wrote to his colleague that he had told Merrill Lynch, the advisor to HCA's special committee, that "if the committee was so interested in receiving a competitive offer, they should never had agreed to a right to match, which would probably ensure that there would be no competitive offer."[11]

The Court concludes, as it did in the Prior Order, that this evidence, while strong, merely creates an issue of fact as to whether an agreement to "stand down" on HCA existed.

For the foregoing reasons, the Court denies the HCA Defendants' Motion for Reconsideration. The HCA Defendants' Motion for Reconsideration of the Court's Order Denying Summary Judgment on Plaintiffs' HCA Claim (Docket No. 807) is, hereby, DENIED.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge

---

[11] "Matching rights" are contractual rights giving the current bidders the ability to match any competing offer made to the company after the current bidders' offer has been accepted.