UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIRK DAHL, ET AL., Individually and
on Behalf of All Others Similarly Situated,

                Plaintiffs

          v.                                CIVIL ACTION NO.:
                                              07-12388-EFH

BAIN CAPITAL PARTNERS, LLC, ET AL.,

                Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

July 16, 2013

HARRINGTON, S.D.J.

    Count One of the Plaintiffs' Fifth Amended Complaint sets forth an allegation of an overarching conspiracy on the part of the Defendants, who are private equity firms, "to allocate the market for and artificially fix, maintain, or stabilize prices of securities in club LBOs in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." Plaintiffs are shareholders of the companies that underwent such LBOs. In a March 13, 2013 Memorandum and Order (the "Prior Order"), this Court denied summary judgment on Count One, holding that there was a genuine issue of fact as to the existence of an overarching conspiracy, and allowed that count to proceed, albeit on a more limited basis than Plaintiffs had initially alleged. Dahl v. Bain Capital Partners, LLC, No. 07-12388-EFH, 2013 WL 950992 (D. Mass. March 13, 2013). The Court held that the evidence only supported an "overarching agreement between the Defendants to refrain from 'jumping' each

other's announced proprietary deals"[1] and that the claim would move forward under this more narrowly-defined overarching conspiracy. Id. at *16. The Prior Order, however, left open the issue of whether the evidence supported each Defendant's connection to the more narrowly defined conspiracy under the summary judgment standard. Id. That issue as it relates to each Defendant is now before the Court on the Defendants' ten (10) renewed individual motions for summary judgment.

I. Legal Standards.

    a. The Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a summary judgment motion, the Court views the record "in the light most favorable to the nonmovant." Hoffman v. Applicators Sales and Service, Inc., 439 F.3d 9, 11 (1st Cir. 2006) (citing Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 50 (1st Cir. 2000)). All reasonable inferences are to be drawn in the favor of the nonmoving party. Poulis–Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004).

    b. Section 1 of the Sherman Antitrust Act.

Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. A Section 1 claim

---

[1] In the Prior Order, the Court referred to "nine" proprietary deals, but this number includes a deal that Plaintiffs erroneously identified as proprietary at the oral argument. Texas Genco was an auction, not a proprietary transaction and, therefore, is excluded from the more narrowly-defined alleged conspiracy. The accurate count of proprietary deals–the only deals still at issue–is eight. Those transactions are: (1) Kinder Morgan (2) Harrah's (3) TXU (4) AMC (5) Aramark (6) HCA (7) Freescale (8) Sungard.

requires "(1) the existence of a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade . . . and (3) that the restraint affected interstate commerce." Lee v. Life Ins. Co. of N. Am., 829 F.Supp. 529, 535 (D.R.I. 1993), aff'd, 23 F.3d 14 (1st Cir. 1994).

"Section 1 by its plain terms reaches only 'agreements'—whether tacit or express." White v. R.M. Packer Co., Inc., 635 F.3d 571, 575 (1st Cir. 2011) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "It does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." White, 635 F.3d at 575. Accordingly, in order to survive summary judgment, plaintiffs must produce direct or circumstantial evidence that is not only consistent with conspiracy, but "tends to exclude the possibility of independent action." Monsanto Co. v. Spray–Rite Serv. Corp., 465 U.S. 752, 767, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

While the summary judgment standard, as set forth above, requires all reasonable inferences to be drawn in favor of the nonmoving party, the Supreme Court has "limit[ed] the range of permissible inferences from ambiguous evidence in a § 1 case," holding that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[I]n other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action . . . ." Id.

Evidence that tends to exclude the possibility of independent action may include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the

parties," Twombly, 550 U.S. at 556 n.4 (internal citations omitted), or "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision," Brown v. Pro Football, Inc., 518 U.S. 231, 241, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (internal citations omitted).

Plaintiffs must satisfy this standard with respect to each defendant alleged to have participated in the purported conspiracy to show that each defendant committed themselves to the conspiracy. See e.g., AD/SAT, Div. of Skylight Inc. v. Assoc. Press, 181 F.3d 216, 234 (2nd Cir. 1999).

II. Analysis.

The Court holds that there is a dispute of fact as to KKR, Bain, Silver Lake, Blackstone, Carlyle, TPG, THL, and Goldman Sachs's participation in the overarching conspiracy to refrain from "jumping" each other's announced proprietary deals. With the exception of THL, each of these Defendants was involved in the circumstances surrounding the HCA and Freescale transactions and it is those circumstances that serve as the basis for each aforesaid Defendant's connection to the alleged overarching conspiracy. As to THL, it is the evidence related to the Harrah's transaction that serves as the basis for its connection to the overarching conspiracy.

    *a. HCA, Freescale and the Prior Order.*

In the Prior Order, the Court considered whether summary judgment should be allowed as to the two counts set forth in Plaintiffs' Fifth Amended Complaint. See Dahl, 2013 WL 950992 at *1. Count One alleges, as limited by the Prior Order, an overarching conspiracy on the part of the Defendants to refrain from "jumping" each other's announced proprietary deals. See id. at

\*16. Count Two, on the other hand, alleges a conspiracy only as to the HCA transaction. The Court found in the Prior Order that the evidence supporting both conspiracy claims was for the most part predicated on the actions and statements made by the Defendants during the HCA and Freescale transactions. See id. at \*6.

As a general overview, the Freescale and HCA transactions involved two consortiums: Consortium #1, which included Blackstone, Carlyle, and TPG; and Consortium #2, which included KKR and Bain. In late July of 2006, Consortium #2 was negotiating a proprietary deal[2] for HCA. The evidence, in the light most favorable to the Plaintiffs, showed that KKR had "asked the industry to step down on HCA" and, despite strong interest in the company, Goldman Sachs, Blackstone, Carlyle, and TPG promptly "stood down" after the deal was signed.

The evidence further showed that in September of 2006, Consortium #1 was close to securing a deal to purchase Freescale when Consortium #2's KKR and Bain, along with Silver Lake, sent an indication of interest to the Freescale Board, disrupting Consortium #1's deal.[3] The Consortium #1 Defendants, shocked by Bain, KKR, and Silver Lake's action, began considering mounting, as retaliation, a competing bid for HCA.[4] Due to the threat of the competing bids, the

---

[2] A proprietary deal, as opposed to an auction, is a deal in which the Target Company would either deal with one buyer or a consortium of buyers and sign an agreement for sale. The signed agreement would then be announced to the public and the Target Company would have a period of time between the announcement of the signed agreement and its formal closing to find a better offer. During this "go-shop" period, the Target Company's financial advisor "proactively goes out to buyers, and also responds to all inquiries that are received, and tries to stimulate the interest and to create a higher bid for the company."

[3] Goldman Sachs was a sell-side advisor to the Freescale Board.

[4] Silver Lake, whose investing focus was technology companies, was not involved with the HCA transaction.

5

consortiums communicated with each other and abruptly "stood down" from each other's deals.

As to Count Two, the Prior Order held that a dispute of fact existed as to Goldman Sachs, Carlyle, TPG and Blackstone's participation in an agreement to "step down" on HCA.[5] Id. at *17. The Court, accordingly, denied Goldman Sachs, Carlyle, TPG and Blackstone's summary judgment motions as to Count Two. The Court concluded the following:

> The evidence establishes that [Goldman Sachs, Carlyle, TPG, and Blackstone] showed interest in the HCA transaction, but promptly "stepped down" from making a topping bid within 48 hours of the commencement of the fifty-day "go-shop" period. The evidence further shows that [Goldman Sachs, Carlyle, TPG, and Blackstone] communicated their decision to "step down" on HCA to [KKR and Bain] within ninety-six hours of the commencement of the "go shop" period and subsequently lamented having forgone a potentially lucrative deal.

Dahl, 2013 WL 950992 at *16.

The Court also found that two statements suggested that Goldman Sachs, Carlyle, TPG, and Blackstone were acting pursuant to a prior agreement to refrain from "jumping" HCA. Id. at *16-17. The first statement was made during an intra-office email exchange between executives of Carlyle after they had learned that Consortium #2 had decided to compete for Freescale. Id. at 16. The statement reads, "[a]nd just think, KKR asked the industry to step down on HCA." The Court held that this statement was significant because, in light of the fact that each Defendant promptly "stepped down" after the deal was signed and announced, it indicated that there was a prior agreement to refrain from "jumping" HCA. Id. The Court further noted that "the shock conveyed in the statement by the Carlyle executive at KKR's decision to pursue Freescale indicates that KKR's decision was a breach of its agreement not to pursue Freescale." Id.

---

[5] KKR and Bain were originally named in Count Two, but were previously dismissed due to shareholder releases for the HCA transaction.

The second statement was made by a Blackstone executive after Consortium #2 decided to pass on Freescale. Id. at 17. It reads, "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours." The Court held that this statement suggested that there was a previous agreement not to "jump" Freescale and that KKR had ultimately decided to adhere to that agreement. Id. The Court also held that, in combination with the rest of the evidence, the statement provided an inference that the decision by Consortium #1 to "step down" on HCA was in exchange for KKR "stepping down" on Freescale. Id.

The Court reaffirmed its holding on Count Two in a June 20, 2013 Memorandum and Order denying the Count Two Defendants' Motion for Reconsideration. Dahl, 2013 WL 950992 at *24.

As to Count One, the Court found that the evidence established a "larger picture" of an overarching conspiracy on the part of the Defendants to refrain from "jumping" each other's announced proprietary deals. Id. at *15-16. The Court singled out three fundamental pieces of evidence that connected the circumstances of the Freescale and HCA transactions to the overarching conspiracy. Id. at *15. The three pieces of evidence were critical to the Court's holding on Count One because, unlike the majority of other evidence supporting a conspiracy only as to HCA and Freescale, these fundamental pieces of evidence indicated a continuous agreement across the proprietary deals. The three fundamental pieces of evidence were:

1. An email by a TPG executive regarding the Freescale transaction, stating that "KKR has agreed not to jump our deal since no one in private equity ever jumps an announced deal."

2. The fact that no Defendant ever "jumped" an announced proprietary deal during the

"go-shop" period.

      3. A Goldman Sachs executive's observation, upon learning that KKR had decided to withdraw from the Freescale transaction, that "club etiquette prevails."

The Court determined that the first two pieces of evidence indicated a uniformity of conduct within the industry to refrain from "jumping" each other's announced proprietary deals. Id. The Court further held that the third piece of evidence indicated that such uniformity may not be the result of independent action because "the term 'club etiquette' denotes an accepted code of conduct between the Defendants." Id.

The Court, accordingly, held in the Prior Order that there was an issue of fact as to the existence of an overarching conspiracy under Count One. Id. at *16. The Court, however, reserved the issue of whether each Defendant was, in turn, connected to that overarching conspiracy.

      b. *Each Defendants' Connection to the Overarching Conspiracy*.

Turning to each Defendants' connection to the overarching conspiracy, the Court holds that the evidence in the light most favorable to the Plaintiffs creates an issue of fact, as it did under Count Two, as to whether Goldman Sachs, Carlyle, TPG, and Blackstone had a prior agreement with Consortium #2's KKR and Bain to "stand down" on the HCA transaction. Likewise, the same evidence creates an issue of fact as to whether KKR, Bain, and Silver Lake had a prior agreement with the Consortium #1 Defendants to "stand down" on Freescale. The three fundamental pieces of evidence act to connect those prior "stand down" agreements to the single overarching conspiracy to refrain from "jumping" announced proprietary deals under Count One. The evidence taken together, in the light most favorable to the Plaintiffs, shows that the act

8

of "standing down" or not "jumping" announced proprietary deals was more than an isolated event applicable to the Freescale and HCA transactions. Rather, the three fundamental pieces of evidence suggest that "standing down" was the practice of the industry instituted pursuant to a code of conduct agreed to by the Defendants.

The "club etiquette" statement is especially significant to the HCA and Freescale Defendants' connection to the overarching conspiracy because it connects the industry practice of never "jumping" announced proprietary deals to an established code of conduct. It also, moreover, connects the isolated agreement to "stand down" on Freescale to a continuing agreement across the industry. For instance, the statements "no one in private equity ever jumps an announced deal"; "he had told me before they would not jump a signed deal of ours"; and "club etiquette prevails" all refer to Consortium #2's reason for "standing down" on Freescale. The first statements shows that the Freescale "stand down" was in conformity with the practice in the industry.[6] The second shows that the Freescale "stand down" was the result of an agreement that at least encompassed the Freescale transaction. The "club etiquette" statement, however, shows that the Freescale "stand down" agreement and the practice of the industry was in an adherence to an established code of conduct.

While Silver Lake, unlike Bain and KKR, was not involved in the HCA transaction, there is sufficient evidence to connect it to the "stand down" agreement on Freescale and, in turn, to the overarching conspiracy. First, the evidence in the light most favorable to the Plaintiffs shows that, after Consortium #2 decided to "stand down" on Freescale, executives at Silver Lake spoke with

---

[6] One of the Defendants' experts also concluded that refraining from "jumping" deals was the practice in the industry.

9

executives of Bain and KKR to discuss a strategy for restoring peace with Consortium #1. That strategy, in which Silver Lake took part, involved "olive branch" emails and "personal check-in/congrats." The evidence shows that Silver Lake wanted to restore the peace because it was concerned about its position in Philips/NXP, a transaction for which Silver Lake, KKR, and members of Consortium #1 were currently involved. Second, in the aftermath of the Freescale "stand down," Silver Lake defended its actions stating, in response to the fact that Consortium #1 was "still bitching about us jumping their deal", that "we did not jump an almost signed deal." This statement indicates that Silver Lake understood the conspiracy to allow for bidding on deals that were not signed, but that once a deal is signed, it was not to be "jumped."

As to THL, Plaintiffs refer to an email correspondence between THL executives' discussing the Harrah's transaction. Plaintiffs contend that this email string shows a connection to the overarching conspiracy because it shows that THL did not want to compete for Harrah's if other Defendants were close to finalizing a signed deal. In the email correspondence, one THL executive states, "let me know if I should have [a contact at UBS, advisor to Harrah's Special Committee,] make intro for us to the situation. I know we typically don't bust things up - I'm trying to find out from my friend who is the CFO what the status of the deal is - early or late stage." A second executive responds, "I hate ambulance chasing someone elses deal if its pretty baked. Find out status." This correspondence, in the light most favorable to the Plaintiffs, creates an issue of fact as to whether THL did not pursue Harrah's because of an agreement to refrain from "jumping" another Defendant's proprietary deal. The correspondence indicates that placing bids at a late stage was not THL's practice and that, while THL would compete for the transaction at an earlier stage, it would not "bust things up" for another Defendant at a later

10

stage (including the stage before the deal is signed and before deal protection measures are in place). The implication in the light most favorable to the Plaintiffs is that THL will not harm an associate after a certain agreed-upon point in the proprietary deal negotiation process.[7] This implication is consistent with Henry Kravis's statement in Freescale that KKR "would not have upset [Consortium #1's] previous deal if he had known how close [Consortium #1 was to signing the deal]." Such evidence tends to exclude the possibility that THL's decision to refrain from "jumping" Harrah's was independently arrived at and suggests that the decision was made pursuant to an understanding between the Defendants that each other's late-stage proprietary deals were not to be "jumped."

The evidence in the light most favorable to the Plaintiffs, therefore, acts to exclude the possibility that each of the aforementioned Defendants were acting independently when choosing not to "jump" announced proprietary deals.

As to the two remaining Defendants, Providence and Apollo, the evidence does not support a connection to the overarching conspiracy. There is no evidence that Providence was involved in the HCA and Freescale transactions and the evidence of its involvement in other

---

[7] Although the Court does not base its holding on THL's involvement in the Aramark transaction, Plaintiffs further contend that the evidence shows that THL and its partners were requesting other Defendants to "step down" from Aramark in a similar way that KKR had requested that the industry "step down" on HCA. Plaintiffs cite to a statement in an email between executives at Goldman Sachs, THL's partner in the Aramark deal, which states "[t]rying to get the word out that given 40% voting control by management this is a done deal, although stock continues to trade above offer price of $32 . . . down a bit today." Plaintiffs contend that this email can be read to show that Goldman, and by implication THL, was spreading the word to other Defendants that Aramark was a "done deal" so that the other Defendants would "step down." Plaintiffs also refer to a statement by an employee of Credit Suisse, the advisor to the Special Committee of Aramark's board, who remarked that "gs and jpm are telling lbo firms to stay away and the [special] committee is upset about this."

11

transactions is insufficient to connect it to the overarching conspiracy.  Plaintiffs' brief primarily refers the Court to evidence showing that Providence considered transactions outside its investment focus.  Plaintiffs flatly contend that Providence "made no effort to 'jump'" those transactions.  Such evidence does not exclude the possibility that not "jumping" was a decision reached by Providence independently of any overarching conspiracy.

As to Apollo, it had interest in the HCA transaction but, unlike the other Defendants therein, did not abruptly "stand down" after the HCA deal was signed and announced.   Rather, the evidence indicates that Apollo considered "jumping" Consortium #2's announced deal long after the other Defendants had "stood down."  Apollo's consideration of "jumping" the HCA announced deal is inconsistent with the overarching conspiracy to refrain from "jumping" any announced deals.

While Apollo never ultimately submitted a topping bid on HCA, Plaintiffs do not cite to evidence tending to exclude the possibility that Apollo acted independently in "standing down." Plaintiffs instead argue that the evidence shows that Apollo's interest in "jumping" Consortium #2's announced deal was for the purpose of leveraging a piece of the final deal. Plaintiffs cite to an internal communication between two Apollo executives regarding the HCA transaction.  In the communication, one executive questions whether "apollo would want to topple a kkr deal" and concludes:

> p.s. be careful of the kkr call.  They offered Warburg a piece but they turned it down because it was too small.  I'm sure they offered tpg a piece to stand down. We're not in that boy's club yet and let's not agree to stand down too quickly and meekly.  I'm tired of mike michaelson ignoring us.

This communication acts in Apollo's favor as it shows that Apollo, at that point, viewed

itself as an outsider to any potential conspiracy. While Apollo speculated that they may be offered some benefit to "stand down," there is no evidence to suggest that such a result occurred. The evidence does not, for instance, indicate that Apollo received something from KKR or abruptly "stood down" after talking to KKR. Nor does the evidence otherwise indicate that Apollo subsequently joined the overarching conspiracy. Apollo's ultimate decision not to "jump" the HCA deal does not, on its own, tend to exclude the possibility that its decision was independently arrived at.

As to the other transactions which Apollo considered, Plaintiffs fail to cite evidence tending to exclude the possibility that Apollo was acting independently in "standing down." Plaintiffs otherwise rehash many of the arguments that the Prior Order held to be unavailing, such as evidence that Apollo exchanged participation in deals with other Defendants. Such evidence does not establish Apollo's connection to the overarching conspiracy.

For the foregoing reasons, Apollo and Providence are dismissed from the case. Other issues raised by KKR, Bain, Silver Lake, Blackstone, Carlyle, TPG, THL, and Goldman Sachs (the "Remaining Defendants") are addressed below.

    *c. Admission of Statements, Hearsay, and the Coconspirator Exception*.

The Remaining Defendants contend that the statements cited by the Plaintiffs to establish their participation in the conspiracy are inadmissible hearsay that do not fall under the coconspirator exception to the hearsay rule. To admit an out-of-court statement as non-hearsay under the coconspirator exception, a court must find by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and defendant were both members of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. Fed. R. Evid.

801(d)(2)(E); United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977).  The court may consider both independent evidence and the statements themselves when making this finding.  Id.

As to the "in furtherance" requirement, while "mere narrative" of past events or "idle chatter" by a coconspirator does not suffice, statements made to keep coconspirators abreast of an ongoing conspiracy's activities and to review, to interpret, and to devise strategy satisfy the requirement.  See United States v. Haldeman, 559 F.2d 31, 110–12 (D.C. Cir. 1976) (en banc) (narratives of past events considered in furtherance of the Watergate cover-up since discussion and review of past events was necessary for planning strategy); see also United States v. Salgado, 250 F.3d 438, 450 (6th Cir. 2001) (concluding that statements informing coconspirators of fact that replacement driver was used to transport cocaine were not "idle chatter" but were "in furtherance" of conspiracy by informing members of conspiracy of coconspirator's activities); United States v. Flores, 572 F.3d 1254, 1264 (11th Cir. 2009) (construing the "in furtherance" requirement liberally and finding statements met the standard by fostering cohesiveness within gang).

The statements at issue along with the extrinsic evidence of the Remaining Defendants' conduct, which those statements put in context, establish by a preponderance of the evidence that the Remaining Defendants were all members of a conspiracy to refrain from "jumping" announced proprietary deals.  Furthermore, the statements which are internal communications of one Defendant or communications between Defendants about the conspiracies' operations acted to inform other participants in the conspiracy of coconspirators' actions and to interpret those

actions.[8] The statements are, therefore, in furtherance of the conspiracy. Accordingly, those statements are admissible against each Defendant under the coconspirator exception to the hearsay rule.[9]

---

[8] The "asked the industry to step down on HCA" statement was made by a Carlyle executive who had just been informed by another Carlyle executive that KKR had sent an indication of interest to Freescale. The statement is in furtherance of the conspiracy because it acted to review and interpret for other members of the conspiracy KKR's recent action in light of KKR's prior request to "stand down" on HCA. The Blackstone executive's statement that KKR had "told me before they would not jump a signed deal of ours" and the TPG executive's statement that "no one in private equity ever jumps an announced deal" both acted to convey to other participants in the conspiracy the fact that KKR was adhering to the conspiracy and the reason for their decision. Such statements are in furtherance of the conspiracy because they act to keep participants abreast of events related to the ongoing conspiracy. The Goldman Sachs executive's statement that "club etiquette prevails" acted to affirm to another Goldman Sachs executive that the action of Consortium #2's "stepping down" on Freescale constituted a return to the regular operation of the conspiracy.

[9] Some of the statements, while double hearsay, fall within the ambit of the coconspirator exception. For instance, the statement that "Henry Kravis [of KKR] just called to say congratulations and that they were standing down because he had told me before they would not jump a signed deal of ours," involves both a statement by Henry Kravis to a Blackstone executive to inform him of Consortium #2's decision and reason for "standing down" and a statement by the Blackstone executive to his colleague to inform the colleague of Consortium #2's decision and reason for "standing down." Both statements were made by members of the conspiracy and in furtherance of the conspiracy. The Defendants argue that the statement "KKR asked the industry to step down" contains multiple hearsay by unidentified declarants. KKR's instructions to the industry, however, is not being introduced for its truth, only for the fact that the instruction was made. Fed. R. Evid. 801(c) (hearsay is evidence a "party offers . . . to prove the truth of the matter asserted"). "An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth." United States v. Shepherd, 739 F.2d 510, 514 (10th Cir. 1984); see also United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999); United States v. Bellomo, 176 F.3d 580, 586-87 (2d Cir. 1999); United States v. Reilly, 33 F.3d 1396, 1410 (3d Cir. 1994); United States v. Tuchow, 768 F.2d 855, 868 n.18 (7th Cir.1985); United States v. Gibson, 675 F.2d 825, 833-34 (6th Cir. 1982); Butler v. United States, 481 A.2d 431, 438 n.10 (D.C. 1984). The statement by KKR instructing the industry to step down, therefore, is not hearsay and, while the email conveying the fact that the instruction was made between Carlyle executives is hearsay, it falls within the coconspirator exception.

*d. Significance of Released Transactions.*

The Remaining Defendants argue that they cannot be connected to the overarching conspiracy because they have been released from claims involving certain transactions. Specifically, Carlyle, TPG, Blackstone, and Goldman argue that they cannot be considered to have participated in the overarching conspiracy because the evidence connecting them to the claim arose out of the Freescale transaction, a transaction for which they have been released from all claims. Similarly, KKR and Bain argue that they cannot be considered to have participated in the overarching conspiracy because they have been released from the HCA transaction. THL, likewise, argues that it has been released from the Aramark transaction. The overarching conspiracy claim, however, does not arise out of any specific transaction but was an agreement across all eight announced proprietary transactions. A release by one group of shareholders does not, thereby, bind another group of shareholders for damages sustained pursuant to the overarching conspiracy. See Metropolitan Property and Cas. Ins. Co. v. Shan Trac, Inc., 324 F.3d 20, 25 (1st Cir. 2003) (court approved release of in personam claims "cannot resolve the rights of non-parties to anything" and "does not bind non-parties who were never served or given an authorized form of notice requiring them to present their claims"); see also E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

Moreover, each Defendant's connection to the overarching conspiracy is not based on conduct related to the transaction for which they have been released. Rather, Carlyle, TPG, Blackstone, and Goldman Sachs are connected to the conspiracy through their conduct relative to HCA, namely "stepping down" from that transaction and Bain, KKR, and Silver Lake are

16

connected to the conspiracy through their conduct in "standing down" on Freescale. Likewise, THL is connected to the conspiracy through its conduct and statements related to the Harrah's transaction. Accordingly, the releases do not mandate dismissal.[10]

   *e. Evidence of Independent Action.*

Each Remaining Defendant also cites to contemporaneous documents and statements tending to show independent, legitimate reasons for not pursuing each proprietary deal. Defendants contend that this evidence renders any notion of an overarching conspiracy implausible. There is, without doubt, strong evidence that each Defendant determined that certain transactions were not worth pursuing for independent reasons, such as a hesitance to enter an industry in which the company operates, the price of the transaction, regulatory hurdles related to the transaction, deal-protection measures and other characteristics specific to each transaction. The Remaining Defendants' arguments with respect to these justifications, however, go to the weight of the evidence, a matter with which the Court is not concerned on summary judgment.

While evidence may show that the Remaining Defendants had independent concerns related to certain transactions, such evidence acts only to create a genuine issue of fact as to the Remaining Defendants' reasons for not "jumping" announced proprietary deals. The evidence does not render Plaintiffs' theory implausible. Sworn testimony of Defendants' executives may be disbelieved and contemporaneous documents may articulate additional independent concerns notwithstanding the existence of the conspiracy. The evidence, however, when viewed in the light most favorable to the Plaintiffs, creates a genuine issue as to the Remaining Defendants'

---

[10] Many of the Defendants signed shareholder releases for some or many of the other six proprietary deals. It is, however, each Defendant's conduct with respect to the deals for which they have not been released which connects them to the overarching conspiracy.

connections to the overarching conspiracy because it shows that not "jumping" proprietary deals was the uniform practice of these Defendants and tends to exclude the possibility that this practice was the result of independent decisions.

  *f.  Arguments of Specific Defendants*.

    A.  Freescale as Evidence of a "Jump."

  KKR, Bain, and Silver Lake argue that they cannot be considered part of a overarching conspiracy to refrain from "jumping" announced proprietary deals because they submitted an indication of interest in the Freescale transaction and, thus, disrupted Consortium #1's deal.  They contend that such action would contravene any finding of their participation in an overarching conspiracy.  There is evidence on the record, however, suggesting that KKR, Bain, and Silver Lake believed they were acting in conformity with the agreement when they submitted the indication of interest because Consortium #1's deal had not yet been "announced."  An internal Carlyle email states that "Kravis [of KKR] says he would not have upset the previous [Freescale] deal if he had known how close we were."  Similarly, a Silver Lake executive defended the action of submitting the indication of interest on Freescale by stating that "we did not jump an almost signed deal."  This evidence in the light most favorable to the Plaintiffs shows that Bain, KKR, and Silver Lake thought the deal was still open when they submitted the indication of interest and would not have submitted it had they known the deal was close to being "signed" and "announced."  Whether or not the Bain, KKR, and Silver Lake's action weighs against a finding of an overarching conspiracy is a matter for the jury.

    B.  Goldman Sachs's investment Banking Arm's Economic Interest.

Goldman Sachs argues that its participation in an overarching conspiracy to suppress

18

prices on proprietary LBOs would be against its economic self-interest. Goldman Sachs's business has two sides, an investment banking side, which, among other things, advises companies seeking to sell themselves, and a private equity side, which purchases companies. Goldman Sachs does not permit PIA (the private equity side) to bid for any company that IBD (the investment banking side) is advising and vice versa. When acting as a sell-side advisor Goldman Sachs is compensated on a percentage of the total transaction price. Goldman Sachs argues that it would be against its self-interest to join an overarching price-fixing conspiracy because its investment banking side seeks to maximize the price of target companies. It is plain, however, that Goldman Sachs's private equity side has an incentive to prevent other companies from "jumping" its signed or announced proprietary deals. Whether the existence of its investment banking side diminishes such an incentive to the point that it makes its alleged participation in an overarching conspiracy unlikely is a question of fact for the jury.[11]

### C. Silver Lake's Technology-Only Focus.

Silver Lake asserts that it could not be part of an overarching conspiracy because of its limited investment focus on the technology industry. It argues that its co-conspirators would have no economic incentive to include Silver Lake in the broader conspiracy where Silver Lake was already contractually bound not to compete for most deals. Silver Lake also argues that it would be irrational for it to forfeit its ability to compete for the small number of proprietary deals that satisfied its technology-only mandate. The Court disagrees that Silver Lake's limited investment

---

[11] Goldman also argues that it has long-standing policy of not "jumping" deals so as to maintain relationships for other aspects of its business. Evidence supporting this contention only acts to create an issue of fact as to whether the policy was instituted because of or in addition to an overarching conspiracy to refrain from "jumping" announced proprietary deals.

focus renders its participation in the overarching conspiracy implausible. Silver Lake had incentive to prevent other Defendants from jumping its technology-focused deals and other Defendants, conversely, had incentive to prevent Silver Lake from jumping their technology focused deals. Therefore, Silver Lake's alleged participation in the overarching conspiracy is not implausible, even where that participation may be limited.

Silver Lake further argues that its investment focus prevents its connection to a market-wide agreement since it could not have been involved in six of the eight transactions at issue. As articulated above, there is evidence tending to show that Silver Lake was involved in the "stand down" agreement on Freescale. Silver Lake is, therefore, in turn connected to the evidence tending to show that such a "stand down" agreement on Freescale was in compliance with an industry-wide code of conduct.

    g. *Conclusion*.

For the reasons set forth above, KKR, Bain, Silver Lake, Blackstone, Carlyle, TPG, THL, and Goldman Sachs's Renewed Motions for Summary Judgment (Dockets No. 776, 777, 779, 781, 783, 787, 788, and 797) are, hereby, DENIED. Apollo and Providence's Renewed Motions for Summary Judgment (Docket No. 773 and 785) are, hereby, ALLOWED.

SO ORDERED.

                                          /s/ Edward F. Harrington
                                          EDWARD F. HARRINGTON
                                          United States Senior District Judge