UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

KIRK DAHL, et al.,                          :
                                            :
              Plaintiffs,                   :
                                            :
       v.                                   :        Civil Action
                                            :        No. 07-cv-12388-WGY
BAIN CAPITAL PARTNERS, LLC, et al.,         :
                                            :        Leave to File in Excess of 20 Pages
              Defendants.                   :        Granted on January 7, 2014.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## **<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 3

ARGUMENT ......................................................................................................................... 5

I.   BROAD RELEASES THAT APPLY TO SEVEN OF THE EIGHT
     TRANSACTIONS AT ISSUE PRECLUDE CLASS CERTIFICATION ......................... 6

     A.   Class Members Bound By The Broad Releases Cannot Use Evidence
          Relating To Released Transactions Against Released Defendants ......................... 8

     B.   As A Result Of The Broad Releases, Individual Issues Predominate, And
          Any Class-Wide Trial Would Be Unmanageable. ................................................ 12

     C.   The Broad Releases Render Plaintiffs' Claims Atypical Of Putative Class
          Members' Claims And Make Plaintiffs Inadequate Class Representatives .......... 16

II.  PLAINTIFFS' REQUEST TO CERTIFY BOTH PROPOSED CLASSES FAILS
     FOR LACK OF A RELIABLE METHOD SHOWING THE FACT OF INJURY
     BY COMMON PROOF ................................................................................................ 17

     A.   Plaintiffs Must Offer A Reliable Method That Uses Common Proof To
          Establish The Fact of Injury On A Class-Wide Basis ........................................... 18

     B.   Plaintiffs Fail To Offer A Reliable Methodology To Prove Impact Based
          On Common Evidence Grounded In The Facts Of The Case ............................... 20

          1.   The Wilkie/Williams Model Does Not Disaggregate The Effects
               Of Lawful Conduct ..................................................................................... 22

               a.   The Law Requires Disaggregation ................................................ 22

               b.   Plaintiffs' Experts Here Did Exactly What The Supreme
                    Court Forbid In *Comcast* ............................................................... 24

          2.   The Wilkie/Williams Model Does Not Reliably Show Impact
               Because Its Key Factual Assumptions Are Untethered From The
               Record ......................................................................................................... 29

|   |   | a. | Wilkie/Williams' Model Does Not Prove Reliably That *Anyone* Would Have Been Willing To Bid At The Predicted Prices In The But-For World .......................................... 31 |

|   |   | b. | The Wilkie/Williams Model's Inability To Identify The Purported Bidders Precludes Reliable Proof Of Impact ............... 33 |

|   |   | c. | The Wilkie/Williams Model Is Not Reliable Because It Does Not Explain The Mechanism Of Causation ......................... 37 |

|   |   | d. | The Wilkie/Williams Model Assumes Without Basis That Non-Conspiring Firms Would Have Behaved Differently In The But-For World ...................................................................... 38 |

|   |   | e. | Wilkie/Williams' Method Fails To Properly Account For The Financial Impact Of "Leverage" In The Leveraged Buyouts ........................................................................................... 40 |

a. Wilkie/Williams' Model Does Not Prove Reliably That *Anyone* Would Have Been Willing To Bid At The Predicted Prices In The But-For World .......................................... 31

b. The Wilkie/Williams Model's Inability To Identify The Purported Bidders Precludes Reliable Proof Of Impact ............... 33

c. The Wilkie/Williams Model Is Not Reliable Because It Does Not Explain The Mechanism Of Causation ......................... 37

d. The Wilkie/Williams Model Assumes Without Basis That Non-Conspiring Firms Would Have Behaved Differently In The But-For World ...................................................................... 38

e. Wilkie/Williams' Method Fails To Properly Account For The Financial Impact Of "Leverage" In The Leveraged Buyouts ........................................................................................... 40

3.   The Wilkie/Williams Model Circularly Relies On Inapposite Aspects Of Auction Theory ...................................................................... 41

4.   Wilkie/Williams' Model Generates False Positives, Which Proves That It Does Not Show Impact From The Alleged Conspiracy ............... 44

III.   COMMON ISSUES WILL NOT PREDOMINATE BECAUSE THE VALUATIONS UNDERLYING PLAINTIFFS' THEORY OF IMPACT AND THE EVIDENCE DEFENDANTS WILL PRESENT IN DEFENSE ARE DEAL-SPECIFIC ................................................................................................................ 45

IV.   AMC IS OUTSIDE THE CLASS DEFINITION BECAUSE NO DEFENDANT ACQUIRED SHARES OF AMC AS PART OF THAT TRANSACTION ..................... 50

CONCLUSION ......................................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978) ................................................20

*Behrend v. Comcast Corp.*, 264 F.R.D. 150 (E.D. Pa. 2010)...........................................45, 47

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................................5

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)..........................................................passim

*DeRosa v. Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87 (D. Mass. 2010)...................................................................................................................................7

*Disparte v. Corporate Exec. Bd.*, 223 F.R.D. 7 (D.D.C. 2004)..............................................16

*Dovberg v. Dow Chem. Co.*, 195 F. Supp. 337 (E.D. Pa. 1961) ............................................12

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253 (D.C. Cir. 1981)..................................................................................................................................20

*In re Agric. Chems. Antitrust Litig.*, No. 94-40216-MMP, 1995 WL 787538 (N.D. Fla. Oct. 23, 1995)................................................................................20, 21

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) ..........................................................................................................................20, 45

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) .........................19, 20

*In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522 F.3d 6 (1st Cir. 2008)........................................................................................................passim

*In re Nexium (Esomeprazole) Antitrust Litig.,* No. 12-md-02409-WGY, 2013 WL 6486917 (D. Mass. Dec. 11, 2013).......................................................................6

*In re Physician Corp. of Am. Sec. Litig.*, No. 97-3678-CIV, 2003 WL 25820056 (S.D. Fla. May 21, 2003)................................................................................18

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, No. Civ. 95-4704 (DRD), 2006 WL 1479024 (D.N.J. May 26, 2006), *aff'd,* 232 F. App'x 161 (3d Cir. 2007) .................................................................................................................12

*In re Prudential Insurance Co. of America Sales Practice Litigation*, 261 F.3d 355 (3d Cir. 2001) ....................................................................................................11

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) .......................................................................................... 19, 21, 47, 48

*In re Stone & Webster, Inc. Sec. Litig.*, No. 00-10874-RWZ, 2006 WL 1738348 (D. Mass. June 23, 2006) ................................................................. 7

*Johnson v. Advanced Bionics, LLC,* No. 2:08-cv-02376-JPM, 2011 WL 1323883 (W.D. Tenn. Apr. 4, 2011) ............................................................. 16

*Klimaski v. Parexel Int'l*, No. Civ.A. 05-298, 2005 WL 857350 (E.D. Pa. Apr. 4, 2005)........................................................................................... 16

*Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012) ....................................... 14

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618 (6th Cir. 2011) ................................................................. 15

*Shanley v. Cadle*, 277 F.R.D. 63 (D. Mass. 2011) .................................................... 17

*Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256 (11th Cir. 2009).................................................49

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)............................................................5

**RULES**

Federal Rules of Civil Procedure Rule 23 ...................................................................... passim

## PRELIMINARY STATEMENT

Although Plaintiffs claim this case is "like numerous other antitrust and securities class actions" (Pls. Br. at 3) and "no different" than a run-of-the-mill price-fixing case (*id*. at 14 & n.8), they do not and cannot cite a single case with analogous facts.  This is not a case involving the sales of a near homogenous product or stock in a single company.  Instead, Plaintiffs seek to certify an unprecedented class of former shareholders of eight different companies in eight different industries who sold their shares at eight different prices and eight different premiums in eight discrete, unrelated transactions that took place at different times over a five-year period.

Each deal involved a different set of potential acquirers, involving negotiations and decisions by different sets of boards of directors and financial advisors with differing sales processes.  Each Defendant made its "decisions about each of these investment opportunities" based on "the specific facts and circumstances of that particular transaction."[1]  Because "[e]ach deal is different[,] each industry is different[, and] the circumstances around each process is different,"[2] these decisions necessarily varied by deal.  To combine all of these heterogeneous factors and issues into a single class action has no analog in the cases Plaintiffs cite.

While the unprecedented class Plaintiffs seek to certify would be improper under any circumstance, the impact of settlement releases in underlying class action lawsuits challenging the transactions by itself defeats any possibility that common issues could predominate here.  Shareholders in seven of the eight deals at issue are subject to broad releases, and every Defendant but one has a release in at least one transaction.  The Court has already ruled that

---

[1]  Ex. 1 [DiNovi Dep.] at 335:12-19; *see also* Ex. 2 [Pagliuca Dep.] at 233:15-17; Ex. 3 [ Davidson Dep.] at 202:15-210:19.  "Ex. __" refers to the exhibits to the Declaration Of Joseph F. Tringali In Support Of Defendants' Opposition To Plaintiffs' Motion For Class Certification.

[2]  Ex. 1 [DiNovi Dep.] at 335:12-19.

shareholders who are bound by those releases cannot use evidence relating to a released deal against a released Defendant.  As a result, Plaintiffs' motion for class certification is inherently flawed because it relies on evidence of all eight transactions against all Defendants, released and non-released alike.  The evidence that can be offered at trial against any one Defendant will not be common.  Rather, it will vary by each putative class member depending on which releases from prior litigation bind that shareholder.

Even if Plaintiffs could surmount problems wrought by these releases, they have failed to meet their burden to offer a reliable model that uses common proof to establish the fact of injury or "impact" as to all class members.  Plaintiffs' experts assume, rather than demonstrate, that prices would have been different in each deal absent the alleged conspiracies.  In direct contravention of the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), Plaintiffs' experts concede that they did not disaggregate the effects of lawful conduct in their flawed impact and damages model.  Most importantly, they do nothing to take into account that the Court dismissed any claim related to the formation of bidding groups rather than each Defendant bidding separately, which these same experts previously opined lowered the price paid to shareholders.  Moreover, Plaintiffs offer a model that is not grounded in the facts of the case.  Their experts rely on projections made by Defendants and non-defendants, at times even before they had conducted any diligence on the target, and they argue that these projections represent an actual willingness to bid at a specific price and, therefore, that the prices that Defendants and non-defendants would be willing to bid in a world without the alleged conspiracies (the "but-for" world) can be derived directly from those projections.  But, Plaintiffs fail to show that anyone would have been willing to bid at the prices their experts predict in the but-for world in any deal, much less all of them, and the theoretical economic principles on

which they rely cannot substitute for actual evidence, and are indeed irreconcilable with the record here.  It is therefore no surprise that Plaintiffs' unreliable methodology shows false "impact" in at least five deals that the Court already held were *not* subject to the alleged conspiracy.

These and numerous additional defects are equally fatal to Plaintiffs' request to certify both a "Proprietary Deal Class" and an "HCA Class."  Although Plaintiffs assert that their separate HCA count involves a distinct agreement and is not redundant of their overarching conspiracy count (*see*, *e.g*., Pls. Opp. to the HCA Defs. Mot. to Strike Pls. HCA Bid-Rigging Claim, Dkt. No. 607, at 1), they rely on the same evidence and same flawed impact and damages methodology in seeking certification of both proposed classes.  As a result, their request to certify an HCA Class rises or falls with their request to certify their supposed Proprietary Deal Class.[3]  In seeking to certify the larger, unprecedented class, Plaintiffs put forth a deeply flawed model that does not reliably establish impact for any of the eight deals at issue, including the HCA transaction.

## BACKGROUND

Plaintiffs now allege a sprawling seven-Defendant overarching conspiracy involving eight leveraged buyouts ("LBOs") over a five-year period:  AMC, Aramark, Freescale, Harrah's, HCA, Kinder Morgan, SunGard and TXU.  Each of these LBOs is an inherently unique and heterogeneous transaction, as explained in the accompanying reports of Profs. Paul Gompers and Ted Snyder.  For example:

---

[3]   Plaintiffs could have attempted to devise a damages methodology customized to the specific facts and circumstances of the HCA transaction.  They instead offered a generic model that purports to apply to all eight deals notwithstanding their myriad differences.

- Each of the eight LBOs was in a different industry:  AMC (movie theatre industry), Aramark (food services), Freescale (semiconductors), Harrah's (casinos), HCA (hospitals), Kinder Morgan (oil/gas pipelines), SunGard (software/technology) and TXU (utility).  Each industry has different strategic as well as private equity and other financial buyers that focus on the space, and companies in each industry are valued in different ways by the different potential acquirers.

- The LBOs closed at different times over a five year period:  one in 2004 (AMC), one in 2005 (SunGard), two in 2006 (HCA, Freescale), three in 2007 (Aramark, Kinder Morgan and TXU) and one in 2008 (Harrah's).  Market conditions, including the availability and terms of financing for potential acquirers, vary over time.

- The target firms conducted different sales processes. For example, four of the deals— AMC, Aramark, Kinder Morgan and SunGard—were publicly disclosed before signing and had "no shop" provisions.  While "go shop" deals permit a target to solicit higher bids, "no shop" deals prohibit the target from soliciting bids or even providing diligence to potential bidders after signing.

- The target firms selected their "proprietary" deal partners for a variety of reasons and under a variety of circumstances.  For example, HCA's management, along with HCA's founder, hand-picked Bain and KKR to participate in HCA.  Similarly, the Chairman and CEO of Kinder Morgan, initially worked only with Goldman Sachs to develop that deal.

- Non-defendants were involved to different degrees in acquiring the target companies.  For example, the acquiring consortiums included non-defendants in Aramark, Harrah's, HCA, Freescale, Kinder Morgan and SunGard; AMC was acquired only by non-defendants; and non-defendants participated as initial purchasers in the TXU transaction. And, there were an array of non-defendant third-parties that influenced the sales process.  For example, in Harrah's, a non-defendant waged a heated bidding war before losing to TPG and non-defendant Apollo in this "proprietary" deal.

- The merger agreements for each deal contained different deal protections, such as varying amount of break-up fees (to be paid by the target to the party with whom it had a signed deal if the deal was terminated in favor of another proposal) and matching rights (permitting buyers to match any superior offers).[4]

This action is made even more unique by the settlement agreements that resolved prior

shareholders class actions challenging seven of the eight LBOs at issue.  Bain Capital has been

---

[4]   These idiosyncratic features and many others are discussed in detail in the accompanying expert reports.  *See, e.g.*, Expert Report of Paul A. Gompers, Ph.D., dated Jan. 24, 2014 (the "Gompers Report") at ¶¶ 18-32, Ex. 2; Expert Report of Edward A. Snyder, Ph.D., dated Jan. 24, 2014 (the "Snyder Report") at ¶ 98, App'x D, Exs. 1-3.

released from one transaction, Carlyle and KKR from two, Blackstone and TPG from three, and Goldman Sachs from six.[5]  As the Court ruled, these releases prohibit the shareholders bound by them from using evidence relating to the released transactions to prove their conspiracy claims against released Defendants.[6]

## ARGUMENT

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).

Under Rule 23(a), Plaintiffs must prove: (i) "the class is so numerous that joinder of all members is impracticable"; (ii) "there are questions of law or fact common to the class"; (iii) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (iv) "the representative parties will fairly and adequately protect the interests of the class."  Plaintiffs here must make the additional Rule 23(b)(3) showing that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) "a class action is superior to other available methods for fairly and efficiently

---

[5]   Ex. 4 [Order of Dismissal, Dkt. No. 153]; Ex. 5 [Order of Dismissal, Dkt No. 156]; Ex. 6 [Order, Dkt. No. 201]; Ex. 7 [Order, Dkt. No. 209]; Ex. 8 [Order, Dkt. No. 437]; Ex. 9 [Memorandum and Order, Dkt. No. 616].

[6]   Ex. 9 [Memorandum and Order, Dkt. No. 616] at 2.

adjudicating the controversy."   "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."  *Comcast*, 133 S. Ct. at 1432.[7]

## I.   BROAD RELEASES THAT APPLY TO SEVEN OF THE EIGHT TRANSACTIONS AT ISSUE PRECLUDE CLASS CERTIFICATION

Plaintiffs' allegations are staggering in proportion, encompassing eight different transactions in different industries, spanning a five-year period and involving discrete groups of Defendant and non-defendant acquirers, dozens of other non-parties (including financial advisors, board members and other potential acquirers) and disparate collections of thousands of shareholders.   Such a morass of transactions and evidence would be unsuitable for class treatment in any case, as each of the complicated transactions supposedly affected by the massive alleged conspiracies involved its own unique facts and circumstances that splinter the proposed classes and render class-wide consideration of Plaintiffs' claims impossible.

This case, however, presents an even more formidable hurdle to class certification: throughout this action, the Court has enforced broad releases and covenants not to sue in settlement agreements that resolved prior shareholder class actions challenging seven of the eight transactions at issue.[8]  As the Court correctly ruled, those releases not only preclude Plaintiffs and other shareholders bound by them from seeking damages from released Defendants based on released transactions, but also prohibit those same shareholders from using evidence concerning the released transactions in attempting to prove their conspiracy claims against released Defendants.  (Ex. 9 [Memorandum and Order, Dkt. No. 616] at 2 (released transactions "remain

---

[7]   *See also In re Nexium (Esomeprazole) Antitrust Litig.,* No. 12-md-02409-WGY, 2013 WL 6486917, at *5 (D. Mass. Dec. 11, 2013) (Rule 23(b)(3) inquiry demands greater scrutiny than the Rule 23(a) analysis).

[8]   Ex. 4 [Order of Dismissal, Dkt. No. 153]; Ex. 5 [Order of Dismissal, Dkt. No. 156]; Ex. 6 [Order, Dkt No. 201]; Ex. 7 [Order, Dkt No. 209] (enforcing AMC, Aramark, Freescale and HCA releases); Ex. 8 [Order, Dkt. No. 437] (enforcing Kinder Morgan release); Ex. 9 [Memorandum and Order, Dkt. No. 616] (enforcing TXU and Harrah's releases).

at issue in this case as evidence of the overarching conspiracy" but only "as they relate to the *non-released* Defendants" (emphasis added).)  That ruling is the law of the case.  *In re Stone & Webster, Inc. Sec. Litig.*, No. 00-10874-RWZ, 2006 WL 1738348, at *2 (D. Mass. June 23, 2006).

The releases defeat Plaintiffs' motion because they preclude Plaintiffs from using most of the evidence on which they ostensibly rely in seeking class certification.  The Court may "consider[] only *admissible* evidence in determining whether Rule 23's requirements have been met."  *DeRosa v. Mass. Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 95 (D. Mass. 2010) (emphasis added).  Plaintiffs and other shareholders bound by the releases thus cannot use evidence relating to released transactions against released Defendants in support of their motion. This evidentiary bar is fatal to Plaintiffs' motion, which relies almost exclusively on deal-specific evidence.  Because seven of the eight transactions at issue are covered by releases, evidence for those deals is essentially off limits to Plaintiffs because they cannot use that evidence against *all* Defendants.[9]  For example, a critical component of their damages model is their calculation of purportedly "competitive" rates of return for each transaction based on a supposed "benchmark" derived from the Freescale transaction.  (*See* Wilkie/Williams Report ¶ 26.[10])  Four of the six named Plaintiffs are bound by the Freescale release, which also covers four of the seven Defendants.  Without Freescale-related evidence, Plaintiffs have no damages model and no means of establishing class-wide impact with common proof.

---

[9]   Plaintiffs submitted a joint motion seeking class certification of their claims against all Defendants, without regard to whether the transaction-specific evidence cited by Plaintiffs may be used by all or only some putative class members against particular Defendants.  Defendants' opposition necessarily responds to Plaintiffs' arguments in kind.  In so doing, Defendants do not intend to waive their rights under the releases or the Court's orders enforcing them.

[10]  "Wilkie/Williams Report" refers to the Expert Report of Simon J. Wilkie, Ph.D. and Michael A. Williams Ph.D, dated Oct. 21, 2013.

Beyond Plaintiffs' inability to support their motion with admissible evidence, the releases also deprive the putative classes of the cohesion necessary to satisfy Rule 23's requirements. Different class members are bound by different releases, and some are bound by multiple releases. Likewise, different Defendants are covered by different releases, and most are covered by multiple releases. As a result, the claims here are not subject to common class-wide proof, and a class-wide trial would be unmanageable. Some class members would be barred from using some evidence against some Defendants, while other class members would be barred from using other evidence against other Defendants, resulting in an unwieldy variety of evidentiary combinations that render limiting instructions impractical. It would be unreasonable to force a jury to sort through virtually endless permutations of the record to consider each class member's claims against each Defendant.

### A. Class Members Bound By The Broad Releases Cannot Use Evidence Relating To Released Transactions Against Released Defendants

The releases and covenants not to sue in the prior settlement agreements are extremely broad, enjoining class members from pursuing any and all claims arising from or related to the released transactions or based on facts or conduct concerning those transactions against the released Defendants.[11] The Court has consistently enforced these broad releases. In 2008, the

---

[11] Ex. 10 at ¶ 1.14 (AMC settlement releasing "any and all claims . . . in connection with, based upon, arising from, or related to the [AMC] Acquisition or any related . . . facts, matters, transactions, occurrences, [or] conduct . . . ."); Ex. 11 at ¶ 3(b) (Aramark settlement releasing "any and all claims . . . . known or unknown . . . that have been, could have been, or in the future can or might be asserted in this Court or any other tribunal under the laws of any jurisdiction . . . which arise out of or relate to any facts, events, actions, transactions, representations, omissions or any other issues occurring prior to the execution of the Stipulation . . . ."); Ex. 12 at ¶ 1.12 (Freescale settlement releasing "any and all claims . . . which have arisen, could have arisen, arise now or hereafter arise out of, or relate in any manner to, the allegations, facts, events, transactions, acts, occurrences, statements, representations, misrepresentations, omissions or any other matter, thing or cause whatsoever, or any series thereof, embraced, involved, referred to, set forth, arising out of, or otherwise related to . . . the [Freescale] Merger . . . ."); Ex. 13 at B.1(o) (Harrah's settlement releasing "all claims . . . arising from the acts,

Court "order[ed] certain defendants to be released from all claims arising from or related to" AMC, Aramark, Freescale and HCA. (Ex. 4 [Order of Dismissal, Dkt. No. 153] at 1.) In March 2011, the Court similarly enforced the Kinder Morgan release, "order[ing] [certain] defendants to be released from all claims that arise out of, are based upon, relate to, or concern the Kinder Morgan transaction." (Ex. 8 [Order, Dkt. No. 437] at 1.) After Plaintiffs amended their complaint in 2012 to challenge other transactions, the Court again "order[ed] certain Defendants to be released from all claims arising from or related to" Harrah's and TXU. (Ex. 9 [Memorandum and Order, Dkt. No. 616] at 2.)

Plaintiffs' contention that "the Court has never prohibited Plaintiffs from using evidence" relating to a released transaction against a released Defendant is incorrect and seeks to undo the Court's prior decision. (Pls. Br. at 36.) In opposing Defendants' 2012 motion based on the releases, Plaintiffs asked the Court to hold that the released transactions "remain at issue in the case as evidence of the overarching conspiracy" against "*any of the Defendants*." (Ex. 24 [Pls. Mem. In Opp. To Defs. Mot. To Dismiss, Dkt. No. 610] at 5 (emphasis added).) Defendants replied that they had "always understood this language to mean that Plaintiffs may use evidence concerning the released transactions against *non-released* Defendants, not that Plaintiffs may

---

omissions or failures to act . . . against any of the Released Persons, by reason of or arising out of or relating to or in connection with . . . the facts, matters, transactions, decisions, actions, omissions or conduct . . . relating to the [Harrah's] Transaction . . . ."); Ex. 14 at ¶ 1.38 (HCA settlement releasing "any and all claims . . . that may arise now or hereafter out of, or that relate in any way to the . . . [HCA] Merger . . . [or] any facts, matters, transactions, occurrences, conduct or representations relating to or arising out of the subject matter referred to in the" action); Ex. 15 at ¶ 1.37 (Kinder Morgan settlement releasing "any and all claims . . . that (a) in any way arise out of, are based upon, relate to, or concern the facts, matters, occurrences, allegations, representations, omissions, actions, transactions, or conduct alleged . . . or which could have been raised in the [action] . . and/or (b) in any way arise out of, are based upon, relate to, or concern" the Kinder Morgan transaction"); Ex. 16 at ¶ 1.10 (TXU settlement releasing "any and all claims . . . which have arisen, arise now or hereafter arise out of, or relate in any manner to, the [TXU] Merger"). *See also* Ex. 17 at ¶ 8; Ex. 18 at ¶ 9; Ex. 19 at ¶ 9; Ex. 20 at ¶ 9; Ex. 21 at ¶¶ 9-10; Ex. 22 at 28; Ex. 23 at ¶ 2(i).

rely on evidence concerning those transactions in fashioning their overarching conspiracy against released Defendants." (Ex. 25 [Defs. Proposed Reply In Further Support Of Their Motion To Dismiss, Dkt. No. 611-1] at 2.) The Court agreed with Defendants, expressly holding that the released transactions "remain at issue in the case as evidence of the overarching conspiracy *as they relate to the non-released Defendants*." (Ex. 9 [Memorandum and Order, Dkt. No. 616] at 2 (emphasis added).)

Far from "reject[ing] Defendants' arguments that the releases bar use of evidence" relating to released transactions against released Defendants (Pls. Br. at 37), the Court's summary judgment decisions reaffirmed its prior rulings by making clear that those decisions were "not based on conduct related to the transaction[s] for which [the relevant Defendants] have been released." (Ex. 26 [Memorandum and Order, Dkt. No. 894] at 16; *see also id.* at 17 n.10 (relying exclusively on "each Defendant's conduct with respect to the deals for which they have *not* been released . . .") (emphasis added.) Although the Court clarified that the releases do not bind Plaintiffs who were not members of the prior settlement classes (*id.* at 17), nothing in the Court's summary judgment decisions disturbed its prior rulings that Plaintiffs and other putative class members bound by a release can use evidence relating to the released transaction only against "non-released Defendants."[12]

The Third Circuit has squarely rejected a similar attempt to end-run a broad release in a class-action settlement in *In re Prudential Insurance Co. of America Sales Practice Litigation*, 261 F.3d 355 (3d Cir. 2001). Prudential had entered into a settlement agreement with a class of

---

[12] In granting THL's request for summary judgment, the Court "considered" evidence relating to Aramark, a transaction as to which THL was released, but "found [this evidence] was not sufficient to" create a genuine issue of material fact, whether or not the evidence was admissible against THL. (Pls. Br. at 37-38.) The Court thus had no occasion to reconsider the evidentiary effect of the release in granting THL's motion.

policyholders that included a broad release.  *Id*. at 358-60.   Two policyholders who had participated in the settlement with respect to two policies, but opted out with respect to two others, brought a new action seeking damages based on the two policies excluded from the settlement.  *Id*. at 361.  They argued that "while we do not intend to seek damages based upon the non-opted out policies, *the facts surrounding them were relevant to our claims*, including but not limited to our claim of a pattern and practice by Prudential."  *Id*. at 362-63 (emphasis in original) (internal quotation marks omitted).   The Third Circuit disagreed, and barred the policyholders from using any evidence concerning the settled polices to substantiate their claims related to the excluded policies.  *Id*. at 367 ("[T]he [plaintiffs], as class members on two Class Policies, are precluded from using the sales practices and factual predicates pertaining to their Class Policies in their state court action on the Excluded Policies.").   Accordingly, the district court denied plaintiffs' attempts at "discovery and motion practice to obtain evidence involving the facts and circumstances underlying the released transactions in the class action."  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, No. Civ. 95-4704 (DRD), 2006 WL 1479024, at *5 (D.N.J. May 26, 2006), *aff'd,* 232 F. App'x 161, 167 (3d Cir. 2007).[13]

As in *Prudential*, Defendants here negotiated settlements and obtained broad releases from shareholders in prior class-action litigation.   In participating in those settlements, class members voluntarily relinquished their rights to pursue any claims against released Defendants that in any way relate to the released transactions or the facts or conduct underlying them.   As the district court stated in *Prudential*, permitting those same class members to assert claims in

---

[13]   In arguing otherwise, Plaintiffs rely on decisions addressing statutes of limitations, not releases.  (Pls. Br. at 39.)  At most, those decisions stand for the unremarkable and irrelevant proposition that conduct outside of a limitations period can be probative of a conspiracy within the limitations period. *E.g.*, *Dovberg v. Dow Chem. Co.*, 195 F. Supp. 337, 343 (E.D. Pa. 1961).

this action against released Defendants "would go far to deprive [Defendants] of the benefits for which they bargained when agreeing to the settlement[s]."  2006 WL 1479024, at *5.

> **B.     As A Result Of The Broad Releases, Individual Issues Predominate, And Any Class-Wide Trial Would Be Unmanageable.**

Because of the broad releases in the previous settlements, Plaintiffs and putative class members bound by the releases may not rely on evidence concerning released transactions in support of their claims against released Defendants, but may use such evidence in support of their claims against non-released Defendants.   Adding another complication, Plaintiffs and putative class members who did not sell shares in the released transactions are free to use evidence concerning released transactions against any Defendants.  The resulting variation in the evidence available to different putative class members with respect to different transactions and different Defendants deprives the proposed classes of common proof.

All but one Defendant has been released with respect to at least one transaction, and Goldman Sachs has been released with respect to six.

|            | Bain | Blackstone | Carlyle | Goldman | KKR | Silver Lake | TPG |
|------------|------|------------|---------|---------|-----|-------------|-----|
| AMC        |      |            |         | X       |     |             |     |
| Aramark    |      |            |         | X       |     |             |     |
| Freescale  |      | X          | X       | X       |     |             | X   |
| Harrah's   |      | X          |         | X       |     |             | X   |
| HCA        | X    |            |         |         | X   |             |     |
| KMI        |      | X          | X       | X       |     |             |     |
| SunGard    |      |            |         |         |     |             |     |
| TXU        |      |            |         | X       | X   |             | X   |

Similarly, Plaintiffs and the thousands of other shareholders they seek to represent are bound by different releases (many by multiple releases) and thus are subject to different evidentiary limitations.   For example, Plaintiff Detroit Police and Fire Retirement System

("DPFRS") is bound by releases in *five* of the eight transactions (Aramark, Freescale, HCA, Kinder Morgan and TXU).[14]   The releases thus will prevent DPFRS from relying on evidence concerning: (i) four transactions against Goldman Sachs, (ii) two transactions against KKR, TPG, Carlyle and Blackstone, and (iii) one transaction against Bain.   By contrast, Plaintiff Omaha Police and Fire Retirement System ("OPFRS") was a member of only the HCA settlement class and thus is barred from using HCA-related evidence only against KKR and Bain.   Each of the thousands of putative class members will be subject to similarly differing evidentiary limitations.

In short, the evidence available to each class member for use against each Defendant with respect to each transaction will vary considerably depending on which releases apply to that class member.   Because Plaintiffs' purported evidence of the alleged conspiracies and their supposed impact on class members is a patchwork of transaction-specific emails and other documents, the broad releases render Plaintiffs unable to prove the essential elements of those claims with evidence common to the classes.   "Evidence is considered 'common' to the class if the same evidence can be used to prove an element of the cause of action for each member.   If, however, members of the proposed class would need to present evidence that varies from person to person, the matter to be proved is considered an individual question."   *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 22 (D.D.C. 2012).[15]   Without class-wide proof, common issues do not

---

[14]   Many other institutional investors also were selling shareholders in more than one of the seven transactions subject to a release.   A chart detailing the substantial overlap among institutional shareholders participating in those transactions is attached as Gompers Report Ex. 20.

[15]   Plaintiffs argue that "[t]he Court's Orders simply provide a guide as to which Defendants will be responsible for paying damages relating to each deal." (Pls. Br. at 40.)   That argument ignores that the releases also will affect the evidence available to particular putative class members in attempting to prove *liability* as to particular Defendants.

predominate, and class certification is inappropriate.  *See In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522 F.3d 6, 20 (1st Cir. 2008) [hereinafter *NMV*].

The problems wrought by the broad releases defeat certification of both proposed classes. In Count I, the releases produce countless evidentiary variations because putative class members are subject to different releases arising from seven different transactions that apply to six different Defendants and thus preclude common class-wide evidence for Plaintiffs' eight-deal overarching conspiracy class.  The releases create a similar problem for Count II even though that proposed class is limited to former HCA shareholders.  Although no HCA Defendant is released with respect to the HCA transaction, Plaintiffs rely heavily on evidence concerning the Freescale transaction in attempting to prove their HCA-specific claim, contending that both transactions supposedly were the subject of an unlawful *quid pro quo* agreement.  (*See* Ex. 27 [Memorandum and Order, Dkt. No. 763] at 32.)  All four HCA Defendants have been released from any and all claims related in any way to the Freescale transaction.  (Ex. 4 [Order of Dismissal, Dkt. No. 153] at 2.)  Consequently, DPFRS and other members of the proposed HCA class who also were Freescale shareholders—and, as such, are covered by the Freescale release—cannot use evidence concerning the Freescale transaction in attempting to prove their HCA claim.  By contrast, members of the proposed HCA class who were not Freescale shareholders are not bound by that limitation.  The proposed HCA class thus cannot prove its claim with common class-wide evidence.

A class action is also not the superior method for adjudicating the asserted claims because the different combinations of releases applicable to different class members and Defendants would render any class-wide trial unmanageable.  *See Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 630 (6th Cir. 2011) ("To determine whether a class

action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action."). Unlike multi-defendant criminal conspiracy trials where limiting instructions are commonly used, the evidence here would vary not only by Defendant, but also for each of the thousands of members of the proposed classes, greatly magnifying the complexities. Indeed, a trial in this case would see the Court issuing limiting instructions for almost every piece of evidence offered by Plaintiffs, specifying for the jury the particular class members and particular Defendants as to which the evidence may be considered. The jury then would need to undertake the impossible task of separately assessing many different combinations of the evidence in rendering a verdict on each putative class member's claims against each Defendant. Even if appropriate limiting instructions could be formulated, no juror could be expected to adhere to them by disaggregating the evidence in the myriad of ways required by the releases. Juror confusion and unfair prejudice to Defendants thus would be inevitable.[16]

---

[16] Courts have recognized that such risks are high in cases with multiple plaintiffs with different evidentiary records. *See, e.g.*, *Johnson v. Advanced Bionics, LLC*, No. 2:08-cv-02376-JPM, 2011 WL 1323883, at *5 (W.D. Tenn. Apr. 4, 2011) ("a substantial amount of evidence admissible in [one plaintiff's] case will be inadmissible in the [other plaintiff's] case," and thus a "cumulative presentation of the evidence would risk that the jury would resolve the confusion by considering all the testimony to pertain to all the claims, despite any limiting instructions") (internal quotation marks omitted); *Klimaski v. Parexel Int'l*, No. Civ.A. 05-298, 2005 WL 857350, at *5 (E.D. Pa. Apr. 4, 2005) ("[I]t is likely that the evidence admissible for the purposes of one party's claim may not be admissible or relevant to the claims of his co-parties. Were [plaintiffs] to proceed by way of a single action, it would be extremely difficult for the jury, even given limiting instructions, to consider each party's claim . . . independently of the others."); *Disparte v. Corporate Exec. Bd.*, 223 F.R.D. 7, 15 (D.D.C. 2004) (allowing joint plaintiffs to pursue claims together "would prejudice the defendant because there is a significant likelihood that a single jury would be confused by the different items of evidence and different witnesses' testimony").

**C.      The Broad Releases Render Plaintiffs' Claims Atypical Of Putative Class Members' Claims And Make Plaintiffs Inadequate Class Representatives**

The releases also preclude class certification under Rule 23(a) because the widely varying evidence available to Plaintiffs and putative class members ensure that Plaintiffs' claims are not typical of those of the proposed classes and that Plaintiffs cannot adequately represent those classes.  Because of the evidentiary bar arising from the releases, certain Plaintiffs cannot rely upon certain evidence against certain Defendants in attempting to prove the alleged conspiracies, but many of the absent class members they seek to represent are not bound by the same releases and thus would face no such restrictions.  Conversely, some class members would be precluded by releases that bind them from relying on specific evidence against specific Defendants, while certain Plaintiffs would be free to use that evidence in attempting to prove their claims.  In other words, proving a given Plaintiff's claim against a given Defendant would not necessarily prove a given class member's claim (and vice versa).  The releases thus create fundamental differences between Plaintiffs' claims and the putative class members' claims that make it impossible for Plaintiffs to fairly and fully represent the interests of absent class members.  *See Shanley v. Cadle*, 277 F.R.D. 63, 70 (D. Mass. 2011) (denying class certification on adequacy and typicality grounds because of varying effect of settlement agreements).

Similarly, the releases create conflicts between Plaintiffs and members of the proposed classes concerning the evidence to introduce and emphasize at trial.  For example, it would be in DPFRS's interest to downplay evidence relating to the released Defendants' involvement in the many transactions subject to releases that bind DPFRS because it cannot use that evidence against those Defendants.  By contrast, it would be in the interest of many members of the putative class that DPFRS seeks to represent to emphasize the same evidence because they are not bound by the releases.  Similarly, DPFRS would have an incentive to discount Freescale-

16

related evidence in attempting to prove its HCA claim because DPFRS, as a Freescale shareholder, cannot use that evidence against the HCA Defendants, while members of the proposed HCA Class who were not Freescale shareholders presumably would want to emphasize that evidence.  Such contrary incentives create conflicts that preclude class certification.  *See*, *e.g.*, *In re Physician Corp. of Am. Sec. Litig.*, No. 97-3678-CIV, 2003 WL 25820056, at *10 (S.D. Fla. May 21, 2003) (certification inappropriate where named plaintiffs and class members "have conflicting incentives in shaping the evidence") (internal quotation marks omitted).

## II.   PLAINTIFFS' REQUEST TO CERTIFY BOTH PROPOSED CLASSES FAILS FOR LACK OF A RELIABLE METHOD SHOWING THE FACT OF INJURY BY COMMON PROOF

Even if their claims were not subject to seven broad releases, Plaintiffs' class certification motion still would fail because binding precedent requires them to establish the fact of injury or "antitrust impact" by common evidence.  Under *Comcast* and the First Circuit's decision in *NMV*, Plaintiffs must proffer a methodology that reliably shows, using common evidence, that the specific conspiracy alleged here—one purportedly involving an agreement among seven Defendants not to submit topping bids for eight specific announced proprietary deals—actually caused the share prices to be lower in each of those deals than they otherwise would have been. To meet their burden of proving the fact of injury by common evidence, Plaintiffs rely on a methodology proposed by Profs. Wilkie and Williams.  But the Wilkie/Williams methodology suffers from *exactly the same* fatal defects that the Supreme Court and First Circuit have held preclude class certification:  (i) it fails to disaggregate the effects caused by lawful and unlawful conduct, (ii) its critical factual assumptions regarding impact are completely untethered from the real world of private equity, and (iii) it assumes rather than proves impact, based on a novel and wholly inappropriate use of the economic concept of auction theory.  Those errors are not

hypothetical; the defects of Plaintiffs' model are made plain by the "false positives" it generates when applied to LBOs that the Court has previously excluded from the alleged conspiracy.

> ### A. Plaintiffs Must Offer A Reliable Method That Uses Common Proof To Establish The Fact of Injury On A Class-Wide Basis

To obtain class certification, it is not enough to present common proof that defendants conspired to violate the antitrust laws. Rather, "plaintiffs need to demonstrate that common issues prevail as to [both] the existence of the conspiracy and the fact of injury." *NMV*, 522 F.3d at 19 n.18 (internal quotations and citation omitted); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013) (plaintiffs must show "more than common evidence the defendants colluded"; they "must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy").

Proof of the fact of injury means proof of causation—that is, proof of an actual causal link between the alleged conspiracy and the claimed harm. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 325 (3d Cir. 2008). Plaintiffs cannot simply show that the alleged conduct could have affected the prices that the class received "in theory." *Id.* Rather, they must show that the alleged misconduct actually caused the class to receive a lower share price than they otherwise would have received, based on actual, real world evidence that is common to the class. *Id.*; *NMV*, 522 F.3d at 27-28; *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502 (N.D. Cal. 2008) (denying class certification where plaintiffs showed only that "market conditions are favorable for impact").

By conflating the issues of impact and damages, Plaintiffs incorrectly suggest that they are essentially entitled to a "presumption" of impact if there was an antitrust violation, and that the only issue to resolve is the dollar amount by which each class member was damaged. (Pls. Br. at 31.) But that is not the law. To the contrary, the issues of impact and damages are distinct

inquiries and subject to different standards of proof.  *In re Agric. Chems. Antitrust Litig.*, No. 94-40216-MMP, 1995 WL 787538, at *5 (N.D. Fla. Oct. 23, 1995) ("measure of proof necessary to show impact (i.e., 'fact of damage') [and] that necessary to prove 'amount of damage'" are "analytically separate").  The fact of injury or impact "must be proved *with certainty*."  *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 327 (5th Cir. 1978) (emphasis added); *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 268 (D.C. Cir. 1981) ("[T]he fact of injury must be certainly proved.") (internal quotations removed).  "[O]nly after impact has been proven, does a less stringent standard of proof govern the amount of damage inquiry."  *In re Agric. Chems.*, 1995 WL 787538, at *5.

At the class certification stage, Plaintiffs must present a reliable methodology that uses common proof to demonstrate that "each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding."  *NMV*, 522 F.3d at 28.  A common method that reliably establishes impact is "essential to [Plaintiffs'] claim they can offer common evidence of classwide injury."  *In re Rail Freight*, 725 F.3d at 253.  Without a reliable common method, there is "no predominance, no class certification."  *Id.*  Courts must take a "hard look at the soundness" of the proposed method to ensure that it is reliable.  *Id.* at 255.  Plaintiffs must support with facts each of "the key logical steps behind their theory."  *NMV*, 522 F.3d at 26 (court must engage "in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed").  "Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."  *In re Rail Freight*, 725 F.3d at 252-53; *see also NMV*, 522 F.3d at 27-29.

Thus, the dispositive question before this Court is whether the Wilkie/Williams method reliably shows that the alleged conspiracy not to submit topping bids for eight different deals

19

*actually caused* the share price in each of those deals to be lower than it otherwise would have been.  Plaintiffs' method does not come close to showing the fact of injury on a class-wide basis for *any* of the deals at issue, including the HCA transaction.  Because Wilkie/Williams use the same model to show the purported impact of the HCA conspiracy alleged in Count II (Ex. 28 [Wilkie Dep.] at 284:3-8.) Plaintiffs' motion to certify the HCA Class should be denied for the same reasons.

### B.    Plaintiffs Fail To Offer A Reliable Methodology To Prove Impact Based On Common Evidence Grounded In The Facts Of The Case

The Wilkie/Williams' method does not offer a reliable means to prove causation.  They employ a but-for approach that divines the value that they contend certain firms (both Defendants and non-defendants) would have placed upon each target company at issue absent the alleged conspiracies.  They then conclude that, in each deal, the second highest valuation[17] of any of those firms would have become the prevailing price.  (Pls. Br. at 32-34.)  Finally, they assert that any difference between this second highest price (which they label the "competitive price") and the actual sale price is the injury to the putative class members.  (*Id.* at 34; *see also* Ex. 28 [Wilkie Dep.] at 62:9-63:3.)  That approach necessarily assumes that in each of the eight deals at issue, but for the alleged no-jumping conspiracy, there would actually have been a higher price paid by some entity.  But Plaintiffs cannot merely assume causation; they must provide a reliable basis to prove that the alleged conspiracy actually caused lower prices in each challenged deal, including HCA.  The Wilkie/Williams model fails to meet this burden for four independent reasons.

---

[17]    When the second highest valuation in their model yields no damages as was the case with Freescale, Plaintiffs conveniently depart from the model and use a different valuation.  (*See* Wilkie/Williams Report at ¶ 24, Table 3.)

*First*, the model fails to disaggregate the causal effects of challenged and unchallenged conduct.  Plaintiffs' experts admit that their model does not isolate what effects, if any, were caused by the narrow alleged conspiracy that the Court permitted to proceed, as opposed to other factors.  As a result, there is no way to determine that the alleged conspiracy among seven firms not to top eight announced proprietary deals, rather than other lawful factors, actually caused the alleged price effects that the Wilkie/Williams method purports to measure.

*Second*, far from showing "facts necessary for the theory to succeed," *NMV*, 522 F.3d at 26, Plaintiffs' experts make critical factual assumptions that draw no support from, and in important instances are contradicted by, the real world evidence about how the private equity industry and LBOs work.  As a result, there is no evidentiary basis (much less a common one) to conclude that Plaintiffs' method reliably predicts causation of any price difference at all.

*Third*, the method relies on a novel and circular application of an economic theory, known as auction theory, that has no applicability to the market setting of this case.  The method's reliance on auction theory makes the method circular because auction theory assumes rather than demonstrates that a firm would be willing to bid an ascribed valuation in a given transaction.  Plaintiffs provide no evidence to support this bold assumption, which is contrary to the record.   As a result, plaintiffs cannot rely on auction theory to cure their failure to demonstrate causation of actual injury to the class by means of common proof.

*Finally*, by generating "false positives" in deals not subject to the alleged conspiracy, the Wilkie/Williams method proves that, whatever else it may be doing, it cannot be measuring the impact from the specific conspiracies at issue here.  When the method is applied to deals that are not part of either alleged conspiracy, it finds that those share prices were supposedly depressed as well.

### 1.      The Wilkie/Williams Model Does Not Disaggregate The Effects Of Lawful Conduct

The Court cannot certify a class because the Wilkie/Williams method of proving impact does not show that the specific seven-Defendant, eight-deal no-topping conspiracy alleged here is what caused the share price suppression they purport to measure.  Plaintiffs' experts concede that their model does not disaggregate the purported effects of the specific conspiracy at issue here from other potential causes of price suppression unrelated to the conspiracy.  Their failure to disaggregate the effect that permissible conduct has on price is fatal to Plaintiffs' request to certify both proposed classes under *Comcast* and *NMV*.

#### a.      The Law Requires Disaggregation

Both the Supreme Court and the First Circuit have held that a plaintiff's model must "measure only those damages attributable to" the specific wrongful conduct—here, an alleged conspiracy not to jump eight specific proprietary deals after they were publicly announced—and nothing else.  *Comcast*, 133 S. Ct. at 1433; *see also NMV*, 522 F.3d at 27.  The model thus must "sort out" or "disaggregate" the effects of any permissible conduct from the effects of the alleged impermissible conduct because there otherwise is no way to confirm that the alleged conspiracy caused any impact at all.  *Comcast*, 133 S. Ct. at 1433; *NMV*, 522 F.3d at 27 (method fails to support class certification where it provides no "viable means for distinguishing between [lawful and unlawful] effects").  A model that fails to disaggregate cannot support class certification.

In *Comcast*, plaintiffs originally proposed four different theories of antitrust impact.  *See* 133 S. Ct. at 1430-31.  Their expert offered an economic model that purported to calculate the impact from all four theories in the aggregate, but did not isolate damages resulting from any one theory.  *Id.* at 1431, 1434.  The district court ultimately concluded that plaintiffs could proceed on only one of their four theories, but accepted the aggregate model as proof of impact for this

22

one theory.  *Id.* at 1431.  The Supreme Court reversed, holding that a model "must measure only those damages attributable to [the one anticompetitive] theory" plaintiffs are entitled to pursue and nothing else.  *Id.* at 1433.  Because plaintiffs' model included the effects of three types of conduct that were "not 'anticompetitive' in any sense relevant [to the case at issue]," it could not establish impact and could not support class certification.  *Id.* at 1435.

Similarly, plaintiffs in *NMV* alleged that U.S. car manufacturers conspired to restrict the flow of Canadian cars into this country.  522 F.3d at 10.  It was undisputed that defendants had engaged in permissible vertical conduct, but plaintiffs alleged that they had also engaged in a *per se* illegal horizontal conspiracy.  *Id.* at 27.  The First Circuit held that plaintiffs' model had "to sort out the effects of any permissible vertical restraints from the effects of the alleged, impermissible horizontal conspiracy."  *Id.*  The court explained:  "If plaintiffs do not have a viable means for distinguishing between these two sets of effects, they cannot show that it was the horizontal conspiracy that caused the impact on the domestic national market upon which their theory depends."  *Id.*

This rule of law imposes a strict burden on Plaintiffs.  They must demonstrate that their model measures only the impact of the alleged conspiracy not to top the eight specific announced proprietary deals, and that it does not include the impact of any other conduct that also could have reduced share prices, such as a decision not to bid for a reason other than the alleged conspiracy or the decision to form a bidding consortium.  But Plaintiffs' experts admit that their model does not disaggregate, and that the price suppression it purports to show is not limited to the specific no-jumping conspiracy alleged.   (Ex. 28 [Wilkie Dep.] at 64:7-64:9 ("[I]n our analysis we've never opined on exactly what the form of the agreement was.  And so we don't disaggregate. . . ."); *id.* at 14:16-18 ("For the purposes of [C]ount I, we did not, again, we did not

assume a specific form of the conspiracy per se."); Ex. 29 [Williams Dep.] at 29:23-25 ("[we]

don't specifically single out . . . a specific type of conspiracy").)

        **b.**    **Plaintiffs' Experts Here Did Exactly What The Supreme Court Forbid In *Comcast***

Plaintiffs' failure to disaggregate is strikingly similar to the dispositive deficiency in

*Comcast*.  As in *Comcast*, Plaintiffs initially alleged several theories of harm that the Court later

held could not be the basis for liability.  And, just as in *Comcast*, Plaintiffs' experts designed a

model that supposedly demonstrated the aggregate effect of "bidder collusion" on the prices of

the deals at issue (among others), and then failed to modify their model when the Court ruled that

most of those theories of harm could not give rise to liability.

Plaintiffs previously alleged that eleven Defendants engaged in an overarching

conspiracy covering 27 separate deals of different types, including some auctions and some

proprietary deals.  Plaintiffs claimed that those eleven Defendants carried out an alleged 27-deal

conspiracy through a variety of conduct that included, in addition to refraining from jumping

signed proprietary deals, (i) forming "clubs" or consortium to limit competition, (ii) bid rigging,

(iii) auction manipulation, and (iv) quid pro quo exchanges.  (*See* Pls. Mem. In. Opp. To Defs.

Mot. For Summ. J., Dkt. No. 689 (Aug. 23, 2012).)  In opposition to summary judgment,

Wilkie/Williams submitted a report that purported to prove that the eleven Defendants' wide-

ranging conduct in the 27 different auction and proprietary deals suppressed share prices and

therefore showed that Defendants' conduct was consistent with collusion.  (*See* Wilkie/Williams

Summ. J. Report, Dkt. No. 695.[18])

---

[18] "Wilkie/Williams Summ. J. Report" refers to the Expert Report of Simon J. Wilkie, Ph.D. and Michael A. Williams, Ph.D., dated Aug. 23, 2012.

The Court, however, dismissed the vast majority of Plaintiffs' claims on summary judgment, holding that much of the conduct Plaintiffs had alleged suppressed share prices was perfectly lawful. In so ruling, the Court reduced the number of Defendants, the range of allegedly unlawful conduct and the number and nature of deals at issue. (Ex. 27 [Memorandum and Order, Dkt. No. 763] at 25-30.) As Plaintiffs acknowledge (Pls. Br. at 6), the only theory on which they may now proceed is a very narrow alleged conspiracy among seven Defendants not to top eight specific publicly-announced proprietary deals. Gone are the allegations of improper consortia formation, bid rigging, auction manipulation and quid pro quo exchanges, as well as 19 of the originally challenged deals, including all the auction deals, and four of the eleven Defendants. (Ex. 27 [Memorandum and Order, Dkt. No. 763] at 25-30; Ex. 26 [Memorandum and Order, Dkt. No. 894] at 20.) The Court also held, unequivocally, that "joint bidding and the formation of consortiums . . . are, as Plaintiffs concede, established and appropriate business practices in the industry," and that it was lawful for Defendants to invite each other to join them, even if this conduct reduced the prices obtained by shareholders. (*Id.* at 25-27.) Under *Comcast*, none of that should be measured by the Wilkie/Williams model. 133 S. Ct. at 1435.

Yet Plaintiffs' experts concede that the method they now offer to prove impact is the same method they offered back in August 2012 in opposition to summary judgment purportedly to show depressed share prices from the alleged eleven-Defendant, 27-deal overarching conspiracy implemented through a wide variety of different conduct that must now be presumed lawful. (*Compare* Ex. 28 [Wilkie Dep.] at 46:23-47:3 ("Our theoretical assumptions have not changed [since the summary judgment decision narrowed the case]."), *with Comcast*, 133 S. Ct. at 1435 ("factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here")).

Plaintiffs' experts are candid about their failure to disaggregate.  For example, they acknowledge that the Court has found consortia formation to be legitimate behavior, that "club bidding" would be "an appropriate practice" in the "but-for" world (Ex. 28 [Wilkie Dep.] at 60:18-61:7), and they allege that forming consortia would have led to depressed bid prices.[19] They nevertheless admit that their model does not "disaggregate the effect of price suppression due to club formation."  (Ex. 28 [Wilkie Dep.] at 63:21-64:13.)  To the contrary, their model implicitly assumes every firm could and would bid individually rather than join a consortium. (*Id*. at 133:2-6 ("the calculation is done as if [each defendant could do the deal entirely on their own if they had to].").)  As Defendants' experts demonstrate, consortia formation could explain all or the vast majority of the price difference that Wilkie/Williams' model identifies in certain deals.  (*See* Snyder Report at ¶¶ 70-74 (demonstrating that bulk of alleged impact in SunGard may be explained by consortia formation); *see also* Gompers Report at ¶¶ 158, 164-86 (same for HCA).)

Plaintiffs' prior allegations concerning the SunGard transaction show precisely why disaggregation is required, and why Plaintiffs have failed to meet this burden.  For years Plaintiffs alleged that SunGard showed the effect of club bidding by claiming there was "no competition" because "the parties agreed to join forces rather than compete."  (Pls. Mem. In Opp. To Defs. Mot. For Summ. J., Dkt. No. 689, at 8.)[20]  In that transaction, six of the seven

---

[19]  *See* Wilkie/Williams Summ. J. Report, Dkt. No. 695, at ¶ 75 ("Plaintiffs allege that Defendants formed clubs to reduce the already limited number of PE firms that could participate in a given transaction. As discussed above, auction theory shows that a reduction in the number of bidders will, on average, lead to a reduction in the winning bid.").

[20]  *See also* Ex. 27 [Memorandum and Order, Dkt. No. 763] at 7 n.6.  Plaintiffs were adamant that Defendants "joined forces" on SunGard in one consortium rather than "drive up the price paid."  (Pls. Mem. In. Opp. To Defs. Mot. For  Summ. J., Dkt. No. 692, at 91.)  Plaintiffs did not allege that SunGard was the subject of a no jumping agreement.

defendants were part of the acquiring consortium—and therefore could not have threatened to or actually jumped their own deal—and the seventh defendant (Carlyle) also was in that consortium until it dropped out due to price. (Defs. Local Rule 56.1 Statement, Dkt. No. 632, at ¶¶ 193-196.) The Wilkie/Williams model finds antitrust impact and damages for the SunGard deal by assuming defendants would have bid against their own consortium and that Carlyle would have re-emerged post-signing to bid on a deal on which it already passed. The SunGard transaction thus shows precisely why the model needs to disaggregate the effect of lawful behavior—such as club bidding—in order to be a reliable method.

Additionally, the Court has held that it is lawful for Defendants independently to decide not to top a signed deal to "maintain friendly relationships" with other Defendants and to avoid "inciting retaliation." (Ex. 27 [Memorandum and Order, Dkt. No. 763] at 27.) But the Wilkie/Williams model assumes the existence of a competing, second-highest-valuation bid in every deal, which necessarily assumes away any private equity firms legitimately choosing not to bid in the but-for world. As a result, the Wilkie/Williams model does not disaggregate the effects of any such legitimate choices for any transactions. (Ex. 28 [Wilkie Dep.] at 161:17-19 ("we are assuming in the but-for world that a firm would not stand down purely for the reputation of being cooperative"); *id*. at 163:22-164:10 ("Our assumption is in the but-for world that [concerns about retaliation by members of the initial consortium] are not present.").) That failure to disaggregate prevents the model from reliably demonstrating whether the alleged conspiracies caused any of the impact the model identifies.

Wilkie/Williams' model also does not exclude impact on share prices that may have been caused by firms declining to bid because they had investments in or were considering investments in other companies in the same industry. Although Plaintiffs' experts acknowledge

27

that could be a legitimate reason for not bidding on a deal, their model does not account for it. (*Id.* at 151:1-22 ("our analysis is considering these as stand-alone deals").)[21]

Their model also does not disaggregate the impact of deal protection provisions, such as matching rights and breakup fees, on but-for world bidding behavior.  (*Id.* at 50:18-23; Gompers Report at ¶¶ 62-65 (describing impact of deal protection mechanisms on bidding).)  That failure to disaggregate is indefensible in light of the Court's holdings that it is lawful for Defendants to decide independently not to top a signed deal based on deal protection mechanisms, and that there was "strong evidence" that Defendants "determined that certain transactions were not worth pursuing for independent reasons, such as . . . deal-protection measures and other characteristics specific to each transaction."  (Ex. 26 [Memorandum and Order, Dkt No. 894] at 17.)  Deal protection provisions in merger agreements are expressly designed to deter rival bidders and to give the buyer at least some comfort that the time and expense in performing diligence and negotiating the agreement will not go to waste easily.  (Gompers Report at ¶ 63.)  For example, deal protections deterred bids for HCA by TPG and by Blackstone.  Gompers Report at ¶ 65; Snyder Report at ¶¶ 91 n.177.[22]

There are a host of other legitimate reasons why a firm might not submit a topping bid apart from a supposed conspiracy, but ignored by Wilkie/Williams, including:

- <u>Lack of access to non-public information</u>:  The valuation document relied upon for AMC was created before Blackstone received non-public information.  (Ex. 28 [Wilkie Dep.] at 143:3-24.) (admitting that the Blackstone model is dated July 15, 2004); Ex. 43 at BX-0139045 (confidentiality agreement dated July 16,

---

[21]  For example, Plaintiffs have admitted that Carlyle decided to pursue a different hospital group instead of HCA.  (Pls. Local Rule 56.1 Statement Of Material Facts In Dispute, Dkt. No. 690, at ¶ 572.)

[22]  *See also* Defs. Local Rule 56.1 Statement, Dkt. No. 632, at ¶ 466 n.677 (TPG stating "they should never have had agreed to a right to match, which would probably ensure that there would be no competitive offer"); *id.* at ¶ 475 (Blackstone passed on HCA, in part, due to "matching rights and break up fee.")

2004).)  But no firm submitted a binding bid for the eight transactions without receiving non-public information.  (Ex. 28 [Wilkie Dep.] at 214:23-215:3.)

- <u>Unsatisfactory predicted rate of return</u>:  Plaintiffs have admitted that Blackstone decided not to submit a topping bid for TXU because, among other legitimate reasons, there was "not enough irr [internal rate of return] no matter how we slice it [the deal]."  (Pls. Resp. to Def. Blackstone's Local Rule 56.1 Statement, Dkt. No. 691, at ¶ 59 (quoting DEX 942, BX-1526356).)

- <u>Regulatory obstacles to the deal</u>:  Bain decided not to bid on Harrah's in part because of the "onerous disclosures" that would have been required to satisfy gaming industry licensing requirements.  (Bain Supp. SOF, Dkt. No. 777, at ¶ 43).

In short, there is no way to assure that the purported "injury" and "damages" that the Wilkie/Williams method calculates flow only from the limited alleged conspiracy that remains at issue in this litigation.  All of the price suppression identified by the model (if it even actually happened) could have resulted from perfectly lawful behavior, not from the alleged no-topping conspiracy.  Because their method does not even attempt to prove that the alleged conspiracy alone is what caused the predicted damages, Plaintiffs "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Comcast*, 133 S. Ct. at 1433.  This failure to disaggregate is fatal to both classes that Plaintiffs seek to certify.

### 2. The Wilkie/Williams Model Does Not Reliably Show Impact Because Its Key Factual Assumptions Are Untethered From The Record

Plaintiffs' methodology cannot prove that the alleged conspiracy caused prices to be lower because it does not identify, much less provide evidence to support, the "key logical steps" underlying the model's core assumptions, as the law requires.  *NMV*, 522 F.3d at 26.  Indeed, the real-world evidence contradicts those assumptions.

Plaintiffs' but-for world must represent the "actual world" absent the specific anticompetitive conduct at issue and nothing else.  *Comcast*, 133 S. Ct. at 1435; *NMV*, 522 F.3d

at 27.  Thus, any reliable but-for impact model at a minimum must start with defining what the but-for world would have looked like, *i.e.*, what would have happened absent the alleged conspiracy.  But Plaintiffs' experts run from that task, conceding that they did not even attempt to define the contours of the but-for world.  Remarkably, they claim that the contours of the but-for world are "not relevant" to their analysis, and that they are "agnostic" as to what it should look like.  (Ex. 28 [Wilkie Dep.] at 52:2-11; Ex. 29 [Williams Dep.] at 32:21-25 ("[i]t is not necessary, nor relevant," to define the but-for world).  By failing to define the but-for world, Wilkie/Williams committed the same type of error that the First Circuit found in *NMV*—they proffered a model that does not "fully answer[]" all of the questions potentially relevant to causation.  *NMV*, 522 F.3d at 27.

In *NMV*, plaintiffs' expert offered a two-step methodology to prove that the alleged conspiracy among auto manufacturers caused U.S. consumers to pay higher retail prices for cars.  First, the expert said that, but-for the alleged conspiracy, car manufacturers would have had to lower their dealer invoice prices and manufacturer suggested retail prices (MSRPs) to avoid losing sales to lower-priced Canadian cars that would come across the border for resale in the U.S.  *Id.*  Second, he said that the conspiratorially higher MSRPs and dealer invoice prices caused U.S. consumers to pay higher retail prices.  *Id.*  As the First Circuit explained, to reliably demonstrate step one of his theory, plaintiffs' expert had to establish the basis for the implicit assumption that, in the but-for world, there would have been "a flood of significantly lower-priced Canadian cars coming across the border for resale in the United States" to cause U.S. car manufacturers to "take steps to protect the American market from this competition by decreasing nationally set prices."  *Id.*  Without a sufficiently large number of cars poised to cross the border, plaintiffs' impact theory "collapses" and would be "implausible."  *Id.*  The First Circuit found

that the proffered method was not reliable because it failed to "fully answer[] such potentially relevant questions as how the size of the but-for influx of cars would be established or how large that influx would have to be to affect the national market sufficiently to raise effective dealer invoice prices and MSRPs." *Id.*

Just as plaintiffs' expert in *NMV* had not "fully answered" a key causation question—how many Canadian cars would have had to "flood" the U.S. to lower all dealer and list prices, *id.*—Wilkie/Williams have not answered (i) what events or dynamics would have caused the bid price to rise to the second highest valuation that they calculate for each deal in the but-for world, and (ii) whether any firm would have been ready, willing and able to pay that price in each deal, much less who and how. Without answering these fundamental questions—and without offering common evidence to support the answer—Wilkie/Williams cannot reliably show that the alleged conspiracy caused class members participating in any of the eight challenged deals (much less all of them) to receive less for their shares than they would have received in the but-for world.

### a. Wilkie/Williams' Model Does Not Prove Reliably That *Anyone* Would Have Been Willing To Bid At The Predicted Prices In The But-For World

The essential premise of Wilkie/Williams' model is that, but-for the alleged conspiracy, some firm would actually have been ready, willing and able to bid the second highest "equity valuation per share"—a number Wilkie/Williams come up with based on their manual manipulation of Defendants' ordinary course documents—in each of the eight deals. But Wilkie/Williams proffer no evidence to support that assumption. Instead, their model relies on the mere existence of documents that provide some valuation analysis for the company at issue. The model thus unjustifiably treats the mere existence of a valuation document, without any inquiry into the specific context surrounding such a document, as proof of willingness and

31

capability to bid in the but-for world.  (Ex. 28 [Wilkie Dep.] at 128:21-22 ("That is the implicit assumption in our calculations."); *see id.* at 72:18-24.)[23]

Plaintiffs offer no evidence that, in the real world, willingness to evaluate a company equates to willingness to bid.  Plaintiffs offer no evidence that the world ever operated that way, before or after the alleged conspiracy, nor outside its supposed membership.  Firms model returns at a variety of price points for a variety of reasons at various times, and those models are merely one factor among many others that firms consider in deciding whether to pursue a particular deal at all.  (Gompers Report ¶¶ 45-73; *see also supra* pp. 25-28.)  Indeed, many of the valuations on which Plaintiffs rely were done before any deal was signed, but did not result in a bid.  (*See, e.g.*, Snyder Report ¶¶ 93; Ex. 28 [Wilkie Dep.] at 142:22-144:12.)  If Plaintiffs' theory were correct, and merely creating a valuation document evidenced a willingness to bid, then those firms should have been willing to bid the prices in those documents before the deal was signed because, as Prof. Wilkie freely admits (Ex. 28 [Wilkie Dep.] at 17:4-10), the alleged conspiracy did not constrain any firm's pre-signing behavior.

For example, Wilkie/Williams' model predicts that, in the but-for world, Carlyle would have been willing to bid on SunGard up to $36.35 (Wilkie/Williams Report at Table 7) or $36.60 (Wilkie/Williams Report at Table 16) based on their manipulation of a Carlyle valuation document found among the millions of pages of discovery produced.  But it is undisputed that, before any deal was signed and therefore without any alleged conspiratorial constraints, Carlyle

---

[23] Plaintiffs are not even willing to say that the firm that created the valuation document would have been the one to bid at the level they calculate.  (*See, e.g.*, Ex. 29 [Williams Dep.] at 98:8-99:10; *id.* at 106:19-107:9.)  They simply posit that the mere existence of a valuation document means that some firm somewhere would have been willing to bid at the price Plaintiffs derive from the document.  (*Id.* at 100:6-13, 104:24-105:11, 112:24-113:10.)  As discussed below, *infra* Part III, there is no factual basis to believe these valuations reliably reflect the considered judgment of the firm that created it, much less that they reliably evidence some other, unidentified firm's willingness to bid at the identified price.

dropped out of the consortium that ultimately bought SunGard because it was unwilling to participate in a $36 per share bid.  Similarly, Wilkie/Williams' model predicts that, in the but-for world, KKR would have bid on Kinder Morgan up to $138.30 (Wilkie/Williams Report at Table 6) or $129.66 (Wilkie/Williams Report at Table 15).  But Plaintiffs acknowledge that KKR was offered an opportunity to participate in the winning buyout group at $100 before any deal signing and *declined*.

If the firms that actually created the valuations used by Wilkie/Williams declined to participate in winning consortiums at prices well below those calculated by the Wilkie/Williams method, then there is certainly no reliable basis for Plaintiffs to claim that *any* firm would have bid the Wilkie/Williams predicted "prices."  Without evidence that some firm would actually have been ready, willing and able to bid at the prices Plaintiffs claim, Plaintiffs' entire model "collapses" and is "implausible."  *NMV*, 522 F.3d at 27.

### b.    The Wilkie/Williams Model's Inability To Identify The Purported Bidders Precludes Reliable Proof Of Impact

Plaintiffs concede that they did not offer any opinion as to the identity of the firm (or consortium of firms) that would have won any deal in the but-for world, nor as to how that firm (or consortium of firms) would have financed the deal.  According to Prof. Williams, it would take "a lot of work" to do that analysis.  (Ex. 29 [Williams Dep.] at 171:5-17; *see also id.* at 165:24-166:4 ("[W]e never name the identity of the firm that would win the bid in the but-for world.  We just identified the price that would exist in the but-for world."); *id.* at 188:23-189:4 ("I don't see that as a necessary part of the damage analysis.").)[24]  But without knowing which

---

[24]  When asked if their analysis determined what clubs would have formed in the but-for world, Prof. Wilkie testified:  "We did not undertake the analysis."  (Ex. 28 [Wilkie Dep.] at 64:14-18.)  When asked how one would have gone about that task, he replied:  "We haven't addressed that issue.  So I don't want to speculate on an answer at this point in time."  (*Id.* at 65:3-8.)

firm(s) supposedly would have won the deal in the but-for world, the Court cannot determine that the model reliably depicts the but-for world; there is no way to confirm that the Wilkie/Williams model proves that the but-for price actually would have been different.

Plaintiffs' experts cannot even agree among themselves how their methodology works.  While Prof. Wilkie conceded the "equity valuation per share" listed in his damages table is specific to the identified Defendant, (Ex. 28 [Wilkie Dep.] at 103:13-22 (discussing Goldman's willingness to pay for HCA)), Prof. Williams claimed that Prof. Wilkie's view is just "one interpretation of [their] table[s]" but "not a necessary interpretation." (Ex. 29 [Williams Dep.] at 98:16-18.)  The inability of Plaintiffs' experts to agree on the assumptions and implications of their own methodology, and their attempt to have it both ways, underscores the fundamental disconnect between their methodology and the real world.  Prof. Wilkie's approach of blindly attributing the listed equity valuation per share to the listed Defendant is so superficial as to make no economic sense.  It abdicates responsibility for determining whether the firm would have been willing or able to pay the ascribed price, and how it would have structured and financed the deal.  But Prof. Williams' claimed indifference to the identity of the firm that would have bid the listed price cannot make these firm- and deal-specific factors go away and also necessarily fails to show actual causation.

Wilkie/Williams' model presumes, contrary to all actual evidence and common sense, that *every* firm that evaluated a given deal could have purchased the company by itself at the price their method predicts.   (Ex. 28 [Wilkie Dep.] at 131:18-132:3 (It "is implicit in our analysis" that firms could have done each deal on their own.); Ex. 29 [Williams Dep.] at 91:8-11 ("[W]e are assuming that in the but-for world the bidders would be capable of paying the price, the competitive price.").)  Plaintiffs have no evidence that any of the identified firms would have

been willing or able to close each of the eight deals on its own; indeed, Plaintiffs admit that they never even tried to analyze that issue. (Ex. 29 [Williams Dep.] at 92:2-6 (how firm might pay "is not actually part of our damage methodology. So, I don't have a specific opinion on how the winning bidder in the but-for world would finance the competitive price."); *id.* at 100:6-13 (considered it unnecessary to identify winning bidder or how they would have paid the price their model predicts); Ex. 28 [Wilkie Dep.] at 129:14-19 ("we haven't considered" possibility that firms might not be able to cover equity in deal without partners.).)

The real-world evidence disproves that all of the identified firms could have (much less would have) purchased each of the eight companies on their own. (Gompers Report at ¶¶ 84-87.) Private equity firms generally have contractual and/or prudential limits on how much they can invest in any one asset or in companies in the same industry. (*Id.*at ¶¶ 85 & n.66.) And it is a given that no firm could invest without the necessary equity capital to do so. (*Id.* at ¶¶ 86.) Yet Plaintiffs have not shown (or even considered) whether any of the firms at issue would have had access to sufficient equity capital to do these particular deals at these particular times.[25] (*Id.* at ¶ 87.) For example, the amount of equity needed to purchase SunGard ($3.5 billion) or Freescale ($7.15 billion) would have exceeded the total value in Silver Lake's fund at the time, so there was no way Silver Lake could have purchased either company alone, much less both. (Gompers Report at ¶¶ 84, Table 1, 85 n.66, 86.) Indeed, Plaintiffs' expert concedes that there are a variety of reasons why, even in the but-for world, these firms might not have been able to finance deals of this size on their own. (Ex. 28 [Wilkie Dep.] at 128:23-129:19 (conceding in

---

[25] Prof. Wilkie speculated that if a firm did not have enough equity to do a deal on its own, it simply could have "rais[ed] another fund." (Ex. 28 [Wilkie Dep.] at 134:19-25.) That is the economic equivalent of magical thinking. In the real world, that could never have happened. (Gompers Report at ¶ 87.)

but-for world firm might not have been able to finance deal itself and might have been unable to find sufficient partners).)  Wilkie/Williams' model thus cannot reliably show causation without identifying, for each of the challenged deals, a specific winning firm that was capable of financing the deal at the price Plaintiffs claim should have been the "competitive price."  No single Defendant, for example, could have acquired TXU with an $8 billion equity investment, and yet Wilkie/Williams assume precisely that.  If no firm was willing and able to pay the second highest price that the model predicts, then the alleged conspiracy could not have caused share prices to be lower than that level.

Plaintiffs also decline to address whether, in the but-for world, a consortium would have formed to do any of the challenged deals.  They claim that issue is "not relevant to [their] analysis."  (Ex. 29 [Williams Dep.] at 35:23-36:8.)  But Plaintiffs' experts have long claimed that doing deals on a consortium basis, by itself, leads to lower deal prices.  (*See supra* n.17 (citing Wilkie/Williams Summ. J. Report, Dkt. No. 695, at ¶ 75).)  The existence of a consortium in the but-for world is quite material.  The Wilkie/Williams model necessarily (though implicitly) assumes that the winning consortium would have paid the highest price *any* one of its members was willing to pay.  More logically, however, that consortium would have been willing to pay only the highest price *all* of its members were willing to pay.  (Ex. 28 [Wilkie Dep.] at 67:5-20 (acknowledging that he never analyzed issue of what price consortium might be willing to pay); Gompers Report ¶ 90 (economic theory cannot answer definitively how consortium would arrive at its price).)  Indeed, Plaintiffs' experts prepare hypothetical "but for" valuations per share that they opine represent the "maximum price" that a particular firm would have been willing to pay for the target (Wilkie/Williams Report ¶ 13) without pausing to consider the obvious implication: if they are correct, then a consortium would fall apart unless it paid no more than the lowest

valuation prepared by one of its members.  Without knowing the identity of the consortium members, there is no way to know whether its members would have been willing to pay the highest price that the model assumes, or the lowest valuation dictated by its members.  As a result, there is no way to know whether the model reliably predicts a but-for price that any consortium would have paid.

**c.**      **The Wilkie/Williams Model Is Not Reliable Because It Does Not Explain The Mechanism Of Causation**

While the Wilkie/Williams model assumes the absence of the alleged no-topping conspiracy would have led to higher prices in each of the eight deals, it never explains for any deal what would have caused the price to rise in the but-for world.  Plaintiffs' experts never opine that there actually would have been a topping bid in any of the eight deals in the but-for world.  Instead, they speculate that maybe some deals would have been topped, or maybe none would have.  (Ex. 28 [Wilkie Dep.] at 51:17-52:11 ("We are agnostic.").)  Either way, they say, the target would have received the exact same, higher deal price that they predict (*i.e.*, the second highest equity valuation per share).  *Id.*[26]

But Plaintiffs offer no logical explanation, much less one supported by evidence, why the *exact same* price would result whether a deal was topped or not.  Plaintiffs do not explain how, without knowing what other firms are willing to pay by seeing the topping bid, the original bidder would have known to raise its bid to that precise level.  Plaintiffs simply engage in more speculation—maybe, prior to signing any proprietary deal, the target would have talked to a

---

[26]  That Plaintiffs' experts do not assert that firm(s) necessarily would have submitted a topping bid in the but-for world is unsurprising.  They have previously agreed with Defendants' expert Prof. Gompers that jumping, in the real world, is very rare regardless of any alleged conspiracy.  (Wilkie/Williams Reply Report (May 16, 2013), Dkt. No. 844, at ¶ 7 ("[T]he fact that there is a low incidence of bid jumping in mergers and LBOs generally is both well-known and fully understood given an appreciation of the basic economics of bidding.").)

37

number of potential bidders to see what price they would have been willing to pay to "get an idea of where the second highest value is at and negotiate over around that benchmark price." (Ex. 28 [Wilkie Dep.] at 54:11-55:3.) But Wilkie/Williams provide no evidence of that ever happening in the real world, and their model does not explain how the alleged conspiracy prevented that from happening in the actual world.

The only alleged overarching conspiracy left in the case is that Defendants agreed not to top eight announced proprietary deals. Under this theory, Defendants were free to compete vigorously on price before signing. (Ex. 28 [Wilkie Dep.] at 17:4-10.) In addition, if the conspiracy were to apply and restrain the threat of bid jumping after an announced agreement, basic economic principles indicate that competition before announcement would intensify. (Snyder Report at ¶ 42.) Furthermore, if, as Plaintiffs' experts speculate, the target would have shopped around to see what other bidders were willing to pay before signing the proprietary deal, those prices, unconstrained by the alleged conspiracy, would dictate the price the target was willing to accept from the proprietary bidder. (Gompers Report at ¶ 104; Snyder Report at ¶ 19(iii) and *id.* n.19.) In that scenario, the actual world price and the but-for world price would be the same. *Id.*

       **d.**    **The Wilkie/Williams Model Assumes Without Basis That Non-Conspiring Firms Would Have Behaved Differently In The But-For World**

The Wilkie/Williams model also errs by assuming that at least some non-defendants, *e.g.,* firms dismissed from the case, such as TH Lee, J.P. Morgan Partners ("JPMP"), Apollo and Warburg, would have behaved differently in the but-for world. (Ex. 29 [Williams Dep.] at 123:9-15 (model does not vary depending on which firms are in conspiracy and which ones are not).) The model thus violates the rule that the only difference in the but-for world is the

absence of the alleged conspiracy. *Comcast*, 133 S. Ct. at 1435; *NMV*, 522 F.3d at 27. The Wilkie/Williams model also never explains *which* non-defendant firms would have behaved differently (*e.g.,* which firm would have bid the supposed "competitive" price), much less *why* they would have done so, given that those firms were not constrained by the alleged conspiracy in the actual world.

For example, the Wilkie/Williams analysis of the AMC deal relies on purported valuations from and competition between, AMC's acquirers, non-defendants Apollo and JPMP. Their model predicts that the competitive price should have been based on the equity valuation per share that their method calculated for JPMP of $21.00, because that was the second highest valuation below the equity valuation per share that they calculated for Apollo of $22.52. (Wilkie/Williams Decl. Table 1.) But neither JPMP nor Apollo bid at those prices in the actual world, even though they were not constrained by any supposed conspiracy. Thus, the Wilkie/Williams model asks the Court to conclude that two companies that the Court has found did not participate in the alleged conspiracy would have acted differently in the but-for world, without any evidence or explanation as to why that would be so. (Ex. 28 [Wilkie Dep.] at 240:5-6 (model assumes non-defendants would have acted differently in but-for world).)

If Plaintiffs had excluded the purported valuations of non-defendants JPMP and Apollo from their AMC analysis, then their model would have predicted the second highest bid as $19.14 (Goldman's supposed valuation). (Wilkie/Williams Report at Table 1.) Because $19.14 is less than the actual AMC sale price of $19.50, their model would show no damages for AMC, and thus no impact on AMC's shareholders. *Id.* Alternatively, if Plaintiffs included Apollo and JPMP in the chart, but listed them with the price they were willing to pay in the real world ($19.50), there would also be no damages.

The same is true for TXU.  If Plaintiffs had excluded the purported valuations of non-defendants Apollo and JPMorgan from their model, it would again predict no damages.  The second highest purported valuation then would be Goldman's valuation of $68.00, which is lower than the actual sale price of $69.25.  (Ex. 28 [Wilkie Dep.] at 242:3-244:23.)  Again, Plaintiffs offer no explanation, much less evidence, to support their assumption that Apollo and JPMorgan (a debt financier, not a private equity firm) would have bid at the valuation prices that Wilkie and Williams attribute to them in the but-for world, when they did not do so in the actual world.  Accordingly, the simple exclusion of non-defendants' valuations from the model suffices to show that it does not reliably show impact as to either AMC or TXU, and therefore fails to show impact from the alleged conspiracy on a class-wide basis involving all shareholders from all of the eight deals.

### e.   Wilkie/Williams' Method Fails To Properly Account For The Financial Impact Of "Leverage" In The Leveraged Buyouts

Plaintiffs' methodology is also fundamentally flawed because Profs. Wilkie and Williams, who lack any relevant expertise in finance, have failed to properly account for leverage, the hallmark of LBOs.  As Prof. Gompers explains, the Wilkie/Williams method calculates the purported "equity valuation per share" for each of the eight target companies consistent with their *pre*-LBO debt structure, yet private equity firms price their bids using the target companies' *post*-LBO debt structure.  (Gompers Report at ¶ 116.)  This is equivalent to mistaking that an all-cash homebuyer (*e.g.*, 100% equity) faces the same risk as one with a mortgage financing 80% of the price.  (*Id.* at ¶¶ 118-19, 122.)  The riskiness and potential returns generated from a LBO are directly affected by the post-LBO leverage—as is, by extension, the price a firm might be willing to pay.  *(Id.* at ¶¶ 121-22.)  Because they execute their model with only *pre*-LBO leverage, Plaintiffs' experts ignore that *post*-LBO leverage would significantly

increase the returns that Defendants would require and therefore lower the price Defendants would be willing to pay.  When the Wilkie/Williams method is adjusted to correct this one fundamental error, it shows *no impact* from the alleged conspiracy in five out of the eight deals. (*Id.* ¶ 126, Ex. 5.)[27]

### 3.  The Wilkie/Williams Model Circularly Relies On Inapposite Aspects Of Auction Theory

As shown above, Plaintiffs' proposed methodology merely assumes, rather than demonstrates, causation, *i.e.*, that there would have been higher winning bids in all eight deals but-for the alleged conspiracy.  Plaintiffs' attempt to solve that problem via auction theory is wholly circular.   Auction theory is not a proper, recognized economic approach for demonstrating that any particular bids would have occurred in all eight deals in the but-for world.[28]  To the contrary, auction theory expressly *assumes* every firm's willingness to bid as a given, but does not provide a proper mechanism to prove that any particular firm *had* such a willingness in the but-for world.  (Snyder Report at ¶¶ 100, 103, 107.)  That renders it useless as a common methodology for demonstrating that the alleged conspiracy caused impact.  *Cf. In re*

---

[27]  Furthermore, determining the proper post-LBO leverage to use in any prediction of pricing is an idiosyncratic undertaking not susceptible to common proof.  As demonstrated by Prof. Gompers, leverage varies not only across deal, but also by firms considering the same deal.  For example, in the SunGard deal (based on the Silver Lake model), the leverage was expected to increase from 0% to 211%.  On the other hand, in the Aramark deal (based on Apollo's model), the leverage was expected to increase from 47% to about 171%.  Also, in the Harrah's deal, Goldman expected leverage to increase from 73% to over 750%, whereas Blackstone expected an increase to around 350%. (Gompers Report at ¶¶ 124-25.)

[28]  Plaintiffs try to defend their experts' method by arguing that auction theory in general is "well-understood" and "well accepted."  (Pls. Br. at 34.)  But that does not answer the question whether Wilkie/Williams have reliably applied auction theory to show common proof of impact in this case. Plaintiffs must, but cannot, tie the application of the economic theory on which they rely to the facts of *this* case.  *NMV*, 522 F.3d at 27-28.  This is not the first time that Prof. Williams has had this problem. The district court in *Comcast* rejected his model based on the well-accepted economic theory of benchmarking because he had no evidence that it applied to the specific facts of the underlying case. *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 175-77 (E.D. Pa. 2010), *rev'd on other grounds*, *Comcast*, 133 S. Ct. at 1435.

*Graphics Processing*, 253 F.R.D. at 502 (denying class certification because plaintiffs showed only that conspiracy could have impacted the market).

Auction theory, and specifically the Revenue Equivalence Theorem and Revelation Principle that Wilkie/Williams rely upon, can, under certain circumstances, provide a mechanism to predict the prevailing price, *if* all of the potential bidders are, in fact, willing and able to bid up to the valuations ascribed to them.  (Snyder Report at ¶¶ 100, 103, 107.)  But Wilkie/Williams' application of auction theory here is missing the critical predicate step; they have offered no common evidence that any firm would have bid a price higher than the actual deal price in any of the eight deals, much less bid up to the manipulated valuations that Wilkie/Williams calculate.

To the contrary, as explained above, there are many reasons why a firm who created a valuation for a company (even the firm with the highest valuation) might not actually bid up to that specific value or even bid at all.  (Snyder Report at ¶ 91.)  For example, a firm might not be able to obtain the equity necessary to purchase a multibillion dollar asset on its own and might not be able to find suitable partners willing to do the deal at the same price.  (Gompers Report at ¶¶ 67-69.)  Or a firm could be unable to purchase the company because of legal or regulatory constraints, such as antitrust issues arising from owning other companies in the same industry.  (*Id.* at ¶ 71.)  A firm also might lack sufficient information to be comfortable making a bid at its valuation.  (*Id.* at ¶¶ 52-56.)

In the eight deals at issue, the target negotiated with only a single bidder (or bidding group) for a period of time.  (Gompers Report at ¶ 22 n.16.)  During this time, only its chosen bidder had critical access to key management personnel and confidential business and financial information, and the chosen bidder is recognized by others as having a built-in advantage.  (*Id.* at ¶ 22.)  In some of the transactions, after a deal was signed, the target shopped the deal around to

42

other potentially interested parties (the "go-shop period"), but those firms did not necessarily believe that the target would give them equivalent access to the data and personnel that the original bidder received, and the extensive cost of obtaining such information if it was available might foreclose a bid in all events.  (*Id.* at ¶¶ 22, 60-61)  Regardless, during a go-shop period, potential buyers were often months behind the original suitor in their diligence, had limited time to perform diligence with no commitment that the target or management was interested in dealing with them at all, and had to overcome all the deal protection terms in the signed agreement (such as matching rights and breakup fees).  (*Id.* at ¶¶ 55-56, 60-61.)  Thus, if the firm(s) with the highest valuations were not the target's favored bidder, they would not be operating on an even playing field in terms of access to information.  Even Plaintiffs' experts acknowledge that, if the seller does not reveal the same information to all potential buyers, then an auction might not run efficiently and the entity with the highest valuation might not necessarily end up winning the object.  (Ex. 28 [Wilkie Dep.] at 31:25-32:13 (acknowledging that if all bidders did not receive "all relevant information," it "could lead to an inefficient outcome"); *id.* at 28:18-29:4 (acknowledging that a "lack of transparency could lead to inefficiency").)  What any given firm would do based on the amount of information that it has is a firm-specific and deal-specific inquiry that the Wilkie/Williams method does not address.

In sum, because they have not tied the theory to the facts of this case, the Wilkie/Williams method does not and cannot properly rely on auction theory, either to prove that any particular bid would have materialized in the but-for world, or what the but-for price of any of the eight deals would have been.  *NMV*, 522 F.3d at 27-28; *Behrend v. Comcast*, 264 F.R.D. at 175-77.

### 4.    Wilkie/Williams' Model Generates False Positives, Which Proves That It Does Not Show Impact From The Alleged Conspiracy

The fundamental unreliability of the Wilkie/Williams model is demonstrated by its generation of "false positives"—it predicts impact from an alleged conspiracy "where none could exist."  *In re Rail Freight*, 725 F.3d at 252.  The existence of false positives is a natural and predictable consequence of Wilkie/Williams' failure to disaggregate lawful from unlawful conduct, their failure to tether their theory to the real world of how private equity operates, and their unreliable and unsupported application of auction theory to the real world of proprietary LBOs.

In *Rail Freight*, plaintiffs alleged that the major freight railroads fixed the price of their fuel surcharges beginning in 2003.  *Id.* at 248.  Plaintiffs supported their class certification motion with an economic model that purported to show that shippers overpaid for their surcharges during the conspiracy period.  *Id.* at 250.  But that model detected impact during the class period for customers whose prices were locked in before the alleged conspiracy supposedly started ("legacy shippers").  *Id.* at 252.  The D.C. Circuit held that the model's generation of "false positives," *i.e.*, its detection of "injury where none could exist," "shred[ded] the plaintiffs' case for certification" because there was no way to know whether "the overcharges the damages model calculates for class members is any more accurate than the obviously false estimates it produces for legacy shippers."  *Id.* at 252, 254.  Plaintiffs thus had not met their burden of putting forth a reliable methodology to show impact.  *Id.* at 253.

The same is true here.  When the Wilkie/Williams model is applied to deals that have been adjudged *not* to be subject to the alleged conspiracy, the model still finds supposed impact.  (Snyder Report ¶¶ 79-88, Ex. 4.)  For example, the Wilkie/Williams model finds impact in the Alltel, Clear Channel, Michaels and Univision deals, even though those deals were auctions that

44

the Court held were not included in the alleged overarching conspiracy. (Ex. 27 [Memorandum and Order, Dkt. No. 763] at 28 n.18, 30.) The model claims that Alltel shareholders were underpaid for their shares by $459.7 million, Clear Channel shareholders by $817.9 million, Michaels shareholders by $129.7 million, and Univision shareholders by $489.9 million. (Snyder Report at ¶¶ 83-88, Ex. 4.) All of those purported underpayments are, by definition, "false positives." Thus, whatever, if anything, the Wilkie/Williams model is measuring, it is not reliably measuring impact from an alleged conspiracy not to top the eight specific announced proprietary deals at issue in this case.

## III. COMMON ISSUES WILL NOT PREDOMINATE BECAUSE THE VALUATIONS UNDERLYING PLAINTIFFS' THEORY OF IMPACT AND THE EVIDENCE DEFENDANTS WILL PRESENT IN DEFENSE ARE DEAL-SPECIFIC

Putting aside all the other problems with the Wilkie/Williams model shown above, the model does not rely on common evidence. For each deal, the Wilkie/Williams model relies upon purported valuations that are *deal-specific*. Further, to determine predominance, the Court must consider not only Plaintiffs' evidence, but also the evidence that Defendants intend to offer in their defense. *See, e.g., Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1274 (11th Cir. 2009) (evidence defendant will present in defense "would require substantial individualized evidence different from and in addition to that which [plaintiff] would proffer to establish his own claim"). Here, the evidence Defendants will present to defeat Plaintiffs' claim of impact requires individualized inquiry into the idiosyncratic features of each of the eight deals, further demonstrating that individual issues of impact will predominate.

As Defendants' experts clearly show, the valuation documents that Wilkie/Williams selected in their analysis for each of the eight deals do *not* in fact represent a willingness to bid by a particular Defendant. Rather, Wilkie/Williams haphazardly pulled valuation documents

45

without any attempt to consider anything more about the specific document or deal itself.  For example, Wilkie/Williams fail to consider:

1.     *Issues related to a valuation's author and source, including*:  (i) whether the valuation was reviewed and ultimately approved by key decision-makers (*e.g.,* an Investment Committee); (ii) whether the valuation was created by a non-private equity division of the firm (*e.g.,* the investment banking division) and/or for a non-bidding purpose (*e.g.,* financier/advisor role, particularly where conflict would prevent bidding); and (iii) whether the model is based on verified or unverified information, or whether the entire model had been received from another entity (*e.g.,* advisor or potential advisor).[29]

2.     *Issues related to a document's preparation and quality, including*:  (i) whether the valuation was created early in the process and/or whether later models were materially different; (ii) whether the valuation was created from public information or confidential information obtained during due diligence; and (iii) whether the model is a final version or work-in-progress draft, and whether updated versions of the model exist and whether those are materially different.[30]

3.     *Issues related to context, including*: (i) whether the valuation was actually representative of what the firm was willing to pay when contrasted against other documentary evidence and testimony; (ii) whether—valuation aside—a firm may not bid for other reasons (*e.g.*, diversification of investments, regulated industries, charter restrictions, allocation of resources to other deals); (iii) whether the deal involves non-defendants that have been held not to be part of the conspiracy; and (iv) whether the IRR imputed by Wilkie/Williams would be

---

[29]   Snyder Report at ¶¶ 90-91, 93 (iv), (vi).
[30]   Snyder Report at ¶¶ 91, 93(ii), (iii).

below fund-level restrictions or agreements with limited partners.[31]

Each of these questions must be addressed through proof that is specific to each deal and each Defendant to determine whether the given valuation represents a Defendant's willingness to bid that amount.  As detailed in the accompanying reports of Professors Snyder and Gompers, Wilkie/Williams' failure to conduct any such analysis in connection with their selection of valuations used in their model results in numerous obvious mistakes, including:

 i. Assuming that firms were willing to pay a purported valuation when they had explicitly rejected bidding for other, non-price related reasons;

 ii. Estimating a Defendant's willingness to bid at a certain price using a deal analysis that was drafted *prior* to conducting any due diligence;

 iii. Estimating a Defendant's valuation using a deal analysis that was subsequently revised based on due diligence from the target company;

 iv. Assuming that a firm was willing to pay a price that was higher than the actual price, even though the firm had already dropped out of the winning consortium because it considered the actual price too high; and

 v. Estimating a Defendant's equity valuation using a deal analysis, but ignoring that the Defendant was unwilling to even bid because, for example, it did not want to bid against management or was concerned about existing deal protections designed to protect the winning bidder, such as breakup fees and matching rights.[32]

Defendants will submit evidence demonstrating how these and other fundamental flaws in the Wilkie/Williams model undermine their analysis of alleged impact for each deal.  This evidence will not be common, but rather will be highly individualized evidence relating to *individual* Defendants' *individual* valuations of *individual* deals.  Set forth below is just some of the evidence that Defendants will submit to refute the Wilkie/Williams model.[33]

---

[31] Snyder Report at ¶¶ 91, 98.
[32] For specific examples of each of these errors, see Snyder Report at ¶¶ 93 (i)-(iii), (vii)-(ix).
[33] For additional examples of the deal-specific and defendant-specific inquiries necessitated by the Wilkie/Williams model, see generally Gompers Report at App'x 1 and Snyder Report at ¶¶ 31-50.

47

- *AMC.*  The Wilkie/Williams model implies a but-for world where the two *non-defendant* acquirers, Apollo and JPMP, would have bid against each other until the bid reached JPMP's purported valuation.  This raises AMC-specific inquiries, including why non-conspirators' behavior would have changed in the world without conspiracy and why Defendants would have changed their behavior with respect to a deal signed by non-defendants.  Additionally, the only Defendant with a higher purported valuation is Blackstone, but its valuation pre-dated access to confidential due diligence materials.  After gaining access to due diligence, Blackstone revised its models and declined to bid.[34]

- *Aramark.*  Wilkie/Williams' Aramark analysis implies a but-for world where Blackstone and KKR would have been willing to bid higher than the final price paid by the acquiring consortium even though Blackstone and KKR declined to pursue Aramark pre-signing at a price *lower* than the final price ultimately paid by the acquiring consortium.[35]

- *Freescale.*  Wilkie/Williams' analysis of Freescale is flawed because, among other things, they rely on pre-due diligence valuations to assert that KKR and Silver Lake were willing to bid significantly more than the actual price paid.  This ignores both the later iterations of the KKR/Silver Lake model based on access to Freescale confidential due diligence materials with lowered assumptions and the ultimate conclusion by KKR and Silver Lake that the actual price paid was a "[b]ig price" that they "wouldn't have gotten to."[36]

- *HCA.*  The valuation models that Wilkie/Williams selected for Blackstone, Carlyle, Goldman Sachs and non-defendant Merrill Lynch do not reflect what those entities were willing to bid for HCA.  For example, the Merrill Lynch document is dated April 19, 2006—before HCA even contacted Bain and KKR to participate in the LBO—and is from Merrill's investment banking division as opposed to its private equity division.[37]  Similarly, the models they use for Goldman Sachs were prepared by Goldman's investment bank division (not its private equity area), and the Blackstone and Carlyle models were generated without access to any non-public due diligence.[38]  When Blackstone later obtained access to non-public information

---

[34] Ex. 30 [Chae Dep.] at 301:4-17.

[35] Blackstone and KKR declined to pursue Aramark pre-signing for various independent reasons, including insufficient projected returns and low probability of winning given Aramark CEO's participation in the Goldman/JPMP group, evidence ignored by Wilkie/Williams.  See pp. 31-35 *supra*.

[36] Ex. 31 at SLTM-DAHL-E-0019252; *see* Ex. 32 at SLTM-DAHL-E-0048681; Ex. 33 at KKR DAHL 000537779; *see also* Gompers Report at ¶ 155 (discussing the later iterations of the KKR/Silver Lake model).

[37] Snyder Report at ¶ 93(v) (discussing April 19, 2006 Merrill model); Ex. 34 (HCA Proxy) at 19.

[38] Gompers Report at ¶¶ 158-163 (discussing Blackstone, Carlyle and Goldman models).

regarding HCA, Blackstone quickly concluded that a deal with estimated returns of 12-15%[39] at a $55 per share price was unattractive and a waste of time.[40]

- *Harrah's.*  Wilkie/Williams ignore that Defendants were not willing to bid the price indicated by their internal valuations—*e.g.,* Blackstone was unwilling to invest more than a small amount because a larger investment would have required lengthy licensing procedures, and KKR did not pursue casino deals because of the licensing requirements.[41]

- *Kinder Morgan.*  KKR's purported valuation of $138.30 per share is belied by its decision *not* to join the acquiring consortium pre-signing when the bid price was only $105/share.[42]  And, Goldman Sachs and Carlyle were unwilling to pay even $107.50 per share, let alone the $149.55 per share price that Wilkie/Williams claim the winner should have paid for Kinder Morgan.[43]

- *SunGard.*  Wilkie/Williams claim that Carlyle would have been willing to acquire SunGard for $36.60 per share, even though it is undisputed that Carlyle dropped from the winning consortium—of which it had been a member—because it believed that $36.00 was too high.[44]

- *TXU.*  The entire basis for the Wilkie/Williams model's showing of an alleged impact on this deal are purported valuations from *non-defendants* Apollo and JPMorgan (a debt financier) that were higher than the actual price paid by the winning consortium. Plaintiffs do not explain why non-defendants Apollo and JPMorgan, who were not part of the alleged conspiracy, would not jump this deal if they actually valued it at a price higher than the price paid by the acquirers.

All of these issues require deal-specific inquiries, illustrating how common issues will not predominate in determining impact in this action.

---

[39] Ex. 35 at BX-1199676.

[40] Pls. Resp. to Defs. Local Rule 56.1 Statement, Dkt. No. 632, ¶ 485 (not disputing that LBO model showed returns between 12.5% and 15% at price of $55 per share but only disputing characterization of those returns as "low").  *See also*  Ex. 36 [Schorr Dep.] at 243:25-244:14 (noting that when Blackstone signed HCA confidentiality agreement and "got access to the internal numbers" which it thought "would show a much rosier picture," the "internal information actually caused [Blackstone] to take [its] case down to the point where [it] thought that the KKR bid was fairly priced vis-à-vis what the financial picture of the business looked like").

[41] Ex. 37 at BX-1508670-71; Ex. 38 [Sorkin Aff.] at ¶ 8.

[42] Ex. 39 at KKR DAHL 000526314.

[43] Ex. 40 (Kinder Morgan Proxy) at 20; Ex. 41 at GSPE00390484.

[44] Ex. 42 at TCG 0216004.

## IV.   AMC IS OUTSIDE THE CLASS DEFINITION BECAUSE NO DEFENDANT ACQUIRED SHARES OF AMC AS PART OF THAT TRANSACTION

The AMC transaction does not fit within Plaintiffs' own class definition, which includes persons who sold stock "directly to a Defendant or an entity controlled by a Defendant as part of the LBO for each of the preceding target companies [including AMC]."[45]   No Defendant acquired AMC.  As a result, no AMC shareholder sold any AMC stock to any Defendants as part of the AMC transaction, and AMC is not properly part of the purported class proposed by Plaintiffs.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for class certification should be denied in all respects.


Dated: January 24, 2014

                                        Respectfully Submitted,

                                        /s/ John D. Hanify_____
                                        John D. Hanify (BBO# 219880)
                                        Michael T. Marcucci (BBO#652186)
                                        JONES DAY
                                        100 High Street
                                        Boston, MA 02110
                                        (617) 960-3939
                                        jhanify@jones.day.com
                                        mmarcucci@jonesday.com

                                        Craig S. Primis, P.C. (admitted *pro hac vice*)
                                        David R. Dempsey (admitted *pro hac vice*)
                                        KIRKLAND & ELLIS LLP
                                        655 15th Street, NW
                                        Washington, DC 20005

---

[45]   Fifth Am. Compl., Dkt. No. 745, at ¶ 66.

James H. Mutchnik, P.C. (admitted *pro hac vice*)
Jennifer W. Cowen
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654

***Attorneys for Bain Capital Partners, LLP***

/s/ Kevin M. McGinty_____
Kevin M. McGinty (BBO# 556780)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
kmcginty@mintz.com

Kevin Arquit (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Peter Thomas
Hillary C. Mintz
Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
1155 F Street, NW
Washington, DC 20004

***Attorneys for The Blackstone Group L.P.***

/s/ Jennifer L. Giordano_____
Jennifer L. Giordano (BBO# 650537)
William R. Sherman (admitted *pro hac vice*)
E. Marcellus Williamson (admitted *pro hac vice*)
Margaret M. Zwisler (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Washington, DC  20004-1304

Alfred C. Pfeiffer, Jr. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411106538

Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: al.pfeiffer@law.com

**Attorneys for TC Group III, L.P. and TC
Group IV, L.P.**

/s/ John D. Donovan, Jr.
John D. Donovan, Jr. (BBO# 130950)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7566
John.Donovan@ropesgray.com

Richard C. Pepperman II (admitted *pro hac vice*)
Benjamin R. Walker (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004

**Attorneys for The Goldman Sachs Group, Inc.**

/s/ Kevin M. McGinty
Kevin M. McGinty (BBO# 556780)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000
kmcginty@mintz.com

Joseph F. Tringali (admitted *pro hac vice*)
Paul C. Gluckow (admitted *pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017

Ryan A. Kane (admitted *pro hac vice*)
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110

**Attorneys for Kohlberg Kravis Roberts & Co. L.P.**

52

/s/ Kevin M. McGinty\
Kevin M. McGinty (BBO# 556780)\
MINTZ, LEVIN, COHN, FERRIS,\
GLOVSKY AND POPEO, P.C.\
One Financial Center\
Boston, MA 02111\
(617) 542-6000\
kmcginty@mintz.com

Wesley R. Powell (admitted *pro hac vice*)\
Matthew Freimuth (admitted *pro hac vice*)\
Norman P. Ostrove (admitted *pro hac vice*)\
Nicole M. Naples (admitted *pro hac vice*)\
WILLKIE FARR & GALLAGHER LLP\
787 Seventh Avenue\
New York, NY 10019\
(212) 728-8000

***Attorneys for Silver Lake Technology Management LLC***

/s/ John A. Freedman\
John A. Freedman (BBO# 629778)\
Franklin R. Liss (admitted *pro hac vice*)\
Kelly Smith (admitted *pro hac vice*)\
ARNOLD & PORTER LLP\
555 Twelfth Street, NW\
Washington, DC 200004-1206\
(202) 942-5316\
John.Freedman@aporter.com

-and-

Mary Kathryn Sammons (admitted *pro hac vice*)\
Erica W. Harris (admitted *pro hac vice*)\
SUSMAN GODFREY L.L.P.\
1000 Louisiana, Suite 5100\
Houston, TX 77002

***Attorneys for TPG Capital, L.P.***

53

**CERTIFICATE OF SERVICE**

I, Kevin M. McGinty, hereby certify that on January 24, 2014, the foregoing document was served upon the attorneys of record for each party by transmission through the Court's electronic case filing system.

/s/ Kevin M. McGinty
Kevin M. McGinty
